UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
                                            )
KASHNER DAVIDSON SECURITIES CORP., *et al.*   )
                                            )
            v.                              )        Case No. 05-CV-11433-JLT
                                            )
STEVEN MSCISZ, *et al.*                       )
_____ )

**OPPOSITION OF STEVEN MSCISZ, MARK MSCISZ AND LYNDA MSCISZ
TO "MOTION TO MODIFY AND CONFIRM ARBITRATION AWARD
AND FOR ENTRY OF JUDGEMENT [SIC] THEREON"**

Defendants/plaintiffs-in-counterclaim Steven Mscisz ("Steven"), Mark Mscisz

("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") respectfully submit

this memorandum in opposition to the motion (DE #20) of the plaintiffs/defendants-in-

counterclaim, Kashner Davidson Securities Corp. ("KDSC"), Victor Kashner

("Kashner"), Matthew Meister ("Meister") and Timothy Varchetto ("Varchetto")

(collectively "Brokers") for confirmation of the arbitration award underlying this civil

action ("Award"), which was issued by a panel of arbitrators appointed by NASD Dispute

Resolution, Inc. ("NASD").  As discussed more fully below, notwithstanding the

"extremely narrow and exceedingly deferential" standards the Court must apply, the

arbitration was so fundamentally unfair that the Award must be vacated.

***STATEMENT OF MATERIAL FACTS***

To the extent Local Rule 56.1 requires the Customers to include in this opposition

"a concise statement of the material facts of record as to which it is contended that there

exists a genuine issue to be tried," they incorporate hereinto the Declaration of William P.

Corbett, Jr. Pursuant to 28 U.S.C. § 1746 ("Corbett Dec."), as if it were fully set forth in

this memorandum.

### BACKGROUND

The underlying arbitration was never the "simple collection case" depicted by the Brokers. Apparently sensing that claims by the Customers would be forthcoming, KDSC "raced to the courthouse" and commenced the underlying arbitration, KDSC – the underwriter of an initial public offering ("IPO") and subsequently a "market maker" in the stock of Vaso Active Pharmaceuticals, Inc. ("VAPH") – commenced an arbitration proceeding against the Customers before the NASD, claiming to be owed a significant margin debt by the Customers. At the time, KDSC did not have standing to do assert such a claim, and to the extent the Customers might have owed such a debt to any entity, it was occasioned by the Brokers' misconduct, so the Customers responded with claims of their own against KDSC, Kashner, Meister and Varchetto. Corbett Dec. ex 2.

By way of background, KDSC and its principal, Kashner, have lengthy disciplinary records dating back at least to 1971. For instance, in July 1996, the U.S. Securities and Exchange Commission ("SEC" or "Commission") suspended Kashner from association with any registrant for three months, suspended Kashner from acting in a supervisory capacity for two years, and ordered that Kashner and KDSC disgorge ill-gotten gains they obtained through fraud in connection with the sale of shares in Spectra Pharmaceuticals, Inc. (which, like VAPH, was a small-capitalization pharmaceutical company). *In re Kashner,* Case No. 3-9049 (SEC 1996).[1] In May 2000, the NASD fined KDSC $25,000.00, suspended it from the municipal bond market for six months, ordered the firm to hire an outside compliance consultant, fined Kashner $50,000.00, and – like the SEC had four years earlier – subjected Kashner to another two-year suspension from acting in a supervisory capacity. *In re Kashner Davidson Securities Corp.,* Case No.

---

[1] It was this Court, in *SEC v. Williams,* Case No. 93-12789-JLT, which issued the permanent injunction effectuating that disgorgement order.

C07960095 (NASD 2000).  Two years later, in NASD Case No. 01-01448, KDSC settled

a "failure to supervise" claim for $125,000.00; Kashner, KDSC's nominal "President and

CEO", Meister, Varchetto – were also respondents in that arbitration.  The history of

KDSC and Kashner is so sordid that a District Judge with extensive experience in

investment fraud cases noted "concerns about [Kashner's] moral character."  *Newman v.*

*Eagle Bldg. Technologies,* 209 F.R.D. 499, 504 (S.D. Fla. 2002) (Ryskamp, J.).

The Customers alleged in the arbitration that, after the IPO, VAPH shares were

traded on the NASD's automated quotation system ("NASDAQ").  *See* Corbett Dec. ex.

2.  The law firm representing the Broker-Dealer in this proceeding also advised KDSC in

connection with the IPO.  The Customers subscribed to the IPO and – unaware of the past

transgressions of KDSC, Kashner, Meister and Varchetto – were induced by

representatives of KDSC (including but not limited to Meister) to open accounts in which

their VAPH shares were kept and traded.  After the Customers opened their accounts,

KDSC representatives (including but not limited to Varchetto) induced them to trade on

margin without requiring the Customers to complete any application forms before

causing margin credit to be extended to them.  KDSC did not adequately disclose to the

Customers the many risks associated with margin trading – especially in the context of

small-capitalization IPO issues – instead advising them that the trades and trading

strategies KDSC recommended were prudent.

The Customers also alleged that, beginning in or about February 2004, a series of

negative media reports were published about VAPH, ultimately causing its share price to

plummet.  As the stock price declined, KDSC representatives induced the Customers to

increase their "long" positions, to over-trade their accounts, and to follow other trading

strategies that ultimately eroded their positions further.  Excessive "markups" further

compromised the Customers' positions.  The Customers have since been informed and

believe that while the Broker-Dealer was recommending long trades, KDSC, Kashner, Meister, Varcheto and/or other persons affiliated with KDSC took and maintained short positions that were not disclosed to the Customers.

The Customers further asserted that the adverse media coverage caused the SEC to order a temporary suspension of trading in VAPH shares, effective upon the opening of the NASDAQ on April 1, 2004 and terminating at 11:59 p.m. on April 15, 2004. During the period in which trading of its shares was suspended, VAPH voluntarily de-listed itself from the NASDAQ and, since the suspension terminated, its shares have traded on the so-called "pink sheets." After the trading suspension ended, KDSC and its clearing firm, Sterne, Agee and Leach, Inc. ("SALI"), purported to liquidate the Customers' shares without attempting to maximize the price received for the stock. Indeed, the Customers believe that KDSC directly or indirectly used their VAPH shares to cover short positions maintained by KDSC, Kashner, Meister, Varchetto and/or other affiliates of KDSC.

### ARGUMENT

Unless displaced by the Federal Arbitration Act, 9 U.S.C. §§ 1, *et sq.* ("FAA"), the Federal Rules of Civil Procedure control this action. FED. R. CIV. P. 81(a)(3). Because no provision of the FAA provides a procedure to displace FED. R. CIV. P. 56, this Court should treat the Brokers' motion as one seeking summary judgment. *Vento v. Quick & Reilly, Inc.,* 2005 U.S. App. LEXIS 6986 at *13-*14 (10th Cir.); *Milwaukee Typographical Union No. 23 v. Newspapers, Inc.,* 639 F.2d 386, 390 (7th Cir.), *cert. denied,* 454 U.S. 838 (1981). *See Fort Hill Builders, Inc. v. National Grange Mut. Ins. Co.,* 866 F.2d 11, 12 (1st Cir. 1989) (review of summary judgment confirming award). Summary judgment is available only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c).

At the very least, there remain genuine issues of material fact, and the Brokers are not entitled to judgment as a matter of law. Indeed, for the reasons set forth below, if summary judgment is appropriate at all, it should be entered against the Brokers.[2] Under the FAA, the Brokers are entitled to a judgment confirming their Award only if it is not "vacated, modified, or corrected" pursuant to Section 10 or 11 of the FAA. 9 U.S.C. § 9. *Accord* Mass. Gen. L. c. 251, § 11. Because several grounds exist for vacating the Award, the Brokers are not entitled to summary judgment.

The Customers do not ask the Court to entertain claims of mere factual or legal mistakes by the arbitrators; while the record is replete with such errors, the Customers recognize that such a review is not the role of this Court. *United Paperworkers Int'l Union v. Misco, Inc.,* 484 U.S. 29, 38 (1987). To further Congress' stated policy interest in promoting arbitration as a means of dispute resolution, the Court's review of the Award must be "extremely narrow and exceedingly deferential." *Wheelabrator Envirotech Operating Servs. Inc. v. Massachusetts Laborers Dist. Council Local 1144,* 88 F.3d 40, 43 (1st Cir. 1996). Nevertheless, an arbitral award is not "utterly impregnable." *Cytyc Corp. v. Deka Products LP,* 439 F.3d 27, 32 (1st Cir. 2006). The Court's role is not to "grant carte blanche approval to any decision that the arbitrator might make…" *Challenger Caribbean Corp v. Union General de Trabajadores de Puerto Rico,* 903 F.2d 857, 861 (1st Cir. 1990) (quoting *International Bhd. Of Firemen & Oilers, Local 261 v. Great N. Paper Co.,* 765 F.2d 295, 296 (1st Cir. 1985). There are several circumstances in which an award may – and should – be vacated:

---

[2] Because limited discovery is necessary before the Customers can fully respond to the Brokers' Motion or move for summary judgment themselves (*see* Corbett Dec. ¶¶ 136-139), they do not make a formal cross-motion. However, if the Court, acting *sua sponte,* believes the record to be sufficiently developed, it retains the inherent power to enter summary judgment in favor of the Customers and against the Brokers. *National Expositions, Inc. v. Crowley Maritime Corp.,* 824 F.2d 131, 133 (1st Cir. 1987) (Breyer, J.). As required by *Celotex Corp. v. Catrett,* 477 U.S. 317, 326 (1986), the Brokers are herby notified that summary judgment can be entered against them if they do not come forward with all of their evidence.

(1) Where the award was procured by corruption, fraud, or undue means.

(2) Where there was evident partiality or corruption in the arbitrators, or either of them.

(3) Where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced.

(4) Where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).[3]  A common law ground also exists; an award may be vacated for "manifest disregard of the law."  *Advest, Inc. v. McCarthy,* 914 F.2d 6, 8-9 (1st Cir. 1990).  At bottom, however, "[a]rbitration proceedings must meet 'the minimal requirements of fairness – adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator."  *Ramirez de Arellano v. American Airlines,* 133 F.3d 89, 91 (1st Cir. 1997) (quoting *Sunshine Mining Co v. United Steelworkers,* 823 F2d 1289, 1295 (9th Cir. 1987).

## I.    THE AWARD WAS THE PRODUCT OF UNDUE MEANS.

Under the Federal Arbitration Act, an arbitration award may be vacated if it "was procured by corruption, fraud, or undue means."  9 U.S.C. § 10(a)(1).  *See also* Mass. Gen. L. c. 251, § 12(a)(1) (mandating vacation of award when procured by corruption, fraud or undue means).  The Court of Appeals has construed the term "undue means", as used in 9 U.S.C. § 10(a)(1), as describing "underhanded or conniving ways of procuring an award that are similar to corruption or fraud, but do not precisely constitute either." *National Cas. Co. v. First State Ins. Group,* 430 F.3d 492, 499 (1st 2005).  *See A.G. Edwards & Sons, Inc. v. McCollough,* 967 F.2d 1401, 1403-1404 (9th Cir. 1992), *cert. denied,* 506 U.S. 1050 (1993) ("undue means" connotes behavior that is "immoral if not

---

[3] The Commonwealth's equivalent to the FAA likewise specifies grounds for vacating an award. However, as discussed more fully *infra,* the substantive grounds are broader than under Federal law and, unlike the FAA – where vacation is permissive – the Massachusetts act makes vacation mandatory when grounds are present.  *Compare* 9 U.S.C. § 10(a) (court "may make an order vacating the award") *with* Mass. Gen. L. c. 251, § 12(a) ("the court shall vacate an award…").

illegal"). The Supreme Judicial Court ("SJC") similarly construes the Commonwealth's cognate statute, Mass. Gen. L. c. 251, § 12(a)(1). *Superadio LP v. Winstar Radio Prods., LLC,* 446 Mass. 330, 337 (2006). As discussed below, the tactics used by the Brokers and their counsel were manifestly underhanded and conniving, and their misconduct emanated a stench of corruption and fraud. It was precisely the sort of "intentional malfeasance" that justifies vacatur. *See National Cas. Co.,* 430 F.3d at 499.

### A.    The Brokers "Sandbagged" The Customers.

The Customers' presentation at the arbitration hearing was necessarily focused on their "real party in interest" defense – of which the Brokers had been on notice from the earliest days of the arbitration. First by depriving the Customers of any meaningful discovery concerning their affirmative claims against the Brokers (*see* pp. 11, 24-27, *infra*), and then by unlawfully dismissing those claims with prejudice (*see* pp. 14-17, 19-27, *infra*), the arbitrators had denied the Customers a fair opportunity to explain, with evidence of the Brokers' misconduct, how their putative margin debt was incurred. They were therefore limited to attacking KDSC's standing to bring its putative claims.

KDSC had pled its Statement of Claim as if it were a party to the Client Account Agreements with the Customers. Corbett Dec. ex. 1 ¶¶ 18, 19. However, the Client Account Agreements were between the Customers and KDSC's clearing firm, Sterne Agee & Leach, Inc. ("SALI"), and not KDSC itself. *Id.* ex. 1 at ex. B & C. None of the documents produced during discovery suggested that the Customers had been informed that KDSC advanced them any money to pay their putative margin debts to SALI or that they were indebted to KDSC. *Cf. First Union Discount Brokerage Servs., Inc. v. Milos,* 997 F.2d 835, 842 (11th Cir. 1993) (broker real party in interest because account statements informed customers that it had advanced them money to pay margin debt to

clearing firm). Never did KDSC suggest that its claim was based on a subrogation theory or some other indirect means of obtaining standing.

Under Alabama law, which governs the Client Agreements, "one not a party to, or in privity with a contract, cannot sue for its breach." *Twine v. Liberty Nat'l Life Ins. Co.,* 294 Ala. 43, 50 (1975). Consequently, in the very first document filed by the Customers with the NASD – their Answer, Affirmative Defenses, and Counterclaims – they interposed the following affirmative defense: "KDSC"s claims against the Customers must fail because it is not the real party in interest." Corbett Dec. ex. 2 at 8. Despite having notice of this defense, KDSC made no effort over the next 9 months to amend its pleading or otherwise assert a theory by which might arguably be the real party in interest. *Id.* ¶¶ 42-44. Until the time of the hearing – and even after the hearing began – the only indication given to the Customers was that KDSC purported to be claiming directly under the Client Agreements. *Id.* Neither during discovery nor when Rule 10321(c) of the NASD's Code of Arbitration Procedure ("NASD R. 10321(c)") required it to disclose hearing exhibits did KDSC come forward with any documents suggesting that it was changing course, and that its putative standing was based on a subrogation theory or some assignment of KDSC's rights.

The Customers therefore prepared as if KDSC's theory was that it was a party to the Client Agreements. Corbett Dec. ¶ 110. At the hearing, the Customers' counsel succinctly laid out the "real party in interest" defense during his opening statement. *Id.* ex. 22 at 33-35, ex. 24. During that hearing, Varchetto and KDSC's president, Melissa Rothenbach ("Rothenbach") were the only KDSC representatives to testify, and they consistently admitted the factual predicates of that defense. *Id.* at 153-163, 167-208. The testimony of Mark and Steven also lent support to that theory. *Id.* at 77-85, 120-126. At

no time did KDSC adduce any evidence establishing a contract between KDSC and the Customers or an account due and owing to KDSC by the Customers.

KDSC had not given the Customers notice of any indirect standing theory in advance of the hearing.  Corbett Dec. ¶¶ 42-44, 109.  Varchetto, the first KDSC witness to testify, offered no testimony concerning any putative assignment, subrogation or other indirect theory giving KDSC standing to recover from the Customers.  The last witness to testify was Rothenbach; during her testimony, KDSC's counsel came forward with a document – created and executed that very day – which purported to assign SALI's putative rights against the Customers to KDSC.  *Id.* ex. 22 at 191, 201-202.  Rothenbach nonetheless acknowledged that, prior to the mid-hearing assignment of the putative claims, SALI had remained the owner of those claims.  *Id.* at 196-198.  Although the assignment had been received by KDSC and its counsel at 1:45 p.m. on the day of the hearing, they waited until the very end of the testimony – nearly two hours later – to reveal its existence.  *Id.*  As in *Coastal Orthopaedic Inst., P.C. v. Bongiorno,* 61 Mass. App. Ct. 55, 62 (2004), there was no explanation why the Brokers held back on this assignment or their non-communicated claim of subrogation.  Instead, this entirely new standing theory "emerged from out of the blue, after the issue had been joined" on the Customers' real party in interest defense.  *See id.*

Fairness to the Customers required notice of the claims being asserted against them and a meaningful opportunity to defend themselves, and KDSC's "sandbagging" of the Customers with the putative assignment deprived them of both.  KDSC's counsel sought to justify his 180 degree change in course with what he characterized as an oral motion to amend KDSC's Statement of Claim to conform to the evidence, but the NASD Rules contain no provision allowing for such prejudicial *post hoc* changes.  The arbitrators nonetheless denied the Customers' oral motion to dismiss the arbitration,

which motion was based on KDSC's failure to make out a *prima facie* case, and they

allowed KDSC's motion to amend its pleading, accepting the last-minute assignment into

evidence over the Customers' objection.  Corbett Dec. ex. 22 at 194; *id.* ex. 23 at 5-14.  In

other words, the arbitrators placed their imprimatur on the underhanded and conniving

device used by the Brokers and their counsel in their effort to procure the Award.

The Brokers' sandbagging tactics resulted in a fundamentally unfair hearing.  It

did not "serve the interests of justice" for the arbitrators to allow the Brokers "to redeem

a totally unpleaded, unlitigated claim" in a manner that ensured "significant prejudice" to

the Customers.  *Rodriguez v. Doral Mortgage Corp.,* 57 F.3d 1168, 1171 (1st Cir. 1995).

The Customers had an "inalienable right to know in advance the nature of the cause of

action being asserted" against them.  *Id.*  Discovery rules and other prehearing procedures

should make a hearing "less a game of blindman's bluff and more a fair contest with the

basic issues and facts disclosed to the fullest practicable extent."  *United States v. Procter*

*& Gamble Co.,* 356 U.S. 677, 682 (1958).  Even under the Federal Rules of Civil

Procedure – where pleadings "may be constructively amended as a case proceeds" –

litigants are not free to leave their adversaries "to forage in forests of facts, searching at

their period for every legal theory" that may some day be found "lurking in the penumbra

of the record."  *Rodriguez,* 57 F.3d at 1171.  "The truth-seeking function of our

adversarial system of justice is disserved when the boundaries of a suit remain ill-defined

and litigants are exposed to the vicissitudes of trial by ambush."  *Id.*

That the putative assignment was not obtained – indeed, it was not even

concocted – until the latter stages of the hearing is no excuse.  If such documents are

received into evidence after a hearing begins "for the sole reason that they were not

obtained sooner by the party offering them," the discovery rules and arbitrators' orders

"would become empty phrases signifying nothing."  *Klonoski v. Mahlab,* 156 F.3d 255,

271 (1st Cir. 1998), *cert. denied,* 526 U.S. 1039 (1999).  *See Licciardi v. TIG Ins. Group,* 140 F.3d 357, 359 (1st Cir. 1998) (with "no prior disclosure" of "coming *volte face*", abuse of discretion to admit evidence).  As in *Klonoski,* 156 F.3d at 273, the Customers expended great resources preparing and proving their "real party in interest" defense, making strategic and tactical decisions based on the evidence produced during discovery, and on their logical assumption that KDSC would seek to prove the case it pled.

    The Brokers' sandbagging tactics and the arbitrators' revisionist treatment of their Statement of Claim deprived the Customers of adequate notice of the claims asserted against them and a meaningful opportunity to mount a defense.  The hearing was fundamentally unfair, as was the Award resulting from it.  Indeed, not unlike *Totem Marine Tug & Barge, Inc. v. North Am. Towing,* 607 F.2d 649, 651 (5th Cir. 1979) (cited in *Boston Celtics LP v. Shaw,* 908 F.2d 1041, 1046 (1st Cir. 1990)), the Customers' "right to a fair hearing [was] violated by a course of events in which [they] received no notice of, and had no possible opportunity to respond to," an unpled, previously undisclosed theory.  The prejudice to the Customers was palpable; under Section 8-5-25 of the Alabama Code, which governed the Client Agreements, KDSC would have taken SALI's claims against the Customers "subject to all payments, setoffs, and discounts" they had against SALI.  *Head v. Southern Devel't Co.,* 614 So.2d 1044, 1046 (1993).  However, the last-minute assignment prevented the Customers from ascertaining whether they had such offsetting claims against SALI, from taking discovery concerning those offsets or the validity of the putative assignment, and from presenting relevant evidence at the hearing.  "To spring" the assignment – "hitherto unknown" by the Customers and their counsel – on the Customers during the latter stages of the evidentiary portion of the hearing "was a lot more than 'somewhat … prejudicial.'"  *Klonoski,* 156 F.3d at 273.  "Realistically, it was devastating to [the Customers'] ability to succeed" with the arbitrators.  *Id.*

**B.    The Brokers Did Not Serve The Customers With All Hearing Exhibits.**

"At least twenty (20) calendar days prior to the first scheduled hearing date," the Brokers were required to serve on the Customers "copies of documents in their possession they intend[ed] to present at the hearing."  NASD R. 10321(c).  Nevertheless, not only did the Brokers hold back the putative assignment from SALI until the fifty-ninth minute of the eleventh hour, but they also failed to provide the Customers with the affidavit or supporting documentation on which they purported to base their claim for attorneys' fees and collection costs.  Corbett Dec. ex. 22 at 209-214.  The Customers objected to the affidavit and the materials appended to it, because they contained information and incorporated documents that had been in KDSC's possession long before the 20-day deadline, and KDSC's decision to spring that evidence on the Customers at the hearing deprived them of any ability to scrutinize and counter the affidavits and exhibits.  The arbitrators nonetheless received the affidavit and exhibits into evidence, and the Award thereafter included an attorneys' fees component for which the affidavit and exhibits were the only basis.  As with the assignment, to spring such evidence on the Customers at the hearing was manifestly prejudicial.

**C.    The Brokers Did Not Produce Documents In Their Control.**

As discussed in the motion for discovery sanctions filed by the Customers in the arbitration, KDSC did not even comply with the minimal discovery obligations to which the arbitrators did purport to hold it.  Corbett Dec. ex. 6-12.  KDSC knowingly chose to disregard its obligations without seeking reconsideration or modification of the arbitrators' discovery order.  There were certain documents and entire categories of documents were not produced.  For instance, Meister was one of the associated persons ("APs") involved in the Customers' accounts.  *Id.* ex. 11-12.  However, information which the arbitrators ordered KDSC to produce with respect to such APs – was produced

only with respect to Varchetto, and not Meister. *Id.* Although ordered to do so, KDSC did not produce sections of its compliance manual and like materials concerning claims asserted in the case. *Id.* Although KDSC was ordered to produce other records, it redacted them beyond recognition without obtaining leave from the arbitrators. *Id.* Not only were those failures inconsistent with the arbitrators' discovery order, but they also substantive violations of NASD Rules, having been deemed "inconsistent with just and equitable principles of trade and a violation of Rule 2110." NASD Code of Arbitration Procedure, IM-10100(c). Given the serious nature of such violations, KDSC's violation certainly represents additional undue means warranting vacation of the award.

## II.      THE ARBITRATORS EXCEEDED THEIR AUTHORITY.

Section 10(a)(4) of the Federal Arbitration Act, 9 U.S.C. § 10(a)(4), authorizes this Court to vacate the Award if the arbitrators "exceeded their powers." So too for the Commonwealth's equivalent, Mass. Gen. L. c. 251, § 12(a)(3), although the Massachusetts version makes vacatur mandatory under such circumstances. These statutes stem from legislative recognition that an agreement to arbitrate "is not the equivalent to granting limitless power to the arbitrator." *Georgia-Pacific Corp. v. Local 27, United Paperworkers Int'l Union,* 864 F.2d 940, 944 (1st Cir. 1988). "If the language of an agreement is clear and unequivocal, an arbitrator cannot give it a meaning other than that expressed by the agreement." *Id.* An award must "draw its essence" from the underlying contract. *Cytyc Corp.,* 439 F.3d at 32 (quoting *United Paperworkers,* 484 U.S. at 38. Concomitantly, a party "may establish entitlement to vacation of an arbitral award on a persuasive showing that the arbitrators' interpretation is contrary to the plain language of the contract." *Id.* Here, however, the arbitrators were not "even arguably construing or applying the contract and acting within the scope of [their] authority," precluding enforcement of their Award. *United Paperworkers,* 484 U.S. at 38.

**A.    *Dismissal With Prejudice Was Not Permissible.***

As discussed above, the arbitrators exceeded their authority when they permitted KDSC to amend its Statement of Claim to conform to evidence it had manufactured during the hearing, but the arbitrators' placement of their imprimatur on the sandbagging tactics of the Brokers and their counsel was not the only instance where the arbitrators exceeded the limited authority they were given by the Client Agreements, the Submission Agreement, and the NASD rules incorporated thereinto.  When the arbitrators saw fit – *sua sponte* – to dismiss the Customers' affirmative claims, they grossly overstepped the bounds of the power with which they had been contractually entrusted by the parties.

The NASD's rules only afford 3 avenues for dismissing claims or defenses:

> **10305. Dismissal of Proceedings**
>
> (a) At any time during the course of an arbitration, the arbitrators may either upon their own initiative or at the request of a party, dismiss the proceeding and refer the parties to their judicial remedies, or to any dispute resolution forum agreed to by the parties, without prejudice to any claims or defenses available to any party.
>
> (b) The arbitrators may dismiss a claim, defense, or proceeding with prejudice as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective.
>
> (c) The arbitrators shall at the joint request of all the parties dismiss the proceedings.

NASD R. 10305.  The only provision for dismissal of "a claim, defense, or proceeding with prejudice" is set forth in paragraph (b), which allows for such a disposition "as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s)…"  NASD R. 10305(b).  Even then, dismissal with prejudice is available only "if lesser sanctions have proven ineffective."  *Id.*  Because there was no "joint request of all the parties [to] dismiss the proceedings", the arbitrators could only dismiss the counterclaims and third-party claims without prejudice, if they wanted to dismiss them.  NASD R. 10305(a).  It is only the "without prejudice" species of dismissal that the NASD allows to be effected *sua sponte.  Id.*

As in *Bradley v. Davis,* 777 So. 2d 1189, 1190 (Fla. App. 2001), this is not a case where arbitrators had imposed lesser sanctions which proved ineffective, thus permitting dismissal pursuant to NASD R. 10305(b). The arbitrators had imposed no prior sanctions, and there was no finding that the Customers had willfully or intentionally failed to comply with any of their orders. Corbett Dec. ¶¶ 87-88. "Accordingly, neither the discovery disputes, nor the [requested] postponement[ ], warranted the ultimate sanction, dismissal with prejudice." *Bradley,* 777 So.2d at 1190.

The arbitrators arguably had the power under NASD Rule 10305 to dismiss the Customers' affirmative claims with prejudice before the hearing if they believed those claims to be substantively futile. *Vento,* 2005 U.S. App. LEXIS 6986 at *8; *Sheldon v. Vermonty,* 269 F.3d 1202, 1206 (10th Cir. 2001). However, the parties whose claims were dismissed in other cases had been "provided with a fundamentally fair arbitration proceeding in that [they were] provided with the opportunity to fully brief and argue the motions to dismiss." *Sheldon,* 269 F.3d at 1207; *Vento,* 2005 U.S. App. LEXIS 6986 at *8-*9. *See also Warren v. Tacher,* 114 F. Supp. 2d 600, 602 (W.D. Ky. 2000) (customers "were given adequate opportunity to respond to [broker's] motion to dismiss and they did so"). In this case, however, the Customers were not given any opportunity to brief or argue any motion to dismiss their counterclaims and third-party claims with prejudice; indeed, no such motion was ever filed. In *Sheldon* and *Vento,* moreover, the claims at issue were "facially deficient," so the aggrieved parties "had no relevant or material evidence to present at an evidentiary hearing." *Sheldon,* 269 F.3d at 1207; *Vento,* 2005 U.S. App. LEXIS 6986 at *9. *See also Warren,* 114 F. Supp. 2d at 602-603 (customers not "entitled to costly full-blown discovery when it would not change the outcome and the claim could be decided on a pre-hearing motion"). That was not the case here; each of the Customers' claims stated claims on which relief could be granted. *See* Corbett

Dec. ex. 2.  In sum, this case is wholly unlike *Sheldon, Vento* and *Warren.*  The arbitrators had no authority to dismiss the Customers' affirmative claims with prejudice without holding an evidentiary hearing.

### 1.    The Arbitrators Manifestly Disregarded The Law.

For similar reasons, the Award should be vacated because the arbitrators' actions amounted to manifest disregard of Rule 10305.  An award may be vacated for "manifest disregard of the law" if it is "contrary to the plain language" of the operative contract. *Advest,* 914 F.2d at 8.  Rule 10305 – like the other provisions of the NASD's Code of Arbitration Procedure – is "deemed part of and incorporated by reference in every agreement to arbitrate under the Rules of the Association including a duly executed Submission Agreement."  NASD R. 10331.  The Code is therefore part of the Client Agreements, the Brokers' Uniform Submission Agreements, and the Customers' Submission Agreement.

Because the arbitrators' dismissal with prejudice of the Customers' affirmative claims was "contrary to the plain language" of Rule 10305, they manifestly disregarded the law, and their Award must be vacated.  Though the plain text of that Rule – which is incorporated into the operative contracts – deprived the arbitrators of that power, they nonetheless claimed to be "within [their] rights under rule 1035 – 10305" in doing so. Corbett Dec. ex. 22 at 18-20.  There was no basis in the rule for that determination; in other words, the arbitrators "recognized the applicable law – and then ignored it." *Advest,* 914 F.2d at 8-9.  The arbitrators' ruling with respect to Rule 10305 epitomized the dispensation of the arbitrators' "own brand of industrial justice," warranting vacation of the Award.  *Totem Marine,* 607 F.2d at 652 (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597 (1960)).

**B.    There Was No Basis For Imposing Joint-and-Several Liability.**

Although the arbitration arose from distinct margin accounts – one involving Steven, and the other involving Mark and Lynda – the arbitrators' Award held the Customers "jointly and severally liable" for compensatory damages in the amount of $421,000.00.  Even if the Award were otherwise valid, this error alone requires its vacation, because the unwarranted imposition of joint and several liability clearly exceeded the arbitrators' powers.  Nothing in the Customers' agreements with SALI, and nothing in the Customers' Submission Agreement authorized the arbitrators to hold Steven jointly and severally liable with Mark and Lynda.  Nor is there any statutory or common law basis for such a result.  Yet that is precisely what the arbitrators did.

Again, *Totem Marine* is illustrative.  In that case, the Fifth Circuit concluded that a party had not received a "fundamentally fair" arbitration hearing and vacated the award that was issued.  607 F.2d at 651 (quoting *Bell Aerospace Co. Div. of Textron, Inc. v. Local 516, UAW,* 500 F.2d 921, 923 (2nd Cir. 1974)).  As observed in *Raytheon Co. v. Automated Bus. Systems, Inc.,* 882 F.2d 6, 9 (1st Cir. 1989), *Totem Marine* involved a case where the arbitrators had awarded damages three times greater than requested by the claimant, grounding their award on a theory not even argued by the claimant.  This case is similar.  By holding Steven jointly and severally liable with Mark and Lynda – relief which KDSC had not even requested – the arbitrators essentially doubled the principal amounts of their putative liabilities.  This deprived the Customers of their right to a fair arbitration hearing, as they had not notice of, and no possible opportunity to respond to, a theory of loss that came out of left field.  Such a result is, at the very least, "anomalous." *Totem Marine,* 607 F.2d at 651.  By imposing joint-and-several liability, "the arbitrators ignored the arbitral dispute submitted by the parties" and again "dispensed their 'own brand of industrial justice.'"  *Id.* at 652 (quoting *United Steelworkers,* 363 U.S. at 597).

Like the dismissal of the counterclaims and third-party claims, moreover, the imposition of joint-and-several liability also subjects the award to vacation under the common law "manifest disregard of the law" standard.  Vacatur is proper under this standard "when the award is 'unfounded in reason in fact, … based upon reasoning so palpably faulty that no judge or group of judges could ever conceivably have made such a ruling, or is mistakenly based on a crucial assumption which is decidedly a non-fact.'" *Puerto Rico Tel. Co., Inc. v. U.S. Phone Manuf. Corp.,* 427 F.3d 21, 32 (1st Cir. 2005), *cert. denied,* ___ U.S. ___, 126 S. Ct. 1785 (2006) (quoting *Challenger Caribbean,* 903 F.2d at 861 & *In re Hotel da Vinci,* 797 F.2d 33, 34 (1st Cir. 1986)).  "In certain circumstances," moreover, "the governing law may have such widespread familiarity, pristine clarity, and irrefutable applicability that a court could assume the arbitrators knew the rule and, notwithstanding, swept it under the rug."  *Advest,* 914 F.2d at 10.  This case falls into the latter category.  The relief granted by the arbitrators was "chimerical", in that the law regarding [the unavailability of joint and several liability in these circumstances] was so clear and the arbitrators' award so irreconcilable with it that the panel must have disregarded the law and embarked on a flight of fancy."  *See id.* at 9-10. Consequently, their Award must be vacated.[4]

## III.    THERE WAS NO AGREEMENT TO ARBITRATE THE THIRD-PARTY CLAIMS.

Arbitration is "simply a matter of contract between the parties; it is a way to resolve the disputes – but only the disputes – that the parties have agreed to submit to arbitration."  *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 943 (1995).  *Accord*

---

[4] Even the Brokers concede this fatal defect in the Award.  *See* Motion at 2-4.  Though they attempt to shoehorn it into the statutory grounds for modifying the Award, rather than vacating it, vacatur is the proper remedy.  9 U.S.C. § 11 limits modification to circumstances involving *de miminis* errors like a "miscalculation of figures" or an imperfection "in matter of form not affecting the merits of the controversy."  Certainly, a 100 percent increase in each Customers' putative liability is no minor miscalculation or immaterial to the merits.

*Superadio,* 446 Mass. at 334 (quoting *Plymouth-Carver Reg. Sch. Dist. v. J. Farmer & Co.,* 407 Mass. 1006, 1007 (1990) & *Lawrence v. Falzarano,* 380 Mass. 18, 28 (1980)). It is now axiomatic that "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *United Steelworkers of Am. v. Warrior & Gulf Nav. Co.,* 363 U.S. 574, 582 (1960). An award issued with respect to issues a party did not agree to submit to arbitration has no *res judicata* effect. *Wolf v. Gruntal & Co.,* 45 F.3d 524, 530 (1st Cir. 1995).

Unlike the litigants in the cases cited – or, more precisely, mischaracterized – by the Brokers, the Customers did not seek to withdraw their affirmative claims and seek judicial recourse because they were dissatisfied with a final decision by the arbitrators and wished to have a "second bite at the apple." The Customers had the contractual right to withdraw their third-party claims against Kashner, Meister and Varchetto, and they attempted to exercise that right. The Client Account Agreements only required the arbitration of claims between the Customers and SALI, though KDSC can make a colorable argument that it is an intended beneficiary of the arbitration clause. Accordingly, the only contractual basis for the submission of the third-party claims against the individual Brokers was the Submission Agreement executed by the Customers. Unlike the Brokers – whose submission to arbitration was unconditional – the Customers had not executed the NASD's Uniform Submission Agreement.

The arbitrators' apparent assumption that the Customers could not withdraw those claims is not definitive, because that was a question of arbitrability the Customers did not agree to submit to the arbitrators. This Court "should not assume that the parties agreed to arbitrate arbitrability unless there is 'clear and unmistakable evidence that they did so." *First Options,* 514 Mass. at 944 (quoting *AT&T Techs., Inc. v. Communications Workers of Am.,* 475 U.S. 643, 649 (1986)). As in *Coady v. Ashcraft & Gerel,* 223 F.3d 1, 9 (1st

Cir. 2000), the arbitration clause in the Customers' agreements with SALI includes no evidence that the parties agreed to submit the threshold question of arbitrability to the arbitrators. "Thus, the arbitrators' views about what is arbitrable are not given the usual leeway courts give to arbitrators." *Id.* "If the rule were otherwise, a party who did not agree to arbitrate could be locked into an arbitral award through a series of errors." *Id.* Whether the Customers were bound by their non-standard Submission Agreement is "a gateway dispute" that "raises a 'question of arbitrability'" for the Court to decide. *Howsam v. Dean Witter Reynolds, Inc.,* 537 U.S. 79, 83 (2002).

### A.    The Customers' Agreement To Arbitrate Was Conditioned On A Fair & Complete Opportunity To Present Their Claims And Defenses.

Neither Kashner, Meister nor Varchetto is a party to or otherwise mentioned in the Customer Account Agreements, so the sole manifestation of the Customers' agreement to arbitrate claims against them is the Submission Agreement executed by the Customers. Significantly, the Customers did not execute the boilerplate Uniform Submission Agreement provided by the NASD. Rather, because KDSC sought to interpose procedural barriers from the outset, the Customers expressly conditioned their agreement to arbitrate on the proviso that they be "afforded a fair and complete opportunity to obtain adjudication of their claims and defenses." Corbett Dec. ¶¶ 49-51. Their submission of their third-party claims was unambiguously conditioned on the proviso that the Customers be "afforded a fair and complete opportunity to obtain adjudication of their claims and defenses." *Id.* ex. 4 ¶ 1. The Customers only agreed to be bound by an award respecting their third-party claims if they were "afforded a fair and complete opportunity to obtain adjudication of their claims and defenses." *Id.* Without objecting to the form of the Submission Agreement, the Brokers responded to the Customers' affirmative claims, and Meister, Kashner and Varchetto joined the arbitration. Corbett Dec. ¶ 53.

The Brokers now assert that the Submission Agreement is not enforceable as written – that the Customers' agreement to arbitrate was irrevocable. To support that otherwise unsupportable proposition, they distort *Kelleher v. Cersosimo,* 2 Mass. App. Ct. 904 (1974), and suggest that the Commonwealth's Appeals Court held that parties cannot insist upon conditions precedent to an obligation to arbitrate. However, *Kelleher* did not deal with conditions precedent to arbitration; the case instead involved the issue of whether contract language stating that an arbitral award is "a condition precedent to any right of legal action" left the full range of legal action open to the parties after arbitration. *Id. Kelleher* merely reaffirmed the unremarkable proposition that an arbitral award is binding unless as otherwise provided by the Commonwealth's Arbitration Act. *Id.* Here, because a condition precedent to arbitration was not satisfied, at least insofar as the Customers' affirmative claims were concerned, those claims were not properly within the submission and their arbitration was not mandatory.

       **B.**      *The Customers Never Waived Their Right To Seek Judicial Recourse With Respect To Those Claims Whose Arbitration Is Not Mandatory.*

Notwithstanding the Brokers' protestations to the contrary, the Customers never waived their right to commence judicial proceedings against Kashner, Varchetto, Meister and, to the extent class action claims are involved, KDSC. The Customers expressly reserved "their right to seek adjudication of their [third-party claims] in a court of competent jurisdiction if the sponsoring organization [did] not afford them a fair and complete opportunity to obtain such an adjudication" in the arbitration. Corbett Dec. ex. ¶ 5. None of the Brokers objected to the Customers non-standard Submission Agreement, and they thereafter participated in the arbitration, tacitly manifesting their assent to its terms. The authorities cited by the Brokers are inapposite.

For example, the Brokers rely upon *Gargano & Assoc., P.C. v. John Swider & Assoc.,* 55 Mass. App. Ct. 256, 260-61, *review denied,* 437 Mass. 1109 (2002), in which the plaintiffs engaged in arbitration discovery concerning claims they subsequently sought to pursue in court, and in which there was no indication that there had been any problem with the discovery allowed by the arbitrator. In contrast, the Customers in this case had sought to engage in such discovery with respect to their affirmative claims against the Brokers, but it is precisely because the arbitrators denied them meaningful discovery that withdrawal of their affirmative claims became necessary. In *Gargano & Assoc.,* it was only after the arbitrator ruled against them on the merits after the first phase of a bifurcated hearing that the plaintiffs commenced a judicial proceeding. *Id.* at 261. Here, the Customers moved before the hearing – and thus before the issuance of any award – to withdraw their affirmative claims and pursue their judicial remedies, so as to preclude any *res judicata* effect attaching to any Award with respect to those claims.

*Boston Police Patrolmen's Ass'n v. City of Boston,* 60 Mass. App. Ct. 672, *review denied,* 442 Mass. 1103 (2004), likewise affords the Brokers no support for their extraordinary argument. Indeed, the Commonwealth's Appeals Court expressly recognized the core principle implicated by the Customers' Submission Agreement – that with "arbitration being the product of an agreement, the arbitrator is without authority to decide matters outside the scope of what the parties have agreed shall be arbitrated." *Id.* at 674. If an award purports to decide matters beyond the scope of the agreement to arbitrate – and the arbitrators thus "exceeded their powers" – it must be vacated. *Id.*; Mass. Gen. L. c. 251, § 11(a).

Here, the Customers attempted to remove from arbitration the affirmative claims they were not obligated to arbitrate after it became apparent that the condition precedent to their arbitrability would not be satisfied. The arbitrators exceeded their powers under

the Customers' Submission Agreement by purporting to dispose of the claims the Customers had sought to withdraw, because the arbitrators' discovery decisions ensured that the Customers would not have a "fair and complete opportunity" to present those claims at the hearing.[5]

### C. The Customers Have Been Denied A "Fair And Complete Opportunity to Obtain Adjudication Of Their Claims And Defenses.".

Had the Customers waited until after the arbitration hearing to seek judicial recourse, they might properly be accused of "forum shopping" and seeking "a second bite at the apple."  In this case, however, they are not looking for a more favorable forum – they were (and still are) seeking **SOME** forum in which their counterclaims and third party claims might be aired fairly and completely.  The arbitrators' discovery decisions and subsequent dismissal of the Customers' affirmative claims closed the doors of the NASD's forum to those claims.

From the outset of the arbitration, the Customers made no secret that their agreement to arbitrate was contingent on their being afforded "a fair and complete opportunity to obtain adjudication of their claims and defenses."  They never agreed to be bound by an award on claims or defenses they would not have a fair and complete opportunity to present.  With their silence, the Brokers manifested their acceptance of the qualifications set forth in the Customers' Submission Agreement, but they nonetheless set

---

[5] The Florida decision cited by the Brokers is similarly inapposite.  Not only do the laws of that jurisdiction have no bearing on this dispute under the choice of law rules of this Commonwealth, but even if Florida law did apply, the case would be materially distinguishable, because *Victor v. Dean Witter Reynolds, Inc.,* 606 So.2d 681 (Fla. App. 1992), did not involve a Submission Agreement where the respondent's agreement to arbitrate was conditioned upon its being afforded a "fair and complete opportunity to obtain adjudication of [its] claims and defenses."  Instead, "[t]he threshold consideration" in *Victor* was what the parties agreed would be arbitrable; and in that that case – unlike this one – the respondent had stipulated that "any" agreement would be arbitrated.  *Id.* at 685.  Furthermore, the respondent in *Victor* sat back and waited more than seven months before raising its objection to arbitration. *Id.*  In stark contrast, it was only two weeks after receiving the Chairman's essentially-dispositive discovery order in this case – the event which made clear that the condition precedent to arbitration would not be satisfied – that the Customers sought leave to withdraw the claims they would not have a fair or complete opportunity to present.

about to prevent the Customers from obtaining the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which the Customers' agreement to arbitrate was conditioned.

As in *Wilson v. American Investment Servs., Inc.,* 2002 U.S. App. LEXIS 6409 at *18 n.10 (10th Cir.), although the Customers were initially ready and willing to proceed on their counterclaims and third party claims in the arbitration, it was the Brokers who prevented arbitration of those claims by interposing procedural barriers that ultimately caused the Customers to seek leave to withdraw those claims without prejudice. Most significantly, KDSC stonewalled when called upon to produce documents and other materials responsive to the information requests they served – requests that were specific, relevant to the matters in controversy, and afforded KDSC a reasonable time to respond – pursuant to Rule 10321(a) of the NASD's Code. KDSC never sought (as required by NASD R. 10321(a)) to "cooperate to the fullest extent practicable" with the Customers "in the voluntary exchange of documents and information to expedite the arbitration." Indeed, despite the mandate of NASD R. 10321(b), KDSC never sought to narrow or otherwise resolve any dispute it purported to have with any of the Customers' information requests. KDSC instead sat back, produced a handful of inconsequential documents, and objected to the lion's share of the Customers' information requests. KDSC even refused to produce documents deemed by the NASD to be "presumptively discoverable" in cases like this.

It was therefore necessary for the Customers to move to compel compliance with their information requests. In opposing that motion, KDSC never sought to establish that the Customers' requests were non-specific or irrelevant, nor did it argue that the Customers failed to afford them a reasonable time to respond. Rather, for the most part, KDSC refused to produce information relevant to the Customers' counterclaims and third

party claims because – without having sought or obtained any determination from the Panel – it summarily and unilaterally characterized those claims as "frivolous." No motion to dismiss or for summary adjudication of those purportedly "frivolous" claims had ever been filed. The merits of those claims were never briefed or argued. Yet the Chairman of the Panel, in ruling upon the Customers' motion to compel, apparently accepted KDSC's *ipse dixit* and, for the most part, denied that motion.

The arbitrators' discovery decision effectively disposed of the Customers' counterclaims and third party claims. The arbitrators' refusal to compel KDSC even to produce information specified on the pertinent document lists in the NASD's Discovery Guide suggested that they had been persuaded by KDSC's summary, unsupported mischaracterization of the Customers' claims and determined that they would not be presented at the hearing. Accordingly, if the Customers were to avoid having their viable claims precluded simply because the Chairman declined to order KDSC to satisfy its discovery obligations under the Code, they had to withdraw them and seek judicial recourse before an adverse award was entered. *See Beals v. Commercial Union Ins. Co.,* 61 Mass. App. Ct. 189, 194 (2004) (arbitration award on the merits is preclusive of claims in the same way as a final judgment in a judicial proceeding). Here, because the Customers never intended to be bound by an award on claims that they did not have a "fair and complete opportunity" to present, they promptly sought leave to withdraw their counterclaims and third-party claims from the arbitration and present them in a forum where they would have such an opportunity.

Adding insult to injury, however, the arbitrators denied that request and *sua sponte* purported to dismiss the Customers' affirmative claims with prejudice. That decision, coupled with the earlier failure of the arbitrators to afford the Customers the most minimal discovery deprived them of the "fair and complete opportunity to obtain

adjudication" of those claims on which their agreement to arbitrate was conditioned.

Only "[w]hen arbitration affords opportunity for presentation of evidence and argument

substantially similar in form and scope to judicial proceedings [would] the award … have

the same effect on issues necessarily determined as a judgment has." *Id.* (quoting

RESTATEMENT (SECOND) JUDGMENTS § 84, cmt. c (1982)).

## IV.    THE ARBITRATORS REFUSED TO CONSIDER MATERIAL EVIDENCE.

Under 9 U.S.C. § 10(a)(3), and its Massachusetts equivalent, Mass. Gen. L. c. 251,

§ 12(a)(4), an award is susceptible to vacatur if the arbitrators refused to hear evidence

pertinent and material to the parties' dispute.  Arbitrators are therefore bound to "give each

of the parties to the dispute an adequate opportunity" to present their evidence and

arguments.  *Hoteles Condado Beach v. Union de Tronquistas Local 901,* 763 F.2d 34, 39

(1st Cir. 1985).  Vacation of an award is proper "when the exclusion of relevant evidence

'so affects the rights of a party that it may be said that he was deprived of a fair hearing."

*Id.* at 40 (quoting *Newark Stereotypers' Union No. 18 v. Newark Morning Ledger Co.,* 397

F.2d 594, 599 (3rd Cir.), *cert. denied,* 393 U.S. 954 (1968)).  Unfortunately, the arbitration

process giving rise to this proceeding was so fundamentally defective that this ground for

vacation is also present.

Fair discovery is inextricably intertwined with the right to present evidence at an

arbitration hearing.  *See National Cas. Co.,* 430 F.3d 492, 498 (1st Cir. 2005) (assuming,

*arguendo,* that arbitrator's failure "to bring certain evidence into the proceedings" grounds

for vacatur under 9 U.S.C. § 10(a)(3) if it "so affects the rights of a party that it may be said

that he was deprived of a fair hearing); *Ramirez de Arellano,* 133 F.3d at 91 (declining to

give *res judicata* effect to grievance procedure partly because "there was no opportunity for

discovery).  The NASD's Code of Arbitration Procedure contemplates "that all relevant

material will be exchanged."  *In re MONY Securities Corp.,* 83 S.W.3d 279, 284 (Tex. App.

2002). The Customers' discovery requests (Corbett Dec. ex. 5) were narrowly tailored to adduce evidence relevant to their defenses, counterclaims and third-party claims (*id.* ex. 2). Yet the arbitrators arbitrarily and capriciously declined to compel KDSC to produce most of the necessary information. *Id.* ex. 10. In this case, as in *Hoteles Condado Beach*, the evidence "effectively excluded" by the arbitrators was central to the Customers defenses and affirmative claims against the Brokers, and the arbitrators' refusal to consider that evidence was so detrimental to the Customers right to present their case that it warrants vacation of the Award. 763 F.2d at 40. That profound error was only compounded by the arbitrators' unlawful decision to dismiss the Customers' affirmative claims with prejudice.

## V.    THE ARBITRATORS WRONGLY REFUSED TO POSTPONE THE HEARING UNTIL AFTER THE SJC ADDRESSED THE "UNAUTHORIZED PRACTICE OF LAW" ISSUES BEFORE IT

Arbitrators are likewise bound to accede to reasonable requests for continuances made by parties. Failure to do so exposes their awards to vacatur. *Compare* 9 U.S.C. § 10(a)(3) (vacatur permissible "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown") *with* Mass. Gen. L. c. 251, § 12(a)(4) (vacatur mandatory if "the arbitrators refused to postpone the hearing upon sufficient cause being shown therefor"). In this case, the Customers presented the arbitrators with a compelling justification for postponing the hearing in the arbitration: the Brokers intended to be represented at the hearing (which was held in Boston) by attorneys not admitted to practice in Massachusetts; and the issue of whether such representation would violate the Commonwealth's prohibition against the unauthorized practice of law ("UPL"), embodied by Mass. R. Prof. C. 5.5 and Mass. Gen. L. c. 221, § 46A, was on the SJC's docket. *See* Corbett Dec. ¶¶ 98-104. Yet the arbitrators – without any explanation – chose not to wait for the SJC to rule definitively before allowing New York lawyers to conduct the arbitration hearing in Boston.

Regardless of how the SJC might have resolved the overarching UPL issue, or the subsidiary issue of whether the conduct of the hearing by the Brokers' counsel would represent "undue means" within the meaning of Mass. Gen. L. c. 251, § 12(a)(1), the pendency of 3 appeals presenting related UPL issues to the SJC surely constituted "sufficient cause" for postponing the arbitration hearing.  Significantly, when the plaintiffs first asked the arbitrators to postpone the hearing in this case, there had been no indication from this Court as to whether violation of the Commonwealth's UPL prohibitions would render an award susceptible to vacation under Mass. Gen. L. c. 251, § 12(a)(1).  Nor was there (or is there yet) certainty as to whether the conduct of such hearings by attorneys not admitted to practice here would violate the law of this Commonwealth, or whether participation by Massachusetts lawyers in such proceedings could expose them to discipline.  *See Superadio,* 446 Mass. at 336 (in view of study of ABA Model Rule 5.5(c)(3) by standing advisory committee on rules of professional conduct, "prudence dictates that [the UPL] question await the committee's report and [the SJC's] action thereon").[6]  Out of deference to the SJC's role as the repository of the judicial department's constitutional power to provide guidance or standards concerning the practice of law (*see Collins v. Godfrey*, 324 Mass. 574, 578-79 (1949)), the arbitrators should have waited to see how the SJC would approach the UPL issue before going forward with a hearing where the Brokers were represented – potentially unlawfully – by New York lawyers.  At the time, the arbitration had been pending only a few months, and no postponements had been requested previously.

---

[6] In all likelihood, the Brokers' counsel did engage in the unauthorized practice of law.  The SJC's disposition of the appeal related to this case is telling.  The Customers' interpretation of the UPL prohibition was plausible.  Indeed, although a single justice concluded that the Brokers' counsel would not be engaging in the unauthorized practice of law by representing the Brokers at the hearing, the full SJC vacated that judgment.  *Mscisz v. Kashner Davidson Securities Corp.,* 446 Mass. 1008, 1010 (2006).  It was "for a different reason from that articulated by the single justice" that the full SJC held that it was not abusive of the single justice's discretion for him to deny the Customers relief.  *Id.*

Nor was the position taken by the Customers fanciful or frivolous.  Even the NASD recognized that "it can be a violation of state unauthorized practice of law provisions" for attorneys to appear in hearings conducted in jurisdictions where they are not admitted. (Corbett Dec. ex. 15 at ex. A)  The SEC, in soliciting comments on a proposed rule change addressing the UPL issue in NASD arbitrations, observed that no NASD rule would "prevent a state from deciding that an out-of-state attorney may have violated a state's unauthorized practice of law provision by representing a party in an NASD arbitration or mediation."  Self Regulatory Organizations; National Association of Securities Dealers, Inc; Notice of Filing of Proposed Rule Change and Amendment No. 1 Relating to Representation in Arbitration and Mediation, 70 Fed Reg. 42123, 42125 (SEC 2005). Given the seriousness of a UPL violation, and given that the highest courts of at least two states had found that lawyers in the position of the Brokers' counsel violated similar prohibitions (*see Florida Bar v. Rapoport,* 845 So.2d 874, *cert. denied,* 540 U.S. 967 (2003), *and Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,* 17 Cal. 4th 119, 133-34, *cert. denied,* 525 U.S. 920 (1998)) it was an issue that warranted a decision by the SJC before the arbitration hearing went forward with the Brokers represented by their New York lawyers.  Indeed, it was an issue of such significance, yet so unsettled, that the SJC took the extraordinary step of affirmatively soliciting briefs from *amici curiae.  See* DE #17, ex. A (SJC *amicus* announcement).

Under these unusual circumstances – even if the SJC later ruled as it did concerning the UPL issue and the subsidiary issue of whether such conduct affords a basis for vacating an award – the plaintiffs based their requests for postponement on "sufficient cause."  The arbitrators offered no reason – plausible or otherwise – for refusing to postpone the hearing until after the SJC ruled.  The arbitrators' arbitrary failure to grant those reasonable requests requires that the Award be vacated.

### A.       The Federal Standard.

Under the FAA, the Court may vacate an award "where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown…" 9 U.S.C. § 10(a)(3). Accordingly, although "arbitrators are to be accorded a large degree of discretion in exercising their judgment with respect to a respected continuance," it is also true that an "arbitrary denial of a request for postponement may serve as grounds for vacating an arbitration award." *Jarvis v. L.C. Wegard & Co., Inc.,* 1998 U.S. Dist. LEXIS 10471 at *5 (D. Mass.) (O'Toole, J.).

Whether the cause is "sufficient" should be examined from the perspective of the parties and the arbitrators at the time postponement was requested. For instance, a respected District Judge recently confronted the issue of whether an arbitration panel should have postponed a hearing while the parties awaiting a decision by the Small Business Administration. *Naing Int'l Enterprises, LTD v. Ellsworth Assoc., Inc.,* 961 F. Supp. 1, 4-5 (D. D.C. 1997) (Sporkin, D.J.). Applying Section 10(a)(3) of the FAA, 9 U.S.C. § 10(a)(3), Judge Sporkin vacated the award before him, holding that no court or arbitration panel "can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one." *Naing,* 961 F. Supp. at 5. "Yet, by refusing to wait for a reasonable period upon SBA action … the panel did just that." *Id.* Regardless of whether the SBA's decision would have been favorable to the party seeking postponement, the arbitrators' rulings were "clearly less informed" than if they had awaited the SBA decision – "[s]o much so, that the arbitration award must be vacated." *Id.*[7] The same result is appropriate under the circumstances of this case.

---

[7] The result was similar in *Insurance Co. of N. Am. v. St. Paul Fire & Marine Ins.,* 626 N.Y.S.2d 232, 233 (A.D. 1995), where the plaintiff had sought postponement of an arbitration hearing pending a criminal investigation regarding the underlying incident. Under such circumstances, the plaintiff "clearly established good cause for its request," and "it was an abuse of discretion to deny the request" for a postponement. *Id.*

### B.    The Massachusetts Standard.

Mass. Gen. L. c. 251, § 12(a)(4) has never been construed judicially; the SJC has never articulated the circumstances under which arbitrators' refusal to postpone a hearing would warrant vacation of an award under Mass. Gen. L. c. 251, § 12(a)(4). However, the unmistakable intent of the Massachusetts Legislature was to require postponement of hearings when "sufficient cause" is shown, at peril of having any award issued in derogation of that policy vacated, regardless of whether other grounds set forth in Mass. Gen. L. c. 251, § 12 are present. A different interpretation would make inoperative or superfluous the relevant clause of Mass. Gen. L. c. 251, § 12(a)(1).

Unlike the corresponding clause of the FAA, 9 U.S.C. § 10(a)(3), "misconduct" in refusing to postpone the hearing is not a necessary element under the Massachusetts statute. *See also Fairchild & Co., Inc.,* 516 F. Supp. 1305, 1313-14 (D. D.C. 1981) (Sirica, J.) ("arbitrary denial of a reasonable request for a postponement may serve as grounds for vacating an arbitration award" under FAA, but "the statute limits the Court's review to a determination as to whether the arbitrators were guilty of misconduct in refusing a postponement"). By contrast, the Commonwealth's statute does not require that the refusal to postpone be accompanied by "corruption, fraud or other undue means". *Cf.* Mass. Gen. L. c. 251, § 12(a)(1). Nor must there have been "evident partiality", "corruption" or prejudicial "misconduct" by arbitrators. *Cf. id.* § 12(a)(2). The arbitrators need not have "exceeded their powers," and an award can be vacated on this basis even if there is a valid arbitration agreement in place. *Cf. id.* § 12(a)(3), (a)(4). Each of these evils is covered by another part of the statute; all that must be established under Mass. Gen. L. c. 251, § 12(a)(4) is an arbitrators' refusal "to postpone the hearing upon sufficient cause being shown therefor." Accordingly, if *Naing* supports vacation of the Award under the more restrictive FAA, then there is no question that the even more postponement-friendly

Massachusetts statute – which does not encompass a "misconduct" element – mandates

vacation of the Award issued in the instant arbitration.[8]

## VI.    DISCOVERY IS NECESSARY BEFORE OTHER ASPECTS OF THE CUSTOMERS' ARGUMENTS CAN BE RESOLVED DEFINITIVELY.

As discussed more fully in the affidavit filed herewith pursuant to Fed. R. Civ. P.

56(f), if the Court deems it necessary for the Customers to adduce subjective evidence that

the "sandbagging" tactics of the Brokers and their counsel was subjectively underhanded

and conniving, instead of relying on the objective indicia detailed on pages __ through __

of this memorandum, it will be necessary to conduct limited discovery on that issue.

Corbett Dec. ¶¶ 136-137.  Document requests to KDSC and SALI, Rule 30(b)(6)

depositions of those two firms, and limited depositions of two of the Brokers' attorneys,

Marc Ross and Richard Babnick, should adduce adequate subjective evidence in relatively

short order.  *Id.*.

While it would be inappropriate to depose the arbitrators with respect to their

decision-making process, their arbitrary discovery ruling, their chimerical dismissal of the

counterclaims and third-party claims, and apparent pique in reaction to the grounds given

by the Customers for their motion to withdraw their affirmative claims and the honest

response by their counsel to a question concerning the fairness of the proceedings, limited

discovery would be appropriate on the issue of whether the arbitrators were partial.  Corbett

Dec. ¶¶ 139-140.  *See* 9 U.S.C. § 10(a)(2) (award may be vacated where "there was evident

partiality … in the arbitrators"); Mass. Gen. L. c. 251, § 12(a)(2) (award must be vacated if

"there was evident partiality by an arbitrator appointed as a neutral").

---

[8] In the *Mscisz* case, the SJC repeatedly declined to address the refusal to postpone issue.  The issue was raised in the Customers' brief (Corbett Dec. ex. 18 at 5, 36-38) but not in the SJC's decision.  The Customers moved for rehearing (*id.* ex. 19), but that petition was denied without explanation (*id.* ex. 20).  "No legal conclusions can be drawn" form that denial.  *Villages Dev. Co. v. Secretary, Exec. Off. Env'l Affairs*, 410 Mass. 100, 109 n.5 (1991).  If the Court is uncertain as to how the SJC would rule on this issue, it should certify the question pursuant to SJC R. 1:03.

### CONCLUSION

For the foregoing reasons, the Award must be vacated and the case remanded to the NASD for a hearing before a new panel of arbitrators. Additionally, to minimize the possibility that the proceedings might again be tainted by errors of the ilk detailed above, the Court should defer remanding the case until after discovery is complete in the separate lawsuit to be commenced by the Customers against the individual Brokers. Given the 100 percent overlap between the facts underlying the Customers' counterclaims against KDSC and their claims against the individual Brokers, deferral of remand would ensure that the evidence is developed fully and fairly, while eliminating any need for further discovery in the arbitration. If the Court pursues this suggested course, the case between KDSC and the Customers could proceed directly to hearing after remand.

STEVEN MSCISZ,
MARK MSCISZ & LYNDA MSCISZ,

By their attorney,

*/s/ William P. Corbett, Jr.*
_____
William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
 *A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated: June 9, 2006

### CERTIFICATE OF SERVICE

Pursuant to Local Rules 5.4(c) and 5.2(b), I hereby certify that this document, which is being filed with the Court through its ECF system, will be sent electronically to Howard M. Smith, Esquire, a registered ECF participant and attorney of record for the plaintiffs/defendants-in-counterclaim, on this ninth day of June, 2006.

*/s/ William P. Corbett, Jr.*
_____
William P. Corbett, Jr.