UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____ )
)
KASHNER DAVIDSON SECURITIES CORP., *et al.*    )
)
v.                                              )        Case No. 05-CV-11433-JLT
)
STEVEN MSCISZ, *et al.*                          )
_____ )

**DECLARATION OF WILLIAM P. CORBETT, JR.
<u>PURSUANT TO 28 U.S.C. § 1746</u>**

I, William P. Corbett, Jr., depose and state the following under penalty of perjury:

1.    I am counsel of record in the captioned action for defendants/plaintiffs-in-counterclaim Steven Mscisz ("Steven"), Mark Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers"), who oppose the "Motion to Modify and Confirm Arbitration Award and for Entry of Judgement [sic] Thereon" (DE #20) of the plaintiffs/defendants-in-counterclaim, Kashner Davidson Securities Corp. ("KDSC"), Victor Kashner ("Kashner"), Matthew Meister ("Meister") and Timothy Varchetto ("Varchetto") (collectively "Brokers") and, pursuant to 9 U.S.C. §§ 10 & 11 and MASS. GEN. L. c. 251 §§ 12 & 13, seek *vacatur* or modification of the arbitration award ("Award") issued on June 17, 2005 against the Customers and in favor of the Brokers by panel of arbitrators ("Panel") acting under the auspices of NASD Dispute Resolution, Inc. ("NASD") in Case Number 04-03793 ("Arbitration").

2.    I also represented the Customers throughout the Arbitration, witnessing first-hand the fundamentally defective process from which the Award emanated. Accordingly, except where a particular averment is identified as being made on information and belief, I make this Declaration on my personal knowledge.

**The Underlying Dispute**

3.      I am informed and believe, and I therefore aver, that in late 2003, the Customers appointed KDSC to serve as their agent to place securities transactions in accounts they opened at Sterne, Agee & Leach, Inc. and SAL Financial Services, Inc. (collectively "SALI") at they same time they began doing business with KDSC.

4.      I am informed and believe, and I therefore aver, KDSC was not an agent of SALI.

5.      I am informed and believe, and I therefore aver, that the Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced them to establish their relationships with KDSC and SALI.

6.      I am informed and believe, and I therefore aver, that Meister and Varchetto were the KDSC employees responsible for the Customers' accounts.

7.      I am informed and believe, and I therefore aver, that Kashner is a "controlling person" of KDSC, as that term is defined under the Federal securities laws, and he supervised the activities of Meister and Varchetto.

8.      I am informed and believe, and I therefore aver, that SALI and the Customers entered into Client Account Agreements, and neither KDSC nor any of its agents or employees was a party to those contracts.

9.      I am informed and believe, and I therefore aver, that neither Kashner, Meister, nor Varchetto was a third-party beneficiary of the Client Account Agreements between SALI and the Customers.

10.    I am informed and believe, and I therefore aver, that after opening their SALI accounts and appointing KDSC to serve as their agent, the Customers – through Meister and Varchetto – purchased shares in Vaso Active Pharmaceuticals, Inc. ("VAPH").

11.    The brother of Mark and Steven was the President of VAPH, and I am informed and believe, and I therefore aver, that KDSC was in the process of underwriting an initial public offering ("IPO") of VAPH stock at the time the Customers began their relationships with KDSC.

12.    I am informed and believe, and I therefore aver, that in February 2004, the Client Account Agreements between the Customers and SALI were amended to add margin privileges.

13.    I am informed and believe, and I therefore aver, that the Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced them to begin trading on margin after the IPO, when the price of VAPH stock was rising.

14.    I am informed and believe, and I therefore aver, that the Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced them to make unsuitable trades or maintain imprudent positions in VAPH stock.

15.    I am informed and believe, and I therefore aver, that the Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced Mark and Lynda to pursue a "day trading" strategy with respect to VAPH stock soon after they began trading on margin.

16.     I am informed and believe, and I therefore aver, that under the amended Client Account Agreements, margin transactions involved the extension of credit by SALI only, and neither KDSC nor any of its agents ever lent money to the Customers or any of them.

17.     I am informed and believe, and I therefore aver, that SALI kept the securities accounts of Steven separate from the securities accounts of Mark and Lynda, and that SALI kept the margin account of Steven separate from the margin account of Mark and Lynda.

18.     Although the margin liability of Mark and Lynda was to be "joint and several" under their Client Account Agreement with SALI, I am informed and believe, and I therefore aver, that there was never any agreement pursuant to which Mark and Lynda would be jointly and severally liable with Steven for deficiencies in his margin account, nor was there any agreement pursuant to which Steven would be jointly and severally liable with Mark and Lynda for deficiencies in their margin account.

19.     I am informed and believe, and I therefore aver, that no Client Account Agreement between SALI and Steven was ever incorporated into a Client Account Agreement between SALI, Mark and Lynda, and no Client Account Agreement between SALI, Mark and Lynda was ever incorporated into a Client Account Agreement between SALI and Steven.

20.     I am informed and believe, and I therefore aver, that in the Spring of 2004, the price of VAPH stock dropped precipitously, and SALI issued several margin calls to the Customers.

21.     I am informed and believe, and I therefore aver, that the Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care manipulated the market for VAPH stock, were complicit in such manipulation, or otherwise benefited from declines in the value of the Customers' VAPH holdings.

### The Arbitration

22.     I am informed and believe, and I therefore aver, that KDSC, Kashner, Meister and Varchetto feared that the Customers would seek to hold them liable for the deficiencies in their SALI margin accounts that resulted from the declines in the price of VAPH stock.

23.     I am informed and believe, and I therefore aver, that KDSC preemptively and hastily commenced the Arbitration on May 25, 2004 – only 7 weeks after the first margin call – in order to obtain a tactical advantage in proceedings to resolve their anticipated disputed with the Customers.

24.     A true copy of KDSC's Statement of Claim is attached to this Declaration as Exhibit 1.

25.     KDSC pled its Statement of Claim as if it were a party to the Client Account Agreements with the Customers.  Ex. 1 ¶¶ 18, 19.

26.     I am informed and believe, and I therefore aver, that at the time KDSC commenced the Arbitration, none of the Customers was indebted to it.

27.     KDSC's Statement of Claim nonetheless alleged that the Customers were indebted to it.

28.     I am informed and believe, and I therefore aver, that KDSC never issued a margin call to the Customers.

29.     I am informed and believe, and I therefore aver, that KDSC never rendered a putative statement of margin indebtedness to any of the Customers.

30.     I am informed and believe, and I therefore aver, that at the time KDSC commenced the Arbitration, it was not party to any of the Client Account Agreements between the Customers and SALI.

31.     KDSC's Statement of Claim nonetheless alleged that it was party to the Client Account Agreements.

32.     I am informed and believe, and I therefore aver, that none of the Customers had margin accounts with KDSC.

33.     KDSC's Statement of Claim nonetheless alleged that the Customers had margin accounts with KDSC.

34.     KDSC's Statement of Claim did not allege or otherwise give the Customers notice that it contended that SALI assigned its ostensible claims against the Customers to KDSC.

35.     KDSC's Statement of Claim did not allege or otherwise give the Customers notice that it contended that it was subrogated to the putative rights of SALI against the Customers.

36.     KDSC's Statement of Claim did not allege or otherwise give the Customers notice that it contended that KDSC otherwise had some indirect standing to recover from the Customers.

37.     On August 26, 2004, the Customers filed with the NASD and caused the Brokers to be served with their Answer, Affirmative Defenses and Statement of Counterclaims & Third Party Claims ("Answer").  A true copy of the Customers' Answer is attached to this Declaration as Exhibit 2.

38.    As provided by Rule 10314 of the NASD's Code of Arbitration Procedure ("Code"), the Answer responded to the factual averments set forth in KDSC's Statement of Claim and laid out their affirmative defenses, counterclaims against KDSC, and third party claims against Kashner, Meister and Varchetto.  A true copy of operative version of the Code is attached to this Declaration as Exhibit 3.

39.    Each of the Customers' claims stated claims on which relief could be granted.

40.    The Customers' Eighth Affirmative Defense was that "KDSC's claims against the Customers must fail because it is not the real party in interest."

41.    The Customers never withdrew or amended their Eighth Amended Defense, of which the Brokers and their counsel were on notice throughout the Arbitration, and which constituted a complete defense under Alabama law, which governed the Client Account Agreements.

42.    Despite having notice of this defense, KDSC made no effort over the next 9 months to amend its pleading or otherwise assert a theory by which might arguably be the real party in interest.

43.    Never before the May 2005 hearing did KDSC suggest that its claim was based on a subrogation theory or some other indirect means of obtaining standing.

44.    Until the time of the hearing – and even after the hearing began – the only indication given to the Customers was that KDSC purported to be claiming directly under the Client Agreements.

## The Agreements to Arbitrate

45.    The Customers' Client Account Agreements arguably compelled them to submit all disputes between them and KDSC (other than class actions) to arbitration.

46.    However, Kashner, Meister and Varcetto were not parties to or third party beneficiaries of the Client Account Agreements executed by the Customers.

47.    KDSC executed the NASD's standard form Uniform Submission Agreement when it commenced the Arbitration and, according to the Award, Kashner executed the same standard form Uniform Submission Agreement, but neither Meister nor Varchetto executed any submission agreement whatsoever.

48.    The Customers were not generally opposed to Arbitration, but they understood that arbitration of all of their claims was not mandatory.

49.    Because KDSC had sought to interpose procedural barriers from the outset, the Customers did not execute the NASD's Uniform Submission Agreement, instead signing a Submission Agreement expressly conditioning their agreement to arbitrate on the proviso that they be "afforded a fair and complete opportunity to obtain adjudication of their claims and defenses."  A true copy of the Customers' Submission Agreement is attached to this Declaration as Exhibit 4.

50.    So long as they would receive a "fair and complete opportunity to obtain adjudication of their claims and defenses," the Customers were prepared to prosecute in the Arbitration even those claims for which arbitration was not mandatory, and they manifested that position in the Submission Agreement they executed.

51.    The Submission Agreement executed by the Customers gave them the contractual right to withdraw their third-party claims against Kashner, Meister and Varchetto.

52.    The Submission Agreement executed by the Customers represented their only agreement to arbitrate insofar as the Customers' claims against Kashner, Meister and Varchetto were concerned.

53.     Without objecting to the form of the Customers' Submission Agreement, the Brokers responded to their counterclaims and third-party claims, and Meister, Kashner and Varchetto joined the arbitration, tacitly manifesting their assent to its terms.

### Discovery

54.     Pursuant to Rule 10321(b) of the NASD's Code of Arbitration Procedure, the Customers propounded comprehensive but focused requests for information relevant to KDSC's claims and the Customers' defenses, counterclaims and third party claims. A true copy of the Customers' request for information is attached to this Declaration as Exhibit 5.

55.     The Customers' discovery requests were narrowly tailored to adduce evidence relevant to their defenses, counterclaims and third-party claims.

56.     In response, KDSC refused to produce anything but the most innocuous account statements and like documents. A true copy of KDSC's response to the Customers' request for information is attached to this Declaration as Exhibit 6.

57.     KDSC stonewalled when called upon to produce documents and other materials responsive to the information requests they served – requests that were specific, relevant to the matters in controversy, and afforded KDSC a reasonable time to respond – pursuant to Rule 10321(a) of the NASD's Code.

58.     KDSC sat back, produced a handful of inconsequential documents, and objected to the lion's share of the Customers' information requests

59.     KDSC even refused to produce documents identified in the NASD's Discovery Guide as "presumptively discoverable" if the Arbitration involves claims like those asserted by the Customers. A true copy of the NASD's Discovery Guide is attached to this Declaration as Exhibit 7.

60.    KDSC never sought (as required by NASD R. 10321(a)) to "cooperate to the fullest extent practicable" with the Customers "in the voluntary exchange of documents and information to expedite the arbitration."

61.    None of the documents KDSC produced during discovery suggested that the Customers had been informed that KDSC advanced them any money to pay their putative margin debts to SALI or that they were indebted to KDSC.

62.    Despite the mandate of NASD Rule 10321(b), and despite my repeated entreaties, KDSC never sought to narrow or otherwise resolve any dispute it purported to have with any of the Customers' information requests.

63.    The Customers were thus compelled to make a motion seeking compelled production of the requested information. A true copy of the Customers' motion to compel discovery is attached to this Declaration as Exhibit 8.

64.    In opposing that motion, KDSC never sought to establish that the Customers' requests were non-specific or irrelevant, nor did it argue that the Customers failed to afford them a reasonable time to respond. A true copy of KDSC's response to the Customers' motion to compel discovery is attached to this Declaration as Exhibit 9.

65.    For the most part, KDSC refused to produce information relevant to the Customers' counterclaims and third party claims because – without having sought or obtained any determination from the Panel – it summarily and unilaterally characterized those claims as "frivolous."

66.    However, no motion to dismiss or for summary adjudication of those purportedly "frivolous" claims had ever been filed by the Brokers.

67.    The merits of the Customers' counterclaims and third-party claims were never briefed or argued.

68.     Yet the Chairman of the Panel, in ruling upon the Customers' motion to compel, apparently accepted KDSC's *ipse dixit* and, for the most part, denied that motion. A true copy of the Chairman's ruling on the Customers' motion to compel discovery is attached to this Declaration as Exhibit 10.

69.     The Panel's chairman even refused to compel KDSC to produce the "presumptively discoverable" information absolutely necessary to the competent prosecution of their counterclaims and third party claims.

70.     The conduct of discovery in the Arbitration was largely committed to the discretion of the Panel or its designee, but the chairman's unexplained refusal to compel production of the "presumptively discoverable" information was manifestly abusive of that discretion.

71.     Of the limited additional information the Panel's chairman did order KDSC to produce, KDSC only produced a portion – contravening not only the chairman's order, but also the NASD's business conduct standards.

72.     The Customers therefore moved for reconsideration of the chairman's order on their motion to compel, and for an order compelling KDSC's compliance with the portion of the order that required some additional discovery, but neither the Panel nor its chairman ever ruled on those motions.  True copies of those motions are attached to this Declaration as Exhibits 11 and 12.

73.     The arbitrators' refusal to compel KDSC even to produce information specified on the pertinent document lists in the NASD's Discovery Guide suggested that they had been persuaded by KDSC's summary, unsupported characterization of the Customers' claims and determined that they would not be presented at the hearing.

74.    Before the chairman's refusal to compel production even of the "presumptively discoverable" information, it remained possible for the Customers to receive the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their Submission Agreement was conditioned, but the decision denying them essential discovery did irreparable, fundamentally unfair, violence to the Customers' ability to proceed.

75.    The arbitrators' discovery decision effectively disposed of the Customers' counterclaims and third party claims.

### Dismissal of Counterclaims & Third Party Claims

76.    If the Customers were to avoid having their viable claims precluded simply because the Chairman declined to order KDSC to satisfy its discovery obligations under the Code, they had to withdraw them and seek judicial recourse before an adverse award was entered.

77.    Consequently, regretfully, and pursuant to Rules 10305 and 10328(c) of the NASD's Code of Arbitration Procedure, the Customers moved to withdraw without prejudice their third party claims and counterclaims on February 24, 2005 – little more than two weeks after I received the discovery order from the NASD.   A true copy of the Customers' motion to withdraw their affirmative claims is attached to this Declaration as Exhibit 13.

78.    It was the Brokers who prevented arbitration of those claims by interposing procedural barriers that ultimately caused the Customers to seek leave to withdraw those claims without prejudice.

79.     Because the discovery rulings had denied them the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their Submission Agreement was conditioned, the Customers intended to reassert their third party claims and (to the extent arbitration thereof was not compulsory) their counterclaims in a judicial forum.

80.     The Customers moved before the hearing – and thus before the issuance of any award – to withdraw their affirmative claims and pursue their judicial remedies, so as to preclude any *res judicata* effect attaching to any Award with respect to those claims.

81.     The Customers were not looking for a more favorable forum after receiving an unfavorable decision on the merits – they were (and still are) seeking **SOME** forum in which their counterclaims and third party claims might be aired fairly and completely.

82.     The arbitrators' discovery decisions and subsequent dismissal of the Customers' affirmative claims had effectively closed the doors of the NASD's forum to those claims.

83.     The Panel not only denied the Customers' motion to withdraw their counterclaims and third party claims without prejudice, but it went so far as to order, *sua sponte,* that those claims be dismissed with prejudice.

84.     The Brokers had not requested dismissal with prejudice in their opposition to the Customers' motion, and the Customers certainly had not requested that those claims be dismissed with prejudice.

85      The Brokers had never moved to dismiss as factually or legally insufficient the Customers' counterclaims and third party claims, the Customers had never been called upon or afforded an opportunity to explain the specifics of those claims to the Panel, and the Customers had not been afforded notice that dismissal with prejudice was an option that might be considered by the Panel.

86.     Rule 10305(b) of the NASD's Code of Arbitration Procedure – the only provision allowing dismissal of claims with prejudice and without a hearing on their merits – limits that power of the Panel to instances where it is necessary "as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective."

87.     Before the Panel purported to dismiss the Customers' counterclaims and third party claims with prejudice, the Customers had not been sanctioned in the Arbitration, so it logically follows that no lesser sanction could have "proven ineffective."

88.     Indeed, before the Panel purported to dismiss the Customers' counterclaims and third party claims with prejudice, the Customers had never been guilty of a "willful and intentional material failure to comply with an order of the arbitrator(s)", and the Panel's order dismissing their claims did not find that there had been such a failure.

89.     In this case, moreover, the Customers were not given any opportunity to brief or argue any motion to dismiss their counterclaims and third-party claims with prejudice; indeed, no such motion was ever filed.

90.     I am informed and believe, and I therefore aver, that the members of the Panel were piqued and offended by the grounds (that they had been deprived of the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their Submission Agreement was conditioned) the Customers offered for seeking leave to withdraw without prejudice their counterclaims and third party claims.

91.    I am further informed and believe, and I therefore aver, that the Panel's dismissal with prejudice of the Customers' affirmative claims was an arbitrary, capricious, whimsical, and vindictive retaliation for an honest statement of the Customers' belief that they were not being afforded a fair and complete opportunity to present those claims.

92.    The Panel paid lip service to the applicability of Rule 10305 – and then ignored it – when it dismissed the counterclaims and third party claims with prejudice.

94.    Though the plain text of that NASD Rule 10305 – which is incorporated into the operative contracts – deprived the arbitrators of any power, they nonetheless claimed to be "within [their] rights under rule 1035 – 10305" in doing so. Ex. 22 at 18-20.

95.    The order purporting to dismiss the counterclaims and third party claims with prejudice was interlocutory until it was incorporated into the Award, so the Customers could not seek its vacation until after the Award was issued.

<p align="center">**Unauthorized Practice of Law**</p>

96.    Pursuant to the standard operating procedures of the NASD, the hearing in the Arbitration was to be held in Boston.

97.    After the Panel set the initial date for the hearing, KDSC and the Brokers made clear that they would be represented at that hearing by attorneys who are not licensed to practice law in this Commonwealth. The lead attorney was to be Kashner's son-in-law, Marc J. Ross, of the New York Bar.

98.     Believing that participation by those lawyers in the hearing would violate Rule 5.5(a) of the Massachusetts Rules of Professional Conduct, concerned that participation by the Customers' counsel in that hearing with knowledge of that apparent violation would itself violate Rule 5.5(b) of the Rules of Professional Conduct, and mindful that the Chief Judge of this Court had recently certified similar issues to the SJC (*see In re Lucas,* 317 B.R. 195, 215 (D. Mass. 2004)), the Customers filed a motion asking the Panel to stay the arbitration pending the SJC's resolution of the certified issues or disqualify the Brokers' counsel from the Arbitration.  A true copy of that motion is attached to this Declaration as Exhibit 14.

99.     The Panel's Chairman denied that motion without explanation.

100.    The NASD subsequently issued a policy statement consistent with the Customers' position concerning the unauthorized practice of law issue in the Arbitration, so the Customers moved for reconsideration of the chairman's decision.  A true copy of the Customers' motion for reconsideration is attached to this Declaration as Exhibit 15.

101.    The Panel denied that motion.

102.    With the law remaining unsettled, and with the continued possibility that they might unwillingly but knowingly abet the unauthorized practice of law at the hearing, the Customers sought a declaratory judgment from a single justice of the SJC.  A true copy of the Customers' amended complaint at the SJC is attached to this Declaration as Exhibit 16.

103.    The single justice (Cordy, J.) accepted the Customers' reasoning but nonetheless denied their request for a declaratory judgment because he felt that strict application of Mass. R. Prof. C. 5.5(a) under the circumstances of the Arbitration would produce "too harsh a result."  A true copy of the single justice's decision is attached to this Declaration as Exhibit 17.

104.    The Customers appealed the single justice's decision to the full SJC.  A true copy of their brief is attached to this Declaration as Exhibit 18.

105.    In the *Mscisz* case, the SJC repeatedly declined to address the refusal to postpone issue.  The issue was raised in the Customers' brief (ex. 18 at 5, 36-38) but not in the SJC's decision.

106.    The Customers moved for rehearing, but that petition was denied without explanation.  True copies of the Customers' petition for rehearing and the SJC's ruling thereupon are attached to this Declaration as Exhibits 19 and 20, respectively.

### Other Pre-Hearing Procedural Defects

107.    Because discovery motions remained outstanding, and because they wanted to establish definitively the status of their claims and counterclaims, the Customers – as was their absolute right under Rule 10321(d) of the NASD's Code of Arbitration Procedure – requested a pre-hearing conference to discuss those and other issues before final preparations for the hearings had been made.  A true copy of the Customers' request for a prehearing conference is attached to this Declaration as Exhibit 21.

108.    The Panel – despite the clear requirement of Rule 10321(d) – did not hold the pre-hearing conference the Customers had requested on May 11, 2005.  Nor did the Panel even acknowledge that request.

### The Hearing

109.    Neither during discovery nor when Rule 10321(c) of the NASD's Code of Arbitration Procedure ("NASD R. 10321(c)") required it to disclose hearing exhibits did KDSC come forward with any documents suggesting that it was changing course, and that its putative standing was based on a subrogation theory or some assignment of KDSC's rights.

110.    The Customers therefore prepared for the hearing as if KDSC's operative theory was that it was a party to the Client Agreements.

111.    Without holding the requested pre-hearing issue to resolve unresolved issues, the Panel commenced the hearing as scheduled on May 17, 2005, and the hearing continued through the morning of May 18, 2005.  A true copy of the transcript from the May 17 session is attached to this Declaration as Exhibit 22, and a true copy of the transcript from the May 18 session is attached as Exhibit 23.

112.    Although the hearing was held in Boston, the Brokers' case was presented by an attorney not licensed to practice in the Commonwealth of Massachusetts.

113.    Steven, Mark, Varchetto and KDSC's President, Melissa Rothenbach ("Rothenbach"), were the only witnesses to testify during the hearing.

114.    Because they had been denied a fair opportunity to present the Brokers' misconduct to the Panel, the Customers' presentation was focused on the "real party in interest" defense of which the Brokers had been on notice since August 2004.

115.    At the hearing, I succinctly laid out the "real party in interest" defense during my opening statement.  Ex. 22 at 33-35.  A true copy of the PowerPoint presentation I displayed during that opening is attached to this Declaration as Exhibit 24.

116.    Varchetto and Rothenbach consistently admitted the factual predicates of the Customers' "real party in interest" defense.  Ex. 22 at 153-163, 165-208.

117.    The testimony of Mark and Steven also lent support to that theory.  Ex. 22 at 77-85, 120-126.

118.    KDSC did not adduce evidence establishing a contract between KDSC and the Customers or an account due and owing to KDSC by the Customers.

119.    The Brokers did not even attempt to establish the elements of a fraud claim they had asserted against Mark and Lynda.

120.    Varchetto offered no testimony concerning any putative assignment, subrogation or other indirect theory giving KDSC standing to recover from the Customers, and KDSC had not given notice of any such indirect standing theory in advance of the hearing.

121.    During the testimony of Rothenback, the last witness in the hearing, KDSC's counsel came forward with a document – created and executed that very day – which purported to assign SALI's putative rights against the Customers to KDSC.  Ex. 22 at 191, 201-202

122.    Rothenbach acknowledged that, prior to the mid-hearing assignment of the putative claims, SALI had remained the owner of those claims.  *Id.* at 196-198.

123.    Although the assignment had been received by KDSC and its counsel at 1:45 p.m. on the day of the hearing, the Brokers and their counsel waited until the very end of the testimony – nearly two hours later – to reveal its existence.  *Id.*

124.    The Brokers offered no explanation why they and their counsel held back on this assignment or their non-communicated claim of subrogation.

125.    Despite these material failures in the Brokers' evidence, the Panel denied the Customers' oral motion to dismiss the Arbitration, which motion was based on KDSC's failure to make out a *prima facie* case.

126.    Although KDSC had known for 9 months of the Customers' "real party in interest" defense, and despite the requirement in Rule 10321(c) of the NASD's Code of Arbitration Procedure that the parties exchange exhibits at least 20 days before the hearing, the Brokers and their counsel had never previously produced – or even intimated the existence of – any assignment of SALI's putative claims against the Customers.

127. Fairness to the Customers required notice of the claims being asserted against them and a meaningful opportunity to defend themselves, and KDSC's "sandbagging" tactics deprived the Customers of both.

128. KDSC's counsel sought to justify his 180 degree change in course with what he characterized as an oral motion to amend KDSC's Statement of Claim to conform to the evidence.

129. KDSC's "sandbagging" of the Customers was consequential. Under Section 8-5-25 of the Alabama Code, which governed the Client Account Agreements, KDSC would have taken SALI's claims against the Customers "subject to all payments, setoffs, and discounts" they had against SALI, but the last-minute assignment prevented the Customers from ascertaining whether they had such offsetting claims against SALI, from taking discovery concerning those offsets or the validity of the putative assignment, and from presenting relevant evidence at the hearing.

130. Additionally, the Customers and I made strategic and tactical decisions based on their assumption that KDSC would seek to prove the case it pled, and the Customers expended significant resources preparing and proving their "real party in interest" defense.

131. The Panel nonetheless allowed KDSC's post-testimony motion to amend its pleading, and the Panel accepted the last-minute assignment into evidence over the Customers' objection. Ex. 22 at 194; ex. 23 at 5-14

132. At the hearing, KDSC also came forward with an affidavit purporting to justify its claim for attorneys' fees and collection costs.

133.    Nevertheless, not only did the Brokers hold back the putative assignment from SALI until the fifty-ninth minute of the eleventh hour, but they also failed to provide the Customers with the affidavit or supporting documentation on which they purported to base their claim for attorneys' fees and collection costs.  Ex. 22 at 209-214.

134.    The Customers objected to the affidavit and the materials appended to it, because they contained information and incorporated documents that had been in KDSC's possession long before the 20-day deadline for the exchange of exhibits specified by Rule 10321(c) of the NASD's Code of Arbitration Procedure, and KDSC's decision to spring that evidence on the Customers at the hearing deprived them of any ability to scrutinize and counter the affidavits and exhibits.

135.  The Panel nonetheless received the affidavit and exhibits thereto into evidence.

136.    If the Court deems it necessary for the Customers to adduce subjective evidence that the "sandbagging" tactics of the Brokers and their counsel was subjectively underhanded and conniving, instead of relying on the objective indicia detailed in paragraphs 25 through 44 and 110 through 135 of this Declaration, it will be necessary to conduct limited discovery on that issue.

137.    I cannot plumb the states of mind of KDSC and their counsel without first having an opportunity to examine them.  Document requests to KDSC and SALI, Rule 30(b)(6) depositions of those two firms, and limited depositions of two of the Brokers' attorneys, Marc Ross and Richard Babnick, should adduce adequate subjective evidence in relatively short order.

138.    At the end of the hearing, when reading a script mandated by the NASD, the Panel's chairman asked the Customers' attorney "to state affirmatively whether [the Customers] had a full and fair opportunity to be heard" and, consistent with the averments set forth in the Customers' Counterclaims, I gave the only answer I could truthfully provide under the circumstances – "no."  Ex. 23 at 51.

139.    While the Customers concede that it would be inappropriate to depose the arbitrators with respect to their decision-making process, their arbitrary discovery ruling, their chimerical dismissal of the counterclaims and third-party claims, and apparent pique in reaction to the grounds given by the Customers for their motion to withdraw their affirmative claims and the honest response by their counsel to a question concerning the fairness of the proceedings, limited discovery would be appropriate on the issue of whether the arbitrators were partial.

140.    Again, as with the subjective intentions of the Brokers and their counsel, the Customers cannot definitively establish the arbitrators' state of mind unless they are examined under oath.

**The Award**

141.    On June 17, 2005, the Panel issued its Award and:

    a.    found the Customers jointly and severally liable to KDSC for $421,000.00 (including attorneys' fees) in what the Panel characterized as compensatory damages;

    b.    reiterated and incorporated the dismissal with prejudice of the Customers counterclaims and third party claims; and

    c.    directed the Customers, jointly and severally, to pay $6,900.00 in forum fees.

A true copy of the Award is attached to this Declaration as Exhibit 25.

142.    KDSC had never pled or asserted a lawful basis for making the Customers jointly and severally liable with respect to the compensatory damages.

143.    The debt KDSC alleged to be owed by Steven was – as it properly should have been – pled and always treated as separate from the debt allegedly owed by Mark and Lynda.

144.    Although the arbitration arose from distinct margin accounts – one involving Steven, and the other involving Mark and Lynda – the arbitrators' Award held the Customers "jointly and severally liable" for compensatory damages in the amount of $421,000.00.

145.    I received a copy of the Award on the afternoon of June 20, 2005.

Executed at Lynn, Massachusetts on this ninth day of June, 2006.

*/s/ William P. Corbett, Jr.*
_____
William P. Corbett, Jr.

## CERTIFICATE OF SERVICE

Pursuant to Local Rules 5.4(c) and 5.2(b), I hereby certify that this document, which is being filed with the Court through its ECF system, will be sent electronically to Howard M. Smith, Esquire, a registered ECF participant and attorney of record for the plaintiffs/defendants-in-counterclaim, on this ninth day of June, 2006.

*/s/ William P. Corbett, Jr.*
_____
William P. Corbett, Jr.


# Code of Arbitration Procedure

## 10000. Code of Arbitration Procedure

### 10100. Administrative Provisions

IM-10100. Failure to Act Under Provisions of Code of Arbitration Procedure
10101. Matters Eligible for Submission
10102. National Arbitration and Mediation Committee
10103. Director of Arbitration
10104. Composition and Appointment of Panels
IM-10104. Arbitrators' Honorarium
10105. Non-Waiver of Association Objects and Purposes
10106. Legal Proceedings

### 10200. Industry and Clearing Controversies

10201. Required Submission
10202. Composition of Panels
10203. Simplified Industry Arbitration
10204. Applicability of Uniform Code
10205. Schedule of Fees for Industry and Clearing Controversies
10210. Statutory Employment Discrimination Claims
10211. Special Arbitrator Qualifications for Employment Discrimination Disputes
10212. Composition of Panels
10213. Discovery
10214. Awards
10215. Attorneys' Fees
10216. Coordination of Claims Filed in Court and in Arbitration

### 10300. Uniform Code of Arbitration

10301. Required Submission
10302. Simplified Arbitration
IM-10302. Related Counterclaim
10303. Hearing Requirements-Waiver of Hearing
10304. Time Limitation Upon Submission
10305. Dismissal of Proceedings
10306. Settlements
10307. Tolling of Time Limitation(s) for the Institution of Legal Proceedings and
       Extension of Time Limitation(s) for Submission to Arbitration
10308. Selection of Arbitrators
10309. Composition of Panels
10310. Notice of Selection of Arbitrators
10311. Peremptory Challenge
10312. Disclosures Required of Arbitrators and Director's Authority to Disqualify
10313. Disqualification or Other Disability of Arbitrators
10314. Initiation of Proceedings
10315. Designation of Time and Place of First Meeting
10316. Representation by Counsel
10317. Attendance at Hearings
IM-10317. Closing Arguments
10318. Failure to Appear
10319. Adjournments
10320. Acknowledgement of Pleadings
10321. General Provisions Governing Pre-Hearing Proceedings
10322. Subpoenas and Power to Direct Appearances
10323. Evidence
10324. Interpretation of Provisions of Code and Enforcement of Arbitrator Rulings
10325. Determination of Arbitrators
10326. Record of Proceedings
10327. Oaths of the Arbitrators and Witnesses
10328. Amendments

10329. Reopening of Hearings
10330. Awards
10331. Incorporation by Reference
10332. Schedule of Fees for Customer Disputes
10333. Member Surcharge and Process Fees
10334. Direct Communication Between Parties and Arbitrators
10335. Temporary Injunctive Orders; Requests for Permanent Injunctive Relief

**10400. Mediation Rules**

10401. Scope and Authority
10402. Submission of Eligible Matters
10403. Arbitration Proceedings
10404. Mediator Selection
10405. Limitation on Liability
10406. Mediation Ground Rules
10407. Mediation Fees

# 10100. Administrative Provisions

# IM-10100. Failure to Act Under Provisions of Code of Arbitration Procedure

It may be deemed conduct inconsistent with just and equitable principles of trade and a violation of Rule 2110 for a member or a person associated with a member to:

(a) fail to submit a dispute for arbitration under the NASD Code of Arbitration Procedure as required by that Code;

(b) fail to comply with any injunctive order issued pursuant to Rule 10335;

(c) fail to appear or to produce any document in his possession or control as directed pursuant to provisions of the NASD Code of Arbitration Procedure;

(d) fail to honor an award, or comply with a written and executed settlement agreement, obtained in connection with an arbitration submitted for disposition pursuant to the procedures specified by the National Association of Securities Dealers, Inc., the New York, American, Boston, Cincinnati, Chicago, or Philadelphia Stock Exchanges, the Pacific Exchange, Inc., the Chicago Board Options Exchange, the Municipal Securities Rulemaking Board, or pursuant to the rules applicable to the arbitration of disputes before the American Arbitration Association or other dispute resolution forum selected by the parties where timely motion has not been made to vacate or modify such award pursuant to applicable law;

(e) fail to comply with a written and executed settlement agreement, obtained in connection with a mediation submitted for disposition pursuant to the procedures specified by the National Association of Securities Dealers, Inc.; or

(f) fail to waive the California Rules of Court, Division VI of the Appendix, entitled, "Ethics Standards for Neutral Arbitrators in Contractual Arbitration" (the "California Standards"), if application of the California Standards has been waived by all parties to the dispute who are:

1. customers with a claim against a member or an associated person;
2. associated persons with a claim against a member or an associated person;
3. members with a claim against another member; or
4. members with a claim against an associated person that relates exclusively to a promissory note.

Written waiver by such parties shall constitute and operate as a waiver for all member firms or associated persons against whom the claim has been filed. This rule applies to claims brought in California against all member firms and associated persons, including terminated or otherwise inactive member firms or associated persons.

All awards shall be honored by a cash payment to the prevailing party of the exact dollar amount stated in the award. Awards may not be honored by crediting the prevailing party's account with the dollar amount of the award, unless authorized by the express terms of the award or consented to in writing by the parties. Awards shall be honored upon receipt thereof, or within such other time period as may be prescribed by the award.

Action by members requiring associated persons to waive the arbitration of disputes contrary to the provisions of the Code of Arbitration Procedure shall constitute conduct that is inconsistent with just and equitable principles of trade and a violation of Rule 2110.

*[Adopted eff. May 1, 1973; amended July 1, 1987; amended by SR-NASD-90-03 eff. June 18, 1990; amended by SR-NASD-90-62 eff. May 7, 1991; amended by SR-NASD-95-20 eff. Oct. 2, 1995; amended by SR-NASD-93-38 eff. Jan. 3, 1996; amended by SR-NASD-99-19 eff. May 17, 1999; amended by SR-NASD-2002-126 eff. September 30, 2002; amended by SR-NASD-2003-64 eff. March 31, 2003; amended by SR-NASD-2003-106 eff. July 14, 2003; amended by SR-NASD-2003-153 eff. Oct. 6, 2003; amended by SR-NASD-2004-040 eff. March 31, 2004; amended by SR-NASD-2004-126 eff. September 30, 2004 (extending the effectiveness of paragraph (f) to March 31, 2005).]*

## 10101. Matters Eligible for Submission

This Code of Arbitration Procedure is prescribed and adopted pursuant to Article VII, Section 1(a)(iv) of the By-Laws of the Association for the arbitration of any dispute, claim, or controversy arising out of or in connection with the business of any member of the Association, or arising out of the employment or termination of employment of associated person(s) with any member, with the exception of disputes involving the insurance business of any member which is also an insurance company:

   (a) between or among members;
   (b) between or among members and associated persons;
   (c) between or among members or associated persons and public customers, or others; and
   (d) between or among members, registered clearing agencies with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures, and participants, pledgees, or other persons using the facilities of a registered clearing agency, as these terms are defined under the rules of such a registered clearing agency.

*[Amended eff. May 7, 1991; Oct. 1, 1993; amended by SR-NASD-98-86 eff. Nov.19,1998.]*

## 10102. National Arbitration and Mediation Committee

   (a) The NASD Dispute Resolution Board of Directors, following the annual election of its members by the NASD Board of Governors, shall appoint a National Arbitration and Mediation Committee of such size and composition, including representation from the public at large, as it shall deem appropriate and in the public interest. The Chairman of the Committee shall be named by the Chairman of the NASD Dispute Resolution Board. The said Committee shall establish and maintain rosters of neutrals composed of persons from within and without the securities industry.

   (b) The Committee shall have the authority to recommend to the NASD Dispute Resolution Board appropriate Rules, regulations, and procedures to govern the conduct of all arbitration, mediation, and other dispute resolution matters before the Association. All Rules, regulations, and procedures and amendments thereto presented by the Committee must be by a majority vote of all the members of the said Committee. It also shall have such other power and authority as is necessary to effectuate the purposes of this Code.

   (c) The Committee shall meet at least once each year and at such other times as are deemed necessary by the Committee.

*[Amended by SR-NASD-94-77 eff. Feb. 8, 1995; amended by SR-NASD-98-48 eff. Nov. 17, 1998; amended by SR-NASD-99-21 eff. July 9, 2000.]*

## 10103. Director of Arbitration

The Board of Governors of the Association shall appoint a Director of Arbitration (Director) who shall be charged with the performance of all administrative duties and functions in connection with matters submitted for arbitration pursuant to this Code. The Director shall be directly responsible to the National Arbitration and Mediation Committee and shall report to it at periodic intervals established by the Committee and at such other times as called upon by the Committee to do so. The duties and functions of the Director may be delegated by the Director, as appropriate. In the event of the incapacitation, resignation, removal, or other permanent or indefinite inability of the Director to perform the duties and responsibilities of the Director, the President or an Executive Vice President of the Association may appoint an interim Director.

*[Amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## 10104. Composition and Appointment of Panels

Except as otherwise specifically provided in Rule 10308, the Director shall compose and appoint panels of arbitrators from the existing pool of arbitrators of the Association to conduct the arbitration of any matter which shall be eligible for submission under this Code.

*[Amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## IM-10104. Arbitrators' Honorarium

All persons selected to serve as arbitrators pursuant to the Association's Code of Arbitration Procedure shall be paid an honorarium for each hearing session (including a prehearing conference) in which they participate.

The honorarium shall be $200 for each hearing session and $75 per day additional honorarium to the chairperson of the panel. The honorarium for a case not requiring a hearing shall be $125.

The honorarium for travel to a canceled hearing session shall be $50. If a hearing session other than a prehearing conference is adjourned pursuant to Rule 10319(d), each arbitrator shall receive an additional honorarium of $100.

*[Adopted eff. June 14, 1977; amended eff. May 30, 1980; Feb. 8, 1982; Jan. 14, 1987; amended by SR-NASD-97-79 eff. March 18, 1999.]*

## 10105. Non-Waiver of Association Objects and Purposes

The submission of any matter to arbitration under this Code shall in no way limit or preclude any right, action or determination by the Association which it would otherwise be authorized to adopt, administer or enforce. If any matter comes to the attention of an arbitrator during and in connection with the arbitrator's participation in a proceeding, either from the record of the proceeding or from material or communications related to the proceeding, that the arbitrator has reason to believe may constitute a violation of the Association's Rules or the federal securities laws, the arbitrator may initiate a referral of the matter to the Association for disciplinary investigation; provided, however, that any such referral should only be initiated by an arbitrator after the matter before him has been settled or otherwise disposed of, or after an award finally disposing of the matter has been rendered pursuant to Rule 10330 of the Code.

*[Amended by SR-NASD-93-75 eff. Aug. 15, 1994.]*

## 10106. Legal Proceedings

No party shall, during the arbitration of any matter, prosecute or commence any suit, action, or proceeding against any other party touching upon any of the matters referred to arbitration pursuant to this Code.

## 10200. Industry and Clearing Controversies

## 10201. Required Submission

(a) Except as provided in paragraph (b) or Rule 10216, a dispute, claim, or controversy eligible for submission under the Rule 10100 Series between or among members and/or associated persons, and/or certain others, arising in connection with the business of such member(s) or in connection with the activities of such associated person(s), or arising out of the employment or termination of employment of such associated person(s) with such member, shall be arbitrated under this Code, at the instance of:

1. a member against another member;
2. a member against a person associated with a member or a person associated with a member against a member; and
3. a person associated with a member against a person associated with a member.

(b) A claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute is not required to be arbitrated. Such a claim may be arbitrated only if the parties have agreed to arbitrate it, either before or after the dispute arose.

(c) Any dispute, claim or controversy involving an act or failure to act by a clearing member; a registered clearing agency; or participants, pledgees, or other persons using the facilities of a registered clearing agency, under the rules of any registered clearing agency with which the Association has entered into an agreement to utilize the Association's arbitration facilities and procedures shall be arbitrated in accordance with such agreement and the rules of such registered clearing agency.

*[Amended eff. Oct. 1, 1993; amended by SR-NASD-97-77 eff. Jan. 1, 1999; amended by SR-NASD-99-08 eff. Jan 18, 2000. Selected Notice to Members: 99-96.]*

## 10202. Composition of Panels

(a) In disputes subject to arbitration that arise out of the employment or termination of employment of an associated person, and that relate exclusively to disputes involving employment contracts, promissory notes or receipt of commissions, the panel of arbitrators shall be appointed as provided by paragraph (b)(1) or (2) or Rule 10203, whichever is applicable. In all other disputes arising out of the employment or termination of employment of an associated person, the panel of arbitrators shall be appointed as provided by Rule 10212, 10302 or Rule 10308, whichever is applicable.

(b)   (1) Composition of Arbitration Panel

(A) Claims of $50,000 or Less
If the amount of a claim is $50,000 or less, the Director shall appoint an arbitration panel composed of one non-public arbitrator, unless the parties agree to the appointment of a public arbitrator.

(i) If the amount of a claim is $25,000 or less and an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of three non-public arbitrators, unless the parties agree to a different panel composition.

(ii) If the amount of a claim is greater than $25,000 and not more than $50,000 and a party in its initial filing or an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of three non-public arbitrators, unless the parties agree to a different panel composition.

(B) Claims of More than $50,000
If the amount of a claim is more than $50,000, the Director shall appoint an arbitration panel composed of three non-public arbitrators, unless the parties agree to a different panel composition.

(2) Except as otherwise provided in paragraph (a), in all arbitration matters between or among

members and/or persons associated with members and where the amount in controversy exceeds $50,000, exclusive of attendant costs and interest, a panel shall consist of three arbitrators, all of whom shall be non-public arbitrators.

(c) In proceedings relating to injunctions under Rule 10335, the provisions of Rule 10335 shall supersede the provisions of this Rule.

(d) Except as otherwise provided in this Rule or Rule 10203, the provisions of Rule 10308 shall apply to intra-industry disputes.

*[Amended eff. May 10, 1989; Oct. 1, 1993; amended by SR-NASD-97-22 eff. Nov. 17, 1998; amended by SR-NASD-98-64 eff. Nov. 17, 1998; amended by SR-NASD-99-08 eff. Jan 18, 2000. Selected Notice to Members: 99-96.]*

## 10203. Simplified Industry Arbitration

(a) Any dispute, claim, or controversy arising between or among members or associated persons submitted to arbitration under this Code involving a dollar amount not exceeding $25,000, exclusive of attendant costs and interest, shall be resolved by an arbitration panel constituted pursuant to the provisions of subparagraph (1) hereof solely upon the pleadings and documentary evidence filed by the parties, unless one of the parties to the proceeding files with the Office of the Director of Arbitration within ten (10) business days following the filing of the last pleading a request for a hearing of the matter.

1. In any proceeding pursuant to this Rule, an arbitration panel shall consist of a single non-public arbitrator.
2. Notwithstanding the provisions of this Rule, any member of an arbitration panel constituted pursuant to this Rule shall be authorized to request the submission of further documentary evidence in a proceeding and any such panel may by majority vote call and conduct a hearing if such is deemed to be necessary.

(b) All awards rendered in proceedings pursuant to paragraph (a) hereof shall be made within thirty (30) business days from the date the arbitrators review all of the written statements, documents and other evidentiary material filed by the parties and have declared the matter closed.

*[Amended eff May 10, 1989; amended by SR-NASD-97-22 eff. Nov. 17, 1998; amended by SR-NASD-98-64 eff. Nov. 17,1998.]*

## 10204. Applicability of Uniform Code

Except as otherwise provided in the Rule 10200 Series, the Rules and procedures applicable to arbitrations concerning industry and clearing controversies shall be those set forth hereinafter under the Rule 10300 Series.

## 10205. Schedule of Fees for Industry and Clearing Controversies

(a) At the time of filing a Claim, Counterclaim, Third-Party Claim, or Cross-Claim in an industry or clearing controversy which is required to be submitted to arbitration before the Association as set forth in Rule 10201, above, a party who is a member shall pay a non-refundable filing fee and shall remit a hearing session deposit to the Association in the amounts stated in paragraph (k) unless such fee or deposit is specifically waived by the Director of Arbitration. A party who is an associated person shall pay a non-refundable filing fee and shall pay a hearing session deposit in the amounts specified for customer claimants in Rule 10332. If the associated person is a joint claimant with a member, the member shall pay a non-refundable filing fee and shall pay a hearing session deposit in the amounts specified in paragraph (k) of this Rule. Where multiple hearing sessions are required, the arbitrator(s) may require any of the parties to make additional hearing deposits for each additional hearing session. In no event shall the amount deposited by all parties per hearing session exceed the amount of the largest initial hearing deposit made by any party under paragraph (k) below.

(b) A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with an arbitrator, which lasts four (4) hours or less. The forum fee for a pre-hearing conference with an arbitrator shall be the amount set forth in paragraph (k) below as a hearing session

deposit for a hearing with a single arbitrator.

(c) The arbitrators, in their award, shall determine the amount chargeable to the parties as forum fees and shall determine who shall pay such forum fees. Forum fees chargeable to the parties shall be assessed on a per hearing session basis and the aggregate for each hearing session may equal but shall not exceed the amount of the largest initial hearing deposit deposited by any party, except in a case where claims have been joined subsequent to filing in which case hearing session fees shall be computed as provided in paragraph (d). The arbitrator(s) may determine in the award that a party shall reimburse to another party any non-refundable filing fee it has paid. Amounts deposited by a party shall be applied against forum fees, if any. In addition to forum fees, the arbitrator(s) may determine in the award the amount of costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 and, unless applicable law directs otherwise, other costs and expenses of the parties and arbitrator(s) which are within the scope of the agreement of the parties. The arbitrator(s) shall determine by whom such costs shall be borne. If the hearing session fees are not assessed against a party who had made a hearing deposit, the hearing deposit will be refunded unless the arbitrators determine otherwise.

(d) For claims filed separately which are subsequently joined or consolidated under Rule 10314(d) of this Code, the hearing deposit and forum fees assessable per hearing session after joinder or consolidation shall be based on the cumulative amount in dispute. The arbitrator(s) shall determine by whom such fees shall be borne.

(e) If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the non-refundable filing fee assessed on a party who is a member shall be $500. If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the hearing session deposit to be remitted by a party shall be $1000. These amounts may be adjusted by the Director of Arbitration or the panel of arbitrators may require the maximum amount specified in the schedule.

(f) The Association shall retain the total initial amount deposited as hearing session deposits by all the parties in any matter submitted and settled or withdrawn within eight business days of the first scheduled hearing session other than a pre-hearing conference.

(g) Any matter submitted and thereafter settled or withdrawn subsequent to the commencement of the first hearing session, including a pre-hearing conference with an arbitrator, shall be subject to an assessment of forum fees and costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 based on hearing sessions held and scheduled within eight business days after the Association receives notice that the matter has been settled or withdrawn. The arbitrator(s) shall determine by whom such fees and costs shall be borne.

(h) A party seeking a temporary injunctive order in court pursuant to Rule 10335 shall pay a total non-refundable surcharge of $2,500 at the time the party files its Statement of Claim and Request for Permanent Relief as required by Rule 10335. Where more than one party seeks such relief, all such parties shall pay the surcharge. The arbitrator may determine that a party shall reimburse another party for part or all of any non-refundable surcharge it has paid. These surcharge fees shall be in addition to all other non-refundable filing fees, hearing deposits, or costs which may be required.

(i) Reserved

(j) Reserved

(k) Schedule of Fees

### Schedule of Fees

| Amount in Dispute (Exclusive of Interest and Expenses) | Claim Filing Fee | Deposit for Cases to be Decided on the Paper Record | Hearing Session Deposit | |
|---|---|---|---|---|
| | | | 1 Arb.[1] | 3 Arbs.[2] |
| $.01-$1,000 | $200 | $25 | $25 | NA |
| $1000.01-$2,500 | $300 | $50 | $50 | NA |
| $2,500.01-$5,000 | $400 | $125 | $125 | NA |
| $5,000.01-$10,000 | $500 | $250 | $250 | NA |
| $10,000.01-$25,000 | $750 | $300 | $450 | NA |
| $25,000.01-$30,000 | $1,000 | NA | $450 | $600 |
| $30,000.01-$50,000 | $1,000 | NA | $450 | $600 |
| $50,000.01-$100,000 | $1,000 | NA | $450[3] | $750 |
| $100,000.01-$500,000 | $1,000 | NA | $450[4] | $1,125 |

| $500,000.01-$1,000,000 | $1,250 | NA | $450[4] | $1,200 |
| $1,000,000.01-$5,000,000 | $2,000 | NA | $450[4] | $1,200 |
| $5,000,000.01-$10,000,000 | $2,500 | NA | $450[4] | $1,200 |
| Over $10,000,000 | $5,000 | NA | $450[4] | $1,200 |

---

[1] The dispute is resolved by one arbitrator per hearing session, including pre-hearing conferences.

[2] The dispute is resolved by three arbitrators per hearing session.

[3] Fee applies only to pre-hearing conferences with a single arbitrator and to disputes resolved by one arbitrator per hearing session under the Rule 10210 Series.

[4] Fee applies only to pre-hearing conferences with a single arbitrator.

*[Added eff. May 10, 1989; amended by SR-NASD-90-03 eff. June 18, 1990; amended by SR-NASD-94-75 eff. Jan. 1, 1995; amended by SR-NASD-94-10 eff. May 2, 1995; amended by SR-NASD-95-25 eff. Aug. 1, 1995; amended by SR-NASD-93-38 eff. Jan. 3, 1996; amended by SR-NASD-97-79 eff. Mar. 18, 1999; amended by SR-NASD-00-11 eff. November 1, 2000; amended by SR-NASD-00-65 eff. Dec. 31, 2000; amended by SR-NASD-00-02 eff. Mar. 25, 2002.]*

## 10210. Statutory Employment Discrimination Claims

The Rule 10210 Series shall apply only to disputes that include a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute. The Rule 10210 Series shall supersede any inconsistent Rules contained in this Code.

*[Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.]*
Selected Notice to Members: 99-96.

## 10211. Special Arbitrator Qualifications for Employment Discrimination Disputes

(a) Minimum Qualifications for All Arbitrators
Only arbitrators classified as public arbitrators as provided in Rule 10308 shall be selected to consider disputes involving a claim of employment discrimination, including a sexual harassment claim, in violation of a statute.

(b) Single Arbitrators or Chairs of Three-Person Panels

(1) Arbitrators who are selected to serve as single arbitrators or as chairs of three-person panels should have the following additional qualifications:

(A) law degree (Juris Doctor or equivalent);
(B) membership in the Bar of any jurisdiction;
(C) substantial familiarity with employment law; and
(D) ten or more years of legal experience, of which at least five years must be in either:

(i) law practice;
(ii) law school teaching;
(iii) government enforcement of equal employment opportunity statutes;
(iv) experience as a judge, arbitrator, or mediator; or
(v) experience as an equal employment opportunity officer or in-house counsel of a corporation.

(2) In addition, a chair or single arbitrator with the above experience may not have represented primarily the views of employers or of employees within the last five years. For purposes of this Rule, the term "primarily" shall be interpreted to mean 50% or more of the arbitrator's business or professional activities within the last five years.

(c) Waiver of Special Qualifications
If all parties agree, after a dispute arises, they may waive any of the qualifications set forth in paragraph (a) or (b) above.

*[Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.]*

Selected Notice to Members: 99-96.

## 10212. Composition of Panels

For disputes involving a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute:

(a) Each panel shall consist of either a single public arbitrator or three public arbitrators qualified under Rule 10211, unless the parties agree to a different panel composition.

(b) A single arbitrator shall be appointed to hear claims for $100,000 or less.

(c) A panel of three arbitrators shall be appointed to hear claims for more than $100,000, unless the parties agree to have their case determined by a single arbitrator.

*[Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.]*
Selected Notice to Members: 99-96.


## 10213. Discovery

(a) Necessary pre-hearing depositions consistent with the expedited nature of arbitration shall be available.

(b) The provisions of Rule 10321 shall apply to proceedings under this Rule 10210 Series.

*[Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.]*
Selected Notice to Members: 99-96.


## 10214. Awards

The arbitrator(s) shall be empowered to award any relief that would be available in court under the law. The arbitrator(s) shall issue an award setting forth a summary of the issues, including the type(s) of dispute(s), the damages or other relief requested and awarded, a statement of any other issues resolved, and a statement regarding the disposition of any statutory claim(s).

*[Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.]*
Selected Notice to Members: 99-96.


## 10215. Attorneys' Fees

The arbitrator(s) shall have the authority to provide for reasonable attorneys' fee reimbursement, in whole or in part, as part of the remedy in accordance with applicable law.

*[Adopted by SR-NASD-99-08 eff. Jan. 18, 2000.]*
Selected Notice to Members: 99-96.


## 10216. Coordination of Claims Filed in Court and in Arbitration

(a) Option to Combine Related Claims in Court

(1) (A) If a current or former associated person of a member files a statutory discrimination claim in court against a member or its associated persons, and asserts related claims in arbitration at the Association against some or all of the same parties, a respondent who is named in both proceedings shall have the option to move to compel the claimant to bring the related arbitration claims in the same court proceeding in which the statutory discrimination claim is pending, to the full extent to which the court will accept jurisdiction over the related claims.

(B) The respondent shall notify the claimant in writing, before the time to answer under Rule 10314 has expired, that it is exercising this option and shall file a copy of such notification with the Director. If the respondent files an answer without having exercised this option, it shall have

waived its right to move to compel the claimant to assert related claims in court, except as provided in paragraph (b).

(2) (A) If a member or current or former associated person of a member ("party") has a pending claim in arbitration against a current or former associated person of a member and the current or former associated person thereafter asserts a related statutory employment discrimination claim in court against the party, the party shall have the option to assert its pending arbitration claims and any counterclaims in court.

(B) The party shall notify the current or former associated person in writing, before filing an answer to the complaint in court, that it is exercising this option and shall file a copy of such notification with the Director. If the party files an answer in court without having exercised this option, it shall have waived its right to assert the pending arbitration claim in court.

(C) The party may not exercise this option after the first hearing has begun on the arbitration claim.

(b) Option Extended When Claim is Amended

(1) If the claimant files an amended Statement of Claim adding new claims not asserted in the original Statement of Claim, a respondent named in the amended Statement of Claim shall have the right to move to compel the claimant to assert all related claims in the same court proceeding in which the statutory discrimination claim is pending, to the full extent that the court will accept jurisdiction over the related claims, even if those related claims were asserted in the original Statement of Claim.

(2) The respondent shall notify the claimant in writing, before the time to answer the amended Statement of Claim under Rule 10314 has expired, that it is exercising this option and shall file a copy of such notification with the Director. If the respondent files an answer to the amended Statement of Claim without having exercised this option, it shall have waived its right to move to compel the claimant to assert related claims in court.

(c) Requirement to Combine All Related Claims

If a party elects to require a current or former associated person to assert all related claims in court, the party shall assert in the same court proceeding all related claims that it has against the associated person to the full extent to which the court will accept jurisdiction over the related claims.

(d) Right of Respondent to Remain in Arbitration

(1) If there are multiple respondents and a respondent has exercised an option under paragraph (a) or (b), but another respondent wishes to have the claims against it remain in arbitration, then any remaining party may apply for a stay of the arbitration proceeding.

(2) The arbitration shall be stayed unless the arbitration panel determines that the stay will result in substantial prejudice to one or more of the parties. If a panel has not been appointed, the Director shall appoint a single arbitrator to consider the application for a stay. Such single arbitrator shall be selected using the Neutral List Selection System (as defined in Rule 10308) and is not required to have the special employment arbitrator qualifications described in Rule 10211.

(e) Pre-Filing Certification

(1) Prior to or concurrently with filing a Statement of Claim, a claimant may file with the Director a certification that it had communicated unsuccessfully with the respondent concerning the consolidation of all claims in court prior to filing a Statement of Claim, in an effort to save the expense of arbitration fees. A copy of such certification shall be sent to the respondent at the same time and in the same manner as the filing with the Director.

(2) If, after a certification has been filed, all the respondents later exercise the option to consolidate all claims in court, the Director will return the claimant's filing fee and any hearing session deposits for hearings that have not been held, but will retain the member surcharge and any accrued member process fees. If there are any remaining respondents, the filing fee and any hearing deposits will be adjusted to correspond to the claims against the remaining respondents.

(f) Motion to Compel Arbitration

If a member or a current or former associated person of a member files in court a claim against a member or a current or former associated person of a member that includes matters that are subject to mandatory arbitration, either by the rules of the Association or by private agreement, the defending party may move to compel arbitration of the claims that are subject to mandatory arbitration.

(g) Definitions

For purposes of this Rule:

(1) The term "related claim" shall mean any claim that arises out of the employment or termination of employment of an associated person.
(2) The term "statutory discrimination claim" means a claim alleging employment discrimination, including a sexual harassment claim, in violation of a statute.

# 10300. Uniform Code of Arbitration

## 10301. Required Submission

(a) Any dispute, claim, or controversy eligible for submission under the Rule 10100 Series between a customer and a member and/or associated person arising in connection with the business of such member or in connection with the activities of such associated persons shall be arbitrated under this Code, as provided by any duly executed and enforceable written agreement or upon the demand of the customer. A claim involving a member in the following categories shall be ineligible for submission to arbitration under the Code unless the customer agrees in writing to arbitrate the claim after it has arisen:

1. A member whose membership is terminated, suspended, canceled, or revoked;
2. A member that has been expelled from the NASD; or
3. A member that is otherwise defunct.

(b) Under this Code, the Director of Arbitration, upon approval of the Executive Committee of the National Arbitration and Mediation Committee, or the National Arbitration and Mediation Committee, shall have the right to decline the use of its arbitration facilities in any dispute, claim, or controversy, where, having due regard for the purposes of the Association and the intent of this Code, such dispute, claim, or controversy is not a proper subject matter for arbitration.

(c) Claims which arise out of transactions in a readily identifiable market may, with the consent of the Claimant, be referred to the arbitration forum for that market by the Association.

(d) Class Action Claims

1. A claim submitted as a class action shall not be eligible for arbitration under this Code at the Association.
2. Any claim filed by a member or members of a putative or certified class action is also ineligible for arbitration at the Association if the claim is encompassed by a putative or certified class action filed in federal or state court, or is ordered by a court to an arbitral forum not sponsored by a self-regulatory organization for classwide arbitration. However, such claims shall be eligible for arbitration in accordance with paragraph (a) or pursuant to the parties' contractual agreement, if any, if a claimant demonstrates that it has elected not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.

   Disputes concerning whether a particular claim is encompassed by a putative or certified class action shall be referred by the Director of Arbitration to a panel of arbitrators in accordance with Rule 10302 or Rule 10308, as applicable. Either party may elect instead to petition the court with jurisdiction over the putative or certified class action to resolve such disputes. Any such petition to the court must be filed within ten business days of receipt of notice that the Director of Arbitration is referring the dispute to a panel of arbitrators.
3. No member or associated person shall seek to enforce any agreement to arbitrate against a customer, other member or person associated with a member who has initiated in court a

putative class action or is a member of a putative or certified class with respect to any claims encompassed by the class action unless and until: (A) the class certification is denied; (B) the class is decertified; (C) the customer, other member or person associated with a member is excluded from the class by the court; or (D) the customer, other member or person associated with a member elects not to participate in the putative or certified class action or, if applicable, has complied with any conditions for withdrawing from the class prescribed by the court.

4. No member or associated person shall be deemed to have waived any of its rights under this Code or under any agreement to arbitrate to which it is party except to the extent stated in this paragraph.

*[Amended by SR-NASD-91-49 eff. Jan. 2, 1992; amended by SR-NASD-92-28 eff. Oct. 28, 1992; amended by SR-NASD-93-65 eff. Apr. 20, 1994; amended by SR-NASD-98-48 eff. Nov. 17, 1998; amended by SR-NASD-2001-08 eff. June 11, 2001.]*

## 10302. Simplified Arbitration

(a) Any dispute, claim, or controversy arising between a public customer(s) and an associated person or a member subject to arbitration under this Code involving a dollar amount not exceeding $25,000, exclusive of attendant costs and interest, shall be arbitrated as hereinafter provided.

(b) The Claimant shall file with the Director of Arbitration an executed Submission Agreement and a copy of the Statement of Claim of the controversy in dispute and the required deposit, together with documents in support of the Claim. Sufficient additional copies of the Submission Agreement and the Statement of Claim and supporting documents shall be provided to the Director of Arbitration for each party and the arbitrator. The Statement of Claim shall specify the relevant facts, the remedies sought and whether a hearing is demanded.

(c) The Claimant shall pay a non-refundable filing fee and shall remit a hearing session deposit as specified in Rule 10332 of this Code upon the filing of the Submission Agreement. The final disposition of the fee or deposit shall be determined by the arbitrator.

(d) The Director of Arbitration shall endeavor to serve promptly by mail or otherwise on the Respondent(s) one (1) copy of the Submission Agreement and one (1) copy of the Statement of Claim. Within twenty (20) calendar days from receipt of the Statement of Claim, Respondent(s) shall serve each party with an executed Submission Agreement and a copy of Respondent's Answer. Respondent's executed Submission Agreement and Answer shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s) along with any deposit required under the schedule of fees for customer disputes. The Answer shall designate all available defenses to the Claim and may set forth any related Counterclaim and/or related Third-Party Claim the Respondent(s) may have against the Claimant or any other person. If the Respondent(s) has interposed a Third-Party Claim, the Respondent(s) shall serve the Third- Party Respondent with an executed Submission Agreement, a copy of the Respondent's Answer containing the Third-Party Claim, and a copy of the original Claim filed by the Claimant. The Third-Party Respondent shall respond in the manner herein provided for response to the Claim. If the Respondent(s) files a related Counterclaim exceeding $25,000 exclusive of attendant costs and interest, the arbitrator may refer the Claim, Counterclaim and/or Third-Party Claim, if any, to a panel of three (3) arbitrators in accordance with Rule 10308 or, he may dismiss the Counterclaim and/or Third-Party Claim without prejudice to the Counterclaimant(s) and/or Third-Party Claimant(s) pursuing the Counterclaim and/or Third-Party Claim in a separate proceeding. The costs to the Claimant under either proceeding shall in no event exceed the total amount specified in Rule 10332.

(e) All parties shall serve on all other parties and the Director of Arbitration, with sufficient additional copies for the arbitrator(s), a copy of the Answer, Counterclaim, Third-Party Claim, Amended Claim, or other responsive pleading, if any. The Claimant, if a Counterclaim is asserted against him, shall within ten (10) calendar days either (1) serve on each party and on the Director of Arbitration, with sufficient additional copies for the arbitrator(s), a Reply to any Counterclaim or, (2) if the amount of the Counterclaim exceeds the Claim, shall have the right to file a statement withdrawing the Claim. If the Claimant withdraws the Claim, the proceedings shall be discontinued without prejudice to the rights of the parties.

(f) The dispute, claim or controversy shall be submitted to a single public arbitrator knowledgeable in the securities industry appointed by the Director of Arbitration. Unless the public customer demands or consents to a hearing, or the arbitrator calls a hearing, the arbitrator shall decide the dispute, claim or controversy solely upon the pleadings and evidence filed by the parties. If a hearing is necessary, such hearing shall be held as soon as practicable at a locale selected by the Director of Arbitration.

(g) The Director of Arbitration may grant extensions of time to file any pleading upon a showing of good cause.

(h)    (1) The arbitrator shall be authorized to require the submission of further documentary evidence as he, in his sole discretion, deems advisable.

(2) If a hearing is demanded or consented to in accordance with paragraph (f), the General Provisions Governing Pre-Hearing Proceedings under Rule 10321 shall apply.

(3) If no hearing is demanded or consented to, all requests for document production shall be submitted in writing to the Director of Arbitration within ten (10) business days of notification of the identity of the arbitrator selected to decide the case. The requesting party shall serve simultaneously its request for document production on all parties. Any response or objections to the requested document production shall be served on all parties and filed with the Director of Arbitration within five (5) business days of receipt of the requests for production. The appointed arbitrator shall resolve all requests under this Rule on the papers submitted.

(i) Upon the request of the arbitrator, the Director of Arbitration shall appoint two (2) additional arbitrators to the panel which shall decide the matter in controversy.

(j) In any case where there is more than one (1) arbitrator, the majority shall be public arbitrators.

(k) In his discretion, the arbitrator may, at the request of any party, permit such party to submit additional documentation relating to the pleadings.

(l) Except as otherwise provided herein, the general arbitration rules of the Association shall be applicable to proceedings instituted under this Rule.

*[Amended eff. Oct. 1, 1984; Apr. 1, 1988; May 10, 1989; June 1, 1990; Apr. 26, 1991; Jan. 8, 1992; Sept. 8, 1992; amended by SR-NASD-97-22 eff. Nov. 17, 1998.]*


## IM-10302. Related Counterclaim

As used in Rule 10302, the term "related Counterclaim" shall mean any Counterclaim related to a customer's accounts with a member.


## 10303. Hearing Requirements  Waiver of Hearing

(a) Any dispute, claim or controversy except as provided in Rule 10203 (Simplified Industry Arbitration) or Rule 10302 (Simplified Arbitration), shall require a hearing unless all parties waive such hearing in writing and request that the matter be resolved solely upon the pleadings and documentary evidence.

(b) Notwithstanding a written waiver of a hearing by the parties, a majority of the arbitrators may call for and conduct a hearing. In addition, any arbitrator may request the submission of further evidence.


## 10304. Time Limitation Upon Submission

No dispute, claim, or controversy shall be eligible for submission to arbitration under this Code where six (6) years have elapsed from the occurrence or event giving rise to the act or dispute, claim or controversy. This Rule shall not extend applicable statutes of limitations, nor shall it apply to any case which is directed to arbitration by a court of competent jurisdiction.

*[Amended eff. Oct. 1, 1984.]*


## 10305. Dismissal of Proceedings

(a) At any time during the course of an arbitration, the arbitrators may either upon their own initiative or at the request of a party, dismiss the proceeding and refer the parties to their judicial remedies, or to any dispute resolution forum agreed to by the parties, without prejudice to any claims or defenses available to any party.

(b) The arbitrators may dismiss a claim, defense, or proceeding with prejudice as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective.

(c) The arbitrators shall at the joint request of all the parties dismiss the proceedings.

*[Amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (08/14/97)]*


## 10306. Settlements

(a) Parties to an arbitration may agree to settle their dispute at any time.

(b) If the parties agree to settle their dispute, they will remain responsible for payment of fees incurred, including fees for previously scheduled hearing sessions and fees incurred as a result of adjournments, pursuant to Rule 10319.

(c) The terms of a settlement agreement do not need to be disclosed to the Association. However, the parties will remain responsible for payment of fees incurred, including fees for previously scheduled hearing sessions. If the parties fail to agree on the allocation of outstanding fees, the fees shall be divided equally among all parties.

*[Amended by SR-NASD-2001-21 eff. Nov. 19, 2001. Selected Notice to Members: 01-70]*


## 10307. Tolling of Time Limitation(s) for the Institution of Legal Proceedings and Extension of Time

(a) Where permitted by applicable law, the time limitations which would otherwise run or accrue for the institution of legal proceedings shall be tolled where a duly executed Submission Agreement is filed by the Claimant(s). The tolling shall continue for such period as the Association shall retain jurisdiction upon the matter submitted.

(b) The six (6) year time limitation upon submission to arbitration shall not apply when the parties have submitted the dispute, claim or controversy to a court of competent jurisdiction. The six (6) year time limitation shall not run for such period as the court shall retain jurisdiction upon the matter submitted.

*[Amended eff. Oct. 1, 1984.]*


## 10308. Selection of Arbitrators

This Rule specifies how parties may select or reject arbitrators, and who can be a public arbitrator.

## (a) Definitions

### (1) "day"

For purposes of this Rule, the term "day" means calendar day.

### (2) "claimant"

For purposes of this Rule, the term "claimant" means one or more persons who file a single claim.

### (3) "Neutral List Selection System"

The term "Neutral List Selection System" means the software that maintains the roster of arbitrators and performs various functions relating to the selection of arbitrators.

### (4) "non-public arbitrator"

The term "non-public arbitrator" means a person who is otherwise qualified to serve as an arbitrator and:

(A) is, or within the past 5 years, was:

> (i) associated with a broker or a dealer (including a government securities broker or dealer or a municipal securities dealer);
> (ii) registered under the Commodity Exchange Act;
> (iii) a member of a commodities exchange or a registered futures association; or
> (iv) associated with a person or firm registered under the Commodity Exchange Act;

(B) is retired from, or spent a substantial part of a career, engaging in any of the business activities listed in subparagraph (4)(A);

(C) is an attorney, accountant, or other professional who has devoted 20 percent or more of his or her professional work, in the last two years, to clients who are engaged in any of the business activities listed in subparagraph (4)(A); or

(D) is an employee of a bank or other financial institution and effects transactions in securities, including government or municipal securities, and commodities futures or options or supervises or monitors the compliance with the securities and commodities laws of employees who engage in such activities.

**(5) "public arbitrator"**

(A) The term "public arbitrator" means a person who is otherwise qualified to serve as an arbitrator and:

> (i) is not engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);
> (ii) was not engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D) for a total of 20 years or more;
> (iii) is not an investment adviser;
> (iv) is not an attorney, accountant, or other professional whose firm derived 10 percent or more of its annual revenue in the past 2 years from any persons or entities listed in paragraph (a)(4)(A); and
> (v) is not the spouse or an immediate family member of a person who is engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D).

(B) For the purpose of this Rule, the term "immediate family member" means:

> (i) the parent, stepparent, child, or stepchild, or a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);
> (ii) a family member who shares a home with a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D);
> (iii) a person who receives financial support of more than 50 percent of his or her annual income from a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D); or
> (iv) a person who is claimed as a dependent for federal income tax purposes by a person engaged in the conduct or activities described in paragraphs (a)(4)(A) through (D).

**(6) "respondent"**

For purposes of this Rule, the term "respondent" means one or more persons who individually or jointly file an answer to a complaint.

**(7) "send"**

For purposes of this Rule, the term "send" means to send by first class mail, facsimile, or any other method available and convenient to the parties and the Director.

## (b) Composition of Arbitration Panel; Preparation of Lists for Mailing to Parties

**(1) Composition of Arbitration Panel**

(A) Claims of $50,000 or Less

If the amount of a claim is $50,000 or less, the Director shall appoint an arbitration panel composed of one public arbitrator, unless the parties agree to the appointment of a non-public arbitrator.

(i) If the amount of a claim is $25,000 or less and an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition.

(ii) If the amount of a claim is greater than $25,000 and not more than $50,000 and a party in its initial filing or an arbitrator appointed to the case requests that a panel of three arbitrators be appointed, the Director shall appoint an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition.

(B) Claims of More Than $50,000

If the amount of a claim is more than $50,000, the Director shall appoint an arbitration panel composed of one non-public arbitrator and two public arbitrators, unless the parties agree to a different panel composition.

**(2) One List for Panel of One Arbitrator**

If one arbitrator will serve as the arbitration panel, the Director shall send to the parties one list of public arbitrators, unless the parties agree otherwise.

**(3) Two Lists for Panel of Three Arbitrators**

If three arbitrators will serve as the arbitration panel, the Director shall send two lists to the parties, one with the names of public arbitrators and one with the names of non-public arbitrators. The lists shall contain numbers of public and non-public arbitrators, in a ratio of approximately two to one, respectively, to the extent possible, based on the roster of available arbitrators.

**(4) Preparation of Lists**

(A) Except as provided in subparagraph (B) below, the Neutral List Selection System shall generate the lists of public and non-public arbitrators on a rotating basis within a designated geographic hearing site and shall exclude arbitrators based upon conflicts of interest identified within the Neutral List Selection System database.

(B) If a party requests that the lists include arbitrators with expertise classified in the Neutral List Selection System, the lists may include some arbitrators having the designated expertise.

**(5) Sending of Lists to Parties**

The Director shall send the lists of arbitrators to all parties at the same time approximately 30 days after the last answer is due.

**(6) Information About Arbitrators**

The Director shall send to the parties employment history for each listed arbitrator for the past 10 years and other background information. If a party requests additional information about an arbitrator, the Director shall send such request to the arbitrator, and shall send the arbitrator's response to all parties at the same time. When a party requests additional information, the Director may, but is not required to, toll the time for the parties to return the ranked lists under paragraph (c)(2).

# (c) Striking, Ranking, and Appointing Arbitrators on Lists

## (1) Striking and Ranking Arbitrators

(A) Striking An Arbitrator

A party may strike one or more of the arbitrators from each list for any reason.

(B) Ranking - Panel of One Arbitrator

Each party shall rank all of the arbitrators remaining on the list by assigning each arbitrator a different, sequential, numerical ranking, with a "1" rank indicating the party's first choice, a "2" indicating the party's second choice, and so on.

(C) Ranking - Panel of Three Arbitrators

Each party shall rank all of the public arbitrators remaining on the list by assigning each arbitrator a different, sequential, numerical ranking, with a "1" rank indicating the party's first choice, a "2" indicating the party's second choice, and so on. Each party separately shall rank all of the non-public arbitrators remaining on the list, using the same procedure.

**(2) Period for Ranking Arbitrators; Failure to Timely Strike and Rank**

A party must return to the Director the list or lists with the rankings not later than 20 days after the Director sent the lists to the parties, unless the Director has extended the period. If a party does not timely return the list or lists, the Director shall treat the party as having retained all the arbitrators on the list or lists and as having no preferences.

**(3) Process of Consolidating Parties' Rankings**

The Director shall prepare one or two consolidated lists of arbitrators, as appropriate under paragraph (b)(2) or (b)(3), based upon the parties' numerical rankings. The arbitrators shall be ranked by adding the rankings of all claimants together and all respondents together, including third-party respondents, to produce separate consolidated rankings of the claimants and the respondents. The Director shall then rank the arbitrators by adding the consolidated rankings of the claimants, the respondents, including third-party respondents, and any other party together, to produce a single consolidated ranking number, excluding arbitrators who were stricken by any party.

**(4) Appointment of Arbitrators**

(A) Appointment of Listed Arbitrators
The Director shall appoint arbitrators to serve on the arbitration panel based on the order of rankings on the consolidated list or lists, subject to availability and disqualification.

(B) Discretion to Appoint Arbitrators Not on List

If the number of arbitrators available to serve from the consolidated list is not sufficient to fill a panel, the Director shall appoint one or more arbitrators to complete the arbitration panel. Unless the parties agree otherwise, the Director may not appoint a non-public arbitrator under paragraphs (a)(4)(B) or (a)(4)(C). The Director shall provide the parties information about the arbitrator as provided in paragraph (b)(6), and the parties shall have the right to object to the arbitrator as provided in paragraph (d)(1).

**(5) Selecting a Chairperson for the Panel**

The parties shall have 7 days from the date the Director sends notice of the names of the arbitrators to select a chairperson. If the parties notify Dispute Resolution staff prior to the expiration of the original deadline that they need more time in which to reach an agreement, Dispute Resolution staff will extend the time to select a chairperson for an additional 8 days. If the parties cannot agree within the allotted time, the Director shall appoint a chairperson from the panel as follows:

(A) The Director shall appoint as the chairperson the public arbitrator who is the most highly ranked by the parties as long as the person is not an attorney, accountant, or other professional who has devoted 50% or more of his or her professional or business activities, within the last two years, to representing or advising public customers in matters relating to disputed securities or commodities transactions or similar matters.

(B) If the most highly ranked public arbitrator is subject to the exclusion set forth in subparagraph (A), the Director shall appoint as the chairperson the other public arbitrator, as long as the person also is not subject to the exclusion set forth in subparagraph (A).

(C) If both public arbitrators are subject to the exclusion set forth in subparagraph (A), the Director shall appoint as the chairperson the public arbitrator who is the most highly ranked by the parties.

**(6) Additional Parties**

If a party is added to an arbitration proceeding before the Director has consolidated the other parties' rankings, the Director shall send to that party the list or lists of arbitrators and permit the party to strike and rank the arbitrators. The party must return to the Director the list or lists with numerical rankings not later than 20 days after the Director sent the lists to the party. The Director shall then consolidate the rankings as specified in this paragraph (c).

## (d) Disqualification and Removal of Arbitrator Due to Conflict of Interest or Bias

**(1) Disqualification By Director**

After the appointment of an arbitrator and prior to the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, if the Director or a party objects to the continued service of the arbitrator, the Director shall determine if the arbitrator should be disqualified. If the Director sends a notice to the parties that the arbitrator shall be disqualified, the arbitrator will be disqualified unless the parties unanimously agree otherwise in writing and notify the Director not later than 15 days after the Director sent the notice.

**(2) Removal by Director**

After the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, the Director may remove an arbitrator from an arbitration panel based on information that is required to be disclosed pursuant to Rule 10312 and that was not previously disclosed.

**(3) Standards for Deciding Challenges for Cause**

The Director will grant a party's request to disqualify an arbitrator if it is reasonable to infer, based on information known at the time of request, that the arbitrator is biased, lacks impartiality, or has an interest in the outcome of the arbitration. The interest or bias must be direct, definite, and capable of reasonable demonstration, rather than remote or speculative.

**(4) Vacancies Created by Disqualification or Resignation**

Prior to the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, if an arbitrator appointed to an arbitration panel is disqualified or is otherwise unable or unwilling to serve, the Director shall appoint from the consolidated list of arbitrators the arbitrator who is the most highly ranked available arbitrator of the proper classification remaining on the list. If there are no available arbitrators of the proper classification on the consolidated list, the Director shall appoint an arbitrator of the proper classification subject to the limitation set forth in paragraph (c)(4)(B). The Director shall provide the parties information about the arbitrator as provided in paragraph (b)(6), and the parties shall have the right to object to the arbitrator as provided in paragraph (d)(1).

## (e) Discretionary Authority

The Director may exercise discretionary authority and make any decision that is consistent with the purposes of this Rule and the Rule 10000 Series to facilitate the appointment of arbitration panels and the resolution of arbitration disputes.

## (f) Challenges by Customers

In cases involving public customers, any close questions regarding arbitrator classification or challenges for cause brought by a customer will be resolved in favor of the customer.

*[Amended eff. July 1, 1986; Apr. 1, 1988; May 10, 1989; Oct. 7, 1992; amended by SR-NASD-97-22 eff. Nov. 17, 1998; amended by SR-NASD-98-48 eff. Nov. 17, 1998; amended by SR-NASD-98-64 eff. Nov. 17, 1998; amended by SR-NASD-00-34 eff. March 8, 2001; ; amended by SR-NASD-2004-087 eff. June 7, 2004; amended by SR-NASD-2003-095 eff. July 19, 2004; amended by SR-NASD-04-39 eff. Sept. 17, 2004. Selected Notices to Members: 98-90; 01-13; 04-49, 04-61.]*

## 10309. Composition of Panels

Except as otherwise specifically provided in Rule 10308, the individuals who shall serve on a particular arbitration panel shall be determined by the Director. Except as otherwise specifically provided in Rule 10308, the Director may name the chairman of the panel.

*[Amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## 10310. Notice of Selection of Arbitrators

(a) The Director shall inform the parties of the arbitrators' names and employment histories for the past 10 years, as well as information disclosed pursuant to Rule 10312, at least 15 business days prior to the date fixed for the first hearing session. A party may make further inquiry of the Director concerning an arbitrator's background. In the event that, prior to the first hearing session, any arbitrator should become disqualified, resign, die, refuse or otherwise be unable to perform as an arbitrator, the Director shall appoint a replacement arbitrator to fill the vacancy on the panel. The Director shall inform the parties as soon as possible of the name and employment history of the replacement arbitrator for the past 10 years, as well as information disclosed pursuant to Rule 10312. A party may make further inquiry of the Director concerning the replacement arbitrator's background and within the time remaining prior to the first hearing session or the 10 day period provided under Rule 10311, whichever is shorter, may exercise its right to challenge the replacement arbitrator as provided in Rule 10311.

(b) This Rule shall not apply to arbitration proceedings that are subject to Rule 10308.

*[Amended eff. Sept. 19, 1988; May 10, 1989; amended by SR-NASD-97-34 eff. Aug. 6, 1997; amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## 10311. Peremptory Challenge

(a) In an arbitration proceeding, except as provided in Rule 10335, each party shall have the right to one peremptory challenge. In arbitrations where there are multiple Claimants, Respondents, and/or Third-Party Respondents, the Claimants shall have one peremptory challenge, the Respondents shall have one peremptory challenge, and the Third-Party Respondents shall have one peremptory challenge. The Director may in the interests of justice award additional peremptory challenges to any party to an arbitration proceeding. Unless extended by the Director, a party wishing to exercise a peremptory challenge must do so by notifying the Director in writing within 10 business days of notification of the identity of the person(s) named under Rule 10310 or Rule 10321(d) or (e), whichever comes first. There shall be unlimited challenges for cause.

(b) This Rule shall not apply to arbitration proceedings that are subject to Rule 10308.

*[Amended eff. Oct. 1, 1984; amended by SR-NASD-91-49 eff. Jan. 2, 1992; amended by SR-NASD-93-38 eff. Jan. 3, 1996; amended by SR-NASD-97-34 eff. Aug. 6, 1997; amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*

## 10312. Disclosures Required of Arbitrators and Director's Authority to Disqualify

(a) Each arbitrator shall be required to disclose to the Director of Arbitration any circumstances which might preclude such arbitrator from rendering an objective and impartial determination. Each arbitrator shall disclose:

(1) Any direct or indirect financial or personal interest in the outcome of the arbitration;

(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances that are likely to affect impartiality or might reasonably create an appearance of partiality or bias. Persons requested to serve as arbitrators must disclose any such relationships or circumstances that they have with any party or its counsel, or with any individual whom they have been told will be a witness. They must also disclose any such relationship or circumstances involving members of their families or their current employers, partners, or business associates.

(b) Persons who are requested to accept appointment as arbitrators must make a reasonable effort to inform themselves of any interests, relationships or circumstances described in paragraph (a) above.

(c) The obligation to disclose interests, relationships, or circumstances that might preclude an arbitrator from rendering an objective and impartial determination described in paragraph (a) is a continuing duty that requires a person who accepts appointment as an arbitrator to disclose, at any stage of the arbitration, any such interests, relationships, or circumstances that arise, or are recalled or discovered.

(d) Removal by Director

(1) The Director may remove an arbitrator based on information that is required to be disclosed pursuant to this Rule.

(2) After the commencement of the earlier of (A) the first pre-hearing conference or (B) the first hearing, the Director may remove an arbitrator based only on information not known to the parties when the arbitrator was selected. The Director's authority under this subparagraph (2) may be exercised only by the Director or the President of NASD Dispute Resolution.

(3) The Director will grant a party's request to disqualify an arbitrator if it is reasonable to infer, based on information known at the time of request, that the arbitrator is biased, lacks impartiality, or has an interest in the outcome of the arbitration. The interest or bias must be direct, definite, and capable of reasonable demonstration, rather than remote or speculative.

(e) The Director shall inform the parties to an arbitration proceeding of any information disclosed to the Director under this Rule unless either the arbitrator who disclosed the information withdraws voluntarily as soon as the arbitrator learns of any interest, relationship, or circumstances described in paragraph (a) that might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, or the Director removes the arbitrator.

*[Amended eff. May 10, 1989; amended by SR-NASD-98-48 eff. Nov. 17, 1998; amended by SR-NASD-00-34 eff. Mar. 8, 2001; amended by SR-NASD-2003-095 eff. July 19, 2004. Selected Notice to Members: 98-90; 01-13; 04-49.]*


## 10313. Disqualification or Other Disability of Arbitrators

(a) In the event that any arbitrator, after the commencement of the earlier of (1) the first pre-hearing conference or (2) the first hearing but prior to the rendition of the award, should become disqualified, resign, die, refuse or otherwise be unable to perform as an arbitrator, the Director shall appoint a replacement arbitrator to fill the vacancy and the hearing shall continue. In the alternative, if all parties agree to proceed with any remaining arbitrator(s), they shall inform the Director in writing within 5 business days of notification of the vacancy, and the remaining arbitrator(s) shall continue with the hearing and determination of the controversy.

(b) The Director shall inform the parties as soon as possible of the name and employment history of the replacement arbitrator for the past 10 years, as well as information disclosed pursuant to Rule 10312. A party may make further inquiry of the Director concerning the replacement arbitrator's background. If the arbitration proceeding is subject to Rule 10308, the party may exercise his or her right to challenge the replacement arbitrator within the time remaining prior to the next scheduled hearing session by notifying the Director in writing of the name of the arbitrator challenged and the basis for such challenge. If the arbitration proceeding is not subject to Rule 10308, within the time remaining prior to the next scheduled hearing session or the 10 day period provided under Rule 10311, whichever is shorter, a party may exercise the party's right to challenge the replacement arbitrator as

provided in Rule 10311.

*[Amended eff. Sept. 19, 1988; amended by SR-NASD-89-19 eff. May 10, 1989; amended by SR-NASD-97-34 eff. Aug. 6, 1997; amended by SR-NASD-98-48 eff. Nov. 17, 1998; amended by SR-NASD-2002-38 eff. Apr. 22, 2002.]*

## 10314. Initiation of Proceeding

Except as otherwise provided herein, an arbitration proceeding under this Code shall be instituted as follows:

### (a) Statement of Claim

The Claimant shall file with the Director of Arbitration an executed Submission Agreement, a Statement of Claim of the controversy in dispute, together with the documents in support of the Claim, and the required deposit. Sufficient additional copies of the Submission Agreement and the Statement of Claim and supporting documents shall be provided to the Director of Arbitration for each party and each arbitrator. The Statement of Claim shall specify the relevant facts and the remedies sought. The Director of Arbitration shall endeavor to serve promptly by mail or otherwise on the Respondent(s) one (1) copy of the Submission Agreement and one (1) copy of the Statement of Claim.

### (b) Answer – Defenses, Counterclaims, and/or Cross-Claims

(1) Within 45 calendar days from receipt of the Statement of Claim, Respondent(s) shall serve each party with an executed Submission Agreement and a copy of the Respondent's Answer. Respondent's executed Submission Agreement and Answer shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s) along with any deposit required under the schedule of fees. The Answer shall specify all relevant facts and available defenses to the Statement of Claim submitted and may set forth any related Counterclaim the Respondent (s) may have against the Claimant, any Cross-Claim the Respondent(s) may have against any other named Respondent(s), and any Third-Party Claim against any other party or person based upon any existing dispute, claim, or controversy subject to arbitration under this Code.

(2) (A) A Respondent, Responding Claimant, Cross-Claimant, Cross-Respondent, or Third-Party Respondent who pleads only a general denial to a pleading that states specific facts and contentions may, upon objection by a party, in the discretion of the arbitrators, be barred from presenting any facts or defenses at the time of the hearing.

(B) A Respondent, Responding Claimant, Cross-Claimant, Cross-Respondent, or Third-Party Respondent who fails to specify all available defenses and relevant facts in such party's answer may, upon objection by a party, in the discretion of the arbitrators, be barred from presenting such facts or defenses not included in such party's Answer at the hearing.

(C) A Respondent, Responding Claimant, Cross-Claimant, Cross-Respondent, or Third-Party Respondent who fails to file an Answer within 45 calendar days from receipt of service of a Claim, unless the time to answer has been extended pursuant to subparagraph (5), below, may, in the discretion of the arbitrators, be barred from presenting any matter, arguments, or defenses at the hearing. Such a party may also be subject to default procedures as provided in paragraph (e) below.

(3) Respondent(s) shall serve each party with a copy of any Third-Party Claim. The Third-Party Claim shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s) along with any deposit required under the schedule of fees. Third-Party Respondent (s) shall answer in the manner provided for response to the Claim, as provided in subparagraphs (1) and (2) above.

(4) The Claimant shall serve each party with a Reply to a Counterclaim within ten (10) days of receipt of an Answer containing a Counterclaim. The Reply shall also be filed with the Director of Arbitration with sufficient additional copies for the arbitrator(s).

(5) The time period to file any pleading, whether such be denominated as a Claim, Answer, Counterclaim, Cross-Claim, Reply, or Third-Party Pleading, may be extended for such further period as may be granted by the Director of Arbitration or with the consent of the initial claimant.

Extensions of the time period to file an Answer are disfavored and will not be granted by the Director except in extraordinary circumstances.

**(c) Service and Filing with the Director of Arbitration**

(1) Service may be effected by mail or other means of delivery. Service and filing are accomplished on the date of mailing either by first-class postage pre-paid or by means of overnight mail service or, in the case of other means of service, on the date of delivery. Filing with the Director of Arbitration shall be made on the same date as service on a party.

(2) If a member firm and a person associated with the member firm are named parties to an arbitration proceeding at the time of the filing of the Statement of Claim, service on the person associated with the member firm may be made on the associated person or the member firm, which shall perfect service upon the associated person. If the member firm does not undertake to represent the associated person, the member firm shall serve the associated person with the Statement of Claim, shall advise all parties and the Director of Arbitration of that fact, and shall provide such associated person's current address.

**(d) Joinder and Consolidation  Multiple Parties**

(1) Permissive Joinder. All persons may join in one action as claimants if they assert any right to relief jointly, severally, or arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all these claimants will arise in the action. All persons may be joined in one action as respondents if there is asserted against them, jointly or severally, any right to relief arising out of the same transaction, occurrence, or series of transactions or occurrences and if any questions of law or fact common to all respondents will arise in the action. A claimant or respondent need not assert rights to or defend against all the relief demanded. Judgment may be given for one or more of the claimants according to their respective rights to relief, and against one or more respondents according to their respective liabilities.

(2) In arbitrations where there are multiple Claimants, Respondents, and/or Third-Party Respondents, the Director of Arbitration shall be authorized to determine preliminarily whether such parties should proceed in the same or separate arbitrations. Such determination will be considered subsequent to the filing of all responsive pleadings.

(3) The Director of Arbitration shall be authorized to determine preliminarily whether claims filed separately are related and shall be authorized to consolidate such claims for hearing and award purposes.

(4) Further determinations with respect to joinder, consolidation, and multiple parties under this paragraph (d) shall be made by the arbitration panel and shall be deemed final.

**(e) Default Procedures**

(1) A Respondent, Cross-Respondent, or Third-Party Respondent that fails to file an Answer within 45 calendar days from receipt of service of a Claim, unless the time to answer has been extended pursuant to paragraph (b)(5), may be subject to default procedures, as provided in this paragraph, if it is:

(A) a member whose membership has been terminated, suspended, canceled, or revoked;

(B) a member that has been expelled from the NASD;

(C) a member that is otherwise defunct; or

(D) an associated person whose registration is terminated, revoked, or suspended.

(2) If all Claimants elect to use these default procedures, the Claimant(s) shall notify the Director in writing and shall send a copy of such notification to all other parties at the same time and in the same manner as the notification was sent to the Director.

(3) If the case meets the requirements for proceeding under default procedures, the Director

shall notify all parties.

(4) The Director shall appoint a single arbitrator pursuant to Rule 10308 to consider the Statement of Claim and other documents presented by the Claimant(s). The arbitrator may request additional information from the Claimant(s) before rendering an award. No hearing shall be held, and the default award shall have no effect on any non-defaulting party.

(5) The Claimant(s) may not amend the claim to increase the relief requested after the Director has notified the parties that the claim will proceed under default procedures.

(6) An arbitrator may not make an award based solely on the non-appearance of a party. The party who appears must present a sufficient basis to support the making of an award in that party's favor. The arbitrator may not award damages in an amount greater than the damages requested in the Statement of Claim, and may not award any other relief that was not requested in the Statement of Claim.

(7) If the Respondent files an Answer after the Director has notified the parties that the claim will proceed under default procedures but before an award has been rendered, the proceedings under this paragraph shall be terminated and the case will proceed under the regular procedures.

*[Amended eff. Oct. 1, 1984; July 1, 1986; May 10, 1989; May 7, 1991; amended by SR-NASD-98-07 eff. Mar. 16, 1998; amended by SR-NASD-2002-15 eff. Oct. 14, 2002; amended by SR-NASD-2002-62 eff. Oct. 14, 2002; amended by SR-NASD-2004-016 eff. Aug. 5, 2004.]*


## 10315. Designation of Time and Place of First Meeting

The Director shall determine the time and place of the first meeting of the arbitration panel and the parties, whether the first meeting is a pre-hearing conference or a hearing, and shall give notice of the time and place at least 15 business days prior to the date fixed for the first meeting by personal service, registered or certified mail to each of the parties unless the parties shall, by their mutual consent, waive the notice provisions under this Rule. The arbitrators shall determine the time and place for all subsequent meetings, whether the meetings are pre-hearing conferences, hearings, or any other type of meetings, and shall give notice as the arbitrators may determine. Attendance at a meeting waives notice thereof.

*[Amended eff. May 7, 1991; amended by SR-NASD-98-48 eff. Nov. 17, 1998.]*


## 10316. Representation by Counsel

All parties shall have the right to representation by counsel at any stage of the proceedings.


## 10317. Attendance at Hearings

The attendance or presence of all persons at hearings including witnesses shall be determined by the arbitrators. However, all parties to the arbitration and their counsel shall be entitled to attend all hearings.


## IM-10317. Closing Arguments

In response to recent questions concerning the order of closing argument in arbitration proceedings conducted under the auspices of the National Association of Securities Dealers, Inc., it is the practice in these proceedings to allow claimants to proceed first in closing argument, with rebuttal argument being permitted. Claimants may reserve their entire closing for rebuttal. The hearing procedures may, however, be varied in the discretion of the arbitrators, provided all parties are allowed a full and fair opportunity to present their respective cases.


## 10318. Failure to Appear

If any of the parties, after due notice, fails to appear at a hearing or at any continuation of a hearing session, the arbitrators may, in their discretion, proceed with the arbitration of the controversy. In such cases, all awards shall be rendered as if each party had entered an appearance in the matter submitted.

*[Amended eff. Jan. 8, 1992.]*

## 10319. Adjournments

(a) The arbitrator(s) may, in their discretion, adjourn any hearing(s) either upon their own initiative or upon the request of any party to the arbitration.

(b) If an adjournment requested by a party is granted after arbitrators have been appointed, the party requesting the adjournment shall pay a fee equal to the initial deposit of hearing session fees for the first adjournment and twice the initial deposit of hearing session fees, not to exceed $1,500, for a second or subsequent adjournment requested by that party. The arbitrators may waive these fees in their discretion. If more than one party requests the adjournment, the arbitrators shall allocate the fees among the requesting parties.

(c) Upon receiving a third request consented to by all parties for an adjournment, the arbitrator(s) may dismiss the arbitration without prejudice to the Claimant filing a new arbitration.

(d) If an adjournment request is made by one or more parties and granted within three business days before a scheduled hearing session, the party or parties making the request shall pay an additional fee of $100 per arbitrator. If more than one party requests the adjournment, the arbitrators shall allocate the $100 per arbitrator fee among the requesting parties. The arbitrators may allocate all or portion of the $100 per arbitrator fee to the non-requesting party or parties, if the arbitrators determine that the non-requesting party or parties caused or contributed to the need for the adjournment. In the event that a request results in the adjournment of consecutively scheduled hearing sessions, the additional fee will be assessed only for the first of the consecutively scheduled hearing sessions. In the event that an extraordinary circumstance prevents a party or parties from making a timely adjournment request, arbitrators may use their discretion to waive the fee, provided verification of such circumstance is received.

*[Amended eff. July 1, 1986; June 1, 1990; Dec. 30, 1991; amended by SR-NASD-2001-21 eff. Nov. 19, 2001; amended by SR-NASD-2003-164 eff. Aug. 16, 2004.]*

Selected Notice to Members: 01-70, 04-53.

## 10320. Acknowledgement of Pleadings

The arbitrators shall acknowledge to all parties present that they have read the pleadings filed by the parties.

## 10321. General Provisions Governing Pre-Hearing Proceedings

### (a) Requests for Documents and Information

The parties shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the arbitration. Any request for documents or other information should be specific, relate to the matter in controversy, and afford the party to whom the request is made a reasonable period of time to respond without interfering with the time set for the hearing.

### (b) Document Production and Information Exchange

(1) Any party may serve a written request for information or documents ("information request") upon another party 45 calendar days or more after service of the Statement of Claim by the Director of Arbitration or upon filing of the Answer, whichever is earlier. The requesting party shall serve the information request on all parties and file a copy with the Director of Arbitration. The parties shall endeavor to resolve disputes regarding an information request prior to serving any objection to the request. Such efforts shall be set forth in the objection.

(2) Unless a greater time is allowed by the requesting party, information requests shall be satisfied or objected to within thirty (30) calendar days from the date of service. Any objection to an information request shall be served by the objecting party on all parties and filed with the Director of Arbitration.

(3) Any response to objections to an information request shall be served on all parties and filed with the Director of Arbitration within ten (10) calendar days of receipt of the objection.

(4) Upon the written request of a party whose information request is unsatisfied, the matter will be referred by the Director of Arbitration to either a pre-hearing conference under paragraph (d) of this Rule or to a selected arbitrator under paragraph (e) of this Rule.

**(c) Pre-Hearing Exchange**

At least twenty (20) calendar days prior to the first scheduled hearing date, all parties shall serve on each other copies of documents in their possession they intend to present at the hearing and shall identify witnesses they intend to present at the hearing. The arbitrators may exclude from the arbitration any documents not exchanged or witnesses not identified. This paragraph does not require service of copies of documents or identification of witnesses which parties may use for cross-examination or rebuttal.

**(d) Pre-Hearing Conference**

(1) Upon the written request of a party, an arbitrator, or at the discretion of the Director of Arbitration, a pre-hearing conference shall be scheduled. The Director of Arbitration shall set the time and place of a pre-hearing conference and appoint a person to preside. The pre-hearing conference may be held by telephone conference call. The presiding person shall seek to achieve agreement among the parties on any issue which relates to the pre-hearing process or to the hearing, including but not limited to exchange of information, exchange or production of documents, identification of witnesses, identification and exchange of hearing documents, stipulation of facts, identification and briefing of contested issues, and any other matters which will expedite the arbitration proceedings.

(2) Any issues raised at the pre-hearing conference that are not resolved may be referred to a single member of the arbitration panel for decision.

**(e) Decisions by Selected Arbitrator**

The Director of Arbitration may appoint a single member of the arbitration panel to decide all unresolved issues under this Rule. In matters involving public customers, such single arbitrator shall be a public arbitrator, except that the arbitrator may be either public or industry when the public customer has requested a panel consisting of a majority from the securities industry. Such arbitrator shall be authorized to act on behalf of the panel to issue subpoenas, direct appearances of witnesses and production of documents, set deadlines for compliance, and issue any other ruling which will expedite the arbitration proceedings. Decisions under this Rule shall be made upon the papers submitted by the parties, unless the arbitrator calls a hearing. The arbitrator may elect to refer any issue under this Rule to the full panel.

*[Amended eff. May 10, 1989; amended by SR-NASD-95-05 eff. Mar. 23, 1995: amended by SR-NASD-98-91 eff. Jan. 11, 1999.]*

## 10322. Subpoenas and Power to Direct Appearances

**(a) Subpoenas**

The arbitrators and any counsel of record to the proceeding shall have the power of the subpoena process as provided by law. All parties shall be given a copy of a subpoena upon its issuance. Parties shall produce witnesses and present proofs to the fullest extent possible without resort to the subpoena process.

**(b) Power to Direct Appearances and Production of Documents**

The arbitrator(s) shall be empowered without resort to the subpoena process to direct the appearance of any person employed or associated with any member of the Association and/or the production of

any records in the possession or control of such persons or members. Unless the arbitrator(s) directs otherwise, the party requesting the appearance of a person or the production of documents under this Rule shall bear all reasonable costs of such appearance and/or production.

*[Amended eff. May 10, 1989.]*


## 10323. Evidence

The arbitrators shall determine the materiality and relevance of any evidence proffered and shall not be bound by rules governing the admissibility of evidence.


## 10324. Interpretation of Provisions of Code and Enforcement of Arbitrator Rulings

The arbitrators shall be empowered to interpret and determine the applicability of all provisions under this Code and to take appropriate action to obtain compliance with any ruling by the arbitrator(s). Such interpretations and actions to obtain compliance shall be final and binding upon the parties.

*[Amended eff. Nov. 16, 1992.]*


## 10325. Determination of Arbitrators

All rulings and determinations of the panel shall be by a majority of the arbitrators.


## 10326. Record of Proceedings

(a) A verbatim record by stenographic reporter or a tape recording of all arbitration hearings shall be kept. If a party or parties to a dispute elect to have the record transcribed, the cost of such transcription shall be borne by the party or parties making the request unless the arbitrators direct otherwise. The arbitrators may also direct that the record be transcribed. If the record is transcribed at the request of any party, a copy shall be provided to the arbitrators.

(b) A verbatim record of mediation conducted pursuant to the Rule 10400 Series shall not be kept.

*[Amended eff. May 10, 1989; amended by SR-NASD-95-25 eff. Aug. 1, 1995.]*


## 10327. Oaths of the Arbitrators and Witnesses

Prior to the commencement of the first session, an oath or affirmation shall be administered to the arbitrators. All testimony shall be under oath or affirmation.


## 10328. Amendments

(a) After the filing of any pleadings, if a party desires to file a new or different pleading, such change must be made in writing and filed with the Director of Arbitration with sufficient additional copies for each arbitrator. The party filing a new or different pleading shall serve on all other parties, a copy of the new or different pleading in accordance with the provisions set forth in Rule 10314(b). The other parties may, within ten (10) business days from the receipt of service, file a response with all other parties and the Director of Arbitration in accordance with Rule 10314(b).

(b) If a new or amended pleading increases the amount in dispute, all filing fees, hearing session deposits, surcharges, and process fees required under Rules 10332 and 10333 will be recalculated based on the amended amount in dispute.

(c) After a panel has been appointed, no new or different pleading may be filed except for a responsive pleading as provided for in (a) above or with the panel's consent.

*[Amended eff. Oct. 1, 1984; Apr. 26, 1991; amended by SR-NASD-2001-21 eff. Nov. 19, 2001. Selected Notice to Members: 01-70.]*

## 10329. Reopening of Hearings

Where permitted by applicable law, the hearings may be reopened by the arbitrators on their own motion or at the discretion of the arbitrators upon application of a party at any time before the award is rendered.


## 10330. Awards

(a) All awards shall be in writing and signed by a majority of the arbitrators or in such manner as is required by applicable law. Such awards may be entered as a judgment in any court of competent jurisdiction.

(b) Unless the applicable law directs otherwise, all awards rendered pursuant to this Code shall be deemed final and not subject to review or appeal.

(c) The Director will serve a copy of the award on each party, or the representative of the party. The Director will serve the award by using any method available and convenient to the parties and the Director, and that is reasonably expected to cause the award to be delivered to all parties, or their counsel, on the same day. Methods the Director may use include, but are not limited to, registered or certified mail, hand delivery, and facsimile or other electronic transmission.

(d) The arbitrator(s) shall endeavor to render an award within thirty (30) business days from the date the record is closed.

(e) The award shall contain the names of the parties, the name of counsel, if any, a summary of the issues, including the type(s) of any security or product, in controversy, the damages and other relief requested, the damages and other relief awarded, a statement of any other issues resolved, the names of the arbitrators, the dates the claim was filed and the award rendered, the number and dates of hearing sessions, the location of the hearings, and the signatures of the arbitrators concurring in the award.

(f) All awards and their contents shall be made publicly available.

(g) Fees and assessments imposed by the arbitrators under Rules 10205 and 10332 shall be paid immediately upon the receipt of the award by the parties. Payment of such fees shall not be deemed ratification of the award by the parties.

(h) All monetary awards shall be paid within thirty (30) days of receipt unless a motion to vacate has been filed with a court of competent jurisdiction. An award shall bear interest from the date of the award: (1) if not paid within thirty (30) days of receipt, (2) if the award is the subject of a motion to vacate which is denied, or (3) as specified by the arbitrator(s) in the award. Interest shall be assessed at the legal rate, if any, then prevailing in the state where the award was rendered, or at a rate set by the arbitrator(s).

*[Amended eff. May 10, 1989; amended by SR-NASD-91-09 eff. Apr. 26, 1991; amended by SR-NASD-90-62 eff. May 7, 1991; amended by SR-NASD-91-49 eff. Jan. 2, 1992; Oct. 1, 1993; amended by SR-NASD-97-34 eff. Aug. 6, 1997; SEC Rel. No. 34-38907 (08/14/97).]*


## 10331. Incorporation by Reference

This Code shall be deemed a part of and incorporated by reference in every agreement to arbitrate under the Rules of the Association including a duly executed Submission Agreement.

*[Amended eff. May 7, 1991.]*


## 10332. Schedule of Fees for Customer Disputes

(a) At the time of filing a Claim, Counterclaim, Third-Party Claim or Cross-Claim, a party shall pay a non-refundable filing fee and shall remit a hearing session deposit to the Association in the amounts indicated in the schedules below unless such fee or deposit is specifically waived by the Director of Arbitration.

Where multiple hearing sessions are required, the arbitrators may require any of the parties to make additional hearing deposits for each additional hearing session. In no event shall the amount deposited by all parties per hearing session exceed the amount of the largest initial hearing deposit made by any party under the schedules below.

(b) A hearing session is any meeting between the parties and the arbitrator(s), including a pre-hearing conference with an arbitrator, which lasts four (4) hours or less. The forum fee for a pre-hearing conference with an arbitrator shall be the amount set forth in the schedules below as a hearing session deposit for a hearing with a single arbitrator.

(c) The arbitrators, in their awards, shall determine the amount chargeable to the parties as forum fees and shall determine who shall pay such forum fees. Forum fees chargeable to the parties shall be assessed on a per hearing session basis, and the aggregate for each hearing session may equal but shall not exceed the amount of the largest initial hearing deposit deposited by any party, except in a case where claims have been joined subsequent to filing in which case hearing session fees shall be computed as provided in paragraph (d). The arbitrator(s) may determine in the award that a party shall reimburse to another party any non-refundable filing fee it has paid. If a customer is assessed forum fees in connection with an industry claim, forum fees assessed against the customer shall be based on the hearing deposit required under the industry claims schedule for the amount awarded to industry parties to be paid by the customer and not based on the size of the industry claim. No fees shall be assessed against a customer in connection with an industry claim that is dismissed; however, in cases where there is also a customer claim, the customer may be assessed forum fees based on the customer claim under the procedure set out above. Amounts deposited by a party shall be applied against forum fees, if any. In addition to forum fees, the arbitrator(s) may determine in the award the amount of costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 and, unless applicable law directs otherwise, other costs and expenses of the parties and arbitrator(s) which are within the scope of the agreement of the parties. The arbitrator(s) shall determine by whom such costs shall be borne. If the hearing session fees are not assessed against a party who had made a hearing deposit, the hearing deposit will be refunded unless the arbitrators determine otherwise.

(d) For claims filed separately which are subsequently joined or consolidated under Rule 10314(d), the hearing deposit and forum fees assessable per hearing session after joinder or consolidation shall be based on the cumulative amount in dispute. The arbitrator(s) shall determine by whom such fees shall be borne.

(e) If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the non-refundable filing fee for a public customer shall be $250 and the non-refundable filing fee for an industry party shall be $500. The hearing session deposit to be remitted by a party shall be $1,000 or such greater or lesser amount as the Director of Arbitration or the panel of arbitrators may require, but shall not exceed the maximum amount specified in the schedule.

(f) The Association shall retain the total initial amount deposited as hearing session deposits by all the parties in any matter submitted and settled or withdrawn within eight business days of the first scheduled hearing session other than a pre-hearing conference.

(g) Any matter submitted and thereafter settled or withdrawn subsequent to the commencement of the first hearing session, including a pre-hearing conference with an arbitrator, shall be subject to an assessment of forum fees and costs incurred pursuant to Rules 10319, 10321, 10322, and 10326 based on hearing sessions held and scheduled within eight business days after the Association receives notice that the matter has been settled or withdrawn. The arbitrator(s) shall determine by whom such forum fees and costs shall be borne.

(h) Reserved

(i) Reserved

(j) Reserved

(k) Schedule of Fees

For purposes of the schedule of fees, the term "claim" includes Claims, Counterclaims, Third-Party Claims, and Cross-Claims. Any such claim made by a customer or associated person is treated as a customer claim for purposes of the schedule of fees. Any such claim made by a member is an industry claim.

### Customer or Associated Person Claimant

| Amount in Dispute (Exclusive of Interest and Expenses) | Claim Filing Fee | Deposit for Cases to be Decided on the Paper Record | Hearing Session Deposit | |
|---|---|---|---|---|
| | | | 1 Arb.[1] | 3 Arbs.[2] |
| $.01-$1,000 | $25 | $25 | $25 | NA |
| $1000.01-$2,500 | $25 | $50 | $50 | NA |
| $2,500.01-$5,000 | $50 | $125 | $125 | NA |
| $5,000.01-$10,000 | $75 | $250 | $250 | NA |
| $10,000.01-$25,000 | $125 | $300 | $450 | NA |
| $25,000.01-$30,000 | $150 | NA | $450 | $600 |
| $30,000.01-$50,000 | $175 | NA | $450 | $600 |
| $50,000.01-$100,000 | $225 | NA | $450[3] | $750 |
| $100,000.01-$500,000 | $300 | NA | $450[3] | $1,125 |
| $500,000.01-$1,000,000 | $375 | NA | $450[3] | $1,200 |
| $1,000,000.01-$3,000,000 | $500 | NA | $450[3] | $1,200 |
| $3,000,000.01-$5,000,000 | $600 | NA | $450[3] | $1,200 |
| $5,000,000.01-$10,000,000 | $600 | NA | $450[3] | $1,200 |
| Over $10,000,000 | $600 | NA | $450[3] | $1,200 |

[1] The dispute is resolved by one arbitrator per hearing session, including pre-hearing conferences.

[2] The dispute is resolved by three arbitrators per hearing session.

[3] Fee applies only to pre-hearing conferences with a single arbitrator.

### Member Claimant

| Amount in Dispute (Exclusive of Interest and Expenses) | Claim Filing Fee | Deposit for Cases to be Decided on the Paper Record | Hearing Session Deposit | |
|---|---|---|---|---|
| | | | 1 Arb.[1] | 3 Arbs.[2] |
| $.01-$1,000 | $200 | $25 | $25 | NA |
| $1000.01-$2,500 | $300 | $50 | $50 | NA |
| $2,500.01-$5,000 | $400 | $125 | $125 | NA |
| $5,000.01-$10,000 | $500 | $250 | $250 | NA |
| $10,000.01-$25,000 | $750 | $300 | $450 | NA |
| $25,000.01-$30,000 | $1,000 | NA | $450 | $600 |
| $30,000.01-$50,000 | $1,000 | NA | $450 | $600 |
| $50,000.01-$100,000 | $1,000 | NA | $450[3] | $750 |
| $100,000.01-$500,000 | $1,000 | NA | $450[3] | $1,125 |
| $500,000.01-$1,000,000 | $1,250 | NA | $450[3] | $1,200 |
| $1,000,000.01-$5,000,000 | $2,000 | NA | $450[3] | $1,200 |
| $5,000,000.01-$10,000,000 | $2,500 | NA | $450[3] | $1,200 |
| Over $10,000,000 | $5,000 | NA | $450[3] | $1,200 |

[1] The dispute is resolved by one arbitrator per hearing session, including pre-hearing conferences.

[2] The dispute is resolved by three arbitrators per hearing session.

[3] Fee applies only to pre-hearing conferences with a single arbitrator.

*[Amended eff. Oct. 1, 1984; July 1, 1987; Apr. 1, 1988; May 10, 1989; June 1, 1990; amended by SR-NASD-94-75 eff. Jan. 1, 1995; amended by SR-NASD-94-10 eff. May 2, 1995; amended by SR-NASD-95-25 eff. Aug. 1, 1995; amended by SR-NASD-97-79 eff. Mar. 18, 1999; amended by SR-NASD-00-11 eff. November 1, 2000; amended by SR-NASD-00-65 eff. Dec. 31, 2000.]*

## 10333. Member Surcharge and Process Fees

(a) Member Surcharge

(1) Each member that is named as a party to an arbitration proceeding, whether in a Claim, Counterclaim, Cross-Claim or Third-Party Claim, shall be assessed a surcharge pursuant to the schedule below when the Director of Arbitration perfects service of the claim naming the member on any party to the proceeding.

(2) For each associated person who is named, the surcharge shall be assessed against the member or members that employed the associated person at the time of the events which gave rise to the dispute, claim or controversy. No member shall be assessed more than a single surcharge in any arbitration proceeding.

(3) The surcharge shall not be chargeable to any other party under Rules 10332(c) and 10205 (c) of the Code. The Director will refund the surcharge paid by a member in an arbitration filed by a customer if the arbitration panel: (A) denies all of a customer's claims against the member or associated person; and (B) allocates all forum fees assessed pursuant to Rule 10332(c) against the customer. The Director may also refund or cancel the member surcharge in extraordinary circumstances.

| Amount in Dispute | Surcharge |
|---|---|
| $.01 - $2,500 | $150 |
| $2,500.01 - $5,000 | $200 |
| $5,000.01 - $10,000 | $325 |
| $10,000.01 - $25,000 | $425 |
| $25,000.01 - $30,000 | $600 |
| $30,000.01 - $50,000 | $875 |
| $50,000.01 - $100,000 | $1,100 |
| $100,000.01 - $500,000 | $1,700 |
| $500,000.01 - $1,000,000 | $2,250 |
| $1,000,000.01 - $5,000,000 | $2,800 |
| $5,000,000.01 - $10,000,000 | $3,350 |
| Over 10,000,000 | $3,750 |

(4) For purposes of this Rule, service is perfected when the Director of Arbitration properly serves the Respondents to such proceeding under Rule 10314 of the Code.

(5) If the dispute, claim, or controversy does not involve, disclose, or specify a money claim, the non-refundable surcharge shall be $1,500 or such greater or lesser amount as the Director of Arbitration or the panel of arbitrators may require, but shall not exceed the maximum amount specified in the schedule.

(b) Prehearing and Hearing Process Fees

(1) Each member that is a party to an arbitration proceeding in which more than $25,000 is in dispute will pay:

(A) a non-refundable prehearing process fee of $750, due at the time the parties are sent arbitrator lists in accordance with Rule 10308(b)(5); and

(B) a non-refundable hearing process fee, due when the parties are notified of the date and location of the first hearing session, as set forth in the schedule below.

(2) If an associated person of a member is a party, the member that employed the associated person at the time of the events which gave rise to the dispute, claim or controversy will be charged the process fees, even if the member is not a party. No member shall be assessed more than one prehearing and one hearing process fee in any arbitration proceeding.

(3) The prehearing and hearing process fees shall not be chargeable to any other party under Rules

10332(c) and 10205(c) of the Code.

**Hearing Process Fee Schedule**

| Damages Requested | Hearing Process Fee |
|---|---|
| $1 - $25,000 | $ 0 |
| $25,000.01 - $50,000 | $1,000 |
| $50,000.01 - $100,000 | $1,700 |
| $100,000.01 - $500,000 | $2,750 |
| $500,000.01 - $1,000,000 | $4,000 |
| $1,000,000.01 - $5,000,000 | $5,000 |
| More than $5,000,000 | $5,500 |
| Unspecified | $2,200 |

*[Added by SR-NASD-94-11 eff. Feb. 25, 1994; amended by SR-NASD-94-16 eff. Mar. 31, 1994; amended by SR-NASD-94-74 eff. Dec. 28, 1994; amended by SR-NASD-97-40 eff. July 1, 1997; amended by SR-NASD-97-88 eff. Dec. 11, 1997; amended by SR-NASD-97-96 eff. Jan. 2, 1998; amended by SR-NASD-98-93 eff. Dec. 11, 1998; amended by SR-NASD-2001-62 eff. Nov. 19, 2001; amended by SR-NASD-2003-01 eff. Jan. 13, 2003. Selected Notices to Members: 01-70; 03-06.]*

## 10334. [Reserved]

(a) This rule provides procedures under which parties and arbitrators may communicate directly.

(b) Only parties that are represented by counsel may use direct communication under this Rule. If, during the proceeding, a party chooses to appear pro se (without counsel), this Rule shall no longer apply.

(c) All arbitrators and all parties must agree to the use of direct communication during the Initial Prehearing Conference or a later conference or hearing before it can be used.

(d) Parties may send the arbitrators only items that are listed in an order.

(e) Parties may send items by regular mail, overnight courier, facsimile, or email. All the arbitrators and parties must have facsimile or email capability before such a delivery method may be used.

(f) Copies of all materials sent to arbitrators must also be sent at the same time and in the same manner to all parties and the Director. Materials that exceed 15 pages, however, shall be sent to the Director only by regular mail or overnight courier.

(g) The Director must receive copies of any orders and decisions made as a result of direct communications among the parties and the arbitrators.

(h) Parties may not communicate orally with any of the arbitrators outside the presence of all parties.

(i) Any party or arbitrator may terminate the direct communication order at any time, after giving written notice to the other arbitrators and the parties.

*[Adopted by SR-NASD-2003-163 eff. Sept. 30, 2004. Selected Notice to Members: 04-62.]*

## 10335. Temporary Injunctive Orders; Requests for Permanent Injunctive Relief

(a) Temporary Injunctive Orders

(1) In industry or clearing disputes required to be submitted to arbitration pursuant to Rule 10201, parties may seek a temporary injunctive order, as defined in paragraph (a)(2) of this Rule, from a court of competent jurisdiction. Parties to a pending arbitration may seek a

temporary injunctive order from a court of competent jurisdiction even if another party has already filed a claim arising from the same dispute in arbitration pursuant to this paragraph, provided that an arbitration hearing on a request for permanent injunctive relief pursuant to paragraph (b) of this Rule has not yet begun.

(2) For purposes of this Rule, temporary injunctive order means a temporary restraining order, preliminary injunction or other form of initial, temporary injunctive relief.

(3) A party seeking a temporary injunctive order from a court with respect to an industry or clearing dispute required to be submitted to arbitration pursuant to Rule 10201 shall simultaneously file with the Director a Statement of Claim requesting permanent injunctive and all other relief with respect to the same dispute in the manner specified under this Code. The party seeking temporary injunctive relief shall also serve the Statement of Claim requesting permanent injunctive and all other relief on all other parties in the same manner and at the same time as the Statement of Claim is filed with the Director. Filings and service under this Rule shall be made by facsimile, overnight delivery service or messenger. Service shall be made on all parties at the same time and in the same manner, unless the parties agree otherwise. A party obtaining a court-issued temporary injunctive order shall notify the Director and the other parties of the issuance of the order within one business day.

(4) Unless otherwise stated, for purposes of computation of time under any paragraph of this Rule, any reference to days means calendar days, including Saturdays, Sundays or any NASD holiday. However, if a party must provide notice or a response to the Director and the day on which that notice or response to the Director must be given falls on a Saturday, Sunday or any NASD holiday, then the time period is extended until the next business day.

(b) Hearing on Request for Permanent Injunctive Relief

(1) Scheduling of Hearing

If a court issues a temporary injunctive order, an arbitration hearing on the request for permanent injunctive relief shall begin within 15 days of the date the court issues the temporary injunctive order. If the 15th day falls on a Saturday, Sunday, or NASD holiday, the 15-day period shall expire on the next business day. Unless the parties agree otherwise, a hearing lasting more than one day shall be held on consecutive days when reasonably possible. The Director shall provide to all parties notice of the date, time and place of the hearing at least three days prior to the beginning of the hearing.

(2) Composition of Arbitration Panel

The hearing on the request for permanent injunctive relief shall be heard by a panel of three arbitrators, who shall either be all non-public arbitrators as defined in Rule 10308(a)(4), or, if the underlying dispute would be heard by a public arbitrator or panel consisting of a majority of public arbitrators under Rule 10202, a majority of public arbitrators as defined in Rule 10308(a)(5).

(3) Selection of Arbitrators and Chairperson

(A) (i) In cases in which all of the members of the arbitration panel are non-public under paragraph (b)(2) of this Rule, the Director shall generate and provide to the parties a list of seven arbitrators from a national roster of arbitrators. The Director shall send to the parties the employment history for the past 10 years for each listed arbitrator and other background information. At least three of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

(ii) Each party may exercise one strike to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrator, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Direct shall consolidate the parties' rankings, and shall appoint arbitrators based on the order of rankings on the consolidated list, subject to the arbitrators' availability and disqualification.

(B) (i) In cases in which the panel of arbitrators consists of a majority of public arbitrators under paragraph (b)(2) of this Rule, the Director shall generate and provide to the parties a list of nine arbitrators from a national roster of arbitrators. The Director shall send to the

parties employment history for the past 10 years for each listed arbitrator and other background information. At least a majority of the arbitrators listed shall be public arbitrators, and at least four of the arbitrators listed shall be lawyers with experience litigating cases involving injunctive relief.

> (ii) Each party may exercise two strikes to the arbitrators on the list. Within three days of receiving the list, each party shall inform the Director which arbitrators, if any, it wishes to strike, and shall rank the remaining arbitrators in order of preference. The Director shall consolidate the parties' rankings, and shall appoint arbitrators based on the order of rankings on the consolidated list, subject to the arbitrators' availability and disqualification.

(C) (i) Each party shall inform the Director of its preference of chairperson of the arbitration panel by the close of business on the next business day after receiving notice of the panel members.

> (ii) If the parties do not agree on a chairperson within that time, the Director shall select the chairperson. In cases in which the panel consists of a majority of public arbitrators, the Director shall select a public arbitrator as chairperson. Whenever possible, the Director shall select as chairperson the lawyer with experience litigating cases involving injunctive relief whom the parties have ranked the highest.

(D) The Director may exercise discretionary authority and make any decision that is consistent with the purposes of this Rule and Rule 10308 to facilitate the appointment of arbitration panels and the selection of chairperson.

(4) Applicable Legal Standard

The legal standard for granting or denying a request for permanent injunctive relief is that of the state where the events upon which the request is based occurred, or as specified in an enforceable choice of law agreement between the parties.

(5) Effect of Pending Temporary Injunctive Order

Upon a full and fair presentation of the evidence from all relevant parties on the request for permanent injunctive relief, the panel may prohibit the parties from seeking an extension of any court-issued temporary injunctive order remaining in effect, or, if appropriate, order the parties jointly to move to modify or dissolve any such order. In the event that a panel's order conflicts with a pending court order, the panel's order will become effective upon expiration of the pending court order.

(6) Fees, Costs and Expenses, and Arbitrator Honorarium

(A) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in the hearing on the request for permanent injunctive relief. The arbitrators may reallocate such costs and expenses among the parties in the award.

(B) The party seeking injunctive relief shall pay the expedited hearing fees pursuant to Rule 10205(h), or, where both sides seek such relief, both parties shall pay such fees. In either event, however, the arbitrators may reallocate such fees among the parties in the award.

(C) Notwithstanding any other provision in the Code, the chairperson of the panel hearing a request for permanent injunctive relief pursuant to this Rule shall receive an honorarium of $375 for each single session, and $700 for each double session, of the hearing. Each other member of the panel shall receive an honorarium of $300 for each single session, and $600 for each double session, of the hearing. The parties shall equally pay the difference between these amounts and the amounts panel members and the chairperson receive under the Code pursuant to IM-10104. The arbitrators may reallocate such amount among the parties in the award.

(c) Hearing on Damages or other Relief

(1) Upon completion of the hearing on the request for permanent relief, the panel, may, if necessary, set a date for any subsequent hearing on damages or other relief, which shall be held before the same panel of arbitrators and which shall include, but not be limited to, the same record.

(2) The parties shall jointly bear reasonable travel-related costs and expenses incurred by arbitrators who are required to travel to a hearing location other than their primary hearing location(s) in order to participate in any subsequent hearings on damages or other relief. The arbitrators may reallocate such costs and expenses among the parties in the award.

(d) Effective Date

This Rule shall apply to arbitration claims filed on or after March 25, 2002. Except as otherwise provided in this Rule, the remaining provisions of the Code shall apply to proceedings instituted under this Rule.

*[Adopted by SR-NASD-93-38 eff. Jan. 3, 1996; amended by SR-NASD-96-44 eff. Dec. 20, 1996; amended by SR-NASD-97-87 eff. Jan. 3, 1998; amended by SR-NASD-98-42 eff. June 24, 1998; amended by SR-NASD-98-97 eff. Dec. 28, 1998; amended by SR-NASD-99-27 eff. June 16, 1999; amended by SR-NASD-99-72 eff. Dec. 28, 1999; amended by SR-NASD-00-75 eff. Jan. 5, 2001; amended by SR-NASD-00-02 eff. Mar. 25, 2002.]*

## 10400. Mediation Rules

## 10401. Scope and Authority

(a) The NASD Mediation Procedures ("Procedures") set forth in this Rule 10400 Series shall apply to the mediation of any dispute, claim or controversy ("matter") administered by the Association.

(b) A Director of Mediation shall be designated by the NASD Dispute Resolution Board to administer mediations under these Procedures. The Director will consult the National Arbitration and Mediation Committee on the administration of mediations and the Committee shall, as necessary, make recommendations to the Director of Arbitration and recommend to the NASD Dispute Resolution Board amendments to the Procedures. The duties and functions of the Director may be delegated by the Director, as appropriate. For purposes of this Rule 10400 Series, the term "Director" refers to the Director of Mediation.

(c) Neither the Association nor any mediator appointed to mediate a matter pursuant to these Procedures shall have any authority to compel a party to participate in a mediation or to settle a matter.

*[Adopted by SR-NASD-95-25 eff. Aug. 1, 1995; amended by SR-NASD-98-48 eff. Nov. 17, 1998; amended by SR-NASD-99-21 eff. July 9, 2000.]*

## 10402. Submission of Eligible Matters

Any matter eligible for arbitration under this Code, any part thereof, or any issue related to the matter, including procedural issues, may be submitted for mediation under these Procedures upon the agreement of all parties. A matter will be deemed submitted when the Director has received an executed Submission Agreement from each party. The Director shall have the sole authority to determine if a matter is eligible to be submitted for mediation.

*[Adopted by SR-NASD-95-25 eff. Aug. 1, 1995.]*

## 10403. Arbitration Proceedings

(a) Unless the parties agree otherwise, the submission of a matter for mediation shall not stay or otherwise delay the arbitration of a matter pending under this Code. When all parties agree to stay the

arbitration in order to mediate the claim, the arbitration proceeding shall be stayed, notwithstanding any provision to the contrary in this Code.

(b) If mediation is conducted through NASD Dispute Resolution, Inc., no adjournment fees will be charged for staying the arbitration proceeding in order to mediate.

*[Adopted by SR-NASD-95-25 eff. Aug. 1, 1995; amended by SR-NASD-00-11 eff. November 1, 2000.]*


## 10404. Mediator Selection

(a) A mediator may be selected: (1) by the parties from a list supplied by the Director; (2) by the parties from a list or other source of their own choosing; or (3) by the Director if the parties do not act to select a mediator after submitting a matter to mediation.

(b) With respect to any mediator assigned or selected from a list provided by the Association, the parties will be provided with information relating to the mediator's employment, education, and professional background, as well as information on the mediator's experience, training, and credentials as a mediator. Any mediator selected or assigned to mediate a matter shall comply with the provisions of Rule 10312(a), (b) and (c), unless, with respect to a mediator selected from a source other than the Association's lists, the parties elect to waive such disclosure.

(c) No mediator shall be permitted to serve as an arbitrator of any matter pending in Association arbitration in which he served as a mediator, nor shall the mediator be permitted to represent any party or participant to the mediation in any subsequent Association arbitration proceeding relating to the subject matter of the mediation.

*[Adopted by SR-NASD-95-25 eff. Aug. 1, 1995; amended by SR-NASD-99-21 eff. July 9, 2000.]*


## 10405. Limitation on Liability

The Association, its employees, and any mediator named to mediate a matter under this Rule 10400 Series, shall not be liable for any act or omission in connection with a mediation administered pursuant to these Procedures.

*[Adopted by SR-NASD-95-25 eff. Aug. 1, 1995.]*


## 10406. Mediation Ground Rules

(a) The following Ground Rules are established to govern the mediation of a matter. The parties to a mediation may agree to amend any or all of the Ground Rules at any time. The Ground Rules are intended to be standards of conduct for the parties and the mediator.

(b) Mediation is voluntary and any party may withdraw from mediation at any time prior to the execution of a written settlement agreement by giving written notice of withdrawal to the mediator, the other parties, and the Director.

(c) The mediator shall act as a neutral, impartial, facilitator of the mediation process and shall not have any authority to determine issues, make decisions or otherwise resolve the matter.

(d) Following the selection of a mediator, the mediator, all parties and their representatives will meet in person or by conference call for all mediation sessions, as determined by the mediator or by mutual agreement of the parties. The mediator shall facilitate, through joint sessions, caucuses and/or other means, discussions between the parties, with the goal of assisting the parties in reaching their own resolution of the matter. The mediator shall determine the procedure for the conduct of the mediation. The parties and their representatives agree to cooperate with the mediator in ensuring that the mediation is conducted expeditiously, to make all reasonable efforts to be available for mediation sessions, and to be represented at all scheduled mediation sessions either in person or through a person with authority to settle the matter.

(e) The mediator may meet with and communicate separately with each party or their representative. The mediator shall notify all other parties of any such separate meetings or other communications.

(f) The parties agree to attempt, in good faith, to negotiate a settlement of the matter submitted to

mediation. Notwithstanding that a matter is being mediated, the parties may engage in direct settlement discussions and negotiations separate from the mediation process.

(g)    (1) Mediation is intended to be private and confidential. The parties and the mediator agree not to disclose, transmit, introduce, or otherwise use opinions, suggestions, proposals, offers, or admissions obtained or disclosed during the mediation by any party or the mediator as evidence in any action at law, or other proceeding, including a lawsuit or arbitration, unless authorized in writing by all other parties to the mediation or compelled by law, except that the fact that a mediation has occurred shall not be considered confidential.

(2) Notwithstanding the foregoing, the parties agree and acknowledge that the provisions of this paragraph shall not operate to shield from disclosure to the Association or any other regulatory authority, documentary or other information that the Association or other regulatory authority would be entitled to obtain or examine in the exercise of its regulatory responsibilities.

(3) The mediator will not transmit or otherwise disclose confidential information provided by one party to any other party unless authorized to do so by the party providing the confidential information.

*[Adopted by SR-NASD-95-25 eff. Aug. 1, 1995.]*

## 10407. Mediation Fees

(a) Filing Fees: Cases Filed Directly in Mediation

Each party to a matter submitted directly to a mediation administered by the Association shall pay an administrative fee to the Association in the amounts indicated in the schedule below, unless such fee is specifically waived by the Director of Mediation.

| Amount in Controversy | Customer and Associated Person Fee | Member Fee | Total Fees |
|---|---|---|---|
| $.01-$25,000 | $ 50 | $150 | $200 |
| $25,000.01-$100,000 | $150 | $300 | $450 |
| Over $100,000 | $300 | $500 | $800 |

(b) Filing Fees: Cases Initially Filed in Arbitration

When a matter is initially filed in arbitration and subsequently submitted to a mediation administered by the Association, each party shall pay an administrative fee to the Association in the amounts indicated in the schedule below, unless such fee is specifically waived by the Director of Mediation.

| Amount in Controversy | Customer and Associated Person Fee | Member Fee | Total Fees |
|---|---|---|---|
| $.01-$25,000 | $ 0 | $ 0 | $ 0 |
| $25,000.01-$100,000 | $100 | $150 | $250 |
| Over $100,000 | $250 | $500 | $750 |

(c) Mediator Fees and Expenses

The parties to a mediation administered by the Association shall pay all of the mediator's charges, including the mediator's travel and other expenses. The charges shall be specified in the Submission Agreement and shall be apportioned equally among the parties unless they agree otherwise. Each party shall deposit with the Association its proportional share of the anticipated mediator charges and expenses, as determined by the Director of Mediation, prior to the first mediation session.

*[Adopted by SR-NASD-00-11 eff. November 1, 2000.]*

©2004 NASD. All rights reserved. | Legal Notices and Privacy Policy.

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

|  |  |
|---|---|
| In the Matter of the Arbitration Between:<br><br>KASHNER DAVIDSON SECURITIES CORP.,<br><br>    *Claimant/Respondent in Counterclaim,*<br><br>v.<br><br>STEVEN MSCISZ, MARK MSCISZ, and<br>LYNDA MSCISZ,<br><br>    *Respondents/Counterclaimants.*<br><br>v.<br><br>VICTOR KASHNER, MATTHEW MEISTER and<br>TIMOTHY VARCHETTO,<br><br>    *Third Party Respondents.* | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NASD DISPUTE RESOLUTION NO. 04-03793 |

### SUBMISSION AGREEMENT

1.     Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties hereby submit the present matter in controversy, as set forth in the statement of claim, answers, cross claims and all related counterclaims and/or third party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

2.     The undersigned parties hereby state that their attorney has read and explained to them the procedures and rules of the sponsoring organization relating to arbitration.

3.     Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s), and that the arbitration will be conducted in accordance with the Constitution, By-Laws, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

4.  Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.  The undersigned parties reserve their right to seek adjudication of their claims and defenses in a court of competent jurisdiction if the sponsoring organization does not afford them a fair and complete opportunity to obtain such an adjudication.

IN WITNESS WHEREOF, the parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____          ___8/26/04_____
STEVEN MSCISCZ                      Date

_____          ___8/26/04_____
MARK MSCISCZ                        Date

_____          ___8/26/04_____
LYNDA MSCISCZ                       Date


**CERTIFICATE OF SERVICE**

I hereby certify that on this twenty-sixth day of August, 2004, I caused a copy of the foregoing document to be served by overnight mail upon the attorney of record for Kashner Davidson Securities Corporation.

_____
William P. Corbett, Jr.

- 2 -

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____ )
|                                                   )
In the Matter of the Arbitration Between:           )
                                                    )
KASHNER DAVIDSON SECURITIES CORP.,                  )
                                                    )
    *Claimant/Respondent in Counterclaim,*          )
                                                    )
         v.                              )
                                                    )
STEVEN MSCISZ, MARK MSCISZ, and                     )
LYNDA MSCISZ,                                        )    NASD DISPUTE RESOLUTION No. 04-03793
                                                    )
    *Respondents/Counter- and Third Party Claimants.* )
                                                    )
         v.                              )
                                                    )
VICTOR KASHNER, MATTHEW MEISTER and                 )
TIMOTHY VARCHETTO,                                  )
                                                    )
    *Third Party Respondents.*                     )
_____)

**FIRST REQUEST OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ
FOR DOCUMENTS AND OTHER INFORMATION TO BE PRODUCED
BY CLAIMANT/RESPONDENT-IN-COUNTERCLAIM**

       Pursuant to Rule 10321(a), Respondents/Counter- and Third Party Claimants Steven

Mscisz ("Steven"), Mark Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively

"Customers") hereby request that Claimant/Respondent-in-Counterclaim Kashner Davidson

Securities Corporation ("Broker-Dealer" or "KDSC") provide them with the documents and

information specified in this Request.

### *Definitions & Instructions*

Except as otherwise specified, the definitions and instructions set forth below are incorporated into each of the following Requests as if fully stated therein.

Arbitration.  The term "Arbitration" refers to *Kashner Davidson Securities Corp. v. Mscisz,* NASD Dispute Resolution Case No. 04-03793, as well as to any facts and circumstances underlying or otherwise giving rise to the Arbitration.

Association or NASD.  The terms "Arbitration" and "NASD" refer to the National Association of Securities Dealers, Inc.

Broker-Dealer or KDSC.  The terms "Broker-Dealer" and "KDSC" as well as any full or abbreviated name or a pronoun referring to the Broker-Dealer or KDSC means Claimant/ Respondent-in-Counterclaim Kashner Davidson Securities Corporation and any person acting on its behalf.

Communication.  The term "communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

Concerning.  The term "concerning" means referring to, describing, evidencing, or constituting.

Customers.  The term "Customers" as well as any full or abbreviated name or a pronoun referring to the Customers means Respondents/Counter- and Third Party Claimants Steven, Mark Mscisz, Lynda Mscisz, and any person acting on behalf of the Customers or any of them.

Describe.  The term "describe" means to give a full description of all pertinent details, including when, where and how the matter being described occurred.  When a request calls upon you to describe an act, practice or occurrence, you shall:

(1)     identify and produce a copy of each and every document (and, where pertinent, the section, article, or subparagraph thereof), which forms any part of the source of your information regarding the alleged facts referred to in the request;

(2)     identify each and every statement which forms any part of your information regarding the alleged facts referred to in the request;

(3)     state separately the individual acts, practices or omissions on the part of any person (identifying the acts or omissions to act by stating their nature, time, and place, and identifying the persons involved) which form any part of your information regarding the alleged facts referred to in the request; and

(4)     state separately each other fact which forms any part of your information regarding the alleged facts referred to in the request.

Document.  The term "document" is synonymous in meaning and equal in scope to the usage of the term in Federal Rule of Civil Procedure 34, and it extends to all documents in your possession, custody or control.  A draft or non-identical copy is a separate document within the meaning of this term.

Identify (With Respect to Documents).  When referring to documents, "identify" means to specify for each such document the:

(1)     type of document (e.g., report, letter, cable, telecopy, electronic mail, paper, pamphlet, periodical, advertisement);

(2)     general subject matter;

(3)     origin;

(4)     date; and

(5)     all persons creating or receiving the document, including but not limited to author(s), addressee(s), and intended or unintended recipient(s).

Identify (With Respect to Persons).  When referring to a person, "identify" means to give, to the extent known: the person's full name; present or last known home address; home, work and mobile telephone numbers; and, when referring to a natural person, the present or last known place of employment.  Once a person has been identified in accordance with this paragraph, only the name of that person need be listed in response to subsequent Requests requiring identification of that person, provided that if multiple responsive individuals share the same name, you shall provide sufficient additional information to distinguish between them.

Lynda.  The term "Lynda" as well as any full or abbreviated name or a pronoun referring to Lynda means Respondent/Counter- and Third Party Claimant Lynda Mscisz, as well as any person acting on Lynda's behalf.

Mark.  The term "Mark" as well as any full or abbreviated name or a pronoun referring to Mark means Respondent/Counter- and Third Party Claimant Mark Mscisz, as well as any person acting on Mark's behalf.

Parties.  The terms "Claimant," "Respondent," "Third Party Claimaint," "Third Party Respondent," "Counterclaimant," and "Respondent-in-Counterclaim," as well as a party's full or abbreviated name or a pronoun referring to a party mean the party and, where applicable, its officers, directors, employees, partners, corporate parents, attorneys, subsidiaries, or affiliates. This definition is not intended to impose a obligation to produce information on any person who is not a party.

Person.  The term "person" includes natural persons, corporations, firms, partnerships, unincorporated associations, trusts, government agencies, and any other business, legal, or governmental entity or association.

<u>State the Basis</u>.  When a request calls upon you to "state the basis" for a particular claim, defense, assertion, allegation or contention, you shall:

(1)    identify and produce a copy of every document (and where pertinent, the section, article or subparagraph thereof) which forms any part of the source of your information concerning the alleged facts or legal conclusions referred to by the request;

(2)    identify every communication which forms any part of the source of your information concerning the alleged facts or legal conclusions referred to by the request;

(3)    state separately the acts or omissions to act on the part of any person (identifying the acts or omissions to act by stating their nature, time and place and identifying the persons involved) which form any part of your information concerning the alleged facts or legal conclusions referred to in the request; and

(4)    state separately any other fact which forms the basis of your information concerning the alleged facts or conclusions referred to in the request.

<u>Statement</u>.  The term "statement" means any written or oral statement, assertion, representation or communication by or through which information is transmitted (in the form of facts, ideas, inquiries, or otherwise).

<u>Steven</u>.  The term "Steven" as well as any full or abbreviated name or a pronoun referring to Steven means Respondent/Counter- and Third Party Claimant Steven Mscisz, as well as any person acting on Steven's behalf.

<u>You</u>.  The term "you" refers to the party to whom these Requests are directed.

Documents should be produced in the same format as they are kept.  Accordingly, hard copies should be produced as hard copies; documents stored in electronic formats should be produced in the selfsame electronic formats.

All documents produced pursuant to these Requests should be numbered sequentially ("Bates numbered").

Singular and plural nouns and pronouns are used interchangeably in these Requests, and they should be considered to be coextensive in meaning.

Masculine and feminine nouns and pronouns are used interchangeably in these Requests, and they should be considered to be coextensive in meaning.

The disjunctive "or" and conjunctive "and" are used interchangeably in these Requests, and they should be considered to be coextensive in meaning.

Except as otherwise specified, the following Requests concern the time period between January 1, 2003 and the present.

If you respond to any Request by referring to records from which the answer may allegedly be derived or ascertained:

(1)     the specification of records shall be in sufficient detail to permit the plaintiff to locate and identify the records and to ascertain the answer as readily as could you;

(2)     you shall make available any computerized information or summaries thereof that you have or can adduce by a relatively simple procedure, to the extent these materials are not privileged or otherwise immune from discovery;

(3)     you shall provide any relevant compilations, abstracts, or summaries in your custody or readily obtainable by you, unless these materials are privileged or otherwise immune from discovery;  and

(4)     if not previously produced by you, the documents shall be made available for inspection and copying within seven (7) days after service of the answers to Requests unless another date is agreed upon by the parties.

When a claim of privilege is asserted in objection to any request, or any sub-part thereof, and an answer is not provided on the basis of that assertion, the attorney asserting the privilege shall describe in the objection the nature of the privilege that is being claimed, identifying the particular privilege rule that is being invoked.  If that assertion of privilege relates to a book, paper, document or tangible thing you are withholding, you shall provide a log that specifies, for each withheld document, the:

    (1)    type of document (e.g., report, letter, cable, telecopy, electronic mail transmission, paper, pamphlet, periodical, advertisement);

    (2)    general subject matter;

    (3)    origin;

    (4)    date;

    (5)    persons creating or receiving the document, including but not limited to author(s), addressee(s), and intended or unintended recipient(s);

    (6)    number of pages;

    (7)    nature of the privilege claimed; and

    (8)    the particular privilege rule invoked.

*Specific Requests for Information*

**Request No. 1**

Please produce copies of all documents specified in NASD Dispute Resolution Document Production Lists 1, 3, 5, 7, 9 and 13

**Request No. 2**

Please produce copies all documents not produced in response to Request No. 1 which relate in any way whatsoever to any of the facts and circumstances underlying the Arbitration, to any putative claim or defense asserted or which might be asserted in that proceeding, or to your responses to these Requests.

**Request No. 3**

Please identify all persons likely to have any knowledge whatsoever concerning your response to any of these Requests, any of the facts and circumstances underlying the Arbitration, or any putative claim or defense asserted or which might be asserted in that proceeding.  Your response must, at the very least:

(a)     identify all persons known to you or your attorney who witnessed the operative transactions and occurrences;

(b)     identify all persons you or your attorney believe to have substantial discoverable information about such claims and defenses;

(c)     describe the subject and substance of the information possessed by any person identified in response to this request.

**Request No. 4**

Please identify each person whom you expect to call as a fact witness in the Arbitration or at any pre-Arbitration evidentiary hearing, including in your response a description of her expected testimony.

**Request No. 5**

Please describe each communication between KDSC and the Customers.

**Request No. 6**

Please identify each person whom you expect to call as an expert witness in the

Arbitration or at any pre-Arbitration evidentiary hearing, including in your response:

(a)     a complete description of all opinions to be expressed and the basis and
        reasons therefor;

(b)     the data or other information considered by the putative expert in forming
        the opinions;

(c)     any exhibits to be used as a summary of or support for the opinions;

(d)     the qualifications of the putative expert, including a list of all publications
        authored by the putative expert since January 1, 1994;

(e)     the compensation to be paid for the putative expert's study and testimony;
        and

(f)     a description of any other cases in which the witness has testified as an
        expert at trial, at an arbitration, or by deposition since January 1, 1994.

**Request No. 7**

Please identify each person from whom you or your attorneys have obtained a statement

concerning any of the facts and circumstances underlying the Arbitration or any putative claim or

defense asserted or which might be asserted in that proceeding, and describe each such

statement.

**Request No. 8**

Please produce copies of all records, including but not limited to telephone logs, invoices

from service providers, facsimile logs and the like, concerning wireless or wire communications

between KDSC and the Customers.

**Request No. 9**

Please describe each communication between KDSC and any person (including but not limited to internal KDSC communications) concerning: your response to any Request, or any of the facts and circumstances underlying the Arbitration, or any putative claim or defense asserted or which might be asserted in this proceeding.

**Request No. 10**

Please produce copies of all records, including but not limited to telephone logs, invoices from service providers, facsimile logs and the like, concerning wireless or wire communications between KDSC and any person (including but not limited to internal KDSC communications) concerning: your response to any Request, or any of the facts and circumstances underlying the Arbitration, or any putative claim or defense asserted or which might be asserted in this proceeding.

**Request No. 11**

Please identify each government agency, self-regulatory organization or official of a government agency or self-regulatory organization known to you or your attorneys to have investigated or to be investigating any of the acts and occurrences giving rise to the Arbitration, and describe each such investigation

**Request No. 12**

If you contend that the Customers waived any right, state the basis for that contention.

**Request No. 13**

Please describe all arbitrations and civil, criminal and administrative litigation in which KDSC or any of its principals, registered representatives, associated persons or other employees has been involved since January 1, 1994, identifying in your response, for each such proceeding, its parties, the tribunal in which it was pending, docket number, manner in which it was resolved, and sworn testimony given by KDSC or any of its principals, registered representatives, associated persons or other employees.

**Request No. 14**

Please produce copies of all employee handbooks, compliance manuals, policies and other documents concerning the conduct and supervision of KDSC principals, associated persons, registered representatives and other employees.

**Request No. 15**

Please produce copies of all documents concerning training provided by or on behalf of KDSC concerning the conduct and supervision of KDSC principals, associated persons, registered representatives and other employees.

**Request No. 16**

Please produce copies of all documents concerning policies and procedures concerning the extension of margin credit to KDSC customers.

**Request No. 17**

Please produce copies of all documents concerning training provided by or on behalf of KDSC concerning policies and procedures concerning the extension of margin credit to KDSC customers.

**Request No. 18**

Please produce copies of all documents concerning policies and procedures concerning conflicts of interest and the disclosure thereof.

**Request No. 19**

Please state the name, current address, and employment dates of each person registered with the Association who was employed by or associated with the Broker-Dealer at any time during the period in which the Customers maintained accounts at KDSC.

**Request No. 20**

Please describe the outside business activities and private securities transactions (if any) of Matthew Meister, Timothy Varchetto and each other KDSC associated person, registered representative, principal or other employee who communicated with the Customers or serviced their accounts during the period in which the Customers maintained accounts at KDSC.

**Request No. 21**

Please produce copies of the personnel files for Matthew Meister, Timothy Varchetto and each other KDSC associated person, registered representative, principal or other employee who communicated with the Customers or serviced their accounts.

**Request No. 22**

Please describe all plans and programs of KDSC concerning incentives, bonuses, "spiffs," "overrides," commissions and the like paid to associated persons, registered representatives, principals or other employees during the period in which the Customers maintained accounts at KDSC.

**Request No. 23**

Please describe all incentives, bonuses, "spiffs," "overrides," commissions and the like paid to associated persons, registered representatives, principals or other employees who communicated with the Customers or serviced their accounts during the period in which the Customers maintained accounts at KDSC.

**Request No. 24**

Please produce copies of all documents concerning training provided by or on behalf of KDSC concerning policies and procedures concerning conflicts of interest and the disclosure thereof.

**Request No. 25**

Please describe and produce copies of all reports made by KDSC pursuant to Association Business Conduct Rule 3070.

**Request No. 26**

Please produce copies of the personnel files for each current or former KDSC associated person, registered representative, principal or other employee who formerly worked at a Disciplined Firm (as that term is defined in Association Business Conduct Rule 3010(b)(2)(J)).

**Request No. 27**

Please state the basis for each averment set forth in your Statement of Claim.

**Request No. 28**

Please state the basis for each affirmative defense you interpose in response to the Customers' Statement of Counterclaims & Third Party Claims.

**Request No. 29**

Please produce copies of all documents concerning any affidavits, deposition testimony or trial testimony previously given by any KDSC employee since January 1, 1993.

**Request No. 30**

Please describe all contracts and other agreements between or among the Customers and the Broker-Dealer.

**Request No. 31**

Please state the basis for each recommendation concerning a securities transaction or trading strategy made by KDSC to the Customers.

**Request No. 32**

If you contend that KDSC was authorized to exact a "markup" or commission from the Customers when effecting a trade, please state the basis for that contention, specifying the contract or other agreement on which that authority was based the manner in which the "markup" or commission was to be calculated.

**Request No. 33**

Please specify the amounts you presently contend to be owed by the Customers to KDSC and state the basis for that contention.

**Request No. 34**

Please specify, for each securities transaction effected by KDSC ostensibly on the Customers' behalf, its date and time, the exchange on which it was effected, number of shares traded, the commission or "markup" exacted by KDSC, exchange and SEC fees, and taxes assessed, and identify, where possible, the counterparty to each such transaction.

**Request No. 35**

Please describe all long and short positions directly or indirectly maintained by KDSC or any person directly or indirectly associated with KDSC in any security held by the Customers.

**Request No. 36**

Please describe all orders directly or indirectly placed by KDSC or any person directly or indirectly associated with KDSC in any security held by the Customers.

**Request No. 37**

Please identify all other KDSC customers who placed orders or held long or short positions in any security held by the Customers.

**Request No. 38**

Please describe all communications between KDSC and any person (including but not limited to internal KDSC communications) concerning any security held by the Customers.

**Request No. 39**

Please describe the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with any public offering of any security held by the Customers.

**Request No. 40**

Please produce copies of all documents concerning the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with any public offering of any security held by the Customers.

**Request No. 41**

Please describe the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with "making a market" in any security held by the Customers.

**Request No. 42**

Please produce copies of all documents concerning the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with "making a market" in any security held by the Customers.

**Request No. 43**

Please identify and produce each document, not otherwise identified, concerning:  your response to any Request or any of the facts and circumstances underlying the Arbitration or any putative claim or defense asserted or which might be asserted in this proceeding.

**Request No. 44**

Please produce copies of all documents concerning KDSC's financial condition the Broker-Dealer is required to make available for inspection pursuant to the Association's Business Conduct Rule 2270.

**Request No. 45**

Please describe all communications between KDSC and the Customers concerning "day-trading", including in your response a copies of each risk disclosure statement specified by the Association's Business Conduct Rule 2361 that was provided to the Customers.

**Request No. 46**

Please describe all communications between KDSC and any person (including but not limited to internal KDSC communications) concerning "day-trading" by the Customers.

**Request No. 47**

Please identify each person responding to or assisting in the preparation of responses to these Requests.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  August 26, 2004

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

```
------------------------------------------------------------------------x
In the Matter of the Arbitration Between:              :
                                                       :
KASHNER DAVIDSON SECURITIES CORPORATION, :         NASD No. 04-03793
                                                       :
      Claimant/Counterclaim Respondent,                :
                                                       :
             -against-                                 :
                                                       :
STEVEN MSCISZ, MARK MSCISZ, and                        :
LYNDA MSCISZ,                                           :
                                                       :
      Respondents/Counter-and-Third-Party Claimants,   :
                                                       :
VICTOR KASHNER, MATTHEW MEISTER and                    :
TIMOTHY VARCHETTO,                         .           :
                                                       :
      Third-Party Respondents.                         :
------------------------------------------------------------------------x
```

**CLAIMANT AND THIRD-PARTY RESPONDENTS' OBJECTIONS AND
RESPONSES TO RESPONDENTS/THIRD-PARTY CLAIMANTS' FIRST
REQUEST FOR THE PRODUCTION OF DOCUMENTS AND INFORMATION**

Claimant/Counterclaim Respondent Kashner Davidson Securities Corporation

("KDSC"), and Third-Party Respondents Victor Kashner ("Kashner"), Matthew Meister

("Meister") and Timothy Varchetto ("Varchetto") (for ease of reference, hereinafter collectively

"Claimant"), by and through their counsel, Sichenzia Ross Friedman Ference LLP, submit the

following as their Objections and Responses to Respondents' First Request for Documents and

Information.

**General Objections And Responses**

1.      Claimant objects to the requests to the extent that they are inconsistent with, or

attempt to impose obligations on Claimant beyond those found in the NASD Code of Arbitration

Procedure (the "NASD Code") or the NASD Discovery Guide (the "Discovery Guide").

2.      Claimant objects to the requests insofar as they call for the production of documents protected by the attorney-client or other similar privilege, or which are otherwise immune or protected from disclosure. Claimant objects to the requests insofar as they call for the production of materials prepared in the anticipation of litigation and/or trial preparation materials. Claimant also objects to the requests insofar as they call for the production of attorneys' work product including, without limitation, any materials containing or reflecting the mental impressions, conclusions, opinions, and/or legal theories of any attorneys for Respondents. Hereinafter, in the context of Claimant's responses to requests by Respondents, these privileges shall be collectively referred to as "Privileged Materials."

3.      Claimant objects to the requests to the extent they seek "all" documents set forth in the requests as vague, overly broad and unduly burdensome. To the extent not objected to otherwise, Claimant will search for and produce documents that on their face contain references to subjects specifically described in the requests, and documents whose relationship to those subjects is readily apparent because of the manner in which they have been kept.

4.      By responding to the requests, Claimant does not acknowledge or concede the truth or accuracy of any characterization, allegation, or statement made in such document requests, and Claimant objects generally to such characterizations, allegations or statements.

5.      Claimant reserves its right to object on any ground to the use of any of the responses to Respondents' document requests or subject matter thereof in any subsequent proceeding or at the hearing of this action.

6.      To the extent responsive documents may be deemed confidential, Claimant will produce such documents only after all the receiving party has entered into an appropriate confidentiality stipulation.

7.      Claimant reserves its right to object on any ground at any time to a request for further responses to the requests or any other discovery procedure involving or relating to the subject matter of Claimant's responses.

8.      Claimant reserves its right at any time to revise, correct, amend, supplement or clarify any response set forth below.

9.      To the extent documents may be responsive to more than one of the requests, Claimant will produce such documents only once.

10.     Claimant objects to the lengthy and onerous instructions set forth in Respondents' discovery request on the grounds that such instructions are not expressly allowed by the NASD Code and impose an undue burden upon a party in arbitration.

11.     Claimant objects to the time period of the requests propounded by Respondent on the grounds that the time period set forth, January 1, 2003 through the present, seeks documents that are not relevant to the narrow time period at issue in the pleadings. Accordingly, unless specifically stated below, Claimant will limit its response to documents pertaining to the time period December 1, 2003 through April 30, 2004.

### Specific Objections And Responses

Request 1, List 1, Item 1

Responsive documents are produced herewith.

Request 1, List 1, Item 2

Responsive documents are produced herewith.

Request 1, List 1, Item 3

Responsive documents are produced herewith.

Request 1, List 1, Item 4

Responsive documents are produced herewith.

Request 1, List 1, Item 5

Responsive documents are produced herewith.

Request 1, List 1, Item 6

Responsive documents are produced herewith.

Request 1, List 1, Item 7

Responsive documents are produced herewith.

Request 1, List 1, Item 8

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 1, List 1, Item 9

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks confidential and/or proprietary materials, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 1, List 1, Item 10

Responsive documents are produced herewith.

Request 1, List 1, Item 11

Responsive documents are produced herewith.

Request 1, List 1, Item 12

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 1, List 3

Claimant objects to producing items identified on List 3 of the Discovery Guide, which pertains to churning claims, on the grounds that these documents are not relevant to the factual allegations and viable legal claims framed in the pleadings, which do not set forth such a legal claim, and the request for these items places an undue and excessive burden on Claimant.

Request 1, List 5

Claimant objects to producing items identified on List 5 of the Discovery Guide, which pertains to viable claims for failure to supervise, on the grounds that these documents are not relevant to the factual allegations and viable legal claims framed in the pleadings, which do not set forth such a legal claim, and the request for these items places an undue and excessive burden on Claimant.

Request 1, Lists 7 and 9, and List 13, Item 1

Claimant states that the only document potentially responsive to this request is the Prospectus filed by Vaso Active Pharmaceuticals, Inc. with the U.S. Securities and Exchange Commission ("SEC") – a copy of which was previously provided to Respondents and can otherwise be obtained from the SEC's website.

Request 1, List 13, Item 2

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 2

Claimant objects to this omnibus request on the grounds that it is vague, overbroad, it seeks potentially Privileged Materials, and it places an undue burden upon Claimant. Claimant respectfully requests that Respondents propound a specific request for a particular document.

Request 3

Claimant objects to this request on the grounds that is overbroad, unduly burdensome and it is an impermissible interrogatory, which is prohibited by the NASD Discovery Guide. Without waiving its objections, Claimant states that Respondents, Timothy Varchetto, Matthew Meister, and Melissa Rothenbach have knowledge concerning the factual allegations set forth in the pleadings.

Request 4

Claimant objects to this request on the grounds that it seeks to invade the attorney work product privilege. Under Rule 10321(c) of the NASD Code, a party is not required to determine and identify who it will present as factual witnesses in its direct case until twenty days prior to the hearing. At this time, Claimant's Counsel has not definitively determined who they will call as factual witnesses in Claimant's case in chief. Moreover, Claimant objects to the prong of the request seeking the "description of her expected testimony" on the grounds that it is an impermissible interrogatory.

6

Request 5

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, and it is an impermissible interrogatory, which is prohibited by the NASD Discovery Guide.

Request 6

Claimant objects to this request on the grounds that it seeks to invade the attorney work product privilege. Under Rule 10321(c) of the NASD Code, a party is not required to determine and identify who it will present as its testifying expert witness in its direct case until twenty days prior to the hearing. At this time, Claimant's Counsel has not definitively determined who they will call as Claimant's testifying expert witness in Claimant's case in chief. Moreover, Claimant objects to subsections (a) through (f) on the grounds that they are overbroad and unduly burdensome. When Claimant designates and identifies its testifying expert witness, it will provide Respondents with its expert's resume.

Request 7

None.

Request 8

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 9

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks Privileged Materials, and it is an impermissible interrogatory.

Request 10

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 11

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 12

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 13

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 14

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is duplicative of Request 1, List 1, Item 9, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 15

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 16

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 17

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 18

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 19

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 20

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 21

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks private personal information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 22

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 23

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 24

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 25

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it contains an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 26

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks private and confidential information concerning non-parties, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 27

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing. Without waiving its objections, Claimant respectfully refers Respondents to the documents annexed to the Statement of Claim and Reply to the Counterclaims.

Request 28

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, it seeks to invade the attorney-work product privilege, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 29

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 30

Claimant objects to this request on the grounds that it is an impermissible interrogatory. Without waiving its objections, Claimant produces herewith contracts and agreements responsive to this request.

Request 31

None.  Claimant did not recommend any securities transaction or strategies to the Customers.

Request 32

Claimant objects to this request on the grounds that it is an impermissible interrogatory. Without waiving its objection, responsive documents are produced herewith; moreover, all markups were within the policy established by the NASD in IM-2440.

Request 33

Margin debit in the amount of $361,022.94, together with the maximum statutory interest thereon, and all costs of collection, including Claimant's attorneys' fees as provided in Respondents' Customer Agreements.

Request 34

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.  Without waiving its objections, Claimant produces herewith, in response to another request, the confirmations for the transactions in the Customers' accounts, which contains much of the information sought by this request.

Request 35

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 36

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 37

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 38

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 39

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 40

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 41

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 42

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 43

Claimant objects to this omnibus request on the grounds that it is vague, overbroad, it seeks potentially Privileged Materials, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it places an undue burden upon Claimant.  Claimant respectfully requests that Respondents propound a specific request for a particular document.

Request 44

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.  Further, Respondents are not, now, "bona fide regular customer(s)" of KDSC -- as Rule 2270 defines a regular customer "is one who has cash and securities in the possession of the broker firm".  Consequently, Respondents may not make a request of KDSC pursuant to NASD Rule 2270.

Request 45

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in

16

the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 46

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 47

Claimant objects to this request on the grounds that it seeks information that is not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Dated: New York, New York
        September 29, 2004

Respectfully submitted,

SICHENZIA ROSS FRIEDMAN FERENCE LLP

By: _____
    Marc J. Ross, Esq.
    Richard J. Babnick, Jr., Esq.
    1065 Avenue of the Americas, 21st Floor
    New York, New York 10018
    (212) 930-9700

    Attorneys for Kashner Davidson Securities
    Corporation, Victor Kashner, Timothy Varchetto,
    and Matthew Meister

# The Discovery Guide

For NASD arbitrations, the *Discovery Guide* supplements the section in the Securities Industry Conference on Arbitration (SICA) publication entitled *The Arbitrator's Manual*, and captioned "Prehearing Conference," regarding public customer cases.

## I. The Need for New Discovery Procedures

Discovery disputes have become more numerous and time consuming. The same discovery issues repeatedly arise. To minimize discovery disruptions, NASD Dispute Resolution has developed two initiatives to standardize the discovery process: early appointment of arbitrators to conduct an initial prehearing conference and document production lists (Document Production Lists).

No requirement under the *Discovery Guide* supersedes any record-retention requirement of any federal or state law or regulation or any rule of a self-regulatory organization.

The *Discovery Guide* and Document Production Lists are designed for customer disputes with firms and Associated Person(s).[1] The *Discovery Guide* also discusses additional discovery requests, information requests, depositions, admissibility of evidence, and sanctions. The *Discovery Guide*, including the Document Production Lists, will function as a guide for the parties and the arbitrators; it is not intended to remove flexibility from arbitrators or parties in a given case. For instance, arbitrators can order the production of documents not provided for by the Document Production Lists or alter the production schedule described in the *Discovery Guide*. Further, nothing in the *Discovery Guide* precludes the parties from voluntarily agreeing to an exchange of documents in a manner different from that set forth in the *Discovery Guide*. In fact, NASD Dispute Resolution encourages the parties to agree to the voluntary exchange of documents and information and to stipulate to various matters. The fact that an item appears on a Document Production List does not shift the burden of establishing or defending any aspect of a claim.

## II. Document Production Lists

NASD Dispute Resolution will provide the parties with Document Production Lists (attached to the *Discovery Guide*) at the time it serves the statement of claim in customer cases. The arbitrators and the parties should consider the documents described in Document Production Lists 1 and 2 presumptively discoverable. Absent a written objection, documents on Document Production Lists 1 and 2 shall be exchanged by the parties within the time frames set forth below.

The arbitrators and parties also should consider the additional documents identified in Document Production Lists 3 through 14, respectively, discoverable, as indicated, for cases alleging the following causes of action: churning, failure to supervise, misrepresentation/omission, negligence/breach of fiduciary duty, unauthorized trading, and unsuitability. For the general document production and for each of these causes of action, there are separate Document Production Lists for firms/Associated Person(s), and for customers.

---

1 NASD Dispute Resolution may develop separate Document Production Lists for intra-industry disputes.

NASD Rule 10321 provides that the parties shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the arbitration process. As noted, nothing in the *Discovery Guide* precludes parties from voluntarily agreeing to an exchange of documents in a manner different from that set forth in the *Discovery Guide*.

## A. Time Frames for Document Production and Objections

The parties should produce all required documents listed in the applicable Document Production Lists not later than 30 days[2] from the date the answer is due or filed, whichever is earlier. If a party redacts any portion of a document prior to production, the redacted pages (or ranges of pages) shall be labeled "redacted." A party may object to the production of any document, which would include an objection based upon an established privilege such as the attorney-client privilege. If any party objects to the production of any document listed in the relevant Document Production Lists, the party must file written objections with NASD Dispute Resolution and serve all parties not later than 30 days following the date the answer is due or filed, whichever is earlier. Objections should set forth the reasons the party objects to producing the documents. An objection to the production of a document or a category of documents is not an acceptable reason to delay the production of any document not covered by the objection. A response to an objection should be served on all parties within 10 days from service of the written objections. Objections and responses should be filed with NASD Dispute Resolution at the time they are served on the parties. The arbitrator(s) shall then determine whether the objecting party has overcome the presumption based upon sufficient reason(s).

## B. Confidentiality[3]

If a party objects to document production on grounds of privacy or confidentiality, the arbitrator(s) or one of the parties may suggest a stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case, or the arbitrator(s) may issue a confidentiality order. The arbitrator(s) shall not issue an order or use a confidentiality agreement to require parties to produce documents otherwise subject to an established privilege. Objections to the production of documents, based on an established privilege, should be raised in accordance with the time frame for objections set forth above.

## C. Affirmation in the Event that there Are No Responsive Documents or Information

If a party responds that no responsive information or documents exist, the customer or the appropriate person in the brokerage firm who has personal knowledge (i.e., the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist.

---

2  All time periods referenced herein are calendar days.

3  Section II.B. is also applicable to additional discovery requests and information requests (see Sections IV. and V.).

## III. The Initial Prehearing Conference

To maximize the efficient administration of a case by the arbitration panel,[4] the NASD Dispute Resolution staff will schedule an initial prehearing conference in which the arbitrator(s) usually participates.[5] The initial prehearing conference gives the arbitrator(s) and the parties an opportunity to organize the management of the case, set a discovery cut-off date,[6] identify dispositive or other potential motions, schedule hearing dates, determine whether mediation is desirable, and resolve any other preliminary issues.[7] During the initial prehearing conference, the arbitrator(s) and the parties should schedule hearing dates for the earliest available time, consistent with the parties' need to prepare adequately for the hearing.

Prior to the initial prehearing conference, each arbitrator should become familiar with the claims and defenses asserted in the pleadings filed by the parties. At the initial prehearing conference, the arbitrator(s) should order time limits for discovery that will allow the scheduling of hearing dates within a reasonable time and address all outstanding discovery disputes. If the exchange of properly requested documents has not occurred, the arbitrator(s) should order the production of all required documents, including those outlined in the Document Production Lists (see section II above), within 30 days following the conference.

## IV. Additional Discovery Requests

The parties may request documents in addition to those identified in the Document Production Lists pursuant to Rule 10321(b). Unless a longer period is allowed by the requesting party, requests should be satisfied or objected to within 30 days from the date of service of the document request. A response to an objection should be served on all parties within 10 days from service of the written objections. Requests, objections, and responses should be filed with NASD Dispute Resolution at the time they are served on the parties.

A party may move to compel production of documents when the adverse party (a) refuses to produce such documents or (b) offers only to produce alternative documents that are unacceptable to the requesting party. NASD Dispute Resolution will provide the Chairperson of the panel with the motion, opposition, and reply, along with the underlying discovery documents the parties have attached to their pleadings. The Chairperson should determine whether to decide the matter on the papers or to convene a prehearing

---

4  The panel consists of three arbitrators in most cases. Claims between $25,000 and $50,000 may proceed with a single arbitrator. Claims under $25,000 are decided by a single arbitrator, generally on the pleadings.

5  In some instances, the parties may opt out of the initial prehearing conference. To opt out, parties must supply the following information to NASD Dispute Resolution by the specified deadline:

  1) a minimum of four sets of mutually agreeable hearing dates;
  2) a discovery cut-off date;
  3) a list of all anticipated motions with the motion due dates, opposition due dates, and reply due dates provided;
  4) a minimum of four dates and times for any proposed prehearing conferences to hear motions; and
  5) a determination whether briefs will be submitted and, if so, the due date for submission.

6  NASD Dispute Resolution recommends that the panel set a cut-off date during the initial prehearing conference for service of discovery requests, giving due consideration to time frames that permit timely resolution of objections and disputes prior to the scheduled exchange of hearing exhibits pursuant to the NASD Code of Arbitration Procedure.

7  The arbitrators should direct one of the parties to prepare and forward to NASD Dispute Resolution, within 48 hours, a written order memorializing the results of the prehearing conference, approved as to form and content by the other parties. When motions are heard at the initial prehearing conference, the panel may order the parties to submit the order with a stipulation as to form and content from all parties.

conference (usually via telephone). In considering motions to compel, particularly where non-production is based upon an argument asserting an established privilege, such as the attorney-client privilege, the arbitrator(s) should always give consideration to the arguments set forth by both sides, particularly as to the relevancy of the documents or information. The arbitrator(s) should carefully consider such motions, regardless of whether the item requested is on any of the Document Production Lists. If in doubt, the arbitrator(s) should ask the requesting party what specific documents it is trying to obtain and what it seeks to prove with the documents.

## V. Information Requests

Like requests for documents, parties may serve requests for information pursuant to Rule 10321(b). Requests for information are generally limited to identification of individuals, entities, and time periods related to the dispute; such requests should be reasonable in number and not require exhaustive answers or fact finding. Standard interrogatories, as utilized in state and federal courts, are generally not permitted in arbitration.

Unless a longer period is allowed by the requesting party, information requests should be satisfied or objected to within 30 days from the date of service of the requests. A response to an objection should be served on all parties within 10 days from service of the written objections. Requests, objections, and responses should be filed with NASD Dispute Resolution at the time they are served on the parties.

A party may move to compel responses to requests for information that the adverse party refuses to provide. NASD Dispute Resolution will provide the Chairperson of the panel with the motion, opposition, and reply, along with the underlying discovery documents the parties have attached to their pleadings. The Chairperson should determine whether to decide the matter on the papers or to convene a prehearing conference (usually via telephone).

## VI. Depositions

Depositions are strongly discouraged in arbitration. Upon request of a party, the arbitrator(s) may permit depositions, but only under very limited circumstances, such as: 1) to preserve the testimony of ill or dying witnesses; 2) to accommodate essential witnesses who are unable or unwilling to travel long distances for a hearing and may not otherwise be required to participate in the hearing; 3) to expedite large or complex cases; and 4) to address unusual situations where the arbitrator(s) determines that circumstances warrant departure from the general rule. Balanced against the authority of the arbitrator(s) to permit depositions, however, is the traditional reservation about the overuse of depositions in arbitration.

## VII. Admissibility

Production of documents in discovery does NOT create a presumption that the documents are admissible at the hearing. A party may state objections to the introduction of any document as evidence at the hearing to the same extent that any other objection may be raised in arbitration.

## VIII. Sanctions

The arbitration panel should issue sanctions if any party fails to produce documents or information required by a written order, unless the panel[8] finds that there is "substantial justification" for the failure to produce the documents or information. The panel has wide discretion to address noncompliance with discovery orders. For example, the panel may make an adverse inference against a party or assess adjournment fees, forum fees, costs and expenses, and/or attorneys' fees caused by noncompliance. In extraordinary cases, the panel may initiate a disciplinary referral against a registered entity or person who is a party or witness in the proceeding, or may, pursuant to Rule 10305(b), dismiss a claim, defense, or proceeding with prejudice as a sanction for intentional failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective.

8  As with other rulings, an arbitration panel's ruling need only be by majority vote; it need not be unanimous.

# Document Production Lists

## LIST 1

## Documents to Be Produced in All Customer Cases[9]

**Firm/Associated Person(s)**

1) All agreements with the customer, including, but not limited to, account opening documents, cash, margin, and option agreements, trading authorizations, powers of attorney, or discretionary authorization agreements, and new account forms.

2) All account statements for the customer's account(s) during the time period and/or relating to the transaction(s) at issue.

3) All confirmations for the customer's transaction(s) at issue. As an alternative, the firm/Associated Person(s) should ascertain from the claimant and produce those confirmations that are at issue and are not within claimant's possession, custody, or control.

4) All "holding (posting) pages" for the customer's account(s) at issue or, if not available, any electronic equivalent.

5) All correspondence between the customer and the firm/Associated Person(s) relating to the transaction(s) at issue.

6) All notes by the firm/Associated Person(s) or on his/her behalf, including entries in any diary or calendar, relating to the customer's account(s) at issue.

7) All recordings and notes of telephone calls or conversations about the customer's account(s) at issue that occurred between the Associated Person(s) and the customer (and any person purporting to act on behalf of the customer), and/or between the firm and the Associated Person(s).

8) All Forms RE-3, U-4, and U-5, including all amendments, all customer complaints identified in such forms, and all customer complaints of a similar nature against the Associated Person(s) handling the account(s) at issue.

9) All sections of the firm's Compliance Manual(s) related to the claims alleged in the statement of claim, including any separate or supplemental manuals governing the duties and responsibilities of the Associated Person(s) and supervisors, any bulletins (or similar notices) issued by the compliance department, and the entire table of contents and index to each such Manual.

10) All analyses and reconciliations of the customer's account(s) during the time period and/or relating to the transaction(s) at issue.

11) All records of the firm/Associated Person(s) relating to the customer's account(s) at issue, such as, but not limited to, internal reviews and exception and activity reports, which reference the customer's account(s) at issue.

12) Records of disciplinary action taken against the Associated Person(s) by any regulator or employer for all sales practices or conduct similar to the conduct alleged to be at issue.

---

9 Only named parties must produce documents pursuant to the guidelines set forth herein. However, non-parties may be required to produce documents pursuant to a subpoena or an arbitration panel order to direct the production of documents (see Rule 10322). In addition, the arbitration Chairperson may use the Document Production Lists as guidance for discovery issues involving non-parties.

## LIST 2

## Documents to Be Produced in All Customer Cases

**Customer**

1) All customer and customer-owned business (including partnership or corporate) federal income tax returns, limited to pages 1 and 2 of Form 1040, Schedules B, D, and E, or the equivalent for any other type of return, for the three years prior to the first transaction at issue in the Statement of Claim through the date the Statement of Claim was filed.

2) Financial statements or similar statements of the customer's assets, liabilities, and/or net worth for the period(s) covering the three years prior to the first transaction at issue in the Statement of Claim through the date the Statement of Claim was filed.

3) Copies of all documents the customer received from the firm/Associated Person(s) and from any entities in which the customer invested through the firm/Associated Person(s), including monthly statements, opening account forms, confirmations, prospectuses, annual and periodic reports, and correspondence.

4) Account statements and confirmations for accounts maintained at securities firms other than the respondent firm for the three years prior to the first transaction at issue in the Statement of Claim through the date the Statement of Claim was filed.

5) All agreements, forms, information, or documents relating to the account(s) at issue signed by or provided by the customer to the firm/Associated Person(s).

6) All account analyses and reconciliations prepared by or for the customer relating to the account(s) at issue.

7) All notes, including entries in diaries or calendars, relating to the account(s) at issue.

8) All recordings and notes of telephone calls or conversations about the customer's account(s) at issue that occurred between the Associated Person(s) and the customer (and any person purporting to act on behalf of the customer).

9) All correspondence between the customer (and any person acting on behalf of the customer) and the firm/Associated Person(s) relating to the account(s) at issue.

10) Previously prepared written statements by persons with knowledge of the facts and circumstances related to the account(s) at issue, including those by accountants, tax advisors, financial planners, other Associated Person(s), and any other third party.

11) All prior complaints by or on behalf of the customer involving securities matters and the firm's/Associated Person(s') response(s).

12) Complaints/Statements of Claim and Answers filed in all civil actions involving securities matters and securities arbitration proceedings in which the customer has been a party, and all final decisions and Awards entered in these matters.

13) All documents showing action taken by the customer to limit losses in the transaction(s) at issue.

## LIST 3

## Churning

**Firm/Associated Person(s)**

1) All commission runs relating to the customer's account(s) at issue or, in the alternative, a consolidated commission report relating to the customer's account(s) at issue.

2) All documents reflecting compensation of any kind, including commissions, from all sources generated by the Associated Person(s) assigned to the customer's account(s) for the two months preceding through the two months following the transaction(s) at issue, or up to 12 months, whichever is longer. The firm may redact all information identifying customers who are not parties to the action, except that the firm/Associated Person(s) shall provide at least the last four digits of the non-party customer account number for each transaction.

3) Documents sufficient to describe or set forth the basis upon which the Associated Person(s) was compensated during the years in which the transaction(s) or occurrence(s) in question occurred, including: a) any bonus or incentive program; and b) all compensation and commission schedules showing compensation received or to be received based upon volume, type of product sold, nature of trade (e.g., agency v. principal), etc.

## LIST 4

## Churning

**Customer**

No additional documents identified.

## LIST 5

## Failure to Supervise

**Firm/Associated Person(s)**

1) All commission runs and other reports showing compensation of any kind relating to the customer's account(s) at issue or, in the alternative, a consolidated commission report relating to the customer's account(s) at issue.

2) All exception reports and supervisory activity reviews relating to the Associated Person(s) and/or the customer's account(s) that were generated not earlier than one year before or not later than one year after the transaction(s) at issue, and all other documents reflecting supervision of the Associated Person(s) and the customer's account(s) at issue.

3) Those portions of internal audit reports at the branch in which the customer maintained his/her account(s) that: (a) focused on the Associated Person(s) or the transaction(s) at issue; and (b) were generated not earlier than one year before or not later than one year after the transaction(s) at issue and discussed alleged improper behavior in the branch against other individuals similar to the improper conduct alleged in the Statement of Claim.

4)  Those portions of examination reports or similar reports following an examination or an inspection conducted by a state or federal agency or a self-regulatory organization that focused on the Associated Person(s) or the transaction(s) at issue or that discussed alleged improper behavior in the branch against other individuals similar to the improper conduct alleged in the Statement of Claim.

## LIST 6

## Failure to Supervise

**Customer**

No additional documents identified.

## LIST 7

## Misrepresentation/Omissions

**Firm/Associated Person(s)**

Copies of all materials prepared or used by the firm/Associated Person(s) relating to the transactions or products at issue, including research reports, prospectuses, and other offering documents, including documents intended or identified as being "for internal use only," and worksheets or notes indicating the Associated Person(s) reviewed or read such documents. As an alternative, the firm/Associated Person(s) may produce a list of such documents that contains sufficient detail for the claimant to identify each document listed. Upon further request by a party, the firm/Associated Person(s) must provide any documents identified on the list.

## LIST 8

## Misrepresentation/Omissions

**Customer**

1)  Documents sufficient to show the customer's ownership in or control over any business entity, including general and limited partnerships and closely held corporations.

2)  Copy of the customer's resume.

3)  Documents sufficient to show the customer's complete educational and employment background or, in the alternative, a description of the customer's educational and employment background if not set forth in a resume produced under item 2.

## LIST 9

### Negligence/Breach of Fiduciary Duty

**Firm/Associated Person(s)**

Copies of all materials prepared or used by the firm/Associated Person(s) relating to the transactions or products at issue, including research reports, prospectuses, and other offering documents, including documents intended or identified as being "for internal use only," and worksheets or notes indicating the Associated Person(s) reviewed or read such documents. As an alternative, the firm/Associated Person(s) may produce a list of such documents that contains sufficient detail for the claimant to identify each document listed. Upon further request by a party, the firm/Associated Person(s) must provide any documents identified on the list.

## LIST 10

### Negligence/Breach of Fiduciary Duty

**Customer**

1) Documents sufficient to show the customer's ownership in or control over any business entity, including general and limited partnerships and closely held corporations.

2) Copy of the customer's resume.

3) Documents sufficient to show the customer's complete educational and employment background or, in the alternative, a description of the customer's educational and employment background if not set forth in a resume produced under item 2.

## LIST 11

### Unauthorized Trading

**Firm/Associated Person(s)**

1) Order tickets for the customer's transaction(s) at issue.

2) Copies of all telephone records, including telephone logs, evidencing telephone contact between the customer and the firm/Associated Person(s).

3) All documents relied upon by the firm/Associated Person(s) to establish that the customer authorized the transaction(s) at issue.

## LIST 12

## Unauthorized Trading

**Customer**

1) Copies of all telephone records, including telephone logs, evidencing telephone contact between the customer and the firm/Associated Person(s).

2) All documents relied upon by the customer to show that the transaction(s) at issue was made without his/her knowledge or consent.

## LIST 13

## Unsuitability

**Firm/Associated Person(s)**

1) Copies of all materials prepared, used, or reviewed by the firm/Associated Person(s) related to the transactions or products at issue, including but not limited to research reports, prospectuses, other offering documents, including documents intended or identified as being "for internal use only," and worksheets or notes indicating the Associated Person(s) reviewed or read such documents. As an alternative, the firm/Associated Person(s) may produce a list of such documents. Upon further request by a party, the firm/Associated Person(s) must provide any documents identified on the list.

2) Documents sufficient to describe or set forth the basis upon which the Associated Person(s) was compensated in any manner during the years in which the transaction(s) or occurrence(s) in question occurred, including, but not limited to: a) any bonus or incentive program; and b) all compensation and commission schedules showing compensation received or to be received based upon volume, type of product sold, nature of trade (e.g., agency v. principal), etc.

## LIST 14

## Unsuitability

**Customer**

1) Documents sufficient to show the customer's ownership in or control over any business entity, including general and limited partnerships and closely held corporations.

2) Written documents relied upon by the customer in making the investment decision(s) at issue.

3) Copy of the customer's resume.

4) Documents sufficient to show the customer's complete educational and employment background or, in the alternative, a description of the customer's educational and employment background if not set forth in a resume produced under item 3.

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____
                                                    )
In the Matter of the Arbitration Between:           )
                                                    )
KASHNER DAVIDSON SECURITIES CORP.,                  )
                                                    )
    *Claimant/Respondent in Counterclaim,*          )
                                                    )
              v.                                    )
                                                    )
STEVEN MSCISZ, MARK MSCISZ, and                     )
LYNDA MSCISZ,                                       )    NASD DISPUTE RESOLUTION No. 04-03793
                                                    )
    *Respondents/Counter- and Third Party Claimants.* )
                                                    )
              v.                                    )
                                                    )
VICTOR KASHNER, MATTHEW MEISTER and                 )
TIMOTHY VARCHETTO,                                  )
                                                    )
    *Third Party Respondents.*                      )
_____)


### MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ
### TO COMPEL PRODUCTION OF DOCUMENTS AND OTHER
### INFORMATION BY KASHNER DAVIDSON SECURITIES CORPORATION


Respondents/Counter- and Third Party Claimants Steven Mscisz ("Steven"), Mark

Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") hereby request that the

Chairperson compel Claimant/Respondent-in-Counterclaim Kashner Davidson Securities

Corporation ("Broker-Dealer" or "KDSC") to provide them with the documents and other

information specified in their first set of requests for such materials ("Requests").  A true copy of

the Customers' Requests is appended at Exhbit A.

*BACKGROUND*

The Broker-Dealer, the underwriter of an initial public offering ("IPO") and subsequently a "market maker" in the stock of Vaso Active Pharmaceuticals, Inc. ("VAPH "), commenced this arbitration proceeding against the Customers before the National Association of Securities Dealers, Inc. ("Association").  After the IPO, VAPH shares were traded on the Association's automated quotation system ("NASDAQ").  The law firm representing the Broker-Dealer in this proceeding also advised KDSC in connection with the IPO.  KDSC and its principal, third-party respondent Victor L. Kashner ("Kashner"), have lengthy CRD files dating back at least to 1971, which files reflect numerous arbitration awards and disciplinary proceedings.

For instance, in July 1996, the U.S. Securities and Exchange Commission ("SEC" or "Commission") suspended Kashner from association with any registrant for three months, suspended Kashner from acting in a supervisory capacity for two years, and ordered that Kashner and KDSC disgorge ill-gotten gains they obtained through fraud in connection with the sale of shares in Spectra Pharmaceuticals, Inc. (which, like VAPH, was a small-capitalization pharmaceutical company).  *In re Kashner,* Case No. 3-9049 (SEC 1996).  In May 2000, the Association fined the Broker-Dealer $25,000, suspended KDSC from the municipal bond market for six months, ordered the firm to hire an outside compliance consultant, fined Kashner $50,000, and – like the SEC had four years earlier – subjected Kashner to another two-year suspension from acting in a supervisory capacity.  *In re Kashner Davidson Securities Corp.,,* Case No. C07960095 (NASD 2000).  Two years later, in NASD Case No. 01-01448, KDSC settled a "failure to supervise" claim for $125,000.00; Kashner, the Broker-Dealer's nominal "President and CEO", third-party respondent Matt Meister ("Meister"), and its so-called "Compliance Officer", third-party respondent Timothy W. Varchetto ("Varchetto") – were also respondents in that arbitration proceeding.  The history of KDSC and its principal is so sordid

that a highly-regarded U.S. District Judge with extensive experience in investment fraud cases expressly noted "concerns about [Kashner's] moral character." *Newman v. Eagle Bldg. Technologies,* 209 F.R.D. 499, 504 (S.D. Fla. 2002) (Ryskamp, J.).

The Customers subscribed to the IPO and – unaware of the past transgressions of KDSC, Kashner, Meister and Varchetto – were induced by representatives of the Broker-Dealer (including but not limited to Meister) to open accounts in which their VAPH shares were kept and traded. After the Customers opened their accounts with the Broker-Dealer, KDSC representatives (including but not limited to Varchetto) induced them to trade on margin. The Broker-Dealer did not require the Customers to complete any application forms before causing margin credit to be extended to them. KDSC also did not adequately disclose to the Customers the many risks associated with margin trading – especially in the context of small-capitalization IPO issues – instead advising them that the trades and trading strategies the Broker-Dealer recommended was prudent.

Beginning in or about February 2004, a series of negative media reports were published about VAPH, ultimately causing its share price to plummet. As the stock price declined, KDSC representatives induced the Customers to increase their "long" positions, to over-trade their accounts, and to follow other trading strategies that ultimately eroded their positions further. Excessive "markups" further compromised the Customers' positions. The Customers have since been informed and believe that while the Broker-Dealer was recommending long trades, KDSC, Kashner, Meister, Varcheto and/or other persons affiliated with the Broker-Dealer took and maintained short positions that were not disclosed to the Customers.

The adverse media coverage caused the U.S. Securities and Exchange Commission ("SEC" or "Commission") to order a temporary suspension of trading in VAPH shares, effective upon the opening of the NASDAQ on April 1, 2004 and terminating at 11:59 p.m. on April 15, 2004.  During the period in which trading of its shares was suspended, VAPH voluntarily de-listed itself from the NASDAQ and, since the suspension terminated, its shares have traded without interruption on the so-called "pink sheets."  Its trading symbol is now "VAPH.PK". VAPH shares closed at .45 per share on December 15, 2004 – little more than one percent of its peak pre-suspension price.

After the trading suspension ended, KDSC purported to liquidate the Customers' shares without attempting to maximize the price received for the stock.  Indeed, the Customers believe that the Broker-Dealer directly or indirectly used their VAPH shares to cover the short positions maintained by KDSC, Kashner, Meister, Varchetto and/or other affiliates of the Broker-Dealer. Adding insult to injury, the Broker-Dealer claimed to be owed a significant margin debt by the Customers and commenced the captioned arbitration proceeding.  The Customers responded with claims of their own against KDSC, Kashner, Meister and Varchetto.

Nearly four months ago, on August 26, 2004, the Customers served KDSC with their Requests.  As discussed more fully below, the Broker-Dealer "stonewalled", producing only a handful of inconsequential documents that were already in the Customers' possession, thus necessitating this motion.

<div align="center">*SUMMARY OF ARGUMENT*</div>

The Association's Code of Arbitration Procedure ("Code") provides for the pre-hearing exchange of documents and information.  Indeed, Section 10321(a) of the Code even mandates that "parties shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the information."  The only limitations imposed by the Code are that requests "should be specific, relate to the matter in controversy, and afford the party to whom the request is made a reasonable period of time to respond without interfering with the time set for the hearing."  *Id.*  A "reasonable period of time" is presumptively 30 calendar days from the date of service.  Code § 10321(b)(2).

The Broker-Dealer never requested additional time to respond.  Furthermore, despite the admonition to the contrary in Section 10321(b)(1) of the Code, KDSC never "endeavor[ed] to resolve disputes regarding an information request prior to serving any objection to the request."  The first communication to the Customers from the Broker-Dealer concerning the Requests came in the objection served on or about October 19, 2004 (copy at Exhibit B) in which KDSC wantonly objected to virtually every request made by the Customers.  The Broker-Dealer even went so far as to characterize several requests as "designed to harass" it when, in point of fact, the Customers had merely requested information which the Association itself specified for production and called "presumptively discoverable" in customer cases involving claims like those alleged in this proceeding.

As the Chairperson can plainly see from the discussion of Customers' Requests and KDSC's objections, set forth below, the Customers made requests for documents and information that were certainly specific and related to the matter in controversy, and the Broker-Dealers' objections were largely without merit.  A pungent stench of bad faith emanates from KDSC's response.

*A*NALYSIS OF *R*EQUESTS & *R*ESPONSES

### Request No. 1

Please produce copies of all documents specified in NASD Dispute Resolution Document Production Lists 1, 3, 5, 7, 9 and 13.[1]

### Relevant Portion of KDSC Response to Request No. 1:

Request 1, List 1, Item 8

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

### Defects in Response

With this response, KDSC refuses to produce the "Forms RE-3, U-4, and U-5, including all amendments, all customer complaints identified in such forms, and all customer complaints of a similar nature against the Associated Person(s) handling the account(s) at issue" which the Association has deemed "presumptively discoverable" in all customer cases. These forms all reflect disciplinary actions taken against associated persons and firms' knowledge of their employees' misconduct. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such forms are not only "presumptively

---

[1] KDSC responded to this request in parts, several of which are discussed on the pages 6 through 12 of this memorandum. The Broker-Dealer did undertake to produce some documents in response to the request, but its production appears to be significantly under-inclusive. To the extent that KDSC contends that no other responsive information or documents exist, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist. (Discovery Guide § II(C)) The Customers so request.

discoverable," they are also highly relevant.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

***Relevant Portion of KDSC Response to Request No. 1:***

Request 1, List 1, Item 9

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks confidential and/or proprietary materials, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC refuses to produce the "sections of the firm's Compliance Manual(s) related to the claims alleged in the statement of claim, including any separate or supplemental manuals governing the duties and responsibilities of the Associated Person(s) and supervisors, any bulletins (or similar notices) issued by the compliance department, and the entire table of contents and index to each such Manual" which the Association has deemed "presumptively discoverable" in all customer cases.  Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such materials are not only "presumptively discoverable," they are also highly relevant.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

***Relevant Portion of KDSC Response to Request No. 1:***

<u>Request 1, List 1, Item 12</u>

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC refuses to produce the "Records of disciplinary action taken against the Associated Person(s) by any regulator or employer for all sales practices or conduct similar to the conduct alleged to be at issue" which the Association has deemed "presumptively discoverable" in all customer cases.  Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such materials are not only "presumptively discoverable," they are also highly relevant.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

***Relevant Portion of KDSC Response to Request No. 1:***

<u>Request 1, List 3</u>

       Claimant objects to producing items identified on List 3 of the Discovery Guide, which pertains to churning claims, on the grounds that these documents are not relevant to the factual allegations and viable legal claims framed in the pleadings, which do not set forth such a legal claim, and the request for these items places an undue and excessive burden on Claimant.

***Defects in Response***

       With this response, KDSC refuses to produce the three categories of information which the Association has deemed "discoverable" in all cases in which churning is alleged. Churning is specifically alleged in this case, and it is not for the Broker-Dealer to determine unilaterally whether the claim is "viable." *See, e.g.,* Answer, Affirmative Defenses and Statement of Counterclaims & Third Party Claims of Steven Mscisz, Mark Mscisz & Lynda Mscisz ("Counterclaim") ¶¶ 7(g), 10(g), 13(g), 16(j). Accordingly, such materials are not only "presumptively discoverable," but they are also highly relevant.

***Relevant Portion of KDSC Response to Request No. 1:***

Request 1, List 5

Claimant objects to producing items identified on List 5 of the Discovery Guide, which pertains to viable claims for failure to supervise, on the grounds that these documents are not relevant to the factual allegations and viable legal claims framed in the pleadings, which do not set forth such a legal claim, and the request for these items places an undue and excessive burden on Claimant.

***Defects in Response***

With this response, KDSC refuses to produce the four categories of information which the Association has deemed "discoverable" in all cases in which failure to supervise is alleged. Churning is specifically alleged in this case, and it is not for the Broker-Dealer to determine unilaterally whether the claim is "viable." *See* Counterclaim ¶ 16(i). *See also Id.* ¶ 7 (alleging violations of Securities Act of 1934, of which "failure to supervise" is a violation). Accordingly, such materials are not only "presumptively discoverable," but they are also highly relevant.

***Relevant Portion of KDSC Response to Request No. 1:***

Request 1, Lists 7 and 9, and List 13, Item 1

Claimant states that the only document potentially responsive to this request is the Prospectus filed by Vaso Active Pharmaceuticals, Inc. with the U.S. Securities and Exchange Commission ("SEC") – a copy of which was previously provided to Respondents and can otherwise be obtained from the SEC's website.

***Defects in Response***

With this response, KDSC seeks to sidestep its obligation to produce the comprehensive information which the Association has deemed "discoverable" in all cases where misrepresentations, omissions, negligence, breach of fiduciary duty or unsuitability are alleged. Such allegations are made here, and it is not for the Broker-Dealer to determine unilaterally whether they are "viable." To the extent that KDSC contends that no other responsive information or documents exist, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist. (Discovery Guide § II(C)) The Customers so request.

***Relevant Portion of KDSC Response to Request No. 1:***

Request 1, List 13, Item 2

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC seeks to sidestep its obligation to produce the compensation-related information which the Association has deemed "discoverable" in all cases where unsuitability is alleged.   Such allegations are repeatedly made here, and it is not for the Broker-Dealer to determine unilaterally whether they are "viable."

***Request No. 2***

Please produce copies of all documents not produced in response to Request No. 1 which relate in any way whatsoever to any of the facts and circumstances underlying the Arbitration, to any putative claim or defense asserted or which might be asserted in that proceeding, or to your responses to these Requests.

***KDSC Response:***

Request 2

Claimant objects to this omnibus request on the grounds that it is vague, overbroad, it seeks potentially Privileged Materials, and it places an undue burden upon Claimant. Claimant respectfully requests that Respondents propound a specific request for a particular document.

***Defects in Response***

The Customers acknowledge that this request is not particularly specific. However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange. The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation ensuring that all relevant information is exchanged, so that the hearing does not devolve into "trial by ambush."

**Request No. 3**

Please identify all persons likely to have any knowledge whatsoever concerning your response to any of these Requests, any of the facts and circumstances underlying the Arbitration, or any putative claim or defense asserted or which might be asserted in that proceeding. Your response must, at the very least:

      (a)     identify all persons known to you or your attorney who witnessed the operative transactions and occurrences;

      (b)     identify all persons you or your attorney believe to have substantial discoverable information about such claims and defenses;

      (c)     describe the subject and substance of the information possessed by any person identified in response to this request.

**KDSC Response:**

Request 3

Claimant objects to this request on the grounds that is overbroad, unduly burdensome and it is an impermissible interrogatory, which is prohibited by the NASD Discovery Guide. Without waiving its objections, Claimant states that Respondents, Timothy Varchetto, Matthew Meister, and Melissa Rothenbach have knowledge concerning the factual allegations set forth in the pleadings.

**Defects in Response**

Identification of individuals and entities is a wholly proper purpose of an information request in this proceeding. (Discovery Guide § V). To the extent that KDSC contends that no other responsive information exists, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information; 2) describe the extent of the search; and 3) state that, based on the search, no such information exists. (Discovery Guide § II(C)) The Customers so request.

***Request No. 4***

Please identify each person whom you expect to call as a fact witness in the Arbitration or at any pre-Arbitration evidentiary hearing, including in your response a description of her expected testimony.

***KDSC Response:***

Request 4

Claimant objects to this request on the grounds that it seeks to invade the attorney work product privilege. Under Rule 10321(c) of the NASD Code, a party is not required to determine and identify who it will present as factual witnesses in its direct case until twenty days prior to the hearing. At this time, Claimant's Counsel has not definitively determined who they will call as factual witnesses in Claimant's case in chief. Moreover, Claimant objects to the prong of the request seeking the "description of her expected testimony" on the grounds that it is an impermissible interrogatory.

***Defects in Response***

The Customers acknowledge that production of such information is not mandatory until 20 days prior to the hearing. However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange. The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation concerning the timing and extent of witness disclosures.

*Request No. 5*

Please describe each communication between KDSC and the Customers.

*KDSC Response:*

Request 5

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, and it is an impermissible interrogatory, which is prohibited by the NASD Discovery Guide.

*Defects in Response*

The Customers acknowledge that this request is not particularly specific.  However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange.  The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation ensuring that all relevant information is exchanged, so that the hearing does not devolve into "trial by ambush."

*Request No. 6*

Please identify each person whom you expect to call as an expert witness in the Arbitration or at any pre-Arbitration evidentiary hearing, including in your response:

(a)     a complete description of all opinions to be expressed and the basis and reasons therefor;

(b)     the data or other information considered by the putative expert in forming the opinions;

(c)     any exhibits to be used as a summary of or support for the opinions;

(d)     the qualifications of the putative expert, including a list of all publications authored by the putative expert since January 1, 1994;

(e)     the compensation to be paid for the putative expert's study and testimony; and

(f)    a description of any other cases in which the witness has testified as an expert at trial, at an arbitration, or by deposition since January 1, 1994.

***KDSC Response:***

Request 6

Claimant objects to this request on the grounds that it seeks to invade the attorney work product privilege. Under Rule 10321(c) of the NASD Code, a party is not required to determine and identify who it will present as its testifying expert witness in its direct case until twenty days prior to the hearing. At this time, Claimant's Counsel has not definitively determined who they will call as Claimant's testifying expert witness in Claimant's case in chief. Moreover, Claimant objects to subsections (a) through (f) on the grounds that they are overbroad and unduly burdensome. When Claimant designates and identifies its testifying expert witness, it will provide Respondents with its expert's resume.

***Defects in Response***

The Customers acknowledge that production of such information is not mandatory until 20 days prior to the hearing. However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange. The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation concerning the timing and extent of expert disclosures.

### Request No. 7

Please identify each person from whom you or your attorneys have obtained a statement concerning any of the facts and circumstances underlying the Arbitration or any putative claim or defense asserted or which might be asserted in that proceeding, and describe each such statement.

### KDSC Response:

Request 7

None.

### Defects in Response

Because KDSC contends that no other responsive information or documents exist, "the

appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a

physical search), upon the request of the requesting party, must:  1) state in writing that he/she

conducted a good faith search for the requested information or documents; 2) describe the extent

of the search; and 3) state that, based on the search, no such information or documents exist.

(Discovery Guide § II(C))  The Customers so request.

***Request No. 8***

Please produce copies of all records, including but not limited to telephone logs, invoices from service providers, facsimile logs and the like, concerning wireless or wire communications between KDSC and the Customers.

***KDSC Response:***

Request 8

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

Of course, the fraud claims in this case concern communications between the Customers and the Broker-Dealer, and it is necessary to establish the time, duration, manner and content of those communications to the extent practicable. The wire communications sought with this request are especially relevant, given that they constitute predicate acts underlying Count IX of the Counterclaim. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

*Request No. 9*

Please describe each communication between KDSC and any person (including but not limited to internal KDSC communications) concerning: your response to any Request, or any of the facts and circumstances underlying the Arbitration, or any putative claim or defense asserted or which might be asserted in this proceeding.

*KDSC Response:*

Request 9

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks Privileged Materials, and it is an impermissible interrogatory.

*Defects in Response*

This request is narrowly-tailored to discover admissions and other information relevant to this proceeding. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent information responsive to this request is allegedly privileged, KDSC should – as instructed in the Requests – prepare a privilege log so that the Chairperson may ascertain whether its invocation of privilege is appropriate. To the extent this request arguably exceeds the scope of discovery made mandatory by the Code, it is made in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation ensuring that all relevant information is exchanged, so that the hearing does not devolve into "trial by ambush."

***Request No. 10***

Please produce copies of all records, including but not limited to telephone logs, invoices from service providers, facsimile logs and the like, concerning wireless or wire communications between KDSC and any person (including but not limited to internal KDSC communications) concerning:  your response to any Request, or any of the facts and circumstances underlying the Arbitration, or any putative claim or defense asserted or which might be asserted in this proceeding.

***KDSC Response:***

Request 10

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

This request is narrowly-tailored to discover admissions and other information relevant to this proceeding.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."  The wire communications sought with this request are especially relevant, given that they constitute predicate acts underlying Count IX of the Counterclaim.

***Request No. 11***

Please identify each government agency, self-regulatory organization or official of a government agency or self-regulatory organization known to you or your attorneys to have investigated or to be investigating any of the acts and occurrences giving rise to the Arbitration, and describe each such investigation.

***KDSC Response:***

Request 11

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

Identification of entities is a wholly proper purpose of an information request in this proceeding.  (Discovery Guide § V)  Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, the requested information is highly relevant.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

***Request No. 12***

If you contend that the Customers waived any right, state the basis for that contention.

***KDSC Response:***

Request 12

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

To the extent this request arguably exceeds the scope of discovery made mandatory by the Code, it is made in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation ensuring that all relevant information is exchanged, so that the hearing does not devolve into "trial by ambush."

*Request No. 13*

Please describe all arbitrations and civil, criminal and administrative litigation in which KDSC or any of its principals, registered representatives, associated persons or other employees has been involved since January 1, 1994, identifying in your response, for each such proceeding, its parties, the tribunal in which it was pending, docket number, manner in which it was resolved, and sworn testimony given by KDSC or any of its principals, registered representatives, associated persons or other employees.

*KDSC Response:*

Request 13

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

**Defects in Response**

Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such information is not only "presumptively discoverable," they are also highly relevant.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."  To the extent this request arguably exceeds the scope of discovery made mandatory by the Code, it is made in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation ensuring that all relevant information is exchanged, so that the hearing does not devolve into "trial by ambush."

*Request No. 14*

Please produce copies of all employee handbooks, compliance manuals, policies and other documents concerning the conduct and supervision of KDSC principals, associated persons, registered representatives and other employees.

*KDSC Response:*

Request 14

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is duplicative of Request 1, List 1, Item 9, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

As with its response to the Customers' request for the information specified in Item 9 of List 1 in the Association's Discovery Guide – information that has been deemed "presumptively discoverable" by the Association – KDSC refuses to produce compliance-related information that goes to the core of the Customers' allegations against the Broker-Dealer and its confederates. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such materials are not only "presumptively discoverable," they are also highly relevant. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

*Request No. 15*

Please produce copies of all documents concerning training provided by or on behalf of KDSC concerning the conduct and supervision of KDSC principals, associated persons, registered representatives and other employees.

*KDSC Response:*

Request 15

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

As with its response to the Customers' request for the information specified in List 5 of the Association's Discovery Guide – information that has been deemed "presumptively discoverable" by the Association – KDSC refuses to produce training-related and supervision-related information that goes to the core of the Customers' allegations against the Broker-Dealer and its confederates. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such materials are not only "presumptively discoverable," they are also highly relevant. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

*Request No. 16*

Please produce copies of all documents concerning policies and procedures concerning the extension of margin credit to KDSC customers.

*KDSC Response:*

Request 16

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

This request goes to the core of the Broker-Dealer's own claims against the Customers, as well as its suitability-related and fraud counterclaims.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' defenses are "viable."

***Request No. 17***

Please produce copies of all documents concerning training provided by or on behalf of KDSC concerning policies and procedures concerning the extension of margin credit to KDSC customers.

***KDSC Response:***

Request 17

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

This request goes to the core of the Broker-Dealer's own claims against the Customers as well as the Customers' "failure to supervise" claim against KDSC. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims and defenses are "viable."

***Request No. 18***

Please produce copies of all documents concerning policies and procedures concerning conflicts of interest and the disclosure thereof.

***KDSC Response:***

Request 18

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

This request goes to the core of the Customers' fraud-related claims against KDSC.  It is not for the Broker-Dealer to determine unilaterally whether those claims are "viable."

***Request No. 19***

Please state the name, current address, and employment dates of each person registered with the Association who was employed by or associated with the Broker-Dealer at any time during the period in which the Customers maintained accounts at KDSC.

***KDSC Response:***

Request 19

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

This request goes to the core of the Customers' "failure to supervise" and fraud claims against KDSC. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, it seeks information that is highly relevant – especially if the Broker-Dealer employed a cadre of alumni from so-called "Disciplined Firms." It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims and defenses are "viable."

***Request No. 20***

Please describe the outside business activities and private securities transactions (if any) of Matthew Meister, Timothy Varchetto and each other KDSC associated person, registered representative, principal or other employee who communicated with the Customers or serviced their accounts during the period in which the Customers maintained accounts at KDSC.

***KDSC Response:***

Request 20

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

This request goes to the heart of the fraud claims against the Broker-Dealer and its confederates, insofar as it would uncover the "short" positions taken by them against the Customers' "long" positions. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

*Request No. 21*

Please produce copies of the personnel files for Matthew Meister, Timothy Varchetto and each other KDSC associated person, registered representative, principal or other employee who communicated with the Customers or serviced their accounts.

*KDSC Response:*

Request 21

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks private personal information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

This request goes to the core of the Customers' "failure to supervise" and fraud claims against KDSC. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, it seeks information that is highly relevant – especially if the Broker-Dealer employed a cadre of alumni from so-called "Disciplined Firms." It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims and defenses are "viable."

*Request No. 22*

Please describe all plans and programs of KDSC concerning incentives, bonuses, "spiffs," "overrides," commissions and the like paid to associated persons, registered representatives, principals or other employees during the period in which the Customers maintained accounts at KDSC.

*KDSC Response:*

Request 22

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

This request goes to the core of the Customers' "failure to supervise" and churning claims against KDSC.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims and defenses are "viable."

***Request No. 23***

Please describe all incentives, bonuses, "spiffs," "overrides," commissions and the like paid to associated persons, registered representatives, principals or other employees who communicated with the Customers or serviced their accounts during the period in which the Customers maintained accounts at KDSC.

***KDSC Response:***

Request 23

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

This request goes to the core of the Customers' "failure to supervise" and churning claims against KDSC. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims and defenses are "viable."

*Request No. 24*

Please produce copies of all documents concerning training provided by or on behalf of KDSC concerning policies and procedures concerning conflicts of interest and the disclosure thereof.

*KDSC Response:*

Request 24

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

This request goes to the core of the Customers' "failure to supervise" and fraud claims against KDSC. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims and defenses are "viable."

***Request No. 25***

Please describe and produce copies of all reports made by KDSC pursuant to Association Business Conduct Rule 3070.

***KDSC Response:***

Request 25

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it contains an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC refuses to produce the complaint- and discipline-related information the Broker-Dealer must "promptly report to the Association." These forms all reflect disciplinary actions taken against associated persons and firms' knowledge of their employees' misconduct. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such forms are not only "presumptively discoverable," they are also highly relevant. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent KDSC believes that responsive information is "private and/or confidential", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

***Request No. 26***

Please produce copies of the personnel files for each current or former KDSC associated person, registered representative, principal or other employee who formerly worked at a Disciplined Firm (as that term is defined in Association Business Conduct Rule 3010(b)(2)(J)).

***KDSC Response:***

Request 26

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks private and confidential information concerning non-parties, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC seeks to avoid scrutiny of its apparent hiring of associated persons who previously worked at so-called "Disciplined Firms" and whether the Broker-Dealer was required to and did comply with the heightened supervisory obligations of firms meeting certain thresholds. Clearly, this information goes to the core of the Customers' "failure to supervise" claims. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such information is highly relevant. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

***Request No. 27***

Please state the basis for each averment set forth in your Statement of Claim.

***KDSC Response:***

Request 27

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing. Without waiving its objections, Claimant respectfully refers Respondents to the documents annexed to the Statement of Claim and Reply to the Counterclaims.

***Defects in Response***

The Customers acknowledge that production of such information is not mandatory. However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange. The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation concerning the timing and extent of witness disclosures.

*Request No. 28*

Please state the basis for each affirmative defense you interpose in response to the Customers' Statement of Counterclaims & Third Party Claims.

*KDSC Response:*

Request 28

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, it seeks to invade the attorney-work product privilege, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

The Customers acknowledge that production of such information is not mandatory. However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange. The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation concerning the timing and extent of witness disclosures.

*Request No. 29*

Please produce copies of all documents concerning any affidavits, deposition testimony or trial testimony previously given by any KDSC employee since January 1, 1993.

*KDSC Response:*

Request 29

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

With this response, KDSC refuses to produce acknowledgements of wrongdoing, admissions, and other potentially relevant information in its possession, custody or control. Given the demonstrated recidivism of KDSC and Kashner, coupled with the serious allegations made by the Customers, such information is highly relevant. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent KDSC believes that responsive information is "private and/or confidential", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

***Request No. 30***

Please describe all contracts and other agreements between or among the Customers and the Broker-Dealer.

***KDSC Response:***

Request 30

Claimant objects to this request on the grounds that it is an impermissible interrogatory. Without waiving its objections, Claimant produces herewith contracts and agreements responsive to this request.

***Defects in Response***

To the extent that KDSC contends that no other responsive information or documents exist, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must:  1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist.  (Discovery Guide § II(C))  The Customers so request.

*Request No. 31*

Please state the basis for each recommendation concerning a securities transaction or trading strategy made by KDSC to the Customers.

*KDSC Response:*

Request 31

None.  Claimant did not recommend any securities transaction or strategies to the Customers.

*Defects in Response*

To the extent that KDSC contends that no other responsive information or documents exist, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must:  1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist.  (Discovery Guide § II(C))  The Customers so request.

***Request No. 32***

If you contend that KDSC was authorized to exact a "markup" or commission from the Customers when effecting a trade, please state the basis for that contention, specifying the contract or other agreement on which that authority was based the manner in which the "markup" or commission was to be calculated.

***KDSC Response:***

Request 32

Claimant objects to this request on the grounds that it is an impermissible interrogatory. Without waiving its objection, responsive documents are produced herewith; moreover, all markups were within the policy established by the NASD in IM-2440.

***Defects in Response***

The Broker-Dealer has failed to produce any contractual authorization to exact the excessive "markups" it took from the Customers or documents specifying the manner in which these unauthorized "markups" were calculated. To the extent that KDSC contends that no other responsive information or documents exist, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist. (Discovery Guide § II(C)) The Customers so request.

*Request No. 33*

Please specify the amounts you presently contend to be owed by the Customers to KDSC and state the basis for that contention.

*KDSC Response:*

Request 33

Margin debit in the amount of $361,022.94, together with the maximum statutory interest thereon, and all costs of collection, including Claimant's attorneys' fees as provided in Respondents' Customer Agreements.

*Defects in Response*

The response fails to "state the basis" (as that term is defined in the Requests) for the Broker-Dealer's putative damages calculation.

***Request No. 34***

Please specify, for each securities transaction effected by KDSC ostensibly on the Customers' behalf, its date and time, the exchange on which it was effected, number of shares traded, the commission or "markup" exacted by KDSC, exchange and SEC fees, and taxes assessed, and identify, where possible, the counterparty to each such transaction.

***KDSC Response:***

Request 34

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing. Without waiving its objections, Claimant produces herewith, in response to another request, the confirmations for the transactions in the Customers' accounts, which contains much of the information sought by this request.

***Defects in Response***

The Broker-Dealer has failed to produce any contractual authorization to exact the excessive "markups" it took from the Customers or documents specifying the manner in which these unauthorized "markups" were calculated. Nor has KDSC identified the counterparties to the purchases and sales of the Customers' VAPH shares, and identification of individuals and entities is a wholly proper purpose of an information request in this proceeding. (Discovery Guide § V) To the extent that KDSC contends that no other responsive information or documents exist, "the appropriate person in [KDSC] who has personal knowledge (i.e. the person who has conducted a physical search), upon the request of the requesting party, must: 1) state in writing that he/she conducted a good faith search for the requested information or documents; 2) describe the extent of the search; and 3) state that, based on the search, no such information or documents exist. (*Id.* § II(C)) The Customers so request.

***Request No. 35***

Please describe all long and short positions directly or indirectly maintained by KDSC or any person directly or indirectly associated with KDSC in any security held by the Customers.

***KDSC Response:***

<u>Request 35</u>

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC refuses to produce information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent KDSC believes that responsive information is "private and/or confidential", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

*Request No. 36*

Please describe all orders directly or indirectly placed by KDSC or any person directly or indirectly associated with KDSC in any security held by the Customers.

*KDSC Response:*

Request 36

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

With this response, KDSC refuses to produce information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."  To the extent KDSC believes that responsive information is "private and/or confidential", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case."  (Discovery Guide § II(B)).

***Request No. 37***

Please identify all other KDSC customers who placed orders or held long or short positions in any security held by the Customers.

***KDSC Response:***

Request 37

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

Identification of individuals and entities is a wholly proper purpose of an information request in this proceeding.  (Discovery Guide § V)  With this response, KDSC refuses to produce information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."  To the extent KDSC believes that responsive information is "private and/or confidential", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case."  (*Id.* § II(B)).

*Request No. 38*

Please describe all communications between KDSC and any person (including but not limited to internal KDSC communications) concerning any security held by the Customers.

*KDSC Response:*

Request 38

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

With this response, KDSC refuses to produce information reflecting its scienter which, of course, goes to the core of the Customers' fraud claims. This request also seeks information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent KDSC believes that responsive information is "private and/or confidential", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

***Request No. 39***

Please describe the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with any public offering of any security held by the Customers.

***KDSC Response:***

Request 39

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC refuses to produce information reflecting its scienter which, of course, goes to the core of the Customers' fraud claims. This request also seeks information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers. The request also should yield information concerning what, if anything, KDSC might have done to manipulate the market or abet manipulation of the market for VAPH shares. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable."

*Request No. 40*

Please produce copies of all documents concerning the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with any public offering of any security held by the Customers.

*KDSC Response:*

Request 40

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

With this response, KDSC refuses to produce information reflecting its scienter which, of course, goes to the core of the Customers' fraud claims. This request also seeks information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers. The request also should yield information concerning what, if anything, KDSC might have done to manipulate the market or abet manipulation of the market for VAPH shares. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent KDSC believes that responsive information is "confidential and/or proprietary", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

*Request No. 41*

Please describe the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with "making a market" in any security held by the Customers.

*KDSC Response:*

Request 41

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

With this response, KDSC refuses to produce information reflecting its scienter which, of course, goes to the core of the Customers' fraud claims. This request also seeks information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers. The request also should yield information concerning what, if anything, KDSC might have done to manipulate the market or abet manipulation of the market for VAPH shares. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims are "viable." To the extent KDSC believes that responsive information is "confidential and/or proprietary", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

***Request No. 42***

Please produce copies of all documents concerning the role played and activities undertaken by KDSC, whether directly or indirectly, in connection with "making a market" in any security held by the Customers.

***KDSC Response:***

Request 42

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

***Defects in Response***

With this response, KDSC refuses to produce information reflecting its scienter which, of course, goes to the core of the Customers' fraud claims. This request also seeks information that would confirm the extent to which the Broker-Dealer and its confederates traded VAPH shares in conflict with the Customers. The request also should yield information concerning what, if anything, KDSC might have done to manipulate the market or abet manipulation of the market for VAPH shares. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims or defenses are "viable." To the extent KDSC believes that responsive information is "confidential and/or proprietary", the proper recourse is a "stipulation between the parties that the document(s) in question will not be disclosed or used in any manner outside of the arbitration of the particular case." (Discovery Guide § II(B)).

***Request No. 43***

Please identify and produce each document, not otherwise identified, concerning:  your response to any Request or any of the facts and circumstances underlying the Arbitration or any putative claim or defense asserted or which might be asserted in this proceeding.

***KDSC Response:***

Request 43

Claimant objects to this omnibus request on the grounds that it is vague, overbroad, it seeks potentially Privileged Materials, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it places an undue burden upon Claimant.  Claimant respectfully requests that Respondents propound a specific request for a particular document.

***Defects in Response***

The Customers acknowledge that this request is not particularly specific.  However, the Association encourages the voluntary exchange of information in a manner different from that set forth in the Discovery Guide if the parties can agree to that exchange.  The Customers made this request in the spirit of cooperating to the fullest extent practicable in the voluntary exchange of information to expedite the arbitration process, and they therefore encourage KDSC to engage them in dialogue with an eye toward negotiating a stipulation ensuring that all relevant information is exchanged, so that the hearing does not devolve into "trial by ambush."  To the extent information responsive to this request is allegedly privileged, KDSC should – as instructed in the Requests – prepare a privilege log so that the Chairperson may ascertain whether its invocation of privilege is appropriate.  It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims or defenses are "viable."

*Request No. 44*

Please produce copies of all documents concerning KDSC's financial condition the Broker-Dealer is required to make available for inspection pursuant to the Association's Business Conduct Rule 2270.

*KDSC Response:*

Request 44

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing. Further, Respondents are not, now, "bona fide regular customer(s)" of KDSC -- as Rule 2270 defines a regular customer "is one who has cash and securities in the possession of the broker firm". Consequently, Respondents may not make a request of KDSC pursuant to NASD Rule 2270.

*Defects in Response*

Rule 2270 mandates disclosure of this information to "any bona fide regular customer, upon request." It is only because of KDSC's misconduct that the Customers no longer have cash or securities in the Broker-Dealer's possession, and it is illogical to suggest that a member may avoid providing such information to customers simply by stealing their money and securities. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims or defenses are "viable."

*Request No. 45*

Please describe all communications between KDSC and the Customers concerning "day-trading", including in your response a copies of each risk disclosure statement specified by the Association's Business Conduct Rule 2361 that was provided to the Customers.

*KDSC Response:*

Request 45

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

Among the inappropriate trading strategies recommended to – and for a time, utilized by – one or more of the Customers was "day trading," and Rule 2361 mandates the provision of certain information – including but not limited to risk disclosures – to customers concerning such strategies when promoted by members. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims or defenses are "viable."

*Request No. 46*

Please describe all communications between KDSC and any person (including but not limited to internal KDSC communications) concerning "day-trading" by the Customers.

*KDSC Response:*

Request 46

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

Among the inappropriate trading strategies recommended to – and for a time, utilized by – one or more of the Customers was "day trading," and Rule 2361 mandates the provision of certain information – including but not limited to risk disclosures – to customers concerning such strategies when promoted by members. It is not for the Broker-Dealer to determine unilaterally whether the Customers' claims or defenses are "viable."

*Request No. 47*

Please identify each person responding to or assisting in the preparation of responses to these Requests.

*KDSC Response:*

Request 47

Claimant objects to this request on the grounds that it seeks information that is not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

*Defects in Response*

Identification of individuals and entities is a wholly proper purpose of an information request in this proceeding. (Discovery Guide § V) The information sought with this request will be useful for cross-examination and/or impeachment at the hearing.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  December 15, 2004

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

```
-----------------------------------------------------------------------x
In the Matter of the Arbitration Between:                    :
                                                             :
KASHNER DAVIDSON SECURITIES CORPORATION, :          NASD No. 04-03793
                                                             :
        Claimant/Counterclaim Respondent,                    :
                                                             :
            -against-                                        :
                                                             :
STEVEN MSCISZ, MARK MSCISZ, and                              :
LYNDA MSCISZ,                                                :
                                                             :
        Respondents/Counter-and-Third-Party Claimants,  :
                                                             :
VICTOR KASHNER, MATTHEW MEISTER and                          :
TIMOTHY VARCHETTO,                          .                :
                                                             :
        Third-Party Respondents.                             :
-----------------------------------------------------------------------x
```

**CLAIMANT AND THIRD-PARTY RESPONDENTS' OBJECTIONS AND
RESPONSES TO RESPONDENTS/THIRD-PARTY CLAIMANTS' FIRST
REQUEST FOR THE PRODUCTION OF DOCUMENTS AND INFORMATION**

Claimant/Counterclaim Respondent Kashner Davidson Securities Corporation

("KDSC"), and Third-Party Respondents Victor Kashner ("Kashner"), Matthew Meister

("Meister") and Timothy Varchetto ("Varchetto") (for ease of reference, hereinafter collectively

"Claimant"), by and through their counsel, Sichenzia Ross Friedman Ference LLP, submit the

following as their Objections and Responses to Respondents' First Request for Documents and

Information.

### General Objections And Responses

1.        Claimant objects to the requests to the extent that they are inconsistent with, or

attempt to impose obligations on Claimant beyond those found in the NASD Code of Arbitration

Procedure (the "NASD Code") or the NASD Discovery Guide (the "Discovery Guide").

2.      Claimant objects to the requests insofar as they call for the production of documents protected by the attorney-client or other similar privilege, or which are otherwise immune or protected from disclosure. Claimant objects to the requests insofar as they call for the production of materials prepared in the anticipation of litigation and/or trial preparation materials. Claimant also objects to the requests insofar as they call for the production of attorneys' work product including, without limitation, any materials containing or reflecting the mental impressions, conclusions, opinions, and/or legal theories of any attorneys for Respondents. Hereinafter, in the context of Claimant's responses to requests by Respondents, these privileges shall be collectively referred to as "Privileged Materials."

3.      Claimant objects to the requests to the extent they seek "all" documents set forth in the requests as vague, overly broad and unduly burdensome. To the extent not objected to otherwise, Claimant will search for and produce documents that on their face contain references to subjects specifically described in the requests, and documents whose relationship to those subjects is readily apparent because of the manner in which they have been kept.

4.      By responding to the requests, Claimant does not acknowledge or concede the truth or accuracy of any characterization, allegation, or statement made in such document requests, and Claimant objects generally to such characterizations, allegations or statements.

5.      Claimant reserves its right to object on any ground to the use of any of the responses to Respondents' document requests or subject matter thereof in any subsequent proceeding or at the hearing of this action.

6.      To the extent responsive documents may be deemed confidential, Claimant will produce such documents only after all the receiving party has entered into an appropriate confidentiality stipulation.

7.      Claimant reserves its right to object on any ground at any time to a request for further responses to the requests or any other discovery procedure involving or relating to the subject matter of Claimant's responses.

8.      Claimant reserves its right at any time to revise, correct, amend, supplement or clarify any response set forth below.

9.      To the extent documents may be responsive to more than one of the requests, Claimant will produce such documents only once.

10.     Claimant objects to the lengthy and onerous instructions set forth in Respondents' discovery request on the grounds that such instructions are not expressly allowed by the NASD Code and impose an undue burden upon a party in arbitration.

11.     Claimant objects to the time period of the requests propounded by Respondent on the grounds that the time period set forth, January 1, 2003 through the present, seeks documents that are not relevant to the narrow time period at issue in the pleadings. Accordingly, unless specifically stated below, Claimant will limit its response to documents pertaining to the time period December 1, 2003 through April 30, 2004.

### Specific Objections And Responses

Request 1, List 1, Item 1

Responsive documents are produced herewith.

Request 1, List 1, Item 2

Responsive documents are produced herewith.

Request 1, List 1, Item 3

Responsive documents are produced herewith.

Request 1, List 1, Item 4

Responsive documents are produced herewith.

Request 1, List 1, Item 5

Responsive documents are produced herewith.

Request 1, List 1, Item 6

Responsive documents are produced herewith.

Request 1, List 1, Item 7

Responsive documents are produced herewith.

Request 1, List 1, Item 8

Claimant objects to this request on the grounds that the request is overbroad, unduly

burdensome, seeks documents that are not relevant to the factual allegations and viable legal

claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to

collect a debt justly due and owing.

Request 1, List 1, Item 9

Claimant objects to this request on the grounds that the request is overbroad, unduly

burdensome, seeks confidential and/or proprietary materials, seeks documents that are not

relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is

merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 1, List 1, Item 10

Responsive documents are produced herewith.

Request 1, List 1, Item 11

Responsive documents are produced herewith.

Request 1, List 1, Item 12

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 1, List 3

Claimant objects to producing items identified on List 3 of the Discovery Guide, which pertains to churning claims, on the grounds that these documents are not relevant to the factual allegations and viable legal claims framed in the pleadings, which do not set forth such a legal claim, and the request for these items places an undue and excessive burden on Claimant.

Request 1, List 5

Claimant objects to producing items identified on List 5 of the Discovery Guide, which pertains to viable claims for failure to supervise, on the grounds that these documents are not relevant to the factual allegations and viable legal claims framed in the pleadings, which do not set forth such a legal claim, and the request for these items places an undue and excessive burden on Claimant.

Request 1, Lists 7 and 9, and List 13, Item 1

Claimant states that the only document potentially responsive to this request is the Prospectus filed by Vaso Active Pharmaceuticals, Inc. with the U.S. Securities and Exchange Commission ("SEC") – a copy of which was previously provided to Respondents and can otherwise be obtained from the SEC's website.

Request 1, List 13, Item 2

Claimant objects to this request on the grounds that the request is overbroad, unduly burdensome, seeks documents that are not relevant to the factual allegations and viable legal claims asserted in the pleadings, and it is merely designed to harass Claimant in its attempt to collect a debt justly due and owing.

Request 2

Claimant objects to this omnibus request on the grounds that it is vague, overbroad, it seeks potentially Privileged Materials, and it places an undue burden upon Claimant. Claimant respectfully requests that Respondents propound a specific request for a particular document.

Request 3

Claimant objects to this request on the grounds that is overbroad, unduly burdensome and it is an impermissible interrogatory, which is prohibited by the NASD Discovery Guide. Without waiving its objections, Claimant states that Respondents, Timothy Varchetto, Matthew Meister, and Melissa Rothenbach have knowledge concerning the factual allegations set forth in the pleadings.

Request 4

Claimant objects to this request on the grounds that it seeks to invade the attorney work product privilege. Under Rule 10321(c) of the NASD Code, a party is not required to determine and identify who it will present as factual witnesses in its direct case until twenty days prior to the hearing. At this time, Claimant's Counsel has not definitively determined who they will call as factual witnesses in Claimant's case in chief. Moreover, Claimant objects to the prong of the request seeking the "description of her expected testimony" on the grounds that it is an impermissible interrogatory.

Request 5

      Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, and it is an impermissible interrogatory, which is prohibited by the NASD Discovery Guide.

Request 6

      Claimant objects to this request on the grounds that it seeks to invade the attorney work product privilege.  Under Rule 10321(c) of the NASD Code, a party is not required to determine and identify who it will present as its testifying expert witness in its direct case until twenty days prior to the hearing.  At this time, Claimant's Counsel has not definitively determined who they will call as Claimant's testifying expert witness in Claimant's case in chief.  Moreover, Claimant objects to subsections (a) through (f) on the grounds that they are overbroad and unduly burdensome.  When Claimant designates and identifies its testifying expert witness, it will provide Respondents with its expert's resume.

Request 7

      None.

Request 8

      Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 9

      Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks Privileged Materials, and it is an impermissible interrogatory.

Request 10

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 11

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 12

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 13

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 14

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is duplicative of Request 1, List 1, Item 9, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 15

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 16

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 17

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 18

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 19

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 20

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 21

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks private personal information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 22

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 23

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 24

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 25

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, seeks private and/or confidential information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it contains an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 26

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks private and confidential information concerning non-parties, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 27

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing. Without waiving its objections, Claimant respectfully refers Respondents to the documents annexed to the Statement of Claim and Reply to the Counterclaims.

Request 28

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it is an impermissible interrogatory, it seeks to invade the attorney-work product privilege, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 29

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 30

Claimant objects to this request on the grounds that it is an impermissible interrogatory. Without waiving its objections, Claimant produces herewith contracts and agreements responsive to this request.

Request 31

None. Claimant did not recommend any securities transaction or strategies to the Customers.

Request 32

Claimant objects to this request on the grounds that it is an impermissible interrogatory. Without waiving its objection, responsive documents are produced herewith; moreover, all markups were within the policy established by the NASD in IM-2440.

Request 33

Margin debit in the amount of $361,022.94, together with the maximum statutory interest thereon, and all costs of collection, including Claimant's attorneys' fees as provided in Respondents' Customer Agreements.

Request 34

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing. Without waiving its objections, Claimant produces herewith, in response to another request, the confirmations for the transactions in the Customers' accounts, which contains much of the information sought by this request.

Request 35

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 36

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 37

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 38

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 39

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 40

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it seeks confidential and/or proprietary information, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 41

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 42

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 43

Claimant objects to this omnibus request on the grounds that it is vague, overbroad, it seeks potentially Privileged Materials, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it places an undue burden upon Claimant.  Claimant respectfully requests that Respondents propound a specific request for a particular document.

Request 44

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks confidential and/or proprietary information, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.  Further, Respondents are not, now, "bona fide regular customer(s)" of KDSC -- as Rule 2270 defines a regular customer "is one who has cash and securities in the possession of the broker firm".  Consequently, Respondents may not make a request of KDSC pursuant to NASD Rule 2270.

Request 45

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in

the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 46

Claimant objects to this request on the grounds that it is overbroad, unduly burdensome, it seeks materials that are not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Request 47

Claimant objects to this request on the grounds that it seeks information that is not relevant to the factual allegations and viable legal claims framed in the pleadings, it is an impermissible interrogatory, and it is merely designed to harass Claimant in its attempts to collect a debt justly due and owing.

Dated: New York, New York
        September 29, 2004

Respectfully submitted,

SICHENZIA ROSS FRIEDMAN FERENCE LLP

By: _____
    Marc J. Ross, Esq.
    Richard J. Babnick, Jr., Esq.
    1065 Avenue of the Americas, 21st Floor
    New York, New York 10018
    (212) 930-9700

    Attorneys for Kashner Davidson Securities
    Corporation, Victor Kashner, Timothy Varchetto,
    and Matthew Meister

17

Before NASD
DISPUTE RESOLUTION, INC.

In the Matter of the Arbitration Between:⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀)
KASHNER DAVIDSON SECURITIES CORP.,⠀⠀)
⠀⠀*Claimant/Respondent in Counterclaim,*⠀⠀)
⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀)
STEVEN MSCISZ, MARK MSCISZ, and⠀⠀⠀)⠀⠀NASD DISPUTE
LYNDA MSCISZ,⠀⠀⠀⠀)⠀⠀RESOLUTION NO.
⠀⠀*Respondents/Counter- and Third Party Claimants.*⠀)⠀⠀04-03793
⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀v.⠀⠀⠀⠀⠀)
⠀⠀⠀⠀⠀)
VICTOR KASHNER, MATTHEW MEISTER and⠀⠀)
TIMOTHY VARCHETTO,⠀⠀⠀)
⠀⠀*Third Party Respondents.*⠀⠀)

## ORDER OF ARBITRATOR REGARDING
## RESPONDENTS' MOTION TO COMPEL PRODUCTION OF DOCUMENTS

The Claimant is hereby ordered to respond on or before February 10, 2005 to the
Respondents' Documents and Information Requests as follows:

| Request No. | 1 | List 1 | Item 8 | Granted |
|---|---|---|---|---|
| Request No. | 1 | List 1 | Item 9 | Granted |
| Request No. | 1 | List 1 | Item 12 | Granted |
| Request No. | 1 | List 3 | | Denied |
| Request No. | 1 | List 5 | | Denied |
| Request No. | 1 | List 7 | | Granted |
| Request No. | 1 | List 9 | | Denied |
| Request No. | 1 | List 13 | Item 1 | Denied |
| Request No. | 1 | List 13 | Item 2 | Denied |
| Request No. | 2 | | | Denied |
| Request No. | 3 | | | Denied |
| Request No. | 4 | | | Denied |
| Request No. | 5 | | | Denied |
| Request No. | 6 | | | Denied |
| Request No. | 8 | | | Granted |
| Request No. | 9 | | | Denied |
| Request No. | 10 | | | Denied |
| Request No. | 11 | | | Denied |
| Request No. | 12 | | | Denied |
| Request No. | 13 | | | Denied |
| Request No. | 14 | | | Denied |
| Request No. | 15 | | | Denied |
| Request No. | 16 | | | Granted |
| Request No. | 17 | | | Granted |
| Request Nos. | 18 to 47 | | | Denied |

If the Claimant responds that no responsive information or documents exist, the response must include a statement that a good faith search for the requested information or document was made, describe the extent of the search and state that no such information or documents exist.

Arthur J. Giacomarra, Arbitrator

2-1-05

Date

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____

|  |  |  |
|---|---|---|
| In the Matter of the Arbitration Between: | ) | |
| | ) | |
| KASHNER DAVIDSON SECURITIES CORP., | ) | |
| | ) | |
| *Claimant/Respondent in Counterclaim,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| STEVEN MSCISZ, MARK MSCISZ, and | ) | |
| LYNDA MSCISZ, | ) | NASD DISPUTE RESOLUTION NO. 04-03793 |
| | ) | |
| *Respondents/Counter- and Third Party Claimants,* | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VICTOR KASHNER, MATTHEW MEISTER and | ) | |
| TIMOTHY VARCHETTO, | ) | |
| | ) | |
| *Third Party Respondents.* | ) | |

_____)

### MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ TO WITHDRAW COUNTERCLAIMS & THIRD PARTY CLAIMS WITHOUT PREJUDICE

Pursuant to Rules 10305 and 10328(c) of the Code of Arbitration Procedure ("Code") promulgated by the National Association of Securities Dealers, Inc. ("Association"), Respondents/Counter- and Third Party Claimants Steven Mscisz, Mark Mscisz and Lynda Mscisz (collectively "Customers") hereby request that the Panel or its Chairman dismiss without prejudice or allow the Customers to withdraw without prejudice the counterclaims and third party claims they have asserted in this arbitration, referring the Customers to their judicial remedies to the extent arbitration is not compulsory.

In support of this motion, the Customers state the following:

1.      The Customers did not execute a Uniform Submission Agreement in this matter. Rather, the Submission Agreement they signed (Exhibit A) included a significant proviso – the Customers agreed to submit their claims to arbitration only if they would be afforded a "fair and complete opportunity to obtain adjudication of their claims and defenses."

2.      Although the Customers do not, as a matter of principle, oppose arbitration, although the Customers preferred to have their counterclaims and third party claims resolved in this proceeding, although the Customers concede that the claims asserted against them by Claimant/Respondent-in-Counterclaim Kashner Davidson Securities Corporation ("KDSC") must be resolved in this forum and that arbitration is likewise mandatory with respect to claims asserted by the Customers individually against KDSC, the Customers have been left with no viable alternative to withdrawing their counterclaims and third party claims from this arbitration.

3.      The stonewalling by KDSC during the more than 4 ½ months following the Customers' discovery requests, the Chairman's recent decision unfairly denying most of the Customers' motion to compel discovery from KDSC, KDSC's incomplete compliance even with the limited discovery obligation imposed by the Chairman's order, and the Chairman's failure to rule in a timely fashion upon the Customers' motion to continue the upcoming hearing – have collectively done significant violence to the otherwise-viable counterclaims and third party claims the Customers planned to present at the upcoming hearing.

4.      Indeed, these circumstances – all of which were beyond the Customers' control – have made it impossible for the Customers to obtain the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their agreement to arbitration was conditioned.

5.      However, it remains possible for the Customers have a "fair and complete opportunity to obtain adjudication of their claims and defenses" – albeit not in this arbitration – because judicial remedies are available with respect to KDSC and the Third Party Respondents.

6.      The Client Account Agreements ("Agreements") on which KDSC purports to base its claims only require arbitration of the claims asserted against the Customers by KDSC and those asserted against KDSC by the Customers individually, and not as members of any putative class.  Nor do the Agreements mandate arbitration of the Customers' claims against the Third Party Respondents.

7.      The Agreements and Rule 10301(d) of the Code both specifically exclude class action litigation from any arbitration.  The Customers therefore remain members of the plaintiff class in *In re Vaso Active Pharmaceuticals Securities Litigation,* Docket No. 04-10708-RCL (D. Mass.), and KDSC remains a defendant in that litigation, regardless of what transpires in this arbitration.

8.      Should the Customers elect to commence or participate in a separate class action against KDSC concerning issues not raised in the *Vaso Active Securities Litigation* matter, they would have to do so in a judicial forum, not in an arbitration commenced before the Association.

9.      Likewise, because the membership of Third Party Respondent Matthew Meister ("Meister") in the Association was "terminated, suspended, canceled, or revoked", and because the condition precedent to the Customers' agreement to arbitrate claims against Meister has not been satisfied, Rule 10301(a) of the Code does not require arbitration of the Customers' claims against Meister.

10.      There is another important reason why the Customers' claims against Meister and the other Third Party Respondents need not be arbitrated.  The Agreements purports to be

governed by Alabama law. In that State, strangers to the operative agreement generally cannot compel arbitration. *Jim Burke Automotive, Inc. v. McGrue,* 826 So. 2d 122, 131-32 (Ala. 2002). There is nothing in the Agreements which suggests that the Third Party Respondents are intended beneficiaries of the arbitration provisions, nor are the claims asserted against them in this proceeding (which KDSC has persistently and repeatedly characterized as a "simple case to collect a margin debt") inextricably intertwined with KDSC's affirmative claims. Accordingly, under Alabama law, arbitration is not mandatory with respect to the Customers' claims against the individual Third Party Respondents.

11.    By allowing this motion and referring the Customers to their judicial remedies, the Panel can limit (but not eliminate) the prejudice caused to the Customers by the circumstances recited in paragraph 3, while ensuring that KDSC gets the arbitration on which it has insisted upon all along – a hearing which involves nothing but a "simple case to collect a[n alleged] margin debt." Indeed, as recently as Tuesday of this week, KDSC itself insisted on dismissal of the Customers' claims, albeit for different reasons.

12.    In contrast, if the Panel or its Chairman were to deny this motion, any award issued in this matter would be exposed to vacation under the Massachusetts and Federal Arbitration Acts – both of which prohibit enforcement of arbitral awards procured by "undue means." Should the Customers' Counterclaims and Third Party Claims remain part of this case despite the Customers' desire to withdraw them without prejudice, although the Customers have been denied "a fair and complete opportunity to obtain adjudication" of those claims, and although the Customers did not consent to arbitrate them, any award purporting to encompass a decision on the merits of the Customers' Counterclaims and Third Party Claims would necessarily be procured by "undue means."

WHEREFORE, the Customers respectfully request that the Panel or its Chairman grant the foregoing motion.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  February 24, 2005

# *Exhibit A*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

| | |
|---|---|
| In the Matter of the Arbitration Between:<br><br>KASHNER DAVIDSON SECURITIES CORP.,<br><br>    *Claimant/Respondent in Counterclaim,*<br><br>                v.<br><br>STEVEN MSCISZ, MARK MSCISZ, and<br>LYNDA MSCISZ,<br><br>    *Respondents/Counterclaimants.*<br><br>                v.<br><br>VICTOR KASHNER, MATTHEW MEISTER and<br>TIMOTHY VARCHETTO,<br><br>    *Third Party Respondents.* | NASD DISPUTE RESOLUTION NO. 04-03793 |

## SUBMISSION AGREEMENT

1.      Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties hereby submit the present matter in controversy, as set forth in the statement of claim, answers, cross claims and all related counterclaims and/or third party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

2.      The undersigned parties hereby state that their attorney has read and explained to them the procedures and rules of the sponsoring organization relating to arbitration.

3.      Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s), and that the arbitration will be conducted in accordance with the Constitution, By-Laws, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

4.    Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.    The undersigned parties reserve their right to seek adjudication of their claims and defenses in a court of competent jurisdiction if the sponsoring organization does not afford them a fair and complete opportunity to obtain such an adjudication.

IN WITNESS WHEREOF, the parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____          _____8/26/04_____
STEVEN MSCISCZ                           Date

_____          _____8/26/04_____
MARK MSCISCZ                             Date

_____          _____8/26/04_____
LYNDA MSCISCZ                            Date

**CERTIFICATE OF SERVICE**

I hereby certify that on this twenty-sixth day of August, 2004, I caused a copy of the foregoing document to be served by overnight mail upon the attorney of record for Kashner Davidson Securities Corporation.

_____
William P. Corbett, Jr.

- 2 -

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____

In the Matter of the Arbitration Between:　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
KASHNER DAVIDSON SECURITIES CORP.,　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　*Claimant/Respondent in Counterclaim,*　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
STEVEN MSCISZ, MARK MSCISZ, and　　　　　　　)
LYNDA MSCISZ,　　　　　　　　　　　　　　　　)　　NASD DISPUTE RESOLUTION NO. 04-03793
　　　　　　　　　　　　　　　　　　　　　　　　)
　　*Respondents/Counter- and Third Party Claimants.*　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　　　　　　　　v.　　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
VICTOR KASHNER, MATTHEW MEISTER and　　　　)
TIMOTHY VARCHETTO,　　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　　　　　　　　　)
　　*Third Party Respondents.*　　　　　　　　　　)
_____)


**MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ**
**TO DISQUALIFY COUNSEL OR, ALTERNATIVELY, TO STAY PROCEEDINGS**


Respondents/Counter- and Third Party Claimants Steven Mscisz ("Steven"), Mark

Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") hereby request that the

Panel or its Chairperson disqualify Marc J. Ross ("Mr. Ross"), Richard J. Babnick, Jr. ("Mr.

Babnick"), and any other attorney not admitted to practice in Massachusetts from participating in

the referenced arbitration, or in the alternative, to stay this proceeding pending resolution of

*Chimko v. King,* Case No. SJC-09388 (entered Nov. 22, 2004) by the Commonwealth's Supreme

Judicial Court ("SJC").  In support of this motion, the Customers state the following:

1.    Mr. Ross and Mr. Babnick are the only attorneys of record for Claimant/ Respondent-in-Counterclaim Kashner Davidson Securities Corporation ("KDSC") and third-party respondents Victor L. Kashner ("Mr. Kashner"), Matt Meister and Timothy W. Varchetto.

2.    The hearing in this arbitration will be held in Boston, Massachusetts, but records of the Commonwealth's Board of Bar Overseers ("BBO") indicate that neither Mr. Ross nor Mr. Babnick is licensed to practice law in Massachusetts. Printouts reflecting searches of the BBO's website for registration records concerning Mr. Ross and Mr. Babnick are appended to this motion as Exhibits A and B, respectively.

3.    Attorneys not admitted to the Massachusetts Bar are prohibited from engaging in the practice of law in this Commonwealth. MASS. R. PROF. C. 5.5(a).

4.    Courts of other jurisdictions have expressly interpreted cognate rules to preclude out-of-state attorneys from participating in arbitration proceedings within their borders. *See, e.g., Florida Bar v. Rapoport,* 845 So.2d 874, *cert. denied,* 540 U.S. 967 (2003) (securities arbitration) (Exhibit C); *Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,* 17 Cal. 4th 119, 133-34, *cert. denied,* 525 U.S. 920 (1998) (commercial arbitration) (Exhibit D).

5.    The Massachusetts Rules of Professional Conduct are based on Model Rules promulgated by the American Bar Association ("ABA"), which were amended in 2002 to include, among other items, a new subsection c(3) to Rule 5.5. In fora where that subsection has been adopted, out-of-state attorneys generally may participate in arbitration proceedings.

6.    However, this Commonwealth has not amended its version of Rule 5.5 to adopt the ABA's changes. Furthermore, no Massachusetts tribunal has squarely addressed the "unauthorized practice of law" issue in the arbitration context. *See, e.g., Superadio L.P. v. Walt "Baby" Love Productions, Inc.,* 2004 Mass. App. LEXIS 1356 at *13 n.5 (Nov. 29, 2004)

(vacating arbitral award on other grounds without deciding whether it was obtained by "undue means" and thus voidable because prevailing party was represented by counsel from another state) (copy at Exhibit E); *In re Lucas,* 2004 U.S. Dist. Lexis 21905 *59-60 (D. Mass., Sept. 30, 2004) (Young, U.S.D.J.) (certifying to SJC bankruptcy-related "unauthorized practice of law" issues) (copy at Exhibit F).

7.      Upon receipt of Judge Young's certification in *Lucas,* the SJC docketed that case under the name *Chimko v. King,* assigned it docket number SJC-09388, and set a briefing schedule.  A copy of the SJC's docket is appended as Exhibit G.

8.      Accordingly, while the "unauthorized practice of law" issue remains unsettled in this Commonwealth, it will soon be resolved, and there is a strong possibility that this resolution will establish that participation of Mr. Ross and Mr. Babnick in this arbitration would violate Rule 5.5(a).

9.      It logically follows that, having knowledge of this potential violation, the Customers' attorney and the members of the Panel could "assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law" – and thus violate Rule 5.5(b) themselves – if they countenance the participation of Mr. Ross and Mr. Babnick and the SJC subsequently decides *Chimko* in a fashion that fails to create an "arbitration exception" to the prohibition against the unauthorized practice of law.

10.      Furthermore, *Superadio*, 2004 Mass. App. LEXIS 1356 at *13 n.5, leaves open the significant possibility that any award issued after participation by Mr. Ross and Mr. Babnick could be voidable.  *See* G.L. c. 251, § 12(a)(1) ("Upon application of a party, the court shall vacate an award if . . . the award was procured by . . . undue means.").

11.    Under these circumstances, the prudent course would be to disqualify Mr. Ross and Mr. Babnick from participating in this proceeding or, in the alternative, to stay the arbitration pending the SJC's decision in *Chimko.*

12.    Given that the hearing is nearly 3 months away, and that at least two parties have preexisting relationships with Massachusetts counsel (*see, e.g., SEC v. Williams,* 884 F. Supp. 28 (1995) (Mr. Kashner & KDSC represented in SEC enforcement action by Boston office of Kirkpatrick & Lockhart)), disqualification should not result in significant prejudice to any party.

13.    On the other hand, Rule 10315 of the Code of Arbitration Procedure appears to impose no limits on the Panel's plenary power to "determine the time" for hearings, so it would be well within the confines of its authority for the Panel to stay this arbitration until the SJC decides *Chimko.*

14.    Furthermore, the docket in *Chimko* indicates that the plaintiff's brief is due on January 3, 2005.  The defendant's brief must therefore be filed on or before February 2, 2005, and the plaintiff's reply brief must be filed on or before February 17, 2005.  MASS. R. APP. P. 19(a).  In other words, the case should be ready for oral argument in approximately two months.

15.    Though it is impossible to predict authoritatively how long the SJC will take to resolve *Chimko,* that case involves the discrete legal issues certified by Judge Young, not a lengthy trial record, so it can be decided expeditiously.  It is therefore unlikely that any stay pending the *Chimko* decision would be excessively long.

WHEREFORE, the Customers respectfully request that the Panel or its Chairperson grant the foregoing motion.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  December 17, 2004

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____
                                                    )
In the Matter of the Arbitration Between:           )
                                                    )
KASHNER DAVIDSON SECURITIES CORP.,                  )
                                                    )
    *Claimant/Respondent in Counterclaim,*          )
                                                    )
              v.                                    )
                                                    )
STEVEN MSCISZ, MARK MSCISZ, and                     )
LYNDA MSCISZ,                                        )    NASD DISPUTE RESOLUTION No. 04-03793
                                                    )
    *Respondents/Counter- and Third Party Claimants,* )
                                                    )
              v.                                    )
                                                    )
VICTOR KASHNER, MATTHEW MEISTER and                 )
TIMOTHY VARCHETTO,                                  )
                                                    )
    *Third Party Respondents.*                      )
_____)


**MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ FOR
RECONSIDERATION OF DENIAL OF MOTION TO DISQUALIFY COUNSEL**


Respondents/Counter- and Third Party Claimants Steven Mscisz, Mark Mscisz and Lynda

Mscisz (collectively "Customers") hereby request that the Panel or its Chairman reconsider the

Chairman's oral decision of January 31, 2005 denying the "Motion of Steven Mscisz, Mark

Mscisz & Lynda Mscisz to Disqualify Counsel or, Alternatively, to Stay Proceedings" ("Motion

to Disqualify") and the subsequent determination, verbalized during March 2, 2005 pre-hearing

telephone conference, not to revisit that order.  In support of this motion, the Customers state the

following:

1.      On February 9, 2005 – ten days after the Chairman ruled on their Motion to Disqualify – the National Association of Securities Dealers, Inc. ("NASD" or "Association") filed with the Securities & Exchange Commission ("SEC" or "Commission") a Proposed Rule Change ("PRC") which embraced the selfsame legal analysis offered by the Customers but apparently rejected by the Chairman.  A copy of the PRC is appended as Ex. A.  The Customers were not aware of the PRC's existence prior to the March 2, 2005 telephone conference.

2.      In the PRC, the NASD recognized that its Code of Arbitration Procedure ("Code") does not currently permit arbitrators to admit out-of-state attorneys *pro hac vice.* Rather, the Association "believes a rule is needed to address the issue of multi-jurisdictional practice of law in arbitration."  PRC at 5.

3.      The Association consequently sought leave from the SEC to amend Rule 10316 of the Code and adopt a new Rule 10408, which would apply to arbitrations and mediations, respectively.  If the PRC is approved and takes effect, attorneys could, under specified circumstances, appear in arbitration hearings in jurisdictions where they are not admitted to practice.  PRC at 3.  That is not a ratification or codification of current law; the PRC recognizes that the new rules would "expand the concept of representation in arbitration. . ."  *Id.* at 7.

4.      Because the PRC has not yet been published in the Federal Register – let alone commented upon by interested persons, approved by the Commission, or announced to the Association in a Notice to Members – the change described in the PRC certainly will not be effective before the May 17, 2005 date on which the hearing in this matter is to commence.  *See* PRC at 5 ("The NASD will announce the effective date of the proposed rule change in a Notice to Members to be published no later than 60 days following Commission approval.  The effective date will be 30 days following publication of the Notice to Members announcing Commission

approval."); 15 U.S.C. § 78s(b)(1) (unless otherwise permitted, no proposed change "shall take effect unless approved by the Commission" after appropriate notice and an opportunity for interested persons to comment on the proposed change); 17 C.F.R. § 240.19b-4(g) (same).

5.      It is important to note that the Association's PRC acknowledges the current state of the law – as set forth in the Customers' original Motion to Disqualify – that "[a]lthough this practice is common, it can be a violation of state unauthorized practice of law provisions" for attorneys to appear in hearings conducted in jurisdictions where they are not admitted.  PRC at 5.

6.      Thus, even if the PRC were approved by the Commission and subsequently took effect, it would remain the province of the Massachusetts Supreme Judicial Court ("SJC") – the Commonwealth's highest court, which promulgated the Rules of Professional Conduct and oversees the practice of law in this jurisdiction – to determine whether participation in the hearing by the Brokers' counsel would violate the express, unambiguous proscription against the unauthorized practice of law.  The Association itself acknowledges – and the PRC provides – that the states would retain the right "to determine what activities violate the states' unauthorized practice of law provisions," and that no state would be prevented "from deciding that an out-of-state attorney may have violated a state's unauthorized practice of law provision by representing a party in an NASD arbitration."  PRC at 8.

7.      While the American Bar Association ("ABA") might have amended its Model Rules of Professional Conduct to allow lawyers to represent clients in arbitrations conducted where they are not licensed, the Association recognizes that the ABA's amendment "can be enforced only if the states adopt it into their laws."  PRC at 6.  Massachusetts has not adopted that amendment.  *Compare* Mass. R. Prof. C. 5.5(a) (Ex. B) *with* ABA Mod. R. Prof. C. 5.5(a) (Ex. C).  *See also* G.L. c. 221, § 46A (Ex. D).  Nor is there any rule of court, statute or common

law principle in this Commonwealth allowing arbitrators to admit attorneys to practice *pro hac vice.* The upshot is that, for so long as Massachusetts retains its current versions of Mass. R. Prof. C. 5.5 and G.L. c. 221, § 46A, the change described in the PRC would be of no consequence for purposes of any hearing conducted in this jurisdiction.

8.    The "unauthorized practice of law" issue, insofar as it relates to this case, is the subject of a declaratory judgment action pending in the SJC's single justice session, *Mscisz v. Kashner Davidson Securities Corp.,* et al., Case No. 2005-SJ-0088 (Mass., filed Feb. 25, 2005).[1] Similar issues remain to be decided by that Court in *Chimko v. King,* Case No. SJC-09388, and *Superadio L.P. v. Walt "Baby" Love Productions, Inc.,* Case No. FAR-14557.   One way or another, the issue will soon be resolved conclusively in this Commonwealth – and the Brokers' attorneys may be permanently enjoined from participating in the hearing.  *See* Ex. E at 14.

9.    When the highest courts of other states have analyzed cognate rules, they have held that participation in arbitration hearings by out-of-state attorneys is prohibited.  *See, e.g., Florida Bar v. Rapoport,* 845 So.2d 874, *cert. denied,* 540 U.S. 967 (2003) (securities arbitration) (Ex. F); *Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,* 17 Cal. 4th 119, 133-34, *cert. denied,* 525 U.S. 920 (1998) (commercial arbitration) (Ex. G)

10.    If the Panel or its Chairman revisits the denial of the Motion to Disqualify and excludes the Brokers' counsel from the hearing, the SJC declaratory judgment action would be rendered moot.  Alternatively, if the Panel reconsiders the Chairman's decision but is not inclined to disqualify the Brokers' current attorneys, the proper course would be to wait until the SJC acts in *Mscisz, Chimko,* and/or *Superadio* before allowing the hearing to proceed in a manner that could violate the laws of this Commonwealth.

---

[1] A copy of the First Amended Complaint filed in that action, without its lengthy exhibits (both are already part of the record of this arbitration), is appended to this motion as Exhibit E.

11.     Otherwise, if the hearing goes forward with the Brokers represented by their present counsel, the Panel and the Customers' attorney – aware of the Commonwealth's rules governing the unauthorized practice of law – could themselves be abetting that violation.  *See* Mass. R. Prof. C. 5.5(b) ("A lawyer shall not . . . assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.") *and* Mass. R. Prof. C. 8.4(a) ("It is professional misconduct for a lawyer to . . . knowingly assist . . . another to [violate or attempt to violate the Rules of Professional Conduct]").

12.     Furthermore, since the Panel has knowledge of the current state of the law – including the Association's own assessment thereof – it would act in "manifest disregard for the law" and expose any award to vacation under the Federal Arbitration Act if the Brokers' attorneys participate in the hearing.  *Wilko v. Swan,* 346 U.S. 427, 436-37 (1953).  Such a clear contravention of the Commonwealth's public policy would likewise constitute "undue means" warranting vacation of any award in the Brokers' favor under the Massachusetts Arbitration Act. G.L. c. 251, § 12(a)(1).  Furthermore, because the Customers have reasonably requested (as an alternative to disqualification of the Brokers' counsel) that the hearing be postponed until after the SJC rules – which is certainly "sufficient cause" for postponement – any award would be susceptible to vacation under the Federal and Massachusetts Arbitration Acts for that reason, as well.  9 U.S.C. § 10(a)(3); G.L. c. 251, § 12(a)(4).

13.     Concededly, in the context of NASD arbitration, state prohibitions against the unauthorized practice of law are often observed in the breach.  Generally, that is because the parties implicitly or expressly agree not to raise the issue, mindful that the expertise of out-of-state counsel often outweighs the benefit to be derived from insisting that all participating attorneys be licensed domestically.  *See* PRC at 8 ("the level of knowledge, training and skill of an attorney affects the outcome of an arbitration hearing, not the jurisdiction from which the attorney received his license to practice").  However, by engaging in hijinks like refusing to accede to reasonable requests for extensions (*see, e.g.,* Ex. H, I & J), intentionally disrupting the vacation of the Customers' attorney (*see* Ex. K ¶¶ 3-7), failing to communicate with their adversaries even when mandated to do so (*see, e.g.,* Ex. L at 3-4), and routinely resorting to distortion and misrepresentation (*see, e.g.,* Ex. M, N & O), the Brokers' counsel have, at the very least, refused to embrace the culture of civility fostered in this Commonwealth.  *See, e.g.,* BBA Civility Standards for Civil Litigation (Ex. P) ("First requests for reasonable extensions of time to respond to litigation deadlines, whether relating to pleadings, discovery or motions, should ordinarily be granted as a matter of courtesy unless time is of the essence", and lawyers should "maintain open communication with opposing lawyers," "discuss each issue with opposing lawyers in a good faith attempt to resolve it without protracted negotiation or unnecessary litigation," "be guided by the principle that representation behalf of his or her client ought to be characterized by good faith and honesty," "avoid creating unnecessary animosity or contentiousness," should not use "[t]he timing and manner of service of papers . . . to the disadvantage of the party receiving the papers [or] to take advantage of a lawyer's known absence from the office . . . ," and should "always deal with parties, other lawyers, witnesses, jurors or prospective jurors, court personnel and the judge with courtesy and civility").

14.    The rank incivility of the Broker's attorneys outweighs any benefit that might otherwise be gained from disregarding the Commonwealth's proscription against the unauthorized practice of law.  Indeed, this arbitration is what those same lawyers have persistently and repeatedly characterized as "a simple collection case in which Claimant seeks to collect a margin debt from Respondents" (*see* Ex. J (2nd par.)) and no special expertise is required to handle it ably.  The Brokers would therefore suffer no prejudice if the Panel were to insist that the hearing be conducted by attorneys who are lawfully able to do so.

WHEREFORE, the Customers respectfully request that the Panel or its Chairman grant the foregoing motion, and either disqualify the Brokers' present counsel or stay this proceeding until after the SJC finally adjudicates the pending declaratory judgment action.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
  *A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  March 9, 2005

# *Exhibit A*

OMB APPROVAL

OMB Number:          3235-0045
Expires:          June 30, 2007
Estimated average burden
hours per response............38

Page 1 of | 18 |

**SECURITIES AND EXCHANGE COMMISSION**
WASHINGTON, D.C. 20549
Form 19b-4

File No. SR - | 2005 | - | 023 |

Amendment No. | |

Proposed Rule Change by  National Association of Securities Dealers

Pursuant to Rule 19b-4 under the Securities Exchange Act of 1934

| Initial [✓] | Amendment [ ] | Withdrawal [ ] | Section 19(b)(2) [✓] | Section 19(b)(3)(A) [ ] | Section 19(b)(3)(B) [ ] |

Rule

| Pilot [ ] | Extension of Time Period for Commission Action [ ] | Date Expires [ ] | 19b-4(f)(1) [ ]    19b-4(f)(4) [ ] |
| | | | 19b-4(f)(2) [ ]    19b-4(f)(5) [ ] |
| | | | 19b-4(f)(3) [ ]    19b-4(f)(6) [ ] |

Exhibit 2 Sent As Paper Document [ ]          Exhibit 3 Sent As Paper Document [ ]

**Description**

Provide a brief description of the proposed rule change (limit 250 characters).

The proposed rule change amends Rule 10316 and adopts Rule 10408 of the NASD Code of Arbitration Procedure to address attorney representation in arbitration and mediation.

**Contact Information**

Provide the name, telephone number and e-mail address of the person on the staff of the self-regulatory organization prepared to respond to questions and comments on the proposed rule change.

First Name | Mignon |          Last Name | McLemore |

Title | Counsel |

E-mail | mignon.mclemore@nasd.com |

Telephone | (202) 728-8151 |    Fax | (202) 728-8833 |

**Signature**

Pursuant to the requirements of the Securities Exchange Act of 1934,

has duly caused this filing to be signed on its behalf by the undersigned thereunto duly authorized.

Date | 02/09/2005 |

By | Jean I. Feeney |          | Vice President and Chief Counsel, Dispute Resolution |
     (Name)                                              (Title)

NOTE: Clicking the button at right will digitally sign and lock this form.  A digital signature is as legally binding as a physical signature, and once signed, this form cannot be changed.

| Jean Feeney, jean.feeney@nasd.com |

SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, D.C. 20549

For complete Form 19b-4 instructions please refer to the EFFS website.

---

**Form 19b-4 Information**

[Add] [Remove] [View]

The self-regulatory organization must provide all required information, presented in a clear and comprehensible manner, to enable the public to provide meaningful comment on the proposal and for the Commission to determine whether the proposal is consistent with the Act and applicable rules and regulations under the Act.

---

**Exhibit 1 - Notice of Proposed Rule Change**

[Add] [Remove] [View]

The Notice section of this Form 19b-4 must comply with the guidelines for publication in the Federal Register as well as any requirements for electronic filing as published by the Commission (if applicable). The Office of the Federal Register (OFR) offers guidance on Federal Register publication requirements in the Federal Register Document Drafting Handbook, October 1998 Revision. For example, all references to the federal securities laws must include the corresponding cite to the United States Code in a footnote. All references to SEC rules must include the corresponding cite to the Code of Federal Regulations in a footnote. All references to Securities Exchange Act Releases must include the release number, release date, Federal Register cite, Federal Register date, and corresponding file number (e.g., SR-[SRO]-xx-xx). A material failure to comply with these guidelines will result in the proposed rule change being deemed not properly filed. See also Rule 0-3 under the Act (17 CFR 240.0-3)

---

**Exhibit 2 - Notices, Written Comments, Transcripts, Other Communications**

[Add] [Remove] [View]

Exhibit Sent As Paper Document
☐

Copies of notices, written comments, transcripts, other communications. If such documents cannot be filed electronically in accordance with Instruction F, they shall be filed in accordance with Instruction G.

---

**Exhibit 3 - Form, Report, or Questionnaire**

[Add] [Remove] [View]

Exhibit Sent As Paper Document
☐

Copies of any form, report, or questionnaire that the self-regulatory organization proposes to use to help implement or operate the proposed rule change, or that is referred to by the proposed rule change.

---

**Exhibit 4 - Marked Copies**

[Add] [Remove] [View]

The full text shall be marked, in any convenient manner, to indicate additions to and deletions from the immediately preceding filing. The purpose of Exhibit 4 is to permit the staff to identify immediately the changes made from the text of the rule with which it has been working.

---

**Exhibit 5 - Proposed Rule Text**

[Add] [Remove] [View]

The self-regulatory organization may choose to attach as Exhibit 5 proposed changes to rule text in place of providing it in Item I and which may otherwise be more easily readable if provided separately from Form 19b-4. Exhibit 5 shall be considered part of the proposed rule change.

---

**Partial Amendment**

[Add] [Remove] [View]

If the self-regulatory organization is amending only part of the text of a lengthy proposed rule change, it may, with the Commission's permission, file only those portions of the text of the proposed rule change in which changes are being made if the filing (i.e. partial amendment) is clearly understandable on its face. Such partial amendment shall be clearly identified and marked to show deletions and additions.

1.    <u>Text of Proposed Rule Change</u>

(a)    Pursuant to the provisions of Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act"), the National Association of Securities Dealers, Inc. ("NASD" or "Association"), through its wholly owned subsidiary, NASD Dispute Resolution, Inc. ("NASD Dispute Resolution"), is filing with the Securities and Exchange Commission ("SEC" or "Commission") a proposed rule change to amend Rule 10316 and to adopt Rule 10408 of the NASD Code of Arbitration Procedure ("Code") to address attorney representation in arbitration and mediation.  Below is the text of the proposed rule change.  Proposed new language is underlined; proposed deletions are in brackets.

\* \* \*

**10316.  Representation <u>in Arbitration</u> [by Counsel]<sup>1</sup>**

**(a)  <u>Representation by a Party</u>**

<u>Parties may represent themselves in an arbitration held in a United States hearing location.</u>

**(b)  <u>Representation by an Attorney</u>**

<u>At any stage of the arbitration proceeding held in a United States hearing location,</u> [A]<u>a</u>ll parties shall have the right to [representation by counsel at any stage of the proceedings.] <u>be represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States.  A member of a partnership may represent the partnership; and a bona fide officer of a corporation, trust, or association may represent the corporation, trust, or association.</u>

**(c)  <u>Qualifications of Representative</u>**

<u>Issues regarding the qualifications of a person to represent a party in arbitration are governed by applicable law and may be determined by an appropriate court or other</u>

---

<sup>1</sup> These provisions will be renumbered as appropriate following Commission approval of the pending revisions to the Customer Code filed on October 15, 2003, and amended on January 3, 2005 and January 19, 2005 (SR-NASD-2003-158); the Industry Code filed on January 16, 2004, and amended on February 26, 2004 and January 3, 2005 (SR-NASD-2004-011); and the Mediation Code filed on January 23, 2004, and amended on January 3, 2005 (SR-NASD-2004-013).

regulatory agency.  In the absence of a court order, the arbitration proceeding shall not be stayed or otherwise delayed pending resolution of such issues.

* * * *

## 10408.  Representation in Mediation

### (a)  Representation by Party

Parties may represent themselves in mediation held in a United States hearing location.

### (b)  Representation by an Attorney

At any stage of the mediation proceeding held in a United States hearing location, all parties shall have the right to be represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States.  A member of a partnership may represent the partnership; and a bona fide officer of a corporation, trust, or association may represent the corporation, trust, or association.

### (c)  Qualifications of Representatives

Issues regarding the qualifications of a person to represent a party in mediation are governed by applicable law and may be determined by an appropriate court or other regulatory agency.  In the absence of a court order, the mediation proceeding shall not be delayed pending resolution of such issues.

* * * *

(b)     Not applicable.

(c)     Not applicable.

2.     Procedures of the Self-Regulatory Organization

(a) The proposed rule change was approved by the Board of Directors of NASD

Regulation at its meeting on November 17, 2004, which authorized the filing of the rule

change with the SEC.  Counsel for The Nasdaq Stock Market and NASD Regulation

have been provided an opportunity to consult with respect to the proposed rule change,

pursuant to the Plan of Allocation and Delegation of Functions by the NASD to its

Subsidiaries.  The NASD Board of Governors had an opportunity to review the proposed

rule change at its meeting on November 18, 2004.  No other action by the NASD is

necessary for the filing of the proposed rule change.  Section 1(a)(ii) of Article VII of the

NASD By-Laws permits the NASD Board of Governors to adopt amendments to NASD

Rules without recourse to the membership for approval.

The NASD will announce the effective date of the proposed rule change in a

Notice to Members to be published no later than 60 days following Commission

approval.  The effective date will be 30 days following publication of the Notice to

Members announcing Commission approval.

(b) Questions regarding this rule filing may be directed to Mignon McLemore,

Counsel, NASD Dispute Resolution at (202) 728-8151.

3.    Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis

for, the Proposed Rule Change

a) Purpose

Background

NASD Dispute Resolution believes a rule is needed to address the issue of multi-

jurisdictional practice of law in arbitration.  The multi-jurisdictional practice of law

occurs when attorneys, licensed in one United States jurisdiction, practice law in a

jurisdiction in which they are not licensed.  In the area of arbitration, for example, it is

common for an attorney licensed to practice law in one state to represent a client in an

arbitration proceeding in another state in which the attorney is not licensed.  Although

this practice is common, it can be a violation of state unauthorized practice of law

provisions.  Until recently, most states had taken no action against this practice.

However, recent case law developments suggest that states are reconsidering this position.  For example, two state court rulings have found that an out-of-state attorney providing representation in an arbitration or mediation proceeding is engaging in the practice of law, and that it is a violation of the state's unauthorized practice of law statute to participate in such a proceeding without being licensed in that jurisdiction.[2]

In light of these developments and the trend toward multi-jurisdictional practice, the American Bar Association (ABA) amended its Model Rule of Professional Conduct 5.5 (Rule 5.5) so that those attorneys representing a client in an arbitration in a United States jurisdiction where they are not licensed could participate in the arbitration in that jurisdiction without violating the state's unauthorized practice of law rules.[3]  While Rule 5.5 establishes a new standard for certain types of legal activity, it can be enforced only if the states adopt it into their laws.  Some states have either adopted Rule 5.5 or a similar version of the rule.[4]  Other states have adopted a temporary practice rule, like Rule 5.5,

---

[2] See Birbrower, Montalbano, Condo & Frank v. Superior Court, 949 P.2d 1 (Cal. 1998); see also Florida Bar v. Rapoport, 845 So. 2d 874, 2003 Fla. LEXIS 250 (Fla. 2003).

[3] Model Rule 5.5, as amended, would allow a United States lawyer, admitted in one United States jurisdiction, to engage in certain types of legal activity in another United States jurisdiction where he is not licensed to practice, without being deemed to be engaging in the unauthorized practice of law.  As amended, Model Rule 5.5 states that a lawyer may provide legal services on a temporary basis in an out-of-state jurisdiction that: (1) are undertaken in association with a lawyer who is admitted to practice in the jurisdiction and who actively participates in the matter; (2) are in or reasonably related to a pending or potential proceeding before a tribunal in the jurisdiction or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized; (3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in the jurisdiction or another jurisdiction, if the services arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires pro hac vice admission; or (4) are not within paragraphs 2 or 3, and arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice.  This rule is sometimes referred to as the temporary practice rule.

[4] Fourteen states have either adopted Rule 5.5 or a similar version of the rule or currently have a temporary practice rule in effect.  An additional seven states have recommendations pending in their states' highest courts to adopt a rule identical or similar to Rule 5.5.  American Bar Association, Commission on Multijurisdictional Practice, State Implementation of ABA Model Rule 5.5 (visited Jan. 31, 2005) <http://www.abanet.org/cpr/mjp-home.html>.

which allows an attorney not licensed in a state to provide certain types of legal services in the state on a limited basis.[5]  And, in those states where a temporary practice rule has yet to be adopted, the state bar associations appear willing to grant requests from attorneys not licensed in that state to represent a client in an arbitration in that state.[6]

<u>Representation by an Attorney in NASD Arbitration Forum</u>

The proposed rule change would expand the concept of representation in arbitration to allow a party to be represented by an attorney admitted to practice in any jurisdiction of the United States.[7]  The proposed rule change also states explicitly what is currently the case, that parties may represent themselves in arbitration.

The proposed rule change states that if a party chooses to be represented by an attorney, the attorney must be licensed to practice in a United States jurisdiction.  NASD believes that this requirement will protect the public and benefit investors by ensuring that a party's representative has a minimum level of skill, training, and character to provide effective representation in arbitration.[8]

The proposed rule change also would allow attorneys to represent a client in an NASD arbitration, held in any United States hearing location, regardless of the

---

[5] The laws of Michigan and Virginia specifically authorize occasional or incidental practice by out-of-state lawyers.  <u>See</u> Mich. Comp. Law Ann. sec. 600.916 and Va. State Bar Rule, Pt. 6, sec. 1(C).

[6] <u>See</u> Philadelphia Bar Association, Ethics Opinions, Opinion 2003-13 (December 2003) (advising an attorney not licensed in Pennsylvania that he could conduct an arbitration in Philadelphia).

[7] The proposed rule change would apply only to hearing locations in the United States, which include any commonwealth, territory, or possession of the United States.

[8] NASD continues to be concerned about the on-going problems that are caused by the practice of non-attorney representatives in the forum.  These problems, which have been well documented, may have negative implications for parties in arbitration.  <u>See</u> <u>Securities Arbitration Reform, Report of the Arbitration Policy Task Force to the Board of Governors, National Association of Securities Dealers, Inc.</u> (January 1996); <u>see</u> <u>also</u> <u>Report of the Securities Industry Conference on Arbitration on Representation of Parties in Arbitration by Non-Attorneys</u>, 22 Fordham Urb. L. J. 507 (1995).

jurisdiction in which the attorneys are licensed. The attorneys' qualifications to participate as representatives in a jurisdiction in which they are not licensed would be subject to the applicable law of that jurisdiction. NASD believes the proposed rule change would assist attorneys in addressing the issue of multi-jurisdictional practice without encroaching on the states' rights to determine what activities violate the states' unauthorized practice of law provisions. The proposed rule change is not intended to prevent a state from deciding that an out-of-state attorney may have violated a state's unauthorized practice of law provision by representing a party in an NASD arbitration. It is intended, however, to reflect current practice in the forum, which, based on experience, shows that the level of knowledge, training and skill of an attorney affects the outcome of an arbitration hearing, not the jurisdiction from which the attorney received his license to practice.

Further, the requirement that an attorney must be licensed to practice in a United States jurisdiction sets a standard of practice for the arbitration forum that is consistent with the other rules and proceedings of NASD. Rule 9141(b) of the NASD Code of Procedure states, in relevant part, that a person may be represented in any disciplinary proceeding by an attorney at law admitted to practice before the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States.[9]

Moreover, the SEC (as well as other federal agencies) also has a similar practice rule. Rule 102(b) of the SEC Rules of Practice states that, in any proceeding, a person

---

[9] This rule has been enforced in NASD Enforcement proceedings. In two similar cases, a respondent's answer was stricken from the record because the respondent's representative had not indicated that he was a licensed attorney. See NASDR Office of the Hearing Officers, OHO Order 97-15 (C01970032); see also OHO Order 98-10 (C10970176).

may be represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any State.[10]

b) Statutory Basis

NASD believes that the proposed rule change is consistent with the provisions of Section 15A(b)(6) of the Act, which requires, among other things, that the Association's rules must be designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest.  NASD believes that implementing this standard of practice in its arbitration forum will ensure that a party's representative will possess an adequate level of skill and training in providing legal services to investors, which will ultimately enhance the integrity of the arbitration process.

4.     <u>Self-Regulatory Organization's Statement on Burden on Competition</u>

NASD does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act, as amended.

5.     <u>Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participants, or Others</u>

Written comments were neither solicited nor received.

6.     <u>Extension of Time Period for Commission Action</u>

NASD does not consent at this time to an extension of the time period for Commission action specified in Section 19(b)(2) of the Act.

---

[10] <u>See</u> SEC Rules of Practice, 17 C.F.R. §201.102(b) (2004).

7.    <u>Basis for Summary Effectiveness Pursuant to Section 19(b)(3) or for Accelerated</u>

<u>Effectiveness Pursuant to Section 19(b)(2)</u>

    Not applicable.

8.    <u>Proposed Rule Change Based on Rules of Another Self-Regulatory Organization</u>

<u>or of the Commission</u>

    Not applicable.

9.    <u>Exhibits</u>

    1.    Completed notice of proposed rule change for publication in the <u>Federal</u>

<u>Register</u>.

EXHIBIT 1

SECURITIES AND EXCHANGE COMMISSION
Release No. 34-_____; File No. SR-NASD-2005-023

Self-Regulatory Organizations;  Notice of Filing of Proposed Rule Change by National Association of Securities Dealers, Inc. Relating to Representation in Arbitration and Mediation

Pursuant to Section 19(b)(1) of the Securities Exchange Act of 1934 ("Act")[1] and Rule 19b-4 thereunder,[2] notice is hereby given that on February 9, 2005, the National Association of Securities Dealers, Inc. ("NASD"), through its wholly owned subsidiary, NASD Dispute Resolution, Inc. ("NASD Dispute Resolution") filed with the Securities and Exchange Commission ("SEC" or "Commission") the proposed rule change as described in Items I, II, and III below, which Items have been prepared by NASD Dispute Resolution. The Commission is publishing this notice to solicit comments on the proposed rule change from interested persons.

I.      SELF-REGULATORY ORGANIZATION'S STATEMENT OF THE TERMS OF SUBSTANCE OF THE PROPOSED RULE CHANGE

NASD Dispute Resolution is proposing to amend Rule 10316 and to adopt Rule 10408 of the NASD Code of Arbitration Procedure ("Code"), to address attorney representation in arbitration and mediation.  Below is the text of the proposed rule change. Proposed new language is in italics; proposed deletions are in brackets.

* * * * *

---

[1]      15 U.S.C. 78s(b)(1).

[2]      17 CFR 240.19b-4.

12 of 18

## 10316.  Representation <u>in Arbitration</u> [by Counsel][3]

### (a)  Representation by a Party

Parties may represent themselves in an arbitration held in a United States hearing location.

### (b)  Representation by an Attorney

At any stage of the arbitration proceeding held in a United States hearing location, [A]all parties shall have the right to [representation by counsel at any stage of the proceedings.] be represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States.  A member of a partnership may represent the partnership; and a bona fide officer of a corporation, trust, or association may represent the corporation, trust, or association.

### (c)  Qualifications of Representative

Issues regarding the qualifications of a person to represent a party in arbitration are governed by applicable law and may be determined by an appropriate court or other regulatory agency.  In the absence of a court order, the arbitration proceeding shall not be stayed or otherwise delayed pending resolution of such issues.

* * * *

## 10408.  Representation in Mediation

### (a)  Representation by Party

Parties may represent themselves in mediation held in a United States hearing location.

### (b)  Representation by an Attorney

At any stage of the mediation proceeding held in a United States hearing location, all parties shall have the right to be represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any state of the United States, the District of Columbia, or any commonwealth, territory, or possession of the United States. A member of a partnership may represent the partnership; and a bona fide officer of a corporation, trust, or association may represent the corporation, trust, or association.

---

[3] These provisions will be renumbered as appropriate following Commission approval of the pending revisions to the Customer Code filed on October 15, 2003, and amended on January 3, 2005 and January 19, 2005 (SR-NASD-2003-158); the Industry Code filed on January 16, 2004, and amended on February 26, 2004 and January 3, 2005 (SR-NASD-2004-011); and the Mediation Code filed on January 23, 2004, and amended on January 3, 2005 (SR-NASD-2004-013).

**(c)  Qualifications of Representatives**

Issues regarding the qualifications of a person to represent a party in mediation are governed by applicable law and may be determined by an appropriate court or other regulatory agency.  In the absence of a court order, the mediation proceeding shall not be delayed pending resolution of such issues.

* * * *

II.    SELF-REGULATORY ORGANIZATION'S STATEMENT OF THE PURPOSE OF, AND STATUTORY BASIS FOR, THE PROPOSED RULE CHANGE

In its filing with the Commission, NASD included statements concerning the purpose of and basis for the proposed rule change and discussed any comments it received on the proposed rule change.  The text of these statements may be examined at the places specified in Item IV below.  NASD has prepared summaries, set forth in Sections (A), (B), and (C) below, of the most significant aspects of such statements.

(A)    Self-Regulatory Organization's Statement of the Purpose of, and Statutory Basis for, the Proposed Rule Change

(a)  Purpose

Background

NASD Dispute Resolution believes a rule is needed to address the issue of multi-jurisdictional practice of law in arbitration.  The multi-jurisdictional practice of law occurs when attorneys, licensed in one United States jurisdiction, practice law in a jurisdiction in which they are not licensed.  In the area of arbitration, for example, it is common for an attorney licensed to practice law in one state to represent a client in an arbitration proceeding in another state in which the attorney is not licensed.  Although this practice is common, it can be a violation of state unauthorized practice of law provisions.  Until recently, most states had taken no action against this practice.  However, recent case law developments

suggest that states are reconsidering this position. For example, two state court rulings have found that an out-of-state attorney providing representation in an arbitration or mediation proceeding is engaging in the practice of law, and that it is a violation of the state's unauthorized practice of law statute to participate in such a proceeding without being licensed in that jurisdiction.[4]

In light of these developments and the trend toward multi-jurisdictional practice, the American Bar Association (ABA) amended its Model Rule of Professional Conduct 5.5 (Rule 5.5) so that those attorneys representing a client in an arbitration in a United States jurisdiction where they are not licensed could participate in the arbitration in that jurisdiction without violating the state's unauthorized practice of law rules.[5] While Rule 5.5 establishes a new standard for certain types of legal activity, it can be enforced only if the states adopt it into their laws. Some states have either adopted Rule 5.5 or a similar version of the rule.[6] Other states have adopted a temporary practice rule, like Rule 5.5, which allows an attorney

---

[4] See Birbrower, Montalbano, Condo & Frank v. Superior Court, 949 P.2d 1 (Cal. 1998); see also Florida Bar v. Rapoport, 845 So. 2d 874, 2003 Fla. LEXIS 250 (Fla. 2003).

[5] Model Rule 5.5, as amended, would allow a United States lawyer, admitted in one United States jurisdiction, to engage in certain types of legal activity in another United States jurisdiction where he is not licensed to practice, without being deemed to be engaging in the unauthorized practice of law. As amended, Model Rule 5.5 states that a lawyer may provide legal services on a temporary basis in an out-of-state jurisdiction that: (1) are undertaken in association with a lawyer who is admitted to practice in the jurisdiction and who actively participates in the matter; (2) are in or reasonably related to a pending or potential proceeding before a tribunal in the jurisdiction or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized; (3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in the jurisdiction or another jurisdiction, if the services arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires *pro hac vice* admission; or (4) are not within paragraphs 2 or 3, and arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice. This rule is sometimes referred to as the temporary practice rule.

[6] Fourteen states have either adopted Rule 5.5 or a similar version of the rule or currently have a temporary practice rule in effect. An additional seven states have recommendations pending in their states' highest courts to adopt a rule identical or similar to Rule 5.5. American Bar Association, *Commission on Multijurisdictional Practice, State Implementation of ABA Model Rule 5.5* (visited Jan. 31, 2005) <http://www.abanet.org/cpr/mjp-home.html>.

not licensed in a state to provide certain types of legal services in the state on a limited basis.[7]
And, in those states where a temporary practice rule has yet to be adopted, the state bar
associations appear willing to grant requests from attorneys not licensed in that state to
represent a client in an arbitration in that state.[8]

### Representation by an Attorney in NASD Arbitration Forum

The proposed rule change would expand the concept of representation in arbitration
to allow a party to be represented by an attorney admitted to practice in any jurisdiction of
the United States.[9]  The proposed rule change also states explicitly what is currently the case,
that parties may represent themselves in arbitration.

The proposed rule change states that if a party chooses to be represented by an
attorney, the attorney must be licensed to practice in a United States jurisdiction.  NASD
believes that this requirement will protect the public and benefit investors by ensuring that a
party's representative has a minimum level of skill, training, and character to provide
effective representation in arbitration.[10]

The proposed rule change also would allow attorneys to represent a client in an
NASD arbitration, held in any United States hearing location, regardless of the jurisdiction in
which the attorneys are licensed.  The attorneys' qualifications to participate as

---

[7] The laws of Michigan and Virginia specifically authorize occasional or incidental practice by out-of-state
lawyers.  See Mich. Comp. Law Ann. sec. 600.916 and Va. State Bar Rule, Pt. 6, sec. 1(C).

[8] See Philadelphia Bar Association, Ethics Opinions, Opinion 2003-13 (December 2003) (advising an attorney
not licensed in Pennsylvania that he could conduct an arbitration in Philadelphia).

[9] The proposed rule change would apply only to hearing locations in the United States, which include any
commonwealth, territory, or possession of the United States.

[10] NASD continues to be concerned about the on-going problems that are caused by the practice of non-attorney
representatives in the forum.  These problems, which have been well documented, may have negative
implications for parties in arbitration.  See Securities Arbitration Reform, Report of the Arbitration Policy Task
Force to the Board of Governors, National Association of Securities Dealers, Inc. (January 1996); see also
Report of the Securities Industry Conference on Arbitration on Representation of Parties in Arbitration by Non-
Attorneys, 22 Fordham Urb. L. J. 507 (1995).

representatives in a jurisdiction in which they are not licensed would be subject to the

applicable law of that jurisdiction.  NASD believes the proposed rule change would assist

attorneys in addressing the issue of multi-jurisdictional practice without encroaching on the

states' rights to determine what activities violate the states' unauthorized practice of law

provisions.  The proposed rule change is not intended to prevent a state from deciding that an

out-of-state attorney may have violated a state's unauthorized practice of law provision by

representing a party in an NASD arbitration.  It is intended, however, to reflect current

practice in the forum, which, based on experience, shows that the level of knowledge,

training and skill of an attorney affects the outcome of an arbitration hearing, not the

jurisdiction from which the attorney received his license to practice.

    Further, the requirement that an attorney must be licensed to practice in a United

States jurisdiction sets a standard of practice for the arbitration forum that is consistent with

the other rules and proceedings of NASD.  Rule 9141(b) of the NASD Code of Procedure

states, in relevant part, that a person may be represented in any disciplinary proceeding by an

attorney at law admitted to practice before the highest court of any state of the United States,

the District of Columbia, or any commonwealth, territory, or possession of the United

States.[11]

    Moreover, the SEC (as well as other federal agencies) also has a similar practice rule.

Rule 102(b) of the SEC Rules of Practice states that, in any proceeding, a person may be

---

[11] This rule has been enforced in NASD Enforcement proceedings.  In two similar cases, a respondent's answer
was stricken from the record because the respondent's representative had not indicated that he was a licensed
attorney.  See NASDR Office of the Hearing Officers, OHO Order 97-15 (C01970032); see also OHO Order
98-10 (C10970176).

represented by an attorney at law admitted to practice before the Supreme Court of the United States or the highest court of any State.[12]

(b) Statutory Basis

NASD believes that the proposed rule change is consistent with the provisions of Section 15A(b)(6) of the Act, which requires, among other things, that the Association's rules must be designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, and, in general, to protect investors and the public interest.  NASD believes that implementing this standard of practice in its arbitration forum will ensure that a party's representative will possess an adequate level of skill and training in providing legal services to investors, which will ultimately enhance the integrity of the arbitration process.

(B)    Self-Regulatory Organization's Statement on Burden on Competition

NASD does not believe that the proposed rule change will result in any burden on competition that is not necessary or appropriate in furtherance of the purposes of the Act, as amended.

(C)    Self-Regulatory Organization's Statement on Comments on the Proposed Rule Change Received from Members, Participants, or Others

Written comments were neither solicited nor received.

III.    DATE OF EFFECTIVENESS OF THE PROPOSED RULE CHANGE AND TIMING FOR COMMISSION ACTION

Within 35 days of the date of publication of this notice in the Federal Register or within such longer period (i) as the Commission may designate up to 90 days of such date if it finds such longer period to be appropriate and publishes its reasons for so finding or (ii) as to which the self-regulatory organization consents, the Commission will:

---

[12] See SEC Rules of Practice, 17 C.F.R. §201.102(b) (2004).

18 of 18

A.    by order approve such proposed rule change, or

B.    institute proceedings to determine whether the proposed rule change should be

disapproved.

IV.    <u>SOLICITATION OF COMMENTS</u>

Interested persons are invited to submit written data, views, and arguments

concerning the foregoing.  Persons making written submissions should file six copies thereof

with the Secretary, Securities and Exchange Commission, 450 Fifth Street, N.W.,

Washington, D.C. 20549.  Copies of the submission, all subsequent amendments, all written

statements with respect to the proposed rule change that are filed with the Commission, and

all written communications relating to the proposed rule change between the Commission

and any person, other than those that may be withheld from the public in accordance with the

provisions of 5 U.S.C. 552, will be available for inspection and copying in the Commission's

Public Reference Room.  Copies of such filing will also be available for inspection and

copying at the principal office of the NASD.  All submissions should refer to the file number

in the caption above and should be submitted by [insert date 21 days from the date of

publication].

For the Commission, by the Division of Market Regulation, pursuant to delegated

authority, 17 CFR 200.30-3(a)(12).

Jonathan G. Katz
Secretary

# *Exhibit B*

**RULE 5.5 UNAUTHORIZED PRACTICE OF LAW**

A lawyer shall not:

(a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or

(b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.

# *Exhibit C*

**Rule 5.5 Unauthorized Practice of Law; Multijurisdictional Practice of Law**

(a) A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

(b) A lawyer who is not admitted to practice in this jurisdiction shall not:

(1) except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or

(2) hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.

(c) A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:

(1) are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter;

(2) are in or reasonably related to a pending or potential proceeding before a tribunal in this or another jurisdiction, if the lawyer, or a person the lawyer is assisting, is authorized by law or order to appear in such proceeding or reasonably expects to be so authorized;

(3) are in or reasonably related to a pending or potential arbitration, mediation, or other alternative dispute resolution proceeding in this or another jurisdiction, if the services arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice and are not services for which the forum requires pro hac vice admission; or

(4) are not within paragraphs (c)(2) or (c)(3) and arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice.

(d) A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services in this jurisdiction that:

(1) are provided to the lawyer's employer or its organizational affiliates and are not services for which the forum requires pro hac vice admission; or

(2) are services that the lawyer is authorized to provide by federal law or other law of this jurisdiction.

# *Exhibit D*

# GENERAL LAWS OF MASSACHUSETTS

### PART III.
### COURTS, JUDICIAL OFFICERS AND PROCEEDINGS IN CIVIL CASES

### TITLE I.
### COURTS AND JUDICIAL OFFICERS

**CHAPTER 221.** CLERKS, ATTORNEYS AND OTHER OFFICERS OF JUDICIAL COURTS

### ATTORNEYS AT LAW

### Chapter 221: Section 46A Practice of law; persons authorized

  Section 46A. No individual, other than a member, in good standing, of the bar of this commonwealth shall practice law, or, by word, sign, letter, advertisement or otherwise, hold himself out as authorized, entitled, competent, qualified or able to practice law; provided, that a member of the bar, in good standing, of any other state may appear, by permission of the court, as attorney or counselor, in any case pending therein, if such other state grants like privileges to members of the bar, in good standing, of this commonwealth.

# *Exhibit E*

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY

Case No. 2005-SJ-0088

_____

STEVEN MSCISZ,
MARK MSCISZ and LYNDA MSCISZ,

*Plaintiffs*

*v.*

KASHNER DAVIDSON SECURITIES CORP.,
VICTOR KASHNER, MATTHEW MEISTER,
TIMOTHY VARCHETTO, MARC J. ROSS,
RICHARD J. BABNICK, JR. &
SICHENZIA ROSS FRIEDMAN FERENCE LLP,

*Defendants*

_____

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

_____

**Introduction**

1.   This First Amended Complaint concerns the impending participation by attorneys not admitted to practice in this Commonwealth in an arbitration hearing to be held in Boston -- despite the prohibition against the unauthorized practice of law set forth in Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A.  No substantive issue or the arbitrability thereof is at issue.

2.    The underlying arbitration is pending before a panel appointed by the dispute resolution subsidiary of the National Association of Securities Dealers, Inc. ("NASD"), a self-regulatory organization which is not a party to this action.  The arbitration involves three Massachusetts customers, a Florida broker-dealer, and three registered representatives of the broker-dealer who also reside in Florida.  Originally scheduled to begin on March 2, 2005, the arbitration hearing has been postponed until May 17, 2005.

3.    Defendants Kashner Davidson Securities Corporation, Victor Kashner, Matthew Meister and Timothy Varchetto (collectively "Broker Defendants") have indicated that they will be represented at the hearing by Marc J. Ross, Richard J. Babnick, Jr., and Sichenzia Ross Friedman Ference LLP (collectively "Lawyer Defendants"), none of whom are admitted to practice law in this Commonwealth.

4.    Believing that the participation of out-of-state lawyers in a Massachusetts arbitration hearing might violate G.L. c. 221, § 46A and Mass. R. Prof. C. 5.5(a), and concerned that their own counsel's participation in such a hearing would constitute knowing assistance of that violation, in violation of Mass. R.

Prof. C. 5.5(b) and 8.4(a), the plaintiffs filed in the arbitration a motion to disqualify the foreign attorneys or postpone the hearing until after the full Court resolves a pending appeal where a similar issue has been raised.  A true copy of the plaintiffs' motion is appended to this First Amended Complaint as Exhibit A.

5.    The defendants opposed the plaintiffs' motion, and a true copy of the defendants' opposition is appended to this First Amended Complaint as Exhibit B.

6.    The chairman of the arbitration panel orally denied the plaintiffs' motion on January 31, 2005, but he never issued a written order explaining the reasons for that denial.  The plaintiffs subsequently sought reconsideration of that decision, but that request was denied orally on March 2, 2005.

7.    The U.S. District Court for the District of Massachusetts (Young, J.) recently faced similar issues in the context of bankruptcy proceedings.  However, unlike the chairman of the arbitration panel in this case, Judge Young certified the "unauthorized practice of law" issues to this Court.  In re Lucas, 317 B.R. 195, 215 (D. Mass. 2004).  That case has since been docketed under the name Chimko v. King and assigned docket number SJC-09388.

8.   The Appeals Court recently declined to address the precise issues raised in this case.  <u>See</u> <u>Superadio</u> <u>L.P. v. Walt "Baby" Love Productions, Inc.</u>, 62 Mass. App. Ct. 546, 552 n.5 (2004)(vacating arbitration award on other grounds without deciding whether it was voidable because prevailing party was represented by out-of-state lawyer).  However, an application for further appellate review is pending in that case, to which the Clerk of the full Court has assigned docket number FAR-14557.

9.   In any event, the issues framed in Counts I through IV of this First Amended Complaint may not be resolved in the other cases, because <u>Chimko</u> does not arise in the context of arbitration, because further review may not be granted in <u>Superadio</u>, and because the "unauthorized practice of law" issue may not be argued by the parties even if review is granted in the latter case.

10.   It is therefore necessary for the plaintiffs to seek an independent judicial determination of whether:

> a.   a lawyer admitted to practice in another United States jurisdiction but not admitted to practice in Massachusetts engages in the unauthorized practice of law, in violation of one of this Court's own rules, Mass. R. Prof. C. 5.5(a), as well as G.L. c. 221, § 46A, by representing a party or parties at an arbitration hearing held in this Commonwealth;

      b.    a Massachusetts attorney, by participating in an arbitration hearing held within the Commonwealth where parties are represented by lawyers not licensed to practice in this jurisdiction, would knowingly assist a violation of Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a);

      c.    an arbitrator's refusal to postpone the hearing until after this Court resolves the "unauthorized practice of law" issue would subject any award to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12(a)(5); and

      d.    an award issued after an arbitration hearing in which attorneys violated Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A would be procured by "undue means" and thus subject to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12.

These are purely questions of law. Although the factual issues in the underlying arbitration are vigorously contested, there is no dispute concerning the facts recited in this First Amended Complaint, and no discovery will be necessary in this action.

    11. Accordingly, and for the other reasons set forth in this First Amended Complaint, the plaintiffs request that a single justice of this Court:

a.  issue the declaratory judgments requested in Counts I through IV of this First Amended Complaint, permanently enjoining the Broker Defendants from going forward in the arbitration with the Lawyer Defendants as their counsel and permanently enjoining the Lawyer Defendants from participating in the underlying arbitration; or

b.  reserve the issues framed in Counts I through IV of this First Amended Complaint and

i.  report the issues to the full Court, pursuant to Mass. R. Civ. P. 1 (1st par) & 64(a), and

ii.  consolidate that report with <u>Chimko</u> and (if further review is allowed on the unauthorized practice of law issue in that case) with <u>Superadio</u>.

### *Parties*

12.  The plaintiffs – Steven Mscisz, Mark Mscisz and Lynda Mscisz – are individuals residing in the Town of Topsfield.  The plaintiffs in this action are the respondents, counter- claimants and third party claimants in the underlying arbitration.

13.  Defendant Kashner Davidson Securities Corp. ("KDSC") is a corporation organized under the laws of the State of Florida, and KDSC maintains its only place of business in that jurisdiction.  KDSC is the claimant and respondent-in-counterclaim in the pending arbitration.

14.   Defendant Victor Kashner ("Kashner") is an individual residing in the State of Florida and a registered representative of KDSC.  KDSC's namesake, Kashner is its controlling shareholder, chairman of its board of directors, and – until suspended by the U.S. Securities and Exchange Commission in In re Kashner, Case No. 3-9049 (SEC 1996), and by the NASD in In re Kashner Davidson Securities Corp., Case No. C07960095 (NASD 2000) – Kashner was an officer of KDSC.  Kashner is a third party respondent in the pending arbitration.

15.   Defendant Matthew Meister ("Meister") is an individual residing in the State of Florida and, at the time of the events operative for purposes of the underlying arbitration, was a registered representative of KDSC.  Meister is a third party respondent in the pending arbitration.

16.   Defendant Timothy Varchetto ("Varchetto") is an individual residing in the State of Florida and a registered representative of KDSC.  Varchetto is a third party respondent in the pending arbitration.

17.   Defendants Marc J. Ross ("Ross") and Richard J. Babnick, Jr. ("Babnick") are attorneys admitted to practice law in the State of New York, but not in this Commonwealth, and they are the Broker Defendants' only

attorneys of record in the underlying arbitration.  Ross
and Babnick are affiliated with defendant Sichenzia Ross
Friedman Ference LLP ("SRFF"), a limited liability
partnership organized and existing under the laws of the
State of New York.  SRFF is a law firm whose only office
is located in New York City, and none of whose attorneys
is an active member of the Commonwealth's Bar.

### *Jurisdiction*

17.  Pursuant to G.L. c. 223A, § 3, this Court may
exercise personal jurisdiction over the defendants,
because this action arises from their transaction of
business in this Commonwealth.

18.  Exercising jurisdiction over the defendants
would not offend the Due Process Clause of the 14th
Amendment to the U.S. Constitution, because:

    a.  the defendants have sufficient minimum
contacts with this Commonwealth such that
maintenance of this action would not
offend traditional notions of fair play
and substantial justice;

    b.  the defendants' conduct and connection
with this Commonwealth are such that they
should reasonably anticipate being haled
into a Massachusetts court;

    c.  the actions of the defendants at issue in
this action are purposefully directed
toward this Commonwealth;

d.  the Commonwealth has a legitimate interest in ensuring that arbitration hearings conducted within its borders do not result in awards procured by undue means;

e.  the Commonwealth has a legitimate interest in ensuring that arbitration hearings conducted within its borders are postponed upon sufficient cause if failure to postpone would substantially prejudice the rights of a party; and

f.  the Commonwealth has a legitimate interest in ensuring that law is practiced within its borders in accordance with this Court's Rule 3:07 and pertinent enactments by the Legislature.

19. This Court may exercise jurisdiction over the subject matter of this action, because this is an action seeking a binding declaration of right, duties, status or other legal relations, and G.L. c. 231A, § 1 confers this Court with original jurisdiction (concurrent with that of several departments of the Trial Court) over such matters.

20. The plaintiffs commence this action before a single justice of this Court, and not in the Superior Court, because Chimko and Superadio are already pending in this Court, because this action requires definitive interpretation of one of this Court's own rules, because discovery is not necessary in this action, and because it would therefore be most efficient and economical for the judiciary and the parties to have this case adjudicated simultaneously with those matters.

*Count I*
*(Declaratory Judgment:*
*Unauthorized Practice of Law)*

21.   The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 20 of this First Amended Complaint.

22.   A dispute exists between the plaintiffs and defendants concerning the issue of whether a lawyer admitted to practice in another United States jurisdiction but not admitted to practice in Massachusetts engages in the unauthorized practice of law, in violation of G.L. c. 221, § 46A and Mass. R. Prof. C. 5.5(a), by representing a party or parties at an arbitration hearing held in this Commonwealth.

23.   The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

24.   Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count I.

*Count II*
*(Declaratory Judgment:*
*Aiding & Abetting Unauthorized Practice of Law)*

25. The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 24 of this First Amended Complaint.

26. A dispute exists between the plaintiffs and defendants concerning the issue of whether a Massachusetts attorney, by participating in an arbitration hearing held within the Commonwealth where parties are represented by lawyers not licensed to practice here, would knowingly assist a violation of Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a).

27. The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

28. Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count II.

*Count III*
*(Declaratory Judgment:  Refusal to*
*Postpone Hearing Pending Resolution of*
*Unauthorized Practice of Law Issue)*

29.  The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 28 of this First Amended Complaint.

30.  A dispute exists between the plaintiffs and defendants concerning the issue of whether an arbitrator's refusal to postpone the hearing until after this Court resolves the "unauthorized practice of law" issue would subject any award to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12(a)(5).

31.  The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

32.  Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count III.

### Count IV
### (Declaratory Judgment:
### Enforceability of Arbitral Award
### Procured By Attorneys Not Admitted
### To Practice in Massachusetts)

33.  The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 32 of this First Amended Complaint.

34.  A dispute exists between the plaintiffs and defendants concerning the issue of whether an award issued after an arbitration hearing in which attorneys violated Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A would be procured by "undue means" and thus subject to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12.

35.  The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

36.  Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count IV.

WHEREFORE, the plaintiffs respectfully request that
a single justice of this Court:

a.    make, pursuant to G.L. 231A, § 1, binding
      declarations of right, duty, status and
      other legal relations concerning the
      issues set forth in paragraph 10 of this
      First Amended Complaint, permanently
      enjoining the defendants from engaging in
      conduct such as that described in
      paragraph 10; or

b.    reserve and report to the full Court,
      pursuant to Mass. R. Civ. P. 1(1st par.) &
      64(a), the issues framed in Counts I
      through IV of this First Amended
      Complaint, consolidate that report with
      Chimko v. King, Docket No. SJC-09388 (and,
      if further review is allowed in that case,
      with Superadio LP v. Walt "Baby" Love
      Productions, Inc., Docket No. FAR-14557),
      and preliminarily enjoining the defendants
      from conducting or participating in any
      hearing in the underlying arbitration
      until the consolidated appeal is
      adjudicated; and

c.    grant such other and further relief as the
      single justice deems necessary and just.

Respectfully submitted,

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

_____
William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
A Professional Corporation
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  March 2, 2005

- 14 -

# *Exhibit F*

LEXSEE 845 SO2D 874

**THE FLORIDA BAR, Complainant, vs. ALBERT A. RAPOPORT, Respondent.**

**No. SC01-73**

**SUPREME COURT OF FLORIDA**

*845 So. 2d 874; 2003 Fla. LEXIS 250; 28 Fla. L. Weekly S 174*

**February 20, 2003, Decided**

**SUBSEQUENT HISTORY:** [**1] Rehearing denied by *Fla. Bar v. Rapoport, 2003 Fla. LEXIS 793* (Fla., May 6, 2003)
US Supreme Court certiorari denied by *Rapoport v. Fla. Bar, 2003 U.S. LEXIS 7740* (U.S., Oct. 20, 2003)

**PRIOR HISTORY:** *The Florida Bar v. Rapoport, 732 So. 2d 329, 1999 Fla. LEXIS 692* (Fla., 1999)

**DISPOSITION:** Enjoined from engaging in the practice of law in Florida.

**LexisNexis(R) Headnotes**

**COUNSEL:** John F. Harkness, Jr., Executive Director, The Florida Bar, Tallahassee, Florida; R. Lee Bennett, Chair, Standing Committee on Unlicensed Practice of Law, Tallahassee, Florida; Lori S. Holcomb, Unlicensed Practice of Law Director, The Florida Bar, Tallahassee, Florida; and Janet Bradford Morgan, Bar Counsel, Fort Lauderdale, Florida, for Complainant.

Ainslee R. Ferdie of the Law Offices of Ainslee R. Ferdie, Coral Gables, Florida, for Respondent.

**JUDGES:** ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, and CANTERO, JJ., concur. SHAW, Senior Justice, dissents with an opinion, in which QUINCE, J., concurs.

**OPINION:** [*875] Original Proceeding - The Florida Bar

PER CURIAM.

We have for review a referee's report finding as a matter of law that respondent, Albert A. Rapoport, engaged in the unlicensed practice of law. We have jurisdiction. See art. V, § 15, Fla. Const.

Rapoport is licensed to practice law in Washington, D.C. He is a member in good standing of the bars of the Supreme Court of the United States and the District [**2] of Columbia Court of Appeals. He is not a member of The Florida Bar.

The Bar filed its petition for an injunction in January 2001, claiming that Rapoport was engaged in the unlicensed practice of law (UPL) because he (1) represents parties in Florida in securities arbitration proceedings by entities such as the American Arbitration Association, the National Association of Securities Dealers, and the New York Stock Exchange; and (2) advertises his securities arbitration services in the Fort Lauderdale Sun-Sentinel. n1 The Court issued an order to show cause on January 29, 2001. Rapoport responded to the order to show cause. Although it appeared to the Court at that time that Rapoport admitted the material allegations in The Florida Bar's petition, the Court referred the matter to a referee for determination of any questions of fact. See *R. Regulating Fla. Bar 10-7.1(b)(6)*.

n1 The petition also included an allegation that Rapoport formerly advertised as an attorney in Florida on the American Association of Retired Persons website. However, because the Bar did not include that claim in its motion for summary judgment and the referee made no findings as to that claim, we deem it abandoned

845 So. 2d 874, *; 2003 Fla. LEXIS 250, **;
28 Fla. L. Weekly S 174

and have not considered that allegation in our disposition of this case.

[**3]

After discovery was propounded by both parties, including the Bar's request for admissions, the Bar filed a motion for summary judgment, alleging that there were no material facts in dispute. n2 The referee granted summary judgment, making the following findings of undisputed facts: Rapoport (1) is not a licensed Florida attorney; (2) operates a law practice in Florida and represents persons in securities arbitration matters; (3) advises clients about the legal merits of their securities arbitration claims; (4) prepares, signs, and files securities arbitration claims for his clients; (5) represents his clients in securities arbitration proceedings; (6) offers advice and representation to stockbrokers defending claims in securities arbitration; and (7) [*876] has, in the past, advertised in the Sun-Sentinel his availability to represent persons in securities arbitration proceedings.

n2 As "Appendix A" to its motion, the Bar attached this Court's unpublished order dated April 15, 1999, approving a stipulation for permanent injunction in case no. 94,049, *Florida Bar v. Rapoport, 732 So. 2d 329 (Fla. 1999).* According to the stipulation, Rapoport agreed not to practice law in Florida unless "authorized to do so by state or federal law, statute, rule, regulation, or decision."

[**4]

Based on these findings of fact, the referee concluded that (1) Rapoport is a nonlawyer in Florida and cannot operate a law practice or engage in the general practice of law in Florida; (2) Rapoport has engaged in the practice of law by giving legal advice and consultation to clients, by drafting, signing, and filing securities arbitration claims for clients, and by representing clients in securities arbitration proceedings; (3) no federal or state law authorizes Rapoport as a nonlawyer to provide legal services and advice in securities arbitration matters; (4) Florida maintains its substantial interest and authority to prohibit UPL to protect the public; (5) Rapoport has advertised his availability to represent parties in securities arbitration proceedings; and (6) Rapoport has engaged in UPL and is subject to injunction.

Rapoport does not contend that any of these material facts are in dispute. Rather, Rapoport claims that the Federal Arbitration Act, *9 U.S.C. § § 1 - 307 (2000),* (FAA) preempts state law n3 and that Florida has no

authority to forbid an attorney from acting in Florida for parties in federal securities matters.

n3 The Federal Arbitration Act, *9 U.S.C. § § 1 - 307 (2000),* was enacted in 1925. See Pub. L. No. 68-401, 43 Stat. 883 (1925). "The Act was designed 'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate,' and place such agreements 'upon the same footing as other contracts.'" *Volt Information Sciences, Inc. v. Board of Trustees, 489 U.S. 468, 474, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)* (citations omitted). Securities arbitration agreements are subject to the Federal Arbitration Act. See *Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987).*

[**5]

In *Sperry v. Florida ex rel. Florida Bar, 373 U.S. 379, 10 L. Ed. 2d 428, 83 S. Ct. 1322, 1963 Dec. Comm'r Pat. 211 (1963),* the United States Supreme Court, although acknowledging Florida's substantial interest in regulating the practice of law within the state, held that Florida could not enjoin a nonlawyer registered to practice before the U.S. Patent Office from preparing and prosecuting patent applications in Florida because a federal statute and Patent Office regulations authorized the practice. Rapoport provides a long list of federal cases concerning securities arbitration that involve preemption of state law by the FAA. n4 None of the cases, however, concerns the authorization of the practice of law in securities arbitration proceedings.

n4 See *Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 134 L. Ed. 2d 902, 116 S. Ct. 1652 (1996); Southland Corp. v. Keating, 465 U.S. 1, 79 L. Ed. 2d 1, 104 S. Ct. 852 (1984); Doctor's Associates, Inc. v. Hamilton, 150 F.3d 157 (2d Cir. 1998); Ferro Corp. v. Garrison Indus., Inc., 142 F.3d 926 (6th Cir. 1998); Olde Discount Corp. v. Tupman, 1 F.3d 202 (3d Cir. 1993); Saari v. Smith Barney, Harris Upham & Co., 968 F.2d 877 (9th Cir. 1992); David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London), 923 F.2d 245 (2d Cir. 1991); Saturn Distribution Corp. v. Williams, 905 F.2d 719 (4th Cir. 1990); Securities Indus. Ass'n v. Connolly, 883 F.2d 1114 (1st Cir. 1989); Cohen v. Wedbush, Noble, Cooke, Inc., 841 F.2d 282 (9th Cir. 1988),* overruled by *Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931(9th Cir. 2001); Cent. Jersey Freightliner, Inc. v. Freightliner*

*Corp.*, 987 F. Supp. 289 (D. N.J. 1997); *Morrison v. Colo. Permanente Med. Group, P.C.*, 983 F. Supp. 937 (D. Colo. 1997); *Johnson v. Hubbard Broad., Inc.*, 940 F. Supp. 1447 (D. Minn. 1996); *Haluska v. RAF Fin. Corp.*, 875 F. Supp. 825 (N.D. Ga. 1994); *Medika Int'l, Inc. v. Scanlan Int'l, Inc.*, 830 F. Supp. 81 (D. P.R. 1993); *Matter of Management Recruiters Int'l, Inc. and Nebel*, 765 F. Supp. 419 (N.D. Ohio 1991); *Seymour v. Gloria Jean's Coffee Bean Franchising Corp.*, 732 F. Supp. 988 (D. Minn. 1990); *Reed v. Bear, Stearns & Co.*, 698 F. Supp. 835 (D. Kan. 1988); *Russolillo v. Thomson McKinnon Securities, Inc.*, 694 F. Supp. 1042 (D. Conn. 1988); *In re Pate*, 198 B.R. 841 (Bankr. S.D. Ga 1996).

[**6] [*877]

Florida Bar re Advisory Opinion on Nonlawyer Representation in *Securities Arbitration, 696 So. 2d 1178 (Fla. 1997)*, is directly on point. In that case, this Court held that it was unlicensed practice of law for nonlawyers in securities arbitration proceedings to give specific legal advice and perform the traditional tasks of the lawyer at arbitration proceedings. Rapoport admittedly has engaged in the traditional tasks of the lawyer--giving of legal advice, preparing and submitting claims, representing clients in proceedings, advertising his ability to represent clients--in securities arbitration proceedings in Florida. He is a nonlawyer in Florida under *Rule Regulating the Florida Bar 10-2.1(c)*, which provides in pertinent part:

For purposes of this chapter, a nonlawyer or nonattorney is an individual who is not a member of The Florida Bar. This includes, but is not limited to, lawyers admitted in other jurisdictions, law students, law graduates, applicants to The Florida Bar, disbarred lawyers, and lawyers who have resigned from The Florida Bar.

As a nonlawyer, Rapoport is not authorized to practice law in Florida.

Although Rapoport does not point to [**7] any material issues that are in dispute, he claims that the referee erred in entering summary judgment without holding a hearing. He points to the language of *Florida Rule of Civil Procedure 1.510(c)*, which provides that a motion for summary judgment "shall be served at least 20 days before the time fixed for hearing."

We previously have held that a referee in a UPL case has the authority to enter summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See *Florida Bar v. Miravalle*, 761 So. 2d 1049, 1051 (Fla.

2000). Furthermore, the standard of review on summary judgment orders is de novo. See *Florida Bar v. Cosnow*, 797 So. 2d 1255, 1258 (Fla. 2001). Lastly, we are aware that rule 1.510(c) has been interpreted to require hearings on motions for summary judgments. See *Kozich v. Hartford Ins. Co. of Midwest*, 609 So. 2d 147, 148 (Fla. 4th DCA 1992).

We deem it unnecessary to reach the issue of whether rule 1.510(c) mandates a hearing before summary judgment may be entered in a civil proceeding if there has been adequate notice and an opportunity to be heard, and [**8] the party opposing the summary judgment has failed to show that there are any material issues in dispute. Unlike other proceedings, this Court has original jurisdiction over petitions against the unlicensed practice of law. See *R. Regulating Fla. Bar 10-1.1*. The Court does not automatically refer UPL petitions to referees. Referral to a referee is made only if the respondent raises issues of disputed fact after we have issued an order to show cause. See *R. Regulating Fla. Bar 10-1(b)(6)* ("The court may, upon its motion or upon motion of any party, enter a judgment on the pleadings or refer questions of fact to a referee for determination.").

In this case, as noted above, referral to a referee was made after a response was filed because it appeared that Rapoport may have been asserting some disputed issues of fact. However, in the proceedings before the referee, and in the multiple pleadings filed with this Court, including Rapoport's initial brief and reply brief, Rapoport has failed to demonstrate the existence of even a single disputed fact--much less a material one. Accordingly, Rapoport had no right to even have a referee hear The Florida Bar's petition against the unlicensed [**9] practice of law unless there were disputed issues of material fact. Once Rapoport filed his response to our order to show cause, this Court had [*878] the discretion to enter judgment on the pleadings or to refer questions of fact to a referee. See *R. Regulating Fla. Bar 10-7.1(b)(6)*. Because there are no disputed issues of material fact raised by Rapoport, the referee's decision not to hold a hearing before entering summary judgment in this case was proper. n5

n5 The dissent asserts that Rapoport's due process rights were violated when the referee refused to continue the proceedings, even though Rapoport recently underwent heart surgery. The dissent further asserts that there were disputed issues of fact that Rapoport never had an opportunity to present to the referee. However, a review of the record demonstrates that Rapoport had multiple opportunities to raise factual

845 So. 2d 874, *; 2003 Fla. LEXIS 250, **;
28 Fla. L. Weekly S 174

disputes. The Bar's motion for summary judgment was served by mail on August 17, 2001. Rapoport's motion to halt proceedings was signed by him on August 30, raising his recent heart surgery as a basis for the request. Despite the fact that the motion for summary judgment had already been served, he did not raise any issues of fact in dispute that would have provided the referee cause to continue the proceedings. Further, after the referee denied this motion, Rapoport filed a motion to reconsider on September 10, 2001, that only made a bare assertion that there were material issues of fact in dispute, without naming a single specific fact that was in dispute to give the referee a basis to reconsider. Perhaps most significantly, in his numerous pleadings before this Court Rapoport still does not assert that there are material issues of fact in dispute that the referee must resolve. Therefore, Rapoport has had ample opportunity to be heard. His challenge to the Bar's proceedings is one that involves issues of law and not disputed issues of fact. Hence, his due process rights have not been violated.

[**10]

Rapoport received both notice and an opportunity to be heard before this Court. There are no material issues of disputed fact, and based on Rapoport's admissions that he is engaged in representing parties in securities arbitration in this state we conclude that, as a matter of law, Rapoport is engaged in the unlicensed practice of law.

Rapoport also objects to the referee's recommended assessment of costs in the amount of $ 530.40. *Rule Regulating the Florida Bar 10-7.1(d)(2)* gives the referee discretion to recommend the assessment of costs, including the investigative costs and court reporter's fees requested in this action. Rapoport has demonstrated no abuse of discretion by the referee. Therefore, we approve the assessment of costs as recommended.

Accordingly, respondent, Albert A. Rapoport, is hereby enjoined from engaging in the practice of law in Florida, including specifically the representation of parties in securities arbitration proceedings in this state, until he is duly licensed to practice law in Florida. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399-2300, for recovery of costs from Albert A. Rapoport, in the amount of $ [**11] 530.40, for which sum let execution issue.

It is so ordered.

ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, and CANTERO, JJ., concur.

SHAW, Senior Justice, dissents with an opinion, in which QUINCE, J., concurs.

**DISSENTBY:** SHAW

**DISSENT:** SHAW, Senior Justice, dissenting.

I respectfully dissent because I believe that there was a violation of Rapoport's constitutional right to due process. As Florida courts have consistently recognized, due process entitles a litigant to notice and an opportunity to be heard. n6

n6 See, e.g., *Florida Bar v. Fredericks, 731 So. 2d 1249, 1254 (Fla. 1999)* ("Accordingly, because Fredericks was made aware of the conduct alleged by the Bar to be unethical and had the opportunity to be heard as to this conduct, there was no violation of due process."); *Florida Bar v. Rubin, 709 So. 2d 1361, 1363 (Fla. 1998)* ("Prior to being found guilty of the charges at issue here, Rubin was afforded appropriate notice and a full opportunity to be heard during the final hearing before the referee. This was sufficient to satisfy the demands of due process."); see also *Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 655, 85 L. Ed. 2d 652, 105 S. Ct. 2265, 17 Ohio B. 315 (1985)* (holding that where appellant was put on notice of disciplinary charges against him and was afforded opportunity to respond to board's recommendation, demands of due process were satisfied); *In re McKay, 280 Ala. 174, 191 So. 2d 1, 5 (Ala. 1966)* ("An attorney must be accorded due process in . . . disciplinary proceedings, and the requirements of due process are met when the attorney is served with charges or specifications reasonably informing him of the charges against him and the attorney is thereafter accorded a hearing with an opportunity to defend.").

[**12]

[*879] While representing himself, Rapoport requested that the referee continue his case since he had undergone three-vessel coronary artery bypass surgery, was still suffering from cardiac arrhythmias, and was under instructions from his doctor to avoid all undue stress. A copy of his doctor's instructions was attached to the motion. When his request for a continuance was denied, Rapoport asked that the referee reconsider his

845 So. 2d 874, *; 2003 Fla. LEXIS 250, **;
28 Fla. L. Weekly S 174

decision and permit him an opportunity to recover from his surgery so that he could "fully and properly prepare his response" to the Bar's motion for summary judgment. He asserted that there were material issues of fact in dispute and that he should be available in approximately one month. n7 The referee denied this motion and five days later issued an order granting summary judgment in favor of the Bar. n8

> n7 The majority opinion seems to suggest that Rapoport, who was proceeding pro se at the time, should have spelled out the disputed issues of fact in his request for a continuance. I find this reasoning disingenuous for if Rapoport was able to formulate his research and submit his issues of disputed fact, then he would not need a motion for continuance at all. [**13]

> n8 Interestingly, after the referee denied both of Rapoport's requests for a continuance, the referee requested an extension from this Court based on Rapoport's illness. This Court granted the request and extended the time to file the referee's report until November 28, 2001.

The decision to grant or deny a motion for continuance is a matter of discretion that will normally not be disturbed. n9 In this instance, however, where it was asserted that there were material issues of fact to be resolved and a continuance was requested because of serious medical problems, I feel that it was an abuse of discretion to deny the continuance and grant summary judgment without giving Rapoport a meaningful opportunity to respond. n10

> n9 *Florida Bar v. Lipman, 497 So. 2d 1165, 1167-68 (Fla. 1986)* ("It is within the sound discretion of the referee, assigned by this Court to preside over a disciplinary proceeding such as this, to grant or deny a motion for continuance. Such a ruling will not be disturbed by this Court absent a clear abuse of discretion."). [**14]

> n10 See *Greene v. Seigle, 745 So. 2d 411 (Fla. 4th DCA 1999)* (holding that plaintiff's due process rights were violated when the trial court granted a summary judgment motion eight days after it was filed without providing the plaintiff with a sufficient opportunity to be heard); *Mondestin v. Duval Fed. Sav. & Loan Ass'n, 500 So. 2d 580 (Fla. 4th DCA 1986)* (holding that a party against whom a motion for summary judgment is filed is entitled to notice and a meaningful opportunity to be heard).

The majority opinion concludes that Rapoport is not entitled to relief because he received "both notice and an opportunity to heard before this Court." I do not believe that this constitutes a sufficient remedy. As noted above, Rapoport was not given an opportunity to submit disputed factual issues before the referee, and there are no provisions which permit him [*880] to present such disputed factual issues before this Court.

The majority opinion relies heavily on the fact that the referee's findings of fact were based on Rapoport's own admissions. A litigant's right [**15] to due process is not forfeited, however, because the most damaging evidence comes from his own confession or admissions. The right to be heard is fundamental, and Rapoport has been denied this right. For the above reasons, I dissent.

QUINCE, J., concurs.

*Exhibit G*

LEXSEE 17 CAL4TH 119

**BIRBROWER, MONTALBANO, CONDON & FRANK, P.C., et al., Petitioners, v.
THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent; ESQ
BUSINESS SERVICES, INC., Real Party in Interest.**

**No. S057125.**

**SUPREME COURT OF CALIFORNIA**

*17 Cal. 4th 119; 949 P.2d 1; 70 Cal. Rptr. 2d 304; 1998 Cal. LEXIS 2; 97 Cal.
Daily Op. Service 51; 98 Daily Journal DAR 107*

**January 5, 1998, Decided**

**SUBSEQUENT HISTORY:** As Modified, February 25, 1998. Certiorari *Denied October 5, 1998, 67 U.S.L. Week 3239.* Certiorari Denied October 5, 1998, Reported at: *1998 U.S. LEXIS 6358.*

**PRIOR HISTORY:** Superior Court of Santa Clara County. Super. Ct. No. CV737595. John F. Herlihy, Judge.

**DISPOSITION:** We conclude that Birbrower violated section 6125 by practicing law in California. To the extent the fee agreement allows payment for those illegal local services, it is void, and Birbrower is not entitled to recover fees under the agreement for those services. The fee agreement is enforceable, however, to the extent it is possible to sever the portions of the consideration attributable to Birbrower's services illegally rendered in California from those attributable to Birbrower's New York services. Accordingly, we affirm the Court of Appeal judgment to the extent it concluded that Birbrower's representation of ESQ in California violated section 6125, and that Birbrower is not entitled to recover fees under the fee agreement for its local services. We reverse the judgment to the extent the court did not allow Birbrower to argue in favor of a severance of the illegal portion of the consideration (for the California fees) from the rest of the fee agreement, and remand for further proceedings consistent with this decision.

**LexisNexis(R) Headnotes**

**COUNSEL:** Halley, Cornel & Lynch, Roger C. Peters, Hoge, Fenton, Jones & Appel, David P. Eby, William J. Elfving and Scott R. Mosko for Petitioners.

Latham & Watkins, Joseph A. Wheelock, Jr., and Julie V. King as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Hopkins & Carley, Jon Michaelson, Denise Y. Yamamoto and Robert W. Ricketson for Real Party in Interest.

Diane C. Yu, Lawrence C. Yee, Mark Torres-Gil and Robert M. Sweet as Amici Curiae on behalf of Real Party in Interest.

**JUDGES:** Opinion by Chin, J., with George, C. J., Mosk, Baxter, Werdegar, and Brown, JJ., concurring. Dissenting opinion by Kennard, J.

**OPINIONBY:** CHIN

**OPINION:** [*124] [**2] [***306]

CHIN, J. *Business and Professions Code section 6125* states: "No person shall practice law in California unless the person is an active member of the State Bar." n1 We must decide whether an out-of-state law firm, not licensed to practice law in this state, violated section 6125 when it performed legal services in California for a California-based client under a fee agreement stipulating that California law would govern all matters in the representation.

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

n1 All further statutory references are to the Business and Professions Code unless otherwise specified.

Although we are aware of the interstate nature of modern law practice and mindful of the reality that large firms often conduct activities and serve clients in several states, we do not believe these facts excuse law firms from complying with section 6125. Contrary to the Court of Appeal, however, we do not believe the Legislature intended section 6125 to apply to those services an out-of-state firm renders in its home state. We therefore conclude that, to the extent defendant law firm Birbrower, Montalbano, Condon & Frank, P.C. (Birbrower), practiced [**3] law in California without a license, it engaged in the unauthorized practice of law in this state. (§ 6125.) We also conclude that Birbrower's fee agreement with real party in interest ESQ Business Services, Inc. (ESQ), is invalid to the extent it authorizes payment for the substantial legal services Birbrower performed in California. If, however, Birbrower can show it generated fees under its agreement for limited services it performed in New York, and it earned those fees under the otherwise invalid fee agreement, it may, on remand, present to the trial court evidence justifying its recovery of fees for those New York services. Conversely, ESQ will have an opportunity to produce contrary evidence. Accordingly, we affirm the Court of Appeal judgment in part and reverse it in part, remanding for further proceedings consistent with this opinion.

I. BACKGROUND

The facts with respect to the unauthorized practice of law question are essentially undisputed. Birbrower is a professional law corporation incorporated in New York, with its principal place of business in New York. During 1992 and 1993, Birbrower attorneys, defendants Kevin F. Hobbs and Thomas A. Condon (Hobbs and Condon), performed substantial work in California relating to the law firm's representation of ESQ. Neither Hobbs nor Condon has ever been licensed to practice law in California. None of Birbrower's attorneys were licensed to practice law in California during Birbrower's ESQ representation.

ESQ is a California corporation with its principal place of business in Santa Clara County. In July 1992, the parties negotiated and executed the fee [*125] agreement in New York, providing that Birbrower would perform legal services for ESQ, including "All matters pertaining to the investigation of and prosecution of all claims and causes of action against Tandem Computers Incorporated [Tandem]." The "claims and causes of

action" against Tandem, a Delaware corporation with its principal place of business in Santa Clara County, California, related to a software development and marketing contract between Tandem and ESQ dated March 16, 1990 (Tandem Agreement). The Tandem Agreement stated that "The internal laws of the State of California (irrespective of its choice of law principles) shall govern the validity of this Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties hereto." Birbrower asserts, and ESQ disputes, that ESQ knew Birbrower was not licensed to practice law in California.

While representing ESQ, Hobbs and Condon traveled to California on several occasions. In August 1992, they met in California with ESQ and its accountants. During these meetings, Hobbs and Condon discussed various matters related to ESQ's dispute with Tandem and strategy for resolving the dispute. They made recommendations and gave advice. During this California trip, Hobbs and Condon also met with Tandem representatives on four or five occasions during [***307] a two-day period. At the meetings, Hobbs and Condon spoke on ESQ's behalf. Hobbs demanded that Tandem pay ESQ $ 15 million. Condon told Tandem he believed that damages would exceed $ 15 million if the parties litigated the dispute.

Around March or April 1993, Hobbs, Condon, and another Birbrower attorney visited California to interview potential arbitrators and to meet again with ESQ and its accountants. Birbrower had previously filed a demand for arbitration against Tandem with the San Francisco offices of the American Arbitration Association (AAA). In August 1993, Hobbs returned to California to assist ESQ in settling the Tandem matter. While in California, Hobbs met with ESQ and its accountants to discuss a proposed settlement agreement Tandem authored. Hobbs also met with Tandem representatives to discuss possible changes in the proposed agreement. Hobbs gave ESQ legal advice during this trip, including his opinion that ESQ should not settle with Tandem on the terms proposed.

ESQ eventually settled the Tandem dispute, and the matter never went to arbitration. But before the settlement, ESQ and Birbrower modified the contingency fee [**4] agreement. n2 The modification changed the fee arrangement from contingency to fixed fee, providing that ESQ would pay Birbrower [*126] over $ 1 million. The original contingency fee arrangement had called for Birbrower to receive "one-third (1/3) of all sums received for the benefit of the Clients . . . whether obtained through settlement, motion practice, hearing, arbitration, or trial by way of judgment, award, settlement, or otherwise . . . ."

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

n2 Birbrower's brief refers to the "Fee Agreement" without specifying whether it means the original contingency agreement or the later modified fixed fee agreement. The operative fee agreement that would be enforced is in dispute, and, as explained below, is subject to clarification on remand. To avoid confusion, we simply refer to one "fee agreement" for purposes of our analysis.

In January 1994, ESQ sued Birbrower for legal malpractice and related claims in Santa Clara County Superior Court. Birbrower removed the matter to federal court and filed a counterclaim, which included a claim for attorney fees for the work it performed in both California and New York. The matter was then remanded to the superior court. There ESQ moved for summary judgment and/or adjudication on the first through fourth causes of action of Birbrower's counterclaim, which asserted ESQ and its representatives breached the fee agreement. ESQ argued that by practicing law without a license in California and by failing to associate legal counsel while doing so, Birbrower violated section 6125, rendering the fee agreement unenforceable. Based on these undisputed facts, the Santa Clara Superior Court granted ESQ's motion for summary adjudication of the first through fourth causes of action in Birbrower's counterclaim. The court also granted summary adjudication in favor of ESQ's third and fourth causes of action in its second amended complaint, seeking declaratory relief as to the validity of the fee agreement and its modification. **(1)** (See. fn. 3.) The court concluded that: (1) Birbrower was "not admitted to the practice of law in California"; (2) Birbrower "did not associate California counsel"; n3 (3) Birbrower "provided legal services in this state"; and (4) "The law is clear that no one may recover compensation for services as an attorney in this state unless he or she was a member of the state bar at the time those services were performed."

n3 Contrary to the trial court's implied assumption, no statutory exception to section 6125 allows out-of-state attorneys to practice law in California as long as they associate local counsel in good standing with the State Bar.

Although the trial court's order stated that the fee agreements were unenforceable, at the hearing on the summary adjudication motion, the trial court also observed: "It seems to me that those are some of the issues that this Court has to struggle with, and then it becomes a question of if they aren't allowed to collect their attorney's fees here, I don't think that puts the attorneys in a position from being precluded from collecting all of their attorney's fees, only those fees probably that were generated by virtue of work that they performed in California and [***308] not that work that was performed in New York." [*127]

In granting limited summary adjudication, the trial court left open the following issues for resolution: ESQ's malpractice action against Birbrower, and the remaining causes of action in Birbrower's counterclaim, including Birbrower's fifth cause of action for quantum meruit (seeking the reasonable value of legal services provided).

Birbrower petitioned the Court of Appeal for a writ of mandate directing the trial court to vacate the summary adjudication order. The Court of Appeal denied Birbrower's petition and affirmed the trial court's order, holding that Birbrower violated section 6125. The Court of Appeal also concluded that Birbrower's violation barred the firm from recovering its legal fees under the written fee agreement, including fees generated in New York by the attorneys when they were physically present in New York, because the agreement included payment for California or "local" services for a California client in California. The Court of Appeal agreed with the trial court, however, in deciding that Birbrower could pursue its remaining claims against ESQ, including its equitable claim for recovery of its fees in quantum meruit.

[**5] We granted review to determine whether Birbrower's actions and services performed while representing ESQ in California constituted the unauthorized practice of law under section 6125 and, if so, whether a section 6125 violation rendered the fee agreement wholly unenforceable.

II. DISCUSSION

A. *The Unauthorized Practice of Law*

**(2)** The California Legislature enacted section 6125 in 1927 as part of the State Bar Act (the Act), a comprehensive scheme regulating the practice of law in the state. ( *J.W. v. Superior Court (1993) 17 Cal. App. 4th 958, 965 [22 Cal. Rptr. 2d 527]* (*J.W.*).) Since the Act's passage, the general rule has been that, although persons may represent themselves and their own interests regardless of State Bar membership, no one but an active member of the State Bar may practice law for another person in California. (*Ibid.*) The prohibition against unauthorized law practice is within the state's police power and is designed to ensure that those performing legal services do so competently. ( *Id. at p. 969.*)

A violation of section 6125 is a misdemeanor. (§ 6126.) Moreover, "No one may recover compensation for

services as an attorney at law in this state unless [the person] was at the time the services were performed a member of The State Bar." ( *Hardy v. San Fernando Valley C. of C. (1950) 99 Cal. App. 2d 572, 576 [222 P.2d 314] (Hardy).)* [*128]

   **(3)** Although the Act did not define the term "practice law," case law explained it as " 'the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure.' " ( *People v. Merchants Protective Corp. (1922) 189 Cal. 531, 535 [209 P. 363] (Merchants).) Merchants* included in its definition legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation. (*Ibid.;* see *People v. Ring (1937) 26 Cal. App. 2d. Supp. 768, 772-773 [70 P.2d 281] (Ring)* [holding that single incident of practicing law in state without a license violates § 6125]; see also *Mickel v. Murphy (1957) 147 Cal. App. 2d 718, 721 [305 P.2d 993]* [giving of legal advice on matter not pending before state court violates § 6125], disapproved on other grounds in *Biakanja v. Irving (1958) 49 Cal. 2d 647, 651 [320 P.2d 16, 65 A.L.R.2d 1358].) Ring* later determined that the Legislature "accepted both the definition already judicially supplied for the term and the declaration of the Supreme Court [in *Merchants]* that it had a sufficiently definite meaning to need no further definition. The definition . . . must be regarded as definitely establishing, for the jurisprudence of this state, the meaning of the term 'practice law.' " (*Ring, supra, 26* Cal. App. 2d at p. Supp. 772.)

   In addition to not defining the term "practice law," the Act also did not define the meaning of "in California." In today's legal practice, questions often arise concerning whether the phrase refers to the nature of the legal services, or restricts the Act's application [***309] to those out-of-state attorneys who are physically present in the state.

   Section 6125 has generated numerous opinions on the meaning of "practice law" but none on the meaning of "in California." In our view, the practice of law "in California" entails sufficient contact with the California client to render the nature of the legal service a clear legal representation. In addition to a quantitative analysis, we must consider the nature of the unlicensed lawyer's activities in the state. Mere fortuitous or attenuated contacts will not sustain a finding that the unlicensed lawyer practiced law "in California." The primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations.

   Our definition does not necessarily depend on or require the unlicensed lawyer's physical presence in the state. Physical presence here is one factor we may consider in deciding whether the unlicensed lawyer has violated section 6125, but it is by no means exclusive. For example, one may practice law in the state in violation of section 6125 although not physically present here by advising a California client on California law in connection [**6] with a [*129] California legal dispute by telephone, fax, computer, or other modern technological means. Conversely, although we decline to provide a comprehensive list of what activities constitute sufficient contact with the state, we do reject the notion that a person *automatically* practices law "in California" whenever that person practices California law anywhere, or "virtually" enters the state by telephone, fax, e-mail, or satellite. (See e.g., *Baron v. City of Los Angeles (1970) 2 Cal. 3d 535, 543 [86 Cal. Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036] (Baron)* ["practice law" does not encompass all professional activities].) Indeed, we disapprove *Ring, supra, 26 Cal. App. 2d Supp. 768,* and its progeny to the extent the cases are inconsistent with our discussion. We must decide each case on its individual facts.

   This interpretation acknowledges the tension that exists between interjurisdictional practice and the need to have a state-regulated bar. As stated in the American Bar Association Model Code of Professional Responsibility, Ethical Consideration EC 3-9, "Regulation of the practice of law is accomplished principally by the respective states. Authority to engage in the practice of law conferred in any jurisdiction is not per se a grant of the right to practice elsewhere, and it is improper for a lawyer to engage in practice where he is not permitted by law or by court order to do so. However, the demands of business and the mobility of our society pose distinct problems in the regulation of the practice of law by the states. In furtherance of the public interest, the legal profession should discourage regulation that unreasonably imposes territorial limitations upon the right of a lawyer to handle the legal affairs of his client or upon the opportunity of a client to obtain the services of a lawyer of his choice in all matters including the presentation of a contested matter in a tribunal before which the lawyer is not permanently admitted to practice." (Fns. omitted.) *Baron* implicitly agrees with this canon. (*Baron, supra, 2 Cal. 3d at p. 543.)*

   If we were to carry the dissent's narrow interpretation of the term "practice law" to its logical conclusion, we would effectively limit section 6125's application to those cases in which nonlicensed out-of-state lawyers appeared in a California courtroom without permission. (Dis. opn., *post,* at pp. 142-144.) Clearly, neither *Merchants, supra, 189 Cal. at page 535,* nor

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

*Baron, supra, 22 Cal. 3d at page 543,* supports the dissent's fanciful interpretation of the thoughtful guidelines announced in those cases. Indeed, the dissent's definition of "practice law" ignores *Merchants* altogether, and, in so doing, substantially undermines the Legislature's intent to protect the public from those giving unauthorized legal advice and counsel.

**(4)** Exceptions to section 6125 do exist, but are generally limited to allowing out-of-state attorneys to make brief appearances before a state court [*130] or tribunal. They are narrowly drawn and strictly interpreted. For example, an out-of-state attorney not licensed to practice in California may be permitted, [***310] *by consent of a trial judge,* to appear in California in a particular pending action. (See *In re McCue (1930) 211 Cal. 57, 67 [293 P. 47]; 1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 402,* p. 493.)

In addition, with the permission of the California court in which a particular cause is pending, out-of-state counsel may appear before a court as counsel pro hac vice. (*Cal. Rules of Court, rule 983.*) A court will approve a pro hac vice application only if the out-of-state attorney is a member in good standing of another state bar and is eligible to practice in any United States court or the highest court in another jurisdiction. (*Cal. Rules of Court, rule 983(a).*) The out-of-state attorney must also associate an active member of the California Bar as attorney of record and is subject to the Rules of Professional Conduct of the State Bar. (*Cal. Rules of Court, rules 983(a),* (d); see *Rules Prof. Conduct, rule 1-100(D)(2)* [includes lawyers from other jurisdictions authorized to practice in this state].)

The Act does not regulate practice before United States courts. Thus, an out-of-state attorney engaged to render services in bankruptcy proceedings was entitled to collect his fee. ( *Cowen v. Calabrese (1964) 230 Cal. App. 2d 870, 872 [41 Cal. Rptr.* [**7] *441, 11 A.L.R.3d 903]* (*Cowen*); but see U.S. Dist. Ct. Local Rules, Northern Dist. Cal., rule 11-1(b); Eastern Dist. Cal., rule 83-180; Central Dist. Cal., rule 2.2.1; Southern Dist. Cal., rule 83.3 c.1.a. [today conditioning admission to their respective bars (with certain exceptions for some federal government employees) on active membership in good standing in California State Bar].)

Finally, *California Rules of Court, rule 988,* permits the State Bar to issue registration certificates to foreign legal consultants who may advise on the law of the foreign jurisdiction where they are admitted. These consultants may not, however, appear as attorneys before a California court or judicial officer or otherwise prepare pleadings and instruments in California or give advice on the law of California or any other state or jurisdiction except those where they are admitted.

The Legislature has recognized an exception to section 6125 in international disputes resolved in California under the state's rules for arbitration and conciliation of international commercial disputes. ( *Code Civ. Proc., § 1297.11* et seq.) This exception states that in a commercial conciliation in California involving international commercial disputes, "The parties may appear in person or be represented or assisted by any person of their choice. A person assisting or representing a party need not be a member of the legal [*131] profession or licensed to practice law in California." ( *Code Civ. Proc., § 1297.351.*) Likewise, the Act does not apply to the preparation of or participation in labor negotiations and arbitrations arising under collective bargaining agreements in industries subject to federal law. (See e.g., *Teamsters Local v. Lucas Flour Co. (1962) 369 U.S. 95, 103 [82 S. Ct. 571, 576-577, 7 L. Ed. 2d 593];* see also Labor-Management Relations Act of 1947, *29 U.S.C. § 185*(a).)

B. *The Present Case*

**(5a)** The undisputed facts here show that neither *Baron*'s definition ( *Baron, supra, 2 Cal. 3d at p. 543*) nor our "sufficient contact" definition of "practice law in California" (*ante,* at pp. 128-129) would excuse Birbrower's extensive practice in this state. Nor would any of the limited statutory exceptions to section 6125 apply to Birbrower's California practice. As the Court of Appeal observed, Birbrower engaged in unauthorized law practice *in California* on more than a limited basis, and no firm attorney engaged in that practice was an active member of the California State Bar. As noted (*ante,* at p. 125), in 1992 and 1993, Birbrower attorneys traveled to California to discuss with ESQ and others various matters pertaining to the dispute between ESQ and Tandem. Hobbs and Condon discussed strategy for resolving the dispute and advised ESQ on this strategy. Furthermore, during California meetings with Tandem representatives in August 1992, Hobbs demanded Tandem pay $ 15 million, and Condon told Tandem he believed damages in the matter would exceed that amount if the parties proceeded to litigation. Also in California, Hobbs met with ESQ for the stated purpose of helping to reach a settlement agreement and to discuss the agreement that was eventually proposed. Birbrower attorneys also traveled to California to initiate arbitration proceedings before the matter was settled. As the Court of Appeal concluded, ". . . the Birbrower firm's [***311] in-state activities clearly constituted the [unauthorized] practice of law" *in California*.

Birbrower contends, however, that section 6125 is not meant to apply to *any* out-of-state *attorneys*. Instead, it argues that the statute is intended solely to prevent nonattorneys from practicing law. This contention is without merit because it contravenes the plain language

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

of the statute. Section 6125 clearly states that *no person* shall practice law in California unless that person is a member of the State Bar. The statute does not differentiate between attorneys or nonattorneys, nor does it excuse a person who is a member of another state bar. **(6)** It is well-settled that, in determining the meaning of a statute, we look to its words and give them their usual and ordinary meaning. ( *DaFonte v. Up-Right, Inc. (1992) 2 Cal. 4th 593, 601 [7 Cal. Rptr. 2d 238, 828 P.2d 140]; Kimmel v. Goland (1990) 51 Cal. 3d 202, 208-209 [271 Cal. Rptr. 191, 793 P.2d 524].)* "[I]f statutory language is 'clear [*132] and unambiguous there is no need for construction, and courts should not indulge in it.' [Citation.]" ( *Tiernan v. Trustees of Cal. State University & Colleges (1982) 33 Cal. 3d 211, 218 [188 Cal. Rptr. 115, 655 P.2d 317].)* **(5b)** The plain meaning controls our interpretation of the statute here because Birbrower has not shown "that [**8] the natural and customary import of the statute's language is either 'repugnant to the general purview of the act' or for some other compelling reason, should be disregarded . . . ." ( *Id. at pp. 218-219.)*

Birbrower next argues that we do not further the statute's intent and purpose--to protect California citizens from incompetent attorneys--by enforcing it against out-of-state attorneys. Birbrower argues that because out-of-state attorneys have been licensed to practice in other jurisdictions, they have already demonstrated sufficient competence to protect California clients. But Birbrower's argument overlooks the obvious fact that other states' laws may differ substantially from California law. Competence in one jurisdiction does not necessarily guarantee competence in another. By applying section 6125 to out-of-state attorneys who engage in the extensive practice of law in California without becoming licensed in our state, we serve the statute's goal of assuring the competence of all attorneys practicing law in this state. ( *J.W., supra, 17 Cal. App. 4th at p. 969.)*

California is not alone in regulating who practices law in its jurisdiction. Many states have substantially similar statutes that serve to protect their citizens from unlicensed attorneys who engage in unauthorized legal practice. Like section 6125, these other state statutes protect local citizens "against the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." ( *Spivak v. Sachs (1965) 16 N.Y.2d 163 [263 N.Y.S.2d 953, 211 N.E.2d 329, 331].)* Whether an attorney is duly admitted in another state and is, in fact, competent to practice in California is irrelevant in the face of section 6125's language and purpose. (See *Ranta v. McCarney (N.D. 1986) 391 N.W.2d 161, 163 (Ranta)* [noting that out-of-state attorney's competence is irrelevant because purpose

of North Dakota law against unauthorized law practice is to assure competence *before* attorney practices in state].) Moreover, as the North Dakota Supreme Court pointed out in *Ranta:* "It may be that such an [out-of-state attorney] exception is warranted, but such a plea is more properly made to a legislative committee considering a bill enacting such an exception or to this court in its rule-making function than it is in a judicial decision." ( *Id. at p. 165.)* Similarly, a decision to except out-of-state attorneys licensed in their own jurisdictions from section 6125 is more appropriately left to the California Legislature. [*133]

Assuming that section 6125 does apply to out-of-state attorneys not licensed here, Birbrower alternatively asks us to create an exception to section 6125 for work incidental to private arbitration or other alternative dispute resolution proceedings. Birbrower points to fundamental differences between private arbitration and legal proceedings, including procedural differences relating to discovery, rules of evidence, compulsory process, cross-examination of witnesses, and other areas. (See *Alexander v. Gardner-Denver* [***312] *Co. (1974) 415 U.S. 36, 57-58 [94 S. Ct. 1011, 1024-1025, 39 L. Ed. 2d 147]* [illustrating differences between arbitration and court proceedings].) As Birbrower observes, in light of these differences, at least one court has decided that an out-of-state attorney could recover fees for services rendered in an arbitration proceeding. (See *Williamson v. John D. Quinn Const. Corp. (S.D.N.Y. 1982) 537 F. Supp. 613, 616 (Williamson).)*

In *Williamson*, a New Jersey law firm was employed by a client's New York law firm to defend a construction contract arbitration in New York. It sought to recover fees solely related to the arbitration proceedings, even though the attorney who did the work was not licensed in New York, nor was the firm authorized to practice in the state. ( *Williamson, supra, 537 F. Supp. at p. 616.)* In allowing the New Jersey firm to recover its arbitration fees, the federal district court concluded that an arbitration tribunal is not a court of record, and its fact-finding process is not similar to a court's process. (*Ibid.*) The court relied on a local state bar report concluding that representing a client in an arbitration was not the unauthorized practice of law. (*Ibid.*; see Com. Rep., Labor Arbitration and the Unauthorized Practice of Law (May/June 1975) 30 Record of the Association [**9] of the Bar of the City of New York, No. 5/6, p. 422 et seq.) But as amicus curiae the State Bar of California observes, "While in *Williamson* the federal district court did allow the New Jersey attorneys to recover their fees, that decision clearly is distinguishable on its facts. . . . [P] In the instant case, it is undisputed that none of the time that the New York attorneys spent in California was" spent in arbitration; *Williamson* thus carries limited

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

weight. (See also *Moore v. Conliffe (1994) 7 Cal. 4th 634, 637-638 [29 Cal. Rptr. 2d 152, 871 P.2d 204]* [private AAA arbitration functionally equivalent to judicial proceeding to which litigation privilege applies].) Birbrower also relies on California's rules for arbitration and conciliation of international commercial disputes for support. ( *Code Civ. Proc., § 1297.11* et seq.) As noted (*ante*, at pp. 130-131), these rules specify that, in an international commercial conciliation or arbitration proceeding, the person representing a party to the conciliation or arbitration is not required to be a licensed member of the State Bar. ( *Code Civ. Proc., § 1297.351*.)

We decline Birbrower's invitation to craft an arbitration exception to section 6125's prohibition of the unlicensed practice of law in this state. Any [*134] exception for arbitration is best left to the Legislature, which has the authority to determine qualifications for admission to the State Bar and to decide what constitutes the practice of law. ( *Baron, supra, 2 Cal. 3d at pp. 540-541;* see also *Eagle Indem. Co. v. Industrial Acc. Com. (1933) 217 Cal. 244, 247 [18 P.2d 341].*) Even though the Legislature has spoken with respect to *international* arbitration and conciliation, it has not enacted a similar rule for private arbitration proceedings. Of course, private arbitration and other alternative dispute resolution practices are important aspects of our justice system. (See *Moncharsh v. Heily & Blase (1992) 3 Cal. 4th 1, 9 [10 Cal. Rptr. 2d 183, 832 P.2d 899]* [noting a strong public policy in favor of arbitration].) Section 6125, however, articulates a strong public policy favoring the practice of law in California by licensed State Bar members. In the face of the Legislature's silence, we will not create an arbitration exception under the facts presented. (See *Baron, supra, 2 Cal. 3d at pp. 540-541* [membership, character, and conduct of attorneys is proper subject of state legislative regulation and control].) n4

n4 The dissent focuses on an arbitrator's powers in an attempt to justify its conclusion that an out-of-state attorney may engage in the unlicensed representation of a client in an arbitration proceeding. (See dis. opn., *post*, at pp. 144-145.) This narrow focus confuses the issue here. An arbitrator's powers to enforce a contract or "award an essentially unlimited range of remedies" has no bearing on the question whether unlicensed out-of-state attorneys may represent California clients in an arbitration proceeding. (Dis. opn., *post*, at p. 145.) Moreover, any discussion of the practice of law in an arbitration proceeding is irrelevant here because the parties

settled the underlying case before arbitration proceedings became necessary. Nonetheless, we emphasize that, in the absence of clear legislative direction, we decline to create an exception allowing unlicensed legal practice in arbitration in violation of section 6125.

[***313] In its reply brief to the State Bar's amicus curiae brief, Birbrower raises for the first time the additional argument that the Federal Arbitration Act (FAA) preempted the rules governing the AAA proposed arbitration and section 6125. The FAA regulates arbitration that deals with maritime transactions and contracts involving the transportation of goods through interstate or foreign commerce. *(9 U.S.C. § 1* et seq.) Although we need not address the question under *California Rules of Court, rule 29(b)(1)*, and note the parties' settlement agreement rendered the arbitration unnecessary, we reject the argument for its lack of merit. First, the parties incorporated a California choice-of-law provision in the Tandem Agreement, indicating they intended to apply California law in any necessary arbitration, and they have not shown that California law in any way conflicts with the FAA. Moreover, in interpreting the California Arbitration Act stay provisions ( *Code Civ. Proc., § 1281.2*, subd. (c)), the high court observed that the FAA does not contain an express preemptive provision, nor does it "reflect a congressional intent to occupy the entire field of arbitration." (*Volt Info. Sciences v.* [**10] *Leland* [*135] *Stanford Jr. U. (1989) 489 U.S. 468, 477 [109 S. Ct. 1248, 1255, 103 L. Ed. 2d 488].)*

Finally, Birbrower urges us to adopt an exception to section 6125 based on the unique circumstances of this case. Birbrower notes that "Multistate relationships are a common part of today's society and are to be dealt with in commonsense fashion." ( *In re Estate of Waring (1966) 47 N.J. 367 [221 A.2d 193, 197].)* In many situations, strict adherence to rules prohibiting the unauthorized practice of law by out-of-state attorneys would be " 'grossly impractical and inefficient.' " (*Ibid.*; see also *Appell v. Reiner (1964) 43 N.J. 313 [204 A.2d 146, 148]* [strict adherence to rule barring out-of-state lawyers from representing New Jersey residents on New Jersey matters may run against the public interest when case involves inseparable multistate transactions].)

Although, as discussed (*ante*, at pp. 129-130), we recognize the need to acknowledge and, in certain cases, to accommodate the multistate nature of law practice, the facts here show that Birbrower's extensive activities within California amounted to considerably more than any of our state's recognized exceptions to section 6125 would allow. Accordingly, we reject Birbrower's

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

suggestion that we except the firm from section 6125's rule under the circumstances here.

### C. Compensation for Legal Services

**(7a)** Because Birbrower violated section 6125 when it engaged in the unlawful practice of law in California, the Court of Appeal found its fee agreement with ESQ unenforceable in its entirety. Without crediting Birbrower for some services performed in New York, for which fees were generated under the fee agreement, the court reasoned that the agreement was void and unenforceable because it included payment for services rendered to a California client in the state by an unlicensed out-of-state lawyer. The court opined that "When New York counsel decided to accept [the] representation, it should have researched California law, including the law governing the practice of law in this state." The Court of Appeal let stand, however, the trial court's decision to allow Birbrower to pursue its fifth cause of action in quantum meruit. n5 We agree with the Court of Appeal to the extent it barred Birbrower from recovering fees generated under the fee agreement for the unauthorized legal services it performed in California. We disagree with the same court to the extent it implicitly barred Birbrower [*136] from recovering fees generated under the fee agreement for the limited legal services the firm performed in New York.

> n5 We observe that ESQ did not seek (and thus the court did not grant) summary adjudication on the Birbrower firm's quantum meruit claim for the reasonable value of services rendered. Birbrower thus still has a cause of action pending in quantum meruit.

It is a general rule that an attorney is barred from recovering compensation for [***314] services rendered in another state where the attorney was not admitted to the bar. (Annot., Right of Attorney Admitted in One State to Recover Compensation for Services Rendered in Another State Where He Was Not Admitted to the Bar *(1967) 11 A.L.R.3d 907; Hardy, supra, 99 Cal. App. 2d at p. 576.)* The general rule, however, has some recognized exceptions.

Initially, Birbrower seeks enforcement of the entire fee agreement, relying first on the federal court exception discussed *ante*, at page 130. (*Cowen, supra, 230 Cal. App. 2d at p. 872; In re McCue, supra, 211 Cal. at p. 66;* see Annot., *supra*, 11 A.L.R.3d at pp. 912-913 [citing *Cowen* as an exception to general rule of nonrecovery].) This exception does not apply in this case; none of Birbrower's activities related to federal court practice.

A second exception on which Birbrower relies to enforce its entire fee agreement relates to "Services not involving courtroom appearance." (Annot., *supra, 11 A.L.R.3d at p. 911* [citing *Wescott v. Baker (1912) 83 N.J.L. 460 [85 A. 315]].*) California has implicitly rejected this broad exception through its comprehensive definition of what it means to "practice law." Thus, the exception Birbrower seeks for all services performed outside the courtroom [**11] in our state is too broad under section 6125.

Some jurisdictions have adopted a third exception to the general rule of nonrecovery for in-state services, if an out-of-state attorney "makes a full disclosure to his client of his lack of local license and does not conceal or misrepresent the true facts." (Annot., *supra, 11 A.L.R.3d at p. 910.*) For example, in *Freeling v. Tucker (1930) 49 Idaho 475 [289 P. 85]*, the court allowed an Oklahoma attorney to recover for services rendered in an Idaho probate court. Even though an Idaho statute prohibited the unlicensed practice of law, the court excused the Oklahoma attorney's unlicensed representation because he had not falsely represented himself nor deceptively held himself out to the client as qualified to practice in the jurisdiction. (*Id*. at p. 86.) In this case, Birbrower alleges that ESQ at all times knew that the firm was not licensed to practice law in California. Even assuming that is true, however, we reject the full disclosure exception for the same reasons we reject the argument that section 6125 is not meant to apply to nonattorneys. Recognizing these exceptions would contravene not only the plain language of section 6125 but the underlying policy of assuring the competence of those practicing law in California. [*137]

Therefore, as the Court of Appeal held, none of the exceptions to the general rule prohibiting recovery of fees generated by the unauthorized practice of law apply to Birbrower's activities in California. Because Birbrower practiced substantial law in this state in violation of section 6125, it cannot receive compensation under the fee agreement for any of the services it performed in California. Enforcing the fee agreement in its entirety would include payment for the unauthorized practice of law in California and would allow Birbrower to enforce an illegal contract. (*See Hardy, supra, 99 Cal. App. 2d at p. 576.*)

Birbrower asserts that even if we agree with the Court of Appeal and find that none of the above exceptions allowing fees for unauthorized California services apply to the firm, it should be permitted to recover fees for those limited services it performed exclusively *in New York* under the agreement. In short, Birbrower seeks to recover under its contract for those services it performed for ESQ in New York that did not involve the practice of law in California, including fee

contract negotiations and some corporate case research. Birbrower thus alternatively seeks reversal of the Court of Appeal's judgment to the extent it implicitly precluded the firm from seeking fees generated in New York under the fee agreement.

We agree with Birbrower that it may be able to recover fees under the fee agreement for the limited legal services it performed for ESQ in New York to the extent they did not constitute practicing law in California, even though those services were performed for a California client. Because section 6125 applies to the practice of law in California, it does not, in general, regulate law practice in other states. (See *ante*, at pp. 128-131.) [***315] Thus, although the general rule against compensation to out-of-state attorneys precludes Birbrower's recovery under the fee agreement for its actions in California, the severability doctrine may allow it to receive its New York fees generated under the fee agreement, if we conclude the illegal portions of the agreement pertaining to the practice of law in California may be severed from those parts regarding services Birbrower performed in New York. (See Annot., *supra, 11 A.L.R.3d at pp. 908-909,* and cases cited [bar on recovery by out-of-state attorney extends only to compensation for *local* services]; see also *Ranta, supra, 391 N.W.2d at p. 166* [remanding case to determine which fees related to practice locally and which related to attorney's work in state where he was licensed].)

The law of contract severability is stated in *Civil Code section 1599*, which defines partially void contracts: "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." In [*138] *Calvert v. Stoner (1948) 33 Cal. 2d 97 [199 P.2d 297]* (*Calvert*), we considered whether a contingent fee contract containing a provision restricting a party's right to compromise a suit [**12] without her attorney's consent was void entirely or severable in part. ( *Id. at p. 103.*) We observed that "It is unnecessary . . . to determine whether the particular provision is invalid as against public policy. It is sufficient to observe, assuming such invalidity, that in this state . . . the compensation features of the contract are not thereby deemed affected if in other respects the contract is lawful." ( *Id. at p. 104.*) *Calvert* concluded that the invalid provision preventing the client from compromising the suit could be severed from the valid provision for attorney fees. (*Ibid.*)

The fee agreement between Birbrower and ESQ became illegal when Birbrower performed legal services in violation of section 6125. (**8**) It is true that courts will not ordinarily aid in enforcing an agreement that is either illegal or against public policy. ( *Asdourian v. Araj (1985) 38 Cal. 3d 276, 291 [211 Cal. Rptr. 703, 696*

*P.2d 95]; Homami v. Iranzadi (1989) 211 Cal. App. 3d 1104, 1109-1110 [260 Cal. Rptr. 6].)* Illegal contracts, however, will be enforced under certain circumstances, such as when only a part of the consideration given for the contract involves illegality. In other words, notwithstanding an illegal consideration, courts may sever the illegal portion of the contract from the rest of the agreement. ( *Keene v. Harling (1964) 61 Cal. 2d 318, 320 [38 Cal. Rptr. 513, 392 P.2d 273]* (*Keene*).) " ' "When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the . . . law . . . [divides] according to common reason; and having made that void that is against law, lets the rest stand. . . ." ' " ( *Id. at pp. 320-321,* quoting *Jackson v. Shawl (1865) 29 Cal. 267, 272.*) If the court is unable to distinguish between the lawful and unlawful parts of the agreement, "the illegality taints the entire contract, and the entire transaction is illegal and unenforceable." ( *Keene, supra, 61 Cal. 2d at p. 321.*)

In *Keene*, the defendant agreed to pay the plaintiffs $ 50,000 in exchange for their business involving coin-operated machines. The defendant defaulted on his payments, and the plaintiffs sued. The defendant argued that the sales agreement was void because part of the sale involved machines that were illegal under a California penal statute. The court affirmed the lower court's determination that the price of the illegal machines could be deducted from the amount due on the original contract. "Since the consideration on the buyer's side was money, the court properly construed the contract by equating the established market price of the illegal machines to a portion of the money consideration." ( *Keene, supra, 61 Cal. 2d at p. 323.*) Thus, even though the entire contract was for a fixed sum, the court was able [*139] to value the illegal portion of the contract and separate it from the rest of the amount due under the agreement.

(**7b**) In this case, the parties entered into a contingency fee agreement followed by a [***316] fixed fee agreement. n6 ESQ was to pay money to Birbrower in exchange for Birbrower's legal services. The object of their agreement may not have been entirely illegal, assuming ESQ was to pay Birbrower compensation based in part on work Birbrower performed in New York that did not amount to the practice of law in California. The illegality arises, instead, out of the amount to be paid to Birbrower, which, if paid fully, would include payment for services rendered in California in violation of section 6125.

n6 The parties apparently do not dispute that they modified the original contingency fee

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

arrangement to call for a fixed fee payment of over $ 1 million. They dispute, however, whether the original contingency fee arrangement became operative once again when ESQ failed to make a payment to Birbrower under the fixed fee arrangement. Because the trial court and the Court of Appeal believed the fee agreements to be unenforceable in their entirety, neither court addressed issues relating to the fee agreements themselves or the parties' disputes surrounding those agreements. We agree with the Court of Appeal that issues surrounding the two fee agreements and the applicability of either section 6147 (regulating contents of contingency fee agreements) or the *State Bar Rules of Professional Conduct, rules 3-300* and *4-200* (governing fees for legal services), are best resolved by the trial court on remand.

Therefore, we conclude the Court of Appeal erred in determining that the fee [**13] agreement between the parties was entirely unenforceable because Birbrower violated section 6125's prohibition against the unauthorized practice of law in California. Birbrower's statutory violation may require exclusion of the portion of the fee attributable to the substantial illegal services, but that violation does not necessarily entirely preclude its recovery under the fee agreement for the limited services it performed outside California. ( *Calvert, supra,* 33 Cal. 2d at pp. 104-105.)

Thus, the portion of the fee agreement between Birbrower and ESQ that includes payment for services rendered in New York may be enforceable to the extent that the illegal compensation can be severed from the rest of the agreement. On remand, therefore, the trial court must first resolve the dispute surrounding the parties' fee agreement and determine whether their agreement conforms to California law. If the parties and the court resolve the fee dispute and determine that one fee agreement is operable and does not violate any state drafting rules, the court may sever the illegal portion of the consideration (the value of the California services) from the rest of the fee agreement. Whether the trial court finds the contingent fee agreement or the fixed fee agreement to be valid, it will determine whether some amount is due under the valid agreement. The trial court must then determine, on [*140] evidence the parties present, how much of this sum is attributable to services Birbrower rendered in New York. The parties may then pursue their remaining claims.

III. DISPOSITION

We conclude that Birbrower violated section 6125 by practicing law in California. To the extent the fee

agreement allows payment for those illegal local services, it is void, and Birbrower is not entitled to recover fees under the agreement for those services. The fee agreement is enforceable, however, to the extent it is possible to sever the portions of the consideration attributable to Birbrower's services illegally rendered in California from those attributable to Birbrower's New York services. Accordingly, we affirm the Court of Appeal judgment to the extent it concluded that Birbrower's representation of ESQ in California violated section 6125, and that Birbrower is not entitled to recover fees under the fee agreement for its local services. We reverse the judgment to the extent the court did not allow Birbrower to argue in favor of a severance of the illegal portion of the consideration (for the California fees) from the rest of the fee agreement, and remand for further proceedings consistent with this decision.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**DISSENTBY:** KENNARD

**DISSENT:**

**KENNARD, J.,**

Dissenting.--In California, it is a misdemeanor to practice law when one is not a member of the State Bar. ( *Bus. & Prof. Code, § 6125, 6126,* subd. (a).) In this case, New York lawyers who were not members of the California Bar [***317] traveled to this state on several occasions, attempting to resolve a contract dispute between their clients and another corporation through negotiation and private arbitration. Their clients included a New York corporation and a sister corporation incorporated in California; the lawyers had in previous years represented the principal owners of these corporations. The majority holds that the New York lawyers' activities in California constituted the unauthorized practice of law. I disagree.

The majority focuses its attention on the question of whether the New York lawyers had engaged in the practice of law *in California*, giving scant consideration to a decisive preliminary inquiry: whether, through their activities here, the New York lawyers had engaged in the practice of law *at all*. In my view, the record does not show that they did. In reaching a contrary conclusion, the majority relies on an overbroad definition of the term "practice of law." I would adhere to this court's decision in *Baron v. City of* [*141] *Los Angeles (1970) 2 Cal. 3d 535 [86 Cal. Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036],* more narrowly defining the practice of law as the representation of another in a judicial proceeding or an activity requiring the application of that degree of legal

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

knowledge and technique possessed only by a trained legal mind. Under this definition, this case presents a triable issue of material fact as to whether the New York [**14] lawyers' California activities constituted the practice of law.

### I

Defendant Birbrower, Montalbano, Condon & Frank, P.C. (hereafter Birbrower) is a New York law firm. Its lawyers are not licensed to practice law in California.

Kamal Sandhu was the sole shareholder of ESQ Business Services Inc., a New York corporation (hereafter ESQ-NY), of which his brother Iqbal Sandhu was the vice-president. Beginning in 1986, Birbrower lawyers represented the Sandhu family in various business matters. In 1990, Kamal Sandhu asked Birbrower lawyer Kevin Hobbs to review a proposed software development and marketing agreement between ESQ-NY and Tandem Computers Incorporated (hereafter Tandem). The agreement granted Tandem worldwide distribution rights to computer software created by ESQ-NY. The agreement also provided that it would be governed by California law and that, according to Birbrower's undisputed assertion, disputes were to be resolved by arbitration under the rules of the American Arbitration Association. ESQ-NY and Tandem signed the agreement.

Thereafter, a second corporation, also named ESQ Business Services, Inc. (hereafter ESQ-CAL), was incorporated in California, with Iqbal Sandhu as a principal shareholder. In 1991, ESQ-CAL consulted Birbrower lawyers concerning Tandem's performance under the agreement. In 1992, ESQ-NY and ESQ-CAL jointly hired Birbrower to resolve the dispute with Tandem, including the investigation and prosecution of claims against Tandem if necessary. ESQ-NY and ESQ-CAL entered into a contingency fee agreement with Birbrower; this agreement was executed in New York but was later modified to a fixed fee agreement in California.

The efforts of the Birbrower lawyers to resolve the dispute with Tandem included several brief trips to California. On these trips, Birbrower lawyers met with officers of both ESQ-NY and ESQ-CAL and with representatives of Tandem; they also interviewed arbitrators and participated in negotiating the settlement of the dispute with Tandem. (Maj. opn., *ante*, at p. 125.) On February 12, 1993, Birbrower initiated an arbitration proceeding against [*142] Tandem, on behalf of both ESQ-NY and ESQ-CAL, by filing a claim with the American Arbitration Association in San Francisco, California. Before an arbitration hearing was held, the dispute with Tandem was settled.

In January 1994, ESQ-CAL and Iqbal Sandhu, the principal shareholder, sued Birbrower for malpractice. Birbrower cross-complained to recover its fees under the fee agreement. Plaintiffs ESQ-CAL and Iqbal Sandhu thereafter amended their complaint to add ESQ-NY as a plaintiff. Plaintiffs moved for summary adjudication, asserting [***318] the fee agreement was unenforceable because the Birbrower lawyers had engaged in the unauthorized practice of law in California. The trial court agreed, and granted plaintiffs' motion. The Court of Appeal upheld the trial court's ruling, as does a majority of this court today.

### II

*Business and Professions Code section 6125* states: "No person shall practice law in California unless the person is an active member of the State Bar." The Legislature, however, has not defined what constitutes the practice of law.

Pursuant to its inherent authority to define and regulate the practice of law (see, e.g., *Merco Constr. Engineers, Inc. v. Municipal Court (1978) 21 Cal. 3d 724, 728 [147 Cal. Rptr. 631, 581 P.2d 636]; In re Lavine (1935) 2 Cal. 2d 324, 328; People v. Turner (1850) 1 Cal. 143, 150),* this court in 1922 defined the practice of law as follows: " '[A]s the term is generally understood, the practice of the law is the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure. But in a larger sense it includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be [*15] depending in a court.' " ( *People v. Merchants Protective Corp. (1922) 189 Cal. 531, 535 [209 P. 363]* (*Merchants*).) The *Merchants* court adopted this definition verbatim from a decision by the Indiana Court of Appeals, *Eley v. Miller (1893) 7 Ind.App. 529 [34 N.E. 836, 837-838].* ( *Merchants, supra, at p. 535.*)

In 1970, in *Baron v. City of Los Angeles, supra, 2 Cal. 3d 535, 542* (*Baron*), this court reiterated the *Merchants* court's definition of the term "practice of law." We were quick to point out in *Baron*, however, that "ascertaining whether a particular activity falls within this general definition may be a formidable endeavor." ( *Id. at p. 543.*) *Baron* emphasized "that it is not the whole spectrum of professional services of lawyers with which the State Bar [*143] Act is most concerned, but rather it is the smaller area of activities defined as the 'practice of law.' " ( *Ibid.*) It then observed: "In close cases, the courts have determined that the resolution of legal questions for another by advice and action is practicing law 'if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

of a *trained legal mind*.' [Citations.]" (*Ibid.*, italics added.) *Baron* added that "if the application of legal knowledge and technique is *required*, the activity constitutes the practice of law . . . ." (*Ibid.*, italics added.) This definition is quite similar to that proposed by Cornell Law School Professor Charles Wolfram, the chief reporter for the American Law Institute's Restatement of the Law Governing Lawyers: "The correct form of the test [for the practice of law] should inquire whether the matter handled was of such complexity that only a person trained as a lawyer should be permitted to deal with it." (Wolfram, Modern Legal Ethics (1986) p. 836.)

The majority asserts that the definition of practice of law I have stated above misreads this court's opinion in *Baron*. (Maj. opn., *ante*, at p. 129.) But what the majority characterizes as "the dissent's fanciful interpretation of the [*Baron* court's] thoughtful guidelines" (*ibid.*) consists of language I have quoted directly from *Baron*.

The majority also charges that the narrowing construction of the term "practice of law" that this court adopted in *Baron* "effectively limit[s] section 6125's application to those cases in which nonlicensed out-of-state lawyers appeared in a California courtroom without permission." (Maj. opn., *ante*, at p. 129.) Fiddlesticks. Because the *Baron* definition encompasses all activities that " 'reasonably demand application of a trained legal mind' " (*Baron, supra, 2 Cal. 3d at p. 543*), the majority's assertion would be true only if there were no activities, apart from court appearances, requiring [***319] application of a trained legal mind. Many attorneys would no doubt be surprised to learn that, for example, drafting testamentary documents for large estates, preparing merger agreements for multinational corporations, or researching complex legal issues are not activities that require a trained legal mind.

According to the majority, use of the *Baron* definition I have quoted would undermine protection of the public from incompetent legal practitioners. (Maj. opn., *ante*, at p. 129.) The *Baron* definition provides ample protection from incompetent legal practitioners without infringing upon the public's interest in obtaining advice and representation from other professionals, such as accountants and real estate brokers, whose skills in specialized areas may overlap with those of lawyers. This allows the public the freedom to choose professionals who may be able to provide the public with [*144] needed services at a more affordable cost. (See Wolfram, Modern Legal Ethics, *supra*, at p. 831; Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions (1981) 34 Stan.L.Rev. 1, 97-98;* Weckstein, *Limitations on the Right to Counsel: The Unauthorized Practice of Law, 1978 Utah L.Rev. 649, 650.)* As this

court has recognized, there are proceedings in which nonattorneys "are competent" [**16] to represent others without undermining the protection of the public interest. ( *Consumers Lobby Against Monopolies v. Public Utilities Com. (1979) 25 Cal. 3d 891, 913-914 [160 Cal. Rptr. 124, 603 P.2d 41].)*

The majority, too, purports to apply the definition of the practice of law as articulated in *Baron, supra, 2 Cal. 3d 535.* The majority, however, focuses only on *Baron*'s quotation of the general definition of the practice of law set forth in *Merchants, supra, 189 Cal. 531, 535.* The majority ignores both the ambiguity in the *Merchants* definition and the manner in which *Baron* resolved that ambiguity. The majority apparently views the practice of law as encompassing *any* "legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation." (Maj. opn., *ante*, at p. 128.)

The majority's overbroad definition would affect a host of common commercial activities. On point here are comments that Professor Deborah Rhode made in a 1981 article published in the Stanford Law Review: "For many individuals, most obviously accountants, bankers, real estate brokers, and insurance agents, it would be impossible to give intelligent counsel without reference to legal concerns that such statutes reserve as the exclusive province of attorneys. As one [American Bar Association] official active in unauthorized practice areas recently acknowledged, there is growing recognition that ' "all kinds of other professional people are practicing law almost out of necessity." ' Moreover, since most legislation does not exempt gratuitous activity, much advice commonly imparted by friends, employers, political organizers, and newspaper commentators constitutes unauthorized practice. For example, although the organized bar has not yet evinced any inclination to drag [nationally syndicated advice columnist] Ann Landers through the courts, she is plainly fair game under extant statutes [proscribing the unauthorized practice of law]." (Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions, supra, 34 Stan.L.Rev. at p. 47,* fns. omitted.)

Unlike the majority, I would for the reasons given above adhere to the more narrowly drawn definition of the practice of law that this court articulated in *Baron, supra, 2 Cal. 3d 535, 543:* the representation of another in a judicial proceeding or an activity requiring the application of that degree [*145] of legal knowledge and technique possessed only by a trained legal mind. Applying that definition here, I conclude that the trial court should not have granted summary adjudication for plaintiffs based on the Birbrower lawyers' California activities. That some or all of those activities related to

arbitration does not necessarily establish that they constituted the practice of law, as I shall explain.

[***320]   III

As I mentioned earlier, Birbrower's clients had a software development and marketing agreement with Tandem. The agreement provided that its validity, interpretation, and enforcement were to be governed by California law. It also contained an arbitration provision. After a dispute arose pertaining to Tandem's performance under the agreement, Birbrower initiated an arbitration on behalf of its clients by filing a claim with the American Arbitration Association in San Francisco, and held meetings in California to prepare for an arbitration hearing. Because the dispute with Tandem was settled, the arbitration hearing was never held.

As I explained in part II, *ante*, this court in *Baron, supra, 2 Cal. 3d 535, 543,* defined the term "practice of law" in narrower terms than the court had done earlier in *Merchants, supra, 189 Cal. 531, 535,* which simply adopted verbatim the general definition set forth in a 1893 decision of the Indiana Court of Appeals. Under the narrower definition articulated in *Baron,* the practice of law is the representation of another in a judicial proceeding or an activity requiring the application of that degree of legal knowledge and technique possessed only by a trained legal mind.

[**17]   Representing another in an arbitration proceeding does not invariably present difficult or doubtful legal questions that require a trained legal mind for their resolution. Under California law, arbitrators are "not ordinarily constrained to decide according to the rule of law . . . ." ( *Moncharsh v. Heily & Blase (1992) 3 Cal. 4th 1, 11 [10 Cal. Rptr. 2d 183, 832 P.2d 899].)* Thus, arbitrators, " 'unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action.' [Citations.]" ( *Id. at pp. 10-11.)* They " 'are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].' [Citation.]" ( *Id. at p. 11,* original brackets.) For this reason, "the existence of an *error of law* apparent on the face of the [arbitration] award *that causes substantial injustice* does not provide grounds for judicial review." ( *Id. at p. 33,* italics added; contra, *id. at pp. 33-40* (conc. and dis. opn. of Kennard, J.).)  [*146]

Moreover, an arbitrator in California can award any remedy "arguably based" on "the contract's general subject matter, framework or intent." ( *Advanced Micro Devices, Inc. v. Intel Corp. (1994) 9 Cal. 4th 362, 381 [36 Cal. Rptr. 2d 581, 885 P.2d 994].)* This means that

"an arbitrator in a commercial contract dispute may award an essentially unlimited range of remedies, whether or not a court could award them if it decided the same dispute, so long as it can be said that the relief draws its 'essence' from the contract and not some other source." ( *Id. at p. 391* (dis. opn. of Kennard, J.).)

To summarize, under this court's decisions, arbitration proceedings are not governed or constrained by the rule of law; therefore, representation of another in an arbitration proceeding, including the activities necessary to prepare for the arbitration hearing, does not necessarily require a trained legal mind.

Commonly used arbitration rules further demonstrate that legal training is not essential to represent another in an arbitration proceeding. Here, for example, Birbrower's clients agreed to resolve any dispute arising under their contract with Tandem using the American Arbitration Association's rules, which allow any party to be "represented by counsel *or other authorized representative*." (Am. Arbitration Assn., Com. Arbitration Rules (July 1, 1996) § 22, italics added.) Rules of other arbitration organizations also allow for representation by nonattorneys. For instance, the Rules of Procedure of the Inter-American Commercial Arbitration Commission, article IV provides: "The parties may be represented or assisted by persons of their choice." By federal law, this rule applies in all arbitrations between a United States citizen and a citizen of another  [***321]  signatory to the Inter-American Convention on International Commercial Arbitration, unless the arbitrating parties have expressly provided otherwise. *(9 U.S.C. § 303*(b); Inter-Am. Convention on International Com. Arbitration, art. 3.)

The American Arbitration Association and other major arbitration associations thus recognize that nonattorneys are often better suited than attorneys to represent parties in arbitration. The history of arbitration also reflects this reality, for in its beginnings arbitration was a dispute-resolution mechanism principally used in a few specific trades (such as construction, textiles, ship chartering, and international sales of goods) to resolve disputes among businesses that turned on factual issues uniquely within the expertise of members of the trade. In fact, "rules of a few trade associations forbid representation by counsel in arbitration proceedings, because of their belief that it would complicate what might otherwise be simple proceedings." (Grenig, Alternative Dispute Resolution (1997) § 5.2, p. 81.) The majority gives no adequate justification for its decision to deprive parties of their  [*147]  freedom of contract and to make it a crime for anyone but California lawyers to represent others in arbitrations in California.

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

[**18]   In addressing an issue similar to that presented here, a federal court held that a firm of New Jersey lawyers not licensed to practice law in New York was entitled to recover payment for legal services rendered in a New York arbitration proceeding. ( *Williamson v. John D. Quinn Const. Corp. (S.D.N.Y. 1982) 537 F. Supp. 613* (*Williamson*).) In allowing recovery of fees, the court cited a report by the Association of the Bar of The City of New York: "The report states, 'it should be noted that no support has to date been found in judicial decision, statute or ethical code for the proposition that representation of a party in any kind of arbitration amounts to the practice of law.' The report concludes '[t]he Committee is of the opinion that representation of a party in an arbitration proceeding by a nonlawyer or a lawyer from another jurisdiction is not the unauthorized practice of law.' " ( *Id. at p. 616,* quoting Com. Rep., Labor Arbitration and the Unauthorized Practice of Law (May/June 1975) 30 Record of the Association of the Bar of The City of New York, No. 5/6, at pp. 422, 428.)

The majority's attempt to distinguish *Williamson, supra, 537 F. Supp. 613,* from this case is unpersuasive. The majority points out that in *Williamson,* the lawyers of the New Jersey firm actually rendered services at the New York arbitration hearing, whereas here the New York lawyers never actually appeared at an arbitration hearing in California. (Maj. opn., *ante,* at pp. 133, 134, fn. 4.) The majority distinguishes *Williamson* on the ground that in this case no arbitration hearing occurred. Does the majority mean that an actual appearance at an arbitration hearing is not the practice of law, but that preparation for arbitration proceedings is?

In this case, plaintiffs have not identified any specific California activities by the New York lawyers of the Birbrower firm that meet the narrow definition of the term "practice of law" as articulated by this court in *Baron, supra, 2 Cal. 3d 535, 543.* Accordingly, I would reverse the judgment of the Court of Appeal and direct it to remand the matter to the trial court with directions to vacate its order granting plaintiff's motion for summary adjudication and to enter a new order denying that motion.

On February 25, 1998, the opinion was modified to read as printed above.

# *Exhibit H*

# THE CORBETT LAW FIRM
*A Professional Corporation*

July 29, 2004

**BY FACSIMILE & FIRST CLASS MAIL**

Marc J. Ross, Esquire
SICHENZIA ROSS FRIEDMAN FERENCE LLP
1065 Avenue of the Americas
New York, New York 10018

**RE:** ***Kashner Davidson Securities Corp. v. Mscisz***
**NASD-R Case No. 04-03793**

Dear Mr. Ross:

Be advised that I have been engaged to represent Mark, Steven and Lynda Mscisz in connection with the referenced arbitration.  As I must conduct a preliminary investigation of the facts before preparing their response to the Statement of Claim, it will be impracticable for me to serve that response before tomorrow's deadline.  I therefore request that you agree, pursuant to Rule 10314(b)(5) of the NASD's Code of Arbitration Procedure, to extend that deadline (as well as the deadlines for filing the Uniform Submission Agreement and List of Issues) until August 27, 2004.

Please contact me immediately to let me know whether you will agree to such an extension.

Thank you for your anticipated courtesy.

Very truly yours,

William P. Corbett, Jr.

WPC/13-004-001
cc:     Lynda, Mark & Steven Mscisz

85 Exchange Street, Suite 326 ▪ Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300 ▪ Facsimile: (781) 596-9302
www.BostonBarristers.com

# *Exhibit I*

# THE CORBETT LAW FIRM
*A Professional Corporation*

August 4, 2004

**BY FIRST CLASS MAIL**

Director of Arbitration
NASD DISPUTE RESOLUTION
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1400

**RE:    *Kashner Davidson Securities Corp. v. Mscisz***
**NASD-R Case No. 04-03793**

Dear Sir or Madam:

I write pursuant to Rule 10314(b)(5) of the NASD's Code of Arbitration Procedure.

This firm was recently engaged to represent Mark, Steven and Lynda Mscisz in connection with the referenced arbitration. As you must surely appreciate, it is in the interest of all parties, and ultimately the panel of arbitrators, to ensure that the issues are cogently framed. To that end, coming into this proceeding with no knowledge of the underlying facts and circumstances, it was imperative that I conduct a preliminary investigation before preparing my clients' response to the Statement of Claim. It therefore was not practicable for me to serve the requisite response before the July 30, 2004 deadline.

Accordingly, by facsimile transmission dated July 29, 2004, I contacted Marc J. Ross, Esquire, the claimant's attorney, asking for his agreement to extend the deadline for answering the Statement of Claim (as well as the deadlines for filing the Uniform Submission Agreement and List of Issues) until August 27, 2004. I fully expected that Mr. Ross – like most attorneys engaged in active litigation practice – would have extended me this courtesy as a matter of course. However, more than four days later, after the close of business on Monday, August 2, 2004, Mr. Ross left me a voice mail message indicating that he would not assent to my request. I followed up with Mr. Ross yesterday, explaining that it was in the interest of all parties to ensure that the pleadings are as focused as possible, yet he still demurred. It therefore became necessary for me to request such an extension from your office, so that my clients' defenses and potential counterclaims are preserved while doing my best to ensure that the arbitration is conducted in the most efficient manner possible.

NASD DISPUTE RESOLUTION
August 4, 2004
Page 2 of 2


Thank you for your attention to this issue.  Please advise me at your earliest convenience whether you will grant the modest extension I seek.

Very truly yours,

William P. Corbett, Jr.

WPC/13-004-001
cc:    Zoë B. Marcus, Legal Assistant (by facsimile & first class mail)
       Lynda, Mark & Steven Mscisz (by first class mail)
       Marc J. Ross, Esquire (by facsimile & first class mail)

# *Exhibit J*

# SICHENZIA ROSS FRIEDMAN FERENCE LLP

1065 AVENUE OF THE AMERICAS  NEW YORK NY 10018

TEL  212 930 9700   FAX  212 930 9725   EMAIL: INFO@SRFLLP.NET

August 5, 2004

Via Federal Express
Mr. George Friedman
Director of Arbitration
NASD Regulation, Inc.
125 Broad Street, 36th Floor
New York, NY 10004-2193

      Re:    Kashner Davidson Securities Corp. v.
               Steven Mscisz, Mark Mscisz, and Lynda Mscisz
               NASD No. 04-03793

Dear Mr. Friedman:

This firm represents Claimant Kashner Davidson Securities Corp. ("KDSC") in the above-referenced matter.  I write in reference to the letter from Respondents' Counsel, William P. Corbett Jr., Esq., dated August 4, 2004 requesting an extension of time to submit Respondents' Answer in this matter.

Claimant strongly objects to the granting of an extension of time for Respondents to submit their Answer.  Rule 10314(b)(5) provides that "[e]xtensions of the time period to file an Answer **are disfavored and will not be granted by the Director except in extraordinary circumstances.**"  This is not such a case.  This is a simple collection case in which Claimant seeks to collect a margin debit from Respondents.

Accordingly, KDSC respectfully requests that you deny Respondents' application, immediately assign a Staff Attorney to this matter, and circulate Arbitrator Ranking Forms for the parties consideration.  Once a Panel is empanelled, KDSC will move the Panel to preclude Respondents from submitting their Answer or raise any affirmative defenses based on their default under the NASD Code.

Your prompt attention to this matter is greatly appreciated.

Respectfully submitted,

Richard J. Babnick Jr.

cc:    William P. Corbett Jr., Esq.
        Kashner Davidson Securities Corp.

*Exhibit K*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____

In the Matter of the Arbitration Between:

KASHNER DAVIDSON SECURITIES CORP.,

    *Claimant/Respondent in Counterclaim,*

        v.

STEVEN MSCISZ, MARK MSCISZ, and
LYNDA MSCISZ,

    *Respondents/Counter- and Third Party Claimants.*

        v.

VICTOR KASHNER, MATTHEW MEISTER and
TIMOTHY VARCHETTO,

    *Third Party Respondents.*
_____

NASD DISPUTE RESOLUTION
CASE NO. 04-03793

**MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ
FOR SIMULTANEOUS NOTICE OF ARBITRATOR ACTIONS**

      Respondents/Counter- and Third Party Claimants Steven Mscisz, Mark Mscisz and Lynda Mscisz (collectively "Customers") respectfully request that the Panel or its Chairman direct the administrative staff of NASD Dispute Resolution, Inc. ("Staff") to ensure that the parties simultaneously receive notice of orders, decisions or other actions by the Panel or its Chairman – such as by sending such notice to the parties by electronic mail or facsimile transmission, in addition to first class mail.  In support of this motion, the Customers state the following:

1.     Because the offices of the Claimant's counsel are located in the same city as the Staff's offices, while the Customers and their counsel are located in another state, more than 225 miles away, the Staff's practice of sending notices by first class mail ensures that the Claimant's counsel receives them at least a day before the Customers' attorney receives them.

2.     In some instances, that discrepancy is inconsequential, but when notices are time-sensitive – such as by setting a time for compliance with discovery orders – that method of delivery affords the Claimant an unfair advantage.

3.     The Claimant's counsel cannot be trusted to bridge the gap and ensure that their adversaries receive equivalent notice, even when asked direct questions on the issue by the Customers' attorney.

4.     For example, on February 18, 2005, the Staff notified the parties by first class mail that the Customers' recent motion to continue the hearing had been granted. Had the notice been transmitted to the parties by facsimile or e-mail, both parties would have received it on that day.

5.     The Customers' counsel did not receive that notice before he left for vacation on February 19, 2005, and his office was not open to receive the notice during the following week.

6.     By letter dated February 21, 2005 (Exhibit A), the Customers' attorney advised one of the Claimant's lawyers that his office was closed and informed that lawyer that he had not yet received notice of the Panel's decision concerning the continuance. The Customers' attorney specifically asked the Claimant's counsel if he had received such notice and, if so, to leave a message saying what the decision was.

7.      Although the Claimant's counsel presumably received the Staff's notice on February 19 or 22, he never responded to the direct inquiry of the Customers' attorney. That knowing silence – clearly intended to ensure that the Customers' attorney spent his vacation preparing for a March 2 hearing – was needlessly discourteous, if not outright dishonest.  (At the very least, that gamesmanship by the Claimant's counsel provides yet another reason why the Customers' motion to disqualify should be reconsidered and allowed.)

8.      In an e-mail (Exhibit B) he sent two days after his inquiry to the Claimant's counsel, the Customers' attorney asked the Staff member administering this case for information concerning the status of the pending motions.

9.      Another day passed without any response from the Claimant's counsel or the Staff, so the Customers' attorney followed up in another e-mail (Exhibit C) asking what the status of the hearing was.  It was not until two days later – when the Customers' attorney was in transit back to Massachusetts – that the Staff member responded. (Exhibit D)

10.     Because of the deceptive silence by the Claimant's counsel and the Staff's delay in responding to his inquiries, the Customers' attorney did not receive notice of the continuance until February 25 – a week after it was sent to the parties.

11.     To ensure that the Claimant's attorney cannot engage in similar gamesmanship going forward, and to ensure that the parties have equivalent abilities to act upon notices issued by or on behalf of the Panel, it is necessary for the Staff to deviate from its usual practice and ensure simultaneous receipt of such notices.  It is not enough for the Staff to deposit such notices in the mail simultaneously.

WHEREFORE, the Customers respectfully request that the Panel or its Chairman grant the foregoing motion.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
 *A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  March 1, 2005

# THE CORBETT LAW FIRM
*A Professional Corporation*

February 21, 2005

**BY OVERNIGHT COURIER**

Richard J. Babnick, Jr., Esquire
SICHENZIA ROSS FRIEDMAN FERENCE LLP
1065 Avenue of the Americas
New York, New York 10018

> **RE:**  ***Kashner Davidson Securities Corp. v. Mscisz***
> **NASD Dispute Resolution Case No. 04-03793**

Dear Mr. Babnick:

Enclosed please find the documents (Bates Nos. M&LM 00001 through 00088) I am producing on behalf of Mark and Lynda Mscisz and the documents (Bates Nos. SM 00001 through 00232) I am producing on behalf of Steven Mscisz.

These documents should have been sent by mail on February 17, 2005, but the envelope was inadvertently placed in a crate of materials I packed for this week, instead of the outgoing mail. I discovered the envelope in that crate this morning, and I am immediately sending it to you by overnight mail. Though the documents are being sent to you several days late, you should have the documents in your possession at the same time (if not earlier than) you would have received the envelope I intended to mail on Thursday, so you are not being prejudiced by this unintended delay.

Be advised that I my office is closed this week, so I will be unable to receive facsimile transmissions, FedEx packages and the like you might send there. Accordingly, if you wish to send me a document you might otherwise fax or FedEx, please scan it into a PDF file and e-mail the document to me. If that is impracticable, leave me a voice mail message, and I can make arrangements to receive a fax or overnight delivery.

Finally, I have not yet heard from the NASD concerning my clients' outstanding motions. If you have received rulings on those motions, please leave me a voice mail message or send me an e-mail advising me of them.

Very truly yours,

William P. Corbett, Jr.

Enclosures
WPC/13-004-001

**Bill Corbett**

---

**From:**    Bill Corbett [WPC@BostonBarristers.com]
**Sent:**    Wednesday, February 23, 2005 3:51 PM
**To:**    'avi.rosenfeld@nasd.com'
**Cc:**    'rbabnick@srff.com'
**Subject:**    Kashner Davidson Securities v. Mscisz / Case No. 04-03793

Mr. Rosenfeld,

Attached is a PDF copy of a letter I am mailing you today in response to Richard Babnick's unfortunate letter of yesterday.  It is imperative that this letter be forwarded to the Panel immediately.

Additionally, I have not received rulings on the two motions I filed on February 7, 2005.  Have they been ruled upon? If so, please send me PDF copies of the orders (I am out of my office this week and cannot receive faxes).  If you have not yet received rulings from the Chairman, would you please contact him to see if they might have been lost in the mail?  One of the orders involves a request for postponement of a hearing scheduled to begin next Wednesday, and it is important that I know as soon as possible whether we will be going forward, since my clients will need to make arrangements for child care and time off from work if the hearing is to proceed.

Thank you for your attention to this matter.

Regards,

Bill Corbett

William P. Corbett, Jr.
**THE CORBETT LAW FIRM**
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300
Facsimile: (781) 596-9302
E-Mail: WPC@BostonBarristers.com
www.BostonBarristers.com

3/1/2005

**Bill Corbett**

| | |
|---|---|
| **From:** | Bill Corbett [WPC@BostonBarristers.com] |
| **Sent:** | Thursday, February 24, 2005 5:07 PM |
| **To:** | 'avi.rosenfeld@nasd.com' |
| **Cc:** | 'rbabnick@srff.com'; 'MROSS@srff.com' |
| **Subject:** | Kashner Davidson Securities v. Mscisz / Case No. 04-03793 |

Mr. Rosenfeld,

Attached are PDF copies of four documents I am sending to the Director of Arbitration by overnight mail.  Please forward the documents to the Panel immediately, as there is a hearing scheduled for next week.  I continue to await a ruling on my motion to postpone the hearing.

Thank you for your attention to this matter.

Regards,

Bill Corbett


William P. Corbett, Jr.
**THE CORBETT LAW FIRM**
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300
Facsimile: (781) 596-9302
E-Mail: WPC@BostonBarristers.com
www.BostonBarristers.com

**Bill Corbett**

**From:**     Rosenfeld, Avi [Avi.Rosenfeld@nasd.com]
**Sent:**     Friday, February 25, 2005 9:16 AM
**To:**       WPC@BostonBarristers.com
**Subject:**  RE: Kashner Davidson Securities v. Mscisz / Case No. 04-03793


Mr. Corbett,

The Motion to Adjourn is granted. There's a telephonic scheduling conference scheduled on March 2, 2005 at 10:00 a.m.

Avi Rosenfeld
212-858-4312

-----Original Message-----
**From:** Bill Corbett [mailto:WPC@BostonBarristers.com]
**Sent:** Thursday, February 24, 2005 5:07 PM
**To:** Rosenfeld, Avi
**Cc:** rbabnick@srff.com; MROSS@srff.com
**Subject:** Kashner Davidson Securities v. Mscisz / Case No. 04-03793

Mr. Rosenfeld,

Attached are PDF copies of four documents I am sending to the Director of Arbitration by overnight mail. Please forward the documents to the Panel immediately, as there is a hearing scheduled for next week.  I continue to await a ruling on my motion to postpone the hearing.

Thank you for your attention to this matter.

Regards,

Bill Corbett


William P. Corbett, Jr.
**THE CORBETT LAW FIRM**
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300
Facsimile: (781) 596-9302
E-Mail: WPC@BostonBarristers.com
www.BostonBarristers.com


This e-
mail, including attachments, may include confidential and/or proprietary informati

mail is not the intended recipient or his or her authorized agent, the reader is here
mail is prohibited. If you have received this e-mail in error, please notify the sende

# *Exhibit L*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____

In the Matter of the Arbitration Between:    )
    )
KASHNER DAVIDSON SECURITIES CORP.,    )
    )
    *Claimant/Respondent in Counterclaim,*    )
    )
        v.    )
    )
STEVEN MSCISZ, MARK MSCISZ, and    )
LYNDA MSCISZ,    )    NASD DISPUTE RESOLUTION No. 04-03793
    )
    *Respondents/Counter- and Third Party Claimants.*    )
    )
        v.    )
    )
VICTOR KASHNER, MATTHEW MEISTER and    )
TIMOTHY VARCHETTO,    )
    )
    *Third Party Respondents.*    )
_____)

### OPPOSITION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ TO THE BROKERS' LETTER SEEKING ONE-SIDED DISCOVERY AND SANCTIONS

Respondents/Counter- and Third Party Claimants Steven Mscisz ("Steven"), Mark

Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") hereby oppose the

request, embodied by the December 15, 2004 letter from Richard J. Babnick, Jr. to Zoë Marcus

("Letter"), of Claimant/Respondent-in-Counterclaim Kashner Davidson Securities Corporation

("Broker-Dealer" or "KDSC") and Third Party Respondents Victor Kashner ("Kashner"),

Timothy Varchetto ("Varchetto"), and Matthew Meister ("Meister") (collectively "Brokers") for

an order which essentially compels the Customers to make discovery unilaterally and sanctions

them for their legitimate and necessary resistance to the abuses of the Brokers and their lawyers.

### BACKGROUND

The Customers incorporate into this memorandum by reference the "Background" section of their December 15, 2004 motion to compel discovery.

### ARGUMENT

Not only was the Brokers' substantive conduct in connection with the Customers' accounts reprehensible, so too has been their approach and that of their attorneys[1] to this arbitration proceeding. Bombastically hurling about inflammatory terms like "trumped up", "frivolous" and "bad faith" to describe the serious, well-founded counterclaims and third-party claims the Customers have asserted against them,[2] the Brokers have consistently sought to miscast this proceeding as a simple "case to collect upon a margin debit." Letter at 1. Seeking to preempt the claims they surely anticipated from the customers, KDSC falsely accused two of them of fraud – basing its claim on a document on which it could not have plausibly relied to its detriment,[3] given that there was not a single penny of margin credit extended after the putative

---

[1] As set forth in the Customers' motion to disqualify counsel or stay the arbitration, it is likely that those attorneys are not even lawful participants in this proceeding.

[2] The Brokers decry the lack of detail in the Customers' Statement of Claim. The Brokers should remember that it is they who chose to avoid the courts with their insertion of a boilerplate arbitration clause into their contracts with the Customers. Were this matter pending in U.S. District Court, for example, many of the Customers' claims would have to be stated with particularity (*see* Fed. R. Civ. P. 9(b)) and comply with the Private Securities Litigation Reform Act of 1995, 15 U.S.C. §§ 77a, *et seq.* In contrast, the Code of Arbitration Procedure ("Code") of the National Association of Securities Dealers ("NASD" or "Association") required the Customers only to specify the "relevant facts and remedies sought" – which they did. Code § 10314. Furthermore, had the Brokers accepted the Customers' repeated invitations to participate in the dialogue mandated by Rule 10321 of the Code, the parties might have agreed to reciprocal contention interrogatories or depositions that would have allayed any such concerns. However, seeking to preserve their ability to engage in "trial by ambush," the Brokers left themselves in a position where they might not have as much information as they prefer concerning the Customers' claims and defenses. That deficiency is of the Brokers' own making.

[3] This is not an enforcement proceeding, where reliance need not be proved. Regardless of which state's laws are ultimately applied, KDSC's common law fraud claim against Mark and Lynda requires proof of reliance and causation. Despite its inflammatory rhetoric, KDSC has not advanced a plausible theory supporting either element.

execution of the document.  The Brokers intensified their effort to paint the Customers in an unflattering light after they asserted their claims against KDSC and its confederates by interposing extraneous allegations of complicity in alleged violations of the securities laws by a stranger to this proceeding; if anyone was complicit in those alleged violations, it was the Brokers – given that KDSC underwrote the initial public offering at issue, and the alleged violations could not have occurred if the Broker-Dealer and its transactional attorneys had properly undertaken "due diligence" with respect to the IPO.  In simple terms, the Brokers have pursued a strategy that can be summed up as "the best defense is a good offense."

## I.    THE BROKERS DO NOT SUBMIT THEIR LETTER IN GOOD FAITH.

Unfortunately, the Brokers' conduct with respect to discovery – culminating in the instant Letter – has been consistent with their hyper-aggressive approach to the substantive issues in the case.  Significantly, before objecting to the Customers' discovery requests or seeking to initiate motion practice, the Brokers and their counsel never undertook in good faith – or even make a *pro forma* effort – to resolve discovery disputes, in violation of Rule 10321(b)(1) of the Code. The Customers have repeatedly invited the Brokers and their counsel to engage in discussions in the spirit of Rule 10321(a), with an eye toward cooperating "to the fullest extent practicable in the exchange of documents and information to expedite the arbitration."  *See* Objections of Steven Mscisz, Mark Mscisz & Lynda Mscisz to "Claimant and Third-Party Respondents' First Request for the Production of Documents and Information" at 3 (copy appended to Letter as Exhibit B); Letter dated November 18, 2004 from William P. Corbett Jr., to Marc J. Ross (copy appended hereto as Exhibit A).  Yet they have "picked a fight" with the Customers instead of attempting to work with them and their counsel to ensure a fair exchange of relevant information.

The Brokers' *chutzpah* is both palpable and unmitigated. For instance, KDSC repeatedly refused to produce broad categories of materials which the Association's Discovery Guide deems "presumptively discoverable" or which its Business Conduct Rules require it to make available to any customer on request. Yet the Brokers excoriate the Customers for their limited objection to the production of certain materials included on the Document Lists. Letter at 4.

Similarly audacious is the Brokers' contention that they have "propounded reasonable discovery requests that challenged the shopping list of legal claims asserted by the Respondents and their Counsel." Letter at 2. However, the Customers' own motion to compel discovery reveals how KDSC persistently refused to produce materials responsive to the Customers' requests for information concerning those selfsame claims.

What the Brokers decry as "cookie cutter" objections made in "bad faith" are merely repeated iterations of the same principles: the Customers will not produce categories of documents KDSC has refused to produce; nor will they produce documents concerning their counterclaims and third-party claims so long as KDSC refuses to produce such documents based upon its rote characterization of the Customers' requests as "not relevant to the factual allegations and viable legal claims framed in the pleadings" and "merely designed to harass [KDSC] in its attempts to collect a debt justly due and owing." Much of the information the Brokers seek might properly be the subject of discovery requests, but the production of such materials cannot justly be compelled when KDSC refuses to produce similar information. Discovery is a "two-way street" – especially under the rules governing this arbitration.

The fact of the matter is that the Code contemplates a meaningful exchange of information – not a one-sided process whereby a party can evade its discovery obligations with an *ipse dixit* casting baseless aspersions on its opponents' claims and defenses. The Customers

remain – as they have from the outset – willing to engage in a genuine dialogue concerning discovery with the Brokers and whichever attorneys might lawfully represent them in this proceeding.  The Association's policy is the Customers' desire – that "[t]he parties shall cooperate to the fullest extent practicable in the voluntary exchange of documents and information to expedite the arbitration."  Code § 10321(a).  Motion practice should not be necessary to commence such a dialogue.

## II.    THERE IS NO BASIS FOR SANCTIONING THE CUSTOMERS OR THEIR ATTORNEY.

As described more fully above, the Customers have not engaged in conduct that warrants any sanction.  Their approach to discovery has been necessitated by the Brokers' contumacious disregard for their own obligations under the Code.  The Customers would have preferred a voluntary exchange of all relevant information months ago, but the stonewalling of KDSC and its confederates necessitated defensive reciprocity, so that the Customers would not be unfairly disadvantaged in their preparation for the March 2005 hearing in this matter.

If any faction has engaged in "baseless and fad faith discovery conduct" that might warrant sanctions, it is the Brokers.  Would that such sanctions were possible.  However, the parties have not agreed that sanctions should be available in circumstances like these, and the Code does not expressly provide for them – other than by empowering arbitrators to dismiss a claim, defense or proceeding "as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s).  Code § 10305(b).  Even that relief is available only "if lesser sanctions have proven ineffective."  *Id.*  Here, there has been no failure – let along a "willful and intentional material failure" – to comply with any order of the Panel, because no discovery orders have been issued.  Accordingly, discovery sanctions are not available at this juncture.  *Superadio LP v. Walt "Baby" Love Productions, Inc.,* 62 Mass. App. Ct. 546 (2004).

*CONCLUSION*

For the foregoing reasons, the Customers request that the Panel or its designee deny the Brokers' motion, order the Brokers and their lawyers to enter into the long-overdue dialogue with the Customers concerning the appropriate scope of discovery, and mandate that the Brokers and their attorneys make a good faith effort to effectuate the purposes of Rule 10321(a) while participating in that dialogue.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  January 7, 2005

- 6 -

# *Exhibit M*

# THE CORBETT LAW FIRM
*A Professional Corporation*

February 1, 2005

**BY FACSIMILE & FIRST CLASS MAIL**

Avi Y. Rosenfeld, Staff Attorney
NASD DISPUTE RESOLUTION
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1400

> **RE:** ***Kashner Davidson Securities Corporation v. Mscisz***
> **NASD Dispute Resolution Case No. 04-03793**

Dear Mr. Rosenfeld:

I write to correct a significant misrepresentation that was made during yesterday's pre-hearing conference call.

During that call, the panel's chairman asked whether third-party respondent Victor L. Kashner is an officer or director of his namesake, Kashner Davidson Securities Corporation ("KDSC"). Counsel unequivocally responded "no" to that direct question.

I subsequently reviewed KDSC's corporate filings with the Florida Department of State, and those records indicate that Mr. Kashner has at all relevant times been Chairman of the Board of KDSC, and (as reflected by the firm's report for 2005, which was filed only last Thursday) he continues to serve in that capacity. Copies of KDSC's three most recent annual reports are enclosed.

Please forward this information to the arbitrators as soon as possible, as it might affect the outcome of motions under consideration.

Very truly yours,

William P. Corbett, Jr.

Enclosures
WPC/13-004-001
cc:     Lynda, Mark & Steven Mscisz (by e-mail)
        Marc J. Ross, Esquire (by first class mail)

# 2005 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Jan 27, 2005**
**Secretary of State**

DOCUMENT# 544101

**Entity Name:** KASHNER DAVIDSON SECURITIES CORPORATION

**Current Principal Place of Business:**

77 S. PALM AVE.
SARASOTA, FL 34236

**New Principal Place of Business:**

**Current Mailing Address:**

77 S. PALM AVE.
SARASOTA, FL 34236

**New Mailing Address:**

FEI Number: 59-1773381     FEI Number Applied For ( )     FEI Number Not Applicable ( )     Certificate of Status Desired ( )

**Name and Address of Current Registered Agent:**

FERGESON, SKIPPER, SHAW, KEYSER, ET AL
1515 RINGLING BLVD
SUITE 1000
SARASOTA, FL 34236  US

**Name and Address of New Registered Agent:**

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____
                          Electronic Signature of Registered Agent                                    Date

**Election Campaign Financing Trust Fund Contribution ( ).**

## OFFICERS AND DIRECTORS:

| | | |
|---|---|---|
| Title: | COB | ( ) Delete |
| Name: | KASHNER, VICTOR L., | |
| Address: | 77 S. PALM AVE. | |
| City-St-Zip: | SARASOTA, FL 34236 | |

| | | |
|---|---|---|
| Title: | PCEO | ( ) Delete |
| Name: | MEISTER, MATTHEW | |
| Address: | 77 S. PALM AVE | |
| City-St-Zip: | SARASOTA, FL 34236 | |

| | | |
|---|---|---|
| Title: | CFO | ( ) Delete |
| Name: | ROTHENBACH, MELISSA | |
| Address: | 77 S. PALN AVE | |
| City-St-Zip: | SARASOTA, FL 34236 | |

## ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:

| | | |
|---|---|---|
| Title: | | ( ) Change ( ) Addition |
| Name: | | |
| Address: | | |
| City-St-Zip: | | |

| | | |
|---|---|---|
| Title: | PCEO | (X) Change ( ) Addition |
| Name: | ROTHENBACH, MELISSA J | |
| Address: | 77 SOUTH PALM AVENUE | |
| City-St-Zip: | SARASOTA, FL 34236 | |

| | | |
|---|---|---|
| Title: | CFO | (X) Change ( ) Addition |
| Name: | ROTHENBACH, MELISSA | |
| Address: | 77 SOUTH PALM AVENUE | |
| City-St-Zip: | SARASOTA, FL 34236 | |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  MELISSA J ROTHENBACH                          PCEO                 01/27/2005
                     Electronic Signature of Signing Officer or Director                                    Date

# 2004 FOR PROFIT CORPORATION ANNUAL REPORT

**FILED**
**Feb 03, 2004**
**Secretary of State**

DOCUMENT# 544101

**Entity Name:** KASHNER DAVIDSON SECURITIES CORPORATION

| **Current Principal Place of Business:** | **New Principal Place of Business:** |
|---|---|

77 S. PALM AVE.
SARASOTA, FL 34236

| **Current Mailing Address:** | **New Mailing Address:** |
|---|---|

77 S. PALM AVE.
SARASOTA, FL 34236

**FEI Number:** 59-1773381    **FEI Number Applied For ( )**    **FEI Number Not Applicable ( )**    **Certificate of Status Desired ( )**

| **Name and Address of Current Registered Agent:** | **Name and Address of New Registered Agent:** |
|---|---|

FERGESON, SKIPPER, SHAW, KEYSER, ET AL
1515 RINGLING BLVD
SUITE 1000
SARASOTA, FL 34236

The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida.

SIGNATURE: _____

Electronic Signature of Registered Agent                                                        Date

**Election Campaign Financing Trust Fund Contribution ( ).**

## OFFICERS AND DIRECTORS:

### ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS:

| | | | |
|---|---|---|---|
| Title: | COB        ( ) Delete | Title: | ( ) Change  ( ) Addition |
| Name: | KASHNER, VICTOR L., | Name: | |
| Address: | 77 S. PALM AVE. | Address: | |
| City-St-Zip: | SARASOTA, FL  34236 | City-St-Zip: | |
| | | | |
| Title: | PCEO        ( ) Delete | Title: | ( ) Change  ( ) Addition |
| Name: | MEISTER, MATTHEW | Name: | |
| Address: | 77 S. PALM AVE | Address: | |
| City-St-Zip: | SARASOTA, FL  34236 | City-St-Zip: | |
| | | | |
| Title: | CFO        ( ) Delete | Title: | ( ) Change  ( ) Addition |
| Name: | ROTHENBACH, MELISSA | Name: | |
| Address: | 77 S. PALN AVE | Address: | |
| City-St-Zip: | SARASOTA, FL  34236 | City-St-Zip: | |

I hereby certify that the information supplied with this filing does not qualify for the for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my electronic signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears above, or on an attachment with an address, with all other like empowered.

SIGNATURE:  MATTHEW MEISTER                                    PCEO                    02/03/2004

Electronic Signature of Signing Officer or Director                                        Date

# 2003 FOR PROFIT CORPORATION
# UNIFORM BUSINESS REPORT (UBR)

**FILED**
**Apr 18, 2003 8:00 am**
**Secretary of State**
04-18-2003 90203 026 ***150.00

DOCUMENT #    **544101**

1. Entity Name
**KASHNER DAVIDSON SECURITIES CORPORATION**

| Principal Place of Business | Mailing Address |
|---|---|
| 77 S. PALM AVE.<br>SARASOTA FL 34236 | 77 S. PALM AVE.<br>SARASOTA FL 34236 |

2. Principal Place of Business

3. Mailing Address

Suite, Apt. #, etc.

Suite, Apt. #, etc.

City & State

City & State

Zip    Country

Zip    Country

☐ CHECK HERE IF MAKING CHANGES

4. FEI Number **59-1773381**    Applied For / Not Applicable

5. Certificate of Status Desired ☐    **$8.75** Additional Fee Required

6. Name and Address of Current Registered Agent

**FERGESON, SKIPPER, SHAW, KEYSER, ET AL**
**1515 RINGLING BLVD**
**SUITE 1000**
**SARASOTA FL 34236**

7. Name and Address of New Registered Agent

Name

Street Address (P.O. Box Number is Not Acceptable)

City    **FL**    Zip Code

8. The above named entity submits this statement for the purpose of changing its registered office or registered agent, or both, in the State of Florida. I am familiar with, and accept the obligations of registered agent.

SIGNATURE _____
Signature, typed or printed name of registered agent and title if applicable.    (NOTE: Registered Agent signature required when reinstating)    DATE

**FILE NOW!!! FEE IS $150.00**
After May 1, 2003 Fee will be $550.00
Make Check Payable to Florida Department of State

9. Election Campaign Financing Trust Fund Contribution. ☐    **$5.00** May Be Added to Fees

| 10. OFFICERS AND DIRECTORS | | 11. ADDITIONS/CHANGES TO OFFICERS AND DIRECTORS IN 11 | |
|---|---|---|---|
| TITLE **COB**<br>NAME **KASHNER, VICTOR L.**<br>STREET ADDRESS **77 S. PALM AVE.**<br>CITY-ST-ZIP **SARASOTA FL 34236** | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Change ☐ Addition |
| TITLE **PCEO**<br>NAME **MEISTER, MATTHEW**<br>STREET ADDRESS **77 S. PALM AVE**<br>CITY-ST-ZIP **SARASOTA FL 34236** | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Change ☐ Addition |
| TITLE **CFO**<br>NAME **ROTHENBACH, MELISSA**<br>STREET ADDRESS **77 S. PALN AVE**<br>CITY-ST-ZIP **SARASOTA FL 34236** | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Change ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Change ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Change ☐ Addition |
| TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Delete | TITLE<br>NAME<br>STREET ADDRESS<br>CITY-ST-ZIP | ☐ Change ☐ Addition |

CR2E034 (10/02)

12. I hereby certify that the information supplied with this filing does not qualify for the exemption stated in Section 119.07(3)(i), Florida Statutes. I further certify that the information indicated on this report or supplemental report is true and accurate and that my signature shall have the same legal effect as if made under oath; that I am an officer or director of the corporation or the receiver or trustee empowered to execute this report as required by Chapter 607, Florida Statutes; and that my name appears in Block 10 or Block 11 if changed, or on an attachment with an address, with all other like empowered.

SIGNATURE: *SIGNATURE REQUIRED*    4-16-03    941-951-2626
SIGNATURE AND TYPED OR PRINTED NAME OF SIGNING OFFICER OR DIRECTOR    Date    Daytime Phone #

# *Exhibit N*

# THE CORBETT LAW FIRM
*A Professional Corporation*

February 9, 2005

By Facsimile & First Class Mail

Avi Y. Rosenfeld, Staff Attorney
NASD Dispute Resolution
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1400

> RE:  ***Kashner Davidson Securities Corporation v. Msciz***
> **NASD Dispute Resolution Case No. 04-03793**

Dear Mr. Rosenfeld:

Yet again, I am compelled to correct misstatements by the Claimant's counsel.

Specifically, Attorney Babnick's letter of this afternoon purporting to address my clients' motion to postpone the upcoming hearing manufactured a non-existent provision of Rule 10319(b) of the Association's Code of Arbitration Procedure as grounds for summary denial of that motion. Counsel declared in footnote 1 that the rule requires that a party requesting an adjournment "***shall deposit with the request for an adjournment, a fee*** equal to the initial deposition of hearing session fees. . ." (***emphasis*** in original). However, there is no such requirement. Below is a reproduction of the published rule:

**10319. Adjournments**

(a) The arbitrator(s) may, in their discretion, adjourn any hearing(s) either upon their own initiative or upon the request of any party to the arbitration.

(b) If an adjournment requested by a party is granted after arbitrators have been appointed, the party requesting the adjournment shall pay a fee equal to the initial deposit of hearing session fees for the first adjournment and twice the initial deposit of hearing session fees, not to exceed $1,500, for a second or subsequent adjournment requested by that party. The arbitrators may waive these fees in their discretion. If more than one party requests the adjournment, the arbitrators shall allocate the fees among the requesting parties.

(c) Upon receiving a third request consented to by all parties for an adjournment, the arbitrator(s) may dismiss the arbitration without prejudice to the Claimant filing a new arbitration.

(d) If an adjournment request is made by one or more parties and granted within three business days before a scheduled hearing session, the party or parties making the request shall pay an additional fee of $100 per arbitrator. If more than one party requests the adjournment, the arbitrators shall allocate the $100 per arbitrator fee among the requesting parties. The arbitrators may allocate all or portion of the $100 per arbitrator fee to the non-requesting party or parties, if the arbitrators determine that the non-requesting party or parties caused or contributed to the need for the adjournment. In the event that a request results in the adjournment of consecutively scheduled hearing sessions, the additional fee will be assessed only for the first of the consecutively scheduled hearing sessions. In the event that an extraordinary circumstance prevents a party or parties from making a timely adjournment request, arbitrators may use their discretion to waive the fee, provided verification of such circumstance is received.

*[Amended eff. July 1, 1986; June 1, 1990; Dec. 30, 1991; amended by SR-NASD-2001-21 eff. Nov. 19, 2001; amended by SR-NASD-2003-164 eff. Aug. 16, 2004.]*

*Selected Notice to Members: 01-70, 04-53.*

Any deposit requirement is a sanctionable figment of counsel's robust imagination.

85 Exchange Street, Suite 326 ■ Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300 ■ Facsimile: (781) 596-9302
www.BostonBarristers.com

Avi Y. Rosenfeld, Staff Attorney
NASD DISPUTE RESOLUTION
February 9, 2005
Page 2 of 2

Furthermore, a portion of the Rule which Mr. Babnick saw fit to replace with ellipses states that the arbitrators have discretion to waive any adjournment fee. I expressly requested such a waiver in paragraph 14 of my clients' motion because the postponement is the inevitable product of the Claimant's discovery abuses.

Though I mentioned the difficult position in which my clients have been placed due to the Claimant's decision to wait 4 ½ months before producing responsive documents (including information which the Association itself deems presumptively discoverable), I never previously made a motion to adjourn the hearing, nor was any such motion ever argued or denied – whether at a Discovery Conference or otherwise.

I reiterate the seriousness of the concerns described in my clients' motion, whose rights would be substantially prejudiced if they were compelled to go forward on March 2, 2005. Additionally, because Mr. Babnick's letter did not set forth "sufficient cause" for denying their motion, refusing the requested postponement would be a basis under Massachusetts law for vacating any award that might be issued. G.L. c. 251, § 12(a)(4).

While many of the other characterizations in Mr. Babnick's letters of this afternoon are either inaccurate or illogical, I will not address them individually. However, it is important that you immediately forward to the arbitrators forward this correction of counsel's most glaring misstatements, so that the Panel is not unfairly influenced by false information in deciding the pending motions.

In closing, I repeat the Respondents' request that the hearing be postponed for at least the 138 days by which their preparation has been delayed by the Claimant's failure to make discovery, and that the arbitrators waive the adjournment fee, as provided by Rule 10319(b) of the Code.

Very truly yours,

William P. Corbett, Jr.

Enclosures
WPC/13-004-001
cc:    Lynda, Mark & Steven Mscisz (by e-mail)
       Marc J. Ross, Esquire (by facsimile & first class mail)

# *Exhibit O*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____
                                                    )
In the Matter of the Arbitration Between:           )
                                                    )
KASHNER DAVIDSON SECURITIES CORP.,                  )
                                                    )
    *Claimant/Respondent in Counterclaim,*          )
                                                    )
              v.                                     )
                                                    )
STEVEN MSCISZ, MARK MSCISZ, and                     )    NASD DISPUTE RESOLUTION
LYNDA MSCISZ,                                        )    CASE NO. 04-03793
                                                    )
    *Respondents/Counter- and Third Party Claimants.* )
                                                    )
              v.                                     )
                                                    )
VICTOR KASHNER, MATTHEW MEISTER and                 )
TIMOTHY VARCHETTO,                                  )
                                                    )
    *Third Party Respondents.*                      )
_____)


**OPPOSITION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ
TO BROKERS' FEBRUARY 28, 2005 DISCOVERY MOTION**


Respondents/Counter- and Third Party Claimants Steven Mscisz, Mark Mscisz

and Lynda Mscisz (collectively "Customers") respectfully request that the Panel or its

Chairman deny the motion of Claimant/Respondent-in-Counterclaim Kashner Davidson

Securities Corporation ("KDSC") and Third Party Respondents Victor Kashner, Timothy

Varchetto and Matthew Meister (collectively "Brokers") for additional discovery and

sanctions against the Customers for what the Brokers mischaracterize as "continued and

substantial abuse of the discovery process and their refusal to comply with the

Chairperson's Discovery Order." The Brokers' motion is, in a word, frivolous.

In opposition to the Brokers' motion, the Customers state the following:

1.      This is the Brokers' third bite at the sanctions apple.  Their initial motion to compel discovery improperly requested dismissal of the Customers' affirmative claims, although there had been no "willful and intentional material failure to comply with an order of the arbitrator(s)," and although "lesser sanctions" had not "proven ineffective" – or even been imposed.  Code of Arbitration Procedure ("Code") Rule 10305(b).

2.      Last week, in a letter dated February 22, 2005 (Exhibit A), the Brokers' counsel represented to the Panel that "as of today," the Customers had not "produced a single document" (emphasis omitted) to the Brokers, yet again seeking to have the Customers' claims and defenses stricken as a sanction.  Of course, if the Brokers' counsel had not sent that letter first thing in the morning – instead waiting until after that day's mail had actually arrived before making representations "as of today" – he would have had 320 pages of documents in his possession.[1]

3.      The Customers' attorney sent the Brokers' counsel two separate e-mails (Exhibits B and C) calling upon him to withdraw the letter falsely accusing the Customers of non-compliance with the Chairman's discovery order, but the Brokers' counsel never did so, apparently intending to leave the Panel with the misimpression that the Customers had not produced any documents in response to the Chairman's February 1, 2005 order.  It was therefore necessary for the Customers' counsel to send a letter of his own (Exhibit D).

---

[1] The Customers note, moreover, that February 22 was only the second business day after the February 17 deadline for compliance which they, of necessity, had requested.  Since Rule 10314(c) of the Code provides that service of documents "may be effected by mail" and is "accomplished on the date of mailing," February 22 is the first day on which the Brokers should have expected to receive the documents produced by the Customers.

4.    The Brokers' most recent motion has no more foundation than their previous exercises in overreaching.

5.    As described more fully in the Customers' motion to withdraw their counterclaims and third party claims without prejudice (filed on February 24, 2005), the Chairman's recent decision on the Customers' motion to compel discovery by KDSC effectively deprived them of any meaningful ability to prosecute their affirmative claims against the Brokers.  Consequently, and pursuant to Rules 10305(a) and 10328(c), the Customers have requested leave to withdraw those claims without prejudice.  To the extent arbitration of those claims is not mandatory (or even possible in some instances), they intend to avail themselves of their judicial remedies.

6.    With their motion for leave to withdraw their affirmative claims against the Brokers, the Customers simultaneously served a motion for reconsideration of the Chairman's discovery orders, paragraph 3 of which explained that several of the requests at issue pertained only to the Customers' counterclaims and, if those claims were withdrawn from the arbitration, there would no longer be any basis for the Brokers' attempt to rummage through their personal financial records.

7.    Paragraph 4 of the Customers' motion for reconsideration of the discovery orders further explained that other requests with which they had been ordered to comply represented an unwarranted fishing expedition in ostensible support of a fraud claim that has no viability whatsoever.  Rule 10321(a) expressly provides that requests for information must concern a "matter in controversy," and KDSC's sham fraud claim is not a *bona fide* matter in controversy.

8.    To the extent the Customers have not yet complied fully with the Chairman's order compelling discovery, that noncompliance is substantially justified, as it is based on a valid motion for relief from that order.  Of course, the Customers intend to comply fully with whatever order the Panel or its Chairman makes on their motion for reconsideration of the discovery orders, but they will appropriately await that determination before producing additional documents.

9.    In sum – the Brokers' bluster and bombast notwithstanding – the Customers have committed no "willful and intentional material failure to comply with an order of the arbitrators."  The terrain of this arbitration has significantly changed in recent weeks, and the Customers merely seek to ensure that their discovery obligations fairly reflect the current battleground.

10.    The Customers' respectful request for reconsideration of the discovery order should be compared with KDSC's unilateral election (described in the Customers' February 24 motion for compelled compliance by KDSC with the Chairman's order) to withhold entire categories of documents the Chairman ordered it to produce.  Unlike the Customers, KDSC never sought modification of the Chairman's order or otherwise made a proper request to alter its discovery obligations.  That is not only a "willful and intentional material failure to comply", but it is also a substantive violation of NASD rules.  Code IM-10100(c).  If there are sanctions to be imposed, it is KDSC that deserves them.

WHEREFORE, the Customers respectfully request that the Panel or its Chairman
deny the Brokers' motion.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
   *A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  March 1, 2005

# SICHENZIA ROSS FRIEDMAN FERENCE LLP

### ATTORNEYS AT LAW

February 22, 2005

Via Facsimile
and First Class Mail
Avi Y. Rosenfeld, Esq.
NASD Dispute Resolution, Inc.
One Liberty Plaza
165 Broadway, 27th Floor
New York, NY 10006-1400

> Re:    Kashner Davidson Securities Corp. v. Steven Mscisz,
>        Mark Mscisz, and Lynda Mscisz, NASD No. 04-03793

Dear Mr. Rosenfeld:

This firm represents Claimant in the above-referenced matter. I write to inform the Panel that Respondents have failed to satisfy the Chairperson's Discovery Order and request that the Panel issue sanctions against Respondents by striking their baseless counterclaims and affirmative defenses. Accordingly, please immediately forward a copy of this letter to the Panel for their review and consideration.

On February 7, 2005, Respondents received the Chairperson's Discovery Order requiring full compliance by February 10, 2005 as time is of the essence in light of the hearing scheduled to commence on March 2, 2005. Respondents' filed an "emergency" motion requesting "an additional week in which to comply".

As of today, more than five days after the "additional week to comply", and twelve days after the date provided by the Discovery Order, ***Respondents have not produced a single document to Claimant***.

The NASD Discovery Guide authorizes the Panel to issue sanctions for violations of written discovery orders. See NASD Discovery Guide, NTM 99-90, at VIII. Respondents' refusal and/or failure to comply with the written Discovery Order – even after the time that Respondent claimed it needed to comply with such order – is a blatant violation of the Discovery Order and purposely designed to prejudice Claimant.

Accordingly, Claimant respectfully requests that the Panel issue an order sanctioning Respondents for their violation of the Discovery Order that strikes the baseless counterclaims and affirmative defenses.

Respectfully submitted,

Richard J. Babnick Jr.

cc:    William P. Corbett Jr., Esq.
       Kashner Davidson Securities Corp.



**Bill Corbett**

**From:** Bill Corbett [WPC@BostonBarristers.com]
**Sent:** Tuesday, February 22, 2005 1:12 PM
**To:** 'rbabnick@srff.com'
**Subject:** FW: KDSC v. Mscisz

Mr. Babnick,

I received your letter of this morning.  Before I must send the NASD yet another letter correcting one of your misstatements, I suggest that you do so yourself.

More specifically, you represented in your letter that, "as of today," my clients "have not produced a single document" to you. That is simply untrue.  Exactly 50 minutes before your letter was sent, at 10:24 a.m., your office received a delivery of 320 page of documents.  The package was signed for by a receptionist named "Andrassy."

Though the mechanics of that production were, as described in my cover letter, unintentionally convoluted, the fact remains that you received those documents on the very day you would have received them had I mailed them on February 17, 2005 – th extended production deadline I requested.

That your letter was scanned and sent to me by e-mail (as requested in my cover letter) suggests that you were aware of this document production at the time you represented to the NASD that no documents had been produced.   On the one hand, I appreciate your honoring my request to send such communications by e-mail, but on the other, I am concerned that you might have knowingly misrepresented facts to the NASD.  It was Mr. Ross who mischaracterized his brother-in-law's role in KDSC, and you claim to have consulted an out-of-date version of the rule governing the Customers' request for a continuance, but this morning's chain of events suggests an intention on your part to deceive the arbitrators.

If that was not, in fact, your intention, please correct your misstatement forthwith.

Thank you again for sending me the PDF by e-mail.  Going forward, so as to minimize delivery delays occasioned by the distance between our offices, I propose a stipulation whereby service of PDF copies will suffice, even after I return to Massachusetts.  Please let me know if you are amenable to such a stipulation.

Bill Corbett


William P. Corbett, Jr.
**THE CORBETT LAW FIRM**
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300
Facsimile: (781) 596-9302
E-Mail: WPC@BostonBarristers.com
www.BostonBarristers.com

-----Original Message-----
**From:** SRosner@srff.com [mailto:SRosner@srff.com]
**Sent:** Tuesday, February 22, 2005 11:14 AM
**To:** wpc@BostonBarristers.com
**Cc:** RBabnick@srff.com
**Subject:** FW: KDSC v. Mscisz


Dear Mr. Corbett:

Enclosed herewtih is a copy of a letter, dated February 22, 2005, concerning the Chairperson's Discovery Order in the above-referenced matter.

3/1/2005

Sharon M. Rosner
Legal Assistant
Sichenzia Ross Friedman Ference LLP
1065 Avenue of the Americas
New York, NY 10018
Office:  (212) 930-9700
Fax:  (212) 930-9725

<<Rosenfeld ltr re Discovery Order.022205.pdf>>

3/1/2005

**Bill Corbett**

---

| | |
|---|---|
| **From:** | Bill Corbett [WPC@BostonBarristers.com] |
| **Sent:** | Tuesday, February 22, 2005 9:21 PM |
| **To:** | 'rbabnick@srff.com' |
| **Subject:** | FW: KDSC v. Mscisz |

Mr. Babnick,

Not having heard from you in response to my e-mail of earlier this afternoon, I must assume that my concerns were well-founded, and that you did intend to mislead the arbitrators.

Accordingly, if I do not receive confirmation by 10:00 a.m. EST on Wednesday that you have retracted your letter of earlier today, I will be compelled to bring your misrepresentation to the Panel's attention and seek additional recourse, including (but not necessarily limited to) reconsideration of my motion to disqualify you and Mr. Ross. Not only was that motion improvidently denied, but your recent ethical lapses buttress the grounds originally articulated. It seems that you and Mr. Ross are veracity-challenged. That sort of garbage has no place in this proceeding.

If your letter was a mistake, fix it. Otherwise, you should be prepared to suffer the inevitable consequences of your decision to pursue such a dishonorable course of action.

Bill Corbett


William P. Corbett, Jr.
**THE CORBETT LAW FIRM**
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300
Facsimile: (781) 596-9302
E-Mail: WPC@BostonBarristers.com
www.BostonBarristers.com

-----Original Message-----
**From:** Bill Corbett [mailto:WPC@BostonBarristers.com]
**Sent:** Tuesday, February 22, 2005 12:12 PM
**To:** 'rbabnick@srff.com'
**Subject:** FW: KDSC v. Mscisz

Mr. Babnick,

I received your letter of this morning. Before I must send the NASD yet another letter correcting one of your misstatements, I suggest that you do so yourself.

More specifically, you represented in your letter that, "as of today," my clients "have not produced a single document" to you. That is simply untrue. Exactly 50 minutes before your letter was sent, at 10:24 a.m., your office received a delivery of 320 page of documents. The package was signed for by a receptionist named "Andrassy."

Though the mechanics of that production were, as described in my cover letter, unintentionally convoluted, the fact remains that you received those documents on the very day you would have received them had I mailed them on February 17, 2005 – th extended production deadline I requested.

That your letter was scanned and sent to me by e-mail (as requested in my cover letter) suggests that you were aware of this document production at the time you represented to the NASD that no documents had been produced. On the one hand, I appreciate your honoring my request to send such communications by e-mail, but on the other, I am concerned that you might have knowingly misrepresented facts to the NASD. It was Mr. Ross who mischaracterized his brother-in-law's role in KDSC, and you claim to have consulted an out-of-date version of the rule governing the Customers' request for a continuance, but this morning's chain of events suggests an intention on your part to deceive the arbitrators.

3/1/2005

If that was not, in fact, your intention, please correct your misstatement forthwith.

Thank you again for sending me the PDF by e-mail.  Going forward, so as to minimize delivery delays occasioned by the distance between our offices, I propose a stipulation whereby service of PDF copies will suffice, even after I return to Massachusetts.  Please let me know if you are amenable to such a stipulation.

Bill Corbett


William P. Corbett, Jr.
**THE CORBETT LAW FIRM**
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300
Facsimile: (781) 596-9302
E-Mail: WPC@BostonBarristers.com
www.BostonBarristers.com

-----Original Message-----
**From:** SRosner@srff.com [mailto:SRosner@srff.com]
**Sent:** Tuesday, February 22, 2005 11:14 AM
**To:** wpc@BostonBarristers.com
**Cc:** RBabnick@srff.com
**Subject:** FW: KDSC v. Mscisz


Dear Mr. Corbett:

Enclosed herewtih is a copy of a letter, dated February 22, 2005, concerning the Chairperson's Discovery Order in the above-referenced matter.

Sharon M. Rosner
Legal Assistant
Sichenzia Ross Friedman Ference LLP
1065 Avenue of the Americas
New York, NY 10018
Office:  (212) 930-9700
Fax:  (212) 930-9725

<<Rosenfeld ltr re Discovery Order.022205.pdf>>

3/1/2005

# THE CORBETT LAW FIRM
*A Professional Corporation*

February 23, 2005

**BY ELECTRONIC & FIRST CLASS MAIL**

Avi Y. Rosenfeld, Staff Attorney
NASD DISPUTE RESOLUTION
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1400

> **RE:    *Kashner Davidson Securities Corporation v. Mscisz***
> **NASD Dispute Resolution Case No. 04-03793**

Dear Mr. Rosenfeld:

Once again, the Claimant's counsel resorts to outright misrepresentation in an effort to obtain an illicit tactical advantage in this proceeding. And once again, I must correct the record and ask you to forward the correction to the Panel.

More specifically, Richard Babnick yesterday sent you a letter, punctuated with italics and bold type, seeking dismissal of the Customers' counterclaims and third party claims because they had not, according to Mr. Babnick, produced any documents in response to the Chairman's discovery order of three weeks ago.

The fact of the matter is that Mr. Babnick received 320 pages of documents yesterday morning. Of particular concern is the timing of the cc I received, because it was e-mailed to me at 11:14 a.m. – a full 50 minutes after Mr. Babnick received those documents. UPS confirmed that the package (tracking number 1Z A11 96E 01 4962 805 2) was delivered to Mr. Babnick's firm at 10:24 a.m. In other words, assuming that the copy of his letter was sent contemporaneously with the original sent to you, Mr. Babnick knowingly provided you with false information in order to obtain an improper advantage.

Frustrated that, for the third time in a month, it is necessary to correct misinformation by Mr. Babnick or his colleague, Marc Ross, I immediately contacted Mr. Babnick and called upon him to retract his letter. More than 26 hours have passed without any action by Mr. Babnick. Accordingly, I must once again correct counsel's misstatements myself.

Furthermore, because a conspicuous pattern of misrepresentation by the Claimant's counsel has developed, I must ask the Chairman or the full Panel to reconsider the Customers' motion to disqualify Messrs. Babnick and Ross. Not only is counsel's participation in the upcoming hearing unlawful under Mass. R. Prof. C. 5.5, but their recent conduct evidences a manifest disrespect for their adversaries, the Panel, and these proceedings.

Avi Y. Rosenfeld, Staff Attorney
NASD Dispute Resolution
February 23, 2005
Page 2 of 2

Indeed, even if there were a statute, rule of court, or common law doctrine allowing the Chairman to permit Messrs. Babnick and Ross to participate in the hearing *pro hac vice* (of course, there is no such provision), they would have to comply with the Massachusetts Rules of Professional Conduct if so admitted. At the core of those Rules are requirements of candor to the tribunal in particular and generalized prohibitions against falsehood and conduct prejudicial to the administration of justice.

Compare those requirements to the recent pattern of misconduct by the Claimant's attorneys:

- During a recent conference call, Mr. Ross misrepresented the role of Third Party Respondent Victor Kashner – whom I understand to be Mr. Ross' brother-in-law – in his namesake company. This misrepresentation is recounted more specifically addressed in my letter to you dated February 1, 2005.

- Two weeks ago, in response to my clients' motion to continue the upcoming hearing, Mr. Babnick emphatically misrepresented the operative rule. That misrepresentation is described in my letter of February 9, 2005.

- Now, Mr. Babnick falsely accuses the Customers of failing to comply with their discovery obligations.

In short, even if attorneys not admitted to practice in Massachusetts could lawfully participate in an arbitration in the Commonwealth, Messers. Babnick and Ross have proven themselves unworthy of that privilege.

Finally, I note that the Chairman has not ruled on my February 7, 2005 motions – one of which may now be moot, and one which seeks postponement of a hearing that is scheduled to begin less than a week from now. Please let me know whether decisions have been issued on those motions. If so, please e-mail copies to me, as my office is closed this week, and I will not receive mail or faxes until I return on Monday.

Thank you for your attention to this matter.

Very truly yours,

William P. Corbett, Jr.

Enclosures
WPC/13-004-001
cc:      Lynda, Mark & Steven Mscisz (by e-mail)
         Richard Babnick, Esquire (by e-mail)

# *Exhibit P*

**Boston Bar Association**

press > reports of the bba > civility standards for civil litigation

**BOSTON BAR ASSOCIATION CIVILITY STANDARDS FOR CIVIL LITIGATION**

## Index

- PREAMBLE
- Standards, generally
- Standards, specific applications
  - Continuances and Extensions of Time
  - Service of Papers
  - Written Submissions
  - Communications With Lawyers
  - Depositions
  - Interrogatories
  - Document Demands
  - Motion Practice
  - Dealing with Non-Party Witnesses
  - Ex Parte Communications With the Court
  - Settlement and Alternative Dispute Resolution
  - Trials and Hearings

---

## PREAMBLE

Believing that the following Civil Litigation Standards embody the principles to which most litigating lawyers already adhere, the Boston Bar Association promulgates these Standards in order to articulate those principles in writing for ease of reference to benefit the community, practicing lawyers and new members of the bar.

These Standards are intended to be aspirational and voluntary. They are not intended to generate disputes that may result in additional litigation, and they should not be cited as legal authority in any disciplinary proceeding or in any civil or criminal action. Rather, it is hoped that the Standards will be used as an educational tool with the effect of promoting efficient, economical and respectful conduct of civil litigation.

**A. In his or her representation of a client, a lawyer should conduct himself or herself in a manner which, without compromising the interests of his or her client, will facilitate the resolution of disputed matters. Accordingly, a lawyer should:**

1. maintain open communication with opposing lawyers;
2. communicate respectfully with other lawyers;
3. respect the schedule of opposing lawyers and be truthful about his or her own schedule;
4. present issues efficiently without unnecessarily burdening opposing lawyers by discovery or otherwise;
5. discuss each issue with opposing lawyers in a good faith attempt to resolve it without protracted negotiation or unnecessary litigation;

6. be guided by the principle that representation behalf of his or her client ought to be characterized by good faith and honesty;

7. avoid creating unnecessary animosity or contentiousness;

8. avoid setting forth allegations against another lawyer unless relevant to the proceeding and well founded;

9. require those under his/her control to comply with these guidelines and encourage clients and others to do likewise.

**B. The application of these guidelines to situations frequently occurring in a litigation practice are described herein.**

1. Continuances and Extensions of Time

   a. First requests for reasonable extensions of time to respond to litigation deadlines, whether relating to pleadings, discovery or motions, should ordinarily be granted as a matter of courtesy unless time is of the essence. A first extension should be allowed even if the lawyer requesting it has previously refused to grant an extension.

   b. After a first extension, any additional requests for time should be dealt with by balancing the need for expedition against the deference one should ordinarily give to an opponent's schedule of professional and personal engagements, the reasonableness of the length of extension requested, the opponent's willingness to grant reciprocal extensions, the time actually needed for the task, and whether it is likely a court would grant the extension if asked to do so.

   c. A lawyer should inform clients that the decision whether to grant extensions of time belongs to the lawyer and not to the client.

   d. A lawyer should not seek extensions or continuances for the purpose of harassment or prolonging litigation.

   e. A lawyer should not attach to extensions unfair and extraneous conditions. A lawyer is entitled to impose conditions such as preserving rights that an extension might jeopardize or seeking reciprocal scheduling concessions. A lawyer should not, by granting extensions, seek to preclude an opponent's substantive rights, such as his or her right to move against a complaint.

2. Service of Papers

   a. The timing and manner of service of papers should not be used to the disadvantage of the party receiving the papers.

   b. Papers should not be served so close to a court appearance that they inhibit the ability of opposing lawyers to prepare for that appearance or to respond to the papers, where the law permits a response. In making or responding to a motion for preliminary injunction or other emergency matters, a lawyer should make reasonable efforts to comply with the spirit of this rule.

   c. Papers should not be served in order to take advantage of a lawyer's known absence from the office or at a time or in a manner designed to inconvenience a lawyer or his/her client, such as late on Friday afternoon or the day preceding a secular or religious holiday.

   d. Service should be made personally or by facsimile transmission when it is likely that service by mail, even when allowed, will prejudice the opposing party. A lawyer who has obtained a short order of notice and knows the identity of or can reasonably identify the opposing lawyer should immediately notify that lawyer by telephone or by facsimile. A lawyer who receives notification as described above should immediately notify his or her client of any temporary restraining order and that he or she is bound by it even before formal service is made.

3. Written Submissions to a Court, Including Briefs, Memoranda, Affidavits and Declarations

    a. Written briefs or memoranda of points and authorities should not rely on facts that are not properly part of the record or subject to judicial notice.

    b. Neither written submissions nor oral presentations should disparage the intelligence, ethics, morals, integrity or personal behavior of another lawyer or his/her client, unless such matters are directly and necessarily in issue.

4. Communications With Lawyers

    a. A lawyer should at all times be civil and courteous in communicating with other lawyers, whether in writing or orally.

    b. A lawyer should not write a letter to ascribe to another lawyer a position he or she has not taken or to create "a record" of events that have not occurred.

    c. Letters intended only to make a record should be used sparingly and only when thought to be necessary under all the circumstances.

    d. Unless specifically permitted or invited by the court, letters between lawyers should not be sent to judges.

5. Depositions

    a. Depositions should be taken only where actually needed to ascertain facts or information or to perpetuate testimony for purposes of the case in which the deposition is taken. They should never be used as a means of harassment or to generate expense or solely to obtain information for use in other pending or anticipated litigation.

    b. In scheduling depositions reasonable consideration should be given to accommodating schedules of opposing lawyers and of the deponent, where it is possible to do so without prejudicing the client's rights.

    c. Before issuing notice of deposition, a lawyer should contact all lawyers of record in an attempt to reach agreement on a schedule for all depositions and all lawyers should attempt in good faith to abide by any agreement reached.

    d. A lawyer should not attempt to delay a deposition for dilatory purposes.

    e. A lawyer should not inquire into a deponent's personal affairs or question a deponent's integrity where such inquiry is irrelevant to the subject matter of the deposition.

    f. A lawyer should not harass a deponent and should refrain from repetitive or arguments live questions.

    g. A lawyer defending a deposition should limit objections to those that are well-founded and necessary for the protection of a client's interest. A lawyer should bear in mind that most objections are preserved and need be interposed only when the form of a question is defective or privileged information is sought.

    h. While a question is pending, a lawyer should not, through objections or otherwise, coach the deponent or suggest answers.

    i. A lawyer should not direct a deponent to refuse to answer questions unless he or she has a good faith basis for claiming privilege or for seeking a protective order.

    j. A lawyer should refrain from self-serving speeches during depositions.

    k. A lawyer should not engage in any conduct during a deposition that would not be allowed or would be inappropriate in the presence of a judicial officer or a jury.

6. Interrogatories

   a. Interrogatories should not be used to harass or impose undue burden or expense.

   b. Interrogatories should not be read by the lawyer in an artificial manner designed to assure that answers are not truly responsive.

   c. Objections to interrogatories should be based on a good faith belief in their merit and not be made for the purpose of withholding relevant information. If an interrogatory is objection able only in part, the unobjectionable portion should be answered.

7. Document Demands

   a. Demands for production of documents should be limited to documents actually and reasonably believed to be needed for the prosecution or defense of an action and not made to harass or embarrass a party or witness or to impose an inordinate burden or expense in responding.

   b. Demands for document production should not be so broad as to encompass documents clearly not relevant to the subject matter of the case.

   c. In responding to document demands, a lawyer should not strain to interpret the request in an artificially restrictive manner in order to avoid disclosure.

   d. Documents should be withheld on the grounds of privilege only where there is a good faith basis for asserting privilege.

   e. A lawyer should not produce documents in a disorganized or unintelligible fashion, or in a way calculated to hide or obscure the existence of particular documents.

   f. Document production should not be delayed to prevent opposing lawyers from inspecting documents prior to scheduled depositions or for any other tactical reason.

8. Motion Practice

   a. Absent justification to do otherwise, before filing or serving a motion, a lawyer should engage the opposing lawyer(s) in more than a mere pro forma discussion of its purpose in an effort to resolve the issue.

   b. A lawyer should respond in good faith to any request for an assent to a motion.

9. Dealing with Non-Party Witnesses

   a. A lawyer should not issue subpoenas to non-party witnesses except in connection with their appearance at a hearing, trial or deposition.

   b. Deposition subpoenas should be accompanied by notices of deposition with copies to all lawyers.

   c. Where a lawyer obtains documents pursuant to a deposition subpoena, copies of the documents should be made available to each other lawyer at his or her expense even if the deposition is canceled or adjourned.

10. Ex Parte Communications With the Court

   a. A lawyer should avoid ex parse communication on the substance of a pending case with a judge (or his or her law clerk) before whom such case is pending.

   b. Even where applicable laws or rules permit an ex parse application or communication to the court, before making such an application or communication, a lawyer should make diligent efforts to notify the

opposing party or a lawyer known to represent or likely to represent the opposing party and should make reasonable efforts to accommodate the schedule of such lawyer to permit the opposing party to be represented on the application, unless subsection (c.) applies.

c. Where the rules permit an ex parte appli cation or communication to the court in an emergency situation, a lawyer should make such an application or communication (including an application to shorten an otherwise applicable time period) only where there is a bona fide emergency such that the lawyer's client will be seriously prejudiced by a failure to make the application or communication on regular notice.

11. <u>Settlement and Alternative Dispute Resolution</u>

a. A lawyer should raise and explore with his or her client the issue of settlement in every case as soon as enough is known about the case to make that discussion meaningful.

b. A lawyer should not falsely hold out the possibility of settlement as a means for adjourning discovery or delaying trial.

c. In every case, a lawyer should consider, and discuss with his/her client, whether the client's interest could be adequately served and the controversy more expeditiously and economically disposed of by arbitration, mediation or other forms of alternative dispute resolution.

12. <u>Trials and Hearings</u>

a. A lawyer should be punctual and prepared for any court appearance.

b. A lawyer should always deal with parties, other lawyers, witnesses, jurors or prospective jurors, court personnel and the judge with courtesy and civility.

© 1995 - 2005 All Rights Reserved
Boston Bar Association, 16 Beacon Street, Boston, MA 02108
Ph:617.742.0615 | Fax:617.523.0127
Terms of Use | Privacy Policy
Questions, comments? contact membership@bostonbar.org

COMMONWEALTH OF MASSACHUSETTS

SUPREME JUDICIAL COURT
FOR SUFFOLK COUNTY

Case No. 2005-SJ-0088

_____

STEVEN MSCISZ,
MARK MSCISZ and LYNDA MSCISZ,

*Plaintiffs*

*v.*

KASHNER DAVIDSON SECURITIES CORP.,
VICTOR KASHNER, MATTHEW MEISTER,
TIMOTHY VARCHETTO, MARC J. ROSS,
RICHARD J. BABNICK, JR. &
SICHENZIA ROSS FRIEDMAN FERENCE LLP,

*Defendants*

_____

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

_____

**Introduction**

1.   This First Amended Complaint concerns the impending participation by attorneys not admitted to practice in this Commonwealth in an arbitration hearing to be held in Boston -- despite the prohibition against the unauthorized practice of law set forth in Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A.  No substantive issue or the arbitrability thereof is at issue.

2.    The underlying arbitration is pending before a
panel appointed by the dispute resolution subsidiary of
the National Association of Securities Dealers, Inc.
("NASD"), a self-regulatory organization which is not a
party to this action.  The arbitration involves three
Massachusetts customers, a Florida broker-dealer, and
three registered representatives of the broker-dealer who
also reside in Florida.  Originally scheduled to begin on
March 2, 2005, the arbitration hearing has been postponed
until May 17, 2005.

3.    Defendants Kashner Davidson Securities
Corporation, Victor Kashner, Matthew Meister and Timothy
Varchetto (collectively "Broker Defendants") have
indicated that they will be represented at the hearing by
Marc J. Ross, Richard J. Babnick, Jr., and Sichenzia Ross
Friedman Ference LLP (collectively "Lawyer Defendants"),
none of whom are admitted to practice law in this
Commonwealth.

4.    Believing that the participation of out-of-
state lawyers in a Massachusetts arbitration hearing
might violate G.L. c. 221, § 46A and Mass. R. Prof. C.
5.5(a), and concerned that their own counsel's
participation in such a hearing would constitute knowing
assistance of that violation, in violation of Mass. R.

Prof. C. 5.5(b) and 8.4(a), the plaintiffs filed in the arbitration a motion to disqualify the foreign attorneys or postpone the hearing until after the full Court resolves a pending appeal where a similar issue has been raised.  A true copy of the plaintiffs' motion is appended to this First Amended Complaint as Exhibit A.

5.    The defendants opposed the plaintiffs' motion, and a true copy of the defendants' opposition is appended to this First Amended Complaint as Exhibit B.

6.    The chairman of the arbitration panel orally denied the plaintiffs' motion on January 31, 2005, but he never issued a written order explaining the reasons for that denial.  The plaintiffs subsequently sought reconsideration of that decision, but that request was denied orally on March 2, 2005.

7.    The U.S. District Court for the District of Massachusetts (Young, J.) recently faced similar issues in the context of bankruptcy proceedings.  However, unlike the chairman of the arbitration panel in this case, Judge Young certified the "unauthorized practice of law" issues to this Court.  In re Lucas, 317 B.R. 195, 215 (D. Mass. 2004).  That case has since been docketed under the name Chimko v. King and assigned docket number SJC-09388.

8.   The Appeals Court recently declined to address the precise issues raised in this case.  See Superadio L.P. v. Walt "Baby" Love Productions, Inc., 62 Mass. App. Ct. 546, 552 n.5 (2004)(vacating arbitration award on other grounds without deciding whether it was voidable because prevailing party was represented by out-of-state lawyer).  However, an application for further appellate review is pending in that case, to which the Clerk of the full Court has assigned docket number FAR-14557.

9.   In any event, the issues framed in Counts I through IV of this First Amended Complaint may not be resolved in the other cases, because Chimko does not arise in the context of arbitration, because further review may not be granted in Superadio, and because the "unauthorized practice of law" issue may not be argued by the parties even if review is granted in the latter case.

10.  It is therefore necessary for the plaintiffs to seek an independent judicial determination of whether:

> a.   a lawyer admitted to practice in another United States jurisdiction but not admitted to practice in Massachusetts engages in the unauthorized practice of law, in violation of one of this Court's own rules, Mass. R. Prof. C. 5.5(a), as well as G.L. c. 221, § 46A, by representing a party or parties at an arbitration hearing held in this Commonwealth;

b.  a Massachusetts attorney, by participating in an arbitration hearing held within the Commonwealth where parties are represented by lawyers not licensed to practice in this jurisdiction, would knowingly assist a violation of Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a);

c.  an arbitrator's refusal to postpone the hearing until after this Court resolves the "unauthorized practice of law" issue would subject any award to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12(a)(5); and

d.  an award issued after an arbitration hearing in which attorneys violated Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A would be procured by "undue means" and thus subject to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12.

These are purely questions of law.  Although the factual issues in the underlying arbitration are vigorously contested, there is no dispute concerning the facts recited in this First Amended Complaint, and no discovery will be necessary in this action.

11.  Accordingly, and for the other reasons set forth in this First Amended Complaint, the plaintiffs request that a single justice of this Court:

  a. issue the declaratory judgments requested in Counts I through IV of this First Amended Complaint, permanently enjoining the Broker Defendants from going forward in the arbitration with the Lawyer Defendants as their counsel and permanently enjoining the Lawyer Defendants from participating in the underlying arbitration; or

  b. reserve the issues framed in Counts I through IV of this First Amended Complaint and

    i. report the issues to the full Court, pursuant to Mass. R. Civ. P. 1 (1st par) & 64(a), and

    ii. consolidate that report with <u>Chimko</u> and (if further review is allowed on the unauthorized practice of law issue in that case) with <u>Superadio</u>.

***Parties***

12. The plaintiffs – Steven Mscisz, Mark Mscisz and Lynda Mscisz – are individuals residing in the Town of Topsfield.  The plaintiffs in this action are the respondents, counter- claimants and third party claimants in the underlying arbitration.

13. Defendant Kashner Davidson Securities Corp. ("KDSC") is a corporation organized under the laws of the State of Florida, and KDSC maintains its only place of business in that jurisdiction.  KDSC is the claimant and respondent-in-counterclaim in the pending arbitration.

14.   Defendant Victor Kashner ("Kashner") is an individual residing in the State of Florida and a registered representative of KDSC.  KDSC's namesake, Kashner is its controlling shareholder, chairman of its board of directors, and – until suspended by the U.S. Securities and Exchange Commission in In re Kashner, Case No. 3-9049 (SEC 1996), and by the NASD in In re Kashner Davidson Securities Corp., Case No. C07960095 (NASD 2000) – Kashner was an officer of KDSC.  Kashner is a third party respondent in the pending arbitration.

15.   Defendant Matthew Meister ("Meister") is an individual residing in the State of Florida and, at the time of the events operative for purposes of the underlying arbitration, was a registered representative of KDSC.  Meister is a third party respondent in the pending arbitration.

16.   Defendant Timothy Varchetto ("Varchetto") is an individual residing in the State of Florida and a registered representative of KDSC.  Varchetto is a third party respondent in the pending arbitration.

17.   Defendants Marc J. Ross ("Ross") and Richard J. Babnick, Jr. ("Babnick") are attorneys admitted to practice law in the State of New York, but not in this Commonwealth, and they are the Broker Defendants' only

attorneys of record in the underlying arbitration. Ross and Babnick are affiliated with defendant Sichenzia Ross Friedman Ference LLP ("SRFF"), a limited liability partnership organized and existing under the laws of the State of New York. SRFF is a law firm whose only office is located in New York City, and none of whose attorneys is an active member of the Commonwealth's Bar.

### *Jurisdiction*

17.    Pursuant to G.L. c. 223A, § 3, this Court may exercise personal jurisdiction over the defendants, because this action arises from their transaction of business in this Commonwealth.

18.    Exercising jurisdiction over the defendants would not offend the Due Process Clause of the 14th Amendment to the U.S. Constitution, because:

   a.    the defendants have sufficient minimum contacts with this Commonwealth such that maintenance of this action would not offend traditional notions of fair play and substantial justice;

   b.    the defendants' conduct and connection with this Commonwealth are such that they should reasonably anticipate being haled into a Massachusetts court;

   c.    the actions of the defendants at issue in this action are purposefully directed toward this Commonwealth;

      d.   the Commonwealth has a legitimate interest in ensuring that arbitration hearings conducted within its borders do not result in awards procured by undue means;

      e.   the Commonwealth has a legitimate interest in ensuring that arbitration hearings conducted within its borders are postponed upon sufficient cause if failure to postpone would substantially prejudice the rights of a party; and

      f.   the Commonwealth has a legitimate interest in ensuring that law is practiced within its borders in accordance with this Court's Rule 3:07 and pertinent enactments by the Legislature.

19.    This Court may exercise jurisdiction over the subject matter of this action, because this is an action seeking a binding declaration of right, duties, status or other legal relations, and G.L. c. 231A, § 1 confers this Court with original jurisdiction (concurrent with that of several departments of the Trial Court) over such matters.

20.    The plaintiffs commence this action before a single justice of this Court, and not in the Superior Court, because Chimko and Superadio are already pending in this Court, because this action requires definitive interpretation of one of this Court's own rules, because discovery is not necessary in this action, and because it would therefore be most efficient and economical for the judiciary and the parties to have this case adjudicated simultaneously with those matters.

*Count I*
*(Declaratory Judgment:*
*Unauthorized Practice of Law)*

21.  The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 20 of this First Amended Complaint.

22.  A dispute exists between the plaintiffs and defendants concerning the issue of whether a lawyer admitted to practice in another United States jurisdiction but not admitted to practice in Massachusetts engages in the unauthorized practice of law, in violation of G.L. c. 221, § 46A and Mass. R. Prof. C. 5.5(a), by representing a party or parties at an arbitration hearing held in this Commonwealth.

23.  The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

24.  Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count I.

### Count II
### *(Declaratory Judgment:*
### *Aiding & Abetting Unauthorized Practice of Law)*

25.   The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 24 of this First Amended Complaint.

26.   A dispute exists between the plaintiffs and defendants concerning the issue of whether a Massachusetts attorney, by participating in an arbitration hearing held within the Commonwealth where parties are represented by lawyers not licensed to practice here, would knowingly assist a violation of Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a).

27.   The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

28.   Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count II.

### Count III
### (Declaratory Judgment:  Refusal to Postpone Hearing Pending Resolution of Unauthorized Practice of Law Issue)

29.  The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 28 of this First Amended Complaint.

30.  A dispute exists between the plaintiffs and defendants concerning the issue of whether an arbitrator's refusal to postpone the hearing until after this Court resolves the "unauthorized practice of law" issue would subject any award to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12(a)(5).

31.  The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

32.  Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count III.

*Count IV*
*(Declaratory Judgment:*
*Enforceability of Arbitral Award*
*Procured By Attorneys Not Admitted*
*To Practice in Massachusetts)*

33.  The plaintiffs incorporate into this paragraph, as if fully set forth herein, the averments set forth in paragraphs 1 through 32 of this First Amended Complaint.

34.  A dispute exists between the plaintiffs and defendants concerning the issue of whether an award issued after an arbitration hearing in which attorneys violated Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A would be procured by "undue means" and thus subject to vacation under the Commonwealth's version of the Uniform Arbitration Act, G.L. c. 251, § 12.

35.  The plaintiffs have exhausted their ability to obtain a suitable declaration in the pending arbitration.

36.  Accordingly, pursuant to G.L. 231A, § 1, the plaintiffs are entitled to a binding declaration of right, duty, status and other legal relations with respect to the issue identified in this Count IV.

WHEREFORE, the plaintiffs respectfully request that a single justice of this Court:

a.  make, pursuant to G.L. 231A, § 1, binding declarations of right, duty, status and other legal relations concerning the issues set forth in paragraph 10 of this First Amended Complaint, permanently enjoining the defendants from engaging in conduct such as that described in paragraph 10; or

b.  reserve and report to the full Court, pursuant to Mass. R. Civ. P. 1(1st par.) & 64(a), the issues framed in Counts I through IV of this First Amended Complaint, consolidate that report with Chimko v. King, Docket No. SJC-09388 (and, if further review is allowed in that case, with Superadio LP v. Walt "Baby" Love Productions, Inc., Docket No. FAR-14557), and preliminarily enjoining the defendants from conducting or participating in any hearing in the underlying arbitration until the consolidated appeal is adjudicated; and

c.  grant such other and further relief as the single justice deems necessary and just.

Respectfully submitted,

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

_____
William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
A Professional Corporation
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  March 2, 2005

- 14 -

# *Exhibit A*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____

| | |
|---|---|
| In the Matter of the Arbitration Between: | ) |
| | ) |
| KASHNER DAVIDSON SECURITIES CORP., | ) |
| | ) |
| *Claimant/Respondent in Counterclaim,* | ) |
| | ) |
| v. | ) |
| | ) |
| STEVEN MSCISZ, MARK MSCISZ, and | ) |
| LYNDA MSCISZ, | ) NASD DISPUTE RESOLUTION No. 04-03793 |
| | ) |
| *Respondents/Counter- and Third Party Claimants.* | ) |
| | ) |
| v. | ) |
| | ) |
| VICTOR KASHNER, MATTHEW MEISTER and | ) |
| TIMOTHY VARCHETTO, | ) |
| | ) |
| *Third Party Respondents.* | ) |

_____)

### MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ
### TO DISQUALIFY COUNSEL OR, ALTERNATIVELY, TO STAY PROCEEDINGS

Respondents/Counter- and Third Party Claimants Steven Mscisz ("Steven"), Mark

Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") hereby request that the

Panel or its Chairperson disqualify Marc J. Ross ("Mr. Ross"), Richard J. Babnick, Jr. ("Mr.

Babnick"), and any other attorney not admitted to practice in Massachusetts from participating in

the referenced arbitration, or in the alternative, to stay this proceeding pending resolution of

*Chimko v. King,* Case No. SJC-09388 (entered Nov. 22, 2004) by the Commonwealth's Supreme

Judicial Court ("SJC").  In support of this motion, the Customers state the following:

1.      Mr. Ross and Mr. Babnick are the only attorneys of record for Claimant/

Respondent-in-Counterclaim Kashner Davidson Securities Corporation ("KDSC") and third-

party respondents Victor L. Kashner ("Mr. Kashner"), Matt Meister and Timothy W. Varchetto.

2.      The hearing in this arbitration will be held in Boston, Massachusetts, but records

of the Commonwealth's Board of Bar Overseers ("BBO") indicate that neither Mr. Ross nor Mr.

Babnick is licensed to practice law in Massachusetts.  Printouts reflecting searches of the BBO's

website for registration records concerning Mr. Ross and Mr. Babnick are appended to this

motion as Exhibits A and B, respectively.

3.      Attorneys not admitted to the Massachusetts Bar are prohibited from engaging in

the practice of law in this Commonwealth.  MASS. R. PROF. C. 5.5(a).

4.      Courts of other jurisdictions have expressly interpreted cognate rules to preclude

out-of-state attorneys from participating in arbitration proceedings within their borders.  *See,*

*e.g., Florida Bar v. Rapoport,* 845 So.2d 874, *cert. denied,* 540 U.S. 967 (2003) (securities

arbitration) (Exhibit C); *Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court,* 17

Cal. 4th 119, 133-34, *cert. denied,* 525 U.S. 920 (1998) (commercial arbitration) (Exhibit D).

5.      The Massachusetts Rules of Professional Conduct are based on Model Rules

promulgated by the American Bar Association ("ABA"), which were amended in 2002 to

include, among other items, a new subsection c(3) to Rule 5.5.  In fora where that subsection has

been adopted, out-of-state attorneys generally may participate in arbitration proceedings.

6.      However, this Commonwealth has not amended its version of Rule 5.5 to adopt

the ABA's changes.  Furthermore, no Massachusetts tribunal has squarely addressed the

"unauthorized practice of law" issue in the arbitration context.  *See, e.g., Superadio L.P. v. Walt*

*"Baby" Love Productions, Inc.,* 2004 Mass. App. LEXIS 1356 at *13 n.5 (Nov. 29, 2004)

(vacating arbitral award on other grounds without deciding whether it was obtained by "undue means" and thus voidable because prevailing party was represented by counsel from another state) (copy at Exhibit E); *In re Lucas,* 2004 U.S. Dist. Lexis 21905 *59-60 (D. Mass., Sept. 30, 2004) (Young, U.S.D.J.) (certifying to SJC bankruptcy-related "unauthorized practice of law" issues) (copy at Exhibit F).

7.     Upon receipt of Judge Young's certification in *Lucas,* the SJC docketed that case under the name *Chimko v. King,* assigned it docket number SJC-09388, and set a briefing schedule.  A copy of the SJC's docket is appended as Exhibit G.

8.     Accordingly, while the "unauthorized practice of law" issue remains unsettled in this Commonwealth, it will soon be resolved, and there is a strong possibility that this resolution will establish that participation of Mr. Ross and Mr. Babnick in this arbitration would violate Rule 5.5(a).

9.     It logically follows that, having knowledge of this potential violation, the Customers' attorney and the members of the Panel could "assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law" – and thus violate Rule 5.5(b) themselves – if they countenance the participation of Mr. Ross and Mr. Babnick and the SJC subsequently decides *Chimko* in a fashion that fails to create an "arbitration exception" to the prohibition against the unauthorized practice of law.

10.     Furthermore, *Superadio*, 2004 Mass. App. LEXIS 1356 at *13 n.5, leaves open the significant possibility that any award issued after participation by Mr. Ross and Mr. Babnick could be voidable.  *See* G.L. c. 251, § 12(a)(1) ("Upon application of a party, the court shall vacate an award if . . . the award was procured by . . . undue means.").

11.     Under these circumstances, the prudent course would be to disqualify Mr. Ross and Mr. Babnick from participating in this proceeding or, in the alternative, to stay the arbitration pending the SJC's decision in *Chimko*.

12.     Given that the hearing is nearly 3 months away, and that at least two parties have preexisting relationships with Massachusetts counsel (*see, e.g., SEC v. Williams,* 884 F. Supp. 28 (1995) (Mr. Kashner & KDSC represented in SEC enforcement action by Boston office of Kirkpatrick & Lockhart)), disqualification should not result in significant prejudice to any party.

13.     On the other hand, Rule 10315 of the Code of Arbitration Procedure appears to impose no limits on the Panel's plenary power to "determine the time" for hearings, so it would be well within the confines of its authority for the Panel to stay this arbitration until the SJC decides *Chimko*.

14.     Furthermore, the docket in *Chimko* indicates that the plaintiff's brief is due on January 3, 2005.  The defendant's brief must therefore be filed on or before February 2, 2005, and the plaintiff's reply brief must be filed on or before February 17, 2005.  MASS. R. APP. P. 19(a).  In other words, the case should be ready for oral argument in approximately two months.

15.     Though it is impossible to predict authoritatively how long the SJC will take to resolve *Chimko,* that case involves the discrete legal issues certified by Judge Young, not a lengthy trial record, so it can be decided expeditiously.  It is therefore unlikely that any stay pending the *Chimko* decision would be excessively long.

WHEREFORE, the Customers respectfully request that the Panel or its Chairperson grant the foregoing motion.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
A Professional Corporation
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  December 17, 2004

- 5 -

# *Exhibit A*

| Massachusetts Board of Bar Overseers  99 High Street  Boston, Ma. 02110 | Attorney Status Report |  |
| --- | --- | --- |

**Results of search for.. Marc Ross . Click any Name for more details.**

| Name | Billdate | Tel# & Firm | Address | Discipline |
| --- | --- | --- | --- | --- |
| No matches found. | | | | |

<div align="center">

**Click HERE to SEARCH AGAIN!**

**or HERE to return to the main page.**

</div>

# *Exhibit B*

# Massachusetts Board of Bar Overseers
## 99 High Street
## Boston, Ma. 02110

# Attorney Status Report



**Results of search for.. Richard Babnick . Click any Name for more details.**

| Name | Billdate | Tel# & Firm | Address | Discipline |
|------|----------|-------------|---------|------------|
| No matches found. | | | | |

**Click HERE to SEARCH AGAIN!**

**or HERE to return to the main page.**

# *Exhibit C*

FOCUS - 5 of 7 DOCUMENTS

**THE FLORIDA BAR, Complainant, vs. ALBERT A. RAPOPORT, Respondent.**

No. SC01-73

**SUPREME COURT OF FLORIDA**

*845 So. 2d 874; 2003 Fla. LEXIS 250; 28 Fla. L. Weekly S 174*

**February 20, 2003, Decided**

**SUBSEQUENT HISTORY:** [**1] Rehearing denied by *Fla. Bar v. Rapoport, 2003 Fla. LEXIS 793* (Fla., May 6, 2003)
US Supreme Court certiorari denied by *Rapoport v. Fla. Bar, 2003 U.S. LEXIS 7740* (U.S., Oct. 20, 2003)

**PRIOR HISTORY:** *The Florida Bar v. Rapoport, 732 So. 2d 329, 1999 Fla. LEXIS 692* (Fla., 1999)

**DISPOSITION:** Enjoined from engaging in the practice of law in Florida.

**LexisNexis(R) Headnotes**

**COUNSEL:** John F. Harkness, Jr., Executive Director, The Florida Bar, Tallahassee, Florida; R. Lee Bennett, Chair, Standing Committee on Unlicensed Practice of Law, Tallahassee, Florida; Lori S. Holcomb, Unlicensed Practice of Law Director, The Florida Bar, Tallahassee, Florida; and Janet Bradford Morgan, Bar Counsel, Fort Lauderdale, Florida, for Complainant.

Ainslee R. Ferdie of the Law Offices of Ainslee R. Ferdie, Coral Gables, Florida, for Respondent.

**JUDGES:** ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, and CANTERO, JJ., concur. SHAW, Senior Justice, dissents with an opinion, in which QUINCE, J., concurs.

**OPINION:** [*875] Original Proceeding - The Florida Bar

PER CURIAM.

We have for review a referee's report finding as a matter of law that respondent, Albert A. Rapoport, engaged in the unlicensed practice of law. We have jurisdiction. See art. V, § 15, Fla. Const.

Rapoport is licensed to practice law in Washington, D.C. He is a member in good standing of the bars of the Supreme Court of the United States and the District [**2] of Columbia Court of Appeals. He is not a member of The Florida Bar.

The Bar filed its petition for an injunction in January 2001, claiming that Rapoport was engaged in the unlicensed practice of law (UPL) because he (1) represents parties in Florida in securities arbitration proceedings by entities such as the American Arbitration Association, the National Association of Securities Dealers, and the New York Stock Exchange; and (2) advertises his securities arbitration services in the Fort Lauderdale Sun-Sentinel. n1 The Court issued an order to show cause on January 29, 2001. Rapoport responded to the order to show cause. Although it appeared to the Court at that time that Rapoport admitted the material allegations in The Florida Bar's petition, the Court referred the matter to a referee for determination of any questions of fact. See *R. Regulating Fla. Bar 10-7.1(b)(6)*.

n1 The petition also included an allegation that Rapoport formerly advertised as an attorney in Florida on the American Association of Retired Persons website. However, because the Bar did not include that claim in its motion for summary judgment and the referee made no findings as to that claim, we deem it abandoned

845 So. 2d 874, *; 2003 Fla. LEXIS 250, **;
28 Fla. L. Weekly S 174

and have not considered that allegation in our disposition of this case.

[**3]

After discovery was propounded by both parties, including the Bar's request for admissions, the Bar filed a motion for summary judgment, alleging that there were no material facts in dispute. n2 The referee granted summary judgment, making the following findings of undisputed facts: Rapoport (1) is not a licensed Florida attorney; (2) operates a law practice in Florida and represents persons in securities arbitration matters; (3) advises clients about the legal merits of their securities arbitration claims; (4) prepares, signs, and files securities arbitration claims for his clients; (5) represents his clients in securities arbitration proceedings; (6) offers advice and representation to stockbrokers defending claims in securities arbitration; and (7) [*876] has, in the past, advertised in the Sun-Sentinel his availability to represent persons in securities arbitration proceedings.

n2 As "Appendix A" to its motion, the Bar attached this Court's unpublished order dated April 15, 1999, approving a stipulation for permanent injunction in case no. 94,049, *Florida Bar v. Rapoport, 732 So. 2d 329 (Fla. 1999)*. According to the stipulation, Rapoport agreed not to practice law in Florida unless "authorized to do so by state or federal law, statute, rule, regulation, or decision."

[**4]

Based on these findings of fact, the referee concluded that (1) Rapoport is a nonlawyer in Florida and cannot operate a law practice or engage in the general practice of law in Florida; (2) Rapoport has engaged in the practice of law by giving legal advice and consultation to clients, by drafting, signing, and filing securities arbitration claims for clients, and by representing clients in securities arbitration proceedings; (3) no federal or state law authorizes Rapoport as a nonlawyer to provide legal services and advice in securities arbitration matters; (4) Florida maintains its substantial interest and authority to prohibit UPL to protect the public; (5) Rapoport has advertised his availability to represent parties in securities arbitration proceedings; and (6) Rapoport has engaged in UPL and is subject to injunction.

Rapoport does not contend that any of these material facts are in dispute. Rather, Rapoport claims that the Federal Arbitration Act, *9 U.S.C. § § 1 - 307 (2000)*, (FAA) preempts state law n3 and that Florida has no

authority to forbid an attorney from acting in Florida for parties in federal securities matters.

n3 The Federal Arbitration Act, *9 U.S.C. § § 1 - 307 (2000)*, was enacted in 1925. See Pub. L. No. 68-401, 43 Stat. 883 (1925). "The Act was designed 'to overrule the judiciary's longstanding refusal to enforce agreements to arbitrate,' and place such agreements 'upon the same footing as other contracts.'" *Volt Information Sciences, Inc. v. Board of Trustees, 489 U.S. 468, 474, 103 L. Ed. 2d 488, 109 S. Ct. 1248 (1989)* (citations omitted). Securities arbitration agreements are subject to the Federal Arbitration Act. See *Shearson/American Express, Inc. v. McMahon, 482 U.S. 220, 96 L. Ed. 2d 185, 107 S. Ct. 2332 (1987)*.

[**5]

In *Sperry v. Florida ex rel. Florida Bar, 373 U.S. 379, 10 L. Ed. 2d 428, 83 S. Ct. 1322, 1963 Dec. Comm'r Pat. 211 (1963)*, the United States Supreme Court, although acknowledging Florida's substantial interest in regulating the practice of law within the state, held that Florida could not enjoin a nonlawyer registered to practice before the U.S. Patent Office from preparing and prosecuting patent applications in Florida because a federal statute and Patent Office regulations authorized the practice. Rapoport provides a long list of federal cases concerning securities arbitration that involve preemption of state law by the FAA. n4 None of the cases, however, concerns the authorization of the practice of law in securities arbitration proceedings.

n4 See *Doctor's Associates, Inc. v. Casarotto, 517 U.S. 681, 134 L. Ed. 2d 902, 116 S. Ct. 1652 (1996); Southland Corp. v. Keating, 465 U.S. 1, 79 L. Ed. 2d 1, 104 S. Ct. 852 (1984); Doctor's Associates, Inc. v. Hamilton, 150 F.3d 157 (2d Cir. 1998); Ferro Corp. v. Garrison Indus., Inc., 142 F.3d 926 (6th Cir. 1998); Olde Discount Corp. v. Tupman, 1 F.3d 202 (3d Cir. 1993); Saari v. Smith Barney, Harris Upham & Co., 968 F.2d 877 (9th Cir. 1992); David L. Threlkeld & Co. v. Metallgesellschaft Ltd. (London), 923 F.2d 245 (2d Cir. 1991); Saturn Distribution Corp. v. Williams, 905 F.2d 719 (4th Cir. 1990); Securities Indus. Ass'n v. Connolly, 883 F.2d 1114 (1st Cir. 1989); Cohen v. Wedbush, Noble, Cooke, Inc., 841 F.2d 282 (9th Cir. 1988),* overruled by *Ticknor v. Choice Hotels Int'l, Inc., 265 F.3d 931(9th Cir. 2001); Cent. Jersey Freightliner, Inc. v. Freightliner*

*Corp., 987 F. Supp. 289 (D. N.J. 1997); Morrison v. Colo. Permanente Med. Group, P.C., 983 F. Supp. 937 (D. Colo. 1997); Johnson v. Hubbard Broad., Inc., 940 F. Supp. 1447 (D. Minn. 1996); Haluska v. RAF Fin. Corp., 875 F. Supp. 825 (N.D. Ga. 1994); Medika Int'l, Inc. v. Scanlan Int'l, Inc., 830 F. Supp. 81 (D. P.R. 1993); Matter of Management Recruiters Int'l, Inc. and Nebel, 765 F. Supp. 419 (N.D. Ohio 1991); Seymour v. Gloria Jean's Coffee Bean Franchising Corp., 732 F. Supp. 988 (D. Minn. 1990); Reed v. Bear, Stearns & Co., 698 F. Supp. 835 (D. Kan. 1988); Russolillo v. Thomson McKinnon Securities, Inc., 694 F. Supp. 1042 (D. Conn. 1988); In re Pate, 198 B.R. 841 (Bankr. S.D. Ga 1996).*

[**6]  [*877]

Florida Bar re Advisory Opinion on Nonlawyer Representation in *Securities Arbitration, 696 So. 2d 1178 (Fla. 1997),* is directly on point. In that case, this Court held that it was unlicensed practice of law for nonlawyers in securities arbitration proceedings to give specific legal advice and perform the traditional tasks of the lawyer at arbitration proceedings. Rapoport admittedly has engaged in the traditional tasks of the lawyer--giving of legal advice, preparing and submitting claims, representing clients in proceedings, advertising his ability to represent clients--in securities arbitration proceedings in Florida. He is a nonlawyer in Florida under *Rule Regulating the Florida Bar 10-2.1(c),* which provides in pertinent part:

For purposes of this chapter, a nonlawyer or nonattorney is an individual who is not a member of The Florida Bar. This includes, but is not limited to, lawyers admitted in other jurisdictions, law students, law graduates, applicants to The Florida Bar, disbarred lawyers, and lawyers who have resigned from The Florida Bar.

As a nonlawyer, Rapoport is not authorized to practice law in Florida.

Although Rapoport does not point to [**7] any material issues that are in dispute, he claims that the referee erred in entering summary judgment without holding a hearing. He points to the language of *Florida Rule of Civil Procedure 1.510(c),* which provides that a motion for summary judgment "shall be served at least 20 days before the time fixed for hearing."

We previously have held that a referee in a UPL case has the authority to enter summary judgment when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See *Florida Bar v. Miravalle, 761 So. 2d 1049, 1051 (Fla.*

*2000).* Furthermore, the standard of review on summary judgment orders is de novo. See *Florida Bar v. Cosnow, 797 So. 2d 1255, 1258 (Fla. 2001).* Lastly, we are aware that rule 1.510(c) has been interpreted to require hearings on motions for summary judgments. See *Kozich v. Hartford Ins. Co. of Midwest, 609 So. 2d 147, 148 (Fla. 4th DCA 1992).*

We deem it unnecessary to reach the issue of whether rule 1.510(c) mandates a hearing before summary judgment may be entered in a civil proceeding if there has been adequate notice and an opportunity to be heard, and [**8] the party opposing the summary judgment has failed to show that there are any material issues in dispute. Unlike other proceedings, this Court has original jurisdiction over petitions against the unlicensed practice of law. See *R. Regulating Fla. Bar 10-1.1.* The Court does not automatically refer UPL petitions to referees. Referral to a referee is made only if the respondent raises issues of disputed fact after we have issued an order to show cause. See *R. Regulating Fla. Bar 10-7.1(b)(6)* ("The court may, upon its motion or upon motion of any party, enter a judgment on the pleadings or refer questions of fact to a referee for determination.").

In this case, as noted above, referral to a referee was made after a response was filed because it appeared that Rapoport may have been asserting some disputed issues of fact. However, in the proceedings before the referee, and in the multiple pleadings filed with this Court, including Rapoport's initial brief and reply brief, Rapoport has failed to demonstrate the existence of even a single disputed fact--much less a material one. Accordingly, Rapoport had no right to even have a referee hear The Florida Bar's petition against the unlicensed [**9] practice of law unless there were disputed issues of material fact. Once Rapoport filed his response to our order to show cause, this Court had [*878] the discretion to enter judgment on the pleadings or to refer questions of fact to a referee. See *R. Regulating Fla. Bar 10-7.1(b)(6).* Because there are no disputed issues of material fact raised by Rapoport, the referee's decision not to hold a hearing before entering summary judgment in this case was proper. n5

n5 The dissent asserts that Rapoport's due process rights were violated when the referee refused to continue the proceedings, even though Rapoport recently underwent heart surgery. The dissent further asserts that there were disputed issues of fact that Rapoport never had an opportunity to present to the referee. However, a review of the record demonstrates that Rapoport had multiple opportunities to raise factual

845 So. 2d 874, *; 2003 Fla. LEXIS 250, **;
28 Fla. L. Weekly S 174

disputes. The Bar's motion for summary judgment was served by mail on August 17, 2001. Rapoport's motion to halt proceedings was signed by him on August 30, raising his recent heart surgery as a basis for the request. Despite the fact that the motion for summary judgment had already been served, he did not raise any issues of fact in dispute that would have provided the referee cause to continue the proceedings. Further, after the referee denied this motion, Rapoport filed a motion to reconsider on September 10, 2001, that only made a bare assertion that there were material issues of fact in dispute, without naming a single specific fact that was in dispute to give the referee a basis to reconsider. Perhaps most significantly, in his numerous pleadings before this Court Rapoport still does not assert that there are material issues of fact in dispute that the referee must resolve. Therefore, Rapoport has had ample opportunity to be heard. His challenge to the Bar's proceedings is one that involves issues of law and not disputed issues of fact. Hence, his due process rights have not been violated.

[**10]

Rapoport received both notice and an opportunity to be heard before this Court. There are no material issues of disputed fact, and based on Rapoport's admissions that he is engaged in representing parties in securities arbitration in this state we conclude that, as a matter of law, Rapoport is engaged in the unlicensed practice of law.

Rapoport also objects to the referee's recommended assessment of costs in the amount of $ 530.40. *Rule Regulating the Florida Bar 10-7.1(d)(2)* gives the referee discretion to recommend the assessment of costs, including the investigative costs and court reporter's fees requested in this action. Rapoport has demonstrated no abuse of discretion by the referee. Therefore, we approve the assessment of costs as recommended.

Accordingly, respondent, Albert A. Rapoport, is hereby enjoined from engaging in the practice of law in Florida, including specifically the representation of parties in securities arbitration proceedings in this state, until he is duly licensed to practice law in Florida. Judgment is entered for The Florida Bar, 650 Apalachee Parkway, Tallahassee, Florida 32399-2300, for recovery of costs from Albert A. Rapoport, in the amount of $ [**11] 530.40, for which sum let execution issue.

It is so ordered.

ANSTEAD, C.J., and WELLS, PARIENTE, LEWIS, and CANTERO, JJ., concur.

SHAW, Senior Justice, dissents with an opinion, in which QUINCE, J., concurs.

**DISSENTBY: SHAW**

**DISSENT: SHAW, Senior Justice, dissenting.**

I respectfully dissent because I believe that there was a violation of Rapoport's constitutional right to due process. As Florida courts have consistently recognized, due process entitles a litigant to notice and an opportunity to be heard. n6

> n6 See, e.g., *Florida Bar v. Fredericks, 731 So. 2d 1249, 1254 (Fla. 1999)* ("Accordingly, because Fredericks was made aware of the conduct alleged by the Bar to be unethical and had the opportunity to be heard as to this conduct, there was no violation of due process."); *Florida Bar v. Rubin, 709 So. 2d 1361, 1363 (Fla. 1998)* ("Prior to being found guilty of the charges at issue here, Rubin was afforded appropriate notice and a full opportunity to be heard during the final hearing before the referee. This was sufficient to satisfy the demands of due process."); *see also Zauderer v. Office of Disciplinary Counsel, 471 U.S. 626, 655, 85 L. Ed. 2d 652, 105 S. Ct. 2265, 17 Ohio B. 315 (1985)* (holding that where appellant was put on notice of disciplinary charges against him and was afforded opportunity to respond to board's recommendation, demands of due process were satisfied); *In re McKay, 280 Ala. 174, 191 So. 2d 1, 5 (Ala. 1966)* ("An attorney must be accorded due process in . . . disciplinary proceedings, and the requirements of due process are met when the attorney is served with charges or specifications reasonably informing him of the charges against him and the attorney is thereafter accorded a hearing with an opportunity to defend.").

[**12]

[*879]  While representing himself, Rapoport requested that the referee continue his case since he had undergone three-vessel coronary artery bypass surgery, was still suffering from cardiac arrhythmias, and was under instructions from his doctor to avoid all undue stress. A copy of his doctor's instructions was attached to the motion. When his request for a continuance was denied, Rapoport asked that the referee reconsider his

decision and permit him an opportunity to recover from his surgery so that he could "fully and properly prepare his response" to the Bar's motion for summary judgment. He asserted that there were material issues of fact in dispute and that he should be available in approximately one month. n7 The referee denied this motion and five days later issued an order granting summary judgment in favor of the Bar. n8

n7 The majority opinion seems to suggest that Rapoport, who was proceeding pro se at the time, should have spelled out the disputed issues of fact in his request for a continuance. I find this reasoning disingenuous for if Rapoport was able to formulate his research and submit his issues of disputed fact, then he would not need a motion for continuance at all. [**13]

n8 Interestingly, after the referee denied both of Rapoport's requests for a continuance, the referee requested an extension from this Court based on Rapoport's illness. This Court granted the request and extended the time to file the referee's report until November 28, 2001.

The decision to grant or deny a motion for continuance is a matter of discretion that will normally not be disturbed. n9 In this instance, however, where it was asserted that there were material issues of fact to be resolved and a continuance was requested because of serious medical problems, I feel that it was an abuse of discretion to deny the continuance and grant summary judgment without giving Rapoport a meaningful opportunity to respond. n10

n9 *Florida Bar v. Lipman, 497 So. 2d 1165, 1167-68 (Fla. 1986)* ("It is within the sound discretion of the referee, assigned by this Court to preside over a disciplinary proceeding such as this, to grant or deny a motion for continuance. Such a ruling will not be disturbed by this Court absent a clear abuse of discretion."). [**14]

n10 See *Greene v. Seigle, 745 So. 2d 411 (Fla. 4th DCA 1999)* (holding that plaintiff's due process rights were violated when the trial court granted a summary judgment motion eight days after it was filed without providing the plaintiff with a sufficient opportunity to be heard); *Mondestin v. Duval Fed. Sav. & Loan Ass'n, 500 So. 2d 580 (Fla. 4th DCA 1986)* (holding that a party against whom a motion for summary judgment is filed is entitled to notice and a meaningful opportunity to be heard).

The majority opinion concludes that Rapoport is not entitled to relief because he received "both notice and an opportunity to heard before this Court." I do not believe that this constitutes a sufficient remedy. As noted above, Rapoport was not given an opportunity to submit disputed factual issues before the referee, and there are no provisions which permit him [*880] to present such disputed factual issues before this Court.

The majority opinion relies heavily on the fact that the referee's findings of fact were based on Rapoport's own admissions. A litigant's right [**15] to due process is not forfeited, however, because the most damaging evidence comes from his own confession or admissions. The right to be heard is fundamental, and Rapoport has been denied this right. For the above reasons, I dissent.

QUINCE, J., concurs.

# *Exhibit D*

LEXSEE 17 CAL. 4TH 119

**BIRBROWER, MONTALBANO, CONDON & FRANK, P.C., et al., Petitioners, v. THE SUPERIOR COURT OF SANTA CLARA COUNTY, Respondent; ESQ BUSINESS SERVICES, INC., Real Party in Interest.**

**No. S057125.**

**SUPREME COURT OF CALIFORNIA**

*17 Cal. 4th 119; 949 P.2d 1; 70 Cal. Rptr. 2d 304; 1998 Cal. LEXIS 2; 97 Cal. Daily Op. Service 51; 98 Daily Journal DAR 107*

**January 5, 1998, Decided**

**SUBSEQUENT HISTORY:** As Modified, February 25, 1998. Certiorari *Denied October 5, 1998, 67 U.S.L. Week 3239.* Certiorari Denied October 5, 1998, Reported at: *1998 U.S. LEXIS 6358.*

**PRIOR HISTORY:** Superior Court of Santa Clara County. Super. Ct. No. CV737595. John F. Herlihy, Judge.

**DISPOSITION:** We conclude that Birbrower violated section 6125 by practicing law in California. To the extent the fee agreement allows payment for those illegal local services, it is void, and Birbrower is not entitled to recover fees under the agreement for those services. The fee agreement is enforceable, however, to the extent it is possible to sever the portions of the consideration attributable to Birbrower's services illegally rendered in California from those attributable to Birbrower's New York services. Accordingly, we affirm the Court of Appeal judgment to the extent it concluded that Birbrower's representation of ESQ in California violated section 6125, and that Birbrower is not entitled to recover fees under the fee agreement for its local services. We reverse the judgment to the extent the court did not allow Birbrower to argue in favor of a severance of the illegal portion of the consideration (for the California fees) from the rest of the fee agreement, and remand for further proceedings consistent with this decision.

**LexisNexis(R) Headnotes**

**COUNSEL:**

Halley, Cornel & Lynch, Roger C. Peters, Hoge, Fenton, Jones & Appel, David P. Eby, William J. Elfving and Scott R. Mosko for Petitioners.

Latham & Watkins, Joseph A. Wheelock, Jr., and Julie V. King as Amici Curiae on behalf of Petitioners.

No appearance for Respondent.

Hopkins & Carley, Jon Michaelson, Denise Y. Yamamoto and Robert W. Ricketson for Real Party in Interest.

Diane C. Yu, Lawrence C. Yee, Mark Torres-Gil and Robert M. Sweet as Amici Curiae on behalf of Real Party in Interest.

**JUDGES:** Opinion by Chin, J., with George, C. J., Mosk, Baxter, Werdegar, and Brown, JJ., concurring. Dissenting opinion by Kennard, J.

**OPINIONBY:** CHIN

**OPINION:** [*124]  [**2]  [***306]

**CHIN, J.** *Business and Professions Code section 6125* states: "No person shall practice law in California unless the person is an active member of the State Bar." n1 We must decide whether an out-of-state law firm, not licensed to practice law in this state, violated section 6125 when it performed legal services in California for a California-based client under a fee agreement stipulating that California law would govern all matters in the representation.

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

n1 All further statutory references are to the Business and Professions Code unless otherwise specified.

Although we are aware of the interstate nature of modern law practice and mindful of the reality that large firms often conduct activities and serve clients in several states, we do not believe these facts excuse law firms from complying with section 6125. Contrary to the Court of Appeal, however, we do not believe the Legislature intended section 6125 to apply to those services an out-of-state firm renders in its home state. We therefore conclude that, to the extent defendant law firm Birbrower, Montalbano, Condon & Frank, P.C. (Birbrower), practiced [**3] law in California without a license, it engaged in the unauthorized practice of law in this state. (§ 6125.) We also conclude that Birbrower's fee agreement with real party in interest ESQ Business Services, Inc. (ESQ), is invalid to the extent it authorizes payment for the substantial legal services Birbrower performed in California. If, however, Birbrower can show it generated fees under its agreement for limited services it performed in New York, and it earned those fees under the otherwise invalid fee agreement, it may, on remand, present to the trial court evidence justifying its recovery of fees for those New York services. Conversely, ESQ will have an opportunity to produce contrary evidence. Accordingly, we affirm the Court of Appeal judgment in part and reverse it in part, remanding for further proceedings consistent with this opinion.

I. BACKGROUND

The facts with respect to the unauthorized practice of law question are essentially undisputed. Birbrower is a professional law corporation incorporated in New York, with its principal place of business in New York. During 1992 and 1993, Birbrower attorneys, defendants Kevin F. Hobbs and Thomas A. Condon (Hobbs and Condon), performed substantial work in California relating to the law firm's representation of ESQ. Neither Hobbs nor Condon has ever been licensed to practice law in California. None of Birbrower's attorneys were licensed to practice law in California during Birbrower's ESQ representation.

ESQ is a California corporation with its principal place of business in Santa Clara County. In July 1992, the parties negotiated and executed the fee [*125] agreement in New York, providing that Birbrower would perform legal services for ESQ, including "All matters pertaining to the investigation of and prosecution of all claims and causes of action against Tandem Computers Incorporated [Tandem]." The "claims and causes of action" against Tandem, a Delaware corporation with its principal place of business in Santa Clara County, California, related to a software development and marketing contract between Tandem and ESQ dated March 16, 1990 (Tandem Agreement). The Tandem Agreement stated that "The internal laws of the State of California (irrespective of its choice of law principles) shall govern the validity of this Agreement, the construction of its terms, and the interpretation and enforcement of the rights and duties of the parties hereto." Birbrower asserts, and ESQ disputes, that ESQ knew Birbrower was not licensed to practice law in California.

While representing ESQ, Hobbs and Condon traveled to California on several occasions. In August 1992, they met in California with ESQ and its accountants. During these meetings, Hobbs and Condon discussed various matters related to ESQ's dispute with Tandem and strategy for resolving the dispute. They made recommendations and gave advice. During this California trip, Hobbs and Condon also met with Tandem representatives on four or five occasions during [***307] a two-day period. At the meetings, Hobbs and Condon spoke on ESQ's behalf. Hobbs demanded that Tandem pay ESQ $ 15 million. Condon told Tandem he believed that damages would exceed $ 15 million if the parties litigated the dispute.

Around March or April 1993, Hobbs, Condon, and another Birbrower attorney visited California to interview potential arbitrators and to meet again with ESQ and its accountants. Birbrower had previously filed a demand for arbitration against Tandem with the San Francisco offices of the American Arbitration Association (AAA). In August 1993, Hobbs returned to California to assist ESQ in settling the Tandem matter. While in California, Hobbs met with ESQ and its accountants to discuss a proposed settlement agreement Tandem authored. Hobbs also met with Tandem representatives to discuss possible changes in the proposed agreement. Hobbs gave ESQ legal advice during this trip, including his opinion that ESQ should not settle with Tandem on the terms proposed.

ESQ eventually settled the Tandem dispute, and the matter never went to arbitration. But before the settlement, ESQ and Birbrower modified the contingency fee [**4] agreement. n2 The modification changed the fee arrangement from contingency to fixed fee, providing that ESQ would pay Birbrower [*126] over $ 1 million. The original contingency fee arrangement had called for Birbrower to receive "one-third (1/3) of all sums received for the benefit of the Clients . . . whether obtained through settlement, motion practice, hearing, arbitration, or trial by way of judgment, award, settlement, or otherwise . . . ."

n2  Birbrower's brief refers to the "Fee Agreement" without specifying whether it means the original contingency agreement or the later modified fixed fee agreement. The operative fee agreement that would be enforced is in dispute, and, as explained below, is subject to clarification on remand. To avoid confusion, we simply refer to one "fee agreement" for purposes of our analysis.

In January 1994, ESQ sued Birbrower for legal malpractice and related claims in Santa Clara County Superior Court. Birbrower removed the matter to federal court and filed a counterclaim, which included a claim for attorney fees for the work it performed in both California and New York. The matter was then remanded to the superior court. There ESQ moved for summary judgment and/or adjudication on the first through fourth causes of action of Birbrower's counterclaim, which asserted ESQ and its representatives breached the fee agreement. ESQ argued that by practicing law without a license in California and by failing to associate legal counsel while doing so, Birbrower violated section 6125, rendering the fee agreement unenforceable. Based on these undisputed facts, the Santa Clara Superior Court granted ESQ's motion for summary adjudication of the first through fourth causes of action in Birbrower's counterclaim. The court also granted summary adjudication in favor of ESQ's third and fourth causes of action in its second amended complaint, seeking declaratory relief as to the validity of the fee agreement and its modification. **(1)**  (See. fn. 3.) The court concluded that: (1) Birbrower was "not admitted to the practice of law in California"; (2) Birbrower "did not associate California counsel"; n3 (3) Birbrower "provided legal services in this state"; and (4) "The law is clear that no one may recover compensation for services as an attorney in this state unless he or she was a member of the state bar at the time those services were performed."

n3  Contrary to the trial court's implied assumption, no statutory exception to section 6125 allows out-of-state attorneys to practice law in California as long as they associate local counsel in good standing with the State Bar.

Although the trial court's order stated that the fee agreements were unenforceable, at the hearing on the summary adjudication motion, the trial court also observed: "It seems to me that those are some of the

issues that this Court has to struggle with, and then it becomes a question of if they aren't allowed to collect their attorney's fees here, I don't think that puts the attorneys in a position from being precluded from collecting all of their attorney's fees, only those fees probably that were generated by virtue of work that they performed in California and [***308] not that work that was performed in New York." [*127]

In granting limited summary adjudication,  the trial court left open the following issues for resolution: ESQ's malpractice action against Birbrower, and the remaining causes of action in Birbrower's counterclaim, including Birbrower's fifth cause of action for quantum meruit (seeking the reasonable value of legal services provided).

Birbrower petitioned the Court of Appeal for a writ of mandate directing the trial court to vacate the summary adjudication order. The Court of Appeal denied Birbrower's petition and affirmed the trial court's order, holding that Birbrower violated section 6125. The Court of Appeal also concluded that Birbrower's violation barred the firm from recovering its legal fees under the written fee agreement, including fees generated in New York by the attorneys when they were physically present in New York, because the agreement included payment for California or "local" services for a California client in California. The Court of Appeal agreed with the trial court, however, in deciding that Birbrower could pursue its remaining claims against ESQ, including its equitable claim for recovery of its fees in quantum meruit.

[**5]  We granted review to determine whether Birbrower's actions and services performed while representing ESQ in California constituted the unauthorized practice of law under section 6125 and, if so, whether a section 6125 violation rendered the fee agreement wholly unenforceable.

## II. DISCUSSION

### A. The Unauthorized Practice of Law

**(2)**  The California Legislature enacted section 6125 in 1927 as part of the State Bar Act (the Act), a comprehensive scheme regulating the practice of law in the state. ( *J.W. v. Superior Court (1993) 17 Cal. App. 4th 958, 965 [22 Cal. Rptr. 2d 527]* (*J.W.*).) Since the Act's passage, the general rule has been that, although persons may represent themselves and their own interests regardless of State Bar membership, no one but an active member of the State Bar may practice law for another person in California. (*Ibid.*) The prohibition against unauthorized law practice is within the state's police power and is designed to ensure that those performing legal services do so competently. ( *Id. at p. 969.)*

A violation of section 6125 is a misdemeanor. (§ 6126.) Moreover, "No one may recover compensation for

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

services as an attorney at law in this state unless [the person] was at the time the services were performed a member of The State Bar." ( *Hardy v. San Fernando Valley C. of C. (1950) 99 Cal. App. 2d 572, 576 [222 P.2d 314] (Hardy)*.) [*128]

(3) Although the Act did not define the term "practice law," case law explained it as " 'the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure.' " ( *People v. Merchants Protective Corp. (1922) 189 Cal. 531, 535 [209 P. 363] (Merchants)*.) *Merchants* included in its definition legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation. (*Ibid.; see People v. Ring (1937) 26 Cal. App. 2d Supp. 768, 772-773 [70 P.2d 281] (Ring)* [holding that single incident of practicing law in state without a license violates § 6125]; see also *Mickel v. Murphy (1957) 147 Cal. App. 2d 718, 721 [305 P.2d 993]* [giving of legal advice on matter not pending before state court violates § 6125], disapproved on other grounds in *Biakanja v. Irving (1958) 49 Cal. 2d 647, 651 [320 P.2d 16, 65 A.L.R.2d 1358]*.) *Ring* later determined that the Legislature "accepted both the definition already judicially supplied for the term and the declaration of the Supreme Court [in *Merchants*] that it had a sufficiently definite meaning to need no further definition. The definition . . . must be regarded as definitely establishing, for the jurisprudence of this state, the meaning of the term 'practice law.' " (*Ring, supra, 26* Cal. 2d at p. Supp. 772.)

In addition to not defining the term "practice law," the Act also did not define the meaning of "in California." In today's legal practice, questions often arise concerning whether the phrase refers to the nature of the legal services, or restricts the Act's application [***309] to those out-of-state attorneys who are physically present in the state.

Section 6125 has generated numerous opinions on the meaning of "practice law" but none on the meaning of "in California." In our view, the practice of law "in California" entails sufficient contact with the California client to render the nature of the legal service a clear legal representation. In addition to a quantitative analysis, we must consider the nature of the unlicensed lawyer's activities in the state. Mere fortuitous or attenuated contacts will not sustain a finding that the unlicensed lawyer practiced law "in California." The primary inquiry is whether the unlicensed lawyer engaged in sufficient activities in the state, or created a continuing relationship with the California client that included legal duties and obligations.

Our definition does not necessarily depend on or require the unlicensed lawyer's physical presence in the state. Physical presence here is one factor we may consider in deciding whether the unlicensed lawyer has violated section 6125, but it is by no means exclusive. For example, one may practice law in the state in violation of section 6125 although not physically present here by advising a California client on California law in connection [**6] with a [*129] California legal dispute by telephone, fax, computer, or other modern technological means. Conversely, although we decline to provide a comprehensive list of what activities constitute sufficient contact with the state, we do reject the notion that a person *automatically* practices law "in California" whenever that person practices California law anywhere, or "virtually" enters the state by telephone, fax, e-mail, or satellite. (See e.g., *Baron v. City of Los Angeles (1970) 2 Cal. 3d 535, 543 [86 Cal. Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036] (Baron)* ["practice law" does not encompass all professional activities].) Indeed, we disapprove *Ring, supra, 26 Cal. App. 2d Supp. 768,* and its progeny to the extent the cases are inconsistent with our discussion. We must decide each case on its individual facts.

This interpretation acknowledges the tension that exists between interjurisdictional practice and the need to have a state-regulated bar. As stated in the American Bar Association Model Code of Professional Responsibility, Ethical Consideration EC 3-9, "Regulation of the practice of law is accomplished principally by the respective states. Authority to engage in the practice of law conferred in any jurisdiction is not per se a grant of the right to practice elsewhere, and it is improper for a lawyer to engage in practice where he is not permitted by law or by court order to do so. However, the demands of business and the mobility of our society pose distinct problems in the regulation of the practice of law by the states. In furtherance of the public interest, the legal profession should discourage regulation that unreasonably imposes territorial limitations upon the right of a lawyer to handle the legal affairs of his client or upon the opportunity of a client to obtain the services of a lawyer of his choice in all matters including the presentation of a contested matter in a tribunal before which the lawyer is not permanently admitted to practice." (Fns. omitted.) *Baron* implicitly agrees with this canon. (*Baron, supra, 2 Cal. 3d at p. 543.*)

If we were to carry the dissent's narrow interpretation of the term "practice law" to its logical conclusion, we would effectively limit section 6125's application to those cases in which nonlicensed out-of-state lawyers appeared in a California courtroom without permission. (Dis. opn., *post,* at pp. 142-144.) Clearly, neither *Merchants, supra, 189 Cal.* at page 535, nor

*Baron, supra, 22 Cal. 3d at page 543,* supports the dissent's fanciful interpretation of the thoughtful guidelines announced in those cases. Indeed, the dissent's definition of "practice law" ignores *Merchants* altogether, and, in so doing, substantially undermines the Legislature's intent to protect the public from those giving unauthorized legal advice and counsel.

(4) Exceptions to section 6125 do exist, but are generally limited to allowing out-of-state attorneys to make brief appearances before a state court [*130] or tribunal. They are narrowly drawn and strictly interpreted. For example, an out-of-state attorney not licensed to practice in California may be permitted, [***310] *by consent of a trial judge,* to appear in California in a particular pending action. (See *In re McCue (1930) 211 Cal. 57, 67 [293 P. 47]; 1 Witkin, Cal. Procedure (4th ed. 1996) Attorneys, § 402,* p. 493.)

In addition, with the permission of the California court in which a particular cause is pending, out-of-state counsel may appear before a court as counsel pro hac vice. (*Cal. Rules of Court, rule 983.*) A court will approve a pro hac vice application only if the out-of-state attorney is a member in good standing of another state bar and is eligible to practice in any United States court or the highest court in another jurisdiction. (*Cal. Rules of Court, rule 983(a).*) The out-of-state attorney must also associate an active member of the California Bar as attorney of record and is subject to the Rules of Professional Conduct of the State Bar. (*Cal. Rules of Court, rules 983(a),* (d); see *Rules Prof. Conduct, rule 1-100(D)(2)* [includes lawyers from other jurisdictions authorized to practice in this state].)

The Act does not regulate practice before United States courts. Thus, an out-of-state attorney engaged to render services in bankruptcy proceedings was entitled to collect his fee. (*Cowen v. Calabrese (1964) 230 Cal. App. 2d 870, 872 [41 Cal. Rptr.* [**7] *441, 11 A.L.R.3d 903]* (*Cowen*); but see U.S. Dist. Ct. Local Rules, Northern Dist. Cal., rule 11-1(b); Eastern Dist. Cal., rule 83-180; Central Dist. Cal., rule 2.2.1; Southern Dist. Cal., rule 83.3 c.1.a. [today conditioning admission to their respective bars (with certain exceptions for some federal government employees) on active membership in good standing in California State Bar].)

Finally, *California Rules of Court, rule 988,* permits the State Bar to issue registration certificates to foreign legal consultants who may advise on the law of the foreign jurisdiction where they are admitted. These consultants may not, however, appear as attorneys before a California court or judicial officer or otherwise prepare pleadings and instruments in California or give advice on the law of California or any other state or jurisdiction except those where they are admitted.

The Legislature has recognized an exception to section 6125 in international disputes resolved in California under the state's rules for arbitration and conciliation of international commercial disputes. (*Code Civ. Proc., § 1297.11* et seq.) This exception states that in a commercial conciliation in California involving international commercial disputes, "The parties may appear in person or be represented or assisted by any person of their choice. A person assisting or representing a party need not be a member of the legal [*131] profession or licensed to practice law in California." (*Code Civ. Proc., § 1297.351.*) Likewise, the Act does not apply to the preparation of or participation in labor negotiations and arbitrations arising under collective bargaining agreements in industries subject to federal law. (See e.g., *Teamsters Local v. Lucas Flour Co. (1962) 369 U.S. 95, 103 [82 S. Ct. 571, 576-577, 7 L. Ed. 2d 593];* see also Labor-Management Relations Act of 1947, *29 U.S.C. § 185*(a).)

## B. *The Present Case*

(5a) The undisputed facts here show that neither *Baron's* definition ( *Baron, supra, 2 Cal. 3d at p. 543*) nor our "sufficient contact" definition of "practice law in California" (*ante,* at pp. 128-129) would excuse Birbrower's extensive practice in this state. Nor would any of the limited statutory exceptions to section 6125 apply to Birbrower's California practice. As the Court of Appeal observed, Birbrower engaged in unauthorized law practice *in California* on more than a limited basis, and no firm attorney engaged in that practice was an active member of the California State Bar. As noted (*ante,* at p. 125), in 1992 and 1993, Birbrower attorneys traveled to California to discuss with ESQ and others various matters pertaining to the dispute between ESQ and Tandem. Hobbs and Condon discussed strategy for resolving the dispute and advised ESQ on this strategy. Furthermore, during California meetings with Tandem representatives in August 1992, Hobbs demanded Tandem pay $ 15 million, and Condon told Tandem he believed damages in the matter would exceed that amount if the parties proceeded to litigation. Also in California, Hobbs met with ESQ for the stated purpose of helping to reach a settlement agreement and to discuss the agreement that was eventually proposed. Birbrower attorneys also traveled to California to initiate arbitration proceedings before the matter was settled. As the Court of Appeal concluded, ". . . the Birbrower firm's [***311] in-state activities clearly constituted the [unauthorized] practice of law" *in California.*

Birbrower contends, however, that section 6125 is not meant to apply to *any* out-of-state *attorneys.* Instead, it argues that the statute is intended solely to prevent nonattorneys from practicing law. This contention is without merit because it contravenes the plain language

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

of the statute. Section 6125 clearly states that *no person shall practice law in California unless that person is a member of the State Bar.* The statute does not differentiate between attorneys or nonattorneys, nor does it excuse a person who is a member of another state bar. **(6)** It is well-settled that, in determining the meaning of a statute, we look to its words and give them their usual and ordinary meaning. ( *DaFonte v. Up-Right, Inc. (1992) 2 Cal. 4th 593, 601 [7 Cal. Rptr. 2d 238, 828 P.2d 140]; Kimmel v. Goland (1990) 51 Cal. 3d 202, 208-209 [271 Cal. Rptr. 191, 793 P.2d 524].)* "[I]f statutory language is 'clear [*132] and unambiguous there is no need for construction, and courts should not indulge in it.' [Citation.]" ( *Tiernan v. Trustees of Cal. State University & Colleges (1982) 33 Cal. 3d 211, 218 [188 Cal. Rptr. 115, 655 P.2d 317].)* **(5b)** The plain meaning controls our interpretation of the statute here because Birbrower has not shown "that [**8] the natural and customary import of the statute's language is either 'repugnant to the general purview of the act' or for some other compelling reason, should be disregarded . . . ." ( *Id. at pp. 218-219.)*

Birbrower next argues that we do not further the statute's intent and purpose--to protect California citizens from incompetent attorneys--by enforcing it against out-of-state attorneys. Birbrower argues that because out-of-state attorneys have been licensed to practice in other jurisdictions, they have already demonstrated sufficient competence to protect California clients. But Birbrower's argument overlooks the obvious fact that other states' laws may differ substantially from California law. Competence in one jurisdiction does not necessarily guarantee competence in another. By applying section 6125 to out-of-state attorneys who engage in the extensive practice of law in California without becoming licensed in our state, we serve the statute's goal of assuring the competence of all attorneys practicing law in this state. ( *J.W., supra, 17 Cal. App. 4th at p. 969.)*

California is not alone in regulating who practices law in its jurisdiction. Many states have substantially similar statutes that serve to protect their citizens from unlicensed attorneys who engage in unauthorized legal practice. Like section 6125, these other state statutes protect local citizens "against the dangers of legal representation and advice given by persons not trained, examined and licensed for such work, whether they be laymen or lawyers from other jurisdictions." ( *Spivak v. Sachs (1965) 16 N.Y.2d 163 [263 N.Y.S.2d 953, 211 N.E.2d 329, 331].)* Whether an attorney is duly admitted in another state and is, in fact, competent to practice in California is irrelevant in the face of section 6125's language and purpose. (See *Ranta v. McCarney (N.D. 1986) 391 N.W.2d 161, 163 (Ranta)* [noting that out-of-state attorney's competence is irrelevant because purpose

of North Dakota law against unauthorized law practice is to assure competence *before* attorney practices in state].) Moreover, as the North Dakota Supreme Court pointed out in *Ranta:* "It may be that such an [out-of-state attorney] exception is warranted, but such a plea is more properly made to a legislative committee considering a bill enacting such an exception or to this court in its rule-making function than it is in a judicial decision." ( *Id. at p. 165.)* Similarly, a decision to except out-of-state attorneys licensed in their own jurisdictions from section 6125 is more appropriately left to the California Legislature. [*133]

Assuming that section 6125 does apply to out-of-state attorneys not licensed here, Birbrower alternatively asks us to create an exception to section 6125 for work incidental to private arbitration or other alternative dispute resolution proceedings. Birbrower points to fundamental differences between private arbitration and legal proceedings, including procedural differences relating to discovery, rules of evidence, compulsory process, cross-examination of witnesses, and other areas. (See *Alexander v. Gardner-Denver [***312] Co. (1974) 415 U.S. 36, 57-58 [94 S. Ct. 1011, 1024-1025, 39 L. Ed. 2d 147]* [illustrating differences between arbitration and court proceedings].) As Birbrower observes, in light of these differences, at least one court has decided that an out-of-state attorney could recover fees for services rendered in an arbitration proceeding. (See *Williamson v. John D. Quinn Const. Corp. (S.D.N.Y. 1982) 537 F. Supp. 613, 616 (Williamson).)*

In *Williamson,* a New Jersey law firm was employed by a client's New York law firm to defend a construction contract arbitration in New York. It sought to recover fees solely related to the arbitration proceedings, even though the attorney who did the work was not licensed in New York, nor was the firm authorized to practice in the state. ( *Williamson, supra, 537 F. Supp. at p. 616.)* In allowing the New Jersey firm to recover its arbitration fees, the federal district court concluded that an arbitration tribunal is not a court of record, and its fact-finding process is not similar to a court's process. (*Ibid.*) The court relied on a local state bar report concluding that representing a client in an arbitration was not the unauthorized practice of law. (*Ibid.;* see Com. Rep., Labor Arbitration and the Unauthorized Practice of Law (May/June 1975) 30 Record of the Association [**9] of the Bar of the City of New York, No. 5/6, p. 422 et seq.) But as amicus curiae the State Bar of California observes, "While in *Williamson* the federal district court did allow the New Jersey attorneys to recover their fees, that decision clearly is distinguishable on its facts. . . . [P] In the instant case, it is undisputed that none of the time that the New York attorneys spent in California was" spent in arbitration; *Williamson* thus carries limited

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

weight. (See also *Moore v. Conliffe (1994) 7 Cal. 4th 634, 637-638 [29 Cal. Rptr. 2d 152, 871 P.2d 204]* [private AAA arbitration functionally equivalent to judicial proceeding to which litigation privilege applies].) Birbrower also relies on California's rules for arbitration and conciliation of international commercial disputes for support. ( *Code Civ. Proc., § 1297.11* et seq.) As noted (*ante*, at pp. 130-131), these rules specify that, in an international commercial conciliation or arbitration proceeding, the person representing a party to the conciliation or arbitration is not required to be a licensed member of the State Bar. ( *Code Civ. Proc., § 1297.351*.)

We decline Birbrower's invitation to craft an arbitration exception to section 6125's prohibition of the unlicensed practice of law in this state. Any [*134] exception for arbitration is best left to the Legislature, which has the authority to determine qualifications for admission to the State Bar and to decide what constitutes the practice of law. ( *Baron, supra, 2 Cal. 3d at pp. 540-541;* see also *Eagle Indem. Co. v. Industrial Acc. Com. (1933) 217 Cal. 244, 247 [18 P.2d 341]*.) Even though the Legislature has spoken with respect to *international* arbitration and conciliation, it has not enacted a similar rule for private arbitration proceedings. Of course, private arbitration and other alternative dispute resolution practices are important aspects of our justice system. (See *Moncharsh v. Heily & Blase (1992) 3 Cal. 4th 1, 9 [10 Cal. Rptr. 2d 183, 832 P.2d 899]* [noting a strong public policy in favor of arbitration].) Section 6125, however, articulates a strong public policy favoring the practice of law in California by licensed State Bar members. In the face of the Legislature's silence, we will not create an arbitration exception under the facts presented. (See *Baron, supra, 2 Cal. 3d at pp. 540-541* [membership, character, and conduct of attorneys is proper subject of state legislative regulation and control].) n4

n4 The dissent focuses on an arbitrator's powers in an attempt to justify its conclusion that an out-of-state attorney may engage in the unlicensed representation of a client in an arbitration proceeding. (See dis. opn., *post*, at pp. 144-145.) This narrow focus confuses the issue here. An arbitrator's powers to enforce a contract or "award an essentially unlimited range of remedies" has no bearing on the question whether unlicensed out-of-state attorneys may represent California clients in an arbitration proceeding. (Dis. opn., *post*, at p. 145.) Moreover, any discussion of the practice of law in an arbitration proceeding is irrelevant here because the parties

settled the underlying case before arbitration proceedings became necessary. Nonetheless, we emphasize that, in the absence of clear legislative direction, we decline to create an exception allowing unlicensed legal practice in arbitration in violation of section 6125.

[***313] In its reply brief to the State Bar's amicus curiae brief, Birbrower raises for the first time the additional argument that the Federal Arbitration Act (FAA) preempted the rules governing the AAA proposed arbitration and section 6125. The FAA regulates arbitration that deals with maritime transactions and contracts involving the transportation of goods through interstate or foreign commerce. *(9 U.S.C. § 1* et seq.) Although we need not address the question under *California Rules of Court, rule 29(b)(1)*, and note the parties' settlement agreement rendered the arbitration unnecessary, we reject the argument for its lack of merit. First, the parties incorporated a California choice-of-law provision in the Tandem Agreement, indicating they intended to apply California law in any necessary arbitration, and they have not shown that California law in any way conflicts with the FAA. Moreover, in interpreting the California Arbitration Act stay provisions ( *Code Civ. Proc., § 1281.2*, subd. (c)), the high court observed that the FAA does not contain an express preemptive provision, nor does it "reflect a congressional intent to occupy the entire field of arbitration." (*Volt Info. Sciences v.* [**10] *Leland* [*135] *Stanford Jr. U. (1989) 489 U.S. 468, 477 [109 S. Ct. 1248, 1255, 103 L. Ed. 2d 488]*.)

Finally, Birbrower urges us to adopt an exception to section 6125 based on the unique circumstances of this case. Birbrower notes that "Multistate relationships are a common part of today's society and are to be dealt with in commonsense fashion." ( *In re Estate of Waring (1966) 47 N.J. 367 [221 A.2d 193, 197]*.) In many situations, strict adherence to rules prohibiting the unauthorized practice of law by out-of-state attorneys would be " 'grossly impractical and inefficient.' " (*Ibid.*; see also *Appell v. Reiner (1964) 43 N.J. 313 [204 A.2d 146, 148]* [strict adherence to rule barring out-of-state lawyers from representing New Jersey residents on New Jersey matters may run against the public interest when case involves inseparable multistate transactions].)

Although, as discussed (*ante*, at pp. 129-130), we recognize the need to acknowledge and, in certain cases, to accommodate the multistate nature of law practice, the facts here show that Birbrower's extensive activities within California amounted to considerably more than any of our state's recognized exceptions to section 6125 would allow. Accordingly, we reject Birbrower's

suggestion that we except the firm from section 6125's rule under the circumstances here.

### C. *Compensation for Legal Services*

(7a) Because Birbrower violated section 6125 when it engaged in the unlawful practice of law in California, the Court of Appeal found its fee agreement with ESQ unenforceable in its entirety. Without crediting Birbrower for some services performed in New York, for which fees were generated under the fee agreement, the court reasoned that the agreement was void and unenforceable because it included payment for services rendered to a California client in the state by an unlicensed out-of-state lawyer. The court opined that "When New York counsel decided to accept [the] representation, it should have researched California law, including the law governing the practice of law in this state." The Court of Appeal let stand, however, the trial court's decision to allow Birbrower to pursue its fifth cause of action in quantum meruit. n5 We agree with the Court of Appeal to the extent it barred Birbrower from recovering fees generated under the fee agreement for the unauthorized legal services it performed in California. We disagree with the same court to the extent it implicitly barred Birbrower [*136] from recovering fees generated under the fee agreement for the limited legal services the firm performed in New York.

> n5 We observe that ESQ did not seek (and thus the court did not grant) summary adjudication on the Birbrower firm's quantum meruit claim for the reasonable value of services rendered. Birbrower thus still has a cause of action pending in quantum meruit.

It is a general rule that an attorney is barred from recovering compensation for [***314] services rendered in another state where the attorney was not admitted to the bar. (Annot., *Right of Attorney Admitted in One State to Recover Compensation for Services Rendered in Another State Where He Was Not Admitted to the Bar (1967) 11 A.L.R.3d 907; Hardy, supra, 99 Cal. App. 2d at p. 576.)* The general rule, however, has some recognized exceptions.

Initially, Birbrower seeks enforcement of the entire fee agreement, relying first on the federal court exception discussed *ante,* at page 130. *(Cowen, supra, 230 Cal. App. 2d at p. 872; In re McCue, supra, 211 Cal. at p. 66; see* Annot., *supra, 11 A.L.R.3d at pp. 912-913* [citing *Cowen* as an exception to general rule of nonrecovery].) This exception does not apply in this case; none of Birbrower's activities related to federal court practice.

A second exception on which Birbrower relies to enforce its entire fee agreement relates to "Services not involving courtroom appearance." (Annot., *supra, 11 A.L.R.3d at p.* 911 [citing *Wescott v. Baker (1912) 83 N.J.L. 460 [85 A. 315]].)* California has implicitly rejected this broad exception through its comprehensive definition of what it means to "practice law." Thus, the exception Birbrower seeks for all services performed outside the courtroom [**11] in our state is too broad under section 6125.

Some jurisdictions have adopted a third exception to the general rule of nonrecovery for in-state services, if an out-of-state attorney "makes a full disclosure to his client of his lack of local license and does not conceal or misrepresent the true facts." (Annot., *supra, 11 A.L.R.3d at p. 910.)* For example, in *Freeling v. Tucker (1930) 49 Idaho 475 [289 P. 85],* the court allowed an out-of-state attorney to recover for services rendered in an Idaho probate court. Even though an Idaho statute prohibited the unlicensed practice of law, the court excused the Oklahoma attorney's unlicensed representation because he had not falsely represented himself nor deceptively held himself out to the client as qualified to practice in the jurisdiction. *(Id.* at p. 86.) In this case, Birbrower alleges that ESQ at all times knew that the firm was not licensed to practice law in California. Even assuming that is true, however, we reject the full disclosure exception for the same reasons we reject the argument that section 6125 is not meant to apply to nonattorneys. Recognizing these exceptions would contravene not only the plain language of section 6125 but the underlying policy of assuring the competence of those practicing law in California. [*137]

Therefore, as the Court of Appeal held, none of the exceptions to the general rule prohibiting recovery of fees generated by the unauthorized practice of law apply to Birbrower's activities in California. Because Birbrower practiced substantial law in this state in violation of section 6125, it cannot receive compensation under the fee agreement for any of the services it performed in California. Enforcing the fee agreement in its entirety would include payment for the unauthorized practice of law in California and would allow Birbrower to enforce an illegal contract. *(See Hardy, supra, 99 Cal. App. 2d at p. 576.)*

Birbrower asserts that even if we agree with the Court of Appeal and find that none of the above exceptions allowing fees for unauthorized California services apply to the firm, it should be permitted to recover fees for those limited services it performed exclusively *in New York* under the agreement. In short, Birbrower seeks to recover under its contract for those services it performed for ESQ in New York that did not involve the practice of law in California, including fee

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

contract negotiations and some corporate case research. Birbrower thus alternatively seeks reversal of the Court of Appeal's judgment to the extent it implicitly precluded the firm from seeking fees generated in New York under the fee agreement.

We agree with Birbrower that it may be able to recover fees under the fee agreement for the limited legal services it performed for ESQ in New York to the extent they did not constitute practicing law in California, even though those services were performed for a California client. Because section 6125 applies to the practice of law in California, it does not, in general, regulate law practice in other states. (See *ante,* at pp. 128-131.) [***315] Thus, although the general rule against compensation to out-of-state attorneys precludes Birbrower's recovery under the fee agreement for its actions in California, the severability doctrine may allow it to receive its New York fees generated under the fee agreement, if we conclude the illegal portions of the agreement pertaining to the practice of law in California may be severed from those parts regarding services Birbrower performed in New York. (See Annot., *supra, 11 A.L.R.3d at pp. 908-909,* and cases cited [bar on recovery by out-of-state attorney extends only to compensation for *local* services]; see also *Ranta, supra, 391 N.W.2d at p. 166* [remanding case to determine which fees related to practice locally and which related to attorney's work in state where he was licensed].)

The law of contract severability is stated in *Civil Code section 1599,* which defines partially void contracts: "Where a contract has several distinct objects, of which one at least is lawful, and one at least is unlawful, in whole or in part, the contract is void as to the latter and valid as to the rest." In [*138] *Calvert v. Stoner (1948) 33 Cal. 2d 97 [199 P.2d 297]* (*Calvert*), we considered whether a contingent fee contract containing a provision restricting a party's right to compromise a suit [**12] without her attorney's consent was void entirely or severable in part. ( *Id. at p. 103.*) We observed that "It is unnecessary . . . to determine whether the particular provision is invalid as against public policy. It is sufficient to observe, assuming such invalidity, that in this state . . . the compensation features of the contract are not thereby deemed affected if in other respects the contract is lawful." ( *Id. at p. 104.*) *Calvert* concluded that the invalid provision preventing the client from compromising the suit could be severed from the valid provision for attorney fees. (*Ibid.*)

The fee agreement between Birbrower and ESQ became illegal when Birbrower performed legal services in violation of section 6125. **(8)** It is true that courts will not ordinarily aid in enforcing an agreement that is either illegal or against public policy. ( *Asdourian v. Araj (1985) 38 Cal. 3d 276, 291 [211 Cal. Rptr. 703, 696*

*P.2d 95]; Homami v. Iranzadi (1989) 211 Cal. App. 3d 1104, 1109-1110 [260 Cal. Rptr. 6].*) Illegal contracts, however, will be enforced under certain circumstances, such as when only a part of the consideration given for the contract involves illegality. In other words, notwithstanding an illegal consideration, courts may sever the illegal portion of the contract from the rest of the agreement. ( *Keene v. Harling (1964) 61 Cal. 2d 318, 320 [38 Cal. Rptr. 513, 392 P.2d 273]* (*Keene*).) " ' "When the transaction is of such a nature that the good part of the consideration can be separated from that which is bad, the Courts will make the distinction, for the . . . law . . . [divides] according to common reason; and having made that void that is against law, lets the rest stand. . . ." ' " ( *Id. at pp. 320-321,* quoting *Jackson v. Shawl (1865) 29 Cal. 267, 272.*) If the court is unable to distinguish between the lawful and unlawful parts of the agreement, "the illegality taints the entire contract, and the entire transaction is illegal and unenforceable." ( *Keene, supra, 61 Cal. 2d at p. 321.*)

In *Keene,* the defendant agreed to pay the plaintiffs $ 50,000 in exchange for their business involving coin-operated machines. The defendant defaulted on his payments, and the plaintiffs sued. The defendant argued that the sales agreement was void because part of the sale involved machines that were illegal under a California penal statute. The court affirmed the lower court's determination that the price of the illegal machines could be deducted from the amount due on the original contract. "Since the consideration on the buyer's side was money, the court properly construed the contract by equating the established market price of the illegal machines to a portion of the money consideration." ( *Keene, supra, 61 Cal. 2d at p. 323.*) Thus, even though the entire contract was for a fixed sum, the court was able [*139] to value the illegal portion of the contract and separate it from the rest of the amount due under the agreement.

**(7b)** In this case, the parties entered into a contingency fee agreement followed by a [***316] fixed fee agreement. n6 ESQ was to pay money to Birbrower in exchange for Birbrower's legal services. The object of their agreement may not have been entirely illegal, assuming ESQ was to pay Birbrower compensation based in part on work Birbrower performed in New York that did not amount to the practice of law in California. The illegality arises, instead, out of the amount to be paid to Birbrower, which, if paid fully, would include payment for services rendered in California in violation of section 6125.

n6 The parties apparently do not dispute that they modified the original contingency fee

arrangement to call for a fixed fee payment of over $ 1 million. They dispute, however, whether the original contingency fee arrangement became operative once again when ESQ failed to make a payment to Birbrower under the fixed fee arrangement. Because the trial court and the Court of Appeal believed the fee agreements to be unenforceable in their entirety, neither court addressed issues relating to the fee agreements themselves or the parties' disputes surrounding those agreements. We agree with the Court of Appeal that issues surrounding the two fee agreements and the applicability of either section 6147 (regulating contents of contingency fee agreements) or the *State Bar Rules of Professional Conduct, rules 3-300* and *4-200* (governing fees for legal services), are best resolved by the trial court on remand.

Therefore, we conclude the Court of Appeal erred in determining that the fee [**13] agreement between the parties was entirely unenforceable because Birbrower violated section 6125's prohibition against the unauthorized practice of law in California. Birbrower's statutory violation may require exclusion of the portion of the fee attributable to the substantial illegal services, but that violation does not necessarily entirely preclude its recovery under the fee agreement for the limited services it performed outside California. ( *Calvert, supra, 33 Cal. 2d at pp. 104-105.)*

Thus, the portion of the fee agreement between Birbrower and ESQ that includes payment for services rendered in New York may be enforceable to the extent that the illegal compensation can be severed from the rest of the agreement. On remand, therefore, the trial court must first resolve the dispute surrounding the parties' fee agreement and determine whether their agreement conforms to California law. If the parties and the court resolve the fee dispute and determine that one fee agreement is operable and does not violate any state drafting rules, the court may sever the illegal portion of the consideration (the value of the California services) from the rest of the fee agreement. Whether the trial court finds the contingent fee agreement or the fixed fee agreement to be valid, it will determine whether some amount is due under the valid agreement. The trial court must then determine, on [*140] evidence the parties present, how much of this sum is attributable to services Birbrower rendered in New York. The parties may then pursue their remaining claims.

III. DISPOSITION

We conclude that Birbrower violated section 6125 by practicing law in California. To the extent the fee

agreement allows payment for those illegal local services, it is void, and Birbrower is not entitled to recover fees under the agreement for those services. The fee agreement is enforceable, however, to the extent it is possible to sever the portions of the consideration attributable to Birbrower's services illegally rendered in California from those attributable to Birbrower's New York services. Accordingly, we affirm the Court of Appeal judgment to the extent it concluded that Birbrower's representation of ESQ in California violated section 6125, and that Birbrower is not entitled to recover fees under the fee agreement for its local services. We reverse the judgment to the extent the court did not allow Birbrower to argue in favor of a severance of the illegal portion of the consideration (for the California fees) from the rest of the fee agreement, and remand for further proceedings consistent with this decision.

George, C. J., Mosk, J., Baxter, J., Werdegar, J., and Brown, J., concurred.

**DISSENTBY: KENNARD**

**DISSENT:**

  **KENNARD, J.,**

  Dissenting.--In California, it is a misdemeanor to practice law when one is not a member of the State Bar. ( *Bus. & Prof. Code, § 6125, 6126,* subd. (a).) In this case, New York lawyers who were not members of the California Bar [***317] traveled to this state on several occasions, attempting to resolve a contract dispute between their clients and another corporation through negotiation and private arbitration. Their clients included a New York corporation and a sister corporation incorporated in California; the lawyers had in previous years represented the principal owners of these corporations. The majority holds that the New York lawyers' activities in California constituted the unauthorized practice of law. I disagree.

  The majority focuses its attention on the question of whether the New York lawyers had engaged in the practice of law *in California*, giving scant consideration to a decisive preliminary inquiry: whether, through their activities here, the New York lawyers had engaged in the practice of law *at all*. In my view, the record does not show that they did. In reaching a contrary conclusion, the majority relies on an overbroad definition of the term "practice of law." I would adhere to this court's decision in *Baron v. City of* [*141] *Los Angeles (1970) 2 Cal. 3d 535 [86 Cal. Rptr. 673, 469 P.2d 353, 42 A.L.R.3d 1036],* more narrowly defining the practice of law as the representation of another in a judicial proceeding or an activity requiring the application of that degree of legal

knowledge and technique possessed only by a trained legal mind. Under this definition, this case presents a triable issue of material fact as to whether the New York [**14] lawyers' California activities constituted the practice of law.

I

Defendant Birbrower, Montalbano, Condon & Frank, P.C. (hereafter Birbrower) is a New York law firm. Its lawyers are not licensed to practice law in California.

Kamal Sandhu was the sole shareholder of ESQ Business Services Inc., a New York corporation (hereafter ESQ-NY), of which his brother Iqbal Sandhu was the vice-president. Beginning in 1986, Birbrower lawyers represented the Sandhu family in various business matters. In 1990, Kamal Sandhu asked Birbrower lawyer Kevin Hobbs to review a proposed software development and marketing agreement between ESQ-NY and Tandem Computers Incorporated (hereafter Tandem). The agreement granted Tandem worldwide distribution rights to computer software created by ESQ-NY. The agreement also provided that it would be governed by California law and that, according to Birbrower's undisputed assertion, disputes were to be resolved by arbitration under the rules of the American Arbitration Association. ESQ-NY and Tandem signed the agreement.

Thereafter, a second corporation, also named ESQ Business Services, Inc. (hereafter ESQ-CAL), was incorporated in California, with Iqbal Sandhu as a principal shareholder. In 1991, ESQ-CAL consulted Birbrower lawyers concerning Tandem's performance under the agreement. In 1992, ESQ-NY and ESQ-CAL jointly hired Birbrower to resolve the dispute with Tandem, including the investigation and prosecution of claims against Tandem if necessary. ESQ-NY and ESQ-CAL entered into a contingency fee agreement with Birbrower; this agreement was executed in New York but was later modified to a fixed fee agreement in California.

The efforts of the Birbrower lawyers to resolve the dispute with Tandem included several brief trips to California. On these trips, Birbrower lawyers met with officers of both ESQ-NY and ESQ-CAL and with representatives of Tandem; they also interviewed arbitrators and participated in negotiating the settlement of the dispute with Tandem. (Maj. opn., ante, at p. 125.) On February 12, 1993, Birbrower initiated an arbitration proceeding against [*142] Tandem, on behalf of both ESQ-NY and ESQ-CAL, by filing a claim with the American Arbitration Association in San Francisco, California. Before an arbitration hearing was held, the dispute with Tandem was settled.

In January 1994, ESQ-CAL and Iqbal Sandhu, the principal shareholder, sued Birbrower for malpractice. Birbrower cross-complained to recover its fees under the fee agreement. Plaintiffs ESQ-CAL and Iqbal Sandhu thereafter amended their complaint to add ESQ-NY as a plaintiff. Plaintiffs moved for summary adjudication, asserting [***318] the fee agreement was unenforceable because the Birbrower lawyers had engaged in the unauthorized practice of law in California. The trial court agreed, and granted plaintiffs' motion. The Court of Appeal upheld the trial court's ruling, as does a majority of this court today.

II

Business and Professions Code section 6125 states: "No person shall practice law in California unless the person is an active member of the State Bar." The Legislature, however, has not defined what constitutes the practice of law.

Pursuant to its inherent authority to define and regulate the practice of law (see, e.g., Merco Constr. Engineers, Inc. v. Municipal Court (1978) 21 Cal. 3d 724, 728 [147 Cal. Rptr. 631, 581 P.2d 636]; In re Lavine (1935) 2 Cal. 2d 324, 328; People v. Turner (1850) 1 Cal. 143, 150), this court in 1922 defined the practice of law as follows: " '[A]s the term is generally understood, the practice of the law is the doing and performing services in a court of justice in any matter depending therein throughout its various stages and in conformity with the adopted rules of procedure. But in a larger sense it includes legal advice and counsel and the preparation of legal instruments and contracts by which the legal rights are secured although such matter may or may not be [**15] depending in a court.' " ( People v. Merchants Protective Corp. (1922) 189 Cal. 531, 535 [209 P. 363] (Merchants).) The Merchants court adopted this definition verbatim from a decision by the Indiana Court of Appeals, Eley v. Miller (1893) 7 Ind.App. 529 [34 N.E. 836, 837-838]. ( Merchants, supra, at p. 535.)

In 1970, in Baron v. City of Los Angeles, supra, 2 Cal. 3d 535, 542 (Baron), this court reiterated the Merchants court's definition of the term "practice of law." We were quick to point out in Baron, however, that "ascertaining whether a particular activity falls within this general definition may be a formidable endeavor." ( Id. at p. 543.) Baron emphasized "that it is not the whole spectrum of professional services of lawyers with which the State Bar [*143] Act is most concerned, but rather is the smaller area of activities defined as the 'practice of law.' " (Ibid.) It then observed: "In close cases, the courts have determined that the resolution of legal questions for another by advice and action is practicing law 'if difficult or doubtful legal questions are involved which, to safeguard the public, reasonably demand the application

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

of a *trained legal mind.*' [Citations.]" (*Ibid.,* italics added.) Baron added that "if the application of legal knowledge and technique is *required,* the activity constitutes the practice of law . . . ." (*Ibid.,* italics added.) This definition is quite similar to that proposed by Cornell Law School Professor Charles Wolfram, the chief reporter for the American Law Institute's Restatement of the Law Governing Lawyers: "The correct form of the test [for the practice of law] should inquire whether the matter handled was of such complexity that only a person trained as a lawyer should be permitted to deal with it." (Wolfram, Modern Legal Ethics (1986) p. 836.)

The majority asserts that the definition of practice of law I have stated above misreads this court's opinion in *Baron.* (Maj. opn., *ante,* at p. 129.) But what the majority characterizes as "the dissent's fanciful interpretation of the [*Baron* court's] thoughtful guidelines" (*ibid.*) consists of language I have quoted directly from *Baron.*

The majority also charges that the narrowing construction of the term "practice of law" that this court adopted in *Baron* "effectively limit[s] section 6125's application to those cases in which nonlicensed out-of-state lawyers appeared in a California courtroom without permission." (Maj. opn., *ante,* at p. 129.) Fiddlesticks. Because the *Baron* definition encompasses all activities that " 'reasonably demand application of a trained legal mind' " (*Baron, supra, 2 Cal. 3d at p. 543*), the majority's assertion would be true only if there were no activities, apart from court appearances, requiring [***319] application of a trained legal mind. Many attorneys would no doubt be surprised to learn that, for example, drafting testamentary documents for large estates, preparing merger agreements for multinational corporations, or researching complex legal issues are not activities that require a trained legal mind.

According to the majority, use of the *Baron* definition I have quoted would undermine protection of the public from incompetent legal practitioners. (Maj. opn., *ante,* at p. 129.) The *Baron* definition provides ample protection from incompetent legal practitioners without infringing upon the public's interest in obtaining advice and representation from other professionals, such as accountants and real estate brokers, whose skills in specialized areas may overlap with those of lawyers. This allows the public the freedom to choose professionals who may be able to provide the public with [*144] needed services at a more affordable cost. (See Wolfram, Modern Legal Ethics, *supra,* at p. 831; Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions (1981) 34 Stan.L.Rev. 1, 97-98;* Weckstein, *Limitations on the Right to Counsel: The Unauthorized Practice of Law, 1978 Utah L.Rev. 649, 650.)* As this

court has recognized, there are proceedings in which nonattorneys "are competent" [**16] to represent others without undermining the protection of the public interest. ( *Consumers Lobby Against Monopolies v. Public Utilities Com. (1979) 25 Cal. 3d 891, 913-914 [160 Cal. Rptr. 124, 603 P.2d 41].)*

The majority, too, purports to apply the definition of the practice of law as articulated in *Baron, supra, 2 Cal. 3d 535.* The majority, however, focuses only on *Baron's* quotation of the general definition of the practice of law set forth in *Merchants, supra, 189 Cal. 531, 535.* The majority ignores both the ambiguity in the *Merchants* definition and the manner in which *Baron* resolved that ambiguity. The majority apparently views the practice of law as encompassing *any* "legal advice and legal instrument and contract preparation, whether or not these subjects were rendered in the course of litigation." (Maj. opn., *ante,* at p. 128.)

The majority's overbroad definition would affect a host of common commercial activities. On point here are comments that Professor Deborah Rhode made in a 1981 article published in the Stanford Law Review: "For many individuals, most obviously accountants, bankers, real estate brokers, and insurance agents, it would be impossible to give intelligent counsel without reference to legal concerns that such statutes reserve as the exclusive province of attorneys. As one [American Bar Association] official active in unauthorized practice areas recently acknowledged, there is growing recognition that ' "all kinds of other professional people are practicing law almost out of necessity." ' Moreover, since most legislation does not exempt gratuitous activity, much advice commonly imparted by friends, employers, political organizers, and newspaper commentators constitutes unauthorized practice. For example, although the organized bar has not yet evinced any inclination to drag [nationally syndicated advice columnist] Ann Landers through the courts, she is plainly fair game under extant statutes [proscribing the unauthorized practice of law]." (Rhode, *Policing the Professional Monopoly: A Constitutional and Empirical Analysis of Unauthorized Practice Prohibitions, supra, 34 Stan.L.Rev. at p. 47,* fns. omitted.)

Unlike the majority, I would for the reasons given above adhere to the more narrowly drawn definition of the practice of law that this court articulated in *Baron, supra, 2 Cal. 3d 535, 543:* the representation of another in a judicial proceeding or an activity requiring the application of that degree [*145] of legal knowledge and technique possessed only by a trained legal mind. Applying that definition here, I conclude that the trial court should not have granted summary adjudication for plaintiffs based on the Birbrower lawyers' California activities. That some or all of those activities related to

arbitration does not necessarily establish that they constituted the practice of law, as I shall explain.

[***320] III

As I mentioned earlier, Birbrower's clients had a software development and marketing agreement with Tandem. The agreement provided that its validity, interpretation, and enforcement were to be governed by California law. It also contained an arbitration provision. After a dispute arose pertaining to Tandem's performance under the agreement, Birbrower initiated an arbitration on behalf of its clients by filing a claim with the American Arbitration Association in San Francisco, and held meetings in California to prepare for an arbitration hearing. Because the dispute with Tandem was settled, the arbitration hearing was never held.

As I explained in part II, *ante*, this court in *Baron, supra, 2 Cal. 3d 535, 543*, defined the term "practice of law" in narrower terms than the court had done earlier in *Merchants, supra, 189 Cal. 531, 535*, which simply adopted verbatim the general definition set forth in an 1893 decision of the Indiana Court of Appeals. Under the narrower definition articulated in *Baron*, the practice of law is the representation of another in a judicial proceeding or an activity requiring the application of that degree of legal knowledge and technique possessed only by a trained legal mind.

[**17] Representing another in an arbitration proceeding does not invariably present difficult or doubtful legal questions that require a trained legal mind for their resolution. Under California law, arbitrators are "not ordinarily constrained to decide according to the rule of law . . . ." ( *Moncharsh v. Heily & Blase (1992) 3 Cal. 4th 1, 11 [10 Cal. Rptr. 2d 183, 832 P.2d 899].)* Thus, arbitrators, " 'unless specifically required to act in conformity with rules of law, may base their decision upon broad principles of justice and equity, and in doing so may expressly or impliedly reject a claim that a party might successfully have asserted in a judicial action.' [Citations.]" ( *Id. at pp. 10-11.)* They " 'are not bound to award on principles of dry law, but may decide on principles of equity and good conscience, and make their award *ex aequo et bono* [according to what is just and good].' [Citation.]" ( *Id. at p. 11*, original brackets.) For this reason, "the existence of an *error of law* apparent on the face of the [arbitration] award *that causes substantial injustice* does not provide grounds for judicial review." ( *Id. at p. 33*, italics added; contra, *id. at pp. 33-40* (conc. and dis. opn. of Kennard, J.).) [*146]

Moreover, an arbitrator in California can award any remedy "arguably based" on "the contract's general subject matter, framework or intent." ( *Advanced Micro Devices, Inc. v. Intel Corp. (1994) 9 Cal. 4th 362, 381 [36 Cal. Rptr. 2d 581, 885 P.2d 994].)* This means that

"an arbitrator in a commercial contract dispute may award an essentially unlimited range of remedies, whether or not a court could award them if it decided the same dispute, so long as it can be said that the relief draws its 'essence' from the contract and not some other source." ( *Id. at p. 391* (dis. opn. of Kennard, J.).)

To summarize, under this court's decisions, arbitration proceedings are not governed or constrained by the rule of law; therefore, representation of another in an arbitration proceeding, including the activities necessary to prepare for the arbitration hearing, does not necessarily require a trained legal mind.

Commonly used arbitration rules further demonstrate that legal training is not essential to represent another in an arbitration proceeding. Here, for example, Birbrower's clients agreed to resolve any dispute arising under their contract with Tandem using the American Arbitration Association's rules, which allow any party to be "represented by counsel *or other authorized representative.*" (Am. Arbitration Assn., Com. Arbitration Rules (July 1, 1996) § 22, italics added.) Rules of other arbitration organizations also allow for representation by nonattorneys. For instance, the Rules of Procedure of the Inter-American Commercial Arbitration Commission, article IV provides: "The parties may be represented or assisted by persons of their choice." By federal law, this rule applies in all arbitrations between a United States citizen and a citizen of another [***321] signatory to the Inter-American Convention on International Commercial Arbitration, unless the arbitrating parties have expressly provided otherwise. *(9 U.S.C. § 303*(b); Inter-Am. Convention on International Com. Arbitration, art. 3.)

The American Arbitration Association and other major arbitration associations thus recognize that nonattorneys are often better suited than attorneys to represent parties in arbitration. The history of arbitration also reflects this reality, for in its beginnings arbitration was a dispute-resolution mechanism principally used in a few specific trades (such as construction, textiles, ship chartering, and international sales of goods) to resolve disputes among businesses that turned on factual issues uniquely within the expertise of members of the trade. In fact, "rules of a few trade associations forbid representation by counsel in arbitration proceedings, because of their belief that it would complicate what might otherwise be simple proceedings." (Grenig, Alternative Dispute Resolution (1997) § 5.2, p. 81.) The majority gives no adequate justification for its decision to deprive parties of their [*147] freedom of contract and to make it a crime for anyone but California lawyers to represent others in arbitrations in California.

17 Cal. 4th 119, *; 949 P.2d 1, **;
70 Cal. Rptr. 2d 304, ***; 1998 Cal. LEXIS 2

[**18]    In addressing an issue similar to that presented here, a federal court held that a firm of New Jersey lawyers not licensed to practice law in New York was entitled to recover payment for legal services rendered in a New York arbitration proceeding. ( *Williamson v. John D. Quinn Const. Corp. (S.D.N.Y. 1982) 537 F. Supp. 613 (Williamson)*.) In allowing recovery of fees, the court cited a report by the Association of the Bar of The City of New York: "The report states, 'it should be noted that no support has to date been found in judicial decision, statute or ethical code for the proposition that representation of a party in any kind of arbitration amounts to the practice of law.' The report concludes '[t]he Committee is of the opinion that representation of a party in an arbitration proceeding by a nonlawyer or a lawyer from another jurisdiction is not the unauthorized practice of law.' " ( *Id. at p. 616,* quoting Com. Rep., Labor Arbitration and the Unauthorized Practice of Law (May/June 1975) 30 Record of the Association of the Bar of The City of New York, No. 5/6, at pp. 422, 428.)

The majority's attempt to distinguish *Williamson, supra, 537 F. Supp. 613,* from this case is unpersuasive.

The majority points out that in *Williamson,* the lawyers of the New Jersey firm actually rendered services at the New York arbitration hearing, whereas here the New York lawyers never actually appeared at an arbitration hearing in California. (Maj. opn., *ante,* at pp. 133, 134, fn. 4.) The majority distinguishes *Williamson* on the ground that in this case no arbitration hearing occurred. Does the majority mean that an actual appearance at an arbitration hearing is not the practice of law, but that preparation for arbitration proceedings is?

In this case, plaintiffs have not identified any specific California activities by the New York lawyers of the Birbrower firm that meet the narrow definition of the term "practice of law" as articulated by this court in *Baron, supra, 2 Cal. 3d 535, 543.* Accordingly, I would reverse the judgment of the Court of Appeal and direct it to remand the matter to the trial court with directions to vacate its order granting plaintiff's motion for summary adjudication and to enter a new order denying that motion.

On February 25, 1998, the opinion was modified to read as printed above.

# *Exhibit E*

2 of 2 DOCUMENTS

## SUPERADIO LIMITED PARTNERSHIP vs. WALT "BABY" LOVE PRODUCTIONS, INC.

### No. 03-P-27

### APPEALS COURT OF MASSACHUSETTS

*2004 Mass. App. LEXIS 1356*

**February 18, 2004, Argued**
**November 29, 2004, Decided**

**PRIOR HISTORY:** [*1] Worcester. Civil action commenced in the Superior Court Department on August 24, 2001. The case was heard by Francis R. Fecteau, J.

**DISPOSITION:** Judgment confirming arbitrator's award reversed; arbitral award vacated.

**LexisNexis(R) Headnotes**

**COUNSEL:** John O. Mirick (Julie A. Hamon with him) for the plaintiff.

John D. Geelan, of New York (Michelle M. Hansen with him) for the defendant.

**JUDGES:** Present: Armstrong, C.J., Perretta, & Smith, JJ.

**OPINIONBY:** SMITH

**OPINION:**

SMITH, J. In May of 1995, Superadio Limited Partnership (Superadio) entered into a radio network agreement (agreement) with Walt "Baby" Love Productions, Inc. (Baby Love). Under that agreement, Superadio became the exclusive advertising sales agent for a radio program produced by Baby Love and distributed by Superadio. The agreement provided that revenues collected from the sale of advertisements aired on the radio program would be divided between Superadio and Baby Love. The agreement also required that the parties arbitrate any disputes arising from the agreement before a panel of the American Arbitration Association (AAA) and that the ensuing arbitration be conducted pursuant to the AAA's rules. The agreement terminated on December 31, 1998.

On or about March 29, 1999, Superadio filed a demand for arbitration, claiming that Baby Love had [*2] withheld approximately $ 150,000 in revenue from advertisements sold by Superadio. The advertisements had been booked by Superadio during the agreement, but had aired after the termination of the agreement.

Baby Love answered Superadio's demand and asserted counterclaims claiming that Superadio violated the agreement by refusing to turn over advertising revenue that Superadio had collected on Baby Love's behalf. Superadio did not deny that Baby Love was entitled to about $ 75,000 of those revenues, but claimed that it was entitled to hold those funds as a "set-off" against revenues which it might prove at the arbitration hearing.

The parties selected a panel of three arbitrators. Baby Love argued that Superadio had no right of set-off. The arbitration panel agreed; and, on February 7, 2000, the panel ordered Superadio to pay Baby Love the withheld funds. Superadio made the payments.

The parties then attempted to engage in discovery for the hearing on the remaining claims and counterclaims. However, although Baby Love made repeated, specific requests for the production of certain documents, Superadio did not respond to those requests.

As a result of Superadio's failure to respond [*3] to Baby Love's requests, on August 21, 2000, the arbitration panel entered an order directing Superadio to comply with the requests by September 22, 2000, or it would have to pay a fine of "$ 1,000 per day until Superadio is either in compliance or until the date of the hearing

whichever shall occur first." The parties were also told that the failure of either party to produce requested documents would result in the unproduced evidence not being allowed in evidence at the hearing.

On or about September 28, 2000, Superadio withdrew its demand for arbitration. Baby Love, however, proceeded with its counterclaims and again repeated its demands for Superadio to produce responsive documents and witnesses. Superadio again failed to comply with the requests.

After several continuances, which were requested by Baby Love, the hearing on Baby Love's counterclaims commenced on June 20, 2001. At that time, Superadio still had not complied with Baby Love's requests for discovery. During the hearing, Superadio admitted that it possessed the documents requested by Baby Love and, in fact, attempted to introduce them in evidence. The documents were not allowed in evidence by the arbitration panel [*4] because of its previous order that any requested documents that were not produced would not be admitted in evidence.

On July 23, 2001, the arbitration panel entered its award. The panel determined that Baby Love presented sufficient documentary evidence and witness testimony to support its claim that Superadio had indeed underreported the amount of advertising revenue owed to Baby Love. The arbitration panel determined, however, as to the issue of damages that "Superadio's refusal to produce requested documents despite orders and monetary sanctions from the Panel, prevented [Baby] Love from proving its damages with the minimum threshold precision necessary for an award on its breach of contract theory." Because of the failure of Superadio to produce the discovery material, the arbitration panel ruled that it had been "hampered in its ability to determine precise contract damages." Consequently, the panel decided to resolve the outstanding disputes between the parties through an award of discovery sanctions against Superadio.

The arbitration panel then revisited its discovery order and noted that 271 days had elapsed between the date of that order and the start of the hearing. At [*5] the time of the order, the penalty set by the panel for noncompliance was $ 1,000 a day. Therefore, the arbitration panel imposed monetary sanctions on Superadio, in the form of an award, in the amount of $ 271,000 against Superadio.

On August 21, 2001, Superadio filed a complaint in the Superior Court seeking to vacate the award. Baby Love filed an answer requesting the judge to confirm the award. On April 5, 2002, the judge allowed Baby Love's motion and confirmed the award. Judgment entered in favor of Baby Love on August 30, 2002. Superadio then filed a timely appeal.

On appeal, Superadio claims that the arbitration panel exceeded its powers when it imposed monetary sanctions in the form of an award. Superadio also argues that the award was obtained by undue means because Baby Love's attorney, who had been admitted to practice law in New York and not Massachusetts, engaged in an unauthorized practice of law during the arbitration proceedings.

1. Standard of review. Under *G. L. c. 150C, § 11*, "A matter submitted to arbitration is subject to a very narrow scope of review. Absent fraud, errors of law or fact are not sufficient grounds to set aside [*6] an award." *Lynn v. Thompson, 435 Mass. 54, 61, 754 N.E.2d 54 (2001)*, quoting from *Plymouth-Carver Regional Sch. Dist. v. J. Farmer & Co., 407 Mass. 1006, 1007, 553 N.E.2d 1284 (1990)*. "The policy of limited judicial review is reflective of the strong public policy favoring arbitration as an expeditious alternative to litigation for settling commercial disputes." *Plymouth-Carver Regional Sch. Dist. v. J. Farmer & Co., supra at 1007*.

There are a few exceptions, however, to the general rule. Those exceptions, which are contained in *G. L. c. 150C, § 11*, include the admonition that "upon application of a party, the superior court shall vacate an award if . . . (3) the arbitrators exceeded their powers." As defined by our cases, "An arbitrator exceeds his powers if the parties to the agreement never gave the arbitrator the power to make the award he made." *Leominster v. International Bhd. of Police Officers, 33 Mass. App. Ct. 121, 124, 596 N.E.2d 1032 (1992)*. See *Morceau v. Gould-National Batteries, Inc., 344 Mass. 120, 124, 181 N.E.2d 664 (1962)*.

Superadio argues that the arbitration panel exceeded its authority by imposing monetary [*7] sanctions because there is no such authority granted to the panel in the parties' agreement to submit the dispute for arbitration, the AAA rules, or in the *Uniform Arbitration Act for Commercial Disputes*, as adopted by Massachusetts. See *G. L. c. 251*.

2. Analysis. a. The arbitration clause. Baby Love claims that the arbitration clause in the agreement gave the arbitration panel the authority to assess monetary sanctions in the form of an award. See *Drywall Sys., Inc., v. ZVI Constr. Co., 435 Mass. 664, 669-671, 761 N.E.2d 482 (2002)*. n1 In Drywall, the parties agreed to submit to arbitration "any controversy or claim . . . arising out of or related to this subcontract." *Id. at 665*. Disputes arose between the parties, and, after a hearing, the arbitration panel entered an award against the defendant which included, among other things, multiple damages pursuant

to *G. L. c. 93A, § 11. Id. at 666.* On appeal, the Supreme Judicial Court upheld the award, ruling that the arbitration clause was sufficiently broad to allow for multiple damages although the allowance of such damages was not specifically authorized by the arbitration clause. [*8] Ibid. The court noted that neither *G. L. c. 93A, § 11,* nor *G. L. c. 251, § 10,* n2 prohibited an arbitral award of multiple damages. *Id. at 669.*

      n1 Baby Love also claims that *Softkey, Inc. v. Useful Software, Inc., 52 Mass. App. Ct. 837, 840-841, 756 N.E.2d 631 (2001),* supports the award of monetary sanctions. In Softkey, the arbitration agreement specifically included a provision for the award of attorneys' fees "in proportion to [the parties] respective amounts of liability so determined." *Id. at 838.* In determining the amount of attorneys' fees, the arbitrator took in consideration "[Softkey's] stonewalling [during] discovery." Ibid. On appeal, the court ruled that, because the parties specifically agreed to the award of attorneys' fees "in proportion to their respective amounts of liability [so determined]," the arbitrator had the authority to consider and reflect in his award "the degree to which the parties participated constructively in the arbitration process." *Id. at 840.* Softkey does not apply to this matter because the parties never specifically agreed to allow the arbitration panel to impose monetary sanctions. [*9]

      n2 *General Laws c. 251, § 10,* refers to certain fees and expenses that should be included in the award unless otherwise provided by the agreement to arbitrate. See part 2(c), infra.

In the case before us, the arbitration clause states that the parties agree to arbitrate "any dispute arising under the agreement." The award of monetary sanctions for violations of discovery orders was not, however, a dispute that arose under the agreement. Rather it was a dispute that arose from the conduct of the arbitration itself. Accordingly, the arbitration clause in the agreement did not authorize the arbitration panel to impose monetary sanctions in the form of an award for violation of discovery orders.

b. The AAA rules. The agreement also states that any dispute arising under it would be resolved by AAA rules. Rule 23 of the Commercial Arbitration Rules of the AAA states as follows:

"(a) At the request of any party or at the discretion of the arbitrator, consistent with the expedited nature of arbitration, the arbitrator may direct (i) the production of documents [*10] and other information, and (ii) the identification of any witnesses to be called.

"(b) At least five (5) business days prior to the hearing, the parties shall exchange copies of all exhibits they intend to submit at the hearing.

"(c) The arbitrator is authorized to resolve any disputes concerning the exchange of information."

Although rule 23 is silent about the arbitrators' authority to enforce their discovery orders by imposing monetary sanctions, Baby Love points to *rule 45(a)* of the AAA rules which states that "the arbitrator may grant any remedy or relief that the arbitrator deems just and equitable and within the scope of the agreement of the parties." According to Baby Love, rules 23 and 45, when read together, gave the panel the authority to impose monetary sanctions on Superadio for its refusal to comply with Baby Love's discovery requests. We disagree, noting that *rule 45(a)* does not mention monetary sanctions and should not be construed as to sweep in matters not contemplated by the agreement, i.e., to include matters beyond the issue submitted to arbitration.

    c. The Uniform Arbitration Act. In 1960, Massachusetts adopted the Uniform Arbitration Act [*11] (UAA), *G. L. c. 251,* with certain modifications. Because discovery under the UAA was limited only to subpoenas and depositions, and did not, for example, include the production of documents, Massachusetts added a provision, *G. L. c. 251, § 7(e),* n3 permitting a party to serve on another party a request for discovery in accordance with *Mass.R.Civ.P. 34(a), 365 Mass. 792 (1974); Mass.R.Civ.P. 26(b), 365 Mass. 772 (1974).* See *Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 414 Mass. 609, 616, 609 N.E.2d 460 (1993).* Under the statute, enforcement and objections to discovery requests are made to the arbitrator who may issue orders as deemed necessary. *G. L. c. 251, § 7(e).* If discovery requests are not complied with, the arbitrator may issue a subpoena for the production of the documents. *G. L. c. 251, § 7(a).* n4 *Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., supra.* If the party still refuses to comply, the party requesting the documents or the arbitrator [*12] may make an application to the court for

the enforcement of the subpoena. *G. L. c. 251, § 7(a).* Note 4, *supra. Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., supra.* "Service and enforcement of subpoenas are [then] governed by [*Mass.R.Civ.P. 45(b), 365 Mass. 809 (1974).*]" Ibid.

n3 *General Laws c. 251, § 7(e),* inserted by St. 1960, c. 74, § 1, states in pertinent part as follows:

"(e) Any party in an arbitration proceeding may serve upon any other party a request for the production of documents and things . . . . The enforcement and objections of such request shall be made to the arbitrators and the arbitrators only shall issue such orders as they deem necessary on objections and in requests for enforcement of production both prior to and after the commencement of the hearings."

n4 *General Laws c. 251, § 7(a),* inserted by St. 1960, c. 274, § 1, states as follows:

"(a) The arbitrators may cause to be issued subpoenas for the attendance of witnesses and for the production of books, records, documents and other evidence, and shall have the power to

administer oaths. Subpoenas so issued shall be served, and upon application to the court by a party or the arbitrators, enforced, in the manner provided by law for the service and enforcement of subpoenas in a civil action."

[*13]

There is, therefore, no authority in *G. L. c. 251* allowing arbitrators to impose monetary sanctions for violations of discovery orders. Rather, it appears to us that it was the intent of the Legislature to leave that drastic sanction to the courts.

3. Conclusion. It is clear that arbitrators have the power to enforce discovery orders by imposing some sanctions, such as not allowing the withheld documents in evidence. Our decision holds only that unless the parties agree to the imposition of monetary sanctions for violation of discovery orders, arbitrators do not have the authority to impose monetary sanctions for such violations.

The judgment confirming the arbitrator's award is reversed, and the arbitral award is vacated. n5

n5 Because of our decision in favor of Superadio, we do not discuss the unauthorized practice of law issue.

So ordered.

# *Exhibit F*

1 of 3 DOCUMENTS

**IN RE: ANTONIO LUCAS, Debtor. DARRYL CHIMKO, Appellant, v. ANTONIO LUCAS, Appellee.**

CIVIL ACTION NO. 03-40277-WGY

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS**

*2004 U.S. Dist. LEXIS 21905*

**September 30, 2004, Decided**

**PRIOR HISTORY:** *In re Lucas, 2003 Bankr. LEXIS 1328 (Bankr. D. Mass., Oct. 10, 2003)*

**DISPOSITION:** Affirmed in part; Questions certified to the Supreme Judicial Court of Massachusetts

**LexisNexis(R) Headnotes**

**COUNSEL:** [*1] For Darryl Chimko, Appellant: Ann Brennan, Stephen E. Shambam Law Offices, Braintree, MA.

For Darryl Chimko, Appellant: Stephen E. Shamban, Stephen E. Shamban Law Offices, PC, Braintree, MA.

**JUDGES:** WILLIAM G. YOUNG, CHIEF JUDGE.

**OPINIONBY:** WILLIAM G. YOUNG

**OPINION:**

MEMORANDUM AND ORDER

**I. INTRODUCTION**

Michigan attorney Darryl Chimko ("Chimko") appeals from an order (the "Order") of the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court") imposing sanctions for his misleading communications and unauthorized practice of law in Massachusetts. Chimko challenges the Order on two grounds, arguing that his communications with the Bankruptcy Court and a pro se debtor were not misleading and that his actions, which included mailing,

completing, and filing a reaffirmation agreement, did not constitute the practice of law.

**II. BACKGROUND**

**A. Factual Background**

The following facts are essentially undisputed. On April 17, 2003, debtor Antonio Lucas ("Lucas") filed a pro se petition for Chapter 7 bankruptcy relief. Mem. of Decision [R. Item No. 15] at 1. Listed on Lucas's schedule were his residence in Lawrence, Massachusetts, and the [*2] three mortgages that encumber the property: Fleet Bank with a balance of $ 14,000, Principle Residential with a balance of $ 37,900, and Household Finance with a balance of $ 23,700. Id.

Chimko, a Michigan attorney acting on Household Finance's behalf, contacted Lucas by mail regarding reaffirmation of his debt. n1 Id. at 1-3. Chimko sent Lucas documents including a cover letter dated May 12, 2002, n2 a proposed reaffirmation agreement, a "reaffirmation data sheet," and a "notice of pro se reaffirmation." 2 Appellant's App. [Doc. No. 7] at AA 025. The cover letter, like all future correspondence with Lucas, was printed on the letterhead of Chimko's law firm, which appeared as follows:

**SHERMETA, CHIMKO & ADAMS, P.C.**

**Attorneys and Counselors at Law**

445 South Livernois Suite 333

P.O. Box 80490

Rochester Hills, MI 48308-0490

(248) 652-2000

Fax (248) 652-2896

Id.; Mem. of Decision at 2-3. The letter identified Household Finance as "Our Client," described the terms of the reaffirmation agreement, and was signed "SHERMETA, CHIMKO & ADAMS, P.C." 2 Appellant's App. at AA 025. The law firm advised Lucas that "we cannot give you legal advice," but encouraged [*3] him to contact "**DARRYL J. CHIMKO**" with "any questions or concerns." Id.

> n1 Briefly, reaffirmation of a debt waives the protections of bankruptcy. See 4 *Collier on Bankruptcy (15th ed. rev. 2004) (1979)* P 524.04. Individuals such as Lucas, whose liabilities include a secured consumer debt, may choose to reaffirm the debt rather than surrender the collateral that secures it. See *11 U.S.C. § 521(2)(A)*.

> N2 Because the cover letter refers to Lucas's bankruptcy case, which was initiated on April 17, 2003, the Court presumes that the printed date, "May 12, 2002," was a typographical error.

The proposed reaffirmation agreement incorporated the original terms of the Household Finance mortgage. See Appellant's Br. at 22. Chimko entered these terms, unchanged, into a form substantially similar to Official Bankruptcy Form 6. Id.; 7/31/03 Show Cause Hr'g Tr. [R. Item No. 9] at 15:4-10, 37:3-10. Chimko's form, however, differed in at least three respects: [*4] its "Notice to Debtor" was emphasized by bold as well as underlined text, it was signed by Chimko as "Agent for Creditor" rather than as "Creditor Representative," and it was shorter -- two pages rather than six. See 7/31/03 Show Cause Hr'g Tr. at 37:12-38:15; compare 1 Appellant's App. [Doc. No. 6] at A 036-037, with Official Bankruptcy Form 6. Chimko testified that each of these changes was approved by corporate counsel for Household Financial. 7/31/03 Show Cause Hr'g Tr. at 15:11-18.

The enclosed "reaffirmation data sheet" called for Lucas to provide his address and phone number, the name, address, and phone number of his employer, and his monthly net income. Letter from Brennan to the Court of 3/4/04, Ex. A. The intended "notice of reaffirmation," which Chimko captioned as a pleading but included for Chimko's reference, informed the Court that the debtor had reaffirmed a debt secured by real property. 1 Appellant's App. at A 038. The notice began: "**NOW COMES**, Creditor, HOUSEHOLD FINANCE CORPORATION II, by and through its attorneys, SHERMETA, CHIMKO & ADAMS, P.C." Id. In its

penultimate paragraph, the notice requested that the Bankruptcy Court "advise Creditor [*5] of any Hearing on the attached Reaffirmation Agreement by notifying agent for Creditor . . ., **Attention: DARRYL J. CHIMKO.**" Id. P 7. The notice concluded:

> If Creditor is not notified of any Hearing on Reaffirmation concerning the attached Reaffirmation Agreement, Creditor shall proceed in a manner consistent with the plain language of the aforestated statute [*11 U.S.C. § 524*] and shall consider the attached Reaffirmation Agreement to be valid, so long as all other requirements to obtain a valid Reaffirmation Agreement are present under *11 U.S.C. § 524*.

Id. P 8. Chimko signed the notice on behalf of "SHERMETA, CHIMKO & ADAMS, P.C.[.] . . . Agent for Creditor." 1 Appellant's App. at A 038.

By letter dated May 27, 2003, n3 the bankruptcy department of Chimko's law firm advised Lucas that they had not received the executed reaffirmation agreement. Mem. of Decision at 3-4. Like the initial cover letter, this letter was printed on law firm letterhead and identified Household Finance as "Our Client." 2 Appellant's App. at AA026. On June 2, 2003, Lucas executed there affirmation agreement, which Chimko then signed [*6] on behalf of Shermeta, Chimko & Adams, P.C., "Agent for Creditor." 1 Appellant's App. at A037.

> n3 The Bankruptcy Court actually gives the date as "May 27, 2002," but this reflects a typographical error either in the Memorandum of Decision or in the original letter, as it was clearly sent in 2003.

Chimko filed the executed reaffirmation agreement with the Bankruptcy Court on June 16, 2003. Mem. of Decision at 2. Enclosed with the agreement were a cover letter and the notice of reaffirmation described above. Id.; 1 Appellant's App. at A 039. The cover letter, like those previously sent to Lucas, was printed on law firm letterhead and signed by Chimko on behalf of "Shermeta, Chimko & Adams P.C." 1 Appellant's App. at A 039.

**B. Procedural Posture**

The Bankruptcy Court, noting that Chimko had entered an appearance as an "agent" but submitted the notice of reaffirmation as an "attorney []," ordered Chimko to appear at a hearing that would take place on July 31, 2003. See Mem. of Decision at 2. There, [*7] counsel for Chimko argued that preparing and filing the

reaffirmation agreement was merely "ministerial": "It's something that could be performed by someone who doesn't happen to be an attorney, and I know from my own experience that some of the other large companies handle these things in-house." 7/31/03 Show Cause Hr'g Tr. at 54:16-20. The United States Trustee ("Trustee") disagreed. Id. at 58:16-59:6. The Trustee noted that Chimko had revised Local Form 6, signed the reaffirmation agreement, and drafted the accompanying notice, tasks which "other firms . . . hire local counsel to do . . for a good reason." Id. at 58:16-59:6. The Bankruptcy Court, concurring with the Trustee, later ordered Chimko to identify all cases pending in the District of Massachusetts in which he or his law firm had filed a reaffirmation agreement or an appearance. Id. at 59:7-11; Order of 8/4/03 [R. Item No. 11].

The Bankruptcy Court issued its decision on October 10, 2003. [R. Item No. 14]. The accompanying memorandum explained that Chimko, in preparing the reaffirmation agreement, providing Lucas with the notice of reaffirmation, and printing correspondence on law firm letterhead, had misrepresented [*8] his status to Lucas and the Bankruptcy Court, and engaged in the unauthorized practice of law in Massachusetts. Mem. of Decision at 3-6. In addition, the Bankruptcy Court determined that Chimko had "never fully complied" with the order to identify his cases pending before the District of Massachusetts. Id. at 6. In fact, Chimko had omitted nine such cases, three of which listed Chimko or his law firm as "agents." Id. at 6, Attach. As a remedy for Chimko's actions, the Bankruptcy Court sanctioned Chimko in the amount of $ 500, and forwarded copies of its decision to the Massachusetts Board of Bar Overseers and the Michigan Attorney Discipline Board. Id. at 7.

On Chimko's motion for reconsideration, the Bankruptcy Court revised its findings to recognize that Chimko had provided a satisfactory explanation -- namely errors in his law firm's records -- for his omission of certain pending cases. Decision & Order of 10/31/03 [R. Item No. 19] P 2. The Bankruptcy Court stated, however, that Chimko's "compliance with the Court's Order is not material to the Court's conclusion that he held himself out as an attorney without being licensed by this Commonwealth. [*9] " Id. P 3.

Chimko appealed the decision to this Court by notice and election dated November 10, 2003. See Notice of Appeal [R. Item No. 20]; Election of Appeal [R. Item No. 21]. Neither Lucas, the Trustee, nor any other party submitted briefs in opposition. On February 12, 2004, after hearing oral argument, the Court affirmed the Bankruptcy Court's decision as to misrepresentation. See 2/12/04 Hr'g Tr. at 5:21-23. As to unauthorized practice, however, the Court found state policies less

clear. Id. at 4:23-5:5. The Court accordingly invited supplemental briefing on both substance and procedure. Specifically, the Court inquired whether Chimko's actions constituted the unauthorized practice of law, and whether the question ought be certified to the Supreme Judicial Court of Massachusetts. See 2/12/04 Hr'g Tr. at 10:5-11:2. Having since received Chimko's n4 supplemental memorandum, the Court proceeds to decide the appeal.

> n4 The Massachusetts Board of Bar Overseers, Michigan Attorney Discipline Board, and Consumer Protection and Antitrust Division of the Massachusetts Office of the Attorney General were invited to submit briefs as amici curiae but declined to do so. See 2/12/04 Hr'g Tr. at 10:5-17; Order of 3/10/04 [Doc. No. 9]; Letter from Carpenter and Crane to the Court of 4/6/04.

[*10]

## III. DISCUSSION

### A. Jurisdiction

As an initial matter, it is unclear that Chimko in fact challenged a "final Order" when filing his notice of appeal. See Appellant's Br. at 2. If extended to appeals in bankruptcy, the Supreme Court's opinion in *Cunningham v. Hamilton County, 527 U.S. 198, 144 L. Ed. 2d 184, 119 S. Ct. 1915 (1999)*, suggests otherwise. In Cunningham, the Supreme Court held that an order of sanctions, even if imposed on an attorney who no longer represents a party to the case, is not a "final decision" from which an immediate appeal will lie. *Id. at 200*; see also *Empresas Omajede, Inc. v. Bennazar-Zequeira, 213 F.3d 6, 9 & n.4 (1st Cir. 2000)* (suggesting that Cunningham may extend to sanctions orders issued by bankruptcy courts); *In re Rimsat, Ltd., 212 F.3d 1039, 1044 (7th Cir. 2000)* (same).

Yet even if not formerly so, the decision of the Bankruptcy Court has since become final. On November 18, 2003, the Bankruptcy Court issued an order discharging Lucas. Docket Rpt. [R. Item No. 1], Doc. No. 27. Under the doctrine of cumulative finality, this subsequent event "saved" Chimko's appeal, see *Rimsat, 212 F.3d at 1044*, [*11] permitting Chimko to seek review "as of right" rather than "by leave," Fed. R. Bankr. P. 8001. See 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3926.2.

### B. Standard of Review n5

n5 As the First Circuit has recently explained, an order for sanctions may lack finality, and therefore warrant no deference, if the disciplinary proceedings before the bankruptcy court were "non-core," -- that is, not "essential to the administration of the bankruptcy estate." See *In re Sheridan, 362 F.3d 96, 100, 107 (1st Cir. 2004)*. Here, however, in contrast to Sheridan, sanctions were imposed during an ongoing bankruptcy proceeding, and the sanctioned attorney both failed to raise the core/non-core issue and affirmatively characterized the Order as "final,". Appellant's Br. at 2. See *Sheridan, 362 F.3d at 103-04, 111*. The Court thus considers the decision of the Bankruptcy Court a final order, subject to the deferential standard of review outlined in section III. B.

[*12]

On appeal, this Court applies a "clearly erroneous" standard to the bankruptcy court's findings of fact, giving "due regard . . . to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Fed. R. Bankr. P. 8013*. Mixed questions of law and fact ordinarily are also reviewed under the "clearly erroneous" standard, "unless the bankruptcy court's analysis was infected by legal error.'" In *Winthrop Old FarmNurseries, Inc., 50 F.3d 72, 73 (1st Cir. 1995)* (quoting *Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993))*. Conclusions of law, in contrast, are reviewed de novo. *In re LaRoche, 969 F.2d 1299, 1301 (1st Cir. 1992)*.

## C. Misleading Communications

Although the "rules regulating attorney conduct in federal court are strictly a matter of federal law," *In re Sheridan, 362 F.3d 96, 109 n.16 (1st Cir. 2004)*, federal law here incorporates state law, including the Massachusetts Rules of Professional Conduct. See Bankr. D. Mass. R. 2090-2(a) (holding attorneys who appear before the Bankruptcy Court -- defined to include attorneys who file "any pleading or other document," Bankr. D. Mass. [*13] R. 9010-3 (a) -- to the standards of professional conduct set forth by this District); D. Mass. R. 83.6(4) (B) (defining the "ethical requirements and rules" of this District to mean "those canons and rules adopted by the Supreme Judicial Court of Massachusetts"). The Bankruptcy Court determined that Chimko violated Massachusetts Rules of Professional Conduct 7.1 ("Massachusetts *Rule 7.1*") and 7.5 ("Massachusetts *Rule 7.5*") "through his habitual correspondences with his firm's letterhead, admitted typographical error [, which identified Chimko's law firm as "attorneys" for Household Finance], and repeated behavior in committing these errors." Mem. of Decision

at 6-7; see id. at 4. Chimko protested that neither his law firm's letterhead nor his notice of reaffirmation was "misleading." See Appellant's Br. at 25-29. The Court considered the communications in turn, mindful that the interpretation of a bankruptcy court is subject to "clearly erroneous' review " if the writing is subject to more than one reasonable interpretation,' n6 or if the court relies on extrinsic evidence such as the parties' intent." *In re Charlie Auto Sales, Inc., 336 F.3d 34, 37 (1st Cir. 2003)* [*14] (citation omitted) (quoting *Gel Systems, Inc. v. Hyundai Engineering & Construction Co., 902 F.2d 1024, 1027 (1st Cir. 1990))*.

N6 The Court notes, for example, that the notice of reaffirmation identified Shermeta, Chimko & Adams, P.C. both as "attorneys" and as "agent." See Appellant's App. at A 038. The Bankruptcy Court's determination that the notice was misleading as a whole was reviewed for clear error.

As described above, each of Chimko's letters to Lucas and the Bankruptcy Court was printed on the letterhead of Chimko's law firm: "SHERMETA, CHIMKO & ADAMS, P.C. / Attorneys and Counselors at Law." See Mem. of Decision at 4-5. The Bankruptcy Court noted that this letterhead provided the "only indication of Chimko's role," because "Chimko made no mention of his status as agent.'" Id. at 4-5. In fact, the letters were also signed in the name of Chimko's law firm, rather than his own. Id. at 5. Lucas and the Bankruptcy Court thus "could easily be lead to believe that Chimko [*15] was acting as an attorney with the support of his firm." Id. Chimko argued that the letters fell beyond the category of "false advertising," with which he claimed the Massachusetts Rules are primarily concerned. Appellant's Br. at 26-27. Moreover, Chimko maintained, the letters were not misleading: they "did not make any representations regarding the services to be provided to the Debtor," "did not contain any threat," and did not induce reliance. Id. at 26-27.

Massachusetts *Rule 7.5*, "Firm Names and Letterheads," provides in relevant part:

(a) A lawyer shall not use a firm name, letterhead, or other professional designation that violates *Rule 7.1*.

. . .

(b) A law firm with offices in more than one jurisdiction may use the same name in each jurisdiction, but identification of the

lawyers in an office of the firm shall indicate the jurisdictional limitations on those not licensed to practice in the jurisdiction where the office is located.

*Mass. R. Prof. C. 7.5.* Massachusetts *Rule 7.5(a)* thus incorporates the standard set forth in Massachusetts *Rule 7.1*, which prohibits false or misleading "Communications Concerning a Lawyer's Services":

> A [*16] lawyer shall not make a false or misleading communication about the lawyer or the lawyer's services. A communication is false or misleading if it contains a material misrepresentation of fact or law, or omits a fact necessary to make the statement considered as a whole not materially misleading.

*Mass. R. Prof. C. 7.1.* These rules are thus not concerned solely with "false advertising." Appellant's Br. at 26-27. Rather, their scope is broad, "governing all communications about a lawyer's services," *Mass. R. Prof. C. 7.1* cmt. 1, including firm letterheads, *Mass. R. Prof. C. 7.5.* The rules thus recognize, as the Bankruptcy Court did, that use of a law firm's letterhead is itself a communication that "can easily mislead." Mem. of Decision at 5; see ABA/BNA Lawyers' Manual on Professional Conduct 81:3001 ("The use of a lawyer's letterhead to send communications to other parties is seen as a statement that the lawyer is responsible for the fact and the content of the communication."); cf. *Woods v. New York Life Ins. Co., 686 F.2d 578, 581 (7th Cir. 1982)* (deeming judicial letterhead unsuitable for providing class action notice because it conveys "judicial sponsorship" [*17] and "is likely to be misunderstood as a representation that the suit probably has merit"). Chimko's contentions regarding the text of the letters, Appellant's Br. at 26, were thus largely beside the point. It was the letterhead, not the letters, that the Bankruptcy Court found misleading. See Mem. of Decision at 4-5.

That Massachusetts *Rule 7.5* regulates letterheads generally -- and not, as Chimko suggested, only when used to solicit prospective clients, Appellant's Br. at 26 -- is consistent with the "general orientation" of the Massachusetts Rules. Mass. R. Prof. C. Scope P 9. Because a lawyer is an "officer of the legal system" as well as a "representative of clients," Mass. R. Prof. C. Preamble, his responsibilities under the Massachusetts Rules extend to courts and third parties as well as to prospective clients. See *Mass. R. Prof. C. 3.3* ("Candor Toward the Tribunal"); *Mass. R. Prof. C. 4.1* ("Truthfulness in Statements to Others"); see also Mass. R. Prof. C. Preamble P 2 (requiring negotiating lawyers to observe "requirements of honest dealing with others").

Here, the Bankruptcy Court determined that both it and the third party debtor "could easily be lead to believe [*18] that Chimko was acting as an attorney with the support of his firm." Mem. of Decision at 5. The predictable effect of Chimko's letters was thus to pressure the pro se debtor into executing the reaffirmation agreement. Chimko's reply, that Lucas never testified to being actually misled, Appellant's Br. at 26-27, was unpersuasive. Like other rules governing presumptively harmful communications, Massachusetts *Rules 7.1* and *7.5* are prophylactic, intended to prevent injury before it occurs. Cf. *Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 464, 56 L. Ed. 2d 444, 98 S. Ct. 1912 (1978)* (describing the state interest behind similar rules in Ohio). Accordingly, "regulation -- and imposition of discipline -- are permissible" here because the improper use of law firm letterhead has been deemed "inherently likely to deceive." *In re R. M. J., 455 U.S. 191, 202, 71 L. Ed. 2d 64, 102 S. Ct. 929 (1982)*; see *Mass. R. Prof. C. 7.5.* The Court thus discerned no clear error in the Bankruptcy Court's determination that "Chimko's use of the letterhead was a misrepresentation." See Mem. of Decision at 5.

As to Chimko's notice of reaffirmation, the Bankruptcy Court emphasized that the opening paragraph identified Shermeta, Chimko [*19] & Adams, P.C. as "attorneys" for Household Finance. Id. Although Chimko claimed this was merely a typographical error, the Bankruptcy Court discovered that others of Chimko's notices revealed the same oversight. Id. In addition, the Bankruptcy Court noted that Chimko provided notices only to pro se debtors, "exactly the kind of individual likely to believe that the Notice[,] which this Court read as containing information contrary to the Code, was an attorney's statement of what Debtor's mere signing of the reaffirmation obligated him to do." Id. at 5-6. Chimko argued that the notice, while perhaps contrary to the Code, was as a whole consistent with local bankruptcy rules. Appellant's Br. at 28. For this reason, Chimko urged, "it was clearly an erroneous finding to determine that the notice was misleading." Id.

Chimko, however, failed to appreciate the Bankruptcy Court's chief concern: the misrepresentation of his status. See, e.g., Mem. of Decision at 6 ("Chimko appears to believe that his status as either an agent' or an attorney' makes no difference to the Debtor or the Court. It is disturbing to think of potential debtors who would be confused and intimidated [*20] by these typos' . . ."). Indeed, the Bankruptcy Court noted the inaccuracy of the notice primarily -- if not solely -- because debtors were likely to view it as "an attorney's statement." Id. at 5-6. It was thus the introduction to the notice -- "NOW COMES, Creditor . . . by and through its attorneys" -- rather than the notice itself that the Bankruptcy Court

deemed misleading. And although Chimko characterized the error as "unintentional," Appellant's Br. at 29, the Bankruptcy Court found it to be it habitual: "The troublesome fact that Chimko's pleadings have contained the same typo' in so many separate instances suggests that this was no common oversight." Mem. of Decision at 6. The Bankruptcy Court's determination that the notice further misrepresented Chimko's status thus was not clearly erroneous.

In sum, the Court discerned no clear error with regard to Chimko's letters or his notice of reaffirmation. The Bankruptcy Court's conclusion that these communications violated Massachusetts *Rules 7.1* and *7.5* was accordingly affirmed. See 2/12/04 Hr'g Tr. at 9:21-:23.

### D. Unauthorized Practice of Law

The Bankruptcy Court, interpreting Massachusetts standards, determined [*21] that "all of [Chimko's] actions . . . involving the Reaffirmation Agreement constituted the practice of law." Mem. of Decision at 3. Specifically, the Bankruptcy Court noted that Chimko "prepared a Reaffirmation Agreement in which contractual rights were modified and created," "provided pro se debtors with a form of notice he believed would be of assistance to them in understanding the reaffirmation process," and corresponded with Lucas and the Court using law firm letterhead. Mem. of Decision at 3. Chimko challenges the Bankruptcy Court's conclusion on two grounds. He contends that as a general matter, Massachusetts standards have no application to "administrative" practice before federal bankruptcy courts. Appellant's Br. at 19-22. He also asserts that the particular actions at issue do not amount to the practice of law: the reaffirmation agreement merely confirmed preexisting rights, the notice merely requested service, and the letter to the Bankruptcy Court merely directed its attention to the documents. See id. at 22-24.

The Court first addresses Chimko's more general challenge -- that federal, not state, standards ought govern administrative practice before federal bankruptcy [*22] courts. Chimko maintains that the relevant standard is set forth in *Federal Rule of Bankruptcy Procedure 9010(a)* ("*Federal Rule 9010(a)*"), which provides:

A debtor, creditor, equity security holder, indenture trustee, committee or other party may (1) appear in a case under the Code and act either in the entity's own behalf or by an attorney authorized to practice in the court, and (2) perform any act not constituting the practice of law, by

an authorized agent, attorney in fact, or proxy.

*Fed. R. Bankr. P. 9010 (a)*. Relying heavily on *State Unauthorized Practice of Law Comm. v. Paul Mason & Assocs., 46 F.3d 469 (5th Cir. 1995)*, Chimko argues that Federal *Rule 9010(a)* invests nonlawyer agents with "explicit and general authority" that is independent -- and indeed preemptive -- of state limits on the practice of law. Appellant's Br. at 21 (quoting *Paul Mason, 46 F.3d at 471*). In Paul Mason, the Fifth Circuit concluded that a contrary interpretation would be inconsistent with *Federal Rule of Bankruptcy Procedure 1001* ("*Federal Rule 1001*"), which directs that "these rules shall be construed to secure the just, speedy, [*23] and inexpensive determination of every case and proceeding," *Fed. R. Bankr. P. 1001*, and with *Sperry v. Florida ex rel. Florida Bar, 373 U.S. 379, 10 L. Ed. 2d 428, 83 S. Ct. 1322, 1963 Dec. Comm'r Pat. 211 (1963)*, in which the Supreme Court held that the State of Florida could not enforce requirements that would deny nonlawyers their federally granted rights to practice before the Patent Office. See *Paul Mason, 46 F.3d at 471-72*; Appellant's Mem. [Doc. No. 11] at 10-12; see also *In re Poole, 222 F.3d 618, 623 (9th Cir. 2000)* ("The trustee cannot employ a collateral attack based on state law to prevent Smith from practicing federal bankruptcy law in Arizona.").

The Court begins with the basic principles. First, the "rules regulating attorney conduct in federal court are strictly a matter of federal law." *Sheridan, 362 F.3d at 109 n.16*. Second, although federal legislation may displace state law, courts " start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 135 L. Ed. 2d 700, 116 S. Ct. 2240 (1996)* (quoting *Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230, 91 L. Ed. 1447, 67 S. Ct. 1146 (1947)*); [*24] see *Pacific Gas & Elec. Co. v. California ex rel. California Dep't of Toxic Substances Control, 350 F.3d 932, 943 (9th Cir. 2003)* ("The presumption against displacing state law by federal bankruptcy law is just as strong in bankruptcy as in other areas of federal legislative power." (citing *Midlantic National Bank v. New Jersey Department of Environmental Protection, 474 U.S. 494, 501, 88 L. Ed. 2d 859, 106 S. Ct. 755 (1986)*, and *BFP v. Resolution Trust Corp., 511 U.S. 531, 544, 128 L. Ed. 2d 556, 114 S. Ct. 1757 (1994)*)).

Here, the governing federal law clearly contemplates representation by nonlawyer agents. In fact, the Paul Mason court argued, the authority granted by Federal *Rule 9010(a)* is sufficiently "explicit and general" to

evidence Congress's intent to supercede state law. See Appellant's Br. at 21 (quoting *Paul Mason, 46 F.3d at 471*). Yet the express terms of the rule indicate that its authorization is not unlimited; rather nonlawyer agents may perform only those acts "not constituting the practice of law." *Fed. R. Bankr. P. 9010 (a)*. This limitation distinguishes Federal *Rule 9010(a)* from the regulations at issue in Sperry, the decision on which Paul Mason primarily relied. [*25] See *Paul Mason, 46 F.3d at 471*. In Sperry, the Supreme Court interpreted federal regulations to grant nonlawyers "unqualified" authority to practice before the *Patent Office. n7 Sperry, 373 U.S. at 385*. Under these circumstances, the Supreme Court declined to "read in . . . the condition that such practice not be inconsistent with state law." Id. Here, in contrast, the limitation need not be "read in." It is made plain by the language of Bankruptcy *Rule 9010(a)*.

---

n7 The Supreme Court found additional support for its interpretation in "the contrast with the regulations governing practice before the Patent Office in trademark cases." *Sperry, 373 U.S. at 386*. Unlike the regulations governing patent cases, the regulations governing trademark cases provided: "recognition of any person under this section is not to be construed as sanctioning or authorizing the performance of any acts regarded in the jurisdiction where performed as the unauthorized practice of law." *Sperry, 373 U.S. at 386* (quoting *37 C.F.R. § 2.12(d)*) (alteration in original). Federal *Rule 9010(a)*, which similarly excludes "acts constituting the practice of law," is distinguishable from the unqualified authorization of Sperry on the same basis.

---

[*26]

The question, then, is whether federal or state standards ought define the "practice of law" limitation. See *United States v. Kimbell Foods, Inc., 440 U.S. 715, 727-28, 59 L. Ed. 2d 711, 99 S. Ct. 1448 (1979)* ("Controversies . . . governed by federal law do not inevitably require resort to uniform federal rules."). In thus framing the question, the Court necessarily holds that state standards do not directly conflict with federal rules. Where it is otherwise -- that is, where state law is in "actual conflict" with federal law -- state law of course must yield. *Sprietsma v. Mercury Marine, 537 U.S. 51, 64, 154 L. Ed. 2d 466, 123 S. Ct. 518 (2002). n8 Rittenhouse v. Delta Home Improvement, Inc. (In re Desilets), 291 F.3d 925 (6th Cir. 2002)*, for example, involved a Texas attorney properly admitted to practice before the United States District Court for the Western District of Michigan. *Desilets, 291 F.3d at 927*. Because

the district's local rules expressly entitled the attorney to represent and counsel clients, Michigan's contrary requirements did not apply: "When state licensing laws purport to prohibit lawyers from doing that which federal law expressly entitles them to do, the state law must give way." *Id. at 930* [*27] (citing *Sperry, 373 U.S. at 385*).

---

n8 This case obviously does not involve "field preemption," where "the scope of a statute indicates that Congress intended federal law to occupy a field exclusively." *English v. General Elec. Co., 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 110 S. Ct. 2270 (1990)*. Likewise, it does not involve express preemption. For a discussion of "express," "conflict," and "field" preemption, see *Pacific Gas & Electric Co. v. State Energy Resources Conservation & Development Commission, 461 U.S. 190, 203-04, 75 L. Ed. 2d 752, 103 S. Ct. 1713 (1983)*.

---

Unlike the debtor's attorney in Desilets, Chimko was not "expressly entitled" to represent clients before the Bankruptcy Court. In general, to appear and practice before the Bankruptcy Court, an attorney must be either "a member in good standing of the bar of [the] United States District Court for the District of Massachusetts," or a member of another bar who has sought and obtained the leave of the Bankruptcy Court. See *Bankr. D. Mass. R. 9010-1*. Chimko was [*28] neither. See 7/31/03 Show Cause Hr'g Tr. at 13:2-10. Because Chimko was not "properly admitted to the [relevant] federal bar," the federal rules are not in actual conflict with state restrictions. *Desilets, 291 F.3d at 931*; see also *In re Lyon, 301 Mass. 30, 35-36, 16 N.E.2d 74 (1938)* ("We see no reason why our policy or statute should give way in favor of persons who seek to escape State regulation of the practice of law on the ground that their practice is within the field of Federal jurisdiction, when they are not authorized to practice in that jurisdiction."). The reasoning of *Desilets* thus does not apply. See *In re Poole, 222 F.3d 618, 622 (9th Cir. 2000)* (characterizing a decision of the Second Circuit as "completely inapposite" because the attorney involved in that case, unlike the attorney involved in Poole, "was not admitted to practice before the federal district court"). Accordingly, in the absence of an "actual conflict" that would preempt state standards, this Court may "give content" to Federal *Rule 9010(a)* either by "adopting state law" or by "fashioning a nationwide federal rule." *Kimbell Foods, 440 U.S. at 727-29.* [*29]

The Court acknowledges at the outset that a number of scholars have urged federal regulation, at least of practice before federal courts, in response to the

increasingly national nature of legal practice. See, e.g., Stephen B. Burbank, *State Ethical Codes and Federal Practice: Emerging Conflicts and Suggestions for Reform, 19 Fordham Urb. L.J. 969, 978 (1992);* Fred C. Zacharias, *Federalizing Legal Ethics, 73 Tex. L. Rev. 335, 379 (1994);* see also *Frazier v. Heebe, 482 U.S. 641, 648 n.7, 96 L. Ed. 2d 557, 107 S. Ct. 2607 (1987)* ("There is a growing body of specialized federal law and a more mobile federal bar, accompanied by an increased demand for specialized legal services regardless of state boundaries."). Congress, however, has not yet adopted a federal rule defining the "practice of law," nor has any relevant federal court promulgated such a rule. *Frazier, 482 U.S. 641, 646 n.4, 96 L. Ed. 2d 557, 107 S. Ct. 2607 (1987)* ("Congress thus far has chosen to leave regulation of the federal bars to the courts."); see Fred C. Zacharias & Bruce A. Green, *Federal Court Authority to Regulate Lawyers: A Practice in Search of a Theory, 56 Vand. L. Rev. 1303, 1373;* [*30] cf. *28 U.S.C. § 530B* (subjecting an attorney for the federal government not to uniform federal regulation, but to the "State laws and rules, and local Federal court rules, governing attorneys in each State"). Absent a congressionally enacted rule, "it is for the federal courts to fashion the governing rule of law according to their own standards." *Clearfield Trust Co. v. United States, 318 U.S. 363, 367, 87 L. Ed. 838, 63 S. Ct. 573 (1943).* As set forth in Kimbell Foods, these standards direct the Court to consider the need for uniformity, the likelihood that application of state law would frustrate specific federal objectives, and the extent to which application of a federal rule would disrupt commercial relationships predicated on state law. *Kimbell Foods, 440 U.S. at 728-29.*

In "giving content" to Federal *Rule 9010 (a), Kimbell Foods, 440 U.S. at 727,* the Paul Mason court determined that adopting state standards would frustrate the intent of Congress, as reflected in the legislative history and text of the Bankruptcy Reform Act of 1978, "to separate purely administrative functions from judicial ones" and "to secure just, [*31] speedy, and inexpensive determinations" of bankruptcy proceedings. *Paul Mason, 46 F.3d at 471.* This Court disagrees, for two reasons. First, the federal objectives do not appear as broad as Chimko and the Fifth Circuit suggest. Although the Bankruptcy Reform Act indeed separated administrative and judicial functions, it did so with respect to judges, not agents. See 1 *Collier on Bankruptcy, supra, P 1.01* [3] (indicating that the functions were separated to "attract high caliber applicants to the judicial post" and to ensure that the "bankruptcy courts would be fair and unbiased"). In addition, although the Bankruptcy Code indeed seeks speedy and inexpensive determinations, it does not do so at all costs. For example, although the alternative likely would be speedier and less expensive, Federal *Rule 9010(a)* "does not purport to change prior

holdings prohibiting a corporation from appearing pro se." n9 See *Fed. R. Bankr. P. 9010 (a)* advisory committee note (citing *In re Las Colinas Development Corp., 585 F.2d 7 (1st Cir. 1978),* which declined a corporation's request to have its president represent it in bankruptcy proceedings, [*32] notwithstanding the corporation's assertion that it could not afford a lawyer).

> n9 Local Bankruptcy Rule 9010-1 (c) modifies the prohibition, permitting corporations to appear "through an officer or agent, or a person authorized by a power of attorney" when filing or objecting to a proof of claim or an application for payment of unclaimed monies. Bankr. D. Mass. R. 9010-1(c). In all other contexts, however, corporations "shall appear only through counsel." Id.

Second, even if the federal objectives were as broad as the Fifth Circuit and Chimko suggest, it not clear that the application of Massachusetts law would frustrate them. Like the Bankruptcy Reform Act, Massachusetts practice-of-law standards distinguish between administrative (or nonlegal) functions and judicial (or legal) ones. See *Lowell Bar Ass'n v. Loeb, 315 Mass. 176, 181, 52 N.E.2d 27 (1943)* ("The proposition cannot be maintained, that whenever, for compensation, one person gives to another advice that involves some element of law, or [*33] performs for another some service that requires some knowledge of law, or drafts for another some document that has legal effect, he is practising law."). Further, like the Bankruptcy Code, Massachusetts standards promote "just" determinations. The standards "protect [] . . . the public from being advised and represented in legal matters by incompetent and unreliable persons, over whom the judicial department could exercise little control." *Id. at 180.*

A more compelling -- if only indirectly articulated -- argument for fashioning a federal rule asserts a need for uniformity. See Appellant's Mem. at 12. The Bankruptcy Clause of Article I, after all, permits Congress to establish "uniform Laws on the subject of Bankruptcies throughout the United States." *U.S. Const. art. I, § 8; Pacific Gas & Electric, 350 F.3d at 943.* The authority to establish uniform federal laws, however, does not necessarily displace state legislation. Rather, "state laws are thus suspended only to the extent of actual conflict" with the federal system. *Stellwagen v. Clum, 245 U.S. 605, 613, 62 L. Ed. 507, 38 S. Ct. 215 (1918);* see also 1 Laurence H. Tribe, *American Constitutional* [*34] *Law 847 n.2 (3d ed. 2000) (1978)* ("Nor does congressional action necessarily preempt state legislation if the state legislation is not in conflict with federal law.") (citing

*Stellwagen, 245 U.S. at 615).* Absent "actual conflict," federal bankruptcy rules "may recognize the laws of the state in certain particulars," notwithstanding that "such recognition may lead to different results in different states." *Stellwagen, 245 U.S. at 613;* see *Vanston Bondholders Protective Comm. v. Green, 329 U.S. 156, 172, 91 L. Ed. 162, 67 S. Ct. 237 (1946)* (Frankfurter, J., concurring) ("To establish uniform laws of bankruptcy does not mean wiping out the differences among the forty-eight States in their laws governing commercial transactions."). Indeed, in areas of traditional state regulation, "the Bankruptcy Code will be construed to adopt, rather than to displace, pre-existing state law" unless Congress's intent to the contrary is " clear and manifest.'" *BFP v. Resolution Trust Corp., 511 U.S. 531, 544-45, 128 L. Ed. 2d 556, 114 S. Ct. 1757 (1994)* (quoting *English v. General Elec. Co., 496 U.S. 72, 79, 110 L. Ed. 2d 65, 110 S. Ct. 2270 (1990));* accord *In re Bank of New England Corp., 364 F.3d 355, 363 (1st Cir. 2004)* [*35] ("Bankruptcy courts should only modify the usual state-law compendium of [property] rights and remedies if and to the extent that such modifications are specifically authorized or directed by the Bankruptcy Code."). Moreover, if a uniform federal standard is to be adopted, it is much more effective to do so through promulgation of rules by the Supreme Court or by Congress, than through a series of conflicting district court decisions that take years to converge on one standard through the process of appellate review.

Here, as in BFP, "an essential state interest is at issue." *BFP, 511 U.S. at 544.* As the Supreme Court observed in *Leis v. Flynt, 439 U.S. 438, 58 L. Ed. 2d 717, 99 S. Ct. 698 (1979)* (per curiam), "since the founding of the Republic, the licensing and regulation of lawyers has been left exclusively to the States and the District of Columbia within their respective jurisdictions." *439 U.S. at 442; In re Peterson, 163 B.R. 665, 673 (Bankr. D. Conn. 1994)* (citing Leis). In fact, the Supreme Court has "on various occasions" characterized the states' interest in regulating the practice of law not only as traditional, but also as "substantial" [*36] or even "compelling." *Florida Bar v. Went For It, Inc., 515 U.S. 618, 625, 132 L. Ed. 2d 541, 115 S. Ct. 2371 (1995)* (citing *Edenfield v. Fane, 507 U.S. 761, 769, 123 L. Ed. 2d 543, 113 S. Ct. 1792 (1993), Goldfarb v. Virginia State Bar, 421 U.S. 773, 792, 44 L. Ed. 2d 572, 95 S. Ct. 2004 (1975), Ohralik, 436 U.S. at 460,* and *Cohen v. Hurley, 366 U.S. 117, 124, 6 L. Ed. 2d 156, 81 S. Ct. 954 (1961)).* It recognized in Goldfarb that within their boundaries, "the States have a compelling interest in the practice of professions" and an "especially great" interest in the practice of law: n10 "Lawyers are essential to the primary governmental function of administering justice, and have historically been officers of the courts.'" *Goldfarb, 421 U.S. at 792.* But as the Sixth Circuit

suggested in Desilets, these cases may be distinguishable. See *Desilets, 291 F.3d at 929.* They recognized merely that "state rules governed practice in state courts"; they did not suggest that "state rules govern practice in federal courts." Id. (citing *Leis, 439 U.S. at 441-42).* While this Court does not disagree, it finds the cases nevertheless instructive. The states' traditional interest in [*37] regulating lawyers is not relevant because state regulations govern, but because the federal regulations that do govern "cannot . . . be construed without regard to the implications of our dual system of government." *BFP, 511 U.S. at 544* (quoting Felix Frankfurter, Some Reflections on the Reading of Statutes, *47 Colum. L. Rev. 527, 539-40 (1947)).*

n10 In Sperry, the Supreme Court noted that the states' regulatory interests were safeguarded by the Patent Office's "testing applicants for registration" and "insisting on the maintenance of high standards of integrity." *Sperry, 373 U.S. at 402.* In contrast to the Patent Office, the Bankruptcy Court relies primarily on the admission requirements of the Supreme Judicial Court of Massachusetts. See Bankr. D. Mass. R. 9010-1(a); D. Mass. R. 83.5.1(a)(1); see also *Lyon, 301 Mass. at 35* (distinguishing the Massachusetts bar, which "maintains elaborate machinery for ascertaining the qualifications of applicants for admission," from the federal bar, which "commonly relies to a large extent upon the evidence of qualification furnished by admission to practice in the State"). Accordingly, "unlike the patent law license involved in Sperry, admission to practice in the bankruptcy court does not reflect a judgment by any federal authority that an attorney is qualified to practice bankruptcy law generally." *Peterson, 163 B.R. at 674 n.7* (discussing the analogous requirements for admission to the bar of the United States Bankruptcy Court for the District of Connecticut).

[*38]

In sum, Chimko has not demonstrated that the frustration of federal objectives is sufficiently likely, or that the need for uniformity is sufficiently strong to warrant a nationwide federal rule. Absent such a demonstration, the Supreme Court has "indicated that federal courts should incorporate state law as the federal rule of decision." *Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 98, 114 L. Ed. 2d 152, 111 S. Ct. 1711 (1991)* (quoting *Kimbell Foods, 440 U.S. at 728)* (internal quotation marks and alterations omitted); accord *In re Calore Express Co. 288 F.3d 22, 44 (1st Cir. 2002)* ("A

federal court applying federal common law will often simply incorporate the law of the appropriate state if there is no relevant federal interest to justify a distinct federal rule."). This "presumption" favoring the incorporation of state law, *Kamen, 500 U.S. at 98*, is strengthened here by the "especially great" state interest in the regulation of lawyers, *Goldfarb, 421 U.S. at 793*. Accordingly, the Court adopts Massachusetts standards to define the "practice of law" limitation of Federal *Rule 9010 (a)* .

Incorporating Massachusetts standards, however, [*39] does not necessarily mean that Chimko has failed to comply with the federal rule. The rule permits Chimko to appear as (1) "an attorney authorized to practice in the court," or as (2) "an authorized agent" "performing any act not constituting the practice of law." *Fed. R. Bankr. P. 9010(a)*. Under the first prong, Chimko's "authority to practice in the [bankruptcy] court" rests primarily on fulfilling the requirements of the Supreme Judicial Court of Massachusetts. See Bankr. D. Mass. R. 9010-1(a); D. Mass. R. 83.5.1(a)(1). The rules of the Supreme Judicial Court, although distinct in certain "significant respects," substantially parallel the American Bar Association's ("ABA's") Model Rules of Professional Conduct (the "Model Rules"). See Chief Justice Herbert P. Wilkins, The New Massachusetts Rules of Professional Conduct: An Overview, *82 Mass. L. Rev. 261, 261 (1997)* (explaining that the Supreme Judicial Court adopted the new Massachusetts Rules, effective January 1, 1998, "within the framework of the American Bar Association's Model Rules of Professional Conduct"). *Massachusetts Rule 5.5*, adopted in a form "identical to Model Rule 5.5," provides that "a [*40] lawyer shall not (a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction." *Mass. R. Prof. C. 5.5 & cmt.*

The parallel Model Rule, in contrast, has since been amended to permit as well as prohibit certain forms of practice. See American Bar Ass'n, Report of the Commission on Multijurisdictional Practice, Introduction and Overview, at http://www.abanet.org/cpr/mjp-home.html (Aug. 2002). Specifically, in August 2002, in response to the changing "needs of clients in a national and global economy," Model *Rule 5.5* was amended to permit specified aspects of "multijurisdictional" practice -- that is, "legal work . . . in a jurisdiction in which the lawyer is not admitted." Id. As amended, Model *Rule 5.5* provides, in relevant part:

> A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:

. . .

> (4) . . . arise out of or are reasonably related to the lawyer's practice in a jurisdiction in which the lawyer is admitted to practice.

Model Rules of Professional [*41] Conduct *Rule 5.5(c)*. The amended Model Rule, if adopted by the Supreme Judicial Court and read to influence the related rules of the District Court and Bankruptcy Court, arguably would authorize Chimko's actions here. Compare 7/31/03 Show Cause Hr'g Tr. at 22:13-14:10 (discussing Chimko's nationwide "management work" performed on behalf of Household Finance), with Model Rules of Professional Conduct *Rule 5.5* cmt. 14 (suggesting factors that would evidence the "relationship" necessary to authorize a lawyer's multijurisdictional practice: "the lawyer's client may have been previously represented by the lawyer," "the client's activities or the legal issues [may] involve multiple jurisdictions," or "the services may draw on the lawyer's recognized expertise developed through the regular practice of law on behalf of clients in matters involving a particular body of federal, nationally-uniform, foreign, or international law"). Yet the long history of the present Massachusetts Rules, adopted only after "careful consideration of each ABA model rule with the view toward . . . adaptation to Massachusetts needs and preferences," cautions this Court against predicting that the Supreme [*42] Judicial Court would apply amended Model *Rule 5.5* in this, or indeed in any future, case. n11 Wilkins, supra, at 262. The Court thus turns to considering Chimko as both he and the Bankruptcy Court did, as an "agent" rather than "an attorney authorized to practice in the court."

> n11 Although the Supreme Judicial Court might otherwise weigh the "merits of uniformity" in favor of adoption, the states remain in "considerable disagreement" regarding amended Model *Rule 5.5*. See Wilkins, supra, at 262; American Bar Ass'n, Chart on State Implementation of ABA Model *Rule 5.5*, at http://www.abanet.org/cpr/mjp-home.html (last updated Sept. 15, 2004).

Under the second prong of Federal *Rule 9010 (a)*, Chimko's authority as an agent depends on whether his acts "constitute the practice of law." The approach of Massachusetts courts, which this Court adopts for the reasons described above, has not been "to frame any comprehensive . . . definition of what constitutes the

Case 1:05-cv-11433-MLW    Document 23-17    Filed 06/10/2006    Page 62 of 68

Page 11
2004 U.S. Dist. LEXIS 21905, *

practice of law," but rather to decide each [*43] case "upon its own particular facts." *In re Shoe Mfrs. Protective Ass'n, 295 Mass. 369, 372, 3 N.E.2d 746 (1936).* In general, however, the Supreme Judicial Court has said:

> The practice of directing and managing the enforcement of legal claims and the establishment of the legal rights of others, where it is necessary to form and to act upon opinions as to what those rights are and as to the legal methods which must be adopted to enforce them, the practice of giving or furnishing legal advice as to such rights and methods and the practice, as an occupation, of drafting documents by which such rights are created, modified, surrendered or secured are all aspects of the practice of law.

*Id.* The Supreme Judicial Court determined that no exceptions to that statement applied to the case before it, *id.*, but subsequently carved out one such exception for the preparation of simple instruments. See *Loeb, 315 Mass. at 185-86.* In Loeb, the Supreme Judicial Court described the "real" difference "between the drafting of simple instruments and the drafting of complex ones":

> There are instruments that no one but a well trained lawyer should ever [*44] undertake to draw. But there are others, common in the commercial world, and fraught with substantial legal consequences, that lawyers seldom are employed to draw, and that in the course of recognized occupations other than the practice of law are often drawn by laymen for other laymen. . . .

*Id. at 186.* In this context, "the actual practices of the community have an important bearing on the scope of the practice of law." *Id.*

With the aid of these general principles, the Court proceeds to consider "particular facts." The Bankruptcy Court determined that "all of [Chimko's] actions" -- including preparing the reaffirmation agreement, providing Lucas with the notice of reaffirmation, and corresponding with Lucas and the Bankruptcy Court -- "constitute the practice of law." Mem. of Decision at 3. This Court considers the actions in turn.

As to the reaffirmation agreement, the Bankruptcy Court stated simply that it "modified and created" contractual rights. Id. This Court does not disagree. Yet it "cannot be maintained" that Chimko, merely by "drafting for another some document that has legal effect," was necessarily practicing law. See *Loeb, 315 Mass. at 181.* [*45] Rather, as the Supreme Judicial Court has recognized, the preparation of certain simple instruments may "lie in a penumbra" rather than "wholly within the practice of law." *Id. at 183.* Like the income tax returns at issue in Loeb, the reaffirmation agreement was prepared using a "blank form," *id. at 185* (specifically, a version of Official Bankruptcy Form 6, with modifications approved by Household Finance). See 7/31/03 Show Cause Hr'g Tr. at 15:11-18; 37:3-38:13. And although the completion of bankruptcy forms often requires legal expertise -- where, for example, the printed instructions require legal interpretation, see *Taub v. Weber, 366 F.3d 966, 971 (9th Cir. 2004),* or the terms of the agreement must be negotiated, see *In re Carlos, 227 B.R. 535, 536 (Bankr. C.D. Cal. 1998)* -- this apparently was not the case here. Consistent with his practice, Chimko completed the reaffirmation agreement with the original terms of the mortgage; he made no changes and conducted no negotiations. See Appellant's Br. at 22; 7/31/03 Show Cause Hr'g Tr. at 15:7-8; 40:2-8; 42:14-43:17. In addition, while it may sometimes [*46] require legal skill to determine whether a particular legal form will achieve a desired result, see, e.g., *State v. Buyers Serv. Co., Inc., 292 S.C. 426, 430, 357 S.E.2d 15 (1987),* here the form itself disclosed its effect. See Official Bankruptcy Form 6 ("NOTICE TO DEBTOR: This agreement gives up the protection of your bankruptcy discharge for this debt."). For these reasons, Chimko's involvement in preparing the reaffirmation agreement seems closer to permissible "scrivening" or "typing" than impermissible legal drafting. See *Mason, 46 F.3d at 470, 472* (characterizing the activities of a bankruptcy service, which included "filling in appropriate blanks on a reaffirmation form," as "administrative functions that can be performed by authorized nonlawyer agents"); see also *Taub, 366 F.3d at 969, 971* (distinguishing a lawyer, who assists the customer who " does not know what forms to use or how to direct their completion,'" from a scrivener, who assists the customer who " does know what he wants and how he wants it done'" (quoting *Oregon State Bar v. Security Escrows, Inc., 233 Or. 80, 93, 377 P.2d 334 (1962)));* but see *In re van Dyke, 296 B.R. 591, 594 (Bankr. D. Mass. 2003)* [*47] (recognizing the " split of authority [over] whether preparation of preprinted legal forms constitutes unauthorized practice of law'" and observing that "in Massachusetts the issue has not be squarely addressed" (quoting *In re Ellingson, 230 B.R. 426, 433 (Bankr. D. Mont. 1999)).*

Not all of the facts, however, point in the same direction. First, Chimko is a lawyer, not a layman. The bankruptcy court in Carlos suggested that the situation is therefore "different": "Where a client hires an attorney. . . . the client expects and is entitled to the expertise of an attorney. . . ." *Carlos, 227 B.R. at 538-39*. In this regard, the Court notes that while Chimko denied playing the lawyer's "full consultation role" in jurisdictions other than Michigan, he did "keep a record" of each district's local requirements for the benefit of his client. See 7/31/03 Show Cause Hr'g Tr. at 15:1-4; 48:16-21. Second, the Trustee's account of commercial practice, though admittedly anecdotal, suggests that reaffirmation agreements are commonly prepared by local rather than national counsel. *Id. at 33*:11-16; 59:2-6. The "actual practices of the community," then, [*48] may place Chimko's actions within "the scope of the practice of law." See *Loeb, 315 Mass. at 186*; cf. *Johnson v. Avery, 393 U.S. 483, 490 n.11, 21 L. Ed. 2d 718, 89 S. Ct. 747 (1969)* (suggesting that the "power of the States to control the practice of law" does not extend to the preparation of habeas corpus petitions in part because the function is "often, perhaps generally, performed by laymen"). Thus, while the Court considers Chimko's preparation of the reaffirmation agreement to be an "act not constituting the practice of law," it acknowledges that under Massachusetts law, the question is not entirely free from doubt.

With regard to the notice of reaffirmation, the Bankruptcy Court observed that Chimko "believed [it] would be of assistance to [pro se debtors] in understanding the reaffirmation process." Mem. of Decision at 3. Providing such assistance, the Bankruptcy Court concluded, constituted the "practice of law." Id. Chimko urges this Court to credit his contrary testimony that he intended merely to ensure "that a hearing would be scheduled" and "that he would be served notice as agent for Household." Appellant's Br. at 24. Under the prescribed standard of review, [*49] however, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." *Fed. R. Bankr. P. 8013*. What is more, even absent such regard, the Court would note that Chimko's testimony was inconsistent with his actions. Chimko argued before the Bankruptcy Court that the "real thrust of the notice" was a request for service, 7/31/03 Show Cause Hr'g Tr. at 5:20-25, the filing of which does not require leave to appear, see *Bankr. D. Mass. R. 9010-1(d)*; Appellant's Br. at 23-24. Yet as the Bankruptcy Court noted, and as Chimko conceded, the notice was "captioned as a pleading," 7/31/03 Show Cause Hr'g Tr. at 5:16-20, the signing and filing of which typically does require leave to appear, see *Bankr. D. Mass. R. 9010-1 (b), 9011-1*. More importantly, although Chimko purported merely to request action of the Bankruptcy

Court, he also provided the notice to Lucas. The combined effect of Chimko's actions was, in the estimation of the Bankruptcy Court, to present the notice as a formal "attorney's statement" of some significance to the pro se debtor. See Mem. of Decision at 5-6; see also *Massachusetts Conveyancers Ass'n v. Colonial Title [*50] & Escrow, Civ. A. No. 96-2746-C, 2001 Mass. Super. LEXIS 431, 13 Mass. L. Rep. 633, 2001 WL 669280, at *6 (Mass. Super. Ct. June 5, 2001)* (explaining that the "practice of law includes the rendering of legal opinions in circumstances where an individual [there, inexperienced and sometimes financially desperate borrowers] will rely on that opinion").

That said, the finding that Chimko intended the notice to "be of assistance" does not necessarily suggest that he was engaged in the practice of law. Indeed, the ethical considerations of the ABA's Model Code, which the Supreme Judicial Court previously regarded as "a guiding principle," *In re Fordham, 423 Mass. 481, 491, 668 N.E.2d 816 (1996)*, n12 may suggest otherwise. Ethical Consideration 3-5 limits the activities that constitute the "practice of law" to services requiring the "professional judgment of a lawyer" -- that is, "his educated ability to relate the general body and philosophy of law to a specific legal problem." Model Code of Professional Responsibility EC 3-5; see also, e.g., *Oregon State Bar v. Smith, 149 Or. App. 171, 183, 942 P.2d 793 (1997)* ("The practice of law' means the exercise of professional judgment in applying legal [*51] principles to address another person's individualized needs through analysis, advice, or other assistance."). Significantly, then, Chimko's notice was essentially generic. n13 See 1 Appellant's App. at A038. Chimko testified that it was used "in every pro se case" and had been revised to comply with the local laws of every jurisdiction. 7/31/03 Show Cause Hr'g Tr. at 18:5-7, 26:9-27:9. Similarly, the Bankruptcy Court noted Chimko's "repeated" failure to modify the notice from the form he typically used in Michigan. Mem. of Decision at 5. For these reasons, although the policy of the Supreme Judicial Court is again not entirely clear, the Court concludes that Chimko's preparation of the notice did not constitute the practice of law because the "assistance" he provided did not relate to any specific legal problem. See *ABA/BNA Lawyers' Manual on Professional Conduct, supra, 21:8023* ("In general, the dissemination of legal information . . . does not constitute the practice of law, provided the information is geared to the general public and does not involve the provision of individualized advice or legal services to clients.").

n12 Because the Supreme Judicial Court has since replaced the Commonwealth's Code of Professional Responsibility, see Wilkins, supra, at 261, its continued reliance on the ABA's ethical considerations is uncertain. [*52]

n13 The Court acknowledges that Chimko's assistance, even if generic, might be considered an exercise of legal discretion, " an intelligent choice between alternative methods.'" See *Taub, 366 F.3d at 969* (quoting *Security Escrows, Inc., 233 Or. at 91*). Lucas, who had stated his intent to retain his home despite various creditors' apparently unavoidable security interests in that home, Appellant's App. at A026, had two options for doing so: redeem the property or reaffirm the debt secured by the property. See *11 U.S.C. § 521(2)(A)*; *In re Burr, 160 F.3d 843, 848-49 (1st Cir. 1998)* (rejecting a third alternative, endorsed by some courts, known as "retention" or "ride-through," wherein a debtor simply continues to make scheduled payments under a loan agreement, without reaffirming or redeeming). Chimko provided assistance regarding reaffirmation only, with no discussion of redemption. "As a practical matter," though, debtors such as Lucas generally are not free to choose among methods; more often they are "compelled [by financial considerations] to enter into reaffirmation agreements with their secured creditors." *Burr, 160 F.3d at 849*. An individual in bankruptcy will rarely have sufficient funds to redeem collateral.

[*53]

Turning finally to Chimko's correspondence, the Bankruptcy Court stated only that the letters, each printed on the letterhead of Chimko's law firm, were "included" among the actions constituting the practice of law. See Mem. of Decision at 3. Above, this Court described the use of letterhead as "itself a communication." See supra section III(C) (citing, inter alia, Mem. of Decision at 5, and *Mass. R. Prof. C. 7.5*). Other courts have more specifically recognized that a party who uses legal letterhead "holds himself out to be an attorney authorized to practice law." *Board of Overseers of the Bar v. MacKerron, 581 A.2d 424, 425 (Me. 1990)*; accord *The Florida Bar v. Breed, 368 So. 2d 356, 357 (Fla. 1979)*; see also *In re Finn, 433 Mass. 418, 420-21, 742 N.E.2d 1075 (2001)*. Here, although he purported to act as an agent only, Chimko conducted correspondence on the letterhead of "SHERMETA, CHIMKO & ADAMS P.C. / Attorneys and Counselors

at Law." Mem. of Decision at 3. Chimko thus suggested that he was acting as an attorney, id., a suggestion that the Supreme Judicial Court has noted may independently constitute the unauthorized practice of [*54] law, see *In re McInerney, 389 Mass. 528, 536 n.11, 451 N.E.2d 401 (1983)* ("We note that the decisions from other jurisdictions hold that unauthorized practice of law includes the mere holding out by a disbarred attorney that he is practicing or is entitled to practice law.'" (quoting *In re Peterson, 274 N.W.2d 922, 926 (Minn. 1979)*)). See also *Lindsey v. Ogden, 10 Mass. App. Ct. 142, 149-50, 406 N.E.2d 701 (1980)* (characterizing an assertion of unauthorized practice as "frivolous" when the attorney "never held himself out as a Massachusetts lawyer . . . and never did anything else that could be considered as the practice of law in this State"); cf. *Mass. Gen. Laws ch. 221, § 41* (including "whoever . . . represents himself to be an attorney or counsellor at law . . . by means of a sign, business card, letter head or otherwise" among those who may be criminally punished for the unauthorized practice of law).

Yet in McInerney, the Supreme Judicial Court also determined that, the respondent, who had been suspended from the practice of law, "intended to hold himself out as a practicing attorney by listing himself as an attorney in the [telephone] directory. [*55] " *McInerney, 389 Mass. at 536*. Here, the Bankruptcy Court acknowledged that "Chimko might have not intentionally held himself out to be anything other than an agent." n14 Mem. of Decision at 6; see also 7/31/03 Show Cause Hr'g Tr. at 52:8-10 (THE COURT: "I think you're practicing law at every state in the country that you file these in, and I don't think you know it yet."). But see 7/31/03 Show Cause Hr'g Tr. at 55:24-56:1 ("He's seeking to make a distinction because, in my judgment, because they know that they shouldn't be holding themselves out as an attorney in Massachusetts."). In contrast to McInerny, then, the evidence of intent is far from "extensive." *McInerney, 389 Mass, at 536*. Ultimately -- absent contrary guidance from the courts of the Commonwealth -- it appears to this Court that the evidence before it insufficient to warrant the conclusion that Chimko held himself out as a practicing attorney and thus subjected himself to the potentially serious consequences that attend the unauthorized practice of law. See *Attorney Grievance Comm'n of Md. v. Shaw, 354 Md. 636, 652, 732 A.2d 876 (1999)* (concluding that the "respondent's [*56] use of the term Esq.' in correspondence" "provided an insufficient basis for the finding that the respondent held herself out as a lawyer").

n14 The Bankruptcy Court stated an apparently contrary conclusion in response to Chimko's motion for consideration, see Order of

10/31/03, at P 3, but the context of the statement suggests that it was intended only to confirm the prior decision. See id. ("His compliance or non-compliance with the Court's Order is not material to the Court's conclusion that he held himself out as an attorney without being licensed by the Commonwealth and fails to alter the outcome of the Court's Order on Decision with Respect to the Court's Order to Show Cause.").

In sum, it does not appear to this Court that Chimko's actions constituted the "practice of law" as defined by Massachusetts law and incorporated by Federal *Rule 9010(a)*. The Court recognizes, however, that the question is largely one of policy, or, as the ABA described it, one of "balance" -- "between the interests of [*57] a state in protecting its residents and justice system, on the one hand," and, on the other hand, "the interests of clients in a national and international economy in the ability to employ or retain counsel of choice efficiently and economically." See Commission on Multijurisdictional Practice, supra. Moreover, although the Supreme Judicial Court has stated that the "practice of law" must, "to a large extent," be defined in light of "particular facts," *Shoe, 295 Mass. at 372*, facts like those presented here are certain to recur with increasing frequency, with significant effects not only for debtors, creditors, and their counsel, see Appellant's Supp. Br. [Doc. No. 10] at 8; C.R. "Chip" Bowles, But It Says on My Card . . . Unauthorized-Practice-of-Law Issues in Bankruptcy, Am. Bankr. Inst. J., Mar. 2001, at 24, but also for clients and attorneys generally. See Charles W. Wolfram, Sneaking Around in the Legal Profession: Interjurisdictional Unauthorized Practice by Transactional Lawyers, *36 S. Tex. L. Rev. 665 (1995)*; Ethics Northwest, Inc., CrossingtheBar.Com: Information and Commentary on the Multijurisdictional Practice of Law, [*58] at http://www.crossingthebar.com (last edited September 11, 2004). In light of the compelling nature of the Commonwealth's interests, the recognized significance of the issue, and the apparent lack of controlling precedent, the Court respectfully certifies the attached questions to the Supreme Judicial Court. n15 See Sup. Jud. Ct. R. 1:03.

n15 The Court acknowledges that commentators have urged caution both in certifying and receiving questions, see, e.g., Hon. Bruce M. Selya, Certified Madness: Ask a Silly Question, *29 Suffolk U. L. Rev. 677, 691 (1995)*; The Overworked Certification Procedure?, N.Y. St. L. Dig., Apr. 2004, at 1-2, and has exercised such caution here. The Court concludes, after careful consideration, that certification in this instance truly "helps build a cooperative judicial federalism." *Lehman Bros. v. Schein, 416 U.S. 386, 391, 40 L. Ed. 2d 215, 94 S. Ct. 1741 (1974)*.

## IV. CONCLUSION

Accordingly, the Order of the Bankruptcy Court is AFFIRMED as to its conclusion [*59] that Chimko's communications were misleading under the Massachusetts Rules of Professional Conduct. Although the Court is inclined to reverse the Bankruptcy Court's conclusion that Chimko's actions constituted the unauthorized practice of law, because the latter issue is not clearly resolved by controlling precedent, the Court respectfully CERTIFIES the attached questions to the Supreme Judicial Court. Pending the receipt of an opinion from the Supreme Judicial Court, this matter is administratively closed.

SO ORDERED.

WILLIAM G. YOUNG

CHIEF JUDGE

CERTIFICATION

For the reasons discussed in the attached Memorandum & Order, the resolution of a determinative issue depends on questions of Massachusetts law for which there are no clearly controlling precedents in the decisions of the Supreme Judicial Court of Massachusetts. Accordingly, this Court respectfully certifies the following questions to the Supreme Judicial Court of Massachusetts pursuant to its Rule 1:03:

> 1. Does an attorney admitted to practice in another United States jurisdiction but not admitted to practice in the Commonwealth of Massachusetts engage in the "practice of law" by:
>
> > a. completing [*60] a reaffirmation form that modifies and creates rights but does not change the original terms of the loan;
> >
> > b. providing a pro se debtor with a notice intended to provide general assistance in understanding the reaffirmation process; and

c. corresponding with a pro se debtor and the Bankruptcy Court using law firm letterhead but not clearly intending to hold himself out as practicing law?

2. If the above constitutes the "practice of law," may such services be provided on a temporary basis in the Commonwealth of Massachusetts if they are reasonably related to the attorney's practice in the other jurisdiction?

The Court of course welcomes the advice of the Supreme Judicial Court of Massachusetts on any other questions of Massachusetts law deemed material to this case.

The Clerk will transmit these questions, the Court's Memorandum & Opinion, and copies of the Record, briefs, and appendices in this case to the Supreme Judicial Court of Massachusetts.

# *Exhibit G*

# SUPREME JUDICIAL COURT
## for the Commonwealth
### Case Docket

### DARRYL CHIMKO vs. RICHARD A. KING
SJC-09388

| CASE HEADER | | | |
|---|---|---|---|
| Case Status | No briefs yet filed | Status Date | 11/22/2004 |
| Nature | Civil procedure | Entry Date | 11/22/2004 |
| Appellant | Plaintiff | Case Type | Civil |
| Brief Status | Awaiting blue brief | Brief Due | 01/03/2005 |
| Quorum | | | |
| Argued Date | | Decision Date | |
| AC/SJ Number | | Citation | |
| DAR/FAR Number | | Lower Ct Number | 03-40277-WGY |
| Lower Court | Federal Court | Lower Ct Judge | William G. Young, J. |
| Route to SJC | Direct Entry: Certified Question | | |

### ADDITIONAL INFORMATION

Nature of case: Bankruptcy Appeal.

| INVOLVED PARTY | ATTORNEY APPEARANCE |
|---|---|
| **Darryl Chimko**<br>Plaintiff/Appellant<br>Awaiting blue brief | Ann Brennan, Esquire<br>Stephen E. Shamban, Esquire |
| **Richard A. King**<br>Pro Se Defendant/Appellee<br>Awaiting red brief | |

### DOCKET ENTRIES

| Entry Date | Paper | Entry Text |
|---|---|---|
| 11/22/2004 | #1 | Entered. Notice to counsel. |

As of 11/30/2004 01:01

# *Exhibit B*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS. INC.
ARBITRATION DEPARTMENT

```
-------------------------------------------------------------------x
```
In the Matter of the Arbitration Between:                    :

KASHNER DAVIDSON SECURITIES CORPORATION,    :         **NASD No. 04-03793**
                                                             :
Claimant/Counterclaim Respondent.                            :
                                                             :
-against-                                                    :
                                                             :
STEVEN MSCISZ, MARK MSCISZ, and                              :
LYNDA MSCISZ,                                                :
                                                             :
Respondents/Counter-and-Third-Party Claimants,               :
                                                             :
VICTOR KASHNER, MATTHEW MEISTER and                          :
TIMOTHY VARCHETTO,                          .                :
                                                             :
Third-Party Respondents.                                     :
```
-------------------------------------------------------------------x
```

## CLAIMANTS' OPPOSITION TO RESPONDENTS' MOTION TO DISQUALIFY COUNSEL OR, ALTERNATIVELY, STAY THE PROCEEDINGS

Claimant/Counterclaim Respondent Kashner Davidson Securities Corporation

("KDSC"), Third-Party Respondents Victor Kashner ("Kashner"), Matthew Meister ("Meister")

and Timothy Varchetto ("Varchetto") (collectively "Claimants"), by and through their counsel.

Sichenzia Ross Friedman Ference LLP, submit this as their opposition to Respondents' Motion

to Disqualify Counsel or, alternatively, to Stay the Proceedings (the "Motion").

The Motion is yet another stall tactic by Respondents-Debtor's Counsel seeking to delay

and/or upset KDSC from collecting a $361,022.94 margin debt that is justly due and owed to

KDSC. Given the nature of the Motion, however, Claimants' Counsel take this matter very

seriously.

For the reasons set forth below, there is no need for the Panel to delay the hearing in this matter or to disqualify Claimants' chosen counsel in this proceeding.

<u>KDSC Initiated This Legal Proceeding in New York</u>

KDSC initiated this legal proceeding by filing its pleading, the Statement of Claim, with the Director of Arbitration for the National Association of Securities Dealers, Inc. ("NASD") at its headquarters in New York City, New York, as required by the NASD. Respondents' Counsel subsequently filed Respondents' responsive pleading, the Answer, as well as a Counterclaim and Third-Party Claims by filing same with the NASD in New York. Indeed, the instant Motion, as well as all other legal motions, have <u>all</u> been filed by Claimants and Respondents' Counsel with the NASD in New York.[1]

Neither KDSC nor Messrs. Kashner, Varchetto, or Meister are residents or citizens of the State of Massachusetts, and they have retained the undersigned as their chosen securities counsel to represent them in this matter pending before the NASD in its New York office.

Because of an *NASD Policy*, the NASD selects a hearing location that is closest to a public customer's residence from a list of available locales (often local hotels or conference centers) maintained by NASD. <u>See</u> NASD Uniform Forms Guide at pp. 13-14 (April 2003). There is <u>no</u> <u>rule</u> contained in the NASD Code of Arbitration, which the parties agreed to govern this dispute, that mandates that the location of the hearing occur in a public customer's "home state". <u>See</u> <u>generally</u>, NASD Code of Arbitration Procedure. There is no rule preventing the NASD or the Arbitration Panel from moving the hearing location to a location in another state. Indeed, Rule 10315 of the NASD Code empowers the arbitrators to determine the location for

---

[1] Although Respondents' Counsel has filed legal pleadings and legal motions with the NASD in the State of New York, he is not licensed to practice law in the State of New York.

the hearing; consequently, should the Panel determine to hold the hearing in New York, rather than Massachusetts, it has the authority, under the NASD Code, to change the location of the hearing.

#### The Rapoport and Birbrower Decisions Are Not Controlling Law in This Proceeding

In support of his efforts to delay this hearing, or disqualify Claimants' Counsel, Respondents' Counsel cites to the decisions rendered by a Florida Court, Florida Bar v. Rapoport, and a California Court, Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court, in support of his argument for a need to stay this proceeding. See Motion at ¶4. These decisions, however, are not controlling case law in this proceeding, and as discussed below, the Courts and Bar Associations have subsequently adopted rules and policies allowing out-of-state lawyers to temporarily appear in arbitrations.

In the past several years, the high Courts for the States of Florida and California have rendered decisions, in cases with egregious factual circumstances or unrelated factual circumstances, precluding out-of-state attorneys from participating in arbitration hearings held within their state's borders – Florida and California. See e.g., Florida Bar v. Rapoport, 845 So.2d 874 (Fl. 2003)(out-of-state lawyer advertised in Florida his ability to represent Florida residents in securities arbitrations in Florida); Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court, 17 Cal.4th 119 (Ca 1998)(attorney fee dispute arising from representation of California company by out-of-state counsel in commercial arbitration held in California).

Since these rulings, the American Bar Association has adopted revisions to the Model Rules of Professional Conduct concerning the multijurisdictional practice of law, which provide for out-of-state counsel to represent their client on a temporary basis in arbitrations in foreign jurisdictions. See ABA Model Rule of Professional Conduct, Rule 5.5. Moreover, in the

aftermath of <u>Birbrower</u>, the California legislature amended California Civil Procedure Code Section 1282.4 to allow non-California attorneys, after satisfying certain obligations, to represent parties in private arbitration proceedings in California. <u>See</u> Cal. Civ. Proc. §1282.4.  Similarly, in the wake of the <u>Rapoport</u> decision, the Florida Bar Association proposed changes to Rule 1-3.11 of the Rules Regulating the Florida Bar, which would allow out-of-state attorneys to appear in three domestic arbitrations per year.[2]

While the holdings in <u>Rapoport</u> and <u>Birbrower</u> have no binding authority in Massachusetts, they are illustrative of the wide-spread efforts by state legislatures and bar associations to adapt to the multijurisdictional practice of law to allow out-of-state attorneys to practice, on a temporary basis, in arbitrations located within their borders.

<div align="center">

The State of Massachusetts Has Not Followed <em>Rapoport</em> or
<em>Birbrower</em> and There is No Legal Holding or Opinion Preventing Out-of-State
<u>Counsel from Participating in Arbitration Proceedings Located Within the State</u>

</div>

While the State of Massachusetts has not yet adopted the amended Rule 5.5 of the ABA Model Rules of Professional Conduct,[3] there is no legal holding or opinion providing that the participation by out-of-state counsel on behalf of a non-Massachusetts resident at an NASD Arbitration hearing, which has been located within the state, violates Massachusetts law.  Indeed, when the issue was squarely presented to the Appeals Court for the State of Massachusetts, the Court – less than six weeks ago – expressly declined to address the claimed "unauthorized

---

[2] Ms. Lori Holcomb of the Florida Bar informed the undersigned that the Court had not yet adopted the proposed rule change because oral argument on the proposed rule change was cancelled when severe hurricanes hit Florida.  The Court has rescheduled oral argument on the proposed rule change for February 2005.

[3] As reported by the ABA's Survey on State Implementation of ABA Multijurisdictional Practice of Law Recommendations dated as of December 16, 2004, Massachusetts' Supreme Court Standing Committee on Rules of Professional Conduct is conducting a review of the amended rule.

practice of law" by an out-of-state attorney in an arbitration proceeding occurring within the state. Superadio L.P. v. Walt "Baby" Love Productions, Inc., No. 03-P-27, 2004 Mass. App. LEXIS 1356 at *13, n.5 (Nov. 29, 2004).

Further, Respondents' Counsel's reliance on the certified question to be decided by the Supreme Judicial Court of Massachusetts in In re Lucas, No. 03-40277-WGY, 2004 U.S. Dist. LEXIS 21905 (D. Mass. Sept. 30, 2004)(the Court docketed the case under the caption Chimko v. King), does *not* address or concern the issue of the practice of out-of-state counsel in arbitration proceedings. Rather, the questions certified for the Court concern the acts of an attorney before a Bankruptcy Court located in the State of Massachusetts – not a private arbitration proceeding where the hearing has merely been located within the state as an accommodation to a public customer. See id. Respondents' Counsel's request for the Panel to issue a stay pending the determination of the Courts decision in Chimko, which concerns an unrelated factual circumstance and legal issue, is nothing more than a purposeful delay tactic[4] that the Panel should readily deny.

<div align="center">

To Alleviate Any Concern, the Panel Should Admit
Respondents' Counsel *Pro Hac Vice* in this Matter for Purposes of the Hearing

</div>

As recognized by the Court in Lucas, the practice of law by out-of-state counsel in foreign jurisdictions is "largely one of policy, or, as the ABA describes it, one of 'balance' – 'between the interest of a state in protecting its residents and justice system, on the one hand,' and, on the other hand, 'the interest of clients in a national and international economy in the ability to employ or retain counsel of choice efficiently and economically." Lucas, 2004 U.S.

---

[4] Contrary to Respondents' Counsel's assertion that such a stay would not be "excessively long" in light of the Court's briefing schedule, Claimants note that in Superadio, the Appellate Court heard argument on the case on February 18, 2004 and did not render its decision until November 29, 2004 – more than *nine months* after oral argument had been held.

Dist. LEXIS 21905 at * 56-57 (citing American Bar Ass'n, Report of the Commission on Multijurisdictional Practice (Aug. 2002)). Here, Claimants are not Massachusetts residents, this NASD arbitration proceedings is being conducted by a private non-governmental dispute resolution forum headquartered in New York, New York – not part of the State of Massachusetts's justice system. Further, KDSC has chosen to be represented by its counsel of choice - the same counsel who has consistently represented it for more than seven (7) years. Such a choice is both efficient and economical for KDSC, and there is no basis for the Panel to upset that choice, and deny KDSC its chosen counsel.

Were this a matter before the Court, Claimants' Counsel would request that the Court admit them *pro hac vice*, pursuant to Mass. Gen. L. ch. 221, §46A (2004), to appear in the limited matter before the Court. When Respondents' Counsel contacted the Clerk's Office[5] of the Judicial Supreme Court for the State of Massachusetts, the Clerk informed Counsel that, in the context of an arbitration proceeding, it is the Arbitration Tribunal, or the Panel of Arbitrators, to determine the necessity and standards for admission of counsel *pro hac vice* in the arbitration proceeding.

Therefore, to alleviate any concern raised by the Motion, Claimants' chosen Counsel, Marc J. Ross and Richard J. Babnick Jr., respectfully request that the Arbitration Panel admit them *pro hac vice* to appear before the Arbitration Tribunal in this matter.

In this regard, Mr. Ross has been admitted to practice in the State of New York since 1988. He has been admitted to practice before the Courts of the Southern and Eastern District of New York since April 1988. Further, in a proceeding before the Massachusetts Securities

---

[5] The Massachusetts Bar Association, Massachusetts Bar Examiners, and Massachusetts Board of Bar Overseers all referred Respondents' Counsel to the Clerk's Office of the Judicial Supreme Court for the State of Massachusetts for all questions concerning admission *pro hac vice* in arbitration proceedings.

Division entitled In re R.D. White & Co., Inc., et. al., No. E-96-364, the Administrative Law Judge admitted Mr. Ross *pro hac vice* to participate in the administrative hearing. Finally, for the Arbitration Panel's reference, a true and correct copy of the Certificate of Good Standing issued by the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department dated December 20, 2004 for Mr. Ross is annexed hereto as Exhibit 1.

Mr. Babnick has been admitted to practice in the State of New York since 1997. He has been admitted to practice before the Courts of the Southern and Eastern District of New York since May 1998. Further, in a proceeding before the Massachusetts Securities Division entitled In re R.D. White & Co., Inc., et. al., No. E-96-364, the Administrative Law Judge admitted Mr. Babnick *pro hac vice* to participate in the administrative hearing. Finally, for the Arbitration Panel's reference, a true and correct copy of the Certificate of Good Standing issued by the Appellate Division of the Supreme Court of the State of New York, Third Judicial Department dated December 21, 2004 for Mr. Babnick is annexed hereto as Exhibit 2.

Accordingly, Claimants and their Counsel, Messrs. Ross and Babnick, respectfully request that the Arbitration Panel admit them *pro hac vice* to appear on behalf of Claimants in this Arbitration proceeding.

<u>Conclusion</u>

Based on the foregoing, the Panel should deny Respondents' Counsel's efforts to delay and/or upset this proceeding by denying the Motion, and, if deemed necessary, admitting Claimants' Counsel *pro hac vice* to appear at the hearing of this matter, which is to occur at a yet to be determined location within the State of Massachusetts.

Dated: New York, New York
        January 7, 2005

Respectfully submitted,

SICHENZIA ROSS FRIEDMAN FERENCE LLP

By:

Marc J. Ross, Esq.
Richard J. Babnick, Jr., Esq.
1065 Avenue of the Americas, 21st Floor
New York, New York 10018
(212) 930-9700

Attorneys for Kashner Davidson Securities
Corporation, Victor Kashner, Timothy Varchetto,
and Matthew Meister



# Appellate Division of the Supreme Court
## of the State of New York
### Second Judicial Department

———————

I, James Edward Pelzer, Clerk of the Appellate Division of the Supreme Court of the State of New York, Second Judicial Department, do hereby certify That **Marc Jonathan Ross** was duly licensed and admitted to practice as an Attorney and Counselor at Law in all the courts of the State, according to the laws of the State and the court rules and orders, on the **13th** day of **April 1988** has duly taken and subscribed the oath of office prescribed by law, has been enrolled in the Roll of Attorneys and Counselors at Law on file in my office, has duly registered with the administrative office of the courts, and according to the records of this court is in good standing as an attorney and counselor at law.

In Witness Whereof, I have hereunto set my hand and affixed the seal of said Appellate Division on December 20, 2004



Exhibit 1

_James Edward Pelzer_
———————————
Clerk



*State of New York*

*Supreme Court, Appellate Division*

*Third Judicial Department*

---

*I, Michael J. Novack, Clerk of the Appellate Division of the Supreme Court of the State of New York, Third Judicial Department, do hereby certify that*

## Richard Johnnie Babnick, Jr.

*having taken and subscribed the Constitutional Oath of Office as prescribed by law, was duly licensed and admitted to practice by this Court as an Attorney and Counselor at Law in all courts of the State of New York on the 28th day of January, 1997, is currently in good standing and is registered with the Administrative Office of the Courts as required by section four hundred sixty-eight-a of the Judiciary Law.*

*In Witness Whereof, I have hereunto set my hand and affixed the Seal of said Court, at the City of Albany, this 21st day of December, 2004.*







*Clerk*

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.                          SUPREME JUDICIAL COURT
                                     FOR SUFFOLK COUNTY
                                     NO. SJ-05-0088

STEVEN MSCISZ, MARK MSCISZ and LYNDA MSCISZ

vs.

KASHNER DAVIDSON SECURITIES CORP., VICTOR KASHNER, MATTHEW
MEISTER, TIMOTHY VARCHETTO, MARC J. ROSS, RICHARD J. BABNICK, JR.
and SICHENZIA ROSS FRIEDMAN FERENCE LLP

<u>MEMORANDUM OF DECISION AND JUDGMENT</u>

This matter came before me on a petition pursuant to G. L.
c. 231A, § 1, filed by Steven Mscisz, Mark Mscisz, and Lynda
Mscisz (the plaintiffs).[1/] The plaintiffs request that I issue
the following declaratory judgments:

> "a.   [A] lawyer admitted to practice in another United
>       States jurisdiction but not admitted to practice in
>       Massachusetts engages in the unauthorized practice of
>       law, in violation of . . . Mass. R. Prof. C. 5.5(a), as
>       well as G. L. c. 221, § 46A, by representing a party or
>       parties at an arbitration hearing held in this
>       Commonwealth;
>
> "b.   [A] Massachusetts attorney, by participating in an

---

[1/] General Laws c. 231A, § 1, provides in relevant part:

"The supreme judicial court . . . may on appropriate
proceedings make binding the declarations of right, duty,
status and other legal relations sought thereby, either
before or after a breach or violation thereof has occurred
in any case in which an actual controversy has arisen and is
specifically set forth in the pleadings and whether any
consequential judgment or relief is or could be claimed at
law or in equity or not; and such proceeding shall not be
open to objection on the ground that a merely declaratory
judgment or decree is sought thereby and such declaration,
when made, shall have the force and effect of a final
judgment or decree and be reviewable as such."

arbitration hearing held within the Commonwealth where
parties are represented by lawyers not licensed to
practice in this jurisdiction, would knowingly assist a
violation of Mass. R. Prof. C. 5.5(a) and G. L. c. 221,
§ 46A, in violation of Mass. R. Prof. C. 5.5(b) and
8.4(a);

"c.    [A]n arbitrator's refusal to postpone the hearing until
after this Court resolves the 'unauthorized practice of
law' issue would subject any award to vacation under
the Commonwealth's version of the Uniform Arbitration
Act, G. L. c. 251, § 12 (a) (5); and

"d.    [A]n award issued after an arbitration hearing in which
attorneys violated Mass. R. Prof. C. 5.5(a) and G. L.
c. 221, § 46A would be procured by 'undue means' and
thus subject to vacation under the Commonwealth's
version of the Uniform Arbitration Act, G. L. c. 251, §
12."

For the reasons set forth below, I deny the petition.[1]  In the

particular circumstances presented, defendant attorneys Marc J.

Ross and Richard J. Babnick, Jr., and the law firm Sichenzia Ross

Friedman Ference LLP (SRFF) will not be engaging in the

unauthorized practice of law by representing defendants Kashner

Davidson Securities Corporation (KDSC), Victor Kashner, Matthew

Meister, and Timothy Varchetto at an arbitration hearing

scheduled to take place in Massachusetts.

---

[1] Steven Mscisz, Mark Mscisz, and Lynda Mscisz (the
plaintiffs) have also filed a motion to strike the answer and
supporting memorandum of law filed by Kashner Davidson Securities
Corp., Victor Kashner, Matthew Meister, Timothy Varchetto, Marc
J. Ross, Richard J. Babnick, Jr., and Sichenzia Ross Friedman
Ference LLP (collectively the defendants) in connection with this
petition.  Because the defendants' answer and supporting
memorandum of law conformed with the practices and procedures of
the Supreme Judicial Court for Suffolk County, I deny the motion.

3

1.   Background.  KDSC, a broker-dealer, is a Florida corporation that maintains its only place of business in Florida. Defendants Kashner, Meister, and Varchetto are Florida residents and registered representatives of KDSC (collectively the broker defendants).  Defendants Ross and Babnick, attorneys of record for the broker defendants, are affiliated with the New York City law firm of SRFF (collectively the lawyer defendants).  They are admitted to practice law in the State of New York and have represented KDSC in securities-related matters for many years. Neither individual is a member of the Massachusetts bar.[3]

On May 25, 2004, the lawyer defendants filed a claim with the New York office of the National Association of Securities Dealers, Inc. (NASD) on behalf of KDSC, demanding arbitration against the plaintiffs, who are residents of Massachusetts.  The plaintiffs filed an answer, counterclaim, and third-party claims against Kashner, Meister, and Varchetto.  The NASD selected Boston as the site for the arbitration, in accordance with its general policy to "select the hearing location closest to the [public] customer's residence at the time the dispute arose." The arbitrators selected to decide the case were drawn from Massachusetts and New Hampshire.  The plaintiffs subsequently

---

[3] SRFF does not operate a law practice in Massachusetts, nor does it advertise within the Commonwealth.  No attorney affiliated with SRFF is currently an active member of the Massachusetts bar.

4

filed a motion with the arbitration panel to disqualify the lawyer defendants from representing the broker defendants at the hearing on the basis that they were not admitted to practice law in Massachusetts.  The lawyer defendants then requested that the arbitration panel admit them <u>pro hac vice</u> for the purposes of the hearing.  The chairperson of the arbitration panel orally denied the plaintiffs' motion to disqualify the lawyer defendants and the plaintiffs' subsequent motion for reconsideration.  After the plaintiffs moved for reconsideration a second time, the arbitration panel issued an order denying that motion and ruling "that it is not necessary for counsel to be admitted <u>pro hac vice</u> in this matter."[4]  The arbitration hearing is currently scheduled for May 17, 2005.

   2.  <u>Discussion</u>.  Mass. R. Prof. C. 5.5, 426 Mass. 1410 (1998) provides in relevant part: "A lawyer shall not . . . practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction." General Laws c. 221, § 46A, states that "[n]o individual, other than a member, in good standing, of the bar of this commonwealth shall practice law . . . provided, that a member of the bar, in good standing, of any other state may appear, by permission of the court, as attorney or counselor, in any case pending therein,

---

   [4] The arbitration panel also dismissed the plaintiffs' counterclaims and third-party claims with prejudice in this order.

5

if such other state grants like privileges to members of the bar,
in good standing, of this commonwealth."

The plaintiffs argue for a strict interpretation of Mass. R.
Prof. C. 5.5 and G. L. c. 221, § 46A.  They contend that legal
representation at an arbitration proceeding constitutes the
practice of law and, consequently, an out-of-state attorney who
represents a party in an arbitration proceeding that has been
assigned to take place in Massachusetts engages in the
unauthorized practice of law.  I do not disagree with the general
proposition that an attorney's conduct in connection with an
arbitration may fall within the broad scope of "the practice of
law."  The Supreme Judicial Court has defined this scope to
include at least "the practice of directing and managing the
enforcement of legal claims and the establishment of the legal
rights of others," "the practice of giving or furnishing legal
advice as to such rights," and "the practice . . . of drafting
documents by which such rights are created."  In the Matter of
The Shoe Mfrs. Protective Ass'n, Inc., 295 Mass. 369, 372 (1936).
Ross's and Babnick's representation of KDSC in its claim against
the plaintiffs would appear to involve such activities.

I also agree that there is no explicit "arbitration
exception" in either Mass. R. Prof. C. 5.5 or G. L. c. 221, §

6

46A.⁵/   The language of rule 5.5 differs from the recently amended

version of rule 5.5 of the American Bar Association Model Rules

of Professional Conduct, which provide in relevant part:

> "(a)  A lawyer shall not practice law in a jurisdiction in
> violation of the regulation of the legal profession in that
> jurisdiction, or assist another in doing so.
>
> "  . . .
>
> "(c)  A lawyer admitted in another United States
> jurisdiction, and not disbarred or suspended from practice
> in any jurisdiction, may provide legal services on a
> temporary basis in this jurisdiction that:
>
> "  . . .
>
> "  . . .
>
> "(3) are in or reasonably related to a pending or potential
> arbitration, mediation, or other alternative dispute
> resolution proceeding in this or another jurisdiction, if
> the services arise out of or are reasonably related to the
> lawyer's practice in a jurisdiction in which the lawyer is
> admitted to practice and are not services for which the
> forum requires pro hac vice admission."

ABA Model Rule 5.5 (2002).  Adoption of this amended rule is

currently under consideration here.  See also Cal. C. Civ. P.

§ 1282.4(b) ("Notwithstanding any other provision of law,

including section 6125 of the Business and Professions Code [the

unauthorized practice of law statute], an attorney admitted to

---

⁵/The Appeals Court has recently concluded that "[n]othing
in Massachusetts law requires that a party's representative in
arbitration proceedings be admitted to practice in
Massachusetts."  Superadio Ltd. Partnership v. Walt "Baby" Love
Prods., Inc., 62 Mass. App. Ct. 546, 552 n.5 (2004).  Nothing in
Massachusetts law, however, explicitly permits an attorney not
licensed to practice in Massachusetts to serve as legal counsel
at a Massachusetts arbitration proceeding.

7

the bar of any other state may represent the parties in the court
of, or in connection with, an arbitration proceeding in this
state").

My understanding of the rationale behind Mass. R. Prof. C.
5.5, however, convinces me that its strict application in this
matter would create too harsh a result.  The comments to rule 5.5
explain that "[l]imiting the practice of law to members of the
bar protects the public against rendition of legal services by
unqualified persons."  Implicit in this policy is a concern for
Massachusetts citizens.  As the Supreme Court of California noted
in Birbrower, Montalbano, Condon & Frank, P.C., v. Superior Court
of Santa Clara County, 17 Cal. 4th 119, 132 (1998) (quotations
and citations omitted):

> "Many states have substantially similar statutes that serve
> to protect their citizens from unlicensed attorneys who
> engage in unauthorized legal practice.  Like [California's]
> section 6125, these other state statutes protect local
> citizens against the dangers of legal representation and
> advice given by persons not trained, examined and licensed
> for such work, whether they be laymen or lawyers from other
> jurisdictions."[6]

See also Condon v. McHenry, 65 Cal. App. 4th 1138, 1145-1146
(1998) ("the client's residence or its principal place of

---

[6] In Birbrower, Montalbano, Condon & Frank, P.C. v. Superior
Court of Santa Clara County, 17 Cal. 4th 119, 124 (1998), the
Supreme Court of California determined that a law firm not
licensed to practice law in California violated California's
unauthorized practice of law statute "when it performed legal
services in California for a California-based client under a fee
agreement that stipulated that California law would govern all
matters in the representation."

8

business is determinative of the question of whether the practice is proscribed by section 6125"). Here, the clients are not Massachusetts citizens, but rather citizens of Florida regularly represented by the lawyer defendants in securities arbitrations who have a significant understanding of KDSC's business, industry, and management.

Further, the context in which the lawyers will be providing legal services to the broker defendants is an important consideration that weighs against allowing the plaintiffs' petition. Colmar, Ltd. v. Fremantlemedia North America, Inc., 344 Ill. App. 3d 977, 986 (2003), quoting Restatement (Third) of Law Governing Lawyers § 3 (2000) ("When . . . activities of a lawyer in a non-home state are challenged as impermissible for lack of admission to the state's bar, the context in which and purposes for which the lawyer acts should be carefully assessed"). Their representation of KDSC in the underlying arbitration has to date not involved the practice of law in Massachusetts, but rather in the firm's home state of New York. KDSC's claim demanding arbitration against the plaintiffs was filed with the NASD in New York, as were all pleadings and motions in the matter. Boston was selected as the situs of the arbitration hearing not because of Massachusetts's connection to the substantive claims at issue, but because of the NASD policy to select a hearing location close to public customers'

9

residences.  The NASD Code of Arbitration Procedure will govern

the proceeding, and has no provision for <u>pro hac vice</u> admission,

and no provision limiting who may appear in its proceedings as

counsel.

In light of these particular circumstances, I find no public

policy reason to grant the plaintiffs' request for declaratory

relief.  As the ABA's Commission on Multijurisdictional Practice

has contended:

> "[I]n the [alternative dispute resolution] context, there is
> often a strong justification for choosing a lawyer who is
> not admitted to practice law in the jurisdiction in which
> the proceeding takes place but who has an ongoing
> relationship with the client . . . or has developed a
> particular knowledge of expertise that would be advantageous
> in providing the representation.  Admission to practice law
> in the jurisdiction in which the proceeding takes place may
> be relatively unimportant, in part, because that
> jurisdiction may have no relation to the law governing the
> proceeding or to the dispute.  Unlike litigation, in
> [alternative dispute resolution] parties may select the site
> of the proceedings simply on the basis of convenience.
> . . . Thus, in [alternative dispute resolution]
> proceedings, the in-state lawyer is not ordinarily better
> qualified than other lawyers by virtue of greater
> familiarity with state law, state legal processes and state
> institutions."

ABA Commission on Multijurisdictional Practice, Report to the

House of Delegates, Report 201B, at 6 (2002),

http://www.abanet.org/cpr/mjp/201b.doc.  Because I conclude that

the lawyer defendants will not engage in the unauthorized

practice of law by representing the broker defendants at this

particular arbitration hearing in Massachusetts, I decline to

address the remaining issues raised by the plaintiffs' petition.

The plaintiffs' petition is denied.

Robert J. Cordy
Associate Justice

Entered:  May **06**, 2005



The Commonwealth of Massachusetts

SUPREME JUDICIAL COURT

FOR SUFFOLK COUNTY

JOHN ADAMS COURTHOUSE
ONE PEMBERTON SQUARE. SUITE 1300
BOSTON. MASSACHUSETTS 02108-1707

WWW.SJCCOUNTYCLERK.COM

CASE INFORMATION (617) 557-1100
FACSIMILE (617) 557-1117

ATTORNEY SERVICES (617) 557-1050
FACSIMILE (617) 557-1055

MAURA S. DOYLE
CLERK

May 6, 2005

William P. Corbett, Jr., Esquire
The Corbett Law Firm
85 Exchange Street, Suite 326
Lynn, MA 01901-1429

RE:  No. SJ-2005-0088

    STEVEN MSCISZ, MARK MSCISZ and LYNDA MSCISZ
        v.
    KASHNER DAVIDSON SECURITIES CORP., VICTOR KASHNER, MATTHEW
MEISTER, TIMOTHY VARCHETTO, MARC J. ROSS; RICHARD J. BABNICK, JR.
and SICHENZIA ROSS FRIEDMAN FERENCE LLP.

NOTICE OF DOCKET ENTRY

    You are hereby notified that on May 6, 2005, the following was

entered on the docket of the above referenced case:

Memorandum of Decision and Judgment:...."The plaintiff's petition
is denied." (Cordy, J.)

Maura S. Doyle, Clerk

To:  William P. Corbett, Jr., Esquire
     Howard M. Smith, Esquire
     Atty. Marc Ross
     Richard Babnick, Jr.,

SUPREME JUDICIAL COURT
FOR THE
COMMONWEALTH OF MASSACHUSETTS

Case No. SJC-09529

_____

STEVEN MSCISZ,
MARK MSCISZ & LYNDA MSCISZ,

*Appellants*

*v.*

KASHNER DAVIDSON SECURITIES CORP.,
VICTOR KASHNER, MATTHEW MEISTER,
TIMOTHY VARCHETTO, MARC J. ROSS,
RICHARD J. BABNICK, JR. &
SICHENZIA ROSS FRIEDMAN FERENCE LLP,

*Appellees*

_____

*ON APPEAL FROM JUDGMENT OF THE
SUPREME JUDICIAL COURT FOR SUFFOLK COUNTY*
_____

**BRIEF OF APPELLANTS**

William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

*Attorney for Appellants*

Dated:  August 3, 2005

## *TABLE OF CONTENTS*

*TABLE OF CONTENTS*                                                    i

*TABLE OF AUTHORITIES*                                              iii

*INTRODUCTION*                                                        1

*STATEMENT OF ISSUES PRESENTED FOR REVIEW*                            2

*STANDARD OF REVIEW*                                                  3

*STATEMENT OF THE CASE*                                               3

*STATEMENT OF FACTS*                                                  9

*SUMMARY OF ARGUMENT*                                                 9

*ARGUMENT*                                                           10

I.    THE CONDUCT OF ARBITRATION HEARINGS BY OUT-OF-
      STATE ATTORNEYS IS NOT AUTHORIZED UNDER
      MASSACHUSETTS LAW.                                             13

      A.    *To Conduct An Arbitration Hearing Is To
            "Practice Law."*                                         16

      B.    *There Is No "Arbitration Exception" To
            The Proscription Against The Unauthorized
            Practice Of Law.*                                        19

            1.    The Single Justice Approached The
                  "Unauthorized Practice Of Law" Issue
                  From The Wrong Perspective.                        20

            2.    The Single Justice Mistakenly
                  Assumed That The Prohibition Against
                  The "Unauthorized Practice Of Law"
                  Only Benefits Massachusetts Clients.               25

II.   THE DECLARATORY JUDGMENT ACT REQUIRED FAITHFUL
      ADHERENCE TO MASS. R. PROF. C. 5.5.                            27

III.  THE SINGLE JUSTICE SHOULD HAVE ADDRESSED ALL
      ISSUES ON WHICH DECLARATIONS WERE SOUGHT.                      34

A.   *An Attorney May Not Turn A Blind Eye To The Unauthorized Practice Of Law.*          35

B.   *The Arbitrators Should Have Postponed The Hearing Until Resolution Of The Unauthorized Practice Of Law Issues.*          36

C.   *An Arbitration Award Must Be Vacated If It Was The Product Of A Hearing Conducted By Lawyers Not Authorized To Do So.*          38

*CONCLUSION*          39

## TABLE OF AUTHORITIES

### *Cases*

Baldassari v. Public Fin. Tr.,
369 Mass. 33 (1975)                                            32

Bates v. Superior Court,
432 Mass. 1021 (2000)                                         28

Birbrower, Montalbano, Condon & Frank, P.C.
v. Superior Court, 17 Cal. 4th 119,
cert. denied, 525 U.S. 920 (1998)              22, 32, 33

Board of Selectmen of Truro v. Outdoor
Advertising Bd., 346 Mass. 754 (1964)                        30

Cambridge Trust Co. v. Hanify & King, P.C.,
430 Mass. 472 (1999)                                          33

Cepulonis v. Commonwealth,
443 Mass. 1019 (2005)                                          3

Ciszewski v. Industrial Accident Board,
367 Mass. 135 (1975)                                          34

City of Everett v. Local 1656, IAFF,
411 Mass. 361 (1991)                                          29

                                                              5,
Collins v. Godfrey, 324 Mass. 574 (1949)       29, 32, 39

Colmar, LTD v. Fremantlemedia North
America, Inc., 344 Ill. App. 3d 977 (2003)                   33

Commonwealth v. Rahim, 441 Mass. 273 (2004)                  19

Connecticut Valley San. Waste Disp. v.
Zielinski, 436 Mass. 263 (2002)                              36

DiLuzio v. United Electrical, Radio & Mach.
Workers of Am., 391 Mass. 211 (1984)                      5, 20

Essex Co. v. Goldman, 357 Mass. 427 (1970)                  34

Florida Bar v. Rapoport, 845 So.2d 874,
cert. denied, 540 U.S. 967 (2003)                        22, 33

Goldfarb v. Virginia State Bar,
421 U.S. 773 (1975)                                    26

Haddad v. Gonzalez, 410 Mass. 855 (1991)               32

In re Chimko, 2005 Mass. LEXIS 422
(July 22, 2005)                                 16, 17, 32

In re Lucas, 317 B.R. 195 (D. Mass. 2004)              25

In re Lyon, 301 Mass. 30 (1938)                 14, 17, 18

In re Maclub of America, Inc.,
295 Mass. 45 (1936)                                    26

In re Shoe Manuf. Prot. Ass'n,
295 Mass. 369 (1936)                                14, 18

Jean W. v. Commonwealth,
414 Mass. 496 (1993)                                   13

Kartell v. Blue Shield of Mass., Inc.,
592 F.2d 1191 (1st Cir. 1979)                          12

Keene v. Brigham & Womens' Hosp.,
439 Mass. 223 (2003)                                   30

Kilroy v. O'Connor, 324 Mass. 238 (1949)               34

LeBlanc v. Friedman, 438 Mass. 592 (2003)              13

Leis v. Flynt, 439 U.S. 438 (1979)                     21

Lowell Bar Ass'n v. Loeb,
315 Mass. 176 (1943)                             5, 16, 18

Marino v. Tagaris, 395 Mass. 397 (1985)                39

Massachusetts Hwy Dep't v. Perini Corp.,
444 Mass. 366 (2005)                                    8

McInerney v. Lally, 384 Mass. 810 (1981)               39

National Shawmut Bank v. Morey,
320 Mass. 492 (1946)                                   11

Opinion of the Justices,
279 Mass. 607 (1932)                    14, 27, 32

Pazolt v. Director of Div. of Marine
Fisheries, 417 Mass. 565 (1994)                  28

Plymouth-Carver Reg. Sch. Dist. v. J.
Farmer & Co., 407 Mass. 1006 (1990)              36

Romany v. Colegio de Abogados de Puerto
Rico, 742 F.2d 32 (1st Cir. 1984)                11

Superadio L.P. v. Walt "Baby" Love
Productions, Inc., 62 Mass. App. Ct. 546
(2004), further review granted,
444 Mass. 1106 (2005)                            19

Vesce v. Gottfried, 353 Mass. 568 (1968)         34

Zaltman v. Daris, 331 Mass. 458 (1954)           34

## Statutes

Cal. C. Civ. P. § 1282.4(b)                      33

G.L. c. 93A, § 9                                 32

G.L. c. 221, § 46A                      4, 5, 6, 35

G.L. c. 231, § 114                                7

G.L. c. 231A, § 1                        10, 11, 28

                                                 2,
G.L. c. 231A, § 3                        10, 28, 29

G.L. c. 231A, § 5                                31

G.L. c. 231A, § 9                            11, 38

G.L. c. 231A, § 10                                7

G.L. c. 251, § 12                                 6

G.L. c. 251, § 12(a)(1)                          38

G.L. c. 251, § 12(a)(4)                                    37, 38

G.L. c. 251, § 12(a)(5)                                         5

G.L. c. 251, § 12(c)                                          38

### *Court Rules*

Mass. R. App. P. 4(a)                                          7

Mass. R. Prof. C. 3.3                                         26

Mass. R. Prof. C. 3.4                                         26

Mass. R. Prof. C. 3.5                                         27

Mass. R. Prof. C. 3.6                                         27

Mass. R. Prof. C. 3.7                                         27

Mass. R. Prof. C. 3.8                                         27

Mass. R. Prof. C. 3.9                                         27

Mass. R. Prof. C. 4.1                                         27

Mass. R. Prof. C. 4.2                                         27

Mass. R. Prof. C. 4.3                                         27

Mass. R. Prof. C. 4.4                                         27

                                                      12, 13,
                                                  15, 21, 23,
                                                  25, 26, 27,
Mass. R. Prof. C. 5.5                              30, 31, 32

                                                       1, 2, 4,
                                                       5, 6, 10,
                                                  29, 31, 33,
Mass. R. Prof. C. 5.5(a)                          34, 35, 40

Mass. R. Prof. C. 5.5(b)                             4, 5, 35

Mass. R. Prof. C. 6.1                                         27

Mass. R. Prof. C. 6.2                                         27

Mass. R. Prof. C. 6.3                                    27

Mass. R. Prof. C. 6.4                                    27

Mass. R. Prof. C. 8.1                                    27

Mass. R. Prof. C. 8.2                                    27

Mass. R. Prof. C. 8.3                                    27

Mass. R. Prof. C. 8.4                                    27

Mass. R. Prof. C. 8.4(a)                          4, 5, 35

Mass. R. Prof. C. 8.5                                    27

### *Secondary Materials*

ABA Mod. R. Prof. C. 5.5                         23, 24, 25

Borchard, <u>Declaratory Judgments</u> (1941)            29

Gillers, "Lessons from the Multijuris-
dictional Practice Commission:  The Art of
Making Change", 44 ARIZ. L. REV. 685 (2002)            22

**Page Intentionally Left Blank**

### *INTRODUCTION*

This appeal is one of a trio currently before (or recently decided by) this Court, where the parameters of its prohibition against the unauthorized practice of law, in this era of increasing multijurisdictional practice, have come into sharp focus. In re Chimko, Case No. SJC-09388, was decided on July 22, 2005. Two days earlier, this Court granted further appellate review in Superadio L.P. v. Walt "Baby" Love Productions, Inc., Case No. SJC-09542. Like this appeal, which was docketed on June 24, 2005, Chimko and Superadio required this Court to define important aspects of its unauthorized practice of law rule, Mass. R. Prof. C. 5.5(a), and the potential ramifications of such unauthorized activities.

In this case, as discussed more fully below, the single justice abused his direction and clearly erred when he declined to make the declarations sought by appellants Steven Mscisz, Mark Msisz and Lynda Mscisz ("Customers"). The single justice properly determined that the conduct of arbitration hearings constitutes the "practice of law," and that faithful adherence to Mass. R. Prof. C. 5.5(a) would preclude out-of-state attorneys from engaging in such activities. However,

his conclusion that "strict application" of that Rule "would create too harsh a result" was not a "sufficient reason[]", within the meaning of G.L. c. 231A, § 3, for refusing to render the declaratory judgment requested by the Customers.  Nor were the single justice's reasons for declining to address the other issues framed by the Customers "sufficient." The Judgment should be reversed, and the full Court should make the declarations sought by the Customers.

### *STATEMENT OF ISSUES PRESENTED FOR REVIEW*

1.   Whether the conduct of arbitration hearings by out-of-state attorneys is authorized under the laws of this Commonwealth.

2.   Whether the single justice's belief that faithful adherence to Mass. R. Prof. C. 5.5(a) "would create too harsh a result" was a "sufficient reason[]", within the meaning of G.L. c. 231A, § 3, for refusing to render a declaratory judgment.

3.   Whether the single justice, after refusing to grant a declaratory judgment on the "unauthorized practice of law" issue, could permissibly decline to address the remaining issues on which declarations were sought.

***STANDARD OF REVIEW***

A denial of declaratory relief by a single justice of this Court is reviewed for error of law or abuse of discretion.  <u>Cepulonis v. Commonwealth</u>, 443 Mass. 1019 (2005).

***STATEMENT OF THE CASE***

This appeal arises from an arbitration pending before a panel appointed by the dispute resolution subsidiary of the National Association of Securities Dealers, Inc. ("NASD"), a self-regulatory organization which is not a party to this appeal.  App. at 7-8.[1] The arbitration involved three Massachusetts customers, a Florida broker-dealer, and three registered representatives of the broker-dealer who also reside in Florida.  App. at 439.  Originally scheduled to begin on March 2, 2005, the arbitration hearing was postponed until May 17, 2005.  <u>Id</u>. Florida-domiciled appellees Kashner Davidson Securities Corporation, Victor Kashner, Matthew Meister and Timothy Varchetto ("Broker Appellees") indicated that they would be represented at the

---

[1] Citations to specific pages of the record appendix shall take the form "App. at ___."

hearing by New York-based Marc J. Ross, Richard J. Babnick, Jr., and Sichenzia Ross Friedman Ference LLP ("Lawyer Appellees"), none of whom was admitted to practice law in the Commonwealth.  App. at 129.

Believing that the participation of out-of-state lawyers in a Massachusetts arbitration hearing could violate G.L. c. 221, § 46A and Mass. R. Prof. C. 5.5(a), and concerned that their own counsel's participation might constitute knowing assistance of that violation, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a), the Customers filed in the arbitration a motion to disqualify the Lawyer Appellees or postpone the hearing until after the full Court resolved Chimko.  App. at 22-74.  The Customers filed that motion on December 17, 2004 – more than ten weeks before the date originally scheduled for the arbitration hearing, and five months before the hearing actually began.  Id. at 26.  The Broker Appellees opposed the Customers' motion, and the chairman of the arbitration panel orally denied the Customers' motion on January 31, 2005.  App. at 88. The Customers subsequently sought reconsideration of that decision, but that request was denied orally on March 2, 2005.  Id. at 89.

On February 22, 2005, the Customers commenced a civil action in the Suffolk County session of this Court, seeking binding declarations of:

- Whether a lawyer admitted in another United States jurisdiction, but not Massachusetts, would violate Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A,[2] by representing a party or parties at an arbitration hearing held in this Commonwealth (App. at 16);

- Whether a Massachusetts attorney, by participating in an arbitration hearing held within the Commonwealth where parties are represented by lawyers not licensed to practice in this jurisdiction, would knowingly assist a violation of Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a) (App. at 17);

- Whether an arbitrator's refusal to postpone the hearing until this Court resolved the "unauthorized practice of law" issue would subject any award issued to vacation under the Uniform Arbitration Act, G.L. c. 251, § 12(a)(5) (App. at 18); and

---

[2] Although the Complaint invoked both Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A (App. at 7-20), Rule 5.5(a) is the substantively operative provision. The cited statute merely complements this Court's Rule "by providing machinery and criminal penalties, but may not extend the privilege of practising law to persons not admitted to practice by the judicial department." Lowell Bar Ass'n v. Loeb, 315 Mass. 176, 179 (1943). It is simply "an expression of policy for the guidance of the judicial department in exercising its constitutional prerogative of controlling the practice of law in the Commonwealth." DiLuzio v. United Electrical, Radio & Mach. Workers of Am., 391 Mass. 211, 215 (1984). Operation of the statute is "in all respects subject to the 'ultimate power of control' of the judiciary." Id. (quoting Collins v. Godfrey, 324 Mass. 574, 576 (1949)).

- Whether an award issued after an arbitration hearing in which attorneys violated Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A would be procured by "undue means" and subject to vacation under the Uniform Arbitration Act, G.L. c. 251, § 12 (App. at 19).

On March 2, 2005, the Customers filed their First Amended Complaint ("Complaint"), which reflected the arbitrators' denial of their motion for reconsideration. App. at 5, 7-85. The case was extensively briefed by the parties (see App. at 123-44, 398-435), who also participated in a telephonic hearing before a single justice of this Court (Cordy, J.) on April 20, 20005.[3]

The pleadings, affidavits, legal memoranda and oral argument revealed no disputed issues of fact material to the declaratory judgment action. It was questions of law that were argued, and each was to some extent intertwined with the "unauthorized practice of law" issue presented in Count I of the Complaint. The Customers urged the single justice to apply Mass. R. Prof. C. 5.5(a) as it is currently written (App. at 403-413), and the appellees essentially urged him to bypass the Court's procedures for amending its Rules of

---

[3] Because of technical glitches associated with the Court's transition to its new facilities at the John Adams Courthouse, no electronic recording or transcript of that hearing was available for inclusion in the record appendix.

Professional Conduct and imply an "arbitration exception" into that Rule. App. at 129-139.

Five days before the scheduled commencement of the arbitration hearing, the single justice issued a Memorandum of Decision and Judgment ("Judgment") which accepted the Customers' analysis – agreeing that "strict application" of the current rule supported their position – but nonetheless declined to make the declarations they sought because it "would create too harsh a result." App. at 441, 443. The Customers had until June 6, 2005 to appeal from the Judgment. See Mass. R. App. P. 4(a) (notice of appeal must be filed within 30 days of entry of judgment); G.L. c. 231A, § 10 ("orders, judgments, decrees and refusals under this chapter may be reviewed as other orders, judgments and decrees"); G.L. c. 231, § 114 (party aggrieved by final judgment of single justice of SJC may appeal to full Court). However, they filed their notice of appeal more than three weeks early, on May 10, 2005. App. at 5. With their notice of appeal, the Customers filed a motion for an injunction pending their appeal, with a supporting memorandum of law. Id. Two days later, the same single justice (Cordy, J.) denied the Customers' motion without a hearing. Id.

For the reasons set forth in Appellants' Memorandum of Points and Authorities Opposing Appellees' "Notice of Motion to Dismiss the Appeal for Failure to Comply With Mass. R.A.P. 10(a)(1)" and Supporting Their Cross-Motion for Enlargement of Time for Docketing Appeal,[4] the Customers did not cause their appeal to be docketed until June 24, 2005.  The "actual controversy" giving rise to the declaratory judgment action had abated, temporarily rendering this appeal moot.  <u>Massachusetts Hwy Dep't v. Perini Corp.</u>, 444 Mass. 366, 372 (2005). When the Customers again had a stake in its outcome, they promptly paid this Court's fee, caused the appeal to be docketed, and worked with the appellees to assemble the record appendix.  Despite the Customers' unprompted, diligent efforts to prosecute this appeal, the appellees moved on July 19, 2005 – 25 days after the appellants paid the docket fee and the Clerk of this Court docketed this appeal – for dismissal.  That motion and the Customers' cross-motion to extend the time for docketing the appeal remain undecided.

---

[4] That memorandum was filed in this appeal on July 26, 2005; it is noted as Docket Entry #2.

*STATEMENT OF FACTS*

Although the factual issues in the underlying arbitration were (and remain) vigorously contested, there was no dispute concerning the operative facts in the declaratory judgment proceeding:

- The Commonwealth's regulatory framework governing the practice of law limits that privilege to attorneys licensed by and subject to the disciplinary oversight of this Court;

- Appellees Marc J. Ross, Richard J. Babnick, Jr., and Sichenzia Ross Friedman Ference LLP ( "Lawyer Appellees") expressed their intention to represent Kashner Davidson Securities Corp., Victor Kashner, Matthew Meister and Timothy Varchetto ( "Broker Appellees") at an arbitration hearing scheduled to commence in Boston beginning on May 17, 2005; and

- None of the Lawyer Appellees is an attorney admitted to practice law in this Commonwealth.

App. at 439-440, 8-15, 28, 30, 125-129, 146-148, 153-156.

*SUMMARY OF ARGUMENT*

Though he might have acted with commendable intentions, the single justice nonetheless abused his direction and clearly erred when he declined to render the declaratory judgment sought by the Customers. After all, the conduct of arbitration hearings constitutes the "practice of law," and – as the single justice himself concedes – faithful adherence to Mass.

R. Prof. C. 5.5(a) would preclude out-of-state attorneys from engaging in such activities within this Commonwealth.  The single justice's belief that "strict application" of that Rule "would create too harsh a result" was not a "sufficient reason[]", within the meaning of G.L. c. 231A, § 3, for refusing to render the declaratory judgment requested by the Customers.  Nor did the single justice specify on the record "sufficient reasons" for declining to address the other three issues on which the Customers sought binding declarations; those unsettled issues were significant and called out for decision.  The Judgment should be reversed, and the declarations sought by the appellants should be rendered by the full Court.

### *ARGUMENT*

The single justice's Judgment did not serve any of the salutary purposes for which the Commonwealth's Declaratory Judgment Act was promulgated.  This Court has concurrent jurisdiction (which it has delegated to its single justice session) with several departments of the Trial Court, "on appropriate proceedings," to "make binding declarations of right, duty, status and other legal relations sought thereby."  G.L. c. 231A,

§ 1.  The statute is remedial, and the Legislature mandated that it "be liberally construed and administered."  Id., § 9.  See National Shawmut Bank v. Morey, 320 Mass. 492, 496 (1946) (statute "should be construed liberally").  It exists to "remove, and to afford relief from" precisely the sort of "uncertainty and insecurity with respect to rights, duties, status and other legal relations" precipitated by the Lawyer Appellees' declared intention to conduct an arbitration hearing in Boston.  G.L. c. 231A, § 1.

Resolution of the unsettled questions presented by this case would have terminated the controversy giving rise to the proceedings, but the Judgment continued the uncertainty.  As noted in the Customers' opposition to the appellees' motion to dismiss their appeal, several questions the single justice declined to address are at issue in Kashner Davidson Securities Corp., et al., v. Steven Mscisz, et al., Case No. 05-cv-11433-JLT (D. Mass.).[5]

_____

[5] Once the pleadings are complete and the issues are fully joined in the Federal litigation, the Customers will ask the U.S. District Court to abstain from determining those issues until after this Court addresses them.  See Romany v. Colegio de Abogados de Puerto Rico, 742 F.2d 32, 42-43 (1st Cir. 1984) (when state law questions concern matters "peculiarly within

Nor did the single justice's ultimate conclusion logically follow from the analysis which preceded it. As discussed below, the single justice agreed that the Lawyer Appellees' participation in the arbitration hearing would constitute the "practice of law," and that nothing in the law of this Commonwealth provides that the Lawyer Appellees could do so.  Despite his agreement with the Customers' interpretation of Rule 5.5, the single justice focused on what he perceived as the "harsh" results that would ensue from its enforcement, holding "that the lawyer defendants will not engage in the unauthorized practice of law by representing the broker defendants at this particular arbitration hearing in Massachusetts."  App. at 445.

Perhaps the single justice is correct in his apparent belief that out-of-state attorneys should be allowed to represent parties in securities arbitration hearings held within the Commonwealth, but the governing rule, as currently written, does not permit such activities.  His well-intended but misplaced

---

the province of local courts," Federal courts lean toward abstention); Kartell v. Blue Shield of Mass., Inc., 592 F.2d 1191, 1195 (1st Cir. 1979) (remanding with instructions to retain jurisdiction and abstain pending resolution of state law issues).

reasoning is typical of "analyses that result when courts seek to avoid ... harsh results without squarely facing the underlying problem."  Jean W. v. Commonwealth, 414 Mass. 496, 511 (1993) (Liacos, C.J., concurring).  The Judgment "is an example of a hard case making bad law." LeBlanc v. Friedman, 438 Mass. 592, 603 (2003) (Cowin, J., dissenting).  It was abusive of the single justice's discretion and manifested a clear error of law.

I.   **THE CONDUCT OF ARBITRATION HEARINGS BY OUT-OF-STATE ATTORNEYS IS NOT AUTHORIZED UNDER MASSACHUSETTS LAW.**

Although the single justice denied the Customers' petition, he did not disagree with their interpretation of the governing law.  The single justice was instead concerned that "strict application" of Mass. R. Prof. C. 5.5 "would create too harsh a result."  App. at 443.  Accordingly, although the single justice agreed that the conduct of an arbitration is indeed the "practice of law" and that there is no rule allowing non-Massachusetts lawyers to conduct such hearings in this Commonwealth, his concerns about the potential consequences of faithful application of that rule led him to "conclude

that the lawyer defendants will not engage in the unauthorized practice of law by representing the broker defendants at this particular arbitration hearing in Massachusetts." Id. at 445.

The single justice erred in his legal analysis and otherwise abused his discretion.  It is the declared policy of this Commonwealth that only members of its bar should practise law..." In re Lyon, 301 Mass. 30, 35 (1938).  As this Court made clear more than seven decades ago:

> It is indispensable to the administration of
> justice and the interpretation of the laws
> that there be members of the bar of
> sufficient ability, adequate learning and
> sound moral character.  This arises from the
> need of enlightened assistance to the
> honest, and restraining authority over the
> knavish, litigant.  It is highly important,
> also, that the public be protected from
> incompetent and vicious practitioners, whose
> opportunity for doing mischief is wide.

Opinion of the Justices, 279 Mass. 607 (1932).  "Long experience":

> has demonstrated that such activities cannot
> be carried on with fairness to the public,
> except by those … who are subject to
> professional discipline, and who act under
> the constant sense of professional
> responsibility.

In re Shoe Manuf. Prot. Ass'n, 295 Mass. 369, 372 (1936).  That policy is currently manifested in Rule

5.5 of the Massachusetts Rules of Professional

Conduct, which provides:

> A lawyer shall not:
>
> (a) practice law in a jurisdiction where doing so violates the regulation of the legal profession in that jurisdiction; or
>
> (b) assist a person who is not a member of the bar in the performance of activity that constitutes the unauthorized practice of law.

As discussed more fully below, it is clear that the conduct of arbitration hearings constitutes the practice of law, that the laws of this Commonwealth limit the practice of law to attorneys admitted by this Court, and that none of the Lawyer Appellees is a member of the Massachusetts Bar. It is equally true that there is no inherent right of a foreign attorney to conduct an arbitration hearing in a jurisdiction where the lawyer is not admitted to practice law. Nor are there any binding precedents relieving the Lawyer Appellees from the operation of Mass. R. Prof. C. 5.5. Accordingly, unless this Court affirms the single justice's tacit promulgation of the "arbitration exception" urged by the appellees, the Court must reverse the single justice's Judgment and issue the declaratory judgment requested by the Customers.

### A. To Conduct An Arbitration Hearing Is To "Practice Law."

As this Court recently noted, it is not always "easy to define the practice of law."  <u>In re Chimko</u>, 2005 Mass. LEXIS 422 at *13 (July 22, 2005) (quoting <u>Lowell Bar Ass'n</u>, 315 Mass. at 180).  However, there could be no *bona fide* dispute, given this Court's many precedents, that the Lawyer Appellees' conduct of an arbitration hearing for the Broker Appellees would constitute the "practice of law."  The single justice properly credited the Customers' argument that such activities embody "the practice of law."  App. at 441.

That conclusion was not subverted by the Court's response to the first certified question in <u>Chimko</u>, where this Court (in an opinion authored by the same justice whose Judgment is at issue in this appeal) concluded that it was not the "practice of law" for an attorney not admitted in Massachusetts to completing a loan reaffirmation agreement, providing a bankruptcy debtor with a notice of *pro se* reaffirmation, and corresponding with the debtor and Bankruptcy Court using law firm letterhead.  2005 Mass. LEXIS 422 at *2.  As the Court properly observed, none of those activities involved "either rendering legal advice to

or soliciting Massachusetts clients, or even engaging
in a legal contest in a Massachusetts forum on behalf
of an out-of-State client." Id. at *20. Even if the
Court had concluded that any of those activities
constituted the practice of law, "they would be
services falling at the very periphery of such
practice." Id.

Chimko therefore stands in stark contrast to this
appeal, where the only activity at issue is the Lawyer
Appellees' engagement "in a legal contest in a
Massachusetts forum on behalf of an out-of-State
client" – an activity at the core of the attorney's
professional function. For purposes of determining
whether the Lawyer Appellees were engaged in the
"practice of law," it is of no consequence that the
legal contest in which they participated was an
arbitration, and not a judicial proceeding. The
practice of law is not confined to acts performed in
the courts of this Commonwealth or before its judicial
officers. Lyon, 301 Mass. at 34. It is well-
established that:

in general the practice of directing and
managing the enforcement of legal claims and
the establishment of the legal rights of
others, where it is necessary to form and to
act upon opinions as to what those rights
are and as to the legal methods which must
be adopted to enforce them, the practice of
giving or furnishing legal advise as to such
rights and methods and the practice, as an
occupation, of drafting documents by which
such rights are created, modified,
surrendered or secured are all aspects of
the practice of law.

Shoe Manuf. Prot. Ass'n, 295 Mass. at 372.  Because an

arbitration hearing necessarily involves "the

examination of statutes, judicial decisions, and

departmental rulings" and the rendering of opinions

thereon, its conduct is "part of the practice of law

in which only members of the bar may engage."  Lowell

Bar Ass'n, 315 Mass. at 183.  When an unauthorized

person does acts "similar to and concurrent with those

done in relation to proceedings in State courts ...[6]

the resulting evils are the same and reach into the

community in the same way as if the subject matter

related to litigation in State courts."  Lyon, 301

Mass. at 34.

---

[6] Indeed, arbitrations often generate collateral
litigation (like the declaratory judgment action
underlying this appeal) and judicial proceedings to
vacate or confirm an award (like the pending Federal
case).  No rigid barrier between the arbitration process
and the judicial process is workable.

> **B.    There Is No "Arbitration Exception" To The Proscription Against The Unauthorized Practice Of Law.**

Not only did the single justice agree that the Lawyer Appellees were engaged in the "practice of law," but he also agreed that "[n]othing in Massachusetts law ... explicitly permits an attorney not licensed to practice in Massachusetts to serve as legal counsel at a Massachusetts arbitration proceeding."[7]  App. at 442 n.5.  The Single Justice

---

[7] The single justice nonetheless also appears to have relied improvidently upon the recent dictum a panel of the Appeals Court belatedly inserted into a footnote of its opinion in Superadio L.P. v. Walt "Baby" Love Productions, Inc.  App. at 442 n.5.  In that case, the appellant argued that the underlying arbitration award "was obtained by undue means" because the appellee's attorney, "who had been admitted to practice law in New York and not Massachusetts, engaged in an unauthorized practice of law during the arbitration proceedings."  62 Mass. App. Ct. 546 (2004), further review granted, 444 Mass. 1106 (2005).  Initially, the panel did not "discuss the unauthorized practice of law issue" because it otherwise ruled in favor of the appellant.  Id. at 552 n.5.  Nearly four months later, the panel replaced the original footnote 5 with a dictum purporting to address that issue, and it was that dictum quoted by the single justice.  The new footnote contains no substantive analysis or discussion of the issue, and it does not set forth any explanation of the panel's reasons for changing course.  As the single justice recently reasoned for the majority in Commonwealth v. Rahim, 441 Mass. 273, 284-86 (2004), this Court should "give ... little weight" to such a cursory dictum collateral to the core holding.  In any event, this Court has granted further review of Superadio, so the revised footnote 5 is not the final word on the issue.

further agreed "that there is no explicit 'arbitration exception' in either Mass. R. Prof. C. 5.5 or G.L. c. 221, § 46A." App. at 441-442. Those conclusions required the single justice to grant the relief requested in Count I of the Complaint.

      1.    The Single Justice Approached The "Unauthorized Practice Of Law" Issue From The Wrong Perspective.

Implicit in the single justice's Judgment is a fundamental analytical mistake. It is axiomatic that "the right of a litigant to counsel of his choosing is not absolute and cannot always predominate." DiLuzio, 391 Mass. at 216. Yet the single justice appears to assume that everyone is permitted to engage in activities constituting the practice of law unless those activities are specifically prohibited. Of course, it is the converse which is true. Unlicensed persons are prohibited from practicing here unless specifically authorized to do so, not *vice versa.* "[P]ermission of the judicial department" – whether through permanent admission to the Bar or admission *pro hac vice* – "is not merely important but is essential to the right to appear as an attorney." Id., at 215.

There is presently no statute or rule of this Court by which the Lawyer Appellees could have obtained such permission in connection with the arbitration.  Nor do out-of-state lawyers find a safe harbor in the "full faith and credit clause" or any other provision of U.S. Constitution; simply "because a lawyer has been admitted to the bar of one State," there is no requirement that "he or she must be allowed to practice in another." Leis v. Flynt, 439 U.S. 438, 443 (1979).  In other words, there is currently no mechanism under the laws of this Commonwealth pursuant to which lawyers from outside Massachusetts might be authorized to appear at arbitration hearings.

Even the NASD – the very organization sponsoring the forum where the underlying arbitration is pending – recognizes the potential that Rule 5.5 could preclude attorneys from conducting arbitration hearings in jurisdictions where they are not admitted. App. at 98-100.  Consequently, instead of embracing the reasoning offered by the appellees, the NASD recently asked the Securities & Exchange Commission to "expand the concept of representation in arbitration" and allow lawyers, under specified circumstances, to

appear in arbitration hearings in jurisdictions where they are not admitted to practice.  App. at 96, 100.

That proposed rule change represented the NASD's response to recent decisions by other states' highest courts that – when called upon to analyze "unauthorized practice of law" rules substantially indistinguishable from this Commonwealth's – held that participation in arbitration hearings by out-of-state attorneys is unlawful,  App. at 98-99 & n.2 (citing Florida Bar v. Rapoport, 845 So.2d 874, cert. denied, 540 U.S. 967 (2003) and Birbrower, Montalbano, Condon & Frank, P.C. v. Superior Court, 17 Cal. 4th 119, 133-34, cert. denied, 525 U.S. 920 (1998)).[8]  The NASD acknowledged Birbrower and Rapoport, recognized that "it can be a violation of state unauthorized practice of law provisions" for attorneys to appear in hearings conducted in jurisdictions where they are not admitted, and expressed its belief that changes are "needed to address the issue of multi-jurisdictional practice of law in arbitration."  App. at 98.

---

[8] Birbrower, in particular, "was a conceptual torpedo."  Gillers, "Lessons from the Multijurisdictional Practice Commission:  The Art of Making Change", 44 ARIZ. L. REV. 685, 688 (2002).

Like the NASD, the American Bar Association ("ABA") acted to address some of the "unauthorized practice of law" issues present in this case. Before 2002, the ABA's Model Rule 5.5 and the Commonwealth's cognate Rule were identical and did not afford the "arbitration exception" urged by the appellees and effected by the single justice. The ABA thereafter amended Model Rule 5.5, which now takes this form:

**Rule 5.5 Unauthorized Practice of Law; Multijurisdictional Practice of Law**

(a)   A lawyer shall not practice law in a jurisdiction in violation of the regulation of the legal profession in that jurisdiction, or assist another in doing so.

(b)   A lawyer who is not admitted to practice in this jurisdiction shall not:

    (1)   except as authorized by these Rules or other law, establish an office or other systematic and continuous presence in this jurisdiction for the practice of law; or

    (2)   hold out to the public or otherwise represent that the lawyer is admitted to practice law in this jurisdiction.

*(c)   A lawyer admitted in another United States jurisdiction, and not disbarred or suspended from practice in any jurisdiction, may provide legal services on a temporary basis in this jurisdiction that:*

    (1)   are undertaken in association with a lawyer who is admitted to practice in this jurisdiction and who actively participates in the matter;

> **(2)  *are in or reasonably related to a
>        pending or potential proceeding before
>        a tribunal in this or another
>        jurisdiction, if the lawyer, or a
>        person the lawyer is assisting, is
>        authorized by law or order to appear in
>        such proceeding or reasonably expects
>        to be so authorized;***
>
> (3)  are in or reasonably related to a
>      pending or potential arbitration,
>      mediation, or other alternative dispute
>      resolution proceeding in this or
>      another jurisdiction, if the services
>      arise out of or are reasonably related
>      to the lawyer's practice in a
>      jurisdiction in which the lawyer is
>      admitted to practice and are not
>      services for which the forum requires
>      pro hac vice admission; or
>
> (4)  are not within paragraphs (c)(2) or
>      (c)(3) and arise out of or are
>      reasonably related to the lawyer's
>      practice in a jurisdiction in which the
>      lawyer is admitted to practice.

(d)  A lawyer admitted in another United States
     jurisdiction, and not disbarred or suspended
     from practice in any jurisdiction, may
     provide legal services in this jurisdiction
     that:

> (1)  are provided to the lawyer's employer
>      or its organizational affiliates and
>      are not services for which the forum
>      requires pro hac vice admission; or
>
> (2)  are services that the lawyer is
>      authorized to provide by federal law or
>      other law of this jurisdiction.

(**Emphasis** added)  The ***emphasized*** portions of this

amended Model Rule set forth an "arbitration

exception" like that urged by the appellees.  However,

as the NASD cautioned, this amendment "can be enforced
only if the states adopt it into their laws."  App. at
99.  The single justice himself purported to recognize
that, until a corresponding amendment is adopted by
this Court, the language of our Rule 5.5 "differs from
the recently amended version" of the ABA's Model Rule.
App. at 442.[9]

> ### 2. The Single Justice Mistakenly Assumed That The Prohibition Against The "Unauthorized Practice Of Law" Only Benefits Massachusetts Clients.

The single justice oversimplified the policy
underlying the prohibition against the unauthorized
practice of law.  As the single justice purported to
recognize (App. at 443), it is "the public" which the
rule was intended to protect.  Mass. R. Prof. C. 5.5,
cmt 1.  Yet he appears to assume that Rule 5.5 only

---

[9] As Judge Young noted in the opinion to which <u>Chimko</u>
responded, <u>In re Lucas</u>, 317 B.R. 195, 210 n.11 (D. Mass.
2004), the Court "might otherwise weigh the 'merits of
uniformity' in favor of adoption, but the states remain
in 'considerable disagreement' regarding amended Model
Rule 5.5."  As of February 2005, only 14 states had
adopted rules equivalent to that amendment.  App. at 99
n.4.  "[T]he long history of the present Massachusetts
Rules, adopted only after 'careful consideration of each
ABA model rule with the view toward … adaptation to
Massachusetts needs and preferences,'" makes it
impracticable for outsiders to predict whether this
Court will adopt the amended Model Rule 5.5.  <u>Lucas</u>, 317
B.R. at 210.

protects Massachusetts-domiciled clients from the potential evils of unlicensed providers of legal services.  See App. at 443-444 (focusing exclusively on residence of clients).

The single justice conspicuously failed to acknowledge that the rules governing the practice of law not only operate to maintain "the highly fiduciary relations between attorney and client" but they also exist "for the protection of the courts and the public in order to maintain unimpaired the independence, integrity and ethical standards of the bar…"  In re Maclub of America, Inc., 295 Mass. 45, 50 (1936). "Lawyers are essential to the primary governmental function of administering justice…"  Goldfarb v. Virginia State Bar, 421 U.S. 773, 792 (1975).

Clients and potential clients are but a subset of the persons protected by this Court's prohibition against the unauthorized practice of law.  Rule 5.5 is an integral component of a regulatory regime which does seek to protect clients, but which also contains safeguards intended for the protection of tribunals, opposing parties, opposing counsel, various third persons, the legal profession, and the justice system as a whole.  See, e.g., Mass. R. Prof. C. 3.3, 3.4,

3.5, 3.6, 3.7, 3.8, 3.9, 4.1, 4.2, 4.3, 4.4, 6.1, 6.2, 6.3, 6.4, 8.1, 8.2, 8.3, 8.4 & 8.5.  Certainly, honest consumers of legal services require "enlightened assistance," but their adversaries and the justice system itself are also entitled to a "restraining authority over the knavish litigant."  Opinion of the Justices, 279 Mass. 607.  It is "highly important" that the public in general "be protected from incompetent and vicious practitioners, whose opportunity for doing mischief is wide."  Id.

In short, the Florida-domiciled Broker Appellees may be the only clients represented in this matter by the New York-based Lawyer Appellees (App. at 445), but Massachusetts citizens like the Customers are also entitled to the protection intended by Rule 5.5, as are their Massachusetts-based attorney and all other persons and entities that might have come into contact with the Lawyer Appellees during the arbitration.

## II.  THE DECLARATORY JUDGMENT ACT REQUIRED FAITHFUL ADHERENCE TO MASS. R. PROF. C. 5.5.

The Declaratory Judgment Act required the single justice to discern and declare the current state of the law – not to allow concerns about the potential results to dictate the outcome.  The role of the

single justice was to "make binding declarations of right, duty, status and other legal relations."  G.L. 231A, § 1.  It undercuts the predictability of the law when a judge can contort a rule solely out of discomfort with the result it mandates.

Of course, a judge – especially a single justice of this Court – "enjoys some discretion in deciding whether a case is appropriate for declaratory relief." Bates v. Superior Court, 432 Mass. 1021, 1022 n.3 (2000) (quoting Pazolt v. Director of Div. of Marine Fisheries, 417 Mass. 565, 569 (1994)).  That discretion is not without boundaries, however:

> The court may refuse to render or enter a declaratory judgment or decree where such judgment or decree, if rendered or entered, would not terminate the uncertainty or controversy giving rise to the proceedings or for other sufficient reasons.

G.L. c. 231A, § 3.  The single justice also was required to state on the record his reasons for refusing the requested declaratory relief.  Id.  The reasons stated by the single justice in the record of this case indicate that he ventured far beyond the discretion entrusted to him.

The single justice properly did not conclude that a declaratory judgment on the "unauthorized practice

of law" issue would not terminate the dispute between
the parties.  This Court being the ultimate supervisor
of the legal profession in this Commonwealth, <u>Collins</u>,
324 Mass. at 577-579, such a declaration, if affirmed
by the full Court, would have represented a definitive
statement with respect to the scope and proper
application of Mass. R. Prof. C. 5.5(a).

Nor did the single justice conclude that the
Customers misread Rule 5.5(a).  The sole reason he
offered for disregarding the plain text of this
Court's own rule is that "its strict application in
this matter would create too harsh a result."  App. at
443.  Well-intentioned as that rationale might have
been, it was not one of the "other sufficient reasons"
that warrant denial of declaratory relief pursuant to
G.L. c. 231A, § 3.  Such "sufficient reasons" exist:

> where another court has jurisdiction of the
> issue, where a proceeding involving
> identical issues is already pending in
> another tribunal … or where another remedy
> will be more effective or appropriate under
> the circumstances.

<u>City of Everett v. Local 1656, IAFF</u>, 411 Mass. 361,
369 (1991) (quoting Borchard, <u>Declaratory Judgments</u>
302 (1941)).  This Court has also found "sufficient
reasons" when the record was insufficiently complete.

Board of Selectmen of Truro v. Outdoor Advertising Bd., 346 Mass. 754, 759-60 (1964).  However, there is no reported decision of this Court finding "sufficient reasons" to deny a declaratory judgment simply because the judge below was uncomfortable with the potential consequences of faithfully applying the law.

The single justice thus overstepped the boundaries of his discretion when he found "no public policy reason to grant the plaintiffs' request for declaratory relief," primarily because "strict application" of the Commonwealth's proscription against the unauthorized practice of law in this case "would create too harsh a result."  App. at 443-444. Just as there is no "arbitration exception" to Mass. R. Prof. C. 5.5, so too is there no exception applicable when the rule might require a "harsh" result.  That the rule as written might yield an undesirable outcome is a reason for changing the rule – not a reason for declining to enforce it.  See, e.g., Keene v. Brigham & Womens' Hosp., 439 Mass. 223, 242 (2003) (Court bound by existing law despite "harsh results" in particular case).  Regardless of the remedial course the single justice chose to follow,

- 30 -

the case required faithful application of the current rule, not an exegesis of what the rule should be.

There were several other options which would have permitted the single justice to apply the law faithfully without the unspecified "harsh" consequences he sought to avoid. For instance, the single justice could have declared that the Lawyer Appellees' conduct of the arbitration hearing would violate Rule 5.5(a) without granting the ancillary relief sought by the Customers pursuant to G.L. c. 231A, § 5. The Customers had prayed for a permanent injunction ancillary to the declaratory judgment they requested, and it would have been within the power of the single justice to decline to enter such an injunction after declaring that the Lawyer Appellees' participation in the arbitration hearing would violate Rule 5.5 as presently written. The Declaratory Judgment Act expressly provides for such declarations "whether … or not" the single justice saw fit to grant "any consequential judgment or relief." App. at 437 (quoting G.L. c. 231A, § 1))

Alternatively, if the single justice believed that Rule 5.5 should be amended to afford the "arbitration exception" urged by the appellees, he

could have reported the case to the full Court, which might have allayed such concerns by "laying down a rule for future guidance." Collins, 324 Mass. at 578. See also Opinion of the Justices, 279 Mass. 607 (if "established principles as to the practice of law are ever to be changed, the judicial department of the government must act to that end"); Haddad v. Gonzalez, 410 Mass. 855, 866 (1991) (1979 amendment to G.L. c. 93A, § 9, "at least partly a response to the harsh result of Baldassari v. Public Fin. Tr., 369 Mass. 33 (1975)). Indeed, if (as the Court noted in Chimko, 2005 Mass. LEXIS 442 at 11 n.4) the ABA's recent amendment to Model Rule 5.5 "is currently under consideration in Massachusetts", the single justice might have enjoined the Lawyer Appellees from participating in the arbitration hearing, but only until such an amendment might take effect.

By all means, however, the single justice should have declined the appellees' implicit "invitation to craft an arbitration exception" to its proscription against the unauthorized practice of law, just as the California Supreme Court did in Birbrower, 17 Cal. 4th at 134. It was not within the discretion of the single justice to amend Rule 5.5 himself –

manufacturing an "arbitration exception" inconsistent
with the plain text of the current rule – without any
rulemaking activity by the full Court.[10]  Any potential
amendments should have been left to the standing
advisory committee on the rules of professional
conduct, which could, after appropriate inquiry,
recommend such a revision.  <u>Cambridge Trust Co. v.
Hanify & King, P.C.</u>, 430 Mass. 472, 481–82 (1999).[11]

---

[10] The single justice nonetheless followed the lonely
path charted by the intermediate appellate court of
Illinois.  App. at 444.  In the decision on which the
single justice relied, <u>Colmar, LTD v. Fremantlemedia
North America, Inc.</u>, 344 Ill. App. 3d 977, 1026 (2003),
the panel noted that amended "ABA Model Rule 5.5 has not
been adopted by the Illinois Supreme Court" but
nonetheless found it "persuasive in that it reflects the
modern trend in the law of multijurisdictional practice"
and applied its reasoning to craft an arbitration
exception in the case before it.  Tellingly, there is no
reported decision in any United States jurisdiction that
similarly embraced the reasoning of <u>Colmar</u>.

[11] By way of example, after the California Supreme
Court faithfully applied that State's unauthorized
practice of law rule in <u>Birbrower</u>, the legislature
adopted a new *pro hac vice* statute expressly applicable
in the context of arbitration.  <u>See</u> App. at 137 n.5.
Accordingly, instead of supporting the Judgment, the
single justice's citation to Cal. C. Civ. P. § 1282.4(b)
(App. at 442) provides a cogent example of a more
appropriate alternative course.  Similarly, after
<u>Rapoport</u>, a separate rulemaking proceeding was commenced
to amend the rule which required the Florida Supreme
Court to rule as it did.  App. at 138 n.6.  If this
Court believes that there should be an "arbitration
exception" to Mass. R. Prof. C. 5.5(a), then a similar
process could be undertaken here.  Absent such an
amendment, the rule should be enforced as written.

Our rule should be interpreted and enforced as it is currently written.  Until such a recommendation is made and a corresponding amendment adopted by this Court, Rule 5.5(a) remains unchanged.

**III. THE SINGLE JUSTICE SHOULD HAVE ADDRESSED ALL ISSUES ON WHICH DECLARATIONS WERE SOUGHT.**

"One of the principal purposes of the declaratory judgment law … is to settle completely the controversy submitted for decision."  Kilroy v. O'Connor, 324 Mass. 238, 242 (1949).  "It therefore follows that, in proceedings under Chapter 231A, "it is the duty of the judge to adjudicate the decisive issues involved in the controversy between the parties and to make binding declarations concerning such issues, thus putting the controversy to rest."  Zaltman v. Daris, 331 Mass. 458, 462 (1954).  The single justice should have determined "the whole controversy between the parties," and he should not have "left for future determination" any issue reasonably raised by the pleadings and prayers for relief.  Essex Co. v. Goldman, 357 Mass. 427, 434 (1970) (quoting Vesce v. Gottfried, 353 Mass. 568, 569 (1968)).  See Ciszewski v. Industrial Accident Board, 367 Mass. 135, 142 (1975) (expressing Court's hope, in weighing petitions

for interlocutory relief, "to avoid unnecessary court proceedings and 'dispose of the controversy without further delay'").

Despite this unambiguous mandate, the single justice abdicated his responsibility, declining to address the questions framed by Counts II through IV of the Complaint.  App. at 445.  Those issue remain unresolved, and they are now intertwined with the litigation now pending in the U.S. District Court, where the appellants are seeking vacation of the arbitrators' award.  Had the single justice addressed those issues, much of the uncertainty would be gone, limiting (if not altogether eliminating) the need for the Federal lawsuit.

### A.   *An Attorney May Not Turn A Blind Eye To The Unauthorized Practice Of Law.*

Count II of the Complaint frames the issue of whether a Massachusetts attorney, by participating in an arbitration hearing held within the Commonwealth where parties are represented by lawyers not admitted here, would knowingly assist a violation of Mass. R. Prof. C. 5.5(a) and G.L. c. 221, § 46A, in violation of Mass. R. Prof. C. 5.5(b) and 8.4(a).  Both of those provisions essentially bar lawyers from assisting or

inducing another attorney's violation of a Rule of
Professional Conduct.  Clearly, by willfully
participating in a hearing where she knows that
another lawyer is engaged in the unauthorized practice
of law, an attorney would run afoul of those rules.[12]

> **B.    The Arbitrators Should Have Postponed The
> Hearing Until Resolution Of The Unauthorized
> Practice Of Law Issue.**

Writing for the full Court, the single justice
recently reaffirmed the Commonwealth's "strong public
policy favoring arbitration as an expeditious
alternative to litigation for settling commercial
disputes."  Connecticut Valley San. Waste Disp. v.
Zielinski, 436 Mass. 263, 267 (2002) (quoting
Plymouth-Carver Reg. Sch. Dist. v. J. Farmer & Co.,
407 Mass. 1006, 1007 (1990)).  Although the single
justice recognized the "policy of limited judicial
review" of arbitration, he also acknowledged the
general rule that an arbitration award may properly be
reviewed "to determine if the arbitrator has exceeded

---

[12] The appellees did not dispute this point.  See
App. at 139-140.  Instead, they circled back to their
baseline position that the Lawyer Appellees'
participation in the hearing of the arbitration
underlying this case would not constitute the
unauthorized practice of law.  Id.  For the reasons set
forth above, that argument was plainly wrong.

the scope of his authority, or decided the matter based on 'fraud, arbitrary conduct, or procedural irregularity in the hearings.'"  Id.

One "procedural irregularity" requiring a court to vacate an arbitral award occurs when "the arbitrators refused to postpone the hearing upon sufficient cause being shown therefor."  G.L. c. 251, § 12(a)(4), and the potential for such a "procedural irregularity" was at issue before the single justice in this case.  After all, the motion to disqualify the Lawyer Appellees from the underlying arbitration had been presented in the alternative; the Customers asked the arbitrators either to disqualify the Lawyer Appellees or postpone the hearing until after the unauthorized practice of law issue was resolved.  App. at 22-26.  The selfsame alternative species of relief were requested in the Customers' formal motion for reconsideration.  App. at 113-119.  Both of those motions were denied.  In other words, the arbitrators not only refused to disqualify the Lawyer Appellees, but they also refused to postpone the hearing until this Court could address the unresolved unauthorized practice of law issues presented by this appeal, Chimko and Superadio.

That violated G.L. c. 251, § 12(a)(4), but the
single justice declined to address the issue,
preventing a cure of that violation before the
arbitration hearing commenced.  Now, if the Customers
prevail in the pending Federal litigation, the parties
would again have to expend the time and resources
necessary to prepare for and conduct such a hearing.
Id., § 12(c).  The potential for such wasteful re-
litigation is precisely the sort of "uncertainty and
insecurity with respect to rights, duties, status and
other legal relations" from which the Declaratory
Judgment Act was intended to afford relief. G.L. c.
231A, § 9.

### C.   An Arbitration Award Must Be Vacated If It Was The Product Of A Hearing Conducted By Lawyers Not Authorized To Do So.

A court of this Commonwealth also must vacate an
arbitral award if it is "procured by corruption, fraud
or other undue means."  G.L. c. 251, § 12(a)(1).
Certainly, an award obtained by attorneys who elected
to violate the Commonwealth's proscription against the
unauthorized practice of law, and who were allowed to
do so by the arbitrators, would be "procured by ...
undue means."  Accordingly, the same considerations
that required a declaratory judgment concerning the

arbitrators' obligation to postpone the hearing until
the unauthorized practice of law issue was resolved
also warranted such a declaration with respect to the
effect of such unauthorized practice on the
arbitrators' award.

### *CONCLUSION*

This Court "has summary jurisdiction to inquire
into practices at the Bar" that could bring the
administration of justice into disrepute.  <u>McInerney
v. Lally</u>, 384 Mass. 810, 811 (1981).  When necessary
to provide guidance or standards concerning the
practice of law, it is "the Supreme Judicial Court, as
under the Constitution the highest court in the
Commonwealth, is the proper representative of the
judicial department and the repository of the power"
to do so.  <u>Collins</u>, 324 Mass. at 578-79.  The Court
therefore "may intervene 'whenever it appears that, in
the practice of law, methods, customs, or habits have
grown up among members of the bar which are
undermining the confidence of the public in the
courts."  <u>Marino v. Tagaris</u>, 395 Mass. 397, 401 (1985)
(quoting <u>Collins</u>, 324 Mass. at 578).

Inconsistent adherence to the proscription against the unauthorized practice of law in the context of arbitration is certainly such a "method, custom or habit" that should be corrected by the full Court.  Under Rule 5.5(a), in its current form, there is no "arbitration exception."  That the Lawyer Appellees and others like them nonetheless conduct arbitration hearings – engaging in the unauthorized practice of law – in Massachusetts is a situation that requires action by this Court.  The Court should therefore reverse the Judgment of the single justice and make the declarations prayed for in the Complaint.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  August 3, 2005

# THE CORBETT LAW FIRM
*A Professional Corporation*

April 11, 2006

**BY FIRST CLASS MAIL**

Hon. Margaret H. Marshall, Chief Justice
SUPREME JUDICIAL COURT FOR THE
   COMMONWEALTH OF MASSACHUSETTS
John Adams Courthouse
One Pemberton Square
Boston, Massachusetts 02108

> **RE:  *Mscisz v. Kashner Davidson Securities Corp.*,**
> **Case No. SJC-09529**
> **<u>Petition for Rehearing</u>**

Dear Chief Justice Marshall:

Pursuant to Mass. R. App. P. 27, I write to request rehearing of the referenced appeal.  As discussed more fully in the remainder of this petition, the Court's opinion (Ex. A) overlooked two unsettled questions of Massachusetts law on which declarations had been sought.  The appellants, Steven, Mark and Lynda Mscisz (collectively "plaintiffs"), expressly raised those questions in this appeal, as they did before the single justice, but the Court nonetheless failed to address them.

Significantly – although the issue was squarely framed in the arbitration, in the proceedings before the single justice, in the plaintiffs' main brief in this appeal, and at oral argument – the Court did not address an issue of first impression:  whether this Court's imminent consideration of the unauthorized practice of law ("UPL") issues presented by this appeal, by <u>Superadio Ltd. Partnership v. Winstar Radio Prods., LLC</u>, Case No. SJC-09542 ("Superadio"), and by <u>In re Chimko</u>, Case No. SJC-09388 ("Chimko"), was "sufficient cause" for postponement of the hearing under G.L. c. 251, § 12(a)(4).

The Court also did not address whether knowing participation in a hearing conducted in Massachusetts by attorneys not admitted to practice here would

85 Exchange Street, Suite 326 ▪ Lynn, Massachusetts 01901-1429
Telephone: (781) 596-9300 ▪ Facsimile: (781) 596-9302
www.BostonBarristers.com

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 2 of 11

violate Mass. R. Prof. C. 5.5(b) and 8.4(a) – the very
concern which caused the plaintiffs to bring the UPL
question before the arbitrators and single justice in
the first place.  See App. at 8-9 ¶ 4; id. at 24 ¶ 9;
id. at 117 ¶ 11; id. at 413.  As in Messing, Rudavsky
& Weliky, P.C. v. President & Fellows of Harvard
College, 436 Mass. 347, 351 (2002), the Court's
analysis could "have widespread implications for
attorneys throughout the Commonwealth."

      These questions of first impression are presently
before the U.S. District Court in Kashner Davidson
Securities Corp. v. Mscisz, Case No. 05-CV-11433-JLT
(D. Mass.).[1]  Unless this Court addresses those issues,
it will leave its Federal counterpart without any
guidance concerning matters of Massachusetts law which
have not yet been considered by any appellate court.

                     **PROCEDURAL BACKGROUND**

      As the Court acknowledged, whether representation
of a party at an arbitration hearing by a lawyer not
admitted to practice in Massachusetts constitutes the
unauthorized practice of law was "an issue of first
impression" prior to March 28, 2006.  Superadio, 2006
Mass. LEXIS 53 at *8.  Therefore, 6 months before the
May 17-18, 2005 hearing in the arbitration related to
this appeal, the plaintiffs asked the arbitrators to
postpone that proceeding pending this Court's imminent
consideration of the UPL issue.[2]  App. at 22-74.

---

      [1] A copy of the plaintiffs' operative pleading in that case is
attached as Exhibit B.

      [2] Initially, only Chimko presented UPL issues to the Court, and
it did so in the analogous context of bankruptcy.  Three days
after the plaintiffs first raised the UPL issue to the
arbitrators, further review was requested in Superadio, where the
UPL issue was raised in the arbitration context.  While the
Superadio application for further review was pending, the
Plaintiffs commenced their own declaratory judgment action in the
Suffolk County session of Court, Case No. SJ-2005-0088, in which
UPL-related issues specific to this case were framed for the
single justice.  It is the single justice's denial of declaratory
and ancillary relief – not the actual award – which gave rise to
this appeal; the notice of appeal was filed a week before the
arbitration hearing commenced.

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 3 of 11

     The Court's opinion depicts the means by which
the plaintiffs initially raised the UPL issue as a
motion "to disqualify the lawyer defendants from
representing the broker defendants on the ground that
the lawyer defendants were not licensed to practice
law in Massachusetts."  Ex. A. at 2.  The motion
actually sought alternative forms of relief, and the
bulk of the plaintiffs' motion focused on their
request that the arbitrators postpone the hearing
pending this Court's resolution of the UPL issues.
App. at 22-74.  The chairman of the arbitration panel
denied that motion.  Id. at 88-89.

     Because the Court's resolution of the UPL issues
pending in Chimko and Superadio could have left the
plaintiffs in a position where they would have had to
expend the time and resources necessary to prepare for
and conduct a second arbitration hearing, see G.L. c.
251, § 12(c), they invoked the remedial provisions of
G.L. c. 231A, and commenced a separate action.  App.
at 7-85.  The plaintiffs sought an injunction that, in
pertinent part, would have approximated the
postponement they had requested from the arbitrators.
Id. at 20.  The plaintiffs sought "relief from …
uncertainty and insecurity with respect to rights,
duties, status and other legal relations" – precisely
what the Legislature intended.  G.L. c. 231A, § 9.[3]

     The plaintiffs again asked the arbitrators to
postpone the hearing until the unsettled UPL issues
were resolved (App. at 113-121), and the arbitrators
again denied their request, id. at 255, although they
were fully aware of the 3 matters pending in this
Court and of the sanctioning organization's position
concerning state supremacy on UPL questions.  Id. at
113-119 & 94-111.

---

     [3] Had the single justice given effect to the remedial
provisions of the Declaratory Judgment Act and stayed the
arbitration pending the Court's resolution of the UPL issues,
there would not be a pending Federal case in which the plaintiffs
would be seeking to overturn an arbitral award.  The single
justice's failure to address the postponement issue precluded a
cure of the arbitrators' violation of G.L. c. 251, § 12(a)(4),
before the hearing commenced.

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 4 of 11

Count III of the plaintiffs' declaratory judgment
complaint (id. at 18), specifically invoked G.L. c.
251, § 12(a)(4) – which mandates that an arbitration
be postponed upon "sufficient cause" – and they later
submitted a memorandum of law addressing that issue.
App. at 394, 414-416.  The plaintiffs again raised the
issue on appeal.  See Appellants' Br. at 36-38.[4]

In sum, disqualification may have been one
species of relief requested by the plaintiffs, but the
postponement requirement of G.L. c. 251, § 12(a)(4),
has been at the core of this litigation from its
outset.  This is not a case of post-award "sour
grapes."  Nevertheless, although the defendants failed
to argue on appeal that the UPL cases pending before
the Court were not "sufficient cause" for postponing
the hearing, and although none of the amici curiae who
supported the appellees' position on the UPL question
addressed the postponement issue – essentially leaving
the plaintiffs's position uncontroverted – the Court
did not address the issue.

<center>ARGUMENT</center>

**I.    *Only Two Of The Four Counts Of The Plaintiffs'
        Complaint Were Addressed.***

"One of the principal purposes of the declaratory
judgment law … is to settle completely the controversy
submitted for decision."  Kilroy v. O'Connor, 324
Mass. 238, 242 (1949).  As the Court reaffirmed in
this case, "in a properly brought action for
declaratory relief there must be a declaration of the
rights of the parties even though relief is denied to
the plaintiffs."  Ex. A at 3 (quoting Cherkes v.
Westport, 393 Mass. 9, 12 (1984)).  It logically
follows that "it is the duty of the [Court] to
adjudicate the decisive issues involved in the
controversy between the parties and to make binding
declarations concerning such issues, thus putting the

---

[4] Indeed, as you may remember, about 8 minutes into the oral
argument on January 3, 2006, I responded to one of your questions
with a discussion of G.L. c. 251, § 12(a)(4) and its
applicability to this appeal.

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 5 of 11

controversy to rest."  Zaltman v. Daris, 331 Mass.
458, 462 (1954).  That duty carries with it an
obligation to determine "the whole controversy between
the parties," so as not to leave "for future
determination" any issues reasonably raised by the
pleadings and prayers for relief.  Essex Co. v.
Goldman, 357 Mass. 427, 434 (1970) (quoting Vesce v.
Gottfried, 353 Mass. 568, 569 (1968)).  The Court
nonetheless overlooked two of the requested Secondary
Declarations, leaving unsettled at least one
potentially-dispositive question of Massachusetts law
that is at issue in litigation between these parties
pending in the U.S. District Court.

     In one fashion or another, the Court's opinion
addressed only 2 of the 4 prayers for declaratory
relief sought by the plaintiffs.  Count I – which
sought a declaration concerning the issue of whether
the conduct of a Massachusetts arbitration hearing by
the lawyer defendants would offend the Commonwealth's
UPL rules – was indirectly addressed by the Court's
incorporation of its reasoning in Superadio, where it
expressly declined to reach the issue, into its
decision in this appeal.  The Court specifically
addressed Count IV – which sought a declaration that
an award obtained after a hearing conducted in Boston
by a lawyer not admitted to practice here would be
procured by "undue means" and thus subject to vacation
– when it held, for the reasons articulated in
Superadio, that "even assuming that an out-of-State
attorney's representation of a party at an arbitration
proceeding in Massachusetts might constitute the
practice of law, 'the conduct would not provide a
basis to vacate the award.'"  Ex. A at 3.

     However, the Court's statement that the forgoing
"conclusion resolves the controversy" (id.) was
incorrect.[5]  The opinion did not address Count II –

_____

     [5] It appears that the Court may have misapprehended the extent
to which this appeal overlapped with Superadio, because its
opinion suggests that the Court believed this appeal was limited
to the issue of "whether representation of a party by an out-of-
State licensed attorney in a Massachusetts arbitration proceeding
constitutes the unauthorized practice of law."  Ex. A at 1.

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 6 of 11

which concerned the exposure of Massachusetts counsel
to liability for abetting the unauthorized practice of
law – or Count III – which requested a declaration
that the arbitrators' refusal to postpone the hearing
until after this Court addressed the unsettled UPL
issues presented by Superadio, Chimko and this case
would mandate vacation of their award.  Those
questions were expressly raised in this appeal, but
the Court's opinion is silent with respect to both.

     The Court's failure to address those issues will
be consequential.  As the Court was advised on pages
35 and 38 of the plaintiffs' main brief, as well as
during oral argument, the underlying arbitration is
currently at issue in an action pending in the U.S.
District Court, where the broker defendants seek
enforcement of an award issued in their favor, and the
plaintiffs seek vacation of the same award.  The
questions left unresolved by this Court's opinion are
among those at issue in the pending Federal case.  See
Ex. B at 21-22 ¶¶ 81-85, 31 ¶ 124(c), 32 ¶¶ 128(b) &
130-133.  Rehearing and modification of the opinion is
therefore necessary to further comity with the U.S.
District Court, which has been left without guidance
concerning such unsettled issues of Massachusetts law.

     The incompleteness of the Court's opinion also
leaves open the significant possibility that this
selfsame case will again present the Court with the
same issues of Massachusetts law.  See SJC R. 1:03
(allowing certification by Federal Court "if there are
involved in any proceeding before it questions of law
of this state which may be determinative of the cause
then pending in the certifying court and as to which
it appears to the certifying court there is no
controlling precedent in the decisions of this
court"); Bronstein v. Prudential Ins. Co. of Am.,
Inc., 1983 U.S. Dist. LEXIS 17455 (D. Mass.) (Tauro,
J.) (certifying unsettled questions under statutes of
the Commonwealth).  By rehearing the appeal insofar as
it involves the unaddressed Secondary Declarations,
the Court can further comity, afford legal certainty,
and prevent the additional expense and delay that
could be begotten by the certification process.

<u>Mscisz v. Kashner Davidson Securities Corp.</u>,
Petition for Rehearing
Page 7 of 11

        A.    **The Court Overlooked The Plaintiffs' Request
              For A Declaration Concerning The Refusal Of
              The Arbitrators To Postpone The Hearing.**

        The plaintiffs recognize that "[t]he Uniform
Arbitration Act, as set forth in G.L. c. 251, was
promulgated 'to further the speedy, efficient, and
uncomplicated resolution of business disputes with
very limited judicial intervention or participation.'"
<u>Floors, Inc. v. B.G. Danis of New England, Inc.</u>, 380
Mass. 91, 96 (1980).  It is equally true, however,
that an arbitration award may properly be reviewed "to
determine if the arbitrator has exceeded the scope of
his authority, or decided the matter based on 'fraud,
arbitrary conduct, or procedural irregularity in the
hearings.'"  <u>School Comm. of Hanover v. Hanover
Teachers Ass'n</u>, 435 Mass. 736, 740 (2002) (quoting
<u>Plymouth-Carver Reg. Sch. Dist. v. J. Farmer & Co.</u>,
407 Mass. 1006, 1007 (1990)).

        One "procedural irregularity" requiring a court
to vacate an arbitral award occurs when "the
arbitrators refused to postpone the hearing upon
sufficient cause being shown therefor."  G.L. c. 251,
§ 12(a)(4).  This is one of the few procedural
safeguards statutorily engrafted onto the arbitration
process – which has never been construed in a decision
reported by a court of this Commonwealth – and which
is directly implicated by the circumstances of this
appeal.  Because the Court's opinion is silent
concerning that statute, and because it is one of the
specific bases for the plaintiffs' application in
Federal Court, this Court should address the issue on
rehearing, stating whether arbitrators' refusal to
postpone the hearing would warrant vacation of an
award under G.L. c. 251, § 12(a)(4).

        The language of that statute is "plain and
unambiguous", so the Court is "constrained to follow"
it, "unless to do so would lead to an absurd result,
or be contrary to the Legislature's manifest
intention."  <u>Shamban v. Madidlover</u>, 429 Mass. 50, 54
(1999).  Here, the unmistakable intent of the General
Court was to require postponement of hearings when
"sufficient cause" is shown, at peril of having any
award issued in derogation of that policy vacated,

<u>Mscisz v. Kashner Davidson Securities Corp.</u>,
Petition for Rehearing
Page 8 of 11

regardless of whether other grounds set forth in G.L.
c. 251, § 12 are present.  A different interpretation
would make "inoperative or superfluous" the relevant
clause of G.L. c. 251, § 12(a)(1), in derogation of a
"basic tenet of statutory construction."  <u>Boston
Police Patrolmen's Ass'n, Inc. v. Police Department of
Boston</u>, 446 Mass. 46, 50 (2006) (quoting <u>Bankers Life
& Cas. Co. v. Comm'r of Ins.</u>, 427 Mass. 136, 140
(1998) & 2A B. Singer, <u>Sutherland Statutory
Construction</u> § 46.06 at 154 (6th ed. 2000)).

     Unlike the corresponding clause of the Federal
Arbitration Act, 9 U.S.C. § 10(a)(3), "misconduct in
refusing to postpone the hearing" is not a necessary
element.  <u>See also</u> <u>Fairchild & Co., Inc.</u>, 516 F. Supp.
1305, 1313-14 (D. D.C. 1981) (Sirica, J.) ("arbitrary
denial of a reasonable request for a postponement may
serve as grounds for vacating an arbitration award"
under the Federal Arbitration Act, but "the statute
limits the Court's review to a determination as to
whether the arbitrators were guilty of misconduct in
refusing a postponement").  The award need not have
been procured by "corruption, fraud or other undue
means".  <u>Cf</u>. G.L. c. 251, § 12(a)(1).  Nor must there
have been "evident partiality", "corruption" or
prejudicial "misconduct" by arbitrators.  <u>Cf</u>. <u>id</u>. §
12(a)(2).  The arbitrators need not have "exceeded
their powers", and an award can be vacated on this
basis even if there is a valid arbitration agreement
in place.    <u>Cf</u>. <u>id</u>. § 12(a)(3), (a)(4).  Each of these
evils is covered by another part of the statute; all
that must be established under Section 12(a)(4) is a
arbitrators' refusal "to postpone the hearing upon
sufficient cause being shown therefor."

     Such grounds are clearly present under the
circumstances of this appeal.  Regardless of how this
Court might have resolved the overarching UPL issue,
or the subsidiary issue of whether the lawyer
defendants' conduct of the hearing would represent
"undue means" within the meaning of G.L. c. 251, §
12(a)(1), the pendency of 3 appeals presenting related
UPL issues to this Court surely constituted
"sufficient cause" for postponing the arbitration
hearing.  Out of deference to the Court's role as the
repository of the judicial department's constitutional

power to provide guidance or standards concerning the practice of law (see Collins v. Godfrey, 324 Mass. 574, 578-79 (1949)) – a role recognized by the self-regulatory organization sanctioning the underlying arbitration (see App. at 101) – the arbitrators should have waited to see how this Court would approach the UPL issue before going forward with a hearing where the broker defendants were represented – potentially unlawfully – by the lawyer defendants.

Whether the cause is "sufficient" should be examined from the perspective of the parties and the arbitrators at the time postponement was requested. For instance, Naing Int'l Enterprises, LTD v. Ellsworth Assoc., Inc., 961 F. Supp. 1, 4-5 (D. D.C. 1997), presented the issue of whether an arbitration panel should have postponed a hearing while the parties awaiting a decision by the Small Business Administration.  Although deciding the case under the Federal Arbitration Act, 9 U.S.C. § 10(a)(3), where "misconduct" must be present to warrant vacation, Judge Sporkin nonetheless vacated the award before him, holding that no court or arbitration panel "can allow the pursuit of an expedient adjudication to outweigh its obligation to ensure a just and fair one."  Naing, 961 F. Supp. at 5.  "Yet, by refusing to wait for a reasonable period upon SBA action … the panel did just that."  Id.  Regardless of whether the SBA's decision would have been favorable to the party seeking postponement, the arbitrators' rulings were "clearly less informed" than they would have been if they had awaited the SBA decision – "[s]o much so, that the arbitration award must be vacated."  Id.

The result was similar in Insurance Co. of N. Am. v. St. Paul Fire & Marine Ins., 626 N.Y.S.2d 232, 233 (A.D. 1995), where the plaintiff had sought postponement of an arbitration hearing pending a criminal investigation regarding the underlying incident.  Under such circumstances, the plaintiff "clearly established good cause for its request," and "it was an abuse of discretion to deny the request" for a postponement.  Id.

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 10 of 11

When the plaintiffs first asked the arbitrators
to postpone the hearing in this case, there had been
no indication from this Court as to whether violation
of the Commonwealth's UPL prohibitions would render an
award susceptible to vacation under G.L. c. 251, §
12(a)(1).  Nor was there (or is there yet) certainty
as to whether the conduct of such hearings by
attorneys not admitted to practice here would violate
the law of this Commonwealth, or whether participation
by Massachusetts lawyers in such proceedings could
expose them to discipline.  The arbitration had been
pending only a few months, and no postponements had
been requested previously.  Under these extraordinary
circumstances – even if the Court later ruled as it
did concerning the UPL issue and the subsidiary
question of whether such conduct affords a basis for
vacating an award – the plaintiffs based their
requests for postponement on "sufficient cause."  The
unambiguous language of G.L. c. 251, § 12(a)(4) thus
requires that the Court declare that the arbitrators'
refusal to postpone the hearing would mandate vacation
of an adverse arbitration award.

## CONCLUSION

For the foregoing reasons, and pursuant to Mass.
R. App. P. 27(c), the Court should grant rehearing
and, to the extent its initial opinion did not address
each of the so-called Secondary Declarations, the
Court should review and revise that decision.  At the
very least, the Court should declare that the pendency
of 3 appeals concerning the UPL issues litigated in
this appeal, Superadio, and Chimko, constituted
"sufficient cause" within the meaning of G.L. c. 251,
§ 12(a)(4), such that the arbitrators' refusal to
postpone the arbitration hearing until after this
Court ruled would mandate vacation of any award issued
in the wake of such hearing.

Respectfully submitted,

William P. Corbett, Jr.
BBO #561201

Mscisz v. Kashner Davidson Securities Corp.,
Petition for Rehearing
Page 11 of 11


WPC/13-004-001
cc:    SJC Clerk (x7 by first class mail)
       Steven, Lynda & Mark Mscisz (by e-mail)
       Richard J. Babnick, Jr., Esq. (by first class mail)
       Marc J. Ross, Esq. (by first class mail)
       Howard M. Smith, Esq. (by first class mail)

# *Exhibit A*

NOTICE: All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse,
Pemberton Square, Suite 2500, Boston, MA 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-09529


STEVEN MSCISZ & others[1]  vs.  KASHNER DAVIDSON SECURITIES
CORPORATION & others.[2]


March 28, 2006.


Supreme Judicial Court, Appeal from order of single justice.
Arbitration, Judicial review, Vacating award.  Unauthorized
Practice of Law.


     The plaintiffs appeal from an order and judgment of a single
justice denying their request for declaratory relief.  The appeal
pertains to an issue that was raised in Superadio Ltd.
Partnership v. Winstar Radio Prods., LLC, ante     ,    (2006),
namely, whether representation of a party by an out-of-State
licensed attorney in a Massachusetts arbitration proceeding
constitutes the unauthorized practice of law.  Although the
single justice did not need to resolve that issue, his denial of
relief to the plaintiffs was warranted.

     The background of the case is as follows.  The plaintiffs,
Steven Mscisz, Mark Mscisz, and Lynda Mscisz, are Massachusetts
residents and were customers of the defendant Kashner Davidson
Securities Corporation (KDSC).  KDSC, a Florida corporation that
maintains its only place of business in Florida, is a broker-
dealer registered with the United States Securities and Exchange
Commission (SEC), and is a member of the National Association of
Securities Dealers, Inc. (NASD).  The defendants Victor Kashner,
Matthew Meister, and Timothy Varchetto are Florida residents and
are registered representatives of KDSC.  We refer to these
defendants collectively as the broker defendants.

---

     [1] Mark Mscisz and Lynda Mscisz.

     [2] Victor Kashner; Matthew Meister; Timothy Varchetto; Marc
J. Ross; Richard J. Babnick, Jr.; and Sichenzia Ross Friedman
Ference LLP.

The defendants Marc J. Ross and Richard J. Babnick, Jr., are attorneys admitted to practice law in New York State, but are not licensed to practice law in Massachusetts. They are affiliated with the defendant New York City law firm, Sichenzia Ross Friedman Ference LLP (SRFF). We refer to these defendants collectively as the lawyer defendants. The lawyer defendants have represented KDSC in securities-related matters for many years.

In May, 2004, the lawyer defendants, on behalf of KDSC, filed with the New York NASD office a statement of claim demanding arbitration against the plaintiffs, alleging that the plaintiffs had failed to satisfy the margin debit balances in their respective margin accounts with KDSC.[3] The plaintiffs filed an answer and counterclaim, and third-party claims against the broker defendants. Pursuant to its policy to "select the hearing location closest to the [public] customer's residence at the time the dispute arose," NASD selected Boston as the location for the arbitration proceedings. There is no provision in the NASD Code of Arbitration Procedure, which the parties agreed would govern the dispute, concerning pro hac vice admission, and no provision limiting who may appear as counsel on behalf of parties to the arbitration proceeding.[4]

The plaintiffs filed a motion with the arbitration panel to disqualify the lawyer defendants from representing the broker defendants on the ground that the lawyer defendants were not licensed to practice law in Massachusetts. The lawyer defendants opposed the motion and requested that the panel admit them pro hac vice. The panel denied the plaintiffs' motion to disqualify, and later ruled "that it is not necessary for counsel to be admitted pro hac vice in this matter." An arbitration hearing on the case was scheduled for May 17, 2005.

Before the scheduled date for commencement of the arbitration hearing, the single justice entered a memorandum of decision and judgment, denying the plaintiffs' request for

---

[3] KDSC alleged that Steven Mscisz and Mark Mscisz each deposited into their respective accounts a large number of shares, much obtained on margin, of Vaso Active Pharmaceuticals, Inc. (Vaso), a publicly traded company of which their brother was president. Subsequently, the SEC suspended trading in Vaso's stock, rendering the stock valueless and triggering margin call notifications, or requests to satisfy account deficiencies, by KDSC to the plaintiffs.

[4] Section 10316 of the NASD Code of Arbitration Procedure (2004) provides: "All parties shall have the right to representation by counsel at any stage of the proceedings."

declaratory relief.  He concluded that the lawyer defendants
would not be engaging in the unauthorized practice of law in
violation of Mass. R. Prof. C. 5.5 (a), 426 Mass. 1410 (1998),
and G. L. c. 221, § 46A, by representing the broker defendants at
the arbitration hearing.  The single justice declined to address
the remaining issues raised by the plaintiffs.[5]  The plaintiffs
appealed.

    1.  Although we conclude, for a different reason from that
articulated by the single justice, that the plaintiffs are not
entitled to declaratory relief, the single justice did not abuse
his discretion in denying that relief.  See Smith v. Building
Comm'r of Brookline, 367 Mass. 765, 769 (1975).  For the reasons
articulated in Superadio Ltd. Partnership v. Winstar Radio
Prods., LLC, supra at    , even assuming that an out-of-State
attorney's representation of a party at an arbitration proceeding
in Massachusetts might constitute the practice of law, "the
conduct would not provide a basis to vacate the award."  This
conclusion resolves the controversy.

    2.  "Because in a properly brought action for declaratory
relief there must be a declaration of the rights of the parties
even though relief is denied to the plaintiffs," Cherkes v.
Westport, 393 Mass. 9, 12 (1984), we vacate the judgment
"den[ying] the [plaintiffs'] petition."  A new judgment shall
enter in the county court declaring that, even if an out-of-State
attorney's representation of a party at an arbitration proceeding
in Massachusetts might constitute the practice of law, this
conduct does not provide a basis to vacate the arbitration award,
and, as such, the plaintiffs are not entitled to relief.

                        So ordered.


        William P. Corbett, Jr., for the plaintiffs.
        Richard J. Babnick, Jr., of New York (Marc. J. Ross, of New
York, & Howard M. Smith with him) for the defendants.
        The following submitted briefs for amici curiae:
        Timothy P. Burke, Matthew C. Applebaum, Katherine W.
Grearson, Richard A. Johnston, Mark C. Fleming, & James S.
Goldman for Boston Bar Association.
        Timothy P. Burke & Matthew C. Applebaum for Securities
Industry Association.
        Andrew R. Grainger, Martin J. Newhouse, & Ben Robbins for
New England Legal Foundation.

---

[5] The arbitration thereafter proceeded.

# *Exhibit B*

Case 1:05-cv-11433-MLW   Document 21   Filed 08/08/2006   Page 1 of 36

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF MASSACHUSETTS

_____
                                                    )
KASHNER DAVIDSON SECURITIES CORPORATION,   )
VICTOR KASHNER, MATTHEW MEISTER &          )
TIMOTHY VARCHETTO,                         )
                                                    )
    *Plaintiffs/Defendants-in-Counterclaim,*   )      Case No. 05-cv-11433-JLT
    v.                                      )
                                                    )
STEVEN MSCISZ, MARK MSCISZ, & LYNDA MSCISZ, )
                                                    )
    *Defendants/Plaintiffs-in-Counterclaim*  )
_____)


**ANSWER, AFFIRMATIVE DEFENSES & COUNTERCLAIMS**

The defendants/plaintiffs-in-counterclaim, Steven Mscisz, Mark Mscisz and Lynda Mscisz (collectively "Customers") respond to the "Amended Complaint to Modify and Confirm an Arbitration Award" ("Complaint") filed by plaintiffs/ defendants-in-counterclaim Kashner Davidson Securities Corporation ("KDSC"), Victor Kashner ("Kashner"), Matthew Meister ("Meister") and Timothy Varchetto ("Varchetto") (collectively "Brokers") as follows:

1.    This paragraph sets forth a general description of the Brokers' claims to which no substantive response is required.

2.    The Customers admit that KDSC commenced an arbitration proceeding against them and that, with their answer, they filed counterclaims against KDSC and third-party claims against Kashner, Meister and Varchetto. The Customers deny the remainder of this paragraph.

3.     The Customers admit that they submitted the dispute to arbitration (albeit conditionally), that they filed several motions in the arbitration, that they commenced a declaratory judgment action in the single justice session of the Supreme Judicial Court, and that the single justice denied their request for relief. The Customers deny the remainder of this paragraph.

4.     The Customers admit that the arbitrators purported to dismiss their counterclaims and third-party claims before the hearing.  The Customers deny the remainder of this paragraph.

5.     The Customers admit that the arbitrators held a hearing at which they purported to allow them to call witnesses and present documentary evidence, that the arbitrators purported to deliberate, and that the arbitrators issued an award against the Customers.  The Customers deny the remainder of this paragraph.

6.     This paragraph sets forth a general description of the Brokers' claims to which no substantive response is required.

7.     Admitted.

8.     Admitted.

9.     Admitted.

10.    Admitted.

11.    The Customers deny that there is any jurisdiction legally known as "the State of Massachusetts", but they admit the remainder of this paragraph.

12.    The Customers deny that there is any jurisdiction legally known as "the State of Massachusetts", but they admit the remainder of this paragraph.

13-004-001

13.     The Customers deny that there is any jurisdiction legally known as "the State of Massachusetts" and "that this action arises from their transaction of business" within this Commonwealth, but they admit the remainder of this paragraph.

14.     The Customers deny that there is any jurisdiction legally known as "the State of Massachusetts", but they admit the remainder of this paragraph.

15.     Denied.

16.     Admitted.

17.     The Customers deny this paragraph to the extent it implies that their submission of their counterclaims and third-party claims was unconditional or that arbitration of all counterclaims and third-party claims was mandatory, but they admit the remainder of this paragraph.

18.     Admitted.

19.     Admitted.

20.     Admitted.

21.     Admitted.

22.     Admitted.

23.     Admitted.

24.     Admitted.

25.     Admitted.

26.     Denied.

27.     The Customers deny that they were notified of the arbitrators' decision on February 23, 2005, but they admit the remainder of this paragraph.

13-004-001

28.     Admitted.

29.     The Customers deny that they filed their motion to withdraw their counterclaims and third-party claims merely "because they were unhappy with the Discovery Order", but they admit the remainder of this paragraph.

30.     The Customers deny this paragraph to the extent it purports to recite fully the substance of their declaratory judgment action, but they admit the remainder of this paragraph.

31.     Denied.

32.     Admitted.

33.     Admitted.

34.     The Customers deny that "the matters had been fully briefed for the Panel," that there had been "due deliberation," and that the arbitrators genuinely believed "that Rule 10305 of the NASD Code provided them with the authority for their actions," but they admit the remainder of this paragraph.

35.     The Customers deny this paragraph to the extent it purports to recite fully the substance of single justice's decision, but they admit the remainder of this paragraph.

36.     Admitted.

37.     Admitted.

13-004-001

38.     The Customers deny that they were permitted to present all of the witnesses and evidence they would have presented in a full and fair hearing of the matter before the arbitrators and that they submitted their counterclaims and third-party claims "for a decision of the arbitrators under the rules of the NASD," but they admit the remainder of this paragraph.

39.     The Customers deny that the award was "based on the evidence presented at the hearing," but they admit the remainder of this paragraph.

40.     Admitted.

41.     The Customers deny that the arbitrators were authorized to dismiss their counterclaims and third-party claims, but they admit the remainder of this paragraph.

42.     The Customers deny that the award was unconditionally "suppose [sic] to be a final and nonappealable decision on the controversy arbitrated", but they admit the remainder of this paragraph.

43.     Denied.

44.     Admitted.

45.     The Customers incorporate, as if fully set forth herein, their responses to paragraphs 1 through 44 of the Complaint.

46.     This paragraph sets forth a general description of the Brokers' claims to which no substantive response is required.

47.     Admitted.

48.     Admitted.

49.     Admitted.

13-004-001

50.    This paragraph sets forth a general description of the Brokers' claims to which no substantive response is required.

51.    Admitted.

52.    This paragraph sets forth a general description of the Brokers' claims to which no substantive response is required.

### First Affirmative Defense

The arbitrators exceeded their powers.

### Second Affirmative Defense

The arbitrators refused to hear evidence material to the controversy and otherwise conducted the arbitration hearing in such a way as to prejudice the rights of the Customers.

### Third Affirmative Defense

The award was procured by undue means.

### Fourth Affirmative Defense

The arbitrators acted in manifest disregard of the law.

### Fifth Affirmative Defense

The arbitrators refused to postpone the hearing at the Customers' request, notwithstanding sufficient cause for such a postponement.

13-004-001

### *Sixth Affirmative Defense*

The award encompassed issues the Customers had not agreed to submit to arbitration.

### *Seventh Affirmative Defense*

Even if the award is not vacated altogether, it contains errors that require correction.

### *Eighth Affirmative Defense*

The Complaint must be dismissed because it failed to join necessary parties as plaintiffs.

### *Counterclaims*

1.      Pursuant to 9 U.S.C. §§ 10 & 11 and MASS. GEN. L. c. 251 §§ 12 & 13, the Customers respectfully submit the following Counterclaims seeking *vacatur* or modification of the arbitration award ("Award") issued on June 17, 2005 against the Customers and in favor of the Brokers by panel of arbitrators ("Panel") acting under the auspices of NASD Dispute Resolution, Inc. ("NASD") in Case Number 04-03793 ("Arbitration").

13-004-001

2.      As alleged more specifically below, the Customers' Counterclaims involve the fundamentally defective process from which the Award emanated, not the substance of the claims and defenses underlying it.  Despite the "extremely narrow and exceedingly deferential" standards this Court must apply, the Arbitration was so extraordinarily unfair that the Award must be vacated.

### *Parties*

3.      Defendant/Plaintiff-in-Counterclaim Steven Mscisz ("Steven") is an individual residing in the Town of Topsfield, County of Essex, Commonwealth of Massachusetts, and he was a respondent, counterclaimant, and third party claimant in the Arbitration.

4.      Defendant/Plaintiff-in-Counterclaim Mark Mscisz ("Mark") is an individual residing in the Town of Topsfield, County of Essex, Commonwealth of Massachusetts, and he was a respondent, counterclaimant, and third party claimant in the Arbitration.

5.      Defendant/Plaintiff-in-Counterclaim Lynda Mscisz ("Lynda") is an individual residing in the Town of Topsfield, County of Essex, Commonwealth of Massachusetts, and he was a respondent, counterclaimant, and third party claimant in the Arbitration.

6.      Mark and Lynda are husband and wife.

7.      Steven and Mark are brothers.

13-004-001

8.     Defendant Kashner Davidson Securities Corporation ("KDSC" or "Broker-Dealer") is a corporation organized under the laws of the State of Florida, and it maintains its only place of business in that jurisdiction.  KDSC was the claimant and respondent-in-counterclaim in the Arbitration.

9.     Defendant Victor Kashner ("Kashner") is an individual residing in the State of Florida and a registered representative of KDSC.  KDSC's namesake, Kashner is its controlling shareholder, chairman of its board of directors, and – until suspended by the U.S. Securities and Exchange Commision in *In re Kashner,* Case No. 3-9049 (SEC 1996), and by the NASD in *In re Kashner Davidson Securities Corp.,* Case No. C07960095 (NASD 2000) – Kashner was an officer of KDSC.  Kashner was a third party respondent in the Arbitration.

10.     Defendant Matthew Meister ("Meister") is an individual residing in the State of Florida and, at the time of the events operative for purposes of the underlying arbitration, was a registered representative of KDSC.  Meister was a third party respondent in the Arbitration.

11.     Defendant Timothy Varchetto ("Varchetto") is an individual residing in the State of Florida and a registered representative of KDSC.  Varchetto was a third party respondent in the Arbitration.

### *Jurisdiction*

12.     Pursuant to 28 U.S.C. § 1332(a), this Court has original jurisdiction over this civil action, because the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and because the dispute is between citizens of different States.

13-004-001

13.     Pursuant to 28 U.S.C. § 1331, this Court has original jurisdiction over this civil action, which is founded on claims or rights arising under the Constitution, treaties or laws of the United States – including Sections 7, 9, 10(b), 19(g)(1) and 27 of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78g, 78i, 78j(b), 78s(g), 78aa, implementing regulations promulgated by the Securities and Exchange Commission, and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964.

### *Background*

14.     In late 2003, the Customers appointed KDSC to serve as their agent to place securities transactions in accounts they opened at Sterne, Agee & Leach, Inc. and SAL Financial Services, Inc. (collectively "SALI") at they same time they began doing business with KDSC.

15.     KDSC was not an agent of SALI.

16.     The Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced them to establish their relationships with KDSC and SALI.

17.     Meister and Varchetto were the KDSC employees responsible for the Customers' accounts.

18.     Kashner is a "controlling person" of KDSC, as that term is defined under the Federal securities laws, and he supervised the activities of Meister and Varchetto.

19.     SALI and the Customers entered into Client Account Agreements, and neither KDSC nor any of its agents or employees was a party to those contracts.

20.     Neither Kashner, Meister nor Varchetto was a third-party beneficiary of the Client Account Agreements between SALI and the Customers.

21.     After opening their SALI accounts and appointing KDSC to serve as their agent, the Customers – through Meister and Varchetto – purchased shares in Vaso Active Pharmaceuticals, Inc. ("VAPH").

22.     The brother of Mark and Steven was the President of VAPH, and KDSC was in the process of underwriting an initial public offering ("IPO") of VAPH stock at the time the Customers began their relationships with KDSC.

23.     In February 2004, the Client Account Agreements between the Customers and SALI were amended to add margin privileges.

24.     The Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced them to begin trading on margin after the IPO, when the price of VAPH stock was rising.

25.     The Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced them to make unsuitable trades or maintain imprudent positions in VAPH stock.

- 11 -

26.     The Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care induced Mark and Lynda to pursue a "day trading" strategy with respect to VAPH stock soon after they began trading on margin.

27.     Under the amended Client Account Agreements, margin transactions involved the extension of credit by SALI only, and neither KDSC nor any of its agents ever lent money to the Customers or any of them.

28.     SALI kept the securities accounts of Steven separate from the securities accounts of Mark and Lynda, and SALI kept the margin account of Steven separate from the margin account of Mark and Lynda.

29.     Although the margin liability of Mark and Lynda was to be "joint and several" under their Client Account Agreement with SALI, there was never any agreement pursuant to which Mark and Lynda would be jointly and severally liable with Steven for deficiencies in his margin account, nor was there any agreement pursuant to which Steven would be jointly and severally liable with Mark and Lynda for deficiencies in their margin account.

30.     No Client Account Agreement between SALI and Steven was ever incorporated into a Client Account Agreement between SALI, Mark and Lynda, and no Client Account Agreement between SALI, Mark and Lynda was ever incorporated into a Client Account Agreement between SALI and Steven.

13-004-001

**The Dispute**

31.     In the Spring of 2004, the price of VAPH stock dropped precipitously, and SALI issued several margin calls to the Customers.

32.     The Customers would have proven (if they had been afforded access to and permitted to adduce relevant evidence during the Arbitration) that KDSC personnel fraudulently and in derogation of applicable regulations and standards of care manipulated the market for VAPH stock, were complicit in such manipulation, or otherwise benefited from declines in the value of the Customers' VAPH holdings.

33.     The Customers are informed and believe, and they therefore aver, that KDSC, Kashner, Meister and Varchetto feared that the Customers would seek to hold them liable for the deficiencies in their SALI margin accounts that resulted from the declines in the price of VAPH stock.

34.     The Customers are informed and believe, and they therefore aver, that KDSC preemptively and hastily commenced the Arbitration on May 25, 2004 – only 7 weeks after the first margin call – in order to obtain a tactical advantage in proceedings to resolve their anticipated disputed with the Customers.

35.     At the time KDSC commenced the Arbitration, none of the Customers was indebted to it.

36.     KDSC's Statement of Claim nonetheless alleged that the Customers were indebted to it.

37.     KDSC never issued a margin call to the Customers.

38.     KDSC never rendered a putative statement of margin indebtedness to any of the Customers.

13-004-001

39.     At the time KDSC commenced the Arbitration, it was not party to any of the Client Account Agreements between the Customers and SALI.

40.     KDSC's Statement of Claim nonetheless alleged that it was party to the Client Account Agreements.

41.     At the time KDSC commenced the Arbitration, none of the Customers had margin accounts with KDSC.

42.     KDSC's Statement of Claim nonetheless alleged that the Customers had margin accounts with KDSC.

43.     KDSC's Statement of Claim did not allege or otherwise give the Customers notice that it contended that SALI assigned its ostensible claims against the Customers to KDSC.

44.     KDSC's Statement of Claim did not allege or otherwise give the Customers notice that it contended that it was subrogated to the putative rights of SALI against the Customers.

45.     KDSC's Statement of Claim did not allege or otherwise give the Customers notice that it contended that KDSC otherwise had some indirect standing to recover from the Customers.

46.     On August 26, 2004, the Customers filed with the NASD and caused the Brokers to be served with their Answer, Affirmative Defenses and Statement of Counterclaims & Third Party Claims ("Answer").

13-004-001

47.     As provided by Rule 10314 of the NASD's Code of Arbitration Procedure, the Customers' Answer responded to the factual averments set forth in KDSC's Statement of Claim and laid out their affirmative defenses, counterclaims against KDSC, and third party claims against Kashner, Meister and Varchetto.

48.     The Customers' Eighth Affirmative Defense was that "KDSC's claims against the Customers must fail because it is not the real party in interest."

49.     The Customers never withdrew or amended their Eighth Amended Defense, of which the Brokers and their counsel were on notice throughout the Arbitration, and which constituted a complete defense under Alabama law, which governed the Client Account Agreements.

### The Agreements to Arbitrate

50.     The Customers' Client Account Agreements arguably compelled them to submit all disputes between them and KDSC (other than class actions) to arbitration.

51.     However, Kashner, Meister and Varcetto were not parties to or third party beneficiaries of the Client Account Agreements executed by the Customers.

52.     KDSC executed the NASD's standard form Uniform Submission Agreement when it commenced the Arbitration and, according to the Award, Kashner executed the same standard form Uniform Submission Agreement, but neither Meister nor Varchetto executed any submission agreement whatsoever.

53.     The Customers were not generally opposed to Arbitration, but they understood that arbitration of all of their claims was not mandatory.

54.     Accordingly, instead of executing the NASD's Uniform Submission Agreement, the Customers signed a Submission Agreement which conditioned their participation to arbitrate on their being afforded "a fair and complete opportunity to obtain adjudication of their claims and defenses."

55.     A true copy of the Submission Agreement executed by the Customers is appended to this pleading as Exhibit A.

56.     So long as they would receive a "fair and complete opportunity to obtain adjudication of their claims and defenses," the Customers were prepared to prosecute in the Arbitration even those claims for which arbitration was not mandatory, and they manifested that position in the Submission Agreement they executed.

57.     The Submission Agreement executed by the Customers represented their only agreement to arbitrate insofar as the Customers' claims against Kashner, Meister and Varchetto were concerned.


**Discovery**

58.     Pursuant to Rule 10321(b) of the NASD's Code of Arbitration Procedure, the Customers propounded comprehensive but focused requests for information relevant to KDSC's claims and the Customers' defenses, counterclaims and third party claims.

13-004-001

59.     In response, KDSC refused to produce anything but the most innocuous account statements and like documents.

60.     KDSC even refused to produce documents identified in the NASD's Discovery Guide as "presumptively discoverable" if the Arbitration involves claims like those asserted by the Customers.

61.     Despite the repeated entreaties of the Customers and their counsel, the Brokers and their counsel never agreed to confer with them in an effort to narrow their discovery disputes.

62.     The Customers were thus compelled to make a motion seeking compelled production of the requested information.

63.     The Panel's chairman largely denied the Customers' motion to compel – even refusing to compel KDSC to produce the "presumptively discoverable" information absolutely necessary to the competent prosecution of their counterclaims and third party claims.

64.     The conduct of discovery in the Arbitration was largely committed to the discretion of the Panel or its designee, but the chairman's unexplained refusal to compel production of the "presumptively discoverable" information was manifestly abusive of that discretion.

13-004-001

65.     Before the chairman's refusal to compel production of the "presumptively discoverable" information, it remained possible for the Customers to receive the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their Submission Agreement was conditioned, but the decision denying them essential discovery did irreparable, fundamentally unfair, violence to the Customers' ability to proceed.

66.     Of the limited additional information the Panel's chairman did order KDSC to produce, KDSC only produced a portion – contravening not only the chairman's order, but also the NASD's business conduct standards.

67.     The Customers subsequently moved for reconsideration of the chairman's order on their motion to compel, and for an order compelling KDSC's compliance with the portion of the order that required some additional discovery, but neither the Panel nor its chairman ever ruled on those motions.

## Dismissal of Counterclaims & Third Party Claims

68.     Consequently, regretfully, and pursuant to Rules 10305 and 10328(c) of the NASD's Code of Arbitration Procedure, the Customers moved to withdraw without prejudice their third party claims and counterclaims on February 24, 2005 – little more than two weeks after their Counsel received the fundamentally unfair discovery orders from the NASD.

13-004-001

69.     Because the discovery rulings had denied them the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their Submission Agreement was conditioned, the Customers intended to reassert their third party claims and (to the extent arbitration thereof was not compulsory) their counterclaims in a judicial forum.

70.     However, the Panel not only denied the Customers' motion to withdraw their counterclaims and third party claims without prejudice, but it went so far as to order, *sua sponte,* that those claims be dismissed with prejudice.

71.     The Brokers had not requested dismissal with prejudice in their opposition to the Customers' motion, and the Customers certainly had not requested that those claims be dismissed with prejudice.

72.     The Brokers had never moved to dismiss as factually or legally insufficient the Customers' counterclaims and third party claims, the Customers had never been called upon or afforded an opportunity to explain the specifics of those claims to the Panel, and the Customers had not been afforded notice that dismissal with prejudice was an option that might be considered by the Panel.

73.     Rule 10305(b) of the NASD's Code of Arbitration Procedure – the only provision allowing dismissal of claims with prejudice and without a hearing on their merits – limits that power of the Panel to instances where it is necessary "as a sanction for willful and intentional material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective."

13-004-001

74. Before the Panel purported to dismiss the Customers' counterclaims and third party claims with prejudice, the Customers had not been sanctioned in the Arbitration, so it logically follows that no lesser sanction could have "proven ineffective."

75. Indeed, before the Panel purported to dismiss the Customers' counterclaims and third party claims with prejudice, the Customers had never been guilty of a "willful and intentional material failure to comply with an order of the arbitrator(s)", and the Panel's order dismissing their claims did not find that there had been such a failure.

76. The Customers are informed and believe, and they therefore aver, that the members of the Panel were piqued and offended by the grounds (that they had been deprived of the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their Submission Agreement was conditioned) the Customers offered for seeking leave to withdraw without prejudice their counterclaims and third party claims, and that the Panel's dismissal with prejudice of those claims was an arbitrary, capricious, whimsical, and vindictive retaliation for the Customers' honest statement of their reasons.

77. The Panel paid lip service to the applicability of Rule 10305 – and then ignored it – when it dismissed the counterclaims and third party claims with prejudice.

78. The order purporting to dismiss the counterclaims and third party claims with prejudice was interlocutory until it was incorporated into the Award, so the Customers could not seek its vacation until after the Award was issued.

**Unauthorized Practice of Law**

79.     Pursuant to the standard operating procedures of the NASD, the hearing in the Arbitration was to be held in Boston.

80.     After the Panel set the initial date for the hearing, KDSC and the Brokers made clear that they would be represented at that hearing by attorneys who are not licensed to practice law in this Commonwealth.  The lead attorney was to be Kashner's son-in-law, Marc J. Ross, of the New York Bar.

81.     Believing that participation by those lawyers in the hearing would violate Rule 5.5(a) of the Massachusetts Rules of Professional Conduct, concerned that participation by the Customers' counsel in that hearing with knowledge of that apparent violation would itself violate Rule 5.5(b) of the Rules of Professional Conduct, and mindful that the Chief Judge of this Court had recently certified similar issues to the SJC (*see In re Lucas,* 317 B.R. 195, 215 (D. Mass. 2004)), the Customers filed a motion asking the Panel to stay the arbitration pending the SJC's resolution of the certified issues or disqualify the Brokers' counsel from the Arbitration.  The Panel's chairman denied that motion.

82.     The NASD subsequently issued a policy statement consistent with the Customers' position concerning the unauthorized practice of law issue in the Arbitration, so the Customers moved for reconsideration of the chairman's decision, but the chairman of the Panel denied that motion.

13-004-001

83.     With the law remaining unsettled, and with the continued possibility that they might unwillingly but knowingly abet the unauthorized practice of law at the hearing, the Customers sought a declaratory judgment from a single justice of the SJC (Case No. SJ-2005-0088).

84.     The single justice (Cordy, J.) accepted the Customers' reasoning but nonetheless denied their request for a declaratory judgment because he felt that strict application of Mass. R. Prof. C. 5.5(a) under the circumstances of the Arbitration would produce "too harsh a result."

85.     The Customers have appealed the single justice's decision to the full SJC, where it has been docketed under the name *Steven Mscisz, et al. v. Kashner Davidson Securities Corp., et al.* and assigned Case No. SJC-09529; although the SJC on July 22, 2005 decided the case certified by Judge Young, that decision did not resolve the questions at issue in the Customers' appeal.

### Other Pre-Hearing Procedural Defects

86.     Because discovery motions remained outstanding, and because they wanted to establish definitively the status of their claims and counterclaims, the Customers – as was their absolute right under Rule 10321(d) of the NASD's Code of Arbitration Procedure – requested a pre-hearing conference to discuss those and other issues before final preparations for the hearings had been made.

87.     The Panel – despite the clear requirement of Rule 10321(d) – did not hold the pre-hearing conference the Customers had requested on May 11, 2005. Nor did the Panel even acknowledge that request.

13-004-001

**The Hearing**

88.     Without holding the requested pre-hearing issue to resolve unresolved issues, the Panel commenced the hearing as scheduled on May 17, 2005, and the hearing continued through the morning of May 18, 2005.

89.     Although the hearing was held in Boston, the Brokers' case was presented by an attorney not licensed to practice in the Commonwealth of Massachusetts.

90.     Steven, Mark, Varchetto and KDSC's President, Melissa Rothenbach ("Rothenbach"), were the only witnesses to testify during the hearing.

91.     Because they had been denied a fair opportunity to present the Brokers' misconduct to the Panel, the Customers' presentation was focused on the "real party in interest" defense of which the Brokers had been on notice since August 2004.

92.     Varchetto and Rothenbach consistently admitted the factual predicates of the Customers' "real party in interest" defense.

93.     KDSC did not adduce evidence establishing a contract between KDSC and the Customers or an account due and owing to KDSC by the Customers.

94.     The Brokers did not even attempt to establish the elements of a frivolous, calumnious fraud claim they had asserted against Mark and Lynda.

13-004-001

95.     Varchetto offered no testimony concerning any putative assignment, subrogation or other indirect theory giving KDSC standing to recover from the Customers, and KDSC had not given notice of any such indirect standing theory in advance of the hearing.

96.     During the testimony of the last witness in the hearing, KDSC's counsel came forward with a document – created and executed that very day – which purported to assign SALI's putative rights against the Customers to KDSC. That witness acknowledged that, prior to the mid-hearing assignment of the putative claims, SALI had remained the owner of those claims.

97.     Although the assignment had been received by KDSC and its counsel at 1:45 p.m. on the day of the hearing, they waited until the very end of the testimony – nearly two hours later – to reveal its existence.

98.     Despite these material failures in KDSC's evidence, the Panel denied the Customers' oral motion to dismiss the Arbitration, which motion was based on KDSC's failure to make out a *prima facie* case.

99.     Although KDSC had known for 9 months of the Customers' "real party in interest" defense, and despite the requirement in Rule 10321(c) of the NASD's Code of Arbitration Procedure that the parties exchange exhibits at least 20 days before the hearing, the Brokers and their counsel had never previously produced – or even intimated the existence of – any assignment of SALI's putative claims against the Customers.

13-004-001

100.    Fairness to the Customers required notice of the claims being asserted against them and a meaningful opportunity to defend themselves, and KDSC's "sandbagging" tactics deprived the Customers of both.

101.    KDSC's counsel sought to justify his 180 degree change in course with what he characterized as an oral motion to amend KDSC's Statement of Claim to conform to the evidence.

102.    KDSC's "sandbagging" of the Customers was consequential.  Under Section 8-5-25 of the Alabama Code, which governed the Client Account Agreements, KDSC would have taken SALI's claims against the Customers "subject to all payments, setoffs, and discounts" they had against SALI, but the last-minute assignment prevented the Customers from ascertaining whether they had such offsetting claims against SALI, from taking discovery concerning those offsets or the validity of the putative assignment, and from presenting relevant evidence at the hearing.

103.    Additionally, the Customers made strategic and tactical decisions based on their assumption that KDSC would seek to prove the case it pled, and the Customers expended significant resources preparing and proving their "real party in interest" defense.

104.    The Panel nonetheless allowed KDSC's post-testimony motion to amend its pleading, and the Panel accepted the last-minute assignment into evidence over the Customers' objection.

105.    At the hearing, KDSC also came forward with an affidavit purporting to justify its claim for attorneys' fees and collection costs.

- 25 -

106.    The Customers objected to the affidavit and the materials appended

to it, because they contained information and incorporated documents that had

been in KDSC's possession long before the 20-day deadline for the exchange of

exhibits specified by Rule 10321(c) of the NASD's Code of Arbitration Procedure,

and KDSC's decision to spring that evidence on the Customers at the hearing

deprived them of any ability to scrutinize and counter the affidavits and exhibits.

107.  The Panel nonetheless received the affidavit and exhibits thereto into

evidence.

108.    At the end of the hearing, when reading a script mandated by the

NASD, the Panel's chairman asked the Customers' attorney "to state affirmatively

whether [the Customers] had a full and fair opportunity to be heard" and, consistent

with the averments set forth in the Customers' Counterclaims, counsel gave the

only answer he could truthfully provide under the circumstances – "no."

**The Award**

109.    On June 17, 2005, the Panel issued its Award and:

    a.    found the Customers jointly and severally liable to KDSC for
$421,000.00 (including attorneys' fees) in what the Panel
characterized as compensatory damages;

    b.    reiterated and incorporated the dismissal with prejudice of the
Customers counterclaims and third party claims; and

    c.    directed the Customers, jointly and severally, to pay $6,900.00
in forum fees.

110.    KDSC had never pled or asserted a lawful basis for making the

Customers jointly and severally liable with respect to the compensatory damages.

13-004-001

111. The debt KDSC alleged to be owed by Steven was – as it properly should have been – pled and always treated as separate from the debt allegedly owed by Mark and Lynda.

112. The Customers' counsel received the Award on the afternoon of June 20, 2005.

### Grounds for Vacation or Modification of Award

### Count I
### Award Exceeding Powers of Panel
### (9 U.S.C. § 10(a)(4) & Mass. Gen. L. c. 251, § 12(a)(3))

113. The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 112 of the Customers' Counterclaims.

114. The Federal and Massachusetts Arbitration Acts permit this Court to make an order vacating the Award if it concludes that "the arbitrators exceeded their powers."

115. Although no statute, common law rule, agreement between the Customers and Brokers, or NASD rule incorporated into such an agreement gave the Panel the power to do so under the circumstances of this Arbitration, the Panel:

    a.    Dismissed with prejudice the Customers' counterclaims and third party claims;

    b.    Granted KDSC's putative "oral motion to conform the pleadings to the proof"; and

    c.    Held the Customers "jointly and severally liable" for the so-called "compensatory damages" the Panel awarded.

116. The Customers are therefore entitled to an order vacating the Award.

**Count II**
**Refusal to Hear Material Evidence**
**(9 U.S.C. § 10(a)(3) & Mass. Gen. L. c. 251, § 12(a)(4))**

117.    The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 116 of the Customers' Counterclaims.

118.    The Federal and Massachusetts Arbitration Acts permit this Court to make an order vacating the Award if it concludes that the Panel refused to hear evidence material to the controversy or otherwise conducted the Arbitration hearing in such a way as to prejudice the rights of the Customers.

119.    The Panel refused to hear the following material evidence:

    a.    Evidence necessary to ensure a full and fair hearing on the Customers' claim that the Brokers violated Sections 7, 9 and 10(b) of the Securities Act of 1934;

    b.    Evidence necessary to ensure a full and fair hearing on the Customers' claim that the Brokers violated the Florida Securities Transactions Act;

    c.    Evidence necessary to ensure a full and fair hearing on the Customers' claim that the Brokers violated the Massachusetts Uniform Securities Act;

    d.    Evidence necessary to ensure a full and fair hearing on the Customers' claim that the Brokers violated the NASD's own Business Conduct Standards;

    e.    Evidence necessary to ensure a full and fair hearing on the Customers' claim that the Brokers engaged in common law fraud;

    f.    Evidence necessary to ensure a fair and complete hearing on the Customers' claim that the Brokers were unjustly enriched;

    g.    Evidence necessary to ensure a fair and complete hearing on the Customers' claim that the Brokers converted their property;

13-004-001

h.       Evidence necessary to ensure a fair and complete hearing on the Customers' claim that KDSC breached its contracts with them;

i.       Evidence necessary to ensure a fair and complete hearing on the Customers' claim that Kashner, Meister and Varchetto violated the Racketeer Influenced and Corrupt Organizations Act;

j.       Evidence necessary to ensure a fair and complete hearing on the Customers' claim that KDSC abused the NASD's process;

k.       Evidence necessary to ensure a fair and complete hearing on the Customers' claim that the Brokers violated the Massachusetts Consumer Protection Act;

l.       Evidence necessary to ensure a fair and complete hearing on the Customers' claim that the Brokers violated the Florida Consumer Protection Act;

m.       Evidence relevant to the Customers' counterclaims and third party claims, insofar as such evidence was necessary to establish the circumstances under which the alleged margin debts were incurred.

120.    The Panel otherwise prejudiced the rights of the Customers by:

a.       Conducting a hearing in which KDSC sought to establish alleged margin debts owed by the Customers without affording them a fair and complete opportunity to establish how the Brokers' malfeasance had given rise to those alleged debts;

b.       Depriving the Customers of a forum in which they would have a fair and complete opportunity to present their claims and defenses;

c.       Refusing to compel KDSC to produce to the Customers information concerning their claims and defenses which the NASD itself deemed "presumptively discoverable" in such cases;

d.       Failing to enforce its own order compelling KDSC to produce information to the Customers;

13-004-001

e.   Purporting to dispose of third party claims concerning which the Customers' agreement to arbitrate was subject to the proviso that they be "afforded a fair and complete opportunity to obtain adjudication of their claims and defenses" but without fulfilling that condition precedent;

f.   Failing to rule promptly (or, in some instances, at all) on pre-hearing motions made by the Customers;

g.   Failing to hold the pre-hearing conference requested by the Customers on May 11, 2005;

h.   Presenting the Customers with the "Hobson's Choice" of abetting the unauthorized practice of law by the Brokers' counsel or defaulting in the Arbitration; and

i.   Placing its imprimatur on the "sandbagging" strategy of the Brokers and their counsel.

121.   The Customers are therefore entitled to an order vacating the Award.

## Count III
## Award Procured by Undue Means
## (9 U.S.C. § 10(a)(1) & Mass. Gen. L. c. 251, § 12(a)(1))

122.   The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 121 of the Customers' Counterclaims.

123.   The Federal and Massachusetts Arbitration Acts permit this Court to make an order vacating the Award if it concludes that the award was procured by "undue means."

124.   The Award in this case was procured by the following undue means:

a.   KDSC's false allegations in its Statement of Claim that it was a party to the margin agreements at issue, 9 months of muteness while the Customers challenged its standing, and (after all witnesses had finished testifying in the Arbitration hearing) "sandbagging" the Customers with a document purporting to assign to KDSC the putative claims of the real party in interest;

b.     KDSC's abandonment of its Statement of Claim after the evidence was closed and concomitant oral motion to conform that pleading to the evidence adduced during the hearing;

c.     The Brokers' abetting the unauthorized practice of law by their counsel, who – unencumbered by the Massachusetts Rules of Professional Conduct or any need to preserve his standing in the local legal community – effectuated KDSC's "sandbagging" strategy;

d.     KDSC's failure to cooperate, as required by Rule 10321 of the NASD Code, "to the fullest extent practicable in the voluntary exchange of documents and information" to expedite the Arbitration and its failure to "endeavor to resolve disputes" concerning discovery before necessitating motion practice;

e.     KDSC's failure to produce documents in its possession or control as directed by the Panel pursuant to the NASD Code of Arbitration Procedure; and

f.     KDSC's failure to serve the Customers with copies of documents they intended to present as evidence at least 20 days prior to the hearing.

125.   The Customers are therefore entitled to an order vacating the Award.

## Count IV
## Manifest Disregard of the Law

126.   The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 125 of the Customers' Counterclaims.

127.   This Court is permitted to make an order vacating the Award if it concludes that the Panel acted in "manifest disregard of the law."

128.   In the following instances, the Panel "recognized the applicable law – and then ignored it":

- 31 -

13-004-001

     a.     The dismissal with prejudice of the Customers' counterclaims and third-party claims, despite the plain language of Rule 10305 in the NASD's Code of Arbitration Procedure, which only permits dismissal with prejudice under circumstances not present in the Arbitration;

     b.     The refusal to stay the Arbitration or disqualify the Brokers' counsel pending determination by the SJC of the "unauthorized practice of law" issues certified by the Chief Judge of this Court – especially after the Panel had been informed that the NASD had itself taken the position that the ability of a foreign attorney to participate in a hearing is for determination by the courts of the forum state; and

     c.     The Panel chairman's refusal to compel KDSC to produce information specified as "presumptively discoverable" in the NASD's Discovery Guide.

129.    The Customers are therefore entitled to an order vacating the Award.

### Count V
### Refusal to Postpone Hearing
### (9 U.S.C. § 10(a)(3) & Mass. Gen. L. c. 251, § 12(a)(4))

130.    The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 129 of the Customers' Counterclaims.

131.    The Federal and Massachusetts Arbitration Acts permit this Court to make an order vacating the Award if it concludes that the Panel refused to postpone the Hearing "upon sufficient cause."

132.    The Panel refused to postpone the hearing pending determination of the "unauthorized practice of law" issues certified to the SJC by the Chief Judge of this Court, and the unsettled nature of those issues constituted "sufficient cause" for postponement.

133.    The Customers are therefore entitled to an order vacating the Award.

13-004-001

**Count VI**
**No Agreement To Arbitrate**
**Issues Addressed In Award**
**(Mass. Gen. L. c. 251, § 12(a)(5))**

134.    The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 133 of the Customers' Counterclaims.

135.    The Massachusetts Arbitration Act permits this Court to vacate the Award if there was no arbitration agreement and the Customers did not participate in the hearing without objecting to that agreement.

136.    In this case, the Customers agreed to arbitrate disputes between them and KDSC (to the extent such claims are lawfully arbitrable), but the Customers' Submission Agreement – their only agreement to arbitrate the third party claims against Kashner, Meister and Varchetto – was subject to the proviso that they be afforded a "fair and complete opportunity to obtain adjudication of their claims and defenses."

137.    The "fair and complete" adjudication proviso in the Customers' Submission Agreement was not satisfied.

138.    Furthermore, neither Meister nor Varchetto executed an agreement submitting the third party claims to arbitration, so – even if the Customers had been afforded a "fair and complete opportunity to obtain adjudication of their claims and defenses" – there was no meeting of the minds concerning arbitrability of the third party claims against Meister and Varchetto.

13-004-001

139.   At and before the hearing, the Customers objected to the Panel's intention to dispose of the third party claims against Kashner, Meister and Varchetto.

140.   The Customers are therefore entitled to an order vacating the Award to the extent it purported to dispose of their third party claims.

## Count VII
### Correction of Errors
### (9 U.S.C. § 11 & Mass. Gen. L. c. 251, § 13)

141.   The Customers repeat and reallege, as if fully set forth in this paragraph, the averments set forth in paragraphs 1 through 140 of the Customers' Counterclaims.

142.   The Federal and Massachusetts Arbitration Acts permit this Court to modify or correct the Award if it is somehow imperfect in a manner that does not affect the merits of the controversy.

143.   The Award contains at least two such errors that should be corrected if the Award is not vacated altogether for any of the reasons claimed in Counts I through VI of the Customers' Counterclaims:

a.   The Award states that the Customers executed a "Uniform Submission Agreement" but the record establishes that they did not.  Instead, the Customers executed a Submission Agreement expressly conditioning their assent to arbitrate on their being "afforded a fair and complete opportunity to obtain adjudication of their claims and defenses."

b.   The Award holds the Customers "jointly and severally liable" for compensatory damages in the amount of $421,000.00, but the Arbitration actually arose from distinct margin accounts alleged by KDSC – one involving Steven, and the other involving Mark and Lynda – and any compensatory damages ultimately included in the Award should be allocated to the appropriate parties.

13-004-001

WHEREFORE, for the reasons set out above, the Customers respectfully request that the Court

a.    Either:

    i.    Vacate the Award, direct a rehearing of KDSC's claims against the Customers by a new panel of arbitrators, order those arbitrators to afford the Customers fair and complete discovery and a fair and complete hearing concerning their counterclaims against KDSC (to the extent arbitration of such counterclaims is mandatory), and leave the Customers to their judicial remedies concerning the counterclaims and third party claims of which arbitration is not mandatory; or

    ii.    Correct or modify the Award as prayed for in Count VII of the Customers' Counterclaims; and

b.    Grant such other relief as the Court deems necessary and just.

**TO THE EXTENT ANY ISSUE MAY BE TRIED BY A JURY,
THE CUSTOMERS DEMAND SUCH A TRIAL.**

Respectfully submitted,

STEVEN MSCISZ,
MARK MSCISZ & LYNDA MSCISZ

By their attorney,

***/s/ William P. Corbett, Jr.***

William P. Corbett, Jr. (BBO #561201)
THE CORBETT LAW FIRM
  *A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  August 8, 2005

# *Exhibit A*

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

| | |
|---|---|
| In the Matter of the Arbitration Between: | ) |
| | ) |
| KASHNER DAVIDSON SECURITIES CORP., | ) |
| | ) |
| *Claimant/Respondent in Counterclaim,* | ) |
| | ) |
| v. | ) |
| | ) |
| STEVEN MSCISZ, MARK MSCISZ, and | ) |
| LYNDA MSCISZ, | ) |
| | ) |
| *Respondents/Counterclaimants.* | ) |
| | ) |
| v. | ) |
| | ) |
| VICTOR KASHNER, MATTHEW MEISTER and | ) |
| TIMOTHY VARCHETTO, | ) |
| | ) |
| *Third Party Respondents.* | ) |
| | ) |

NASD DISPUTE RESOLUTION NO. 04-03793

## SUBMISSION AGREEMENT

1.  Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties hereby submit the present matter in controversy, as set forth in the statement of claim, answers, cross claims and all related counterclaims and/or third party claims which may be asserted, to arbitration in accordance with the Constitution, By-Laws, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

2.  The undersigned parties hereby state that their attorney has read and explained to them the procedures and rules of the sponsoring organization relating to arbitration.

3.  Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties agree that in the event a hearing is necessary, such hearing shall be held at a time and place as may be designated by the Director of Arbitration or the arbitrator(s), and that the arbitration will be conducted in accordance with the Constitution, By-Laws, Regulations and/or Code of Arbitration Procedure of the sponsoring organization.

4.  Provided that they are afforded a fair and complete opportunity to obtain adjudication of their claims and defenses, the undersigned parties further agree to abide by and perform any award(s) rendered pursuant to this Submission Agreement and further agree that a judgment and any interest due thereon may be entered upon such award(s) and, for these purposes, the undersigned parties hereby voluntarily consent to submit to the jurisdiction of any court of competent jurisdiction which may properly enter such judgment.

5.  The undersigned parties reserve their right to seek adjudication of their claims and defenses in a court of competent jurisdiction if the sponsoring organization does not afford them a fair and complete opportunity to obtain such an adjudication.

IN WITNESS WHEREOF, the parties hereto have signed and acknowledged the foregoing Submission Agreement.

_____          _____
STEVEN MSCISCZ                                        Date   8/26/04

_____          _____
MARK MSCISCZ                                          Date   8/26/04

_____          _____
LYNDA MSCISCZ                                         Date   8/26/04

**CERTIFICATE OF SERVICE**

I hereby certify that on this twenty-sixth day of August, 2004, I caused a copy of the foregoing document to be served by overnight mail upon the attorney of record for Kashner Davidson Securities Corporation.

_____
William P. Corbett, Jr.

- 2 -

# Supreme Judicial Court for the Commonwealth of Massachusetts
## John Adams Courthouse
**One Pemberton Square, Suite 1400, Boston, Massachusetts 02108-1724**
**Telephone 617-557-1020, Fax 617-557-1145**


William P. Corbett, Jr., Esquire
The Corbett Law Firm
85 Exchange Street, Suite 326
Lynn, MA 01901-1429


RE:  No. SJC-09529

**STEVEN MSCISZ & others**
    **v.**
**KASHNER DAVIDSON SECURITIES CORPORATION & others**


### NOTICE OF DENIAL OF PETITION FOR REHEARING

The Petition for Rehearing filed in the above captioned case has been considered by the Court and is denied.

Susan Mellen, Clerk


Dated: May 1, 2006

To:  William P. Corbett, Jr., Esquire
    Howard M. Smith, Esquire
    Atty. Marc Ross
    Richard Babnick, Jr.,
    S.J.C. for Suffolk County
    Richard A. Johnston, Esquire
    Timothy P. Burke, Esquire
    Andrew R. Grainger, Esquire

# THE CORBETT LAW FIRM
*A Professional Corporation*

May 11, 2005

**By E-Mail & First Class Mail**

Avi Y. Rosenfeld, Esquire
NASD Dispute Resolution, Inc.
One Liberty Plaza
165 Broadway, 27th Floor
New York, New York 10006-1400

> **RE:** ***Kashner Davidson Securities Corp. v. Mscisz***
> **NASD Dispute Resolution Case No. 04-03793**

Dear Mr. Rosenfeld:

Enclosed for filing in the referenced matter please find:

- Motion of Steven Mscisz, Mark Mscisz & Lynda Mscisz for Stenographic Transcription of Hearing; and

- Motion of Steven Mscisz, Mark Mscisz & Lynda Mscisz for Refund of Filing Fee and Hearing Session Deposit.

Please forward those motions and this cover letter to the Panel.

In addition to these enclosed pre-hearing motions, there are several others that remain to be decided by the Panel, including the Motion of Steven Mscisz, Mark Mscisz & Lynda Mscisz for Reconsideration of Orders on Discovery Motions and the Motion of Steven Mscisz, Mark Mscisz & Lynda Mscisz for Compelled Compliance with Discovery Orders and Sanctions (both filed February 24, 2005). Neither the Chairman nor any other member of the Panel ever ruled on the substantive discovery issues raised by those motions in the 2 ½ months that have passed since their filing.

Furthermore, we have not yet been advised of the location of next week's hearing. In order to make necessary logistical arrangements, it is important that I have that information. Please advise me of the hearing location once you know it.

NASD DISPUTE RESOLUTION, INC.
May 11, 2005
Page 2 of 3

One other significant issue that needs to be addressed by the Panel is the Chairman's *sua sponte* dismissal with prejudice of the Respondents' counterclaims and third party claims. Because the Chairman appears to have acted beyond his authority, his order threatens to impose needless additional burden and expense on the parties. That drastic result was not contemplated in any agreement between the Claimant and Respondents or in the NASD's Code of Arbitration Procedure, so it exposes the parties to the significant risk that they will have to commence this proceeding all over again, regardless of who prevails during next week's hearing. If the Panel's final award incorporates that dismissal with prejudice, it will be subject to reversal. *Superadio L.P. v. Walt "Baby" Love Productions, Inc.,* 62 Mass. App. Ct. 546, 552 (2004).

After all, Rule 10305(b) of the Code is the only section that allows dismissal with prejudice over a party's objection, and it may only be done "as a sanction for willful and material failure to comply with an order of the arbitrator(s) if lesser sanctions have proven ineffective. Never did the Chairman find a "willful and material failure" by my clients to comply with any order, nor had any "lesser sanctions" ever been imposed – let alone proven ineffective. Indeed, during our March 2, 2005 telephone conference, the Chairman expressly denied "all requests for sanctions." The Respondents did move to withdraw those claims without prejudice, as provided by Rule 10305(a), but the Claimant did not even include a request for dismissal with prejudice in its response. The Chairman thus had three options:

1) Allow the Respondents' motion to withdraw their affirmative claims without prejudice and, to the extent arbitration thereof was not mandatory, refer the parties to their judicial remedies;

2) Afford the Respondents the discovery necessary for their counterclaims and third-party claims, thus ensuring that they would have a "fair and complete opportunity" to present those claims and eliminating their reason for seeking to withdraw them; or

3) Dismiss the arbitration altogether, as provided by Rule 10305(c), if the Claimant agreed.

The Chairman chose none of these lawful alternatives. It is therefore necessary to ascertain what, if any, authority the Chairman purported to act upon, so that the Respondents may formulate an appropriate plan of action.

I also that the Claimaint's lead attorney today advised you of his firm's withdrawal from this case. However, Mr. Ross also said that he "may be called as a witness" during the hearing. The Respondents object to any such testimony, because the identification of Mr. Ross as a witness was 14 days late. Mr. Ross was not identified in the witness list served by the Clamant on February 10, 2005, and that list was never supplemented before the 20-day deadline provided by Rule 10321(c). The Respondents will therefore ask the Panel exclude Mr. Ross from the arbitration, as provided by the aforesaid Rule 10321(c).

Finally, please inform the Panel that – despite the misleading bombast in Mr. Ross' letter of earlier this afternoon – the Respondents did not seek an injunction in the Massachusetts Supreme Judicial Court "to further delay this proceeding" or to forestall a supposed "day of reckoning." There was no "gamesmanship" or "delay tactics." The Respondents never sought to enjoin this arbitration; they merely sought to enjoin conduct by the Claimant's now-former counsel that, at the end of the day, they believe will be found to violate Mass. R. Prof. C. 5.5(a). Even if that injunction were granted, the Claimant would have been free to go forward without delay by proceeding with hearing counsel who can lawfully practice law in the Commonwealth of Massachusetts.

If, as now appears likely, next week's hearing will be limited to the Claimant's affirmative claims against the Respondents, my clients remain ready, willing and able to proceed next week, regardless of how the SJC responds to their application for an injunction pending appeal. The Respondents remain confident that they will prevail on the merits.

In order to ensure that the hearing is not unnecessarily delayed or impeded, I request, pursuant to Rule 10321(d)(1) of the Code, a pre-hearing telephone conference on Thursday afternoon or Friday morning to address the these unresolved matters.

Thank you for your attention to this matter.

Very truly yours,

William P. Corbett, Jr.

Enclosures
WPC/13-004-001
cc:     Steven, Lynda & Mark Mscisz (by e-mail w/enclosures)
        Howard Smith, Esquire (by e-mail & first class mail w/enclosures)
        Marc J. Ross, Esquire (by e-mail & first class mail w/enclosures)

VOLUME:  I
PAGES: 1-220
EXHIBITS: See Index


NASD DISPUTE RESOLUTION, INC.
ARBITRATION DEPARTMENT

Case No. 04-03793


In the Matter of Arbitration Between:
KASHNER DAVIDSON SECURITIES CORP.,
        Claimaint,

    AND

STEVEN MSCISZ, MARK MSCISZ AND
LYNDA MSCISZ,
        Respondents.


BEFORE:  Arthur J. Giacomarra, Esq., Chairman
    Douglas R. Gray
    Patrick W. McKeon, Esq.


HELD AT:  225 Franklin Street
    Boston, Massachusetts 02210

HELD ON:  Tuesday, May 17, 2005
    10:07 a.m.

2

1   APPEARANCES:

2
      SICHENZIA ROSS FRIEDMAN FERENCE, LLP
3        (By Marc J. Ross, Esq.)
         1065 Avenue of the Americas
4        New York, New York  10018
              -AND-
5     NEWMAN & SMITH
         (By Howard Smith, Esq.)
6        One Gateway Center
         Newton, Massachusetts
7        for the Claimant.

8

9     THE CORBETT LAW FIRM
         (By William P. Corbett, Esq.)
10        85 Exchange Street, Suite 326
         Lynn, Massachusetts  01901-1429
11        for the Respondents.

12

13       _____

14

15

16

17

18

19

20

21

22

23

24

1             I N D E X

2   Witness       Direct  Cross  Redirect  Recross

3   MARK MSCISZ

4   (By Mr. Ross)   40           90
    (By Mr. Corbett)      70           95
5
    STEVEN MSCISZ
6
    (By Mr. Ross)   96           --
7   (By Mr. Corbett)      117            --

8   TIMOTHY VARCHETTO

9   (By Mr. Ross)   127          --
    (By Mr. Corbett)      146            --
10
    MELISSA J. ROTHENBACH
11
    (By Mr. Ross)   184          --
12  (By Mr. Corbett)      195            --

13

14             E X H I B I T S
    Claimaint's
15  Exhibit No.                  Page

16  14    Tab No. 14.            44

17  15    Tab No. 15.            47

18  16    Tab No. 16.            52

19  17    Tab No. 17.            52

20  20    Tab No. 20.            56

21  24    Tab No. 24.            64

22  23    Tab No. 23.            90

23  1     Tab No. 1.             100

24  5     Tab No. 5.             104

| 1 | 6 | Tab No. 6. | 104 |
| 2 | 8 | Tab No. 8. | 108 |
| 3 | 13 | Tab No. 13. | 113 |
| 4 | 2 | Tab No. 2. | 131 |
| 5 | 4 | Tab No. 4. | 133 |
| 6 | 7 | Tab No. 7. | 137 |
| 7 | 18 | Tab No. 18. | 144 |
| 8 | 31 | Tab No. 31. | 194 |
| 9 | 29 | Tab No. 29. | 214 |
| 10 | 30 | Tab No. 30. | 214 |

11 Respondents'
Exhibit No.                Page
12
| 15 | Tab No. 15. | 84 |
13
| 10 | Tab No. 10. | 126 |
14
| 11 | Tab No. 11. | 126 |
15
| 12 | Tab No. 12. | 126 |
16
| 13 | Tab No. 13. | 126 |
17
| 14 | Tab No. 14. | 126 |
18
| 1 | Tab No. 1. | 159 |
19
| 2 | Tab No. 2. | 159 |
20
| 3 | Tab No. 3. | 164 |
21
| 19 | Tab No. 19. | 174 |
22
| 18 | Tab No. 18. | 176 |
23
| 16 | Tab No. 16. | 208 |
24

1    P R O C E E D I N G S.

2        CHAIRMAN GIACOMARRA:  Good morning, I

3    am the chairperson of the Arbitration panel.  My

4    name is Arthur Giacomarra.  To my left is Mr.

5    McKeon, an arbitrator; and to my right is Mr.

6    Gray, the third arbitrator on our panel.

7        I have no additional disclosures to

8    make to the parties at this time.  Mr. McKeon, do

9    you have any?

10        ARBITRATOR MCKEON:  I have none.

11        CHAIRMAN GIACOMARRA:  Mr. Gray?

12        ARBITRATOR GRAY:  I have none.

13        CHAIRMAN GIACOMARRA:  Okay.  I'd like

14    to get the names of all the parties in attendance

15    and we'll start on the left with, is it Mr. Ross?

16        MR. ROSS:  Yes.  Good morning.  Marc

17    J. Ross.

18        CHAIRMAN GIACOMARRA:  You're counsel

19    for the --

20        MR. ROSS:  Claimant.

21        CHAIRMAN GIACOMARRA:  Who's next?

22        MS. ROTHENBACH:  Melissa J.

23    Rothenbach.

24        CHAIRMAN GIACOMARRA:  Can you spell

1   that.

2           MS. ROTHENBACH:  R-O-T-H-E-N-B-A-C-H.

3           CHAIRMAN GIACOMARRA:  Your position?

4           MS. ROTHENBACH:  President of the

5   company.

6           CHAIRMAN GIACOMARRA:  Of Kashner

7   Davidson?

8           MS. ROTHENBACH:  That's correct.

9           CHAIRMAN GIACOMARRA:  Sir?

10          MR. VARCHETTO:  I'm Timothy Varchetto,

11   V-A-R-C-H-E-T-T-O.

12          CHAIRMAN GIACOMARRA:  Okay.  And, sir?

13          MR. SMITH:  Good morning.  Howard

14   Smith from the firm Newman & Smith in Newton,

15   co-counsel for Kashner.

16          CHAIRMAN GIACOMARRA:  And?

17          MR. CORBETT:  William Corbett for the

18   respondents.

19          STEVEN MSCISZ:  Steven Mscisz.

20          CHAIRMAN GIACOMARRA:  Can you say the

21   last name again?

22          STEVEN MSCISZ:  Mscisz.

23          CHAIRMAN GIACOMARRA:  And?

24          MARK MSCISZ:  Mark Mscisz.

7

1          CHAIRMAN GIACOMARRA:  Thank you.  I

2   would like at this time to obtain confirmation

3   from all the parties or their representatives of

4   the acceptance of the panel's composition.  Mr.

5   Ross?

6          MR. ROSS:  Claimant so accepts.

7          CHAIRMAN GIACOMARRA:  And Mr. Corbett?

8          MR. CORBETT:  Yes.

9          CHAIRMAN GIACOMARRA:  Thank you.  The

10   arbitrators have already taken their oath.  We've

11   already submitted our properly executed oaths of

12   arbitrators to the NASD Dispute Resolution staff.

13          We'll start with the formal -- before

14   we start with the formal opening of the hearing,

15   I'd like to just resolve an issue on the official

16   record.  I see we have a stenographer here.  Mr.

17   Corbett, my understanding is you've made

18   arrangements for this stenographer?

19          MR. CORBETT:  Yes, I filed a motion

20   last week, and Mr. Ross assented to the motion,

21   although I think he wants to get a free

22   transcript out of it.

23          CHAIRMAN GIACOMARRA:  I have not

24   received a copy of the motion.  But you have

1   assented to the motion?

2        MR. ROSS:  What -- we put in a

3   response saying we didn't object to it.  But as

4   they were required to provide a copy of the

5   transcript to you, and obviously it's at their

6   expense, we requested that we be provided with a

7   copy of the transcript and left the decision up

8   to the panel.

9        CHAIRMAN GIACOMARRA:  You will provide

10  a copy of the transcript to Mr. Ross and to the

11  NASD?

12       MR. CORBETT:  It's our obligation

13  under the rule to provide a copy of the

14  transcript to the panel.  The parties are

15  responsible for procuring their own copies.

16       CHAIRMAN GIACOMARRA:  So is there a

17  disagreement there?

18       MR. CORBETT:  Rule 10326 --

19       MR. ROSS:  It seems that way.

20       MR. CORBETT:  Rule 10326 of the Code

21  requires that the party arranging for the

22  stenographic transcription provide a copy to the

23  panel.  There's no provision for providing a copy

24  to opposing counsel.

1          CHAIRMAN GIACOMARRA:  The panel makes

2    a decision what the official record is, whether

3    it would be the tapes or the stenographer.

4          MR. CORBETT:  Yes.

5          CHAIRMAN GIACOMARRA:  We can take that

6    into consideration in making our decision.

7          MR. CORBETT:  Yes, sir.

8          CHAIRMAN GIACOMARRA:  Mr. Ross?

9          MR. ROSS:  Our position was, as each

10   party who provides something to the panel has to

11   similarly provide it to the other side, in

12   accordance with the Code, and we've cited the

13   relevant section, it enables you, empowers you to

14   say that what is provided to you similarly should

15   be provided to us.  Based upon that, we don't

16   object.  If they're not going to provide a copy

17   of it to us, we obviously would object to the

18   transcript.

19          MR. CORBETT:  They have the ability to

20   obtain a copy of the transcript from Ms.

21   Hennessey; they just have to pay a fee.

22          CHAIRMAN GIACOMARRA:  Right.  But they

23   did not agree to hold it, to hiring her.

24          MR. CORBETT:  No.

10

1          CHAIRMAN GIACOMARRA:  That was only at

2    your unilateral request.

3          MR. CORBETT:  The rule doesn't require

4    they agree.

5          CHAIRMAN GIACOMARRA:  Could I see the

6    rule again, please.

7          MR. CORBETT:  Sure.   It's tab 1,

8    10326.

9          (Document exhibited to the panel.)

10          CHAIRMAN GIACOMARRA:  I'm going to ask

11    everyone to leave the room while we go into

12    executive session.

13          MR. CORBETT:  I also have a copy of my

14    motion if you would like a copy of that.

15          CHAIRMAN GIACOMARRA:  Sure.

16          MR. ROSS:  I assume you'd like a copy

17    of the opposition, then, too.

18          CHAIRMAN GIACOMARRA:  Sure.  I was

19    expecting to get both.

20          MR. ROSS:  If you don't mind, I have

21    one copy, that has the FedEx attached to it, just

22    for your perusal, and I'll try to get you another

23    copy.  Is that okay, Mr. Chairman?

24          (Documents exhibited to the panel.)

1          CHAIRMAN GIACOMARRA:  Okay.

2          (Brief recess.)

3          CHAIRMAN GIACOMARRA:  The panel has

4   reviewed the matter and will grant the

5   respondents' motion to allow stenographic

6   transcription of the hearing, so the stenographer

7   will become the official record.  So the

8   stenographer will become the official record for

9   the hearings instead of the tapes.  The

10  respondent is responsible to provide a transcript

11  to the NASD.  If the claimant wishes a

12  transcript, it would be at their own cost, as the

13  rules provide.

14          MR. CORBETT:  Thank you, Mr. Chairman.

15          CHAIRMAN GIACOMARRA:  So you can take

16  your motions.

17          Let's see where we are here.  Okay.

18  To continue on with the -- you can end the tape

19  now.

20          MR. ROSS:  Well, actually, just as a

21  matter of -- I don't really care, but I'm not

22  sure if you're allowed to usurp the official

23  record.

24          CHAIRMAN GIACOMARRA:  This becomes the

1  official record, the stenographer.

2          MR. ROSS:  Okay.  If that's your

3  ruling, that's fine.  I thought at the NASD as a

4  matter of course the tapes are the official

5  record.

6          CHAIRMAN GIACOMARRA:  Unless there is

7  a stenographer.

8          MR. ROSS:  That's fine.

9          CHAIRMAN GIACOMARRA:  Would you like

10  to see the rule?

11          MR. ROSS:  That's fine.  You've

12  already ruled, I beg your pardon, let's move

13  forward.  Thank you.

14          CHAIRMAN GIACOMARRA:  Okay.  This

15  controversy has been submitted to this panel of

16  arbitrators for hearing in accordance with the

17  Code of Arbitration Procedure.  The panel is

18  authorized to determine each of the matters set

19  forth in the statements submitted and filed with

20  NASD Dispute Resolution unless the law directs

21  otherwise.  All awards rendered pursuant to the

22  code will be final and not subject to appeal.

23          It is suggested that no interruptions

24  be made during an individual's testimony.

13

1  Parties are entitled to make objections,

2  cross-examine and redirect witnesses; and may, in

3  the discretion of the arbitrators, present

4  rebuttal testimony.  The arbitrators may ask

5  questions if they deem, as they deem appropriate.

6           The submittal of this matter to

7  arbitration will not preclude any right of the

8  Association that would otherwise be authorized to

9  adopt, administer or enforce.

10          If any matter comes to the attention

11  of this panel during or in connection with this

12  panel's participation in this proceeding, either

13  from the record or from material or

14  communications related to this proceeding, that

15  this panel has reason to believe may constitute a

16  violation of the Association's rules or the

17  federal securities laws, this panel may initiate

18  a referral of the matter to the Association for

19  disciplinary investigation.  If we make any such

20  referral, it will only be initiated after this

21  dispute has been either settled or otherwise

22  disposed of after a final award has been

23  rendered.

24          We have not been selected to serve

1   as -- we have been selected to serve as neutral

2   arbitrators and to hear this and decide this

3   matter.  We are not NASD Dispute Resolution

4   employees.  Pursuant to Canon 1 of the ABA AAA

5   Code of Ethics for Commercial Arbitrators, we as

6   neutral arbitrators have the duty of conducting

7   these proceedings with fairness and integrity.

8   This duty extends to all parties and to this

9   process, and therefore on behalf of the panel, I

10   respectfully request that all parties and their

11   counsel or representatives refrain from engaging

12   in any conversations or contact with the members

13   of this panel except while in this room and in

14   the presence of all parties, counsel or

15   representatives.  Thank you for your anticipated

16   cooperation.

17          At this time, just to go on the

18   record, this matter is NSAD Dispute Resolution

19   arbitration number 04-03793, Kashner Davidson

20   Securities Corporation versus Steven Mscisz, Mark

21   Mscisz and Lynda Mscisz versus Victor Kashner, et

22   al.

23          At this time we would like to swear in

24   the witnesses and we'll go around the room for

1  each witness.  Mr. Ross?

2       MR. ROSS:  Before we do that, the

3   caption actually is just Kashner Davidson versus

4   Steven Mscisz, Mark Mscisz and Lynda Mscisz.  You

5   had referenced the second part --

6       CHAIRMAN GIACOMARRA:  Correct.

7       MR. ROSS:   -- when you were conveying

8   it, Victor Kashner, Matthew Meister --

9       MR. CORBETT:  That's not entirely

10  accurate because they remain parties until

11  there's a final award.  There's also a question

12  that I wanted to take up with you concerning that

13  dismissal with prejudice of the counterclaims

14  because I don't see where in the code that was

15  authorized to be with prejudice.  Rule 10305

16  allows dismissal with prejudice --

17       CHAIRMAN GIACOMARRA:  Hold on.  You're

18  getting ahead of yourself here.

19       As to Mr. Ross's point, I agree that

20  has been dismissed, so it should be removed from

21  the case name.

22       Mr. Corbett, you're questioning my

23  ruling at this time?

24       MR. CORBETT:  It's one of the things

16

1  that I wanted to take up before we even began

2  today.

3       CHAIRMAN GIACOMARRA:  Well, why don't

4  we go through the process, and about two or three

5  items down we get to other matters.

6       MR. CORBETT:  Okay.

7       CHAIRMAN GIACOMARRA:  If we could

8  address it at that point.

9       MR. CORBETT:  Certainly.

10       CHAIRMAN GIACOMARRA:  Okay.  So at

11  this point I'd like to follow the script, which

12  includes administering oaths to witnesses.  So,

13  Mr. Ross, what witnesses do you have here today?

14       MR. ROSS:  I have Mr. Varchetto and we

15  might as well swear in Ms. Rothenbach as well.

16       CHAIRMAN GIACOMARRA:  So Ms.

17  Rothenbach, could you please state your name,

18  address and business affiliation?

19       MS. ROTHENBACH:  Melissa Rothenbach,

20  address is 1826 Kinsdown Drive, Sarasota,

21  Florida, 34240, and I'm employed by Kashner

22  Davidson Securities.

23       (Ms. Rothenbach sworn.)

24       CHAIRMAN GIACOMARRA:  And, Mr.

1   Varchetto, could I get your full name, please?

2       MR. VARCHETTO:  Timothy W. Varchetto,

3   3437 Whispering Woods Place, Sarasota, Florida,

4   also an employee of Kashner Davidson.

5       CHAIRMAN GIACOMARRA:  Mr. Corbett,

6   your witnesses?

7       MR. CORBETT:  Steve and Mark Mscisz

8   and perhaps Lynda Mscisz may be joining us this

9   afternoon.

10      (Mr. Varchetto sworn.)

11      CHAIRMAN GIACOMARRA:  Could you state

12  your name, Mr. Steve Mscisz?

13      STEVEN MSCISZ:  Steven Mscisz, 22 High

14  Street, Topsfield, Mass.

15      CHAIRMAN GIACOMARRA:  And your

16  business affiliation at present?

17      STEVEN MSCISZ:  North Shore Burial

18  Vault Company.

19      (Steven Mscisz sworn.)

20      CHAIRMAN GIACOMARRA:  And Mr. Mark

21  Mscisz.

22      MARK MSCISZ:  Mark Mscisz, 22 High

23  Street, Topsfield, Mass., same affiliation, North

24  Shore Burial Vault Company.

18

1          (Mark Mscisz sworn.)

2          CHAIRMAN GIACOMARRA:  We have no other

3   witnesses to swear in at this point?

4          MR. CORBETT:  Not at this point.

5          CHAIRMAN GIACOMARRA:  Thank you.  The

6   arbitrators have read the papers that have been

7   submitted by the parties.  These papers, along

8   with the executed submission agreements, will be

9   marked and received into evidence as arbitrators

10  Exhibit 1.  We have the statement of claim, we

11  have the answer, affirmative defense and

12  statement of counterclaims and third-party claims

13  of Steven Mscisz, Mark Mscisz and Lynda Mscisz,

14  and submission agreements and the reply and

15  answer of third-party respondents.

16          Now we come to the other open matters

17  at this time; and, Mr. Corbett, we can deal with

18  your issue now.  I know I made a ruling after

19  consulting with the panel that the counterclaims

20  were dismissed with prejudice.

21          MR. CORBETT:  Yes, sir.

22          CHAIRMAN GIACOMARRA:  And you seem to

23  have a problem with that?

24          MR. CORBETT:  I do because that was

19

1  beyond the authority of the panel under the

2  dismissal rule of the Code.  Rule 10305 of the

3  Code allows dismissal under three circumstances:

4  You can dismiss an entire proceeding with the

5  agreement of the parties; you can dismiss the

6  claims at issue without prejudice at the request

7   of the parties, which is what we had requested;

8  or you can dismiss claims with prejudice, but

9  only after, as a sanction, when other sanctions

10  have proven ineffective for eliminating willful

11  disobedience with panel authority.

12        There's never been a finding of

13  willful disobedience of a panel order by the

14  Msciszes, there's never been a sanction assessed

15  against them, and this was not phrased in terms

16  of a sanction either.

17        CHAIRMAN GIACOMARRA:  I think you're

18  missing the point.  I think we do have authority

19  beyond what you've quoted, and that was what our

20  ruling was based on.  It was after thoughtful

21  consideration that the panel reviewed that and

22  made that ruling.  So we feel we do have

23  authority.

24        MR. CORBETT:  Did the panel consider

20

1   the merits of the counterclaim?

2          CHAIRMAN GIACOMARRA:  We did.

3          MR. CORBETT:  When?  They weren't

4   briefed, they weren't argued.  I never had an

5   opportunity --

6          CHAIRMAN GIACOMARRA:  We had the claim

7   in front of us, but we had -- we'll go off the

8   record, take an executive session for a moment

9   here, and if you could leave the room again.

10         (Brief recess.)

11         CHAIRMAN GIACOMARRA:  We're going back

12  on the record.  After review of the matter, the

13  panel is upholding their decision of dismissing

14  the counterclaims with prejudice.  We feel it's

15  within our rights under rule 1035 -- 10305.

16         MR. CORBETT:  Okay.

17         CHAIRMAN GIACOMARRA:  Okay.  Any other

18  matters at this point?

19         MR. CORBETT:  Yes, Mr. Chairman.

20  First I want to note my objection for the record

21  to the ruling on the dismissal with prejudice,

22  but there are also a couple of outstanding

23  discovery motions that we filed on February 24

24  that still have not been ruled upon.  One had

1   asked the claimant to comply with your order and

2   fully provide all the information that you had

3   ordered them to produce, and the other had asked

4   for reconsideration of the order compelling the

5   Msciszes to produce information with respect to

6   some limited areas of the order.

7           I don't know if you want to set those

8   aside, we're kind of a day late and a dollar

9   short for dealing with discovery issues.  I had

10  asked for a pre-hearing conference last week; I

11  guess that request never made it to you from the

12  NASD.

13          CHAIRMAN GIACOMARRA:  This is February

14  24?

15          MR. CORBETT:  Yes, the motion of

16  Steven Mscisz, Mark Mscisz and Lynda Mscisz to

17  compel compliance with discovery order and

18  sanctions, and there was the motion for

19  reconsideration of orders on discovery motions.

20  I've got copies if you want to take a look at

21  them.

22          (Documents exhibited to the panel.)

23          CHAIRMAN GIACOMARRA:  You're asking us

24  to rule on these today?

1          MR. CORBETT:  Yes, but I don't see

2   what practical effect it will have.  It's a

3   little bit untimely in terms of discovery.

4          CHAIRMAN GIACOMARRA:  Do you have

5   other copies of these?

6          MR. CORBETT:  I have my own copy.

7          CHAIRMAN GIACOMARRA:  Have you

8   received, Mr. Ross, have you received copies of

9   these?

10         MR. ROSS:  Yes, sir, and they were

11  ruled on by -- yes, I have.  And as to the

12   discovery, you had ruled on it, and you had

13  addressed the reconsideration motion during one

14  of the conference calls with the parties.

15         CHAIRMAN GIACOMARRA:  I recall that.

16  Is this post -- is this subsequent to that call?

17         MR. ROSS:  His motion -- the written

18  motion?

19         CHAIRMAN GIACOMARRA:  Uh-huh.

20         MR. CORBETT:  I believe you had

21  addressed the reconsideration of the motion to

22  disqualify Mr. Ross and his colleagues.  You

23  didn't address the motion for reconsideration of

24  the discovery.  The only post-order discovery

1  discussion we had was when you said that you were

2  denying all requests for sanctions.  But in terms

3  of the substance of the discovery order and the

4  substance of the discovery motions, you did not

5  rule.

6          MR. ROSS:  If it will help your

7  recollection, might I?  During that call, the

8  issue -- and I don't recall as I'm sitting here

9  the timing for that, but my recollection is he

10  had asked for the reconsideration, it was another

11  multiple reconsideration issue, and one of them

12  was for discovery, and some of which you gave us

13  the opportunity to reply to and one of which you

14  said you don't need to reply to it, I've been

15  through this before.  That addressed the issue as

16  to discovery.

17          The issue as to disqualifying my firm

18  was addressed by you, and I assume by now you're

19  all aware of the procedural history as to why I

20  am sitting here.  May I assume that?

21          CHAIRMAN GIACOMARRA:  Yes.

22          MR. ROSS:  Okay.  Thank you.  So you

23  did rule on both of those points.  And then

24  subsequent to your order dismissing the

24

1    counterclaims, obviously less issues were germane

2    to the case because it was no longer a ten

3    counterclaim case, where now it was just, and we

4    sent in numerous submissions to you, just a debit

5    case, how much is owed on the debit to the firm.

6    So you did address those, there are papers to

7    that effect as well, and it's curious to me that

8    apparently by his own admission several months

9    later the motions are brought up now on the

10    hearing, not even the eve of hearing.

11        MR. CORBETT:  That was also a motion

12    that was identified in last week's request for a

13    pre-hearing conference.  It's not like this is

14    being dropped on you at the last minute.

15        MR. ROSS:  I think it's been addressed

16    by the panel.

17        MR. CORBETT:  I've also got a copy of

18    the request for the pre-hearing conference if

19    you'd like to see that.

20        MR. ROSS:  If you want to look at it,

21    here's one of the oppositions to the motions that

22    we had submitted.  I don't know if that helps

23    you.

24        CHAIRMAN GIACOMARRA:  The panel will

1  note your motions for the record for the

2  discovery issues, take that into consideration

3  when they're deliberating, but I don't think

4  anything beyond that is appropriate at this time.

5  If we could get copies of these.

6          MR. CORBETT:  You can keep those

7  copies.  And if the panel is inclined to allow

8  those motions, may I suggest --

9          CHAIRMAN GIACOMARRA:  They're not

10  inclined.

11         MR. CORBETT:  I'm saying after

12  consideration of the merits, if the panel decides

13  this information that's identified in these

14  papers, I just ask we be allowed to reopen and

15  adduce the evidence that would have been allowed

16  if those motions had been granted.

17         CHAIRMAN GIACOMARRA:  The panel has

18  wide latitude on what to do for discovery issues,

19  and I've given you my ruling.

20         MR. CORBETT:  Thank you.

21         MR. ROSS:  May I make one comment, if

22  you please.  Since we have in the record, and I

23  assume it's already part of the record, but in

24  connection with the ruling, I would like to just

1   state for the record that not only did you have

2   discretion to do what you did with regard to

3   dismissing the claim under 10305, but we cited in

4   the papers that you also have additional

5   discretion under Section 10324 which talks about

6   exactly what the chairman just said:  "The

7   arbitrators shall be empowered to interpret and

8   determine the applicability of all provisions

9   under this Code and to take appropriate action to

10  obtain compliance with any ruling by the

11  arbitrators.  Such interpretations and actions to

12  obtain compliance shall be final and binding upon

13  the parties."  I just wanted to amplify the

14  record that you also have authority to issue your

15  prior ruling under that section as well, in our

16  opinion.

17         CHAIRMAN GIACOMARRA:  Okay.  Thank

18  you.  Do you have any other matters before we

19  move on with the hearing?

20         MR. ROSS:  No, sir.

21         CHAIRMAN GIACOMARRA:  Okay.  Do you

22  have anything else, Mr. Corbett?

23         MR. CORBETT:  No, sir.

24         CHAIRMAN GIACOMARRA:  Thank you.

1        As part of NASD Dispute Resolution's

2    ongoing effort to improve the arbitration

3    process, each party or representative will be

4    asked to voluntarily complete an evaluation

5    concerning this arbitration.  You'll be provided

6    with an opportunity to complete the evaluation at

7    the conclusion of the final hearing.

8        Now we'll move on to opening

9    statements.  Each party may make an opening

10   statement; it should be limited to what the party

11   intends to prove and not be a presentation of

12   evidence or the merits of the case.

13        Expected conduct:  All parties are

14   expected to act in a civil manner at all times.

15   Parties and attorneys are requested to be on time

16   for all sessions and to limit breaks to the time

17   allotted.  Parties and attorneys are responsible

18   for providing copies of all proposed exhibits to

19   all other parties and to the panel.  Parties are

20   encouraged to avoid repetitive arguments.

21   Parties and counsel must direct all objections

22    and motions to the panel and not to each other.

23        At this time the parties will now

24   proceed with their opening statements beginning

1   with the claimant, Mr. Ross.

2        MR. ROSS:  Thank you.  Good morning,

3   gentlemen.  I am here on behalf of Kashner

4   Davidson Securities, and I'm here to try a debit

5   claim.  I'm here to try a simple collection case,

6   straightforward, not complicated.  I should be

7   done in my presentation of facts, certainly

8   several hours I hope to be done with my case.

9        I assume my adversary will attempt to

10  try a very different case, as he has throughout

11  the course of this proceeding and try to bring up

12  matters that aren't really before you and have

13  been ruled on by you, and sought to have me

14  removed as counsel, he sought to challenge each

15  ruling, to re-challenge each ruling, and this

16  morning to re-challenge the reconsideration of

17  each ruling.  But I encourage the panel and I

18  know the panel will focus on the actual issue

19  that is before you today, which is:  How much

20  money is Kashner Davidson Securities Corporation

21  owed in connection with an unsatisfied debit

22  balance created by these two individuals.  That's

23  the case.  That's the only issue before you, and

24  we'll stay focused on that and I hope we will, we

1   can finish it soon.

2          The facts of the case are very simple,

3   very straightforward.  Mark and Steven Mscisz

4   opened up an account at Kashner Davidson

5   Securities, a discount brokerage dealer.  Mark

6   and Steven Mscisz's brother John Mscisz was the

7   president and CEO of VasoActive.  VasoActive was

8   going public through an initial public offering

9   in the end of '03, and these gentlemen invested

10  in the initial public offering.

11         The stock started to go up, and these

12  gentlemen thereafter opened a margin account at

13  Kashner Davidson, and the margin agreement will

14  be in evidence and makes it clear, and everybody

15  understands what a margin is and the effects of

16  the margin, and they bought more stock.  At first

17  they bought, and the evidence will prove to you

18  and demonstrate to you, and I don't think it's in

19  dispute, that in December of '03, they purchased

20  an amount in the initial public offering.

21  Thereafter in February of '04, when the stock had

22  gone up to $15, a three-fold increase, they

23  bought more stock on margin.

24         Later in the month of February, the

1    stock had gone up to $30, a six-fold increase in

2    approximately two and a half months.  Everything

3    was fine.

4         What happened in April 1 of 2004 is

5    the SEC suspended trading in connection with the

6    VasoActive stock.  The SEC alleged that there was

7    misrepresentations made by the company,

8    VasoActive, and the president of the company,

9    John Mscisz, these gentlemen's brother.

10         As a result, these people had been

11   heavily margined at the time because of the

12   purchases they made.  Each purchase was

13   unsolicited.  These gentlemen called into the

14   broker at Kashner Davidson and said, "buy me

15   more," and the stock was going up so it certainly

16   made sense.

17         The stock ceased trading.  A margin

18   call was generated by the clearing firm.  The

19   clearing firm had sent out the margin call on

20   April 1, the same day that the trading was

21   halted.  The margin call notice to both these

22   gentlemen said, You need to send in several

23   hundred thousand dollars on or before April 8 or

24   we, being at that time the clearing firm, in

1   coordination with the brokerage firm will

2   undertake actions that they're entitled to do.

3        Mark Mscisz, in satisfaction and

4   acknowledgment of that margin notice, on April 7

5   wired in $100,000 to his Kashner Davidson

6   account.  Steven Mscisz did not wire in any

7   money.

8        The stock dropped once the trading was

9   resumed to approximately under a dollar, to 50

10  cents.  The clearing firm, on its own accord,

11  after having the unsatisfied debit in the account

12  for several months, in June and July began

13  liquidating out the position in the account.

14  That, in each of their accounts, resulted in a

15  debit balance, an unsatisfied debit balance of

16  approximately $180,000 which comes to a total of

17  approximately $360,000.

18        Under the margin agreement, the

19  claimants are responsible for all costs

20  associated in connection with the collection

21  efforts of that debit, in this case, SAL or

22  Sterne, Agee, Leach is the clearing firm.  They

23  had taken the money from Kashner Davidson

24  Securities, $360,000 out of Kashner Davidson

1  Securities' account and froze it for their

2  benefit.  Now the obligation belongs to Kashner

3   Davidson, who is here to enforce those debits in

4  the tune of $360,000, approximately, plus the

5  cost of collection.  That's the case.  Thank you

6  very much.

7      CHAIRMAN GIACOMARRA:  Mr. Corbett?

8      MR. CORBETT:  Mr. Chairman, I agree

9   with Mr. Ross.  This case is about how much money

10  is Kashner Davidson owed.  But we have a very

11  different understanding of what that figure is,

12  because the figure is zero.

13      There are four theories of liability

14  that the claimant has asserted in this case:

15  They've asserted a breach of contract; they've

16  asserted an open account; they've asserted money

17  lent, whatever that is; and they've asserted

18  fraud by Mark and Lynda Mscisz.  And for each of

19  those theories, there are essential elements that

20  you will not hear any evidence to support in the

21  course of Mr. Ross's presentation.

22      In fact, if this were proceeding in

23  court, this would have been a summary judgment

24  case because there's a complete failure of proof

1   with respect to the elements of the claims that

2   are going to be pursued by Kashner Davidson.

3         The first is the contract claim.  They

4   very summarily asserted that there's a contract

5   between Kashner David and the Msciszes concerning

6   a margin obligation.  In their pleading,

7   paragraphs 18 and 19, they draw you into

8   paragraphs 6 and 15 of the client account

9   agreement.  And instead of using the language

10  that's in the client account agreement, they use

11  a bracket and insert "KDSC or SAL."  And we'll

12  see when we go through the evidence, that's not

13  what the language says.

14        The actual agreement, and that's

15  appended to the statement of claim, they're

16  identical, I think it's Exhibits 1 and 2 to the

17  statement of claim, uses the word "you."  "I

18  authorize you to take steps to minimize your

19  losses."  It refers to "the account I have with

20  you."  It refers to "the indebtedness owed to you

21  by me."  "I agree to reimburse you for all costs

22  associated with the collection."  "Each of us" --

23  this is Paragraph 15 -- "will be fully liable for

24  any amounts due you under this agreement."  This

34

 1   is what the evidence is going to show.

 2          Now, this all comes down to the

 3   definition of the word "you."  And the words

 4   "you" and "your" refer to Sterne, Agee & Leach,

 5   the clearing firm, and not to Kashner Davidson.

 6   And that authorized agent's phrase, that doesn't

 7   extend to Kashner Davidson, either, because the

 8   agreement expressly says that "my broker dealer

 9   is not an agent of Sterne, Agee & Leach," nor was

10   there any money lent by Kashner Davidson, and I

11   think that even came out in Mr. Ross's opening

12   statement.  The money that was lent in the course

13   of this securities relationship was lent by

14   Sterne, Agee, and Kashner Davidson certainly

15   appreciates that in their own compliance manual.

16          Well, first of all, back to the

17   contract.  It refers to the indebtedness to SAL

18   and the security interest, not to an indebtedness

19   to KDSC.  The contract itself says that margin

20   transactions normally involve the extension of

21   credit made by Sterne, Agee & Leach, not Kashner

22   Davidson.  Again, "your account will be charged

23   interest on any extension of credit to you by

24   Sterne, Agee."

1          When you look, and you'll hear

2   testimony concerning their compliance manual, and

3   that also evidences that Kashner Davidson

4   understands that the extension of credit was by

5   Sterne, Agee, the clearing firm, and not by

6   Kashner Davidson Securities.

7          Nor was there an open book account.

8   That's a creature of Alabama law, which governs

9   this particular transaction according to the

10   client account agreement.  And that would require

11   several elements that I'll discuss in more detail

12   during my closing argument, but suffice it to say

13   that it works, an open book account under Alabama

14   law is essentially a post-transaction promissory

15   note where there is a meeting of the minds as to

16   what amount is owed by person A to person B.  And

17   here there was no meeting of the minds as to

18   whether anything was owed to Kashner Davidson,

19   period, nor was there ever any statement rendered

20   that set forth what was allegedly owed by

21   Kashner, to Kashner Davidson by Steven, Mark and

22   Lynda Mscisz, nor was there any acknowledgment

23   that that statement, which doesn't exist, was

24    accurate.  And you'll hear testimony to that

1   effect during the course of this arbitration.

2          Finally you've got this fraud claim,

3   Count 4 of the complaint.  And regardless of the

4   state's laws that govern this tort-based claim,

5   whether it's Massachusetts, which I think would

6   control, Alabama, which governs the agreement, or

7   Florida, for some reason, which I know Mr. Ross

8   represented to the SJC would govern this fraud

9   claim, the elements are essentially the same, and

10   three of those four elements will not have any

11   evidence supporting them in the course of this

12   arbitration.

13          First, the financial statement that I

14   don't think was even mentioned in Mr. Ross's

15   opening, but it is one of their theories of

16   liability, was not material to the transaction.

17   The financial statement at issue was only

18   submitted by Mark Mscisz, and for an equivalent

19   amount of margin credit, Steven Mscisz wasn't

20   even required to submit it.  It certainly wasn't

21   material to the decision as to whether that

22   credit was going to be extended or not because

23   you have identical situations with virtually

24   identical trading positions, one submitted the

1    agreement, one did not.

2         Second of all, there was no reliance

3    on the margin, on the personal financial

4    statement.

5         The margin account agreement was

6    established on February 12, 2004, and there was

7    no personal financial statement in the file at

8    that point.  That wasn't submitted until March 29

9    of 2004.  And between those two dates, they

10   purchased 3,000 shares on February 13, 2000

11   shares on February 20, 1,000 shares on February

12   20, another 1,000 shares on February 23, 1,000

13   shares on March 3, 3,000 shares on March 5, 5,000

14   shares on March 10, 10,000 shares on March 10,

15   7500 shares on March 10 -- this was all before

16   the financial statement was executed -- another

17   3,000 on March 11, another 2500 on March 11,

18   another 2,000 shares on March 11, another 4,000

19   shares on March 26, and another 5,000 shares on

20   March 26.  Three days later, the financial

21   statement was submitted, and after that financial

22   statement was submitted, do you know how many

23   shares were purchased on margin or sold on

24   margin?  Zero.  There wasn't a single long

1   transaction after that personal financial

2   statement was submitted.

3        What these guys have done, Kashner

4   Davidson, in an effort to bootstrap a claim that

5   they don't have a contractual right to, is

6   essentially accuse Mark and Lynda Mscisz of

7   criminal violation of the federal securities laws

8   when there's no basis whatsoever for it.  It's

9   not just unsupported in the law, it's offensive.

10        I've gone through what the evidence is

11  not going to show in the course of this

12  arbitration.  What the evidence will show, I'm

13  largely constrained by the discovery order and

14  the ruling on the counterclaims where I'm not

15  going to be able to make an affirmative

16  presentation, but based upon the

17  cross-examination of Ms. Rothenbach and Mr.

18  Varchetto, and to the extent that's supplemented

19  by the two Msciszes brothers, I'm confident that

20  at the end of the day, the panel will have no

21  choice but to come back with an award that awards

22  zero to Kashner Davidson Securities.

23        CHAIRMAN GIACOMARRA:  Thank you.  The

24  parties will now present their evidence,

1   beginning with the claimant.

2        MR. ROSS:  I guess claimant calls Mark

3   Mscisz.

4        CHAIRMAN GIACOMARRA:  You've already

5   been sworn in.  So you can -- it's your witness.

6        MR. ROSS:  Thank you.  I guess to move

7   it along, I'll just -- we have exhibit books

8   which I'll pass out to the panel, and I have a

9   copy for the witness as well as a copy for

10  counsel.

11       MR. CORBETT:  I've got exhibit books

12  as well.

13       CHAIRMAN GIACOMARRA:  Do you want to

14  wait until your case?

15       MR. CORBETT:  Might as well have it

16  just to save the time.

17       (Documents exhibited to panel.)

18       MR. ROSS:  If you would be kind enough

19  to hand that to your client.

20       MR. CORBETT:  Sure.

21       MR. ROSS:  And in answer to everyone's

22  question, yes, I know there are blanks on the

23  cover sheet in terms of the exhibits listed, and

24  I don't anticipate using all those documents in

1    evidence or introducing all those documents into

2    evidence, so what I will do is as we discuss it,

3    I'll seek to have it admitted at that point in

4    time.

5         CHAIRMAN GIACOMARRA:  Okay.

6         MR. ROSS:  I'm sorry, which one is

7    Mark?

8         MARK MSCISZ, Sworn.

9         DIRECT EXAMINATION

10    BY MR. ROSS:

11    Q.  Good morning, sir.

12    A.  Good morning.

13    Q.  May I just ask what else you have in front of you

14       other than the exhibit book?

15    A.  A pad of paper and actually some of the

16       settlement statements which are probably in your

17       evidence book here.

18         MR. ROSS:  If it's okay with the

19       panel, I'd rather him focus on the book right now

20       as opposed to other documents and other notations

21       that he may have.

22    Q.  So there's nothing on that pad on the top page?

23    A.  No.

24    Q.  I'm sorry?

1  A.  Here, just notes.

2  Q.  Thank you very much.

3       MR. ROSS:  I should have directed it

4    to the panel.  I beg your pardon.  Is that okay?

5       CHAIRMAN GIACOMARRA:  That's fine.

6  Q.  You're married to Lynda?

7  A.  Correct.

8  Q.  You and Lynda opened up a joint account at

9    Kashner Davidson Securities?

10  A.  We did.

11  Q.  And in connection with that account, you

12    purchased VasoActive stock?

13  A.  Yes.

14  Q.  And your brother John, do you know who he is?

15  A.  Yes.

16  Q.  Do you have a brother John?

17  A.  I do.

18  Q.  He was president and CEO of VasoActive?

19  A.  Yes.

20  Q.  And VasoActive was an IPO?

21  A.  Yes.

22  Q.  Do you know what an IPO is?

23  A.  Yes.

24  Q.  And the IPO, Kashner Davidson Securities was the

1      underwriter?

2  A.  Yes.

3  Q.  You knew that when you opened the account at

4      Kashner Davidson?

5  A.  Yes.

6  Q.  And in connection with that account, you

7      purchased VasoActive stock?

8  A.  Correct, yes.

9  Q.  Correct?  You purchased no other stock?

10  A.  Correct.

11  Q.  You sold -- well, withdraw that.

12            If you would turn to tab No. 14 in the

13      book in front of you, you recognize that

14      document; is that correct?

15  A.  Yes.

16  Q.  That's a new account form from Kashner Davidson

17      Securities?

18  A.  Yes.

19  Q.  And on the bottom left-hand side, that's your

20      signature?

21  A.  Yes.

22  Q.  And Mark Mscisz, that's your name --

23  A.  Correct.

24  Q.  -- on the top?

1           And Lynda Mscisz is your wife?

2  A.  Yes.

3  Q.  And the date of birth and the information

4     contained in there is accurate to the best of

5     your recollection?

6  A.  Yes.

7  Q.  And going back to the bottom of that document on

8     the right-hand side it says, "joint account"?

9           (Cell phone rings.)

10          MR. CORBETT:  I apologize.

11  Q.  On the bottom right-hand side it says "joint

12     account holder" and Lynda, it seems to be Lynda

13     Mscisz, do you see that?

14  A.  Yes.

15  Q.  And that's her signature?

16  A.  No.

17  Q.  Did you sign her name?

18  A.  Yes.

19  Q.  Did she authorize you to sign her name?

20  A.  She knew that the account was being opened.

21  Q.  Did she authorize you to sign her name?

22  A.  No.

23  Q.  You didn't tell anyone at Kashner Davidson that

24     you had signed your wife's name; is that correct?

1  A.  Yes, yes.

2  Q.  I'm sorry?

3  A.  Yes.

4  Q.  Now, if you turn to the second page of exhibit

5    tab No. 14, bottom left-hand side, that's your

6    signature?

7  A.  Yes.

8  Q.  On the right-hand side is your signature or your,

9    you signing your wife's signature?

10  A.  Yes.

11  Q.  And you completed this document in connection

12    with opening your account at Kashner Davidson,

13    correct?

14  A.  Yes.

15  Q.  You completed this document on or about November

16    14, 2003?

17  A.  Yes.

18        MR. ROSS:  I seek to have this

19    document admitted into evidence.

20        MR. CORBETT:  No objection.

21        CHAIRMAN GIACOMARRA:  So ruled.  Tab

22    14.

23        (Document marked as Exhibit C14.)

24  Q.  You had expressed an interest in purchasing 2,000

1    shares of VasoActive in the IPO, do you recall

2    that?

3  A.  Yes.

4  Q.  On the top right-hand side of Exhibit No. 14 in

5    evidence now, it says, "IOI 2000 VAPH."  I don't

6    know if you know what that stands for, IOI?

7  A.  I don't.

8  Q.  But if I represented to you it stood for

9    indication of interest, that comports with your

10    recollection that you had indicated an interest

11    to buy 2,000 shares of VasoActive?

12  A.  What's the question again?

13  Q.  I'll withdraw the question and move along.  Thank

14    you.

15        The VasoActive registration for the

16    initial public offering became effective on

17    December 10, 2003.  Do you recall that?

18  A.  I don't remember the exact date.

19  Q.  If you would turn, if you please, to tab No. 16.

20    And that's a confirmation, yes?

21  A.  Yes.

22  Q.  You know what a confirmation is?

23  A.  Yes.

24  Q.  You've received confirmations in the mail, yes?

1  A.  Yes.

2  Q.  It says "execute" -- it talks about 2,000 shares

3      of VasoActive Pharmaceuticals, Inc., do you see

4      that?

5  A.  Yes.

6  Q.  And the price of VasoActive in the initial public

7      offering was $5; does that comport with your

8      recollection?

9  A.  Yes.

10 Q.  To the right of that it says, "execute on this

11     date, December 10, 2003."  Do you recall that

12     that's the date in which it became effective and

13     you purchased the stock?

14 A.  I mean, I see it here, so yes.

15 Q.  Do you have any reason to doubt that?

16 A.  No.

17 Q.  Prior to the effectiveness of the IPO of

18     VasoActive, you had sent money in to fund the

19     account; is that correct, at Kashner Davidson?

20 A.  Yes.

21 Q.  If you turn to tab No. 15 under the book in front

22     of you, is this the money that you sent in to

23     fund the account prior to the effectiveness of

24     the initial public offering?

1  A.  To sell, yes.

2  Q.  I'm sorry, the question was, is this the money

3     you sent in to fund the initial public offering

4     of VasoActive, the 2,000 shares you said you

5     wanted to buy at $5?

6  A.  Yes, and it was sent to SAL, yes.

7          MR. ROSS:  I'd like to have this

8     admitted into evidence, Exhibit 15.

9          MR. CORBETT:  No objection.

10         (Document marked as Exhibit C15.)

11         CHAIRMAN GIACOMARRA:  What about tab

12    16?

13         MR. ROSS:  I'm going to come right

14    back to that.  Thank you very much.

15  Q.  Actually, you know what a red herring is, right?

16  A.  No.

17  Q.  Do you know what a preliminary prospectus is?

18  A.  Yes.

19  Q.  It's sometimes called a red herring, I beg your

20    pardon.  I'm referring to a preliminary

21    prospectus.  If you turn to tab No. 2 in the

22    book, this is what I call a red herring, but what

23    you call a preliminary prospectus.  Do you

24    recognize this document?

1  A.  Yes.

2  Q.  This is a preliminary prospectus that was sent

3     out as it relates to the VasoActive IPO, yes?

4  A.  Yes.

5  Q.  You received a copy of this?

6  A.  No.

7  Q.  If you turn to tab No. 4.  This is a final

8     prospectus.  Do you see that?

9  A.  Yes.

10  Q.  This is the final prospectus for VasoActive?

11  A.  Yes.

12  Q.  Are you aware -- well, you received a copy of the

13     final prospectus?

14  A.  No.

15  Q.  If you turn to page No. 40 on that tab No. 4

16     under "officers," it says "John J. Mscisz," and

17     it says, "Mr. Mscisz has served as our chief

18     executive officer, president and chairman of the

19     board of directors since our inception."  Is that

20     the John Mscisz, is that your brother?

21  A.  Yes.

22  Q.  Even though he spells the name different, that is

23     your brother?

24  A.  Correct.

1  Q.  If you would turn back to tab No. 16, please.

2              We looked at the first confirmation,

3      do you see that?

4  A.  Yes.

5  Q.  You received a confirmation?

6  A.  Yes.

7  Q.  Do you see underneath the confirmation on the

8      left-hand side, "prospectus mailed under separate

9      cover"?

10  A.  Yes.

11  Q.  Are you aware that in the securities industry,

12      the clearing firm sends out the prospectus in

13      connection with an IPO?

14  A.  Am I aware that that happens?

15  Q.  Yes, sir.

16  A.  No.

17  Q.  It's your testimony as you sit here today that

18      you did not receive the prospectus and it was not

19      mailed to you on December 2?

20  A.  That's correct.

21  Q.  After your initial purchase of 2,000 shares of

22      VasoActive at $5, if you would turn the page, you

23      then purchased additional shares of VasoActive on

24      February 11, 2004; do you see that?

1  A.  Yes.

2  Q.  And that's correct?

3  A.  Yes.

4  Q.  And at this point, two months later, the stock

5    was $14, do you see that?

6  A.  Yes.

7  Q.  If you turn a couple more -- you received a copy

8    of this confirmation?

9  A.  Yes.

10  Q.  To speed things along, I'll represent to you

11    under tab 16 is each confirmation that was sent

12    to you, and I'll ask you if you want to take a

13    look at it, you can, I'll ask if you received

14    each one of those, but I'll ask if you received

15    each one of those?

16  A.  Do you want me to go through each one?

17  Q.  Well, these are the confirmations you received,

18    most of them were produced by you.  I want to see

19    if I can streamline it by saying you received all

20    your confirmations in connection with this

21    action?

22  A.  Right.

23  Q.  You received all the monthly statements which are

24    included under tab 17?

1  A.  Yes.

2          MR. CORBETT:  I object to Mr. Ross's

3      statement that these documents were produced by

4      Mr. Mscisz.  All the documents that were produced

5      by Mr. Mscisz are distinctively Bates numbered.

6      They may resemble documents produced by Mr.

7      Mscisz, but these are not the actual documents.

8          MR. ROSS:  They're indistinguishable

9      except for the Bates numbers, he's right.  For

10     simplicity's sake, I took the records that I had,

11     as opposed to the records he had, but he produced

12     to us in the course of discovery the

13     confirmations and the monthly statements.

14          CHAIRMAN GIACOMARRA:  I'll note the

15     distinction.

16          MR. ROSS:  Thank you.  And I

17     apologize, I didn't mean to suggest otherwise.

18     But thank you for that clarification.

19  Q.  Still on the second confirmation, this was

20     actually -- this was unsolicited, your idea to

21     buy the stock in your brother's company in

22     February 11, 2004?

23  A.  Yes.

24          MR. ROSS:  And if you turn -- I'd like

1    to have all the documents under tab 16 admitted

2    into evidence as well -- well, as well as 17,

3    frankly, since the evidentiary basis has been

4    laid.

5         MR. CORBETT:  No objection.

6         CHAIRMAN GIACOMARRA:  Okay.  We'll

7    admit tab 16 and 17 into evidence.

8         MR. ROSS:  Thank you.

9         (Documents marked as Exhibits C16

10             and C17.)

11   Q.  Now, in March -- in February of 2004, you opened

12       up a margin agreement at Kashner Davidson

13       Securities, excuse me, a margin account at

14       Kashner Davidson Securities?

15   A.  In March or in February?

16   Q.  February.

17   A.  I don't recall the date of when that actually

18       happened.

19   Q.  Okay.  If you would turn to tab No. 20, and so

20       we're all clear, it's entitled Margin Account

21       Agreement, Kashner Davidson Securities.  Do you

22       see that document, sir?

23   A.  Yes.

24   Q.  You received a copy of this document, correct?

1  A.  Yes.

2  Q.  And you understood that this was what it says, a

3     Margin Account Agreement, Kashner Davidson

4     Securities, correct?

5  A.  Yes.

6  Q.  And in fact you signed this document --

7  A.  Yes.

8  Q.  -- if you turn to the third page?

9         MR. CORBETT:  I object to this line of

10    testimony as well because the version of the

11    agreement that you pled and are bound by in this

12    particular arbitration does not contain that

13    "Margin Account Agreement, Kashner Davidson

14    Securities" header at the top.  If you look at

15    your statement of claim, Exhibits 1 and 2, it

16    only says "Client Account Agreement" at the top.

17         CHAIRMAN GIACOMARRA:  I'll let him

18    continue.

19  Q.  Do you see -- well, turn to Page 3 of that

20    document, maybe that will help us along.  Do you

21    see that document?  Do you see that document,

22    Page 3?

23  A.  Yes.

24  Q.  Can you read to the panel what the title of that

1     document says?

2   A.  "Kashner Davidson Securities updated client

3      agreement adding margin to client account."

4   Q.  You saw that document on or about February 12,

5      2004?

6   A.  Yes.

7   Q.  And you had understood in connection with this

8      document that you were opening up a margin

9      account at Kashner Davidson Securities Corp.,

10      correct?

11   A.  Again, I'm not sure of the timing on this, but...

12   Q.  On or about.  I was trying to get the "on or

13      about" --

14   A.  Yeah.

15   Q.  -- so we don't have to wrestle with dates.

16          You signed -- is that your signature

17      on the document?

18   A.  Yes.

19   Q.  And it purports to be dated on February 12

20      of '04?

21   A.  Yes.

22   Q.  Is it fair to say on or about February 12 of '04

23      you signed that document?

24   A.  Yes.

1  Q.  You understood at the time you signed it it was a

2     Kashner Davidson Securities Corp. updated client

3     agreement adding margin to client account?

4  A.  Yes.

5  Q.  Thank you.  That's your signature in the middle

6     where it says "client signature"?

7  A.  Yes.

8  Q.  And that's -- you signed your wife's name in the

9     paragraph, in the line below?

10  A.  Yes.

11  Q.  Did your wife authorize you to sign this?

12  A.  No.

13  Q.  Did your wife know you were signing this?

14  A.  Not at the time, no.

15  Q.  The signature appearing on the bottom of the

16     page, that's your signature, Mark Mscisz?

17  A.  Yes.

18  Q.  That's your signature of your wife?

19  A.  Yes.

20        MR. ROSS:  I'd like to have Exhibit

21     No. 20 admitted into evidence.

22        MR. CORBETT:  Objection.

23        CHAIRMAN GIACOMARRA:  Excuse me?

24        MR. CORBETT:  Objection for the reason

1     that I stated earlier, it's not the operative

2     version of the agreement for purposes of this

3     arbitration.

4                CHAIRMAN GIACOMARRA:  Why is that?

5                MR. CORBETT:  Because of what they

6     plead in their statement of claim.  They appended

7     a particular version of the agreement to that

8     statement of claim.

9                CHAIRMAN GIACOMARRA:  That's just a

10    statement of claim.

11               MR. CORBETT:  It's not binding on

12    them?

13               CHAIRMAN GIACOMARRA:  Just because

14    there's some printing at the top of the page was

15    missing, I don't see any problem with admitting

16    it into evidence.  So your objection is

17    overruled.

18               MR. CORBETT:  Thank you.

19    Q.  In connection with this agreement, you had --

20               CHAIRMAN GIACOMARRA:  Just to clarify,

21    we're making 20 as admitted into evidence.

22               MR. ROSS:  Yes, sir.  Thank you.

23               (Document marked as Exhibit C20.)

24    Q.  You had purchased as well as sold VasoActive in

57

1    your Kashner Davidson account, correct?

2  A.  During the course of the trading?

3  Q.  Yes.

4  A.  Yes.

5  Q.  It was your idea to purchase the VasoActive in

6     the account, correct?

7  A.  The original purchase?

8  Q.  Well, no, all the -- each purchase made in the

9     account of VasoActive was your idea, correct?

10  A.  No.

11  Q.  Each sale in the account was your idea, correct?

12  A.  No.

13  Q.  If you turn to Exhibit No. 17, which is the

14     monthly statements, the first month addressed

15     there is December of '03, do you see that?  On

16     the top right-hand side, it says, "Statement

17     period 12/01/03 to 12/31/03"?

18  A.  Where are we, on 17?

19  Q.  Yes, sir.

20  A.  I've got 4 of '04.

21  Q.  That would be --

22        MR. ROSS:  Does the panel have the

23     right page?

24        CHAIRMAN GIACOMARRA:  I've got 4

1    of '04 as the first page in tab 17.

2          MR. ROSS:  May I look at your book,

3    please?  May I take a break?  Apparently they're

4    out of order.

5          CHAIRMAN GIACOMARRA:  Sure.  We'll go

6    off the record for a moment.

7          (Discussion off the record.)

8          (Brief recess.)

9          CHAIRMAN GIACOMARRA:  We'll go back on

10    the record now.  You can continue with your

11    witness, Mr. Ross.

12          MR. ROSS:  Thank you.

13  Q.  If we try Exhibit 17 again, Mark Mscisz.  The

14    first page of it should be December of '03,

15    monthly statements?

16  A.  You changed the order of the book?

17  Q.  I beg your pardon, it should still be tab No. 17.

18  A.  Yes, it's just upside down now.  What was the

19    question again, please?

20  Q.  Is it for the month of December?

21  A.  Yes.

22  Q.  And that shows that you purchased, the second

23    page will show you purchased 2,000 shares of

24    VasoActive for $10,000.  Do you see that?

1  A.  Yes.

2  Q.  If you turn to the next activity in your account

3     was February of '04; is that correct?

4  A.  It's not the next -- yes, okay.

5  Q.  And as reflected in that monthly statement, you

6     deposited $65,000 into the account on the

7     right-hand side, $65,625.35, do you see that, the

8     first page?

9  A.  Is this February?

10  Q.  Yes, sir.  You didn't buy any stock, you didn't

11     buy any VasoActive in January, did you?

12  A.  I don't believe so.  I don't have a statement

13     from January here.

14  Q.  You never bought anything but VasoActive in the

15     Kashner account?

16  A.  Right.

17  Q.  If you turn to the second page of the February

18     statement, you'll see the purchase of 900 shares

19     on the 11th of February.  Do you see that, sir?

20  A.  Yes.

21  Q.  It's 900 shares on the 12th of February?

22  A.  Yes.

23  Q.  And we already went through that you established

24     margin in connection with your Kashner account at

1    or about this time as well, correct?

2  A.  Correct.

3  Q.  And this shows additional purchases on 3 of 5 for

4    that month, it shows additional purchases of

5    VasoActive, do you see that?  I'm on 3 of 5 for

6    the month of February.  Do you see that, sir?

7  A.  Yes.

8  Q.  So, for example, on February 13, you bought 3,000

9    shares at $14.95.  Do you see that?

10  A.  Yes.

11  Q.  And then February 20, a week later, the stock had

12    jumped to $26.  Do you see that?

13  A.  For the purchase, yes.

14  Q.  And you purchased 2,000 shares?

15  A.  Yes.

16  Q.  And then on that same day the stock had gone up

17    to $29.40.  Do you see that?

18  A.  Yes.

19  Q.  If you turn the page to 4 of 5, you sent in

20    checks to pay for those.  Do you see that?

21  A.  Yes.

22  Q.  And also you sent in some wires where it says

23    "totals, incoming wire transfer," do you see

24    that?

61

1    A.  Yes.

2    Q.  And you sent those in towards the account,

3        correct?

4    A.  Correct.

5    Q.  Then if you turn to the next month, the next

6        month's activity would be March, and if you would

7        turn to the statement, monthly statement for

8        March, and you've already testified you got your

9        monthly statements, so if you would turn to Page

10       1 of 5, do you see that?

11   A.  Yes.

12   Q.  And if you turn to Page 2 of 5, this is a

13       calculation of your margin interest, right?

14   A.  Is that a question?  Yes.

15   Q.  If you turn to Page 3 of 5, on March 30, the

16       price of VasoActive had gone up to almost $40, do

17       you see that?  You sold it?

18   A.  Yes.

19   Q.  So according to Page 3 of 5, you bought 1,000

20       shares on March 30 at $36.85, do you see that?

21   A.  What page again?  3 of 5?

22   Q.  3 of 5.  Do you see that?

23   A.  Yes.

24   Q.  And you sold it on the same day for $40?

1   A.  Yes.

2   Q.  Do you recall doing that?

3   A.  No.

4   Q.  And then the stock -- you continued to have

5        purchases in connection with the securities, do

6        you see that?

7   A.  Yes.

8   Q.  And then the SEC suspended trading of VasoActive.

9        Do you recall that?

10  A.  Yes.

11  Q.  Do you recall the date of that?

12  A.  No.

13  Q.  If you would turn to tab No. 25, excuse me, 26,

14       let me see if this refreshes your recollection.

15  A.  This book is all over the place now.  What tab

16       again?

17  Q.  26.  Do you have the SEC complaint in front of

18       you?

19  A.  Yes.

20  Q.  Are you aware that the SEC brought an action

21       against VasoActive and John Mscisz?

22            MR. CORBETT:  Objection.

23            MR. ROSS:  I'll just jump right ahead.

24       May I respond?  I'm not trying to -- paragraph 19

1   will refresh his recollection, the date of

2   suspension, it's in the SEC --

3           MR. CORBETT:  We'll stipulate it was

4   April 1 of 2004.

5           CHAIRMAN GIACOMARRA:  Is that okay,

6   the stipulation?

7           MR. ROSS:  Sure.  The SEC suspended

8   trading on April 1?

9           MR. CORBETT:  For two weeks.

10  Q.  I assume you adopt your counsel's stipulation?

11  A.  Yes.

12  Q.  And as a result of that, the stock wasn't trading

13      anymore, correct?

14  A.  Correct.

15  Q.  And as a result of that, you were heavily

16      margined at the time, correct?

17  A.  Yes.

18  Q.  And as a result of that, a margin call was

19      triggered, correct?

20  A.  Yes.

21  Q.  You know what a margin call is?

22  A.  Yes.

23  Q.  And if you would turn to tab No. 24, that's a

24      copy of the margin call that you received,

64

1      correct?

2   A.  From Sterne, Agee.

3   Q.  Did you receive that in connection with -- I

4      don't know, as you sit here today, do you know

5      who sent that to you?

6   A.  From Sterne, Agee.

7   Q.  I'm asking you, do you know who sent that to you

8      as you sit here today?

9   A.  It's from Sterne, Agee.

10   Q.  So Sterne, Agee mailed it to you?  I'm asking --

11      I understand it says, respectfully, Stern, Agee.

12      I'm asking you, as you sit here today, do you

13      know who mailed that to you?

14   A.  Yes, Sterne, Agee.

15   Q.  So you received this margin notice, correct?

16   A.  Yes.

17          MR. ROSS:  I would like to have this

18      introduced into evidence, tab No. 24.

19          MR. CORBETT:  No objection.

20          CHAIRMAN GIACOMARRA:  We'll mark that,

21      tab No. 24.

22          (Document marked as Exhibit C24.)

23   Q.  You received this document, right?  Yes?

24   A.  Yes.

1  Q.  And it says, "In order to maintain your general

2      account in an acceptable manner with our firm,"

3      and you see on the top it talks about Kashner

4      Davidson, Inc. was your broker; is that correct?

5  A.  Yes.

6  Q.  And so it says, "In order to maintain your

7      general account in an acceptable manner with our

8      firm, pursuant to the provisions of your general

9      account agreement and to remain in compliance

10      with Regulation C of the Federal Reserve Board,

11      you are hereby requested to deposit in your

12      account at least $331,777.80 in cash or

13      acceptable collateral.  Your deposit of cash or

14      securities should be made on or before April 8,

15      2004." Do you see that?

16  A.  Yes.

17  Q.  You saw that at the time?

18  A.  Yes.

19  Q.  And in response to that email, you wired in

20      $100,000 into your Kashner Davidson account,

21      correct?

22          MR. CORBETT:  Objection.

23          CHAIRMAN GIACOMARRA:  What's the

24      objection?

1          MR. CORBETT:  He's mischaracterizing

2      the document, it's not an email, it's a letter.

3          MR. ROSS:  I beg your pardon.

4   Q.  In response to the letter, thank you, in response

5      to the letter, you wired in $100,000 into your

6      Kashner Davidson account?

7   A.  In response to this letter?

8   Q.  Yes, sir.

9   A.  No.

10  Q.  If you turn back to the monthly statements

11      contained in Exhibit 17, and let me direct your

12      attention to the month of April.  Do you see that

13      sir?

14  A.  These are all backwards.  I'll get there in a

15      minute.  What date am I looking for?

16  Q.  April, the statement period April 1 to April 30.

17      Is the panel with me?  Do you see that, sir?

18  A.  Yes.

19  Q.  It says Page 1 of 3?

20  A.  Yes.

21  Q.  The margin call notice instructed you to send in

22      money on or before April 8, do you recall that?

23  A.  From the margin notice we just read through?

24  Q.  Yes, sir.

1   A.  Yes.

2   Q.  Would you turn to the second page?  In fact, you

3       wired $100,000 into your Kashner Davidson account

4       on April 7 of 2004; is that correct?

5   A.  That's correct.

6   Q.  You made no other payments into that account; is

7       that correct?

8   A.  That's correct.

9   Q.  And if you keep turning through the monthly

10      statements, as you go to the month of June,

11      you'll see the liquidations began.  Do you see

12      that, June 24, a sale?

13  A.  Yes.  Yes.

14  Q.  And June 25, a sale.  Do you see that?

15  A.  Yes.

16  Q.  Now, those sales were done -- you understood when

17      you signed the margin agreement that you had

18      authorized Sterne, Agee as the clearing firm to

19      affect the liquidation if you did not satisfy

20      your debit, did you understand that?

21  A.  Yes.

22  Q.  And let me direct your attention back to the

23      margin agreement, it's Exhibit No. 20 -- and

24      we'll come back to the monthly statements in a

1    second -- and in particular, section 6.  It says

2    as it relates to Sterne, Agee, who is the

3    clearing firm in this matter, "I authorize you to

4    take any steps which you in your sole discretion

5    determine to be necessary to complete or cancel a

6    securities transaction or to minimize your

7    losses, if any.  I shall at all times be liable

8    for the payment upon demand of any debit balance

9    and the interest thereon, or other obligations

10   owing in my securities account or other account

11   which I have with you as security for the

12   repayment of any and all present or future

13   indebtedness owed to you by me under this

14   agreement or otherwise.  I grant you a continuing

15   security interest and lien in and a right of

16   set-off with respect to all securities or other

17   property that are in, now or in the future, held,

18   carried or maintained for any purpose in or

19   through my securities account to the extent of my

20   interest, any present or future brokerage account

21   with you in which I have an interest.  I agree to

22   reimburse you for all costs, including attorneys'

23   fees, losses or liabilities incurred by you in

24   connection with the collection of any debit

1     balance or unpaid deficiency in my securities

2     account." Do you see that?

3  A.  Yes.

4  Q.  You knew that at the time you signed that,

5     correct?

6  A.  Yes.

7  Q.  Now, if you would turn back to the monthly

8     statements, we were just looking at June, you saw

9     the liquidations of -- you didn't request those

10     sales, correct, that we just looked at in June?

11  A.  Correct.

12  Q.  That was liquidated by the clearing firm, to your

13     knowledge; is that correct?

14  A.  Yes.

15  Q.  And then if we turn to July, you'll see

16     additional liquidations. Do you see that?

17  A.  Yes.

18  Q.  Page 2 of 2.

19  A.  Yes.

20  Q.  And Page 1 of 2 shows that in your account at

21     Kashner Davidson Securities, where Sterne, Agee

22     is the clearing firm, you have on the front page,

23     it says a deficit of $180,850.75. Do you see

24     that?

70

1  A.  Yes.

2  Q.  And that's the debit that you currently owe; is

3    that correct?

4        MR. CORBETT:  Objection.

5  A.  I'm not sure what the balance is now.

6  Q.  You have made no payments toward the $180,850.75,

7    correct?

8  A.  Correct.

9        MR. ROSS:  Nothing further.

10        CHAIRMAN GIACOMARRA:

11    Cross-examination, Mr. Corbett?

12        MR. CORBETT:  Thank you.

13        CROSS EXAMINATION

14    BY MR. CORBETT:

15  Q.  Mr. Mscisz, with respect to the agreement that

16    has been marked as Exhibit 18, I believe it is,

17    by the claimant --

18  A.  Could I just ask one question before I go on?

19    This book is completely backwards now.  I don't

20    know, when you changed the exhibits around

21    before -- it's completely backwards.

22        MR. ROSS:  All I did was change the

23    account statements.

24        THE WITNESS:  The numbers are upside

1    down, so when you read the numbers -- I mean, the

2    book is different than before.  Here's the

3    opening of the book and the numbers are all

4    upside down.  Does it matter?

5            MR. ROSS:  If you can follow it, that

6    would help.  I guess I should address the panel.

7    If he could follow it, all we --

8            THE WITNESS:  I can, it's just more

9    tedious to go through it.

10            CHAIRMAN GIACOMARRA:  Would you take a

11    look at it, Mr. Ross?

12            MR. ROSS:  This is the beginning of

13    the book after number 2.  May I just show you?

14    After number 2 comes number 3.  After number 3

15    comes 4, number 5, they're all in the right

16    order, 6.  May I just keep going?  7, 8, 9 comes

17    after this.  This is blank.  I explained that to

18    the panel.

19            THE WITNESS:  I thought it was

20    backwards.

21            MR. ROSS:  It's not backwards.  11,

22    12, 13, 14, 15, 16, everything's in the right

23    order.  17, this is the one that was put in.

24            THE WITNESS:  That's fine.  That was

72

1    the issue.

2              MR. ROSS:  This is the issue?  Is that

3    clearer now?  Is that better?

4              THE WITNESS:  That's why I couldn't

5    find No. 4 when you kept referring to it.

6              MR. ROSS:  Thank you, Mr. Chairman.

7    BY MR. CORBETT:

8    Q.  Mr. Mscisz, would you turn to tab 20, which is

9         the version of the margin account agreement that

10        Mr. Ross has had admitted and asked you some

11        questions about in the course of your direct

12        examination.  I'd like you to turn to the third

13        page of Exhibit 20 where it says up at the top

14        "Kashner Davidson Securities Corp. Updated Client

15        Agreement Adding Margin To Client Account."  Do

16        you see that?

17   A.  Yes.

18   Q.  Is there anything in that page that changed the

19        definition of "you" from the contract as a whole?

20   A.  No.

21   Q.  And I'd like you to read under "Notice to Sterne,

22        Agee & Leach, Incorporated," read the first two

23        sentences?

24   A.  "This is to advise you that I've instructed my

1    broker dealer to establish on my behalf as my

2    agent a securities account with you.  I have

3    appointed my broker dealer as my exclusive agent

4    to act for and on my behalf with respect to all

5    matters regarding my securities account with you

6    including the place of purchase, sales and

7    liquidation orders and delivery of margin and

8    option instructions if authorized by my

9    securities account."

10   Q.  Do you have any understanding as to what that

11        language means?

12   A.  Yes.

13   Q.  What does that mean?

14   A.  That the relationship we established was with

15        Sterne, Agee.

16   Q.  And what was the role of Kashner Davidson?

17   A.  Simply as a broker dealer.

18   Q.  Now, Mr. Ross went into some detail about the

19        signatures on this page and on some of the other

20        documents that were put in front of you.  And you

21        had testified that you signed your wife's name on

22        the documents.  Do you remember that testimony?

23   A.  Yes.

24   Q.  Why did you do that?

1    A.  Several of the documents throughout this whole

2       transaction, this whole relationship with Kashner

3       Davidson, seemed to be given to us not in a very

4       timely manner, and every time there was a contact

5       with me to get these documents back, it was, time

6       was of the essence, and, "we need them back now,"

7       and "can you fill these forms out and fax these

8       things back to us."

9    Q.  And was there anybody in particular that had

10      communications with you?

11   A.  Typically -- well, originally it was Matt

12      Meister, after that it was Tim Varchetto.

13   Q.  I'd like you to take another look at that third

14      page of Exhibit 20.  Can you see anything on that

15      page that says that you were borrowing money from

16      Kashner Davidson?

17   A.  No.

18   Q.  Is there anything there --

19          MR. ROSS:  We'll stipulate, if this

20      helps, just like I appreciate Mr. Colbert --

21      Corbett?

22          MR. CORBETT:  Corbett.

23          MR. ROSS:  Mr. Corbett's overture,

24      we'll stipulate that the money was lent by the

1   clearing firm.  We're happy to stipulate to that.

2        CHAIRMAN GIACOMARRA:  Could you repeat

3   that?

4        MR. ROSS:  The money is lent by the

5   clearing firm.  You need to be a $250,000 BD to

6   lend out money and the clearing firm, or the

7   clearing firm lends the money, we will absolutely

8   stipulate to that if it moves it along.

9        MR. CORBETT:  So are you withdrawing

10   Count 2 of your statement of claim --

11        MR. ROSS:  No, sir.

12        MR. CORBETT:   -- which says that you

13   lent, Kashner Davidson lent the money.

14        MR. ROSS:  Well, I will -- if you want

15   me to explain it to you, I'm happy to do so.  But

16   the only thing I was doing was stipulating that

17   the money directly came from Sterne, Agee.  The

18   obligation is of Kashner Davidson.  Sterne, Agee

19   took Kashner Davidson's money already, and they

20   can't get access to $360,000 until this

21   arbitration is decided.

22        So I just want to try to speed it

23   along in saying that there's no doubt that --

24   it's illegal for Kashner to loan the money, but

1     Kashner is liable for the money that was loaned.

2     I was trying to help things as opposed to

3     complicate them.

4          CHAIRMAN GIACOMARRA:  We'll note the

5     stipulation in the record, and you can make that

6     point as part of your case, the other issues.

7          MR. ROSS:  Thank you.

8          CHAIRMAN GIACOMARRA:  And, Mr.

9     Corbett, you can continue with your

10    cross-examination.

11    BY MR. CORBETT:

12    Q.  Mr. Mscisz, do you see anything in Page 3 or any

13        other part of this client account agreement that

14        purports to assign Sterne, Agee's collection

15        rights to Kashner Davidson?

16    A.  No.

17    Q.  When you sent money in in response to the margin

18        account, who did you send it to?

19    A.  Sterne, Agee.

20    Q.  When you got margin notices, who did you get them

21        from?

22    A.  Sterne, Agee.

23    Q.  When stocks were liquidated pursuant to the

24        margin agreement, who liquidated them?

1  A.  Sterne, Agee.

2  Q.  Given the statement that or the series of

3      statements that Mr. Ross had admitted as Exhibit

4      17, I'd like you to take a look at those and see

5      if you can see anything in the documents that

6      tells you what the statements were representing

7      about who carried the account?

8  A.  That's under 17?

9  Q.  Yes.  Look at the first page of Exhibit 17.  Is

10     there anything there that suggests who was

11     carrying the margin account?  Look at the top

12     left of the page, it might be helpful.

13  A.  Yeah, Sterne, Agee.

14  Q.  The document says, "carried by Sterne, Agee &

15     Leach, Inc."?

16  A.  Yes.

17  Q.  When you made your initial deposit of funds to

18     fund the IPO, where did you send the money?

19  A.  Sterne, Agee.

20  Q.  Did you ever receive a statement from Kashner

21     Davidson purporting to set forth an amount of

22     money that you owed Kashner Davidson?

23  A.  No.

24  Q.  Did you ever agree with Kashner Davidson that you

1     owed them a particular sum of money?

2  A.  No.

3  Q.  You testified that you sent in $100,000 after the

4     margin call?

5  A.  Yes.

6  Q.  Explain why you did that.

7  A.  Originally when the margin call was made, I had

8     received a call from Matt, which is probably one

9     of the second or third times that I had spoken

10     with Matt after the account was set up, saying

11     that the margin balance, that they were going to

12     start to initially sell off some of the shares of

13     the account, that was in the account, they would

14     liquidate those if we didn't get money in, and it

15     would look bad since we were obviously relatives

16     of the person who was the CEO of the company who

17     had gone public.  So I, you know, I quickly got

18     $100,000 into Sterne, Agee.

19  Q.  Was that an acknowledgment on your part that you

20     owed --

21  A.  No.

22  Q.  -- any money to Kashner Davidson?

23  A.  No.

24  Q.  And with respect to that trading halt, have you,

1   your brother Steve or your wife Lynda ever been

2   accused of complicity in the alleged fraud --

3   A.  No.

4   Q.  -- alleged fraud that gave rise to that?

5   A.  No.

6   Q.  Is there any party to this arbitration that's

7   been accused of complicity in that fraud?

8   A.  No.

9   Q.  Even in the class action litigation?

10  A.  Yes.

11  Q.  Which party?

12        MR. ROSS:  Objection.

13        CHAIRMAN GIACOMARRA:  What's the

14  objection?

15        MR. ROSS:  This is an attempt to smear

16  Kashner Davidson.  There's a class action that

17  he's about to go into which has nothing to do

18  with this action, and if you want to get into it,

19  I'm happy to, but it has nothing to do with this

20  debit collection case.  And there's a class

21  action as it relates to VasoActive, and that's

22  what he's, I sense, he's trying to get into.

23        I deliberately respected Mr. Corbett

24  when he didn't want me to get into the SEC

1    findings as it related to John, so I just left it

2    there, and he stipulated to the date of April 1

3    as the trading suspension, and I accepted that

4    and I'm going to focus on the issues of the case.

5    I'd like him to do the same.

6        MR. CORBETT:  I wasn't going to get

7    into the specifics of the class action.  It's

8    just that I saw in several of the draft exhibits

9    what appear to, or proposed exhibits, what appear

10    to be an attempt to back-door allegations about

11    John and the company and to somehow use that to

12    smear Steve, Mark and Lynda, and I just wanted to

13    make it clear for the record that they've not

14    been accused of complicity in any misconduct; and

15    of the parties in this arbitration that have been

16    so accused, there's only one.

17        CHAIRMAN GIACOMARRA:  Just because

18    they're in the binder, if they haven't been

19    offered for evidence yet, they're not in

20    evidence.  At the time they're offered for

21    evidence, you can make that point.

22        MR. CORBETT:  Okay.  Thank you, Mr.

23    Chairman.

24        MR. ROSS:  And I thought I said to the

1    Chair that everything, and the panel, and I

2    intended to address it to my adversary,

3    everything in there I'm not intending to

4    introduce.  Once I had the stipulation, I didn't

5    even seek to introduce the SEC complaint.

6            CHAIRMAN GIACOMARRA:  We'll continue

7    with your cross-examination, Mr. Corbett.

8            MR. CORBETT:  If I can have a moment.

9    BY MR. CORBETT:

10   Q.  To your knowledge did you ever pay money to

11    Kashner Davidson?

12   A.  No.

13   Q.  I'd like you to take a look at another version of

14    one of these documents that is in the

15    respondents' book as Exhibit 15.

16           CHAIRMAN GIACOMARRA:  Are you offering

17    this as respondents' exhibit, Mr. Corbett?

18           MR. CORBETT:  Yes, I am.  Respondents'

19    Exhibit 15.

20           CHAIRMAN GIACOMARRA:  Is it in your

21    binder?

22           MR. CORBETT:  It is.

23           CHAIRMAN GIACOMARRA:  What number is

24    it in your binder?

1          MR. CORBETT:  It's 15.

2          MR. ROSS:  Is that different than the

3    one that's already in evidence?

4          MR. CORBETT:  It is.

5          CHAIRMAN GIACOMARRA:  Which tab is it

6    in the claimant's binder?

7          MR. CORBETT:  It is.

8          CHAIRMAN GIACOMARRA:  Is that 24?

9          MR. CORBETT:  It's similar to 24, but

10    for the Bates label.

11    BY MR. CORBETT:

12    Q.  Mr. Mscisz, would you take a look at respondents'

13    Exhibit 15?

14          MR. ROSS:  Just so I'm clear, what's

15    the difference between this one and -- you said

16    the Bates number.

17          MR. CORBETT:  The Bates number.

18          MR. ROSS:  Other than that, is it the

19    same document?

20          MR. CORBETT:  Yes.

21          ARBITRATOR GRAY:  What number, I'm

22    sorry?

23          MR. CORBETT:  Respondents' 15, it's in

24    a thin binder.

83

1            ARBITRATOR GRAY:  What number did you

2      say was different?

3            MR. CORBETT:  The Bates number KDSC

4      00073 on the bottom right corner.

5            MR. ROSS:  If it helps, I'll represent

6      that I assume we did that in connection with

7      discovery as is customarily done.  If that's the

8      only distinction...

9      BY MR. CORBETT:

10     Q.  Does the KDSC at the bottom indicate to you that

11        this is a copy that was produced by KDSC and not

12        by you?

13     A.  Yes.

14     Q.  And with respect to -- I'll take that back,

15        please.

16            MR. CORBETT:  Move the admission of

17        respondents' Exhibit 15.

18            MR. ROSS:  I'm not sure I get the

19        distinction.

20            MR. CORBETT:  I'll connect it up later

21        with your witnesses.  I can await moving the

22        introduction.

23            MR. ROSS:  No, I have no objection if

24        the panel wants it in as evidence.

1      CHAIRMAN GIACOMARRA:  We'll admit it.

2    We'll mark it as respondents' Exhibit 1.

3      MR. CORBETT:  It may be easier if we

4    do it as 15.  Certainly the first 15 in the

5    binder, there won't be any objections to, and it

6    may be easier to keep them in the same series, if

7    that's okay with the chair.

8      CHAIRMAN GIACOMARRA:  You want to mark

9    it as respondents' Exhibit No. 15?

10     MR. CORBETT:  Yes.  It's already

11    labeled that way anyway.

12     CHAIRMAN GIACOMARRA:  Okay.

13     (Document marked as Exhibit R15.)

14  Q.  Mr. Mscisz, if you take a look at the first

15    paragraph of claimant's Exhibit 24, where it

16    says, "in order to maintain your general account

17    in an acceptable manner with our firm," do you

18    have an understanding of what "our firm" refers

19    to?

20  A.  Yes.

21  Q.  What was that?

22  A.  The relationship between my account and Sterne,

23    Agee.

24  Q.  And in the second paragraph in the third line

1    where it refers to "your agreement with us," what

2    agreement does that refer to, if you have any

3    knowledge?

4  A.  What line is that again?

5  Q.  Third line of the second paragraph.

6  A.  Oh, okay.

7  Q.  What does "the agreement with us" refer to?

8  A.  The agreement that we had with Sterne, Agee.

9  Q.  And did Kashner Davidson sign the letter?

10  A.  No.

11  Q.  Did Kashner Davidson send the letter?

12  A.  No.

13  Q.  The fax header at the top, does that suggest

14    anything to you?

15  A.  No.

16  Q.  There was some, certainly some pretty

17    inflammatory allegations in the statement of

18    claim about the personal financial statement that

19    you executed, although not much in the way of

20    examination.  I'd like you to take a look at

21    that, which in the claimant's book is Exhibit 23,

22    I believe.  Do you have Exhibit 23 in front of

23    you?

24  A.  Yes.

1  Q.  Can you explain how you came to execute Exhibit

2     23?

3  A.  There was -- this was actually faxed to me, a

4     blank copy of this was faxed to me, and it was

5     requested that we get this in because there was

6     no statement of personal financial statement

7     within our accounts, and we -- I guess it was

8     very important for this to actually have

9     happened.  And Tim Varchetto actually faxed this

10     to me and said that we needed it ASAP.  I told

11     him I would try to spend some time with it and

12     get it out, and we actually did it then and there

13     over the phone, and then I faxed it back

14     immediately the same time while we were on the

15     phone.

16  Q.  Are the numbers that are on Exhibit 23, are those

17     the same numbers that you originally put on that

18     form?

19  A.  This is what was faxed back to them.

20  Q.  What did you -- is this what you initially wrote

21     on the form?

22  A.  The original numbers, no.

23  Q.  What were the original numbers?

24  A.  I'm not sure if I could go through and actually

1    replicate the original numbers that were here,

2    but the gist of the conversation that we had had,

3    that I had had with Tim was that we needed to get

4    this document back to him ASAP.  I went through

5    the numbers.

6           We were going through the value of

7    some real estate that was owned, and in the

8    process of doing this, kind of went through and

9    were readjusting some of the numbers.

10   Q.  And who was readjusting some of the numbers?

11   A.  Well, I mean, over the phone I was doing it and

12      Tim and I were coming up with the figures that

13      were on here.

14   Q.  Together?

15   A.  Correct.

16   Q.  And how did you go about doing that?

17   A.  Well, we just -- we were talking about some of

18      the real estate that I own in conjunction with my

19      brother, you know, and we were talking about the

20      value of some of those properties.  We had talked

21      about the home that I own with my wife.  We went

22      through some of the real estate, tried to come up

23      with some of the values.  I had listed a value

24      that was lower than what was here originally.

1    Those numbers were adjusted up.

2        We started to talk a little about the

3    liability side, and then we just said, Let's come

4    up with a number on some of the properties that

5    you owe so that we can get this thing done and

6    get it into the account, into the folder for my

7    account.

8  Q.  And is there anything you can see in that

9    particular document that would confirm that the

10    numbers that are alleged in the complaint to be

11    inaccurate are not the numbers you had originally

12    entered in that document?

13  A.  Yeah.  I mean, the income numbers were all

14    accurate.  The asset and liability side were not.

15    And obviously you can see where there are, those

16    columns were whited out originally.

17  Q.  Was it your decision to white those out?

18  A.  My sole decision?  No.

19  Q.  Did someone suggest that you white those out,

20    change the numbers?

21  A.  Yes.

22  Q.  And who was that?

23  A.  It was Tim Varchetto.

24  Q.  Now, this was not the first financial information

1    that you had provided to Kashner Davidson,

2    correct?

3  A.  Correct.

4  Q.  When you opened your account in November, you

5    submitted the application that's already been

6    admitted as claimant's Exhibit 14; is that

7    correct?

8  A.  Yes.

9  Q.  And is that information accurate?

10  A.  What number is it?

11  Q.  14.

12  A.  Yes.

13  Q.  And that's the information that was in Kashner

14    Davidson's files during the period in which you

15    were actually trading on margin?

16  A.  Correct.

17  Q.  Did you make a single margin trade after you

18    submitted the personal financial statement?

19  A.  No.

20        MR. CORBETT:  I've got no more

21    questions at this time, although I reserve the

22    right to call Mr. Mscisz during my case in chief.

23        CHAIRMAN GIACOMARRA:  Okay.  Mr. Ross,

24    would you like some redirect?

1          MR. ROSS:  Yeah, just a couple of

2     things.

3          REDIRECT EXAMINATION

4     BY MR. ROSS:

5   Q.  Let's stay on the document that you just had

6     open, which is 23.  I assume 23 is in evidence?

7          CHAIRMAN GIACOMARRA:  It hasn't been

8     offered.

9          MR. ROSS:  Why don't we put it into

10     evidence.

11          CHAIRMAN GIACOMARRA:  Do you have any

12     objection, Mr. Corbett?

13          MR. CORBETT:  No objection.

14          CHAIRMAN GIACOMARRA:  We'll mark it as

15     Exhibit 23 in evidence.

16          (Document marked as Exhibit C23.)

17   Q.  Now, if I understood your testimony correctly,

18     you're saying the information contained in this

19     document is false?

20   A.  That's correct.

21   Q.  And you knew that at the time you signed it?

22   A.  Yes.

23   Q.  And right above your signature it says, "The

24     foregoing has been carefully read by me and is

1    given to you for the purpose of obtaining credit

2    from time to time to whatever form.  I hereby

3    certify the foregoing is a true and correct

4    exhibit of my financial condition and may be

5    treated by you as a continuing statement thereof

6    until replaced by a new statement or until I

7    specifically notify you and change therein.  You

8    are hereby authorized to check my credit and

9    employment history and to answer questions about

10    your credit experience with me."   Do you see

11    that?

12  A.  I do.

13  Q.  And your signature's right below that?

14  A.  It is.

15  Q.  So at the time you signed this document, when you

16    certified it was accurate, correct --

17  A.  Yes.

18  Q.  -- you knowingly knew it was false?

19  A.  That's correct.

20  Q.  Is that your signature on the document?

21  A.  Yes.

22  Q.  Did you tell anyone at Sterne, Agee that this

23    information was false?

24  A.  No.

1  Q.  Is that your wife's signature, or is this your

2     signature of your wife?

3  A.  It's my signature.

4  Q.  And your wife didn't authorize you to sign this

5     either?

6  A.  No.

7  Q.  Did you tell anyone at Sterne, Agee that you had

8     forged your wife's signature on this?

9         MR. CORBETT:  Objection.

10        MR. ROSS:  I'll withdraw it.

11  Q.  You had signed your wife's signature on this

12     without authorization?

13  A.  No.  I had no time to get this form to her.

14  Q.  My question was:  Did you inform anyone at

15     Sterne, Agee that you signed your wife's name?

16  A.  No.

17  Q.  And that you did not have authorization from her

18     to do so?

19  A.  No.

20  Q.  You talked about that you had to fill out these

21     forms in a rush.  Do you recall that?

22  A.  Yes.

23  Q.  Why don't you turn to claimant 14.  Is this one

24     of the forms that you had to fill out in a rush?

1  A.  Yes.

2  Q.  You filled this out more than a week -- you

3     filled this out well over a week in advance of

4     even your first trade; isn't that correct?

5  A.  This was handed to me by Matt Meister, yes.

6  Q.  This form you were in such a rush to fill out was

7     filled out well over a week in advance of your

8     first trade; is that correct?

9  A.  That's right.

10  Q.  Thank you.  What is Leerink & Swann?

11  A.  They're a brokerage account, brokerage firm.

12  Q.  And where are they located?

13  A.  In Boston.

14  Q.  And who clears for Leerink & Swann?

15  A.  They've had several clearing houses.

16  Q.  Tell me one or two of them that they've cleared

17     for?

18         MR. CORBETT:  Objection, relevance.

19         MR. ROSS:  I ask for --

20         CHAIRMAN GIACOMARRA:  Could just the

21     witness answer the question, please.

22  A.  I haven't done business with them in a while.

23  Q.  Who cleared for them when you did do business

24     with them?

1  A.  I can't remember.  Like I said, I haven't done

2     business with them in a while.

3  Q.  They weren't self-clearing, can we establish

4     that?  They had a clearing firm?

5  A.  Correct.

6  Q.  For example, in the --

7  A.  Actually, I do remember, Pershing was one of

8     their clearing agents.

9  Q.  Thank you.  If you turn to -- and we'll come

10    right back to the Pershing response.  If you turn

11    to tab No. 20, the margin agreement, Paragraph 3,

12    the second sentence says, "I further understand

13    and agree that Sterne, Agee will carry and

14    maintain my securities account," leaving out the

15    parenthesis, "under the terms of the fully

16    disclosed clearing agreement."  Do you see that?

17 A.  Yes.

18 Q.  I left out the rest of that.

19          You understand the role of a clearing

20    firm, right?

21 A.  Yes.

22 Q.  And in the course of your -- how long did you

23    have an account with Leerink & Swann?

24 A.  I don't recall.

1  Q.  A year, ten years, five years, estimate?

2  A.  Probably three years.

3  Q.  Where else did you have brokerage accounts?

4  A.  I think that was the only one.

5  Q.  You had an account at Schwab?

6  A.  I may have had a joint account.

7  Q.  At Schwab?

8  A.  Yes.

9  Q.  When I'm saying an account, I'm talking about you

10     and your wife.

11  A.  Yeah, I'm not sure if it was a brokerage account.

12  Q.  For the three years you had an account at Leerink

13     & Swann, isn't it a fact that you wrote checks to

14     Pershing, the clearing firm, and not the

15     brokerage firm?

16  A.  Yes.

17         MR. ROSS:  Thank you, nothing further.

18         MR. CORBETT:  A couple of very quick

19     questions.

20         CHAIRMAN GIACOMARRA:  Sure.

21         RECROSS EXAMINATION

22  BY MR. CORBETT:

23  Q.  Back to Exhibit 23, Mr. Ross was asking you

24     questions about the signature on that page.

1  A.  Yes.

2  Q.  Did you put your signature on that page before or

3     after you whited out and changed those entries at

4     Mr. Varchetto's suggestion?

5  A.  Actually, the signature was on there before.

6          MR. CORBETT:  No further questions.

7          CHAIRMAN GIACOMARRA:  Thank you.  Next

8     witness, Mr. Ross?

9          MR. ROSS:  Respondent calls Steven

10     Mscisz.

11          MR. CORBETT:  Claimant.

12          MR. ROSS:  Oh, yeah, claimant.  Sorry,

13     switched the aisle on this one.

14          May I begin?  I'm sorry.

15          CHAIRMAN GIACOMARRA:  Yes, please.

16     I'll remind you that you're under oath.

17          STEVEN MSCISZ, Sworn.

18          DIRECT EXAMINATION

19     BY MR. ROSS:

20  Q.  Good afternoon, Steven Mscisz.

21          Like your brother, you had opened an

22     account at Kashner Davidson?

23  A.  That's correct.

24  Q.  And in connection with that account, you had

1     purchased VasoActive stock?

2   A.  That's correct.

3   Q.  You didn't buy anything else?

4   A.  No.

5   Q.  And actually unlike your brother, you didn't sell

6      any VasoActive, you just purchased in the

7      account?

8   A.  That's correct.

9   Q.  And you're Mark's brother, correct?

10   A.  I am.

11   Q.  And John's your other brother?

12   A.  Yes.

13   Q.  And you understood John's relationship as

14      president and CEO of VasoActive?

15   A.  Yes.

16   Q.  And you had understood that VasoActive was an

17      initial public offering?

18   A.  Yes.

19   Q.  And you know what an initial public offering is

20      as well?

21   A.  Yes.

22   Q.  And you had understood that Kashner was an

23      underwriter of that offering?

24   A.  Yes.

1   Q.  Would you turn to Exhibit No. 1 in claimant's

2      book.  That's your signature on the bottom

3      left-hand side?

4   A.  It is.

5   Q.  And you signed that on or about November 14, '03?

6   A.  Yes.

7   Q.  And if you turn to the second page of that

8      document, on the bottom left-hand side, that's

9      your signature as well where it says "signature

10     of primary account holder"?

11  A.  It is.

12  Q.  You signed that on or about November 14, '03?

13  A.  Yes.

14  Q.  And the information contained on the document is

15     accurate to the best of your recollection?

16  A.  To the best of my recollection, yes.

17  Q.  You understood that this was a new account form

18     for opening up, or on the top right it says, "new

19     account application for opening up your account

20     at Kashner Davidson"?

21  A.  Yes.

22  Q.  You had understood -- did you understand that

23     Sterne, Agee was the clearing firm for Kashner?

24  A.  I did.

1   Q.  You had an account at Leerink & Swann?

2   A.  That's correct.

3   Q.  And I think your brother -- did you have it about

4       the same time, in the same time period as your

5       brother?

6   A.  Roughly.

7   Q.  And Pershing cleared for Leerink & Swann?

8   A.  That's correct.

9   Q.  And so any trades that you did at Leerink & Swann

10      you would have written your checks to Pershing,

11      correct?

12  A.  That's correct.

13  Q.  You had an account at ETrade?

14  A.  I did.

15  Q.  ETrade is not self-clearing, is it?  Do you know

16      who clears for ETrade?

17  A.  I don't.

18  Q.  Who did you make your checks payable to at

19      ETrade, when you do an ETrade transaction,

20      Schroeder?

21  A.  I made one initial deposit.  I can't recollect.

22  Q.  I don't either.  It's not ETrade, right?

23  A.  I'm not sure.

24          MR. ROSS:  I'd like to have Exhibit

1    No. 1 in evidence.

2            MR. CORBETT:  No objection.

3            CHAIRMAN GIACOMARRA:  We'll mark tab 1

4    as an exhibit.

5            (Document marked as Exhibit C1.)

6    Q.  Like your brother, you know what a preliminary

7    prospectus is?

8    A.  I do.

9    Q.  Have you ever heard the term red herring before?

10   A.  I have not.

11   Q.  So you both have that.

12           Would you turn to tab No. 2, please, a

13   preliminary prospectus for VasoActive

14   Pharmaceuticals.  You received a copy of this

15   document?

16   A.  No.

17   Q.  I'm sorry?

18   A.  I did not.

19   Q.  This is the company that -- okay, I'll withdraw

20   that.

21           Would you turn to tab No. 4.  Do you

22   recognize that document?

23   A.  Do I recognize it --

24   Q.  Yes, sir.

1  A.  -- or did I receive one?

2  Q.  Do you know what it is?  That's a final

3     prospectus, right?

4  A.  I see "prospectus," I don't know if it's final.

5  Q.  I'll represent to you it's a final prospectus.

6  A.  Okay.

7  Q.  Did you ever see a copy of this document?

8  A.  No.

9  Q.  If you turn to tab No. 5, do you see that

10     document?  Do you recognize that document as a

11     confirmation?

12  A.  Yes.

13  Q.  And you received this?

14  A.  Yes, I did.

15  Q.  Do you see -- and your initial purchase of

16     VasoActive was 2,000 shares, correct?

17  A.  That's correct.

18  Q.  And the IPO came out at a price of $5?

19  A.  Yes, it did.

20  Q.  Do you see on the bottom left it says,

21     "prospectus mailed under separate cover"?

22  A.  Uh-huh.

23  Q.  Are you aware that the clearing firm mails this

24     out to all people who invest in an initial public

1    offering?

2  A.  No, I'm not.

3  Q.  But it's your testimony today you did not receive

4    it?

5  A.  That's correct.

6  Q.  If you turn to the second page under tab No. 5,

7    it's a purchase of 1400 shares of VasoActive at a

8    price of $14.64 on February 11 of '04.  Do you

9    see that?

10  A.  Yes, I do.

11  Q.  You were here during your brother's testimony.

12    It's your recollection that the price of

13    VasoActive had gone up fairly quickly?

14  A.  It did go up, yes.

15  Q.  I think in February, the end of February it was

16    about $30.  Does that comport with your

17    recollection?

18  A.  I'm looking at a date traded here, February 11 at

19    $14.

20  Q.  Why don't you turn to the next page.

21  A.  Okay.

22  Q.  You see that page?

23  A.  Yes.

24  Q.  The date on that is what?

1  A.  February 23.

2  Q.  The price is what?

3  A.  30.15.

4  Q.  Two and a half months later the price had gone up

5     600 percent; does that comport with your

6     recollection?

7  A.  Yes.

8  Q.  You received copies of your confirmations,

9     correct?

10  A.  Yes.

11  Q.  And it was your idea to purchase the VasoActive?

12  A.  Initially?

13  Q.  Well, throughout the course of your account at

14     Kashner Davidson?

15  A.  Initially it was, yes.

16  Q.  And subsequent?

17  A.  Yes.

18  Q.  And do you have an understanding that because of

19     the fact it was your idea, that's why the tickets

20     would be marked as "unsolicited" on the bottom

21     left-hand side?

22  A.  Some of these, some trades were solicited.

23  Q.  Do you see "unsolicited" on the ticket?

24  A.  I do.

1  Q.  That's on each ticket?

2  A.  Right.

3        MR. ROSS:  Can we stipulate to

4     admission of tab 5 and subsequently --

5  Q.  You received monthly statements in connection

6     with this account as well?

7  A.  I did.

8  Q.  Would you look underneath tab 6 and confirm that

9     those are copies of the statements that you

10    received?

11 A.  They are.

12        MR. ROSS:  I now seek to have Exhibit

13    5 and 6 admitted into evidence, please.

14        MR. CORBETT:  No objection.

15        CHAIRMAN GIACOMARRA:  Okay.  We'll

16    mark tabs 5 and 6 into evidence.

17        (Documents marked as Exhibits C5

18        and C6.

19 Q.  If you would turn to tab No. 3.  Like your

20    brother, you funded the account prior to the

21    actual purchase of VasoActive?

22 A.  Yes.

23 Q.  And this is a check, copy of a check that you

24    sent in to fund the account?

1  A.  Uh-huh.

2        MR. ROSS:  I'd like to have that

3   admitted into evidence.

4        MR. CORBETT:  No objection.

5        (Document marked as Exhibit C3.)

6  Q.  And that check -- withdrawn.

7        MR. CORBETT:  Mr. Chairman, if I might

8   ask, do you plan on taking a break for lunch at

9   some point?

10       CHAIRMAN GIACOMARRA:  I do.  I was

11   hoping to see if we could get through this

12   witness, somewhere around one o'clock.

13       MR. ROSS:  That's exactly what I had

14   anticipated.

15       CHAIRMAN GIACOMARRA:  If it means we

16   go a little over just to finish up, I would

17   probably like to do that, not to break up a

18   witness.

19  Q.  If you look at the monthly statement -- actually,

20   let me withdraw that for a second.  Going to tab

21   No. 5, Exhibit No. 5, the first confirmation you

22   received reflects the IPO purchase, correct?

23  A.  That's correct.

24  Q.  And that's an account type 1.  Do you know what

1    an account type 1 is versus account type 2?

2  A.  I don't.

3  Q.  If you turn to the second confirmation, which is

4    for the shares, the purchase of 1400 shares at

5    $14.64, do you see that?  I'll represent to you

6    that account type 1 is cash and account type 2 is

7    margin.  Okay, sir?

8  A.  Okay.

9  Q.  Now, you had sent in money to pay for this

10    transaction, the second transaction, isn't that

11    correct?  You sent in checks?

12  A.  Yes.

13  Q.  And the third transaction when you purchased 1500

14    shares of VasoActive, the third confirmation in

15    Exhibit 5, that's when -- you executed that on

16    February 23, '04?

17  A.  That's correct.

18  Q.  And at that point, to the best of your

19    recollection, you were on margin?

20  A.  Yes.

21  Q.  I'll suggest to you that's why it says account 2.

22    That reflects a margin account.

23        Let me direct your attention now to,

24    under tab No. 8, have you seen -- it starts with

1    a cover page, fax cover sheet, and then it has,

2    and then the second page of that is entitled

3    "Cash Margin Account Agreement, Kashner Davidson

4    Securities."  Do you see that?

5  A.  The second page?

6  Q.  The first page is a fax cover sheet?

7  A.  Right.

8  Q.  You've seen that document before, correct?

9  A.  Yes.

10  Q.  This was faxed to you from Tim Varchetto at

11    Kashner Davidson, correct?

12  A.  That's correct.

13  Q.  And you received that?

14  A.  Yes.

15  Q.  And you'll see the second page of that has a

16    "Margin Account Agreement, Kashner Davidson

17    Securities"?

18  A.  Yes.

19  Q.  You've seen that before?

20  A.  I have.

21  Q.  And you read it when you executed it?

22  A.  Briefly, yes, sir.

23  Q.  And if you turn to Page 3, you see Page 3 of that

24    document, it's entitled "Kashner Davidson

1      Securities Corp. Updated Client Agreement Adding

2      Margin to Client Account"?

3  A.  Uh-huh.  Yes.

4  Q.  That's your signature on the document?

5  A.  It is.

6  Q.  And you signed it on or about February 18 of '04?

7  A.  That's correct.

8  Q.  And then below on the bottom of that page, it's

9      your signature as well?

10  A.  Yes.

11          MR. ROSS:  I'd like to have Exhibit 8

12      admitted into evidence.

13          MR. CORBETT:  Same objection as with

14      20, but I understand the Chairman overruled the

15      objection.

16          CHAIRMAN GIACOMARRA:  It's the same

17      ruling and we'll admit it into evidence, tab 8.

18      But we've noted your objection.

19          (Document marked as Exhibit C8.)

20          MR. CORBETT:  I also want to apologize

21      for the cell phone; I've taken out the battery

22      and turned it off twice, hopefully that will

23      resolve -- it's a pet peeve of mine, so I imagine

24      it annoys you as well.

1  Q.  If we look at the monthly statements which are in

2      evidence as Exhibit No. 6 -- do you have tab No.

3      6?

4  A.  I do.

5  Q.  The first month that you had any activity in the

6      account was December of '03.  Does that comport

7      with your recollection?

8  A.  That is correct.

9  Q.  And if you turn to Page 3 of 4, it shows that you

10     had purchased the 2,000 shares of VasoActive at

11     $5, you testified to that?

12 A.  Uh-huh.

13 Q.  And on February 3 -- excuse me, on December 3 and

14     December 4 you had sent in additional funds.  Do

15     you see that?

16 A.  That's correct.

17 Q.  That comports with your recollection as well,

18     doesn't it?

19 A.  Yes.

20 Q.  And then if you turn to the month through

21     February of '04, the monthly statement, do you

22     see that?  That shows the securities have now

23     increased in value from $12,000 to approximately

24     $406,000.  Do you see that?

1  A.  Yes.

2  Q.  If you turn to the second of four pages, it shows

3     a purchase of 1400 shares on February 11.  That

4     comports with your recollection?

5  A.  Yes.

6  Q.  You received the monthly statements, too, by the

7     way?

8  A.  Yes.

9  Q.  As well as the confirmations, correct?

10  A.  Correct.

11  Q.  And if you turn to Page 3 of 4, it shows on

12     February 23 the price of VasoActive had now gone

13     up to $30.  Do you see that?

14  A.  Yes.

15  Q.  And you bought 10,000 shares at $30?

16  A.  Uh-huh.  That's correct.

17  Q.  And then you bought 1500 shares at, that same

18     day?

19  A.  Yes.

20  Q.  On February 26, you wired in $301,000, do you

21     recall that?

22  A.  That's correct.

23  Q.  Now, you had actually sent in a check to pay for

24     that earlier, do you recall that?

1  A.  I'm sorry, ask again?

2  Q.  You had actually sent in a check to pay for that

3      earlier but that check was rejected because it

4      was a corporate check.  Does that ring a bell?

5  A.  I'm not a hundred percent.

6  Q.  Why don't you turn to tab No. 10 and see if that

7      refreshes your recollection.  And for the

8      purchases that we just looked at, we looked at

9      that you made total purchases of 11,500 shares of

10     VasoActive on the 23rd of February.  Do you see

11     that?

12  A.  Yup.

13  Q.  You had sent in checks for 301,000 to pay for

14     those trades on February 23.  Does that comport

15     with your recollection?

16  A.  It looks here that it was a single check and it

17     wasn't from me.

18  Q.  The check was sent in to pay for the trade,

19     correct?

20  A.  That's correct.

21  Q.  And that check was returned to you, do you recall

22     that?

23  A.  I don't.

24  Q.  But the check wasn't deposited, instead you had

1    to wire money into the account?

2  A.  That's correct.

3  Q.  And that wire now, if you flip back to Page 3 of

4    4 for the month of February of '04, that wire is

5    reflected for 2/26/04, correct?

6  A.  Yes.

7  Q.  Now, if you turn to the next month, for the month

8    of March of '04, Page 2 of 3 reflects the margin

9    interest?  You knew you were accruing margin

10    interest, obviously, right?

11  A.  Yes.

12  Q.  And then on Page 3 of -- on March 17 you had

13    purchased another 10,000 shares.  Do you see

14    that?

15  A.  Yes.

16  Q.  You continued to make additional purchases,

17    right?

18  A.  All on the 17th, yes.

19  Q.  Right.  Now, your counsel has stipulated that on

20    April 1, the SEC suspended trading in connection

21    with VasoActive, you understand that?

22  A.  Yes.

23  Q.  That comports with your recollection as well?

24  A.  Yes.

1  Q.  Does it similarly comport with your recollection

2    -- you knew you were heavily margined at the

3    time?

4  A.  I knew I was margined, that's correct, yes.

5  Q.  Does it comport with your recollection that that

6    suspension of trading had triggered a margin call

7    notice?

8  A.  It did not.

9  Q.  Did you receive a margin call notice?

10  A.  Not at that time.

11  Q.  Would you turn to tab No. 13.  Do you see that

12    document?

13  A.  Yes.

14  Q.  Did you receive this document on or about April

15    1, 2004?

16  A.  Yes.

17        MR. ROSS:  I'd like to have this

18    document admitted into evidence.

19        MR. CORBETT:  No objection.

20        CHAIRMAN GIACOMARRA:  We'll mark tab

21    13.

22        (Document marked as Exhibit C13.)

23  Q.  And you understood from this document that you

24    were required to take certain actions on or

1    before April 8, 2004?

2  A.  Yes.

3  Q.  And in particular it says, "you are requested,"

4      just jumping in the middle, "requested to deposit

5      into your account at least $210,326.64 in cash or

6      acceptable collateral.  Your deposit of cash or

7      securities should be made on or before April 8,

8      2004."  Do you see that?

9  A.  Yes.

10  Q.  You never made any payment towards that, correct?

11  A.  I did not.

12  Q.  You never sent in any securities?

13  A.  I did not.

14  Q.  If you would turn back to Exhibit No. 6, and we

15      left off, we were starting to look at the month

16      of April, 2004.  If you would look at the month

17      of April, 2004, there was no activity because you

18      said you didn't send in any money.  That comports

19      with your recollection, right?

20  A.  That's correct.

21  Q.  And then if you would turn to June of '04, do you

22      see that?  You didn't ask for, you didn't ask for

23      the stock to be sold in the account, right?

24  A.  I did not.

1 Q. Like your brother, your understanding is this was

2    a liquidation -- and I'm not asking you when you

3    had that understanding -- but this was a

4    liquidation done by the clearing firm?

5 A. That's correct.

6 Q. And that was so for the month of June, it

7    comports with your recollection that

8    approximately $10,000 worth of cash was generated

9    from liquidations in the account?

10 A. Yes.

11 Q. And then if you would turn to July 31, actually

12    the statement period for July of '04, turn to

13    Page 2 of that, it will show that an additional

14    $20,682.74 was generated --

15 A. Yes.

16 Q. -- as a result of liquidations in the account?

17 A. Yes.

18 Q. Does that comport with your recollection?

19 A. It does.

20 Q. If you look at the first page of the July, '04

21    statement, it shows a deficit in the account of

22    $180,172.19.  Do you see that?

23 A. Say that again?  I'm sorry.

24 Q. The first page of July of '04, it says, "current

1    month value." Do you see that?

2  A.  Yes.

3  Q.  And it shows "180,172.19 DEF"?

4  A.  That's correct.

5  Q.  I'm suggesting DEF stands for deficit.

6  A.  Yes.

7  Q.  That's your understanding, that at the close of

8    the account you had a deficit in the amount of

9    $180,172.19?

10  A.  For the close of that month, that's correct.

11  Q.  There was no other activity after the month;

12    isn't that correct?

13  A.  Yeah.

14  Q.  I'm sorry? This is the end of the account, the

15    stock's been sold out?

16  A.  I personally did not close the account out.

17  Q.  Right. I'm saying, all the securities were

18    liquidated in the account?

19  A.  Right, yes.

20  Q.  And you have not satisfied any of the $180,172.19

21    deficit?

22  A.  No.

23        MR. ROSS: I have no further

24    questions, thank you.

1          MR. CORBETT:  If I might take a brief

2     break before I begin my cross, two minutes?

3          CHAIRMAN GIACOMARRA:  Okay.

4          MR. CORBETT:  Thank you.

5          (Brief recess.)

6          CHAIRMAN GIACOMARRA:  We can go back

7     on the record and you may continue with the

8     witness on cross examination.

9          CROSS EXAMINATION

10    BY MR. CORBETT:

11    Q.  Mr. Mscisz, during direct examination, Mr. Ross

12         was asking you some fairly technical questions

13         about the IPO and the confirmations and all those

14         things.  Was this the first IPO that you've ever

15         participated in?

16    A.  No.

17    Q.  How many others had you participated in?

18    A.  Probably two.

19    Q.  Now, you had also -- each of the confirmations

20         that were admitted as claimant's Exhibit 5 are

21         marked "unsolicited"?

22    A.  Yes.

23    Q.  Do you remember that?

24    A.  Yes.

1  Q.  Is that true with respect to each of those

2    trades?

3  A.  No, they were not.

4  Q.  Which trades were not solicited -- were solicited

5    or in general were there trades that were

6    solicited and by whom?

7  A.  The trades that were under margin were solicited

8    trades.

9  Q.  How were they solicited?

10  A.  Through a phone call from Tim to me indicating

11    that Mark had made some purchases and was it my

12    intent to make some purchases as well at that

13    point.

14  Q.  Did the conversations continue in any respect?

15  A.  Conversations continued, usually on a daily

16    basis.

17  Q.  And how did they proceed?

18  A.  I think I made one or two trades on margin.

19  Q.  Now, with respect to the margin aspects, what's

20    your understanding as to who it was that was

21    lending you money?

22  A.  Sterne, Agee.

23  Q.  And when you sent money in to fund your account

24    initially, who did you send it to?

1  A. Sterne, Agee.

2          MR. ROSS:  We can have the same

3      stipulation, it's a $100,000 BD, the money goes

4      to the clearing firm, much like Leerink and his

5      prior firm.  I'll stipulate that none of the

6      checks went to Kashner, and Kashner can't accept

7      checks, they just forward it on to the clearing

8      firm.  You can't deposit checks?  So I'll

9      stipulate to that if it helps move it along.

10          CHAIRMAN GIACOMARRA:  Mr. Corbett?

11          MR. CORBETT:  That's fine.

12  Q. Mr. Ross was walking you through a client account

13      agreement that was marked, that was the last five

14      pages of tab 8.  Do you remember that discussion?

15  A. Yes.

16          MR. ROSS:  I'll just say, that's the

17      margin agreement.  The account agreement is the

18      tab No. 1, so I'll just make a formal objection.

19  Q. When you returned either the initial account

20      agreement or the initial, additional documents

21      that were adding margin to your account, did you

22      return the entire five-page package to Kashner

23      Davidson?

24  A. Did not.

1  Q.  What did you return?

2  A.  Just the signature page.

3  Q.  And was there anything on the signature page of

4     Exhibit 8 that changed the definition of the word

5     "you" in the main body of the document?

6  A.  No.

7  Q.  Was there anything in the signature page of

8     Exhibit 8 or any other part of Exhibit 8 that

9     purported to create an extension of credit by

10    Kashner Davidson to you?

11 A.  No.

12 Q.  What was your understanding of the role of

13    Kashner Davidson in the margin agreement?

14 A.  Simply, again, a brokerage firm making the

15    trades.

16 Q.  And when margin calls subsequently happened, did

17    you send the money to Kashner Davidson?

18 A.  No.

19 Q.  All your checks were payable, not with respect to

20    margin calls, all your checks in the course of

21    the account were payable to SAL or Sterne, Agee?

22 A.  That's correct.

23 Q.  Why didn't you send money back in response to the

24    margin call?

1  A.  Because the -- I received one phone call from,

2     initially from the firm, Kashner, Matt Meister;

3     there were no more follow-up calls after that,

4     and I wanted to, and I wanted to wait to see what

5     would come pursuant to that.

6  Q.  Now I'm going to look at some versions of

7     exhibits that we've marked as they are the copies

8     that have been produced by you.  In particular, I

9     want to draw the panel's attention and Mr. Ross's

10    attention to Exhibits 10 through 14.

11          CHAIRMAN GIACOMARRA:  Are we in the --

12          MR. CORBETT:  In the respondents'

13    book.

14  Q.  Now looking at No. 10, unlike the version of the

15    margin call that you were asked about on direct

16    examination, the top words on that document are

17    not "Broker:  Kashner Davidson, Inc.," correct?

18  A.  That's correct.

19          MR. ROSS:  Wait.

20          MR. CORBETT:  Respondents' Exhibit 10.

21          MR. ROSS:  "Broker-: Kashner Davidson

22    Securities," unless I'm looking at a different

23    document.

24  Q.  What's the top text on the top of that document?

1           MR. ROSS:  Maybe I'm looking at the

2    wrong one.

3           MR. CORBETT:  The letterhead.

4           MR. ROSS:  Oh, the letterhead.

5           MR. CORBETT:  I'm was directing his

6    attention to the letterhead.

7    A.  Sterne, Agee, Leach.

8    Q.  And the version that Mr. Ross examined you about

9    did not have that letterhead?

10   A.  That's correct.

11   Q.  And the version that Mr. Ross examined you about,

12   that's Exhibit 11 in the respondents' book,

13   correct?  That's equivalent to the one that Mr.

14   Ross was asking you about?

15   A.  That's correct, yes.

16   Q.  And in Exhibit 10 and in Exhibit 11, do you have

17   any understanding as to what those documents

18   meant with "your account with our firm," for

19   example, what was "our firm" referred to in that

20   document?

21   A.  That was Sterne, Agee, Leach.

22   Q.  And to your knowledge did Kashner Davidson send

23   either of these documents to you?

24   A.  They did not.

1   Q.  What about Exhibits 12 and 13, who sent those

2       documents to you?

3   A.  Sterne, Agee and Leach.

4   Q.  Was it your understanding that they came from

5       Kashner Davidson?

6   A.  No, they did not.

7   Q.  Was it your understanding or did you have an

8       understanding as to whether those documents

9       purported to refer to a debt that you owed to

10      Kashner Davidson as opposed to Sterne, Agee?

11  A.  No.

12  Q.  What about Exhibit 14, where did that come from?

13  A.  Again, from Sterne, Agee & Leach.

14  Q.  And, again, did that refer to any debt that you

15      allegedly owed to Kashner Davidson?

16  A.  No.

17  Q.  Now, are you familiar with your brother Mark's

18      trading activity in the VasoActive stock?

19  A.  No.

20  Q.  In terms of the gross volume or the magnitude of

21      his positions, do you have any knowledge?

22  A.  No.

23  Q.  Do you have any understanding as to whether he

24      was trading on margin?

1    A.  Only after comments and communication with Tim

2         Varchetto.

3    Q.  Now, when you decided to trade on margin in this

4         account, were you required to submit a personal

5         financial statement?

6    A.  No.

7    Q.  It was okay for Mr. Varchetto to and for Kashner

8         Davidson to go on the information in your initial

9         new account application?

10   A.  Yes.

11   Q.  And that initial new account application was

12        accurate?

13   A.  Yes, it was.

14   Q.  Did you ever have -- did you ever receive a

15        statement from Kashner Davidson purporting to set

16         forth an amount of money that you owed to that

17        firm?

18   A.  No.

19   Q.  Did you ever receive a document that purported to

20        assign a claim of Sterne, Agee to collect under

21        the client account agreement to Kashner Davidson?

22   A.  No.

23   Q.  Did you ever reach any sort of agreement with

24        Kashner Davidson concerning any amount that you

1     would owe it for putative margin debt?

2   A.  No.

3   Q.  Did you ever do anything that might be construed

4     as manifesting your agreement to a particular

5     figure?

6   A.  No.

7   Q.  Did the firm, Kashner Davidson, ever send you, or

8     to your knowledge your brother, Mark, a demand

9     letter before they commenced this arbitration

10     proceeding?

11   A.  No.

12         MR. CORBETT:  I've got no more

13     questions at this time but I reserve my right to

14     recall Mr. Mscisz in my case in chief.

15         CHAIRMAN GIACOMARRA:  The tabs in your

16     binder, 10 through 15 that you made reference

17     to --

18         MR. CORBETT:  I move admission of

19     those exhibits.  Thanks.

20         CHAIRMAN GIACOMARRA:  Any objection to

21     that?

22         MR. ROSS:  No.  What are we doing, 10,

23     11, 12, 13, 14?

24         MR. CORBETT:  10 through 14, yes.

1          MR. ROSS:  15 is already in.

2          (Documents marked as Exhibits R10

3          through R14.)

4          CHAIRMAN GIACOMARRA:  Do you have any

5   redirect for this witness, Mr. Ross?

6          MR. ROSS:  No.

7          CHAIRMAN GIACOMARRA:  Okay.  So we'll

8   break for lunch.  We'll go off the record.

9          (Luncheon recess.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

1          AFTERNOON SESSION

2          CHAIRMAN GIACOMARRA:  I'd like to go

3     back on the record, and, Mr. Ross, would you like

4     to call your next witness?

5          MR. ROSS:  Yes, but I'm going to get

6     some water, if you don't mind.  It will take me

7     roughly three seconds.  Claimant calls Timothy

8     Varchetto.

9          CHAIRMAN GIACOMARRA:  I remind you

10     you're still under oath, Mr. Varchetto.

11          THE WITNESS:  Yes.

12          TIMOTHY VARCHETTO, Sworn.

13          DIRECT EXAMINATION

14     BY MR. ROSS:

15  Q.  Good afternoon.  Would you please tell the panel

16     a little bit about your educational background?

17  A.  I got my GED in the service, attended college,

18     was two classes shy of an associate's degree.

19  Q.  Did you ever obtain -- would you tell the panel

20     about your, when you began working in the

21     securities industry?

22  A.  1985.

23  Q.  And where was that?

24  A.  Kashner Davidson Securities.

1   Q.  And what did you do for Kashner Davidson

2      Securities in 1985?

3   A.  I was a registered rep.

4   Q.  Did your responsibilities ever change at Kashner

5      Davidson?

6   A.  Yes.  In 2000 I became the registered options

7      principal and registered municipal principal,

8      along with associate or assistant compliance.

9   Q.  And --

10   A.  And then --

11   Q.  Let me ask the questions.  I'm sorry.

12              And did your responsibilities ever

13      change after the year 2000?

14   A.  Yes.

15   Q.  And would you tell the panel what they were?

16   A.  Yes.  I became full compliance officer recently.

17   Q.  When was that?

18   A.  Less than a year ago.

19   Q.  If you would turn to Exhibit No. 1 in evidence in

20      the respondents' book.

21              MR. CORBETT:  Claimant's 1.

22              MR. ROSS:  Claimant's 1.  Thank you.

23      I keep forgetting which side I'm on.  As you can

24      tell, I'm usually respondent's counsel.

1  Q.  There was testimony this was the -- Mr. Steven

2      Mscisz testified this was the new account form

3      completed in connection with his Kashner Davidson

4      account.  Do you agree with that?

5  A.  Yes.

6  Q.  If you turn to the second page of that where it

7      says, "registered representative's signature," do

8      you see that?

9  A.  Yes.

10  Q.  Whose signature is that?

11  A.  Matt Meister.

12  Q.  And next to that it says "supervisory principal,"

13      do you see that?

14  A.  My signature.

15  Q.  Do you see where it says "supervisory principal"?

16  A.  Yes, I do.

17  Q.  Whose signature is that?

18  A.  Mine.

19  Q.  If you turn to Exhibit No. 2 in the book, do you

20      know what that document is?

21  A.  Red herring.

22  Q.  Is it also known by any other name?

23  A.  Preliminary prospectus.

24  Q.  And do you know if preliminary prospectuses are

1    ever sent out?

2    A.  They're sent out all the time on indications of

3      initial interest.

4    Q.  And who sends them out?

5    A.  Our office.

6    Q.  Or any other --

7    A.  Kashner Davidson.

8    Q.  Or any other firm that's doing an underwriting?

9    A.  Yes.

10   Q.  Was it sent out in connection with the VasoActive

11     IPO?

12   A.  Yes, it was.

13   Q.  Which clients was it sent to in connection with

14     the VasoActive IPO?

15   A.  All clients that indicated interest.

16   Q.  Do you know if Steven Mscisz indicated an

17     interest?

18   A.  Yes, I do.

19   Q.  And if you turn to Exhibit No. 1 on the bottom

20     left-hand side, it says 5K indication VAPH.  Do

21     you see that?

22   A.  Yes.

23   Q.  Exhibit No. 1, bottom left-hand side.

24           Do you know whose handwriting that is?

1  A.  No, I don't.

2  Q.  Do you know what that refers to, a 5K indication?

3  A.  Yes.

4  Q.  Would you please tell the panel what that refers

5     to?

6  A.  Steve had indicated for 5,000 shares of the

7     initial public offering.

8  Q.  And is that what you testified would trigger

9     sending out the red herring or preliminary

10    prospectus?

11  A.  Yes.

12  Q.  Do you know if it was sent to Steven Mscisz?

13  A.  Yes.

14  Q.  And you know that because?

15  A.  Because he indicated for the offering.

16         MR. ROSS:  I'd like to have Exhibit

17     No. 2 introduced into evidence.

18         MR. CORBETT:  No objection.

19         CHAIRMAN GIACOMARRA:  Mark that.

20         (Document marked as Exhibit C2.)

21  Q.  I'd like to direct your attention to Exhibit No.

22     5 already in evidence, the first page of it.

23     Steven Mscisz testified these are the

24     confirmations he received in connection with the

1    Kashner Davidson account.  Is that your

2    understanding as well?

3  A.  Yes.

4  Q.  On the bottom it says, "prospectus mailed under

5    separate cover."  Let me ask you, first of all,

6    what does this confirmation refer to, if you

7    know?

8  A.  It refers to his being allocated 2,000 shares of

9    the IPO.

10  Q.  And how do you know this is a ticket for an IPO?

11  A.  Because one fact is it says "prospectus mailed

12    under separate cover."

13  Q.  And also that there's no commission, would that

14    be relevant in connection with it?

15  A.  Yes, it would.

16  Q.  What does it mean when it says "prospectus mailed

17    under separate cover"?

18  A.  The prospectus is generated, is sent out by our

19    clearing firm to all clients that receive shares.

20  Q.  And do you know if that was done in this

21    particular case?

22  A.  Yes.

23  Q.  And how do you know that?

24  A.  It's done in all cases.

1  Q.  And there's been testimony, who's your clearing

2     firm?

3  A.  Sterne, Agee, Leach.

4  Q.  Let me direct your attention to Exhibit No. 4,

5     underneath tab No. 4, it's not an exhibit yet,

6     and ask if you recognize this document?

7  A.  That would be the final prospectus.

8  Q.  And when you say the final prospectus was sent

9     out by the clearing firm in connection with the

10    IPO, is this the final prospectus that you're

11    referring to?

12 A.  Yes.

13        MR. ROSS:  I'd like to --

14 Q.  Do you know if it went out in this particular

15    case to Steven Mscisz?

16 A.  Yes, it did.

17 Q.  How do you know that?

18 A.  Because he received shares, and it goes out to

19    everyone.

20        MR. ROSS:  I'd like to have Exhibit

21    No. 4 introduced into evidence.

22        MR. CORBETT:  No objection.

23        CHAIRMAN GIACOMARRA:  We'll mark that.

24        (Document marked as Exhibit C4.)

1  Q.  Now if we can go back to Exhibit No. 5 in

2      evidence, the first confirmation you've testified

3      to.  Who is the broker denoted on the

4      confirmation?

5  A.  Matt Meister.

6  Q.  Is Matt Meister still with the firm?

7  A.  No.

8  Q.  Was there ever another broker who handled this

9      account?

10  A.  Yes.

11  Q.  Who is that?

12  A.  Me.

13  Q.  If you would turn to the second exhibit tab --

14      excuse me.  If you would turn to the second

15      exhibit under tab No. 5.  This reflects -- why

16      don't you tell the panel what this reflects?

17  A.  This would be a buy of 1400 shares of Vaso on

18      February 11.

19  Q.  I'm sorry, what did you say?

20  A.  It was a purchase of 1400 shares of Vaso on

21      February 11.

22  Q.  Now, it says, "account type 1."  Can you tell the

23      panel what "account type 1" means?

24  A.  That would be a cash account.

1  Q.  What other type of account is there?

2  A.  Margin.

3  Q.  Now, this shows "RPTD 14.44 MRKUP .20."  Can you

4      tell the panel what those symbols represent?

5  A.  That would have been the reported offering price

6      was 14.44 and the markup was 20 cents, so the net

7      to the client would have been 14.64.

8  Q.  Below that appears the word "unsolicited."  Do

9      you see that?

10  A.  Yes.

11  Q.  What does that mean on a confirmation?

12  A.  It was the client's idea.

13  Q.  Whose idea was it to invest in VasoActive for

14      this transaction?

15  A.  Steve Mscisz.

16  Q.  Now we've established, and you can take a moment

17      and look through it, that all trades are marked

18      "unsolicited."  If you want to flip through the

19      confirmations and see that.  I guess I'm talking

20      about prior to the liquidations dated June 29,

21      2004.  Do you see all those marked "unsolicited"?

22  A.  Yes, I do.

23  Q.  What does that mean that all those are marked

24      "unsolicited"?

1  A.  They were all the client's idea.

2  Q.  Now, if you turn, just for clarity's sake, if you

3    turn to the confirmation for 6/29/04, that's the

4    seventh one in, I think, the eighth one in, I beg

5    your pardon.  Do you see that, Mr. Varchetto?

6  A.  6/29 -- eighth one in?

7  Q.  Maybe it's 6/24, looking at the settlement date.

8    Maybe that's the confusion.  There it is.

9    Settlement date is 6/29.

10  A.  6/29.

11  Q.  Do you have an understanding -- this says

12    "unsolicited."  Is this reflective of -- the

13    respondents had testified to liquidations done by

14    Sterne, Agee.  Does this reflect the

15    liquidations?

16  A.  Yes, it does.

17  Q.  And this is after -- okay.

18        Would you turn to what's underneath

19    tab No. 7, please.

20  A.  Okay.

21  Q.  Would you please tell the panel what this

22    document is?

23  A.  This is an activity workbook, an account workbook

24    that the brokers can use to verify, to expedite

1    the, being able to tell what the transactions

2    were in the account.

3  Q.  Is this a document that's created in the ordinary

4    course of Kashner Davidson's business?

5  A.  Yes.

6  Q.  And you've reviewed this document?

7  A.  Yes.

8        MR. ROSS:  I'd like to have this

9    document admitted in evidence.

10        MR. CORBETT:  No objection.

11        CHAIRMAN GIACOMARRA:  We'll mark it.

12        (Document marked as Exhibit C7.)

13  Q.  Can you tell the panel what this represents in

14    terms of cash balance on the top, minus

15    180,172.19?

16  A.  That would have been the debit balance of the

17    account at the end of this period.

18  Q.  At the end of the account, right?

19  A.  Right, and the account.

20  Q.  And if you would turn to the last, second to last

21    page underneath tab No. 6, can you tell me how

22    that number compares to what the deficit equity

23    in the account was at the close on July 31, '04?

24  A.  It's the same.

1 Q. I'm sorry?

2 A. It's the same.

3 Q. Now, the Msciszes had both testified to a margin

4    notice. Do you recall that?

5 A. Yes.

6 Q. Let me first direct your attention to Exhibit No.

7    8. Steven Mscisz had said that you had faxed

8    this to him?

9 A. Correct.

10 Q. Is that correct?

11 A. Yes.

12 Q. Is that your handwriting on the top of it?

13 A. Yes.

14 Q. If you would turn to the third page of that

15    five-page document that follows your fax

16    transmission sheet. Mr. Steven Mscisz said that

17    was his signature under the Kashner Davidson

18    Securities Corp. Updated Client Agreement Adding

19    Margin to Client Account. Midway through it

20    says, "Client signature." Steven Mscisz said

21    that was his signature?

22 A. Yes.

23 Q. When it says "authorized by," can you tell me

24    whose signature that is?

1  A.  Mine.

2  Q.  If you would turn to Exhibit No. 13, please.  Mr.

3      Steven Mscisz had said that on receipt of that,

4      he did not send in any additional funds to

5      satisfy this.  Is that your understanding as

6      well?

7  A.  No -- oh, Steve, yes, that is my understanding.

8  Q.  So as of today with regard to the Steven Mscisz

9      account, the debit owed in connection with that

10     you testified is $180,172.19?

11  A.  Yes.

12  Q.  You heard Mark Mscisz testify in this matter as

13     well?

14  A.  Yes.

15  Q.  If you would turn to tab, Exhibit No. 14.  Mark

16     Mscisz testified that this is captioned "New

17     Account Form;" is that correct?

18  A.  Correct.

19  Q.  Now if you turn to the second page of that

20     document, bottom left, it says "Registered

21     Representative."  Do you see that?

22  A.  Yes.

23  Q.  Whose signature appears there?

24  A.  My signature.

1   Q.  To the right of that it says, "Supervisory

2       Principal."  Do you see that?

3   A.  Mine.

4   Q.  Whose signature appears there?

5   A.  Mine.

6   Q.  On the top right-hand corner of the first sheet

7       of that document it says "IOI 2000 VAPH."  Do you

8       see that?

9   A.  Yes, I do.

10  Q.  Do you know whose handwriting that is?

11  A.  No.

12  Q.  Do you have an understanding of what IOI stands

13      for?

14  A.  An indication of interest.

15  Q.  So in connection with this indication of interest

16      from Mark Mscisz and Lynda Mscisz, do you know if

17      Mark Mscisz and Lynda Mscisz would have received

18      a copy of the red herring or preliminary

19      prospectus which was Exhibit 2 in evidence?

20  A.  Yes, they would have.

21  Q.  And if you would turn to Exhibit No. 16.  Can you

22      tell how many shares were purchased in the

23      initial public offering for the benefit of Mark

24      and Lynda Mscisz?

1  A.  Yes.

2  Q.  And how many is that?

3  A.  2,000.

4  Q.  And how can you tell that?

5  A.  Because it states they purchased 2,000 shares on

6      December 10.

7  Q.  And?

8  A.  And also because they, it states the prospectus

9      mailed under separate cover, and there's no

10     mark-up on it.

11  Q.  So the prospectus was mailed under separate

12      cover.  Do you know if a prospectus would have

13      been sent or was sent to Mark and Lynda Mscisz?

14  A.  Yes.

15  Q.  And who sent it?

16  A.  Our clearing firm again.

17  Q.  If you would turn to the second page under

18      Exhibit 16 -- and you can flip through those

19      confirmations -- I'll represent to you that

20      they're all denoted as unsolicited, but you

21      should -- if you want to take a look at that.

22  A.  I remember.

23  Q.  Does your understanding of the word "unsolicited"

24      here differ in any way, shape or form from what

1    you testified already as to unsolicited?

2  A.  No.

3  Q.  Whose ideas were these investments in VasoActive?

4  A.  Mark's.

5  Q.  Do you know what relationship Mark had with

6    anybody in VasoActive?

7  A.  I know he was John's brother.

8  Q.  And do you understand what John's position at

9    VasoActive was?

10  A.  Yes, I do.

11  Q.  And would you please tell the panel what that

12    was?

13  A.  CEO.

14  Q.  And president?

15  A.  And president.

16  Q.  I assume your testimony would be the same for

17    Steven Mscisz's brother?

18  A.  Yes.

19  Q.  Would you turn to what's underneath tab No. 18,

20    please.  Would you identify that document for the

21    panel, please?

22  A.  That is the activity trades in Mark and Lynda's

23    account.

24  Q.  Now, unlike the account we just looked at for

1    Steven Mscisz, apparently there were some sales

2    of VasoActive in the account?

3  A.  Yes.

4  Q.  Do you recall that?

5  A.  Yes, I do.

6  Q.  For example, if you go to entry No. 11 and entry

7    No. 12, can you explain to the panel what those

8    two entries represent?

9  A.  Entry 11 would have been a buy of 1,000 shares of

10    Vaso at 38.85.

11  Q.  I think it's 36 -- 36 or 38?

12  A.  I think you're right, it looks like 36.85.

13  Q.  And what does 12 represent?

14  A.  12 represents the sale of a thousand at, on the

15    same day at $40.

16  Q.  Is this the holding page, is this kind of like a

17    holding page?

18  A.  It's basically -- it can eliminate the holding

19    page because it does show everything that we

20    would put on the holding page.

21  Q.  What does this document reflect as the

22    outstanding balance with regard to the account?

23  A.  $180,850.75.

24  Q.  And if you would turn to, underneath tab No. 18,

1    the second to last page, and tell the panel how

2    that comports with the monthly statements that

3    Mark Mscisz said he received in this matter?

4  A.  It's the same, $180,850.

5        MR. ROSS:  I'd like to have Exhibit

6    No. 18 introduced into evidence.

7        MR. CORBETT:  No objection.

8        CHAIRMAN GIACOMARRA:  We'll mark that.

9        (Document marked as Exhibit C18.)

10  Q.  Would you turn to Exhibit No. 20, please.  Do you

11    recognize this document?

12  A.  Yes.

13  Q.  And what is it?

14  A.  It's a client account agreement, margin account

15    agreement.

16  Q.  And if you would turn to the third page of that

17    document.  Do you see that?

18  A.  Yes, I do.

19  Q.  Mark Mscisz testified that that was his signature

20    in "client's signature"?

21  A.  Yes.

22  Q.  It says, "Authorized by TV."  Do you know who TV

23    refers to?

24  A.  Yes.

1  Q.  Would you tell the panel who that is?

2  A.  That would be me.

3  Q.  If you would turn to Exhibit No. 24.  Mark Mscisz

4    testified he received this document.  Do you

5    recall that testimony?

6  A.  Yes, I do.

7  Q.  He also -- do you know whether he sent in any

8    funds after this date?

9  A.  Yes, $100,000.

10  Q.  And does that appear on the monthly statements

11    that are underneath Exhibit No. 17, and

12    specifically I'll direct your attention to the

13    monthly statements for the month of April of '04?

14  A.  Yes.

15  Q.  And what are you referring to?

16  A.  4/7, incoming wire of $100,000.

17  Q.  Is that Page 2 of 3?

18  A.  Yes, it is.

19      MR. ROSS:  I have no further

20    questions.  Thank you.

21      CHAIRMAN GIACOMARRA:

22    Cross-examination, Mr. Corbett?

23      MR. CORBETT:  Yes, Mr. Chairman.  I'm

24    going to approach the witness with respondents'

1    exhibits.

2           CROSS EXAMINATION

3    BY MR. CORBETT:

4    Q.  Good afternoon, Mr. Varchetto.

5    A.  Good afternoon.

6    Q.  Just as an introductory matter, I heard a lot of

7        discussion during your direct examination and

8        also during the direct examination of Mark and

9        Steve Mscisz about another associated person who

10       had been involved in this account, correct?

11   A.  Yes.

12   Q.  That was Matt Meister; is that correct?

13   A.  Yes.

14   Q.  And is it your understanding that Kashner

15       Davidson was obligated and ordered by the

16       chairman of this panel to produce all of the

17       documents on list 1 of the NASD's discovery

18       guide?

19           MR. ROSS:  I object to that.  First of

20       all, I don't understand the context of his

21       question.  Second of all, I think he's trying to

22       back-door your discovery ruling, unless I'm

23       missing something.

24           MR. CORBETT:  I'm not.

1          MR. ROSS:  Discovery was directed to

2    counsel, so I'm not -- I object to the question.

3          CHAIRMAN GIACOMARRA:  Could you

4    rephrase the question?  I'm not going to allow a

5    discovery question.

6          MR. CORBETT:  It's not a discovery

7    question; it is actually a substantive violation

8    of the rules.

9  Q.  Were you instructed by your counsel or by anybody

10    to perform a search for documents responsive to

11    requests for discovery made by the Msciszes?

12          MR. ROSS:  I'm going to object to

13    that.

14          MR. CORBETT:  Let me explain the basis

15    for the question.  There's been a lot of

16    questioning and there's a few documents in here

17    concerning Matt Meister, who is another

18    associated person who was involved in the case.

19    Even under the limited discovery that we were

20    given under your order, you ordered the claimant

21    to produce all of the documents that are on

22    several of the items on list 1 of the discovery

23    guide.  Among those are things like U4s and U5s

24    concerning all associated persons who have been

1      involved in the account, including Matt Meister,

2      who has left the firm and it's my understanding

3      based upon an arbitration award that we got from

4      the NASD's own web site that Mr. Meister was hit

5      about the time of this termination with a

6      sanction in an arbitration for charging excessive

7      commissions.  And there may be other information

8      in the U4s, U5s and other responsive information

9      as well.  Now --

10           CHAIRMAN GIACOMARRA:  The wasn't

11      directed to Mr. Varchetto specifically, right?

12           MR. CORBETT:  It was directed to

13      Kashner Davidson.  And under rule 10100 of the

14      Code, to fail to produce documents in the

15      possession of KDSC as directed pursuant to the

16      code of arbitration procedure and as directed

17      pursuant to your own order, that's a substantive

18      violation of the Association's Code of Conduct,

19      and I think that's something that is fair game to

20      be established.

21           CHAIRMAN GIACOMARRA:  You've already

22      made your --

23           MR. CORBETT:  I'm not asking for the

24      information; I just want to establish that

1    violation of the code for the record.  They had

2    the order, they didn't comply with the order, and

3    that's a violation.

4              CHAIRMAN GIACOMARRA:  I don't see why

5    it's an appropriate question for this witness.

6    You made the point to the panel already that you

7    didn't receive everything in the discovery order.

8    We said we noted it, we'd take that into

9    consideration, so I'd like you to move on with

10    your case.

11              MR. CORBETT:  Okay.

12    BY MR. CORBETT:

13  Q.  Mr. Varchetto, when Mark Mscisz sent funds after

14    receiving the margin call, did he send that to

15    Kashner Davidson?

16  A.  Yes.

17  Q.  And that went into Kashner Davidson's account?

18  A.  That went into his account.

19  Q.  It went to Sterne, Agee, didn't it?

20  A.  Mark, the $100,000 are you talking about?

21  Q.  Yes.

22  A.  It was wired into his account.

23  Q.  At Sterne, Agee?

24  A.  Yes, our account -- well, I don't know -- I think

1    we've already argued this.  Into his account.

2  Q.  Now, you testified on direct with respect to

3    Exhibits 2 and 5 that you know that those

4    prospectuses, one is the so-called red herring,

5    the other is the final, were sent to Mark and

6    Steve Mscisz?

7  A.  Yes.

8  Q.  Did you see them put in the mail?

9  A.  No, I didn't.

10  Q.  Did you ever hear -- do you have any knowledge as

11    to whether they received them or not?

12  A.  Other than what I have heard -- other than what

13    I've heard, no.

14  Q.  Did you -- do you know who it was at Sterne, Agee

15    that sent those prospectuses to Mr. Msciszes?

16  A.  The final, no, I don't.

17  Q.  Do you know who it was at Kashner Davidson that

18    sent the red herring?

19        MR. ROSS:  Objection.

20  A.  It was Kashner Davidson.  Yes, I do know.

21  Q.  Who at Kashner sent it?

22  A.  Eleanor.

23  Q.  When?

24  A.  After the indication of interest.

1  Q. How did she send it?

2  A. Regular mail.

3  Q. Do you know what date?

4  A. No.

5  Q. Do you know where she sent it to address-wise?

6  A. Not on me, no, I don't.

7  Q. Do you know what caused Eleanor to send that by

8     regular mail?

9  A. I think -- well, you know what, I should state

10    I'm not positive it was regular mail.  I believe

11    it was, but I thought they all went regular mail.

12  Q. Did you specifically instruct Eleanor to send the

13    prospectus out to Steve Mscisz?

14  A. No, I didn't.

15  Q. Did you specifically instruct Eleanor to send a

16    prospectus out to Mark Mscisz?

17  A. No, I didn't.

18  Q. Did you see Eleanor send a prospectus to either

19    Steve or Mark Mscisz?

20  A. No, I didn't.

21  Q. Did you ever receive verification from Eleanor

22    that a prospectus had been sent to Steve or Mark

23    Mscisz?

24  A. No, I didn't.

1  Q. Mr. Ross went through several confirmations with

2     respect to both Mark and Steve's account and

3     talked to you about the word "unsolicited" a

4     little bit.  Did Mark or Steve have any input

5     into whether the word "unsolicited" went on these

6     confirmation statements?

7  A. No.

8  Q. Did they generate the statements?

9  A. No.

10  Q. Did they write the word "unsolicited"?

11  A. No.

12  Q. Did Sterne, Agee or Kashner Davidson verify

13     whether they agreed that the particular trades

14     were unsolicited?

15  A. No.

16  Q. Also in response to some questions from Mr. Ross

17     you discussed two account activity workbooks, one

18     was marked as Exhibit 7 and the other was marked

19     as Exhibit 18.  And were these documents

20     submitted to Mark or Steve Mscisz at any time?

21  A. No, these were just, these are broker's workbook.

22  Q. Did Kashner Davidson separately send out any

23     statement to Mark or Steve Mscisz documenting the

24     margin debt that you claim or Kashner Davidson

1    claims --

2  A.  Yeah, confirmations and statements.

3         MR. ROSS:  You've got to let him

4    finish.  I'm sorry, I shouldn't interrupt.  If

5    you let him finish his question, you'll know what

6    he's asking.  I apologize.

7  Q.  Did Kashner Davidson, not Sterne, Agee, ever send

8    to Steve Mscisz a document purporting to set out

9    an amount of money owed by Steve Mscisz to

10     Kashner Davidson as opposed to Sterne, Agee?

11  A.  No.

12  Q.  What about with respect to Mark?

13  A.  No.

14  Q.  Did Steve Mscisz ever tell you or anybody else at

15     Kashner Davidson that he agreed that he owed

16     Kashner Davidson a specified amount of money?

17  A.  Steve?

18  Q.  Yes.

19  A.  I can't recall.

20  Q.  Did Mark Mscisz --

21  A.  Yes.

22  Q.  -- ever manifest any -- excuse me?

23  A.  Yes.

24  Q.  What did Mark tell you?

1  A.  I called him with, when they halted trading, and

2     that's when he sent in the, after the margin

3     call, sent in a hundred thousand.

4  Q.  He sent $100,000 to Sterne, Agee?

5  A.  Right.

6  Q.  And did that somehow -- with that did he send you

7     some cover letter saying, "I acknowledge that I

8     owe X number of dollars to Kashner Davidson"?

9  A.  I'm sorry, no.

10  Q.  In the statement of claim --

11         MR. ROSS:  Can you see that?

12         MR. CORBETT:  Can the panel see that?

13         CHAIRMAN GIACOMARRA:  That's fine.

14  Q.  In the statement of claim through the use of

15     brackets to substitute KDSC or SAL for the word

16     "you" in the quoted text of the account

17     agreement, Kashner Davidson alleges that, "A,

18     each respondent is liable for payment upon demand

19     of any debit balance and interest thereon or

20     other obligations owing in my securities account

21     or other account which I have with [KDSC or

22     SAL]."  Do you see that?

23  A.  Yes.

24  Q.  Is that what the agreement actually says?

1  A.  I believe so, yes.

2  Q.  And what about No. 19, under Paragraph 6 of the

3     agreement, "Respondents agree to reimburse [KDSC

4     or SAL] for all costs including," yada, yada,

5     yada, "incurred in connection with the collection

6     of any debit balance or unpaid deficient in my

7     securities account."  Is that what the agreement

8     says?

9  A.  I imagine.  Can I go to it?

10  Q.  Sure.

11  A.  Which one is it?

12  Q.  One of them is Exhibit 20 in your book.

13     Actually, take a look at Exhibit 1 and Exhibit 2

14     in the stack I gave you, because I'm going to be

15     working from those.

16        Paragraph 6 of the account agreement,

17     which is numbers 1 and 2 of the exhibits I gave

18     you, do any of -- does that bracketed text, KDSC

19     or SAL, appear?

20        MR. ROSS:  I'm going to object.  The

21     idea of putting a bracket in there is you're not

22     quoting from the text, that's why you put a

23     bracket in there.  When you quote from a case,

24     you put a bracket in there, if that's the

1    question.

2          CHAIRMAN GIACOMARRA:  We'll allow the

3    question.

4          MR. ROSS:  Okay.

5    Q.  Where the bracket is is actually the word "you,"

6      isn't that correct?

7    A.  Pardon me?

8    Q.  Paragraph 6 of the client account agreement --

9    A.  Okay.

10   Q.  -- this is what your lawyer's alleged in the

11     statement of claim, and I just want to see where

12     that KDSC or SAL is in the agreement.

13   A.  No, I don't see it, no.

14   Q.  The word "you" appears where the bracketed text

15     is; isn't that correct?

16   A.  I see "you."  I don't see it bracketed.

17   Q.  If you look up at Paragraph 1 in the agreement,

18     "you" is a defined term; isn't that correct?

19   A.  I guess so, yeah.

20   Q.  And those excerpts that were quoted in the

21     statement of claim aren't the only reference to

22     "you" in that agreement; isn't that correct?  For

23     example, Paragraph 6 again says, "I authorize you

24     to take any steps necessary to minimize your

1    losses."  Doesn't it say that in Paragraph 6?

2  A.  Yes.  Uh-huh.

3  Q.  Again in paragraph 6 it refers to "the account

4    which I have with you;" isn't that correct?

5  A.  Uh-huh.

6  Q.  Again Paragraph 6, "The indebtedness owed by you

7    to me;" doesn't it say that?

8  A.  Uh-huh.

9  Q.  And then at the bottom of that paragraph it says,

10    "I agree to reimburse you for all costs,

11    including attorney's fees, losses or liabilities

12    incurred by you in connection with the collection

13    of any debit balance or unpaid deficiency in my

14    securities account," correct?

15  A.  Yes.

16  Q.  And where all those you's are in Paragraph 6,

17    there's no bracketed text that says KDSC or SAL,

18    correct?

19  A.  I don't see it, no.

20  Q.  If you look to the next page on Paragraph 15, it

21    says, "Each of us will be fully liable for any

22    amounts due you under this agreement"?

23  A.  Okay.

24  Q.  And going back to Paragraph 1, on the first page,

1     "you" is a defined term; isn't that correct?

2  A.  Yeah, you already asked that.

3  Q.  "'You' and 'your' refer to SAL and/or its

4     authorized agents," correct?

5  A.  Yes.

6  Q.  And "you" does not refer to Kashner Davidson,

7     because doesn't Paragraph 3 also say that, "My

8     broker dealer, Kashner Davidson, is not an agent

9     of SAL"?

10  A.  I mean, I guess so, you know.

11         MR. CORBETT:  Move the admission of

12     Respondents' Exhibits 1 and 2.

13         CHAIRMAN GIACOMARRA:  Any objection?

14         MR. ROSS:  Do they differ in any way,

15     shape -- I see they don't have a Bates number.

16     Are they any different that what's already in

17     evidence?

18         MR. CORBETT:  Yes, they don't have the

19     header, and it says --

20         MR. ROSS:  I have no objection to 1

21     and 2.

22         CHAIRMAN GIACOMARRA:  We'll mark those

23     respondents' exhibits.

24         (Documents marked as Exhibits R1

1       and R2.)

2           MR. ROSS:  Other than the caption, if

3       I might inquire, other than the caption, are the

4       documents identical?  May I make that inquiry of

5       counsel?

6           MR. CORBETT:  I believe so.

7   Q.  Now, taking a look at the third page of Exhibit 1

8       and 2, respondents' Exhibits 1 and 2?

9   A.  Back to 1?

10  Q.  Both of them.

11  A.  Okay.

12  Q.  Is there anything on that third page that

13      purports to change the definition of the term

14      "You"?

15  A.  I'm guessing no.  No, I don't see anything.

16  Q.  And is there anything on this page that purports

17      to make Kashner Davidson the creditor in the

18      margin arrangement?

19  A.  No.

20  Q.  And in fact I'd like you to read the first two

21      sentences of the notice to Sterne, Agee & Leach

22      into the record.

23  A.  What about our name up on top?

24  Q.  Beginning -- answer my question.  "This is to

1    advise you"...  Can you read that into the

2    record?

3    A.  Okay.  I'm sorry.  What?

4    Q.  "This is to advise you" -- I'll read it.  Under

5       notice to Sterne, Agee & Leach on Page 3 both

6       documents say, "This is to advise you that I have

7       instructed my broker dealer to establish on my

8       behalf and as my agent a securities account with

9       you."  And you understand "you" to refer to

10       Sterne, Agee, correct?

11    A.  Uh-huh.

12    Q.  "I have appointed my broker dealer" -- that's

13       Kashner Davidson, correct?

14    A.  Right.

15    Q.  -- "as my exclusive agent to act for and on my

16       behalf with respect to all matters regarding my

17       securities account with you."  Again, that's

18       Sterne, Agee, correct?

19    A.  Yes.

20    Q.  "Including the placing of purchase, sales and

21       liquidation orders and delivery of margin and

22       option instructions if authorized by my

23       securities account," correct?

24    A.  Yes.

1  Q.  I'd like you to flip ahead to respondents'

2     Exhibit 3, which is the next tab.  Can you take a

3     look at that document and tell me if you

4     recognize it?

5  A.  It's our office procedures, or Kashner Davidson's

6     manual.

7  Q.  Is that a complete Kashner Davidson compliance

8     manual?

9  A.  I don't know.

10  Q.  Could you take a look and tell me?

11  A.  Not really.  It doesn't look like one.  I'm not

12     sure.  I'd have to have the manual with me.

13  Q.  It's the firm's clearing correspondent, Sterne,

14     Agee, I think the stipulation is, that extends

15     credit on margin accounts introduced by the firm,

16     correct?

17  A.  I'm sorry?

18  Q.  It's the firm's clearing correspondent, Sterne,

19     Agee, that extends credit on margin accounts

20     introduced by the firm, correct?

21  A.  Yes.

22  Q.  If you flip ahead to page KDSC 00117 in Exhibit

23     3, middle of the page, that confirms that

24     understanding and policy of the firm, correct?

1   A.  Yes.

2            MR. CORBETT:  Move the admission of

3   respondents' Exhibit 3.

4            MR. ROSS:  I have no objection.  I'll

5   note it's marked "confidential," and at the end

6   of this arbitration, I'd like to have all those

7   records returned to us, but I have no objection

8   to its admission.

9            CHAIRMAN GIACOMARRA:  From respondent?

10           MR. ROSS:  From respondent.  Not from

11   the panel, I'm sorry, of course, but I would like

12   the original and all copies that respondent has

13    returned to us that is marked "confidential."

14           MR. CORBETT:  Once all related

15   litigation is done.

16           MR. ROSS:  I'm sorry?

17           MR. CORBETT:  Once all related

18   litigation is done, I don't have any objection.

19           MR. ROSS:  I'll probably have social

20   security before that happens, but okay.

21           CHAIRMAN GIACOMARRA:  Okay.  We'll

22   mark it.

23           MR. ROSS:  Let's have a

24   representation, since we have an official record,

1    that this document is to be used in the course of

2    prosecuting this case and is not to be

3    disseminated to any third parties, and that's

4    what noting "confidential" means, and I'd like to

5    have respondent's counsel so state.

6         MR. CORBETT:  Would a court be deemed

7    a third party under your understanding?

8         MR. ROSS:  This is produced to you in

9    connection with this arbitration and for no other

10   purpose.  It's been deemed "confidential."  So

11   I'd like to have, and most procedures by firm are

12   confidential, and are entitled to be treated as

13   confidential.  We didn't take issue with it, we

14   have produced those sections.  I just don't want

15   this being disseminated outside this arbitration

16   hearing as it is marked "confidential."

17        MR. CORBETT:  I will represent that if

18   I am to use it in the court proceeding, I'll file

19   it under seal so you'll have the protection

20   associated with the confidentiality and let the

21   court decide whether it gets accorded that

22   confidentiality to it going forward.

23        MR. ROSS:  Thank you for that.  And

24   that you will not disseminate it to third

1    parties.

2              MR. CORBETT:  No, I will not.

3              MR. ROSS:  Thank you.  And that's on

4    behalf of you and your clients?

5              MR. CORBETT:  Yes.

6              MR. ROSS:  I'm happy to move along now

7    and have it marked.

8              (Document marked as Exhibit R3.)

9    BY MR. CORBETT:

10   Q.  Would you move ahead to Exhibit 4, respondents

11    Exhibit 4.  That is a fed wire instruction,

12    correct?

13   A.  It's an incoming wire instruction.

14   Q.  Incoming to SAL Financial Services, not the

15    Kashner Davidson?

16   A.  Correct.

17   Q.  And that's $20,000 that Steven Mscisz wired in in

18    December, 2003?

19   A.  We requested it in 2003, I imagine.  Yeah, it's a

20    request.

21              MR. CORBETT:  Move the admission of

22    Exhibit 4.

23              MR. ROSS:  Well, do you have -- have

24    you ever seen this document before?

1          THE WITNESS:  No.

2          MR. ROSS:  I think as a matter of

3    foundation I'll object to it.  He's reading the

4    document to Mr. Varchetto.  I assume Mr. Mscisz

5    will testify that's his handwriting and he did

6    what he did, but it would certainly not be

7    appropriate to introduce it through Mr.

8    Varchetto.

9          CHAIRMAN GIACOMARRA:  I agree.

10          MR. CORBETT:  Okay.  If necessary I'll

11    connect it up later.

12    Q.  Move ahead to Exhibit 5, which is Bates stamped

13      KDSC 00050.  Tell me if you've seen that document

14      previously.

15    A.  I know what it is.  I don't recall seeing it.  I

16      don't usually get the checks.

17    Q.  If it has the KDSC Bates number, it is presumably

18      produced by your firm?

19    A.  I'm sorry, say that again?

20    Q.  If it has the KDSC Bates or serial number down at

21      the bottom, it was presumably produced by your

22      firm?

23          MR. ROSS:  It was actually produced by

24      my firm and we Bates stamped the document to be

1   produced.

2            MR. CORBETT:  I'm sorry, I Bates

3   stamped them.

4            MR. ROSS:  Pardon?

5            MR. CORBETT:  I Bates stamped them

6   after receipt.

7            MR. ROSS:  So why are you saying we

8   did?

9            MR. CORBETT:  Excuse me?

10           MR. ROSS:  Why are you saying we did?

11           MR. CORBETT:  I Bates stamped them to

12   control --

13           MR. ROSS:  You Bates stamped them?  So

14   when I said before, when I said we Bates stamped

15   it, I take it back.  Apparently we didn't; he

16   did.  I apologize.

17           Is this different in any way, shape or

18   form from Exhibit 3 other than the fact that it

19   has your Bates stamp on it now?  I think 3 is

20   already in evidence.  And I know the distinction

21   for you is the "KDSC," and I appreciate you

22   telling me your office did it, not mine, but is

23   there any other material distinction or any other

24   distinction?

1          MR. CORBETT:  Exhibit 3 is also

2    endorsed, it's time stamped across --

3          MR. ROSS:  They're both time stamped.

4    The firm time stamps them.

5          MR. CORBETT:  That's true.  Okay.  No,

6    there's no distinction.

7          MR. ROSS:  You can ask him why it's

8    time stamped, if that's your question.

9          THE WITNESS:  Whenever they're

10    received, we stamp the date and time we receive

11    the check.

12    BY MR. CORBETT:

13   Q.  Did Kashner Davidson send any margin call notices

14     to Mark or Steven Mscisz?

15   A.  Sterns did.  Is that what you're getting at?

16   Q.  I was just asking the question.  If that's the

17     answer, that's the answer.

18   A.  Okay.

19   Q.  Now, in this statement of claim, Kashner Davidson

20     alleges that -- turn ahead to Exhibit 16.

21   A.  16?

22   Q.  Yes.  I mean 18.  18.  Kashner Davidson alleges

23     that some of the figures on that document,

24     personal financial statement, are untrue; isn't

1    that correct?

2  A.  That is not correct -- I'm sorry, rephrase that

3     question.

4  Q.  Kashner Davidson --

5  A.  I mean re-ask it.

6  Q.  Sure.  In paragraph 38 of Kashner Davidson's

7     statement of claim --

8         MR. ROSS:  Do you want to show it to

9     him?

10         MR. CORBETT:  I can just read it.

11  Q.  It says, "To obtain margin credit, Mark and Lynda

12     Mscisz provided a personal financial statement

13     setting forth their assets and liabilities to SAL

14     in which they represented that their total assets

15     exceeded $18 million and their total liabilities

16     were $6 million.  Mark and Lynda Mscisz made the

17     aforementioned representations for the specific

18     purpose of inducing KDSC and its clearing company

19     to extend credit to them."

20         First of all, we've already

21     established that KDSC didn't extend any credit --

22  A.  Right.

23  Q.  -- to Mark and Lynda.

24         And we've also established that there

1    was no additional margin credit established after

2    the personal financial statement, correct?

3       MR. ROSS:  I'm going to object as

4    misleading, because the next paragraph, which you

5    didn't read, says, "In reliance upon the

6    aforementioned representations by respondents

7    Mark and Lynda Mscisz, KDSC and its clearing firm

8    continued to extend or extended additional margin

9    credit to respondents Mark and Lynda Mscisz."  So

10    the next paragraph -- I think it's misleading the

11    way he has taken it out of context.

12       CHAIRMAN GIACOMARRA:  You'll have an

13    opportunity to redirect.

14       MR. ROSS:  Well -- okay.

15  Q.  Were there any additional trades placed after the

16    personal financial statement?

17  A.  From what I remember, no, I don't think so.

18  Q.  And the margin call notice was issued, what,

19    three days after that personal financial

20    statement came in?

21  A.  3/29.  Yeah, I believe it was 4/1.

22  Q.  And in paragraph 40, Kashner Davidson said, "The

23    material representations made by respondents Mark

24    and Lynda Mscisz were untrue, deceitful, false

1    and fraudulent, and were known by them to be

2    untrue at the time they were made."

3          And doesn't the source of -- wasn't

4    the source of Kashner Davidson's knowledge to

5    make that representation your conversation with

6    Mark Mscisz concerning --

7  A.  I'm sorry, what are you reading?

8          MR. ROSS:  I'm going to object.

9          He's reading a document he doesn't

10    want to show you, that's his prerogative, but I

11    object to that because we know now that is a fact

12    because Mr. Mark Mscisz has already testified the

13    information in there was false and he knew it, so

14    I'm going to object that it is mischaracterizing

15    the evidence in the case by suggesting it wasn't

16    false at the time and Mr. Mscisz did not know it

17    to be false.

18          MR. CORBETT:  That's not what I'm

19    suggesting.  I'm saying that the source of

20    Kashner Davidson's knowledge that that

21    information was false was the very conversation

22    that Mr. Varchetto had with Mr. Mscisz telling

23    him to change the numbers.

24          THE WITNESS:  I never told him to

1    change any numbers.

2         CHAIRMAN GIACOMARRA:  I'll allow the

3    question.

4    Q.  Isn't that why Kashner Davidson knows those

5    numbers were untrue?

6    A.  That these numbers were untrue?

7    Q.  Yes.  There's no other documents in the record

8    that would show those numbers to be untrue.

9         What's the basis for that assertion?

10   A.  Who says these are untrue?

11   Q.  In Exhibit 18, your lawyers did.

12   A.  I'm confused on what you want me to answer.

13   Q.  In paragraph 40 of your company's statement of

14   claim --

15         MR. ROSS:  Still don't want to show

16   him the statement of claim, right?

17         MR. CORBETT:  You can show it to him.

18         MR. ROSS:  That's fine.  I think

19   that's adding to the confusion, but it's your

20   examination.

21         CHAIRMAN GIACOMARRA:  Could we show

22   the witness the statement of claim to make it

23   easier for him to respond, please?

24         MR. CORBETT:  The copy I'm working

1     from has notations on it.

2              CHAIRMAN GIACOMARRA:  Don't you have a

3     copy?

4              MR. ROSS:  I'll show him mine, but can

5     I look over his shoulder?

6              CHAIRMAN GIACOMARRA:  Absolutely.

7              MR. SMITH:  I have a copy.

8              MR. ROSS:  Are you on 40 or 18?

9              MR. CORBETT:  Paragraph 40.

10             (Document exhibited to witness.)

11   Q.  Isn't it true, Mr. Varchetto, that the source of

12      Kashner Davidson's knowledge with respect to the

13      first sentence in paragraph 40 was your

14      conversation with Mark Mscisz on or about March

15      29 --

16   A.  No.

17   Q.  -- '04?

18             Those numbers that are set forth in

19      Exhibit 18 are the very first numbers you

20      discussed with --

21   A.  I didn't discuss any numbers with him.  I faxed

22      this to him, and I didn't even see what it was

23      until I had asked the office what he put down for

24      his net worth.  I didn't discuss this with him.

1          MR. CORBETT:  One thing that might be

2     helpful here, I don't know, Mr. Ross, if you have

3      the original that was sent back that would have

4     the white-out on it.  You only produced a copy.

5          THE WITNESS:  I didn't white out

6     anything.

7          MR. ROSS:  Yeah, I've never seen it.

8          THE WITNESS:  I don't know what you're

9     talking about.  I don't know what he's fed you.

10    I never altered...

11    BY MR. CORBETT:

12  Q.  Look ahead to Exhibit 19.

13          MR. ROSS:  Just give me a second.  In

14    your book?

15          MR. CORBETT:  Yes.  Respondents'

16    Exhibit 19.

17          MR. ROSS:  And that differs from --

18    does that differ from what's already in evidence?

19    Yes, it apparently does.  Never mind.

20  Q.  Mr. Varchetto, Exhibit 19 was in Kashner

21    Davidson's possession at the time every single

22    margin trade was put on, correct?

23  A.  Uh-huh.  Yeah.

24  Q.  And you have no reason to believe that anything

1    said in Exhibit 19 is inaccurate, correct?

2  A.  I don't know.  I didn't open the account.

3  Q.  Matt Meister did?

4  A.  Right.

5         MR. CORBETT:  I move the admission of

6    19.

7         MR. ROSS:  No objection.

8         CHAIRMAN GIACOMARRA:  Mark it.

9         (Document marked as Exhibit R19.)

10        MR. ROSS:  Although for the record we

11   do know something in it is not accurate:  It's

12   been not signed by Lynda Mscisz.

13        CHAIRMAN GIACOMARRA:  That's already

14   in the record.

15        MR. ROSS:  Okay.  Is 18 in the record?

16        ARBITRATOR MCKEON:  Respondents' 18.

17        MR. CORBETT:  Respondents' 18 is in as

18   your 23.

19        CHAIRMAN GIACOMARRA:  Because you

20   offered respondents' 18.

21        MR. ROSS:  You seem to like your own

22   better.  That's the only reason I'm asking.

23        MR. CORBETT:  I'll move for

24   respondents' 18 to be in so it's clear.

1          CHAIRMAN GIACOMARRA:  Any objection?

2          MR. ROSS:  No.

3          ARBITRATOR GRAY:  Isn't it already in?

4          MR. CORBETT:  As claimant's 23.

5          ARBITRATOR GRAY:  What's the

6    difference?

7          MR. CORBETT:  It's a little bit

8    cleaner.  The signatures are cut off on

9    claimant's 23.

10          ARBITRATOR GRAY:  Is it something I

11    need to read, that I'm unable to read?  Do I need

12    two of these to read this thing completely?  When

13    I figure out that the signatures are not there

14    and I understand what they are.

15          MR. CORBETT:  Substantively there's no

16    difference.

17          ARBITRATOR GRAY:  Then why do we foul

18    up the record, clutter up the record with two of

19    the same things when we don't need them both to

20    understand what they are.

21          CHAIRMAN GIACOMARRA:  I mean, I think

22    it facilitates each counsel's ability to present

23    its case, where he knows where his own exhibit

24    is.  Where it's already in the binder, I'm

1    willing to --

2            ARBITRATOR GRAY:  That's 18, right?

3    Respondents' 18.  Okay.

4            (Document marked as Exhibit R18.)

5    BY MR. CORBETT:

6    Q.  Now, Mr. Varchetto, the alleged debt owed by

7    Steve Mscisz is approximately the same magnitude

8    as the putative debt allegedly owed by Mark and

9    Lynda, correct?

10   A.  Yeah.

11   Q.  Steve never submitted a personal financial

12   statement, did he?

13   A.  No.

14   Q.  It was never required?

15   A.  No.

16   Q.  The accounts are the same magnitude?

17   A.  No.  Mark's went over $250,000, and that's when

18   one of those is required.

19   Q.  You've maintained that the trades that were put

20   on by Steve and Mark Mscisz were unsolicited,

21   correct?

22   A.  Correct.

23   Q.  I'm looking at -- if I were to tell you that I'm

24   looking at Kashner Davidson's phone records for,

1    say, February 12 of 2004 and saw three phone

2    calls being placed to Mark or Steve, would that

3    be consistent with your recollection?

4  A.  Yeah.

5  Q.  Or on February 20, another four calls to Mark or

6    Steve?

7  A.  Uh-huh.

8  Q.  Or February 23, five calls, six calls to Mark and

9    Steve?

10  A.  It can go higher than that if that's what you're

11    driving at.  We kept in close contact.  I let

12    them know what was going on.  They had high debit

13    balances.  As a matter of fact, I was concerned

14    with their debit balances.  They're the only ones

15    that I bought stock for out of all the accounts

16    we've got, and they know damn well I told them to

17    lighten up.

18         Check all the other accounts we've

19    got:  Nobody bought except for these two.  You

20    can look at me, that's the truth.  You can pull

21    the records.  They're the only ones that wanted

22    to buy.  We were telling everybody to lighten up.

23    So you can get off the unsolicited bit.

24  Q.  March 10, you placed six calls?

1  A.  I imagine.  How would I know?

2  Q.  Is that consistent with your recollection?

3  A.  Yes, it is.

4  Q.  March 17, seven calls?

5  A.  Uh-huh.

6  Q.  I'm sorry, 11 calls.  It went over to the next

7     page.

8  A.  Probably.

9  Q.  March 18, six calls?

10  A.  (Witness nods.)  I'll say yes to them all if you

11     want to just speed it up.

12  Q.  March 26, 11 calls?

13  A.  Yes.

14          I'm sorry for my attitude.

15          MR. CORBETT:  I've got no questions.

16     Actually, I do have a couple more questions.

17          MR. ROSS:  Can I take a two-minute run

18     to the men's room, is that all right?

19          MR. CORBETT:  I've only got two

20     minutes worth of questions, it might be better to

21     wait until I'm done.

22          MR. ROSS:  Okay.

23  Q.  When Mr. Ross was asking you about claimant's

24     Exhibit 18, which is the account workbook for

1    Mark and Lynda Mscisz, and he asked you about

2    transactions 10 and 11 and asked you what they

3    resemble, what they suggest to you, correct?

4  A.  Let me --

5        MR. ROSS:  Objection, it was 11 and

6    12.

7        MR. CORBETT:  I'm sorry, 11 and 12.

8  A.  That's in our book, right?

9  Q.  Yes.  Claimant's Exhibit 18.

10  A.  11 and 12?

11  Q.  Uh-huh.

12  A.  Okay.

13  Q.  And Mr. Ross asked you what that looked like to

14    you, correct?

15  A.  Correct.

16  Q.  One term that you did not use in describing what

17    it looked like was day trade, correct?

18  A.  Uh-huh.

19  Q.  But that and several other transactions --

20  A.  I did say he bought it and sold it the same day.

21  Q.  There was a fair amount of day trading in that

22    account, correct?

23  A.  Right.  Yeah.

24  Q.  Were special day trading risk disclosures ever

1    sent to the Msciszes?

2  A.  No, not that I know of.

3         MR. CORBETT:  No more questions at

4    this time, but I reserve the right to call Mr.

5    Varchetto during my case in chief.

6         MR. ROSS:  Actually --

7         CHAIRMAN GIACOMARRA:  We can take a

8    break.

9         MR. ROSS:  Thanks.

10         CHAIRMAN GIACOMARRA:  Five minutes.

11    We're off the record.

12         (Brief recess.)

13         CHAIRMAN GIACOMARRA:  We can go back

14    on the record now that the court reporter is

15    here.  And, Mr. Ross, it's your wish to redirect?

16         MR. ROSS:  I forgot about that,

17    actually.  No, I don't have any redirect.  The

18    only thing I would like to say is that I'd like

19    to, if respondent has more questions of Mr.

20    Varchetto, I'd like him to ask it now.

21         There are only two 24 license people

22    at Kashner Davidson, and that's Ms. Rothenbach

23    and Mr. Varchetto.  He's here, he's testified,

24    he's been asked questions on direct, he's been

1    cross-examined.  He needs to be in the office

2    tomorrow.

3           I know you don't know anything about

4    the firm Kashner Davidson, and I don't want to

5    testify, but there are three brokers, there are

6    three brokers, and both these people sitting here

7    are the only two license 24.  There's an

8    arrangement that the order tickets would be faxed

9    to the hotel tonight, but for NASD compliance, I

10    need to have a 24 licensed individual on the

11    premises tomorrow.

12           So I've done my direct, I assume he's

13    done his cross.  I'd like to dismiss Mr.

14    Varchetto.  If he has more cross, he can ask him

15    now, but I don't want to run afoul of any NASD

16    compliance issues.

17           CHAIRMAN GIACOMARRA:  What is the

18    purpose tomorrow?

19           MR. ROSS:  I'm sorry, Ms. Rothenbach

20    will be here.

21           CHAIRMAN GIACOMARRA:  What's the

22    purpose, Mr. Corbett, of needing Mr. Varchetto

23    tomorrow?

24           MR. CORBETT:  It depends on what Ms.

1      Rothenbach testifies to today.  Are we going to

2      get through Ms. Rothenbach this afternoon?

3            MR. ROSS:  Yes, sir.

4            MR. CORBETT:  Is she going to testify

5      this afternoon?

6            MR. ROSS:  From 3:35 to -- 15 minutes

7      maybe will be her examination.  But I just want

8      to have him confirm -- I've explained what I need

9      for the panel.  I'd like to make sure --

10           CHAIRMAN GIACOMARRA:  Is he able to

11     wait until after Ms. Rothenbach's testimony?

12           MR. CORBETT:  Do you plan to rest

13     after Ms. Rothenbach?

14           MR. ROSS:  Yes, sir.

15           MR. CORBETT:  I expect we'll be able

16     to get through Mr. Varchetto this afternoon

17     regardless, just because I'm not going to put on

18     a lengthy case.  If we just excuse him at the end

19     of this afternoon's session, he'll be able to get

20     down to Florida no problem.

21           MR. ROSS:  That's fine.  The only

22     thing I would request as a courtesy is just three

23     minutes to confirm his next available flight.  I

24     didn't want to bring this up in advance.  Is that

1     okay if we take a five-minute break?

2           CHAIRMAN GIACOMARRA:  We don't need to

3     keep him around.

4           MR. ROSS:  He wants to keep him around

5     to see if Ms. Rothenbach says anything that

6     differs from what he said.  I have no objection

7     to that.  If you indulge me for like three

8     minutes so he can verify when the next flight out

9     is.  I didn't want to raise that too early

10    because I didn't want to impede the progress of

11    the case.  Is that amenable?

12          MR. CORBETT:  I don't have a problem

13    with that.

14          CHAIRMAN GIACOMARRA:  That's fine.

15    You can do that.

16          MR. ROSS:  Thank you very much.

17          (Brief recess.)

18          CHAIRMAN GIACOMARRA:  We'll go back on

19    the record.

20          MR. ROSS:  Claimant, because that's

21    who I am, calls Melissa Rothenbach.

22          CHAIRMAN GIACOMARRA:  I'd like to

23    remind you that you have been sworn.

24          THE WITNESS:  Yes.

1              MR. ROSS:  That's what I was waiting

2      for.

3              CHAIRMAN GIACOMARRA:  Go ahead.

4              MELISSA J. ROTHENBACH, Sworn.

5              DIRECT EXAMINATION

6      BY MR. ROSS:

7   Q.  Describe for the panel your educational

8      background.

9   A.  I have a bachelor's degree in theater from

10      Florida State University, and then I have an

11      accounting degree from the University of South

12      Florida, and have attained my CPA license.

13   Q.  So you're a CPA, is that what you just said?

14   A.  Yes, I have my CPA license.

15   Q.  When did you get your CPA license?

16   A.  1996.

17              MR. ROSS:  I guess, Mr. Chairman, I am

18      calling her, and I'm calling it to your attention

19      for a reason, I'm principally calling her for

20      direct, but I'm also calling her for rebuttal to

21      some of the points that have been raised.  I'm

22      just trying to, because I'm trying to move it

23      along, I guess you'll see why I say that in a

24      moment.

1  Q.  I'm sorry, you were talking about your

2    professional background.

3  A.  Yes.

4  Q.  Please.  What did you do after you graduated

5    college?

6  A.  The first time or second time?

7  Q.  After your second time, after you became a CPA.

8    You became a CPA in '96?

9  A.  Yes, I was going to school part time, got my

10    license after that, and then I started working at

11    Kashner Davidson Securities, 1996.

12  Q.  And what was your position at Kashner Davidson

13    Securities in 1996?

14  A.  I was a financial and operational principal.

15  Q.  Will you tell the panel what a financial and

16    operations principal is?

17  A.  Basically in charge of the financial aspect of

18    the firm, along with any operational duties that

19    go with the broker dealer.

20  Q.  Did your responsibilities at Kashner Davidson

21    ever change?

22  A.  Yes.

23  Q.  When was that?

24  A.  July, 2004.

1  Q.  And what became your responsibilities at Kashner

2      Davidson in July, 2004?

3  A.  I became the president, CEO of the company.

4  Q.  And what licenses do you currently hold?

5  A.  The 27, 7, 24, 4 and 66.

6  Q.  Very briefly, what is the 27?

7  A.  27 is the financial operations license, 7 is the

8      registered rep license, 24 is the general

9      supervisor, 4 is options and 6 is the blue sky

10     registered investment advisor.

11  Q.  66?

12  A.  66.

13  Q.  Would you please describe for the panel what type

14     of firm Kashner Davidson Securities is?

15  A.  We are a full service discount brokerage firm.

16  Q.  What does that mean, please?

17  A.  Offer multiple services and products at a

18     discounted commission rate.

19  Q.  How long has Kashner Davidson been in existence?

20  A.  1969.

21  Q.  How many brokers does it have today?

22  A.  Today we have three brokers.

23  Q.  Has that always been the case?

24  A.  No.

1  Q.  Would you please explain to the panel, was there

2      ever a time in the past when it had more brokers?

3  A.  Yes.  For example, sometime around 2000 we had

4      anywhere from 15 to 18 brokers.  Now we're down

5      to three.

6  Q.  And what was the reason for the change or

7      downsize?

8  A.  Basically the change and downsize occurred

9      because with the tech stock correction that

10     happened in 2000, then with the 9/11 situation,

11     with the corporate scandals that were occurring

12     and so forth, the brokers were just finding it

13     difficult to be gainfully employed in the

14     industry, so they left to find other work.

15  Q.  Who owns Kashner Davidson Securities?

16  A.  Victor Kashner.

17  Q.  Individually?

18  A.  Yes, he's a hundred percent owner.

19  Q.  Has that always been the case?

20  A.  Yes.

21  Q.  How many brokers worked for the firm in December

22     of '03?

23  A.  Seven.

24  Q.  Now, would you turn to tab No. 3 in claimant's

1    book.  Now, there's been some confusion as to

2    where checks sent by the Msciszes, where they

3    were sent to.  Do you recall that testimony,

4    there was some testimony as to where the checks

5    went?

6  A.  Yes.

7  Q.  Would you please tell the panel where this check

8    was sent by Katherine A. Mscisz and Steven Mscisz

9    and why you say that?

10  A.  This check was sent to Kashner Davidson

11     Securities.  And the reason I say that is there's

12     a time stamp that we utilize when checks are

13     received.  This is our time stamp.

14  Q.  Okay.  Is that true of all the checks, for

15     example, if you look under tab No. 15?

16  A.  Yes.

17  Q.  Was this sent to Kashner Davidson Securities?

18  A.  Yes.

19  Q.  And it was not sent to Sterne, Agee?

20  A.  No.

21  Q.  And you know that from the time stamp?

22  A.  Correct.

23  Q.  Could this -- well, withdrawn.

24          Now, there's also, if you turn to tab

1      No. 19, which I admit in advance is not in

2      evidence, there are three more checks.  Do you

3       see that?

4  A.  Yes.

5  Q.  Do you know where those were sent?

6  A.  Those were sent to Kashner Davidson.

7  Q.  And how do you know?

8  A.  Because we time stamp our checks when they come

9       in, and this is our time stamp.

10  Q.  Is that deposited -- what type of account is that

11       deposited into?

12  A.  It's -- the name on the account is Sterne, Agee &

13       Leach for the benefit of Kashner Davidson

14       Securities.

15  Q.  Could you please describe for the panel what the

16       relationship between Kashner Davidson Securities

17       and Sterne, Agee & Leach  is?

18  A.  Kashner Davidson is a correspondent firm for or

19       of Sterne, Agee & Leach.

20  Q.  What does that mean?

21  A.  We --

22  Q.  What does Sterne, Agee and Edwards do?

23          MR. CORBETT:  Objection.

24  A.  They are a clearing firm.

1  Q.  No, what does Sterne, Agee and Edwards do?

2  A.  Sterne, Agee & Leach.

3  Q.  Sterne, Agee & Leach.

4  A.  Sterne, Agee & Leach is our clearing firm.

5  Q.  What does a clearing firm do relative to a

6    correspondent firm?

7  A.  They clear and settle trades for the

8    correspondent.

9  Q.  You've heard a lot of testimony evoked by Mr.

10    Corbett as to the word "you" in this these

11    documents and agreements.  Do you recall that?

12  A.  Yes.

13  Q.  Who is responsible for the debit that remains

14    uncollected in the account of Mark Mscisz and in

15    the account of Steven Mscisz?

16  A.  Kashner Davidson is responsible.

17  Q.  Why do you say Kashner Davidson is responsible

18    for the debit?

19  A.  Because they're the accounts of Kashner Davidson

20    Securities.

21  Q.  Now, what, if any, action has Sterne, Agee &

22    Leach taken, undertaken as it concerns the

23    unsecured debit of $361,000?

24  A.  They segregated those funds in a special account

1     and they withdrew those funds from our account

2     and segregated them into a separate account.

3   Q.  And what, if anything -- and can you get access

4     to that money?

5   A.  No.

6           MR. ROSS:  Now, I am going to

7     introduce a document, I guess I'll show it to my

8     adversary.  Well, I'll show it to my adversary

9     first and then at the same time I'll show it to

10    -- may I show it to my adversary.

11          CHAIRMAN GIACOMARRA:  Absolutely.

12          MR. ROSS:  Then at the same time I

13    will provide copies to the panel.

14          CHAIRMAN GIACOMARRA:  Give him a

15    second to take a look at it, please.  Do you have

16    any problem with him --

17          MR. CORBETT:  Absolutely.

18          CHAIRMAN GIACOMARRA:  What's the

19    objection?

20          MR. CORBETT:  This is an assignment of

21    claim dated today bootstrapping because they

22    realize they had a defect in their claim.

23          MR. ROSS:  May I make a proffer, which

24    is how I understand evidentiary issues are

1    raised.

2              CHAIRMAN GIACOMARRA:  Yes.

3              MR. ROSS:  It has always been our

4    contention and it's, and I have the cases here if

5     you would like to read them, that what happened

6    in this case, and under Alabama, Merfury versus

7    Clisby, the Supreme Court has defined subrogation

8    as one who to protect his own rights satisfies a

9    debt for which another is primarily liable, he

10    may enforce against the person primarily liable

11    all the security benefits and advantages held by

12    the creditor.

13              In connection with this case, I think

14    it's beyond dispute that Kashner Davidson, they

15    have taken -- Sterne, Agee, Edward -- Sterne,

16     Agee & Leach, thank you, has taken the money out

17    of Kashner Davidson.  Kashner is a $100,000 BD.

18    They have taken 360,000, three and a half times

19    the required deposit to satisfy this debit.  They

20    can't get access to the money.  They have the

21    right to stand in the shoes as a matter of law,

22    to stand in the shoes of Sterne, Agee to collect

23    this debit.

24              However, since there was an issue, and

1    as I understand it, their entire case was turning

2    on the word "you," during the break we made the

3    "you" moot.  What we did is we have a notice of

4    assignment of claim which was executed by the

5    general counsel of Sterne, Agee as well as Ms.

6    Rothenbach roughly an hour and a half ago because

7    I didn't dream, and I told Sterne, Agee their

8    position, and they have never heard of anyone

9    taking that position in arbitration, so to belt,

10    suspenders and thumbtack the nails, we have not

11    only the subrogation right, we also have a notice

12    of assignment where they have any -- if in the

13    event that you decided in response to their

14    claim, as a rebuttal to their contention in this

15    case, in the event that you decided there was no

16    subrogation and somehow Kashner doesn't have the

17    right, which I think we've demonstrated they do,

18    it's unequivocal now, since Sterne, Agee has

19    assigned its right to Kashner.  There was no

20    reason to do it in advance because --

21         CHAIRMAN GIACOMARRA:  Are you offering

22    this in evidence?

23         MR. ROSS:  Yes, sir.

24         CHAIRMAN GIACOMARRA:  Okay.  That's

1    your only objection is that it's dated today?

2            MR. CORBETT:  That it was manufactured

3    in mid-hearing, yes.  They have had notice since

4    day one that we believe they were not the real

5    party in interest.  That's the eighth affirmative

6    defense in the answer to their statement of

7    claim.

8            CHAIRMAN GIACOMARRA:  Okay.  We'll

9    note your objection.  But we'll still take it

10    into evidence.

11            MR. ROSS:  May I give this to the

12    panel, one for each of you.

13            (Document exhibited to the panel.)

14            CHAIRMAN GIACOMARRA:  We'll take the

15    document for what it's worth.

16            MR. ROSS:  I'd like to have this

17    admitted into evidence as Exhibit No. 31, please,

18    claimant's 31.

19            CHAIRMAN GIACOMARRA:  We'll mark it as

20    claimant's 31.

21            (Document marked as Exhibit C31.)

22    BY MR. ROSS:

23    Q.  Ms. Rothenbach, would you please explain to the

24    panel what this document is?

1  A.  This is a notice of assignment of claim which

2     basically gives the right to Kashner Davidson

3     Securities to pursue the debt directly against

4     the Mscisz brothers.

5  Q.  Did you have a conversation with Sterne, Agee --

6  A.  And Leach.

7  Q.  -- & Leach this afternoon during the lunch break?

8  A.  Yes.

9  Q.  Do you know who Ronald G. DeLuca is?

10  A.  Yes.

11  Q.  Who is he?

12  A.  He is chief counsel for Sterne, Agee & Leach.

13  Q.  Who signed this on behalf of Kashner Davidson

14     Securities?

15  A.  I did.

16  Q.  And your position at the firm is?

17  A.  President of the company.

18         MR. ROSS:  I have no further

19     examination.

20         CHAIRMAN GIACOMARRA:  Your

21     cross-examination, Mr. Corbett.

22         CROSS EXAMINATION

23     BY MR. CORBETT:

24  Q.  Ms. Rothenbach?

1   A.  Yes, sir.

2   Q.  I've got before me all the documents that were

3       produced by Kashner Davidson in the course of

4       this proceeding.  To your knowledge, is there a

5       single document that was produced to us that

6       purported to describe an assignment from Sterne,

7       Agee to Kashner Davidson?

8           MR. ROSS:  Is that a legal question,

9       because I'll answer that because I think it's a

10      legal question not a factual question.  The

11      answer is yes:  Kashner Davidson, by operation of

12      law, subrogates its rights, subrogates the rights

13      of Sterne, Agee.

14          CHAIRMAN GIACOMARRA:  The question was

15      about a document.

16  Q.  Do you know of a document that sets forth any

17      such assignment?

18  A.  In that packet?

19  Q.  Yes.

20  A.  No.  I have to -- may I look at the packet?

21  Q.  Sure.

22          (Documents exhibited to witness.)

23  A.  No.

24  Q.  And your manufactured execution of this

1    assignment towards the latter moments of this

2    hearing I think can be seen as confirmation that

3    no such assignment had been executed previously,

4    correct?

5         MR. ROSS:  Objection to form.  It's

6    offensive as well.  Manufactured?  It's an

7    agreement.

8         CHAIRMAN GIACOMARRA:  Let's proceed

9    with the question.  Try to rephrase your

10    questions, Mr. Corbett.

11  Q.  You executed this assignment because you knew

12    there had been no assignment previously, correct?

13  A.  Yes.

14  Q.  And is it your knowledge that under Alabama law

15    an action for breach of contract has to be

16    pursued on behalf of a party standing in privity

17    to the contract?

18         MR. ROSS:  Objection.

19  Q.  Do you have any knowledge of that?

20         MR. ROSS:  Objection.  It seems to me

21    that's a legal question of how Alabama law

22    relates as regards contract law.

23         CHAIRMAN GIACOMARRA:  Could you

24    rephrase the question?

1  Q.  You don't dispute that "you" in the customer

2      account agreement refers only to Sterne, Agee &

3      Leach, correct?

4  A.  Repeat the question, please.

5  Q.  In the customer account agreement, "you" only

6      refers to Sterne, Agee & Leach, correct?

7  A.  That's not how, that's not how we operated.

8  Q.  I'm just asking about the agreement itself.  You

9      may have your own rights and responsibilities

10     with respect to Sterne, Agee, but up until you

11     came in here in the last minutes of this

12     arbitration with this assignment, there was

13     nothing that would have stopped Sterne, Agee from

14     coming after the Msciszes even if you had won in

15     this arbitration, correct?  They would have still

16     owned the claim against the Msciszes, correct?

17  A.  No.

18  Q.  Then what are they assigning?  They have to be

19      assigning something that they own?

20  A.  Well, I guess according to the client agreement

21      -- I'll say yes, then.  I understand what you're

22      saying, I'll change it to yes.

23  Q.  Yes?

24  A.  The "you" in the client agreement.

1  Q. Refers to Sterne, Agee?

2  A. Uh-huh.

3  Q. So in the statement of claim where it intimates

4    that the "you" refers to both Sterne, Agee and

5    Kashner Davidson is untrue, correct, or it

6    substitutes KDSC or SAL for "you," that's

7    inaccurate?

8        MR. ROSS:  I'm going to object, and

9    the reason for the objection is he's going into

10   legal theories.  And I'll represent to the panel

11   that the "you" speaks of KDSC and SAL, and it

12   does because KDSC -- the money was taken from

13   KDSC.  I'm keeping it focused, Mr. Chairman.  The

14   money was taken from KDSC.  KDSC stands in the

15   shoes of SAL, subrogated the claim to collect on

16   that claim and gets all rights and claims that

17   SAL would otherwise have.

18       In answer to the question, no, SAL

19   couldn't sue and recover from the Msciszes

20   because they would get double recovery because

21   they have KDSC's money, and they can't take the

22   Msciszes' money and make $360,000 in connection

23   with a loan that it, the clearing firm, extended

24   for 360,000.  That's called a windfall.

1           But he's asking this witness legal

2     conclusions.  KDSC stands in the shoes by

3     operation of law subrogation of SAL's claims.  In

4     addition, if there was a one percent doubt in

5     your mind for belt and suspenders, we also have a

6     valid assignment of the claim.  Not only does the

7     claim -- and in the assignment it says that SAL

8     thought that it was not necessary because KDSC

9     stood in the shoes of it because SAL has already

10     satisfied itself with KDSC's money.  So I'm

11     objecting to it, and that's why it's misleading

12     to this witness.

13          MR. CORBETT:  My problem --

14          CHAIRMAN GIACOMARRA:  The panel

15     understands in the statement of claim why the

16     brackets were used, and they're not verbatim out

17     of a contract.  And we understand the point that

18     you're trying to make who "you" represents.  And

19     you can ask the witness the question, but she's

20     not a lawyer and she can only give you --

21          MR. CORBETT:  But my concern, and this

22     is a general concern, is that one case was pled

23     and discovered, and they're trying another one

24     six hours into the arbitration.  There was no

1    assignment.  There was no assignment produced in

2    discovery, there was no assignment identified in

3    their 20-day notice.

4           CHAIRMAN GIACOMARRA:  This document on

5    its face says it was created today.

6           MR. CORBETT:  Yes.

7           CHAIRMAN GIACOMARRA:  We can weigh

8    that for what it's worth.  I mean, it's just

9    documenting a prior --

10          MR. ROSS:   -- understanding between

11   the parties, SAL and KDSC.

12          CHAIRMAN GIACOMARRA:  We can decide

13   for ourselves --

14          MR. ROSS:   -- what weight to give it.

15          MR. CORBETT:  It's not effective nunc

16   pro tunc.  This is an assignment effective today.

17          CHAIRMAN GIACOMARRA:  That's not the

18   way I read it, but the panel, the three of us,

19   will look at it and come to our own conclusions

20   as a panel.

21   BY MR. CORBETT:

22  Q.  Ms. Rothenbach, I'm directing your attention to

23   the assignment of claim, the last paragraph under

24   "Now, therefore," where it says, "SAL hereby does

1    assign, transfer and set over the Mscisz debt to

2    KDSC." Is that written in the past tense?

3 A. No.

4 Q. So it doesn't refer to a prior assignment, it's

5    being assigned this afternoon, correct?

6        MR. ROSS: I think that's the legal

7    conclusion you wanted her to get away from, Mr.

8    Chairman. I'll object.

9        CHAIRMAN GIACOMARRA: I'd like to just

10    move on. You've made your point. We understand

11    the basis of the document and we can make our own

12    conclusions.

13 Q. When Steven and Mark and Lynda Mscisz responded

14    to Kashner Davidson's statement of claim, did you

15    see a copy of their response?

16 A. Yes.

17 Q. Did you read it?

18 A. Yes.

19 Q. Did you read the eighth affirmative defense?

20 A. I don't have it in -- I'm sure I did, but...

21 Q. I'll show you a copy, if you'd like.

22        MR. ROSS: May I assist her?

23        MR. CORBETT: Sure. It's on Page 8.

24        (Document exhibited to witness.)

1           MR. ROSS:  Is there a question?

2  Q.  Did you see that?  The eighth affirmative defense

3     reads, "KDSC's claims against the customers must

4     fail because it is not the real party in

5     interest."

6  A.  I'm sure I read it.

7  Q.  And this document is dated August 26 of 2004?

8  A.  Okay.

9  Q.  That's nine months ago?

10  A.  Correct.

11  Q.  Nine months before this assignment was put

12     together six hours into this arbitration?

13  A.  Correct.

14  Q.  You characterized Kashner Davidson as a full

15     service discount brokerage firm, correct?

16  A.  Uh-huh.

17  Q.  Discount brokerage is one that has commissions

18     that are lower than the industry average?

19  A.  Correct.

20  Q.  Certainly not one that has commissions that

21     exceed industry limits, correct?

22  A.  Correct.

23  Q.  So Matt Meister wasn't found liable last fall in

24     an arbitration for charging excessive

1    commissions?

2         MR. ROSS:  Objection.

3         MR. CORBETT:  She opened the door to

4    this in characterizing the firm as a discount

5    brokerage.

6         CHAIRMAN GIACOMARRA:  I'm going to

7    uphold this.  Can we just change the line of

8    questioning.  We don't need to get other cases

9    involved.  If you want to pursue the pricing, you

10    can do that.

11        MR. CORBETT:  Actually, I can't,

12    because those were counterclaims.

13        CHAIRMAN GIACOMARRA:  You were trying

14    to dispute that it was a discount brokerage firm.

15        MR. CORBETT:  I'm trying to use these

16    other events to undercut Ms. Rothenbach's

17    credibility in terms of her description of the

18    firm.  And there's a decision by a panel much

19    like this one that found her predecessor

20    president charged excessive commissions.  There's

21    a finding by the District 7 Conduct Commission

22    Committee of the NASD finding the firm violated

23    that rule back in the late '90s.

24        CHAIRMAN GIACOMARRA:  That's not

1   relevant to this case.

2   BY MR. CORBETT:

3   Q.  So we have the disagreement with respect to the

4   contract assignment and whether that's effective

5   or not.  But there has been an agreement that it

6   was not Kashner Davidson that lent money to Mark

7   and Steven and Lynda Mscisz, correct?

8        MR. ROSS:  I think we stipulated to

9   this about two hours ago, that the money was lent

10   by the clearing firm.

11        MR. CORBETT:  You've been changing, so

12   I want to make sure --

13        MR. ROSS:  I don't think I've changed

14   yet, Mr. Chairman.  The money was lent by the

15   clearing firm.  The brokerage firm may not lend

16   money.

17        CHAIRMAN GIACOMARRA:  And you've

18   stipulated to that. Pose your question to the

19   witness and move forward.

20   Q.  To your knowledge, Kashner Davidson didn't take

21   any steps itself in reliance on any financial

22   statement that was submitted by Mark Mscisz,

23   correct?

24   A.  To my knowledge, that is correct.

1  Q.  As a broker dealer licensed by the NASD and

2      indirectly the SEC, Kashner Davidson has an

3      obligation to preserve all customer

4      correspondence; isn't that correct?

5  A.  Correct.

6  Q.  Did you preserve and produce all correspondence

7      in connection with the Mscisz account --

8          MR. ROSS:  Is this --

9  Q.  -- either Mscisz account?

10          MR. ROSS:  I'll object.  I think this

11      is going to the discovery order which I think the

12      chairman said you'll consider in your

13      deliberations.

14          CHAIRMAN GIACOMARRA:  Where are you

15      going here?

16          MR. CORBETT:  Again, it's

17      noncompliance with the Association rules, and to

18      the extent that they directly bear upon this

19       particular proceeding, it's important for the

20      board or the panel to take into account.

21          CHAIRMAN GIACOMARRA:  Again, we've

22      noted that, and we'll take that into

23      consideration when we weigh the evidence or lack

24      thereof.

1   Q.  I'm going to direct your attention to

2    respondents' Exhibit 16.  If you would take a

3    look at that, please, Ms. Rothenbach.

4   A.  Okay.

5   Q.  Have you seen respondents' Exhibit 16 previously?

6   A.  Yes.

7   Q.  What is respondents' Exhibit 16?

8   A.  It is an email sent to Steve Mscisz.

9   Q.  Did you produce that or did Kashner Davidson

10    produce that in the course of this litigation, to

11    your knowledge?

12  A.  Kashner Davidson produced it.

13  Q.  They did?

14        MR. ROSS:  I think we're back to

15    discovery so I'll object.  I think we're in

16    discovery so I don't --

17        CHAIRMAN GIACOMARRA:  Ask a question.

18  Q.  Are there other emails concerning this account?

19        MR. ROSS:  Objection.  I think we're

20    doing discovery.

21        CHAIRMAN GIACOMARRA:  I'll allow the

22    question.

23  A.  There could be.

24  Q.  To your knowledge, were any of those produced?

1  A.  To my knowledge, I don't know.

2          MR. CORBETT:  This Exhibit 16, I'm

3      going to move its admission.

4          MR. ROSS:  I have no objection.

5          CHAIRMAN GIACOMARRA:  Let's mark it.

6          (Document marked Exhibit R16.)

7  Q.  With Exhibit 16, you told Steve Mscisz to make

8      sure his check was made payable to Sterne, Agee &

9      Leach or SAL?

10  A.  Correct.

11  Q.  Now, when you said that checks were sent to

12      Kashner Davidson, Kashner Davidson didn't take

13      control of the funds, correct?  Kashner Davidson

14      doesn't hold client funds?

15  A.  No, we hold them just in receipt and then

16      promptly forward them.

17  Q.  Forward them to who?

18  A.  To a bank account in the name of Sterne, Agee &

19      Leach for the benefit of Kashner Davidson

20      Securities.

21  Q.  Forward them to "you," in other words, to the

22      "you" referenced in the client account agreement?

23  A.  Yes.

24          MR. CORBETT:  I've got no more

1     questions at this time.

2           CHAIRMAN GIACOMARRA:  Any redirect?

3           MR. ROSS:  No, sir.

4           CHAIRMAN GIACOMARRA:  All right.  Do

5     you have any other witnesses today?

6           MR. ROSS:  I don't.  The only thing I

7     have is two other documents that are in the book,

8     one of them is under tab No. 29, one of them is

9     under tab No. 30, but I need to -- I'd like to

10     explain what they are and then ask the panel to

11     make some amendments to them and I'll articulate

12     why.  May I address the panel?  And after this

13     introduction, I will rest my case.

14           Tab No. 29 is my, is my affirmation

15     with the bills that were sent to Kashner

16     Davidson.  And as you can see, everybody knows

17     there's a familial relationship here, I had

18     billed at a reduced hourly rate in connection

19     with this matter, and I have attached as Exhibit

20     B the fee that Kashner Davidson was required to

21     pay in connection with the filing fee for this

22     matter.  And I only submitted as Exhibit C, I

23     didn't do a breakdown of all the photocopying,

24     but I did for photocopying of these books,

1    there's an invoice that we paid for that, and

2    that is what is comprised of Exhibit 29.

3          And under Exhibit 30, which is our

4    summary damage document, if you can take a look

5    at Exhibit No. 30, behind that is the affidavit

6    of counsel regarding legal fees for Howard Smith.

7    I think the panel is aware why we needed to have

8    outside counsel, Massachusetts counsel in

9    connection with this matter, and I think also is

10    aware why so much time was spent prosecuting this

11    claim with this panel, reconsiderations and the

12    three or four times it went to the Supreme Court

13    of the Commonwealth of Massachusetts.

14          So on the damage document, which is

15    page 30, you have the margin debt for Mark

16    Mscisz, the margin debt for Steven Mscisz, you

17    have the hearing fee, which is Exhibit B, you

18    have our attorneys' fees, which come to

19    $53,207.98, and I will need to amend that number

20    with you for fairer disclosure.  You have the

21    hearing book, the copy costs, which is Exhibit C,

22    you have Mr. Smith's attorney's fees, apparently

23    there's a convention in Boston, and there's no

24    hotels, and this shows hotels for two nights for

1    Ms. Rothenbach, myself and Mr. Varchetto.  Since

2    Mr. Varchetto will be going tonight, I'd like to

3    have that number reduced to 503 rather than

4    1,036.  The airfare remains the same.  I didn't

5    put in for cabs and meals and everything else

6    like that.

7        The only other number that I would

8    like to have reduced again is in connection with

9    my fees because I estimated that this hearing

10    would go a full day tomorrow as well.  And to the

11    extent that it doesn't go a full day tomorrow as

12    well, I would ask that the panel reduce the

13    amount of attorney's fees that I would otherwise

14    be awarded.  I wasn't sure of the hours.

15        And if you would look at what is now

16    going back to tab No. 29, the second to last page

17    of tab No. 29, I had to estimate something.  Do

18    you see the time entries on May 17 and 18?

19    Before Exhibit A, second to last page.

20        ARBITRATOR MCKEON:  The asterisk, May

21    13?

22        MR. ROSS:  No, it would be right

23    before -- it's Exhibit A, I beg your pardon.  I'm

24    so sorry, it is part of Exhibit A.  I apologize.

1    Second to last page for Exhibit A.  Thank you for

2    that clarification.

3        Does the panel see where I am for May

4    16, May 17, and May 18 time entries?  I would

5    like to reduce that.  I wasn't sure how long we

6    would go today.  Obviously I met with my clients

7    in the morning, but I would like to reduce -- I

8    guess I'll note those two times.  I don't know

9    how much time we're going to go tomorrow, but for

10    honesty and accuracy, those numbers should be

11    reduced.  Okay?

12        I anticipate I'll spend an hour

13    tonight preparing whatever cross or summation,

14    but I did feel the need to call that to the

15    panel's attention.  Certainly taking Mr. Corbett

16    at his word, if we're here for an hour tomorrow,

17    it certainly shouldn't be 13 hours, which is what

18    I've reflected.

19        CHAIRMAN GIACOMARRA:  Okay.

20        MR. ROSS:  With that, the claimant

21    rests.

22        MR. CORBETT:  I object to Exhibits 29

23    and 30 for several reasons.  First, neither of

24    these documents or the documents that are

1    included in those documents, even the ones that

2    existed, were produced in compliance with the

3    20-day rule, and although some of the attorney's

4    fees related materials were not generated until

5    after the 20-day deadline, there were others that

6    could have been produced, could have been

7    examined, and I would be in a position to probe

8    and argue about the reasonableness or lack of

9    reasonableness.

10           Second of all, back to the "you"

11    issue, Kashner Davidson did not and does not have

12    any rights of its own to recover any sort of

13    collection costs under the client account

14    agreement.  And that's the only document referred

15    to in the pleadings as the basis for attorneys'

16    fees and collection costs.

17           Even this assignment that was put

18    together this afternoon only purports to assign

19    the principal amount of the debit.  It does not

20    purport to assign any other rights under the

21    agreement, collection costs and so forth.  It

22    only assigns the primary amount of the debit.  So

23    to the extent this has any validity at all, it

24    still doesn't operate to change the definition of

1    "you" for purposes of the collection cost

2    provision in the agreement.

3         Third of all, Mr. Smith, his presence

4    was not necessary today because of the order of

5    the single justice last week.  Mr. Ross was not

6    enjoined from participating in this proceeding.

7    And it's not like Mr. Smith has played an active

8    role in the hearing as well.  So to the extent

9    that they seek to recover for his services

10    associated with this, that would not be

11    reasonable and would not be consistent with any

12    agreement or any power to award attorneys' fees

13    and collection costs.

14         MR. ROSS:  May I be heard in response?

15         CHAIRMAN GIACOMARRA:  I'm going to

16    just rule on it.  We're going to note your

17    objections but allow both of these exhibits in.

18    The panel will take your objections into

19    consideration, but we're going to allow these in

20    for our own use.

21         (Documents marked as Exhibits C29

22         and C30.)

23         CHAIRMAN GIACOMARRA:  Before we rest,

24    I'm going to ask if anybody else on the panel has

1    any questions for any of the witnesses that were

2    here today.  Mr. Gray?  Mr. McKeon?

3            ARBITRATOR MCKEON:  No.

4            ARBITRATOR GRAY:  No.

5            CHAIRMAN GIACOMARRA:  Mr. Ross,

6    anything else?

7            MR. ROSS:  No.

8            CHAIRMAN GIACOMARRA:  You rest your

9    case for today?

10            MR. ROSS:  Yes, sir.

11            CHAIRMAN GIACOMARRA:  And, Mr.

12    Corbett, how much time do you think you'll need

13    tomorrow?

14            MR. CORBETT:  I'll give it some

15    thought.  I will go back and see if I can go on

16    the evidence that's already been submitted.  I

17    won't undertake to do that yet.  But I understand

18    the interests of everybody for brevity.  I'll

19    look back on my notes to see, so we may be able

20    to start right away with closings.

21            CHAIRMAN GIACOMARRA:  How long do you

22    think your closing will take?

23            MR. CORBETT:  Less than half an hour.

24            CHAIRMAN GIACOMARRA:  Mr. Ross?

1              MR. ROSS:  Certainly less than half an

2    hour.

3              CHAIRMAN GIACOMARRA:  So we may have

4    an hour or two tomorrow and then --

5              MR. ROSS:  In my understanding, maybe

6    I'm missing it, that you may -- do we want to do

7    closing today so you can deliberate?

8              CHAIRMAN GIACOMARRA:  No, I don't

9    think we can do it.

10             MR. ROSS:  I'll keep my closing to ten

11   minutes.  You folks have been -- it's a day case.

12   Okay, why don't we come back tomorrow and do

13   closings.

14             CHAIRMAN GIACOMARRA:  I'd rather give

15   you time to --

16             ARBITRATOR GRAY:  He has a long way to

17   go home, so do I.

18             CHAIRMAN GIACOMARRA:  All of us are

19   over an hour from here.

20             MR. ROSS:  There's no hotels in the

21   City of Boston, I'll tell you that.

22             CHAIRMAN GIACOMARRA:  I want to give

23   the case the attention it deserves.  I don't want

24   to have to rush the deliberation at the end of

1    the day, and I don't want you to rush your case.

2    I want Mr. Corbett to have the opportunity to

3    decide if he wants to call any witnesses.  I

4     don't want him to feel he's got to rush into

5    closing just to call it a day.

6          But for Mr. Varchetto, he's excused.

7    So if he wants to go -- you have no need for him

8    tomorrow?

9          MR. CORBETT:  I don't foresee a need

10     for Mr. Varchetto tomorrow, and I'll stand by my

11    word.

12          MR. ROSS:  Do I understand that you

13    are conducting -- do I understand he's conducting

14    an examination, or where are we?

15          CHAIRMAN GIACOMARRA:  You've rested

16    your case and we'll resume tomorrow, and I'm

17    going to ask him to present his case, and he can

18    either decline and we'll go right into closing or

19    you can present your response.

20          MR. CORBETT:  Now that Mr. Ross has

21    rested, I do want to move to dismiss his case

22     because he's failed to make a prima facie case

23    with respect to each of the four claims that have

24    been asserted in the statement of claims, several

1    of which they even admit they don't have a prima

2    facie case.  On the fraud claim, they've admitted

3    there's no reliance.  On the money lent claim,

4    they admitted there's no money lent by Kashner

5    Davidson.  With respect to the open account,

6    they've admitted that there was never any account

7    statement submitted, sent by Kashner Davidson to

8    the Msciszes and then agreed upon.

9         The only thing that has any potential

10   viability, and I think that this is actually

11   evidence that it doesn't have viability, is the

12   whole "you" issue in the contract.

13        The fact that they felt a need for

14   this suggests that they know that they didn't put

15   in a prima facie case until four o'clock this

16   afternoon and had to come in with this in order

17   to get over the hurdle and avoid having this

18   dismissed.

19        So certainly with respect to the last

20   three counts in the statement of claim, I don't

21   think there's any reason or more proof to be

22   brought out tomorrow because they haven't

23   satisfied their prima facie burden.

24        With respect to the fourth one, I also

1    think that because of the plain text of the

2    contract that everybody's been litigating under

3    since August at the very latest of last year with

4    knowledge that we took the position that Kashner

5    Davidson is not the real party in interest,

6    certainly prepared for this hearing and conducted

7    the litigation with that mindset, they've also

8    failed to meet their prima facie case with

9    respect to count one as well.

10        CHAIRMAN GIACOMARRA:  Okay.  The panel

11    will take that into consideration.

12        MR. CORBETT:  Thank you, Mr. Chairman.

13        CHAIRMAN GIACOMARRA:  So we'll go off

14    the record for today.  And we'll reconvene

15    tomorrow at ten a.m.

16        (Whereupon, at 4:20 p.m., the

17    proceedings were adjourned.)

18

19

20

21

22

23

24

1          C E R T I F I C A T E

2

3     COMMONWEALTH OF MASSACHUSETTS

4     SUFFOLK, SS.

5          I, Loretta Hennessey, Registered Merit

6     Reporter and Notary Public in and for the

7     Commonwealth of Massachusetts, do hereby certify:

8          That the proceedings hereinbefore set

9     forth is a true and accurate record of my

10    stenotype notes taken in the foregoing matter, to

11    the best of my knowledge, skill and ability.

12          IN WITNESS WHEREOF, I have hereunto set

13    my hand and Notarial Seal this 26th day of May,

14    2005.

15

16

17

18                    Loretta Hennessey, RMR

19                    Notary Public

20

21    My Commission Expires: 6/10/05

22

23

24

VOLUME:  II
PAGES: 1-55
EXHIBITS: None


NASD DISPUTE RESOLUTION, INC.
ARBITRATION DEPARTMENT

Case No. 04-03793


In the Matter of Arbitration Between:
Kashner Davidson Securities CORP.,
          Claimaint,

    AND

STEVEN MSCISZ, Mark Mscisz AND
LYNDA MSCISZ,
          Respondents.


BEFORE:  Arthur J. Giacomarra, Esq., Chairman
     Douglas R. Gray
     Patrick W. McKeon, Esq.


HELD AT:  225 Franklin Street
     Boston, Massachusetts 02210

HELD ON:  Wednesday, May 18, 2005
     10:10 a.m.

1  APPEARANCES:

2
    SICHENZIA ROSS FRIEDMAN FERENCE, LLP
3     (By Marc J. Ross, Esq.)
    1065 Avenue of the Americas
4     New York, New York  10018
    for the Claimant.
5

6
    THE CORBETT LAW FIRM
7     (By William P. Corbett, Esq.)
    85 Exchange Street, Suite 326
8     Lynn, Massachusetts  01901-1429
    for the Respondents.
9

10

       _____
11

12

13

14

15

16

17

18

19

20

21

22

23

24

1                    I N D E X

2   Witness        Direct  Cross  Redirect  Recross

3   No witnesses were called.

4

5
                    E X H I B I T S
6
    Exhibit No.                         Page
7
    No exhibits were marked.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

4

1        P R O C E E D I N G S

2          CHAIRMAN GIACOMARRA:  We'll go back on

3    the record.  It's Wednesday, May 18, in the NASD

4    Dispute Resolution case 04-03793, Kashner

5    Davidson Securities Corporation versus Steven

6    Mscisz, Mark Mscisz and Lynda Mscisz.

7          At the end of yesterday's session, a

8    motion was made to dismiss the proceedings, and

9    the panel is denying that motion.

10          And, Mr. Corbett, you were in the

11    process of deciding whether to continue your case

12    with calling other witnesses.

13          MR. CORBETT:  We decided not to call

14    any witnesses and proceed directly to closings.

15          CHAIRMAN GIACOMARRA:  Is there any

16    other presentation for your response?

17          MR. CORBETT:  Other than the closing?

18    No, Mr. Chairman.

19          CHAIRMAN GIACOMARRA:  Okay.  Thank

20    you.

21          Do the parties have any further

22    evidence or testimony to present?  And Mr.

23    Corbett responded negatively to that.

24          MR. ROSS:  There's two housekeeping

1   issues.  First is, I've never done this in

2   arbitration, but let me do it formally.  This

3   will constitute a motion to conform the pleadings

4   to the proof, and so I'd like to have that on the

5   record.

6           And the second thing is both parties

7   have exhibits in their binders that they haven't

8   referred to so therefore are not in evidence, and

9   we should extract those from the book if you want

10  the books for deliberation.

11          CHAIRMAN GIACOMARRA:  If you wish to

12  do that, we'll do that.  Normally we just note it

13  as they're not in evidence and we won't refer to

14  it.  If you feel --

15          MR. ROSS:  I think it probably is

16  best, it's probably best and we can certainly --

17  you want to go through the list and pull out the

18  exhibits?  Certainly whatever you want to do.

19          CHAIRMAN GIACOMARRA:  Sure.  I have no

20  problem leaving them there as long as they're

21  noted for the record that they're not in evidence

22  and they will not be part of our deliberations.

23          MR. ROSS:  Whatever pleases the panel

24  is fine with me.

1          MR. CORBETT:  I have no objection to

2    that process.

3          CHAIRMAN GIACOMARRA:  Do you have an

4    objection to that?

5          ARBITRATOR GRAY:  The exhibits will be

6    removed anyway by us?  I presume the exhibits

7    will be --

8          CHAIRMAN GIACOMARRA:  Normally I don't

9    go through the whole binder and pull out the ones

10   that haven't been admitted into evidence, other

11   than to make it clear they're not included in

12   evidence and they will not be referred to.

13         ARBITRATOR GRAY:  Wouldn't we take out

14   the exhibits for you to send back to New York?

15         CHAIRMAN GIACOMARRA:  Usually I don't

16   take the time out for that.  Let's just go

17   through the list and do it.  It seems --

18         MR. ROSS:  No preference of mine.  I

19   just -- it's whatever is easiest for the panel.

20         CHAIRMAN GIACOMARRA:  Easiest is just

21   to leave them there and state they're not part of

22   the case.  But if you have a problem that you

23   think we may look at them, there's more than

24   enough to look at here, we don't have to go --

1          MR. ROSS:  Again, whatever the

2    panel -- I'll take guidance from the panel.

3          CHAIRMAN GIACOMARRA:  We have a list

4    of what's in evidence and that's what will be

5    given to --

6          ARBITRATOR MCKEON:  If it's easier, we

7    could run down the list of things that have been

8    admitted.

9          CHAIRMAN GIACOMARRA:  Usually it would

10   be Mr. Corbett asking them to have them pulled

11   out of your binder, but he doesn't seem to have a

12   problem with that.

13         MR. CORBETT:  I trust the arbitrators

14   to remember what's in and what's not.

15         MR. ROSS:  Similarly.  Again, each

16   panel has their own preference.  My experience

17   has been a lot of them like to have just what's

18   in evidence in the binders, but I'm happy to go

19   on to summation.

20         CHAIRMAN GIACOMARRA:  I'm willing to

21   leave it this way.

22         MR. ROSS:  Thank you very much.  I

23   have no objection to that at all.

24         CHAIRMAN GIACOMARRA:  Those were the

1    two matters?

2        MR. ROSS:  Those were the two matters.

3        CHAIRMAN GIACOMARRA:  You want to

4    conform the pleadings to the proof?

5        MR. ROSS:  It's a formal motion to

6    conform the pleadings to the proof.

7        MR. CORBETT:  If I may be heard on

8    that.  That assignment was the quintessence of

9    sandbagging.  This is not a matter of newly

10    discovered evidence.  This is not a matter of a

11    new theory that was sprung upon them at the last

12    minute that they had to respond to.

13        Kashner Davidson pled a case based

14    upon their putative status as a party to the

15    client account agreement, and for the first 558

16    days, I believe, of this arbitration, that was

17    their operative theory.

18        In August of 2004, we challenged in

19    our response to their complaint their

20    characterization of their status as a party to

21    the client account agreement.  We took exception

22    to their use of the brackets to change the effect

23    of the agreement in paragraphs 18 and 19 of their

24    statement of claim, but we also interposed an

1  affirmative defense, eighth affirmative defense

2  that said they weren't parties in interest.

3  They've known that for the last nine months, I

4  believe it was.

5        In October, they asked for information

6  discovery-wise concerning counterclaims, and they

7  chose not, for whatever reason, to ask for

8  information concerning that affirmative defense.

9  In February, they sent an exhibit list to us.  No

10  assignment was included in the exhibit list.  And

11  until 3:30 yesterday afternoon, 550 some odd days

12  into the proceedings, six hours into this

13  arbitration, they suddenly interposed this

14  assignment that changes their entire case.

15        Instead of being primary parties to a

16  contract, which is the theory under which we

17  prepared and litigated and strategized, because

18  that real party in interest defense is a complete

19  defense under Alabama law, they changed course

20  and they pulled the rug out from under that

21  defense when if they had been straightforward and

22  pled assignment or pled subrogation or pled some

23  sort of third-party beneficiary theory, it may

24  have held water, but they didn't.

1          They sandbagged us.  They wanted until

2    the very end of their case in chief.  They waited

3    even a couple of hours after they had that

4    assignment in their pocket to bring it to the

5    attention of the panel.  They waited until the

6    very end of this arbitration, at which time we

7    had no opportunity to deal with it.  And that's

8    important.  That's not just a matter of

9    convenience and ethics or whatever, this is a

10   matter of substantive law, because under Alabama

11   law, there's a statute, I believe it's Section

12   8-5-25 of the Alabama Code, assignee takes a

13   claim from an assignor subject to set-offs,

14   claims and defenses that the obligor would

15   otherwise have against the assignor.

16          And by raising this assignment, not

17   just at the 11th hour, but at the 11th hour and

18   59th minute, they prevented us from investigating

19   whether we have set-offs and claims against

20   Sterne, Agee.  They prevented us from pleading

21   set-offs and claims against Sterne, Agee.  They

22   prevented us from seeking discovery about

23   set-offs and claims against Sterne, Agee.  They

24   prevented us from trying set-offs and claims

1  against Sterne, Agee.  They completely pulled the

2  rug out from under our claims.

3         And in your discretion, and you have

4  the discretion to allow an amendment to conform

5  to the evidence, and allow any amendment to the

6  pleadings after the pleadings have been closed

7  under the Code of Arbitration proceedings, I urge

8  you to exercise that discretion and not permit

9  that amendment.

10        MR. ROSS:  May I be heard on that?  I

11  don't think Mr. Corbett understands what a motion

12  to conform the pleadings to the proof is,

13  respectfully.  It has nothing to do with the

14  assignment.

15        At the end of a case, you're not bound

16  by your pleadings, you're bound by your proof.

17  So all I did was pro forma -- and I did it in

18  this case and I generally do it in court and not

19  in arbitration -- you just say, to the extent I

20  proved something, I am seeking to amend the

21  pleadings, which are not, you're not held to

22  every sentence in the pleadings when you present

23  a case.  You are held to your proof that you've

24  demonstrated at the hearing.

1         I wasn't even referring to the

2   assignment.  I'm happy to argue the assignment in

3   response to his argument, but all it was was a

4   pro forma motion to say if I've proved something

5   at the hearing, I'd like my pleadings to conform

6   to that proof.  It had nothing to do with any

7   evidentiary issues whatsoever.

8         But since he's talking about the

9   evidentiary issue -- do you want me to address

10   the evidentiary issue?  The motion to conform the

11   pleadings to the proof has nothing to do with any

12   piece of evidence, it just has to do with what

13   was demonstrated at the hearing.  So it had no

14   reference to the notice of assignment.  Okay?

15         If in fact I proved something else

16   that wasn't pled with specificity but in your

17   deliberations in the course of arbitration,

18   obviously you apply the law as well as equity,

19   that's what arbitration is supposed to embrace,

20   so that was the purpose of that motion.

21         With regard to his claims that he

22   didn't try a set-off or anything else like that,

23   our position has never changed, and has always

24   been, we stand in the shoes of Sterne, Agee in

1  fact.  Most of the points that he makes we've

2  never contested.  Okay?  And the obligation is

3  to, initially to Sterne, Agee.

4          Sterne, Agee took Kashner Davidson's

5  money of $361,000, so now Kashner Davidson stands

6  in the shoes of Sterne, Agee to collect on this

7  debt.  I don't have to plead subrogation.  You

8  don't put the word subrogation in a complaint.

9  It seems to be me what Mr. Corbett is suggesting,

10  I should have put it in there.  No.

11          All I do is put on my case.  At the

12  end of my case, I ask you to consider what has

13  been presented to you, the evidence that has been

14  adduced, and if I've proved my theory and proved

15  my right to prevail in law, in the court of law

16  or in the equity of arbitration, or both, then I

17  ask that you award me my sums sought.  That's

18  what I've done.

19          There's no obligation for me to use

20  the word subrogation in a complaint.  Generally

21  you don't put subrogation in a complaint.  You

22  put your theories, present your evidence and seek

23  recovery on it.

24          So I wasn't talking about the

1   assignment.  I don't want to go more into

2   summation because I think we're going to do that

3   now.

4           CHAIRMAN GIACOMARRA:  I'd like to go

5   into executive session for a few minutes, so if

6   you could all leave the room.

7           MR. CORBETT:  Thank you, Mr. Chairman.

8           MR. ROSS:  May I add one more point --

9   no, I'll let you go into executive session.

10          (Discussion off the record.)

11          (Brief recess.)

12          CHAIRMAN GIACOMARRA:  We're going to

13  go back on the record.

14          The panel has considered the motion to

15  conform the pleadings to the proof, and we'll

16  grant that motion.

17          Given that there's no other matters to

18  deal with prior to closings, each person, each

19  party may make a closing argument.  The parties

20  are directed to limit their closing argument to a

21  summation of what he or she believes has been

22  proven.  The parties may now begin their closing

23  arguments beginning with the claimant.  Rebuttal

24  is allowed, and the claimant may reserve its

1  entire closing for rebuttal.  So, Mr. Ross.

2          MR. ROSS:  I'll go first and reserve a

3  right for rebuttal.

4          CHAIRMAN GIACOMARRA:  Okay.  Do you

5  need a few minutes?

6          MR. ROSS:  No, I'm ready to go.  Thank

7  you.

8          CHAIRMAN GIACOMARRA:  Okay.

9          MR. ROSS:  First and foremost, let me

10  thank the panel for its attention in this case.

11  This was a long case procedurally leading up to

12  the hearing, there were lots of motions,

13  remotions and remotions on the remotions, and I

14  think the panel paid attention, made careful and

15  deliberate decisions each step of the way, and

16  for that we are grateful and we appreciate the

17  service that you did.

18          In my opening I said that this was a

19  simple straightforward debit case.  I think the

20  facts have demonstrated that this was a simple

21  straightforward debit case.

22          Surprisingly, there's not that much in

23  dispute in this case.  The facts of the case,

24  which are not in dispute, are exactly what I said

 1  in the opening:  That defendants' brother John

 2  Mscisz was the president and CEO of VasoActive,

 3  that VasoActive was an initial public offering in

 4  the end of 2003 in which Kashner Davidson

 5  Securities was the underwriter.

 6      Both defendants purchased VasoActive

 7  securities in their Kashner Davidson account at

 8  the initial public offering at $5, and as Vaso

 9  went up very quickly, we saw two and a half

10  months later it was $15, $30 by the end of

11  February, they bought more, and they executed a

12  margin agreement which afforded them the right to

13  purchase additional shares on margin.  They

14  signed the margin agreement.  There's no evidence

15  to suggest they didn't understand the risks of

16  margin, and they purchased more shares.

17      What happened and is also undisputed

18  is that on April 1 the SEC suspended trading in

19  connection with Vaso activity, and as a result of

20  that suspension of trading, obviously, the stock

21  dropped and a margin call notice was generated.

22  Both defendants acknowledge receiving the margin

23  call notice.  So far everything I've said is not

24  in dispute.

1            In connection with the margin call

2    notice, Mark sent in $100,000 to satisfy that

3    margin call notice.  The margin call, as you

4    recall, said you must send in money on or before

5    April 8.  Mark wired in $100,000 on April 7.

6    Steve ignored the notice and never sent in any

7    more money to the account.

8            The accounts were liquidated by the

9    clearing firm, not by Kashner.  No dispute there.

10   The accounts had a debit, a deficit of

11   approximately $181,000 each.  No dispute there.

12            Under the margin agreement, defendants

13   were liable for all the costs of collection

14   associated with collecting on the debit.  No

15   dispute there.

16            SAL or Sternes, Agee, the clearing

17   firm, seized approximately $362,000 from Kashner

18   Davidson's account that they can't get access to

19   which is in excess of three and a half times the

20   net capital requirement, or almost three and a

21   half times, a little less, the net capital

22   requirement of the firm.  They have taken the

23   capital that belongs to the firm and seized it,

24   which they're entitled to do under the clearing

1   agreement, nobody's taking issue with that.  But

2   they've taken that money, no dispute.

3        Kashner Davidson is here today to

4   collect on that debt, $362,000, plus expenses.

5        Now, everything I've just said is

6   undisputed in the case.  Defendants' only

7   position in the case is, I call it the "you"

8   defense, because -- I presume he'll show it to

9   you in the summation -- what the word "you" means

10  in connection with the account agreement.  That

11  "you" means Sternes, Agee.  We agree.  That's not

12  in dispute either.

13       They also contend that the clearing

14  firm lent the money, part of the "you" defense.

15  We agree.  That's not in dispute.  Clearing firms

16  are the only entities that would lend money; it

17  would be improper for a brokerage firm to lend

18  money.  Not in dispute.

19       The fact is that because Sternes, Agee

20  took the money from Kashner Davidson, $362,000,

21  Kashner Davidson has the right by operation of

22  law, by operation of logic, by operation of

23  equity, by every operation available to you, to

24  stand in the shoes of Sterne, Agee.

1            The Supreme Court of Alabama, in a

2    case entitled Merfury versus Clizby, the cite is

3    168 Alabama 369 in the current year of 1910, but

4    the Supreme Court's defining what subrogation is

5    states, and I quote, "The doctrine of subrogation

6    is that where one not voluntarily but to protect

7    his own rights satisfies a debt for another, for

8    which another is primarily liable, he may enforce

9    against the person primarily liable all the

10    security, benefits and advantages held by the

11    creditor."  A statement of the case has shown

12    that in that particular case.  But that's the

13    law.

14            That has always been our position, it

15    never wavered.

16            The "you" defense doesn't get them

17    where they need to be.

18            However, in an excess of caution and

19    to even remove any doubt in your minds as to

20    whether or not Kashner Davidson has the right to

21    sit here, yesterday afternoon we introduced,

22    through the only witness that it would be proper

23    to introduce it through, Melissa Rothenbach, the

24    notice of assignment.  And the notice of

1  assignment, which is executed by Kashner Davidson

2  and Sterne, Agee provides that, "Whereas, SAL has

3  understood and authorized Kashner Davidson to

4  recover the Mscisz debt from Mark and Lynda

5  Mscisz and Steven Mscisz.  Whereas a prior notice

6  of assignment had been deemed not necessary by

7  the parties hereto.  Whereas, in addition to the

8  subrogation of the Mscisz debt from Sterne, Agee

9  to Kashner Davidson, therefore Sterne, Agee

10  hereby does assign, transfer and set over the

11  Mscisz debt to Kashner Davidson, including all

12  rights and remedies owned or held by Sterne, Agee

13  under the client agreement entered into between

14  Sterne, Agee and Mark and Lynda Mscisz and

15  Sterne, Agee and Steven Mscisz."

16       So it wasn't a sand bag.  This just

17  proves, as far as I'm concerned, beyond any

18  doubt, but I don't have to impose that burden on

19  myself, but clearly and unequivocally makes it a

20  nonissue.  We thought it was a nonissue before.

21  Sternes, Agee agreed with us it was a nonissue

22  before, but notwithstanding, to remove even a

23  scintilla of doubt in your mind, we executed that

24  yesterday during the lunch break in response to

1    the "you" defense proffered by the defendants in

2    this matter.

3        Defendant argued that we're not

4    entitled to attorney's fees under the assignment.

5    That's not correct, because the "now and

6    therefore" states that "Sternes, Agee hereby

7    assigns, transfers and"...  including any --

8    excuse me, "including all rights and remedies

9    owned or held by Sternes, Agee under the client

10   account agreements."

11       It is beyond question in the client

12   account agreements that Sterne, Agee is entitled

13   to its attorney's fees.  We are here in the shoes

14   of Sterne, Agee to collect the attorney's fees as

15   well.

16       Now, there were several, I call them

17   red herrings, nonissues in this case.  I'll just

18   point them out to you, because those are the

19   things that are in dispute but they're not really

20   relevant to your consideration of the debit.

21       First of all, whether the checks went

22   to Sterne, Agee or Kashner Davidson.  And the

23   fact is defendants lied because all the checks

24   were sent to Kashner Davidson.  Ms. Rothenbach

1  testified that the checks would come in, they

2  were time stamped, and that's how you know the

3  checks were received by Kashner Davidson.  But

4  whether they lied in regards to this issue or not

5  is irrelevant to the debit case.

6          At first the defendants took the

7  position that they thought they were only dealing

8  with Sterne, Agee, but we know that's not true

9  because in their Leerink & Swann account, they

10  had written checks to the clearing firm and they

11  had done that for a three-year period.  They

12  testified they had done two other IPOs.  The fact

13  they sent the checks to Sterne, Agee or had the

14  checks addressed to Sterne, Agee is not relevant

15  to the consideration before you, the debit issue.

16          The defendants said they didn't

17  receive a red herring or preliminary prospectus

18  or final prospectus.  I don't believe them.  I

19  think that's for you.  But it doesn't matter.

20  First of all, we all know that in the course, in

21  the course of an IPO, a prospectus is sent out by

22  the clearing firm.  The confirmation says a

23  prospectus was sent out in this case and it is

24  illogical for one to conclude that Sterne, Agee

1    in this particular situation for these two

2    individuals didn't send it to them.  But it

3    doesn't matter for the debit case whether they

4    got it or they didn't get it.

5           Whether the trades were solicited or

6    unsolicited, the tickets say they were

7    unsolicited.  The backs of the tickets say you

8    have to object within ten days or it's deemed you

9    consent to it.  It doesn't matter whether it's

10    solicited or unsolicited to the case you're

11    deciding, the debit case.

12           The notice of assignment or notice of

13    assignment of claim was dated yesterday.  It

14    doesn't matter.  It's a valid, enforceable notice

15    of assignment.  The effect of this legal document

16    is that any claims and rights that Sterne, Agee

17    otherwise would have have been given over to

18    Kashner Davidson as of yesterday at the very

19    earliest, at the very latest, so certainly as of

20    today it is beyond question that Kashner Davidson

21    has it.  Whether it was given over yesterday or a

22    year ago, it doesn't matter.  It's a valid

23    document which conveys the rights.

24           Mr. Corbett references the fourth

1  affirmative defense that says they allege that

2  Kashner's not the party of interest.  I don't

3  know, the eighth affirmative defense alleges

4  there was no consideration.  It's not really

5  relevant to the issue before you.  It's a debit

6  case.  That's the only question that you need to

7  focus on.

8         We have a claim for fraud in the case,

9  and the funny thing is, if you reflect, Mr.

10  Corbett, through his client, adduced the evidence

11  of fraud.  I didn't even ask about the fraud, but

12  he had his client admit that he submitted a

13  fraudulent document to Sterne, Agee in connection

14  with an application for margin credit which he

15  signed, knowing it to be false, and transmitted

16  it through interstate commerce means.  Again, I

17  didn't even introduce that evidence, Mr. Corbett

18  introduced the evidence.

19         Whether Sterne, Agee decides to take

20  any other action as a result of that fraudulent,

21  acknowledged fraudulent document is for them, but

22  I will note that it says, "I hereby certify the

23  foregoing is true and correct," and it's

24  submitted to a bank in connection with an

1   application for credit.

2          The defendants went on credit because

3   VasoActive was a skyrocketing stock.  After the

4   stock was suspended in trading, the margin

5   notices were called, they each had a debit and

6   they owed $181,000 approximately in connection

7   with the debit.

8          I turn your attention to tab No. 30

9   which sets forth Kashner's damages.  And at the

10  end of the case, we ask you to award Kashner

11  Davidson the full amount of its damages as

12  reflected on that document, which is $424,558.90,

13  less the amount of time that I already said, less

14  the $503 for Timothy Varchetto's hotel, and less

15  the amount of my time spent at yesterday's

16  hearing and today's hearing.  Thank you.  And I

17  reserve my right for rebuttal.

18          CHAIRMAN GIACOMARRA:  Mr. Corbett.

19          MR. CORBETT:  Thank you, Mr. Chairman.

20  And may it please the panel, it always gives me

21  great comfort at the close of a trial or

22  arbitration where I can look at the jury or look

23  at the panel and say:  "Remember what I spoke

24  about during my opening statement?  I produced

1    what I promised." I can do that here.

2         First of all, there was no money lent

3    by Kashner Davidson Securities. They pled it in

4    their second cause of action, money lent, but on

5    cross examination, to their credit, Ms.

6    Rothenbach and Mr. Varchetto admitted that it was

7    not Kashner Davidson that lent money to the

8    respondents. If you want to talk about

9    undisputed facts, that's undisputed.

10        Want to talk about red herring? That

11   second cause of action is a red herring. They

12   didn't have any intention of proving it or

13   evidence supporting it. We delivered what we

14   promised. And the contract certainly supports

15   that. The client account agreement refers to the

16   indebtedness to Sternes, Agee and the security

17   interest. It refers to the extension of credit

18   by Sterne, Agee, not Kashner Davidson. It refers

19   to interest being charged on an extension of

20   credit by Sternes, Agee.

21        With respect to the next count, the

22   so-called open book account, again, they pled

23   something, they didn't deliver. We promised

24   something during our opening and we did.

1          Their third cause of action alleges an

2   open book account between Kashner Davidson and

3   the respondents, but Ms. Rothenbach and Mr.

4   Varchetto admitted on cross examination that KDSC

5   rendered no balance statement of account to the

6   respondents.  They admitted that the parties

7   never met as to the correctness of any statement

8   or the amount that was allegedly owing to Kashner

9   Davidson, and the respondents never admitted

10   liability for an account stated or open account

11   which under Alabama law is the requirement.

12          Under Alabama law an account stated is

13   a post-transaction agreement, it's not founded on

14   the original liability, but it's a new agreement

15   between the parties to an original account that

16   the statement of the account with the balance

17   struck is correct and that the debtor will pay

18   that amount.  And that's under Miller versus

19   Chapman, 674 Southern Reporter, Second Series,

20   71, at Page 74.  That's from the Alabama Supreme

21   Court in 1995, citing other authorities.

22          So, again, they pled it, didn't prove

23   it.  We told you yesterday that they wouldn't be

24   able to prove it, and we delivered.

1        There's also no fraud.  Or they can't

2   satisfy essential elements of their fraud claims

3   regardless of the state's choice of law rules or

4   choice of law rules that are ultimately applied

5   because they're similar in whatever jurisdiction

6   might have context to that transaction.

7        There's this fourth cause of action

8   which is again a quintessential red herring.  But

9   fraud isn't just about a false statement.  And

10  we've explained between the testimony of Mr.

11  Varchetto and Mark Mscisz yesterday how an

12  inaccurate financial statement came to be

13  submitted to Kashner Davidson.  And Mr. Mscisz,

14  you'll remember, admitted that there were

15  inaccuracies in the ultimate financial statement

16  that was submitted.  He didn't lie, he didn't try

17  to wiggle around what was said in the statement.

18  He said that he discussed one version of the

19  personal financial statement with Mr. Varchetto,

20  and Mr. Varchetto instructed him to change the

21  numbers so he whited out the numbers, and the

22  form that went down to Kashner Davidson went in

23  the form that he had discussed with Mr.

24  Varchetto.  And if you look at the copy that was

1  produced and adduced in evidence, I think it's

2  Exhibit 20 in the claimant's book, you can see

3  where the White-Out was on the lines, and there

4  are lines obscured around the operative numbers

5  in that particular financial statement that

6  support what Mr. Mscisz testified about with

7  respect to that agreement.

8         Mr. Varchetto wanted to paper his

9  file, and Mr. Mscisz, after giving him an

10  accurate statement, worked with Mr. Varchetto to

11  give him what he wanted.  And the operative

12  financial statements that were in place before

13  these margin trades were put on, the new account

14  applications from November and December of 2003,

15  everybody agrees, Steve Mscisz, Mark Mscisz and

16  Mr. Varchetto, and I believe Ms. Rothenbach --

17  no, I don't think she testified as to that --

18  everybody agreed those initial account

19  applications, which were the operative ones, the

20  ones on which all decisions that led to the

21  extension of credit were made, were accurate.

22         Furthermore, under the laws of every

23  state that could possibly have some connection to

24  this particular transaction, there are three

1   additional facts besides the falsity of the

2   statement that need to be produced:  You've got

3   to establish that the alleged statement was

4   material, you've got to establish that there was

5   reliance, and you've got to establish that the

6   plaintiff was somehow damaged as a result of the

7   alleged fraud.  But Ms. Rothenbach --

8        (Cell phone rings.)

9        MR. ROSS:  Excuse me, I'm sorry.

10       MR. CORBETT:  Are you keeping count?

11  Unfortunately I've still got you beat by one,

12  Marc.

13       MR. ROSS:  I'll pull the battery like

14  you did yesterday.

15       (Discussion off the record.)

16       MR. ROSS:  It is off now, and I beg

17  your pardon, Mr. Corbett.

18       MR. CORBETT:  That's fine.

19       MR. ROSS:  Newfangled gadgets.

20       MR. CORBETT:  We have testimony from

21  everybody concerned yesterday that Kashner

22  Davidson didn't rely on the personal financial

23  statement, that's undisputed.  That's an

24  essential element of the fraud claim.  We also

1   have testimony that Kashner Davidson wasn't

2   damaged as a proximate result of the admitted

3   inaccuracies in the financial statement, that's

4   undisputed.  The fraud claim has to fail.

5         If you'll remember, every one of those

6   margin trades that were put on in Mark Mscisz's

7   account -- and Steve isn't accused of having

8   engaged in any fraud -- every single one of those

9   margin trades was put on before the financial

10   statement was submitted, and to make any argument

11   that a continued extension of credit was

12   somehow -- and we know Kashner Davidson didn't

13   extend any credit anyway -- but if Sternes, Agee

14   had extended any credit to Mark and Lynda Mscisz

15   as a result of the inaccuracies in the personal

16   financial statement, there wasn't any reliance

17   there either because the financial statement was

18   submitted on March 29, but the margin calls

19   started coming on April 1.

20         There were three days where

21   conceivably that personal financial statement

22   could have been operative, but there were no

23   trades put on during that period.  There were no

24   credit decisions made during that period.  We

1   don't even know, and there's no evidence that

2   that financial statement had been submitted to

3   Sterne, Agee after it was submitted to Kashner

4   Davidson.  We don't know whether it went there.

5          Finally we have what I promised

6   yesterday.  Kashner Davidson is not a party to

7   the margin agreement, what Mr. Ross has derided

8   as the "you" defense today, and under Alabama

9   law, it's a perfect defense.  Under Alabama law

10  every action has to be prosecuted in the name of

11  the real party in interest.

12         "It's well-settled law" -- and I'm

13  looking at Dunning versus New England Life

14  Insurance Company, 890 Southern Second, 92 --

15  "It's well-settled law that one not a party to or

16  in privity with a contract cannot sue for its

17  breach."

18         Now, before interposing this real

19  party in interest defense, we looked long and

20  hard at the law, because we didn't want to make

21  it ill-advisedly, and we saw, there are cases

22  where subrogation is pled and proven, the real

23  party in interest defense doesn't work.  Where

24  assignment is pled and proven, the real party in

1    interest defense is not successful.  Where

2    there's a third-party beneficiary theory pled and

3    proven, the real party in interest defense

4    doesn't take.  But here there was never any such

5    suggestion of an indirect acquisition of rights

6    against Mark, Lynda and Steven Mscisz.

7          Take a look at the pleadings, take a

8    look at what they said.  That bracket of KDSC or

9    SAL, the bracketed text there, we know why

10   lawyers use brackets, it's to change the gender

11   of a pronoun, for example, if a statement in a

12   case that you're citing uses "he" but you're

13   referring to a female in your brief, it flows

14   more naturally if you use a bracket and

15   substitute the proper pronoun, or if it uses a

16   proper noun and you want to substitute another

17   noun that does not alter the meaning of the

18   statement that you're quoting and bracketing,

19   that's why we use brackets.

20         Here, if we're assuming -- here, by

21   using KDSC or SAL, what whoever drafted this

22   statement of claim intended to do was to change

23   the meaning of the word "you" and hope that we

24   wouldn't catch it.

1          The statement of claim, which is your

2    own exhibit, it's Arbitrators' Exhibit No. 1, is

3    very clear, it's unequivocal.  It doesn't talk

4    about subrogation; it doesn't talk about any

5    retention that Sterne, Agee had made against

6    funds that Kashner Davidson had deposited with

7    it; it didn't talk about third-party

8    beneficiaries; it didn't talk about assignments.

9    It said that Kashner Davidson was a party to the

10    contract.  Implicit in this bracketed text is

11    that Kashner Davidson is included in "you," and

12    they've known about this since our answer last

13    August, and they've known about it in the nine

14    months that have passed since, and at the very

15    last possible moment they sprung something

16    different on us, they changed their case.

17          The "you" defense is a real defense,

18    because all the collection obligations, all the

19    debts that could be recoverable under that

20    contract relate to the "you," relate to Sterne,

21    Agee.  There's nothing that relates to Kashner

22    Davidson.  There's no primary right to collect on

23    the part of Kashner Davidson.  "You" and "your"

24    refer to Sterne, Agee, period.  Kashner Davidson

1   is not an agent of Sterne, Agee; it's not

2   included in the definition of "you."

3        This assignment yesterday, the

4   statement of claim, what I just had up on that

5   screen, paragraph 18 and 19, that's been around

6   since May 25 of last year, 500 and some odd days,

7   550 some odd days, and there was no suggestion in

8   that pleading of subrogation, assignment or other

9   indirect standing to sue.

10        August 26 of last year, we called them

11   on it.  We disputed in our answer to those

12   paragraphs, we disputed that they fairly

13   characterized the agreement.  They knew that we

14   did that.  They saw the pleading.

15        We also interposed a specific

16   affirmative defense that says that Kashner

17   Davidson wasn't the real party in interest.  This

18   wasn't a surprise that came upon Kashner Davidson

19   at yesterday's hearing that they somehow needed

20   to respond to.  This wasn't a new theory; this

21   wasn't a new piece of evidence; this wasn't

22   anything that they should not have anticipated.

23   It didn't even require supposition or

24   speculation.  We told them.  We said, Look,

1   you're not the real party in interest; you don't

2   have standing to sue."  And we conducted our case

3   accordingly.

4           We assumed we had a perfect defense,

5   and we would have litigated a different case, we

6   would have discovered a different case, we would

7   have strategized a different case, instead we've

8   spent tens of thousands of dollars and countless

9   hours proceeding with the assumption that the law

10  was the law, that the pleadings were the

11  pleadings, that the contract was the contract and

12  that the Mscisz brothers and Mrs. Mscisz had a

13  perfect defense to the claims that were asserted

14  by Kashner Davidson.

15          Kashner Davidson in October served

16  discovery requests where they could, if there was

17  any ambiguity about that affirmative defense or

18  about our challenge to their characterization of

19  the word "you," they served discovery requests,

20  they asked for information, and they didn't ask

21  for information about the eighth affirmative

22  defense.  They didn't ask for information about

23  our response to paragraphs 18 and 19.  They asked

24  about some of the counterclaims.  They asked

1    essentially contention interrogatories or for

2    documents supporting those counterclaims.  But

3    they did nothing of the sort with respect to that

4    plainly pled defense.

5         In February they served an exhibit

6    list.  There was no assignment referenced in that

7    exhibit list.  There was no assignment or

8    anything purporting to constitute an assignment

9    or subrogation or anything like that in the

10   documents that we finally got out of them after

11   the arbitrator, after the chairman ordered them

12   to produce documents.  There was nothing in

13   there.

14        Yesterday at ten o'clock in the

15   morning the arbitration begins.  If you look at

16   the fax header at the top of the assignment, they

17   had this at 1:45 in the afternoon, which is when

18   it came, the most recent fax from Sichenzia Ross

19   Friedman is labeled, it came at 1:45 in the

20   afternoon, 13:45.  It wasn't for nearly two hours

21   more, till 3:30 in the afternoon, when they

22   finally raised this assignment and pulled the rug

23   out, sandbagged the Msciszes and the case that

24   they had prepared in good faith, pled in good

1   faith, strategized in good faith, discovered in

2   good faith, and tried in good faith.

3           Now, a lot of those red herrings that

4   Mr. Ross referred to yesterday during his closing

5   argument were actually issues that were raised by

6   Mr. Ross, suitability or whether the trades were

7   authorized or not, for example, that's something

8   that Mr. Ross raised through his questioning, not

9   anything that we raised because you took away our

10  affirmative claims.  We're not trying to prove

11  anything.  We were just saying that the contract

12  says what the contract says, and they can't live

13  with it.

14          With respect to Mr. Ross's statement

15  accusing Steve and Mark Mscisz about lying about

16  where the checks went, I think their testimony

17  was where the money went, and it's undisputed

18  that the money that Mark and Steve sent in, and

19  Ms. Rothenbach even confirmed this yesterday in

20  her cross-examination, the money went to Sterne,

21  Agee & Leach.  The money never went to Kashner

22  Davidson.  Red herring or not, it certainly

23  wasn't a lie, and Mr. Ross was attempting to use

24  that so-called red herring to attack the

1    credibility of Mark and Steve Mscisz, which is

2    otherwise unassailable.

3        When there were shortcomings in their

4    case with respect to the financial statement, for

5    example, Mark Mscisz -- who's wearing a white

6    shirt, and Steve's in the blue, they've changed

7    so you can tell them apart -- Mark admitted that

8    there were problems with the financial statement.

9    He explained why.  But he came, he stood up and

10   told the truth.  And I have serious doubts -- and

11   you saw Mr. Varchetto's demeanor when he was

12   talking about the conversation with Mr. Mscisz

13   about that financial statement -- I have very

14   grave doubts about his credibility and his

15   explanation of that particular conversation.

16        This whole assignment, this

17   sandbagging issue, it's not without consequence.

18   It's not just a matter of ethics, it's not just

19   about fairness in process, it's not just about

20   all the time and energy and resources that Mark

21   and Steve and Lynda Mscisz dedicated to preparing

22   the claim to address the pleadings and to address

23   the contract.  There's also a substantive

24   dimension to it as well.

1          As I alluded to in addressing Mr.

2    Ross's motion to amend the pleadings to conform

3    to the evidence, there's a specific statute,

4    which is Section 8-5-25 of the Alabama Code, and

5    I've got copies for the members of the panel, and

6    Mr. Ross, if I can hand them to you.

7          (Documents exhibited to the panel

8          and counsel.)

9          MR. CORBETT:  Section 8-5-25 of the

10   Alabama code, which everybody agrees governs the

11   contract, is written into the contract, Alabama

12   law governs, says in no uncertain terms that

13   assignments are subject to the rights of

14   set-offs, recoupment and claims that the obligors

15   would otherwise have as to the original assignor.

16          By sandbagging us with this assignment

17   at 11:59 in the evening, metaphorically speaking,

18    at the very last minute, we weren't given the

19   opportunity to pursue set-offs and claims that we

20   would have against Sterne, Agee.  We didn't have

21   the ability to investigate them, we didn't have

22   the ability to plead them, we didn't have the

23   ability to take discovery concerning the set-offs

24   and claims, we didn't have the ability to present

1  any evidence yesterday concerning those set-offs

2  and claims.  It was completely taken away from

3  us, and that's a substantive right.

4         It's just manifestly unfair that you

5  can switch up like this at the very end and have

6  what's essentially a preclusive finding at the

7  end of the day, if you find for Kashner Davidson

8  based upon this assignment, a preclusive finding

9  that takes away the substantive right from these

10  people who have the substantive right.  They've

11  already lost their right to pursue their

12  counterclaims directly against Kashner Davidson

13  and get the recoupment in that fashion, if not in

14  an affirmative recovery, and those were valuable

15  claims.  But they've also got that right as to

16  Sterne, Agee, it's a matter of statute, and to

17  accept the assignment in the manner in which it

18  was introduced to the panel yesterday is just

19  manifestly unfair.

20         Now, with respect to Mr. Ross's

21  attorney's fees, it's a similar problem.  He has

22  no contractual right directly.  Kashner Davidson,

23  based upon the "you" defense, has no direct

24  contractual right to recover attorney's fees.

1   That all depends on whether you credit the

2   assignment or not.  And he certainly claimed

3   attorney's fees from the very beginning of the

4   case, and if you look at his exhibit, according

5   to the document Damages, a lot of those figures

6   and a lot of those appended documents predate the

7   20-day deadline that parties are supposed to

8   exchange exhibits before under the Code of

9   Arbitration Procedure.

10          He may not have been able to put on

11   his complete case with respect to the attorney's

12   fees, and he may not have been able to enable us

13   to have an auditor look at the fees, to look at

14   the invoices and determine whether the parts that

15   were available prior to the 20-day deadline were

16   reasonable or not, but for the ones that were

17   available before, he certainly had that

18   capability.  He could have produced those, and

19   should have produced those under the 20-day rule,

20   and he did not.

21          Again, it's surprise, it's sandbagging

22   and it's inappropriate.

23          One aspect of the costs, expenses and

24   attorney's fees that we can deal with on the

1   merits is Mr. Smith, who by virtue of the SJC's

2   decision last week didn't have to become involved

3   in this arbitration, didn't need to appear,

4   didn't do anything yesterday, isn't even here

5   today, and at the very least those fees, even if

6   you do credit that otherwise discrediting

7   assignment, Mr. Smith's fees certainly should not

8   be part of any award that's issued in this case.

9          I guess in closing, I appreciate that

10  throughout the pre-hearing process, going back to

11  the first pre-hearing conference and appointment

12  of the arbitrators and all the motion practice

13  that's been involved, you've been acting in a

14  judicial fashion, trying to adhere to the code,

15  adhere to the law and keep the process moving.

16          You're putting on a new hat now,

17  you're essentially becoming a jury.  I'm going to

18  ask you to do what I ask a jury to do at the end

19  of a trial:  Take the measure of the parties,

20   take the measure of the evidence, see how the

21  case has been conducted, and do the right thing,

22  just please do the right thing, come out with a

23   result that's fair.  That's all I ask.  Thank

24   you.

1          CHAIRMAN GIACOMARRA:  Thank you.

2          MR. ROSS:  I have a brief rebuttal.

3          CHAIRMAN GIACOMARRA:  Go ahead.

4          MR. ROSS:  I'm a little bit confused

5    because Mr. Corbett ends his summation by saying,

6    "do the right thing, come out with a result that

7    is fair."

8          It is undisputed that defendants owe

9    $362,000.  They don't even dispute that fact.

10   How you cannot hold them liable and responsible

11   to pay what is an undisputed obligation of

12   $362,000, I can't even imagine how to let them

13   off the hook is the right thing to do or is fair.

14         Kashner Davidson has already had the

15   money taken out of their account.  Sterne, Agee

16   has been paid.  Sterne, Agee has no right to go

17   against the Msciszes for the money owed.  Sterne,

18   Agee's made whole, they can't get a windfall in

19   connection with this action.

20         Do the right thing is to let them off

21   an obligation that no one has even insulted your

22   intelligence and said they don't owe?

23         The issue of brackets.  They wanted me

24   to put in my pleading the word subrogation?  I

1   don't have to.  And you don't put the word

2   subrogation in a pleading.  The irony is by

3   virtue of putting KDSC and SAL in the brackets is

4   giving him notice that we're taking the position

5   that Kashner Davidson stands in the shoes of

6   Sterne, Agee.  Isn't that what it proves?  That's

7   subrogation:  Kashner standing in the shoes of

8   Sterne, Agee.  And the brackets?  We're not

9   distinguishing between those two entities,

10   Sterne, Agee and Kashner Davidson.

11        He wants to be on notice that we

12   consider Kashner to have the rights of Sterne,

13   Agee?  In the pleadings, which his formalistic

14   approach is:  Where is it?  It's right there, he

15   keeps citing to it.  That's his notice.  He says

16   I didn't focus on that notice, I didn't prepare

17   my case on that notice.  Well, that's not my

18   problem if he missed it.  That's okay.  I mean,

19   that's a problem for him and his client, but

20   there's your notice in the pleading, if that's

21   what he's looking for.  Remember, pleadings or

22   notice, jurisdiction is notice pleadings:  You

23   have to give the other party notice of what

24   you're pleading.  Clearly from every document, as

1  they have emphasized and reemphasized is that we

2  in our pleadings and case treated Kashner the

3  same way as we treated Sterne, Agee in the

4  agreements.  They had notice of that.

5         In terms of the statute, the right of

6  set-off and everything like that, absolutely we

7  agree; not in dispute.  If we get all the rights

8  of Sterne, Agee, they get all the set-offs for

9  it, but they always had that.  The statute

10  doesn't change anything.  That's beyond question.

11  We've always taken that position, they've always

12  had that right.

13         The interesting thing that Mr. Corbett

14  did say in his summation is that the party of

15  interest defense does not exist where subrogation

16  is proven and where an assignment is proven.  So

17  he can't claim that we don't have the right and

18  the wrong party is suing where subrogation has

19  been proven.  And I would suggest to you that

20  subrogation has been proven; they had notice of

21  that position we've taken, and similarly the

22  assignment.

23         They can't challenge the assignment.

24  Again, the assignment was done out of excess

1   caution and to eliminate any doubt.  We didn't

2   have to do an assignment.  We didn't intend to do

3   it, but there's your assignment.  It's a valid

4   document which they can't challenge.

5          And as to discovery on affirmative

6   defenses, this is arbitration, this is not court;

7   you don't get discovery on affirmative defenses,

8   generally speaking.  The NASD Code of Mandatory

9   Arbitration, 99-90 Section certain out certain

10   discovery.  This is not federal or state court

11   when you can do a bill of particulars in New York

12   it would be called where you can articulate,

13   state the belief upon which you assert that for

14   each affirmative defense.  Arbitration is not set

15   up in that manner, and generally panels don't

16   award those types of responses.

17          Generally if I said, please state the

18   basis upon which you believe Kashner's unclean

19   hands precluded any recovery sounding in equity,

20   I would expect an objection coming back, and most

21   panels in arbitration, not in court, but in

22   arbitration, would say, Let's focus on the facts

23   of the case and let's get to the hearing, and

24   that's what was done here.

1          His claim that we didn't submit

2    attorney's fees 20 days beforehand because,

3    quote, he didn't have -- it deprived him of an

4    auditor to look at attorney's fees and decide if

5    reasonable.  I don't think you need an auditor to

6    look at attorney's fees; I think courts do it

7    routinely, arbitrators do it routinely, we all do

8    it.  I don't think that has much merit.

9          Candidly, I could have testified as to

10   the attorney's fees, I intended to testify as to

11   the attorney's fees, but when they raised the

12   third motion to the Supreme Court of

13   Massachusetts, maybe it was the fourth, I don't

14   remember, which was the final injunction they

15   sought to prevent me from coming here, yes, I

16   asked Howard Smith to sit in that chair yesterday

17   because I had no idea what other tactic Mr.

18   Corbett had.  Okay?

19          Mr. Corbett fought this case every

20   step on every motion, on every remotion.  He made

21   three applications to the Supreme Court of the

22   State of Massachusetts to prevent me from

23   appearing in this case.  Okay?  There was a

24   substantive decision issued by a single justice

1   of the Supreme Court of Massachusetts authorizing

2   me to appear on behalf of my client in this

3   matter.

4        In response to that, Mr. Corbett, who

5   never ceased trying to interfere with our

6   collection of the debt, made a motion, another

7   motion to the Supreme Court of Massachusetts to

8   seek to enjoin me from appearing so he can appeal

9   that decision to the full court of Massachusetts.

10       Half of my attorney's fees in this

11  case were spent defending the Massachusetts

12  matters that he brought up.  Okay?  Half of the

13  attorney's fees.  And my fees, by the way, are

14  reduced from my hourly rate substantially because

15  of the familial relationship.  But every single

16  step of the way he threw hurdles in, he has a

17  court reporter, he's going to go to court,

18  challenge it, he's said that, and he sought to

19  enjoin it.

20       And what happened here is once he made

21  the motion to seek the injunction, I sent a

22  letter to the panel saying I don't want any more

23  delay because the first time -- I know there was

24  some issue of discovery -- but he also sought the

1    delay because he filed a motion for the Supreme

2    Court to enjoin the hearing from going forward at

3    that time before the panel adjourned the hearing.

4    I decided I didn't want any more adjournments of

5    this hearing because Kashner Davidson is entitled

6    to gets its money back.  So he filed another

7    motion for the injunction, and fortunately the

8    Supreme Court justice remembered what he did two

9    days ago, after he had a lengthy conference,

10    telephonic conference with us on the phone and

11    issued a very detailed decision which was

12    forwarded to the panel and denied his injunction

13    relief again to have the full court hearing.

14          So, yes, I asked Mr. Smith to sit

15    there yesterday because I had no idea what Mr.

16    Corbett's next move was going to be.  That, by

17    the way, is eight hours.  That's the entire part

18    that Mr. Smith spent on the case.

19          Kashner Davidson is out $362,000, plus

20    approximately $60,000 in expenses.  That's the

21    right thing to do is to make the party whole who

22    is out.  Nobody has disputed that, and that is

23    indisputable.

24          So I agree:  Do the right thing, do

1  the fair thing, and I would suggest to you that

2  the fair and right thing is not to let these

3  people laugh as they walk out of here and say,

4  Aha, pulled the wool over them, we got off with

5  $362,000 we don't have to pay and leave this side

6  of the table short 362,000 when those facts are

7  uncontroverted.  So we ask you to award the total

8  sum of $442,558.90, which is the full amount of

9  claims, damages, less, as I said, Mr. Varchetto's

10  hotel reservation and my hourly rate for today.

11          And again I thank you because this

12  panel really did weigh through more motions and

13  remotions than I've seen in an arbitration, and

14  we appreciate your dedication to this process.

15  Thank you very much.

16          CHAIRMAN GIACOMARRA:  Thank you.

17          At this point I'd like to ask each of

18  the parties to state affirmatively whether you

19  have had a full and fair opportunity to be heard.

20  Mr. Ross?

21          MR. ROSS:  Yes, I have.

22          CHAIRMAN GIACOMARRA:  Mr. Corbett?

23          MR. CORBETT:  No.

24          CHAIRMAN GIACOMARRA:  Okay.

1          MR. CORBETT:  With respect to the

2    counterclaims and third-party claims.

3          CHAIRMAN GIACOMARRA:  Those were

4    dismissed.

5          MR. CORBETT:  Right.

6          CHAIRMAN GIACOMARRA:  As far as the

7    claimant's original claim.

8          MR. CORBETT:  Also to the extent the

9    panel credits the assignment, we have not had a

10    full and fair opportunity to be heard as to the

11    set-offs and claims that would run with that

12    assignment; we've had no opportunity.

13          CHAIRMAN GIACOMARRA:  The panel has

14    just accepted that document into evidence.  We

15    have not ruled as to the validity of the document

16    itself.

17          MR. CORBETT:  Okay.

18          CHAIRMAN GIACOMARRA:  You understand

19    that?

20          MR. CORBETT:  I appreciate that.

21          CHAIRMAN GIACOMARRA:  We are going to

22    weigh it, and I think I said this before, we're

23    going to weigh it for what it's worth and take

24    that into consideration.

1          MR. CORBETT:  All I'm saying is that

2    if you do credit it, we will not have had the

3    opportunity to be heard thereupon because there

4    are these other issues that are implicated by the

5    assignment.  I understand the Chairman's position

6    and the Chairman's prerogative, I just have to

7    make sure I'm accurately stating my position for

8    the record.

9          CHAIRMAN GIACOMARRA:  Okay.  The

10   decision will be forwarded to the parties and/or

11   counsel.  In order to expedite the delivery of

12   the panel's decision to the parties, the panel

13   may either execute a handwritten copy of the

14   award or each arbitrator may execute a counter

15   hard copy of the award.

16          As I mentioned at the beginning of the

17   case, I asked each party or representative to

18   complete an evaluation of this arbitration.  Of

19   course your participation is strictly voluntary.

20   The evaluations may be found at the NASD web site

21   at www.nasdadr.com.  You can also contact the

22   NASD case administrator assigned to this matter

23   to request a copy of the evaluation by mail.

24          We will -- the record will remain open

1  until the panel arrives at a decision or the

2  panel determines that it is closed.  No party

3  will contact any member of this arbitration panel

4  directly.  All communications are to be directed

5  to the staff person assigned to this case.  I

6  request that the parties leave the room at this

7  time.

8          MR. ROSS:  Thank you very much.

9          MR. CORBETT:  I need to disassemble.

10          CHAIRMAN GIACOMARRA:  Sure.  Take your

11  time.

12          (Whereupon at 11:20, a.m., the

13  proceedings were closed.)

14

15

16

17

18

19

20

21

22

23

24

1     C E R T I F I C A T E

2

3   COMMONWEALTH OF MASSACHUSETTS

4   SUFFOLK, SS.

5       I, Loretta Hennessey, Registered Merit

6   Reporter and Notary Public in and for the

7   Commonwealth of Massachusetts, do hereby certify:

8        That the proceedings hereinbefore set

9   forth is a true and accurate record of my

10   stenotype notes taken in the foregoing matter, to

11   the best of my knowledge, skill and ability.

12        IN WITNESS WHEREOF, I have hereunto set

13   my hand and Notarial Seal this 26th day of May,

14   2005.

15

16

17

18              Loretta Hennessey, RMR

19              Notary Public

20

21   My Commission Expires: 6/10/05

22

23

24





## ALLEGATIONS OF CONTRACT BETWEEN CLAMANT & RESPONDENTS

18.    Paragraph 6 of the Client Agreement executed by each Respondent expressly provides that, each Respondent is "liable for the payment upon demand of any debit balance, and interest thereon, or other obligations owing in my Securities Account or other account which I have with [KDSC or SAL]. See Exhibits A and B at ¶6. Further, with respect to Mark and Lynda Mscisz' joint account, they each agreed that their liability regarding their joint account "shall be joint and several". See Exhibit A at ¶15.

19.    Finally, under paragraph 6 of the Agreement, Respondents "agree[d] to reimburse [KDSC or SAL] for all cost (including attorneys' fees), losses, or liabilities incurred by you in connection with the collection of any debit balance or unpaid deficient in my Securities Account." Id. at ¶6.

## ALLEGATIONS OF CONTRACT BETWEEN CLAMANT & RESPONDENTS

18.     Paragraph 6 of the Client Agreement executed by each Respondent expressly provides that, each Respondent is "liable for the payment upon demand of any debit balance, and interest thereon, or other obligations owing in my Securities Account or other account which I have with [KDSC or SAL]. See Exhibits A and B at ¶6. Further, with respect to Mark and Lynda Msch's joint account, they each agreed that their liability regarding their joint account "shall be joint and several". See Exhibit A at ¶15.

19.     Finally, under paragraph 6 of the Agreement, Respondents "agree[d] to reimburse [KDSC or SAL] for all cost (including attorneys' fees), losses, or liabilities incurred by you in connection with the collection of any debit balance or unpaid deficient in my Securities Account." Id. at ¶6.

## ALLEGATIONS OF CONTRACT BETWEEN CLAMANT & RESPONDENTS

18.    Paragraph 6 of the Client Agreement executed by each Respondent expressly provides that, each Respondent is "liable for the payment upon demand of any debit balance, and interest thereon, or other obligations owing in my Securities Account or other account which I have with [KDSC or SAL]. See Exhibits A and B at ¶6. Further, with respect to Mark and Lynda Msch.' joint account, they each agreed that their liability regarding their joint account "shall be joint and several". See Exhibit A at ¶15.

19.    Finally, under paragraph 6 of the Agreement, Respondents "agree[d] to reimburse [KDSC or SAL] or all cost (including attorneys' fees), losses, or liabilities incurred by you in connection with the collection of any debit balance or unpaid deficient in my Securities Account." Id. at ¶6.

# MARGIN AGREEMENT WITH SAL, NOT KDSC



# MARGIN AGREEMENT WITH SAL, NOT KDSC



"I authorize you to take any steps...necessary...to minimize **your** losses."

*Client Account Agreement ¶ 6*

# MARGIN AGREEMENT WITH SAL, NOT KDSC



"...account which I have with **you**."

*Client Account Agreement ¶ 6*

# MARGIN AGREEMENT WITH SAL, NOT KDSC



"...indebtedness owed to **you** by me..."
*Client Account Agreement ¶ 6*

# MARGIN AGREEMENT WITH SAL, NOT KDSC



"I agree to reimburse **you** for all cost (including attorneys' fees), losses, or liabilities incurred by **you** in connection with the collection of any debit balance or unpaid deficiency in my Securities Account."

*Client Account Agreement ¶ 6*

# MARGIN AGREEMENT WITH SAL, NOT KDSC





"Each of us will be fully liable for any amounts due **you** under this Agreement."

*Client Account Agreement ¶ 15*

# MARGIN AGREEMENT WITH SAL, NOT KDSC



# MARGIN AGREEMENT WITH SAL, NOT KDSC



"The words 'you' and 'your' refer to SAL and or its authorized agents."

*Client Account Agreement ¶ 1*

# MARGIN AGREEMENT WITH SAL, NOT KDSC



"my broker dealer is not an agent of . . . SAL."

*Client Account Agreement ¶ 3*





# MONEY LENT BY SAL, NOT KDSC

**"Indebtedness to SAL and Security Interest."**
*Client Account Agreement ¶ 6*



# MONEY LENT BY SAL, NOT KDSC





"Margin Transactions normally involve the extension of credit made **by Sterne, Agee & Leach, Inc**… (Sterne Agee)…"

*Client Account Agreement at 4*

# MONEY LENT BY SAL, NOT KDSC





"Your account will be charged interest on any extension of credit to you by **Sterne Agee** in connection with the purchase, sale or carrying of any securities."

*Client Account Agreement at 4*











# Mark & Lynda Mscisz Margin Purchases





# Mark & Lynda Mscisz Margin Purchases

**Feb 12, 2004**

Margin Account Established

**Mar 29, 2004**

Personal Financial Statement Submitted

Feb 10, 2004 | Feb 20, 2004 | Mar 1, 2004 | Mar 10, 2004 | Mar 20, 2004

**Feb 13, 2004**

Purchase 3,000
Shares VAPH

**Feb 20, 2004**

Purchase 2,000
Shares VAPH

**Feb 20, 2004**

Purchase 1,000
Shares VAPH

**Feb 23, 2004**

Purchase 1,000
Shares VAPH

# Mark & Lynda Mscisz Margin Purchases

**Feb 12, 2004**

Margin Account Established

**Mar 29, 2004**

Personal Financial Statement Submitted

Feb 10, 2004    Feb 20, 2004    Mar 1, 2004    Mar 10, 2004    Mar 20, 2004

**Feb 13, 2004**

Purchase 3,000
Shares VAPH

**Mar 3, 2004**

Purchase 1,000
Shares VAPH

**Feb 20, 2004**

Purchase 2,000
Shares VAPH

**Feb 20, 2004**

Purchase 1,000
Shares VAPH

**Feb 23, 2004**

Purchase 1,000
Shares VAPH

# Mark & Lynda Mscisz Margin Purchases

**Feb 12, 2004**

Margin Account Established

**Mar 29, 2004**

Personal Financial Statement Submitted

| Feb 10, 2004 | Feb 20, 2004 | Mar 1, 2004 | Mar 10, 2004 | Mar 20, 2004 |

**Feb 13, 2004**

Purchase 3,000 Shares VAPH

**Mar 3, 2004**

Purchase 1,000 Shares VAPH

**Feb 20, 2004**

Purchase 2,000 Shares VAPH

**Mar 5, 2004**

Purchase 3,000 Shares VAPH

**Feb 20, 2004**

Purchase 1,000 Shares VAPH

**Feb 23, 2004**

Purchase 1,000 Shares VAPH

# Mark & Lynda Mscisz Margin Purchases





# Mark & Lynda Mscisz Margin Purchases









Mark & Lynda Mscisz Margin Purchases
Feb 12, 2004
Margin Account Established
Mar 29, 2004
Personal Financial Statement Submitted
Feb 10, 2004
Feb 20, 2004
Mar 1, 2004
Mar 10, 2004
Mar 20, 2004
Feb 13, 2004
Purchase 3,000 Shares VAPH
Feb 20, 2004
Purchase 2,000 Shares VAPH
Feb 20, 2004
Purchase 1,000 Shares VAPH
Feb 23, 2004
Purchase 1,000 Shares VAPH
Mar 3, 2004
Purchase 1,000 Shares VAPH
Mar 5, 2004
Purchase 3,000 Shares VAPH
Mar 10, 2004
Purchase 5,000 Shares VAPH
Mar 10, 2004
Purchase 10,000 Shares VAPH
Mar 11, 2004
Purchase 7,500 Shares VAPH
Mar 11, 2004
Purchase 3,000 Shares VAPH
Mar 11, 2004
Purchase 2,500 Shares VAPH
Mar 11, 2004
Purchase 2,000 Shares VAPH
Mar 26, 2004
Purchase 4,000 Shares VAPH





# Award
## NASD Dispute Resolution

In the Matter of the Arbitration Between:

Kashner Davidson Securities Corporation (Claimant) v. Steven Mscisz, Mark Mscisz, and Lynda Mscisz (Respondents) v. Victor Kashner, Matthew Meister, and Timothy Varchetto (Third-Party Respondents)

Case Number: 04-03793                    Hearing Site: Boston, Massachusetts

Nature of the Dispute:  Member vs. Customers (Initial Claim).
                        Customers vs. Member (Counterclaim)
                        Customers vs. Associated Persons (Third-Party Claims).

## REPRESENTATION OF PARTIES

Claimant Kashner Davidson Securities Corporation ("KDSC") hereinafter referred to as "Claimant" and Third-Party Respondents Victor Kashner ("V. Kashner"), Matthew Meister ("M. Meister"), and Timothy Varchetto ("T. Varchetto") hereinafter collectively referred to as "Third-Party Respondents": Howard M. Smith, Esq., Newman & Smith, Newton, MA.  Previously represented by:  Marc J. Ross, Esq., Sichenzia Ross Friedman Ference, LLP, New York, NY.

Respondents Steven Mscisz ("S. Mscisz"), Mark Mscisz ("M. Mscisz"), and Lynda Mscisz ("L. Mscisz") hereinafter collectively referred to as "Respondents":  William P. Corbett, Jr., Esq., The Corbett Law Firm, Lynn, MA.

## CASE INFORMATION

Statement of Claim filed on or about:  May 26, 2004.
Claimant signed the Uniform Submission Agreement:  May 24, 2004.

Joint Statement of Answer, Affirmative Defenses, Counterclaims and Third-Party Claims filed by Respondents on or about:  August 26, 2004.
Respondent S. Mscisz signed the Uniform Submission Agreement:  August 26, 2004.
Respondent M. Mscisz signed the Uniform Submission Agreement:  August 26, 2004.
Respondent L. Mscisz signed the Uniform Submission Agreement:  August 26, 2004.

Joint Reply and Answer filed by Third-Party Respondents on or about:  September 9, 2004.
Third-Party Respondent Kashner signed the Uniform Submission Agreement:  October 1, 2004.
Third-Party Respondent Meister did not sign the Uniform Submission Agreement.
Third-Party Respondent Varchetto did not sign the Uniform Submission Agreement.

## CASE SUMMARY

Claimant asserted the following causes of action: breach of contract; money lent; open book account; and fraud/fraud in the inducement. The causes of action relate to unspecified securities.

Unless specifically admitted in its Answer, Respondents denied the allegations made in the Statement of Claim and asserted various affirmative defenses. In its Counterclaims and Third-Party Claims, Claimant asserted the following causes of action: violations of Sections 7, 9, and 10(b) of the Securities Act of 1934; violations of the Florida Securities Transactions Act; violations of the Massachusetts Uniform Securities Act; violations of NASD Business Conduct Standards; common law fraud; unjust enrichment; conversion; breach of contract; violation of the Racketeer Influenced and Corrupt Organization Act; abuse of process; violation of the Massachusetts Consumer Protection Act and the Florida Consumer Protection Act.

Unless specifically admitted in their Reply and Answer of Third-Party Claims, Claimant and Third-Party Respondents denied the allegations made in the Counterclaims and Third-Party Claims and asserted various affirmative defenses.

## RELIEF REQUESTED

Claimant requested compensatory damages in the amount of $173,634.22; compensatory damages in the amount of $176,923.98; interest; costs of collection, including NASD filing and hearing fees and attorneys; fees; and such other and further relief as the Panel deems just, fair, and equitable.

Respondents requested that the Panel dismiss Claimant's Statement of Claim, with prejudice; on their Counterclaims and Third-Party Claims, unspecified compensatory damages in threefold; prejudgment interest; attorneys' fees; costs; an order that Claimant disgorge and make full restitution to Respondents; other appropriate equitable relief; and such other and further relief as the Panel deems necessary and just.

Third-Party Respondents requested that the Panel award Claimant the relief sought in the Statement of Claim; that the Panel deny and dismiss each and every claim asserted in the Counterclaims and Third-Party Claims; that the Panel issue sanctions against Respondents; and such other and further relief as the Panel deems just, equitable, and proper.

## OTHER ISSUES CONSIDERED AND DECIDED

Upon review of the file and the representations made on behalf of the Claimant, the undersigned arbitrators (the "Panel") determined that Respondent L. Mscicz has been properly served with the Statement of Claim and received due notice of the hearing, and that arbitration of the matter would proceed without said Respondent present, in accordance with the NASD Code of Arbitration Procedure (the "Code").

NASD Dispute Resolution
Arbitration No. 04-03793
Award   Page 3 of 6

Third-Party Respondents Meister and Varchetto did not file with NASD Dispute Resolution properly executed Uniform Submission Agreements but are required to submit to arbitration pursuant to the Code and are bound by the determination of the Panel on all issues submitted.

The Panel previously ruled that the Counterclaims and Third-Party Claims filed by Respondents are dismissed, with prejudice.

At the hearing, Claimant made an oral motion to conform the pleadings to the proof. After due consideration, the Panel determined to grant the motion.

Respondents made a motion for a stenographic transcription of the hearing. After due consideration, the Panel granted the motion and ordered the following: "Respondents are to provide NASD with a copy of the transcript. Claimant is to obtain the transcript at its own cost; Respondents do not have to pay for Claimant's transcript".

Respondents made a motion to dismiss for failure to make a prima facie case. After due consideration, the Panel denied the motion.

The parties have agreed that the Award in this matter may be executed in counterpart copies or that a handwritten, signed Award may be entered.

## AWARD

After considering the pleadings, and the testimony and evidence presented at the hearing, the Panel has decided in full and final resolution of the issues submitted for determination as follows:

1. Respondents are jointly and severally liable for and shall pay Claimant compensatory damages in the amount of $421,000.00, inclusive of attorneys' fees and costs according to the margin agreement, plus interest at the WSJ prime rate from May 18, 2005 until the date of payment of the award.

2. Respondents' Counterclaims and Third-Party Claims are dismissed.

2. Any and all relief not specifically addressed herein is denied.

## FEES

Pursuant to the Code, the following fees are assessed:

**Filing Fees**
NASD Dispute Resolution will retain or collect the non-refundable filing fees for each claim:

| | |
|---|---|
| Initial claim filing fee | = $1,000.00 |
| Third-Party Claim filing fee | = $ 250.00 |

**Member Fees**

NASD Dispute Resolution
Arbitration No. 04-03793
Award   Page 4 of 6

Member fees are assessed to each member firm that is a party in these proceedings or to the
member firm that employed the associated persons at the time of the events giving rise to the
dispute. Accordingly, Kashner Davidson Securities Corp. is a party.

| | |
|---|---|
| Member surcharge | = $1,700.00 |
| Pre-hearing process fee | = $  750.00 |
| Hearing process fee | = $2,750.00 |

## Adjournment Fees

Adjournments granted during these proceedings for which fees were assessed:

| | |
|---|---|
| March 2-4, 2005, adjournment by Respondents | = Waived |

## Forum Fees and Assessments

The Panel has assessed forum fees for each session conducted. A session is any meeting
between the parties and the arbitrators, including a pre-hearing conference with the arbitrators,
that lasts four (4) hours or less. Fees associated with these proceedings are:

Tow (2) Pre-hearing sessions with a single arbitrator @ $450.00     = $  900.00
Pre-hearing conferences:     January 20, 2005     1 session
                             January 31, 2005     1 session

Three (3) Pre-hearing sessions with Panel @ $1,000.00*     = $3,000.00
Pre-hearing conferences:     November 8, 2004     1 session
                             November 16, 2004    1 session
                             March 2, 2005        1 session

Three (3) Hearing sessions @ $1,000.00     = $3,000.00
Hearing Dates:     May 17, 2005     2 sessions
                   May 18, 2005     1 session

Total Forum Fees                           = $6,900.00

*In accordance with Rule 10332(c) of the Code of Arbitration Procedure, the forum fees
assessed against the Respondents are based on the Respondents' hearing session deposit.*

1. The Panel has assessed $6,900.00 of the forum fees jointly and severally against
   Respondents.

## Fee Summary

1. Claimant is solely liable for:

| | |
|---|---|
| Initial Filing Fee | = $1,000.00 |
| Member Fees | = $5,200.00 |
| Total Fees | = $6,200.00 |
| Less payments | = $7,325.00 |
| Refund Due Claimants | = $1,125.00 |

NASD Dispute Resolution
Arbitration No. 04-03793
Award   Page 5 of 6

2.   Respondents are jointly and severally liable for:

| | |
|---|---|
| Third-Party Claim Filing Fee | = $   250.00 |
| Forum Fees | = $6,900.00 |
| Total Fees | = $7,150.00 |
| Less payments | = $1,250.00 |
| Balance Due NASD Dispute Resolution | = $5,900.00 |

All balances are payable to NASD Dispute Resolution and are due upon receipt pursuant to Rule 10330(g) of the Code.

NASD Dispute Resolution
Arbitration No. 04-03793
Award    Page 6 of 6

## ARBITRATION PANEL

Arthur J. Giacomarra, Esq.          -          Public Arbitrator, Presiding Chairperson
Douglas R. Gray                     -          Public Arbitrator
Patrick W. McKeon, Esq.             -          Non-Public Arbitrator

## Concurring Arbitrators' Signatures

I, the undersigned arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

_____
Arthur J. Giacomarra, Esq.                                    _____
Public Arbitrator, Presiding Chairperson                      Signature Date


_____
Douglas R. Gray                                               _____
Public Arbitrator                                             Signature Date


_____
Patrick W. McKeon, Esq.                                       _____
Non-Public Arbitrator                                         Signature Date


June 17, 2005
_____
Date of Service  (For NASD Dispute Resolution use only)



NASD Dispute Resolution
Arbitration No. 04-03793
<u>Award    Page 6 of 6</u>

## ARBITRATION PANEL

| | | |
|---|---|---|
| Arthur J. Giacomarra, Esq. | – | Public Arbitrator, Presiding Chairperson |
| Douglas R. Gray | – | Public Arbitrator |
| Patrick W. McKeon, Esq. | – | Non-Public Arbitrator |

## Concurring Arbitrators' Signatures

I, the undersigned arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

_____
Arthur J. Giacomarra, Esq.
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Douglas R. Gray
Public Arbitrator

_6-14-05_
Signature Date

_____
Patrick W. McKeon, Esq.
Non-Public Arbitrator

_____
Signature Date

June 17, 2005
Date of Service  (For NASD Dispute Resolution use only)

NASD Dispute Resolution
Arbitration No. 04-03793
Award   Page 6 of 6

## ARBITRATION PANEL

| | | |
|---|---|---|
| Arthur J. Giacomarra, Esq. | - | Public Arbitrator, Presiding Chairperson |
| Douglas R. Gray | - | Public Arbitrator |
| Patrick W. McKeon, Esq. | - | Non-Public Arbitrator |

### Concurring Arbitrators' Signatures

I, the undersigned arbitrator, do hereby affirm, pursuant to Article 7507 of the Civil Practice Law and Rules, that I am the individual described herein and who executed this instrument which is my award.

_____
Arthur J. Giacomarra, Esq.
Public Arbitrator, Presiding Chairperson

_____
Signature Date

_____
Douglas R. Gray
Public Arbitrator

_____
Signature Date

*Patrick W. McKeon*
Patrick W. McKeon, Esq.
Non-Public Arbitrator

*6-17-05*
Signature Date

*June 17, 2005*
Date of Service  (For NASD Dispute Resolution use only)

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

```
--------------------------------------------------------------------x
In the Matter of the Arbitration Between:              :
                                                       :
KASHNER DAVIDSON SECURITIES CORPORATION, :               NASD No. _____
                                                       :
                             Claimant,                 :
                                                       :
                                                       :
        -against-                                      :        STATEMENT OF CLAIM
                                                       :
STEVEN MSCISZ, MARK MSCISZ, and                        :
LYNDA MSCISZ,                                           :
                                                       :
                             Respondents.              :
--------------------------------------------------------------------x
```

Claimant Kashner Davidson Securities Corporation, by and through its counsel,

Sichenzia Ross Friedman Ference LLP, brings this action against Respondents Steven Mscisz,

Mark Mscisz, and Lynda Mscisz and alleges as follows:


## THE PARTIES

1.      Claimant Kashner Davidson Securities Corporation ("KDSC") is a corporation

organized under the laws of the State of Florida with its principal place of business located at 77

South Palm Avenue, Sarasota, Florida.  KDSC is a broker dealer registered with the United

States Securities and Exchange Commission ("SEC") and a member of the National Association

of Securities Dealers, Inc. ("NASD").

2.      At all relevant times herein, Respondent Steven Mscisz was a customer of KDSC

who maintained a margin account at KDSC, account number 60572265.

3.      At all relevant times herein, Respondent Mark Mscisz, and his wife, Lynda

Mscisz, were customers of KDSC who maintained a joint margin account at KDSC, account

number 60467459.

## JURISDICTION

4.      Under the Federal Arbitration Act (9 U.S.C. §1, *et. seq.*), the NASD has

jurisdiction over the parties and this dispute because each Respondent and Claimant have entered

into an express, unambiguous written agreement to arbitrate, which provides that any and all

controversies between KDSC and each Respondent shall be heard before an arbitration panel

convened by the NASD.

## FACTS COMMON TO ALL COUNTS

5.      On November 14, 2003, Steven Mscisz established a brokerage account with

KDSC, which was designated account numb ⬛REDACTED⬛ 2265, and Mark and Lynda Mscisz also

established a brokerage account with KDSC, which was designated account number 60467459.

6.      Steven Mscisz and Mark Mscisz each subsequently deposited a large number of

shares of Vaso Active Pharmaceuticals, Inc. ("Vaso"), a publicly traded company, into their

respective KDSC accounts.

7.      Steven and Mark Mscisz' brother, John Mscisz, is the President of Vaso.

8.      On February 12, 2004, Mark Mscisz sought margin credit from KDSC and its

clearing firm, Sterne, Agee & Leach, Inc. ("SAL"). To this end, Mark and Lynda Mscisz duly

executed a Client Agreement adding margin privileges to their account. A true and correct copy

of Mark and Lynda Mscisz' Client Account Agreement dated February 12, 2004 is annexed

hereto as Exhibit A.

9.     On February 18, 2004, Steven Mscisz sought margin credit from KDSC and its clearing firm. As a result, Steven Mscisz duly executed a Client Agreement adding margin privileges to his account. A true and correct copy of Steven Mscisz' Client Account Agreement dated February 18, 2004 is annexed hereto as Exhibit B.

10.    Thereafter, Steven and Mark Mscisz each heavily margined the Vaso stock in their respective accounts, which resulted in a margin debit in excess of several hundred thousand dollars.

11.    On March 29, 2004, to obtain additional margin credit, Mark and Lynda Mscisz provided a personal financial statement setting forth their assets and liabilities to SAL "for the purpose of obtaining credit". In the Personal Financial Statement, Mark and Lynda Mscisz represented that their total assets exceeded $18,000,000 and their total liabilities were $6,000,000. A true and correct copy of the Personal Financial Statement prepared and signed by Mark and Lynda Mscisz is annexed hereto as Exhibit C.

12.    On April 1, 2004, the SEC suspended trading in Vaso's stock.

13.    With the trading in Vaso suspended, the stock was not liquid and had no value. As a result, SAL issued a margin call notification to Steven Mscisz in the amount of $210,326.64 and to Mark and Lynda Mscisz in the amount of $331,777.80. A true and correct copy of the margin call notifications to Respondent Steven Mscisz and Respondents Mark and Lynda Mscisz are collectively annexed hereto as Exhibit D.

14.    On April 7, 2004, acknowledging their margin debt obligation, Mark and Lynda Mscisz made a $100,000 payment towards their margin debt. A true and correct copy of KDSC Account Workbook for the activity in Mark and Lynda Mscisz' account for April 2004, which reflects the incoming wire transfer of $100,000, is annexed hereto as Exhibit E. No further

payments in satisfaction of said obligation have been made, and no payments in satisfaction of said obligation have been made by Respondent Steven Mscisz.

15.    Respondent Steven Mscisz and Respondents Mark and Lynda Mscisz have failed to otherwise comply with or satisfy the margin calls or otherwise satisfy the margin debit balance in their respective accounts.

16.    Consequently, there is currently a deficient margin debit in Steven Mscisz' Account in the amount of $173,634.22, which remains due and owing.  A true and correct copy of the KDSC Account Workbook for the balance of Steven Mscisz' account is annexed hereto as Exhibit F.

17.    As to Mark and Lynda Mscisz's Account, there is currently a deficient margin debit in the amount of $176,923.98, which remains due and owing.  A true and correct copy of the KDSC Account Workbook for the balance of Mark and Lynda Mscisz' account is annexed hereto as Exhibit G.

18.    Paragraph 6 of the Client Agreement executed by each Respondent expressly provides that, each Respondent is "liable for the payment upon demand of any debit balance, and interest thereon, or other obligations owing in my Securities Account or other account which I have with [KDSC or SAL].  See Exhibits A and B at ¶6.  Further, with respect to Mark and Lynda Mscisz' joint account, they each agreed that their liability regarding their joint account "shall be joint and several".  See Exhibit A at ¶15.

19.    Finally, under paragraph 6 of the Agreement, Respondents "agree[d] to reimburse [KDSC or SAL] for all cost (including attorneys' fees), losses, or liabilities incurred by you in connection with the collection of any debit balance or unpaid deficient in my Securities Account." Id. at ¶6.

4

20.    Despite due demand for payment of the deficiency and indebtedness in the their accounts, Respondent Steven Mscisz and Respondents Mark and Lynda Mscisz have each failed and refused to pay said sum to KDSC.

## AS AND FOR A FIRST CAUSE OF ACTION
### (Breach of the Contract)

21.    KDSC repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as if fully set forth herein.

22.    KDSC has duly performed all covenants and conditions required to be performed on its part under the terms of each Respondent's Client Agreement.

23.    Respondent Steven Mscisz has breached his Client Agreement by failing to pay the deficiency and indebtedness justly due and owing to KDSC in the his account.

24.    As a result of Steven Mscisz' breach, KDSC has suffered damages in the amount of $173,634.22, together with interest thereon and its reasonable attorneys' fees to collect the indebtedness due and owning, which Respondent Steven Mscisz is liable.

25.    Respondents Mark and Lynda Mscisz have breached their Client Agreement by failing to pay the deficiency and indebtedness justly due and owing to KDSC in the their joint account.

26.    As a result of Mark and Lynda Mscisz' breach, KDSC has suffered damages in the amount of $176,923.98, together with interest thereon and its reasonable attorneys' fees to collect the indebtedness due and owning, which Respondents Mark and Lynda Mscisz are jointly and severally liable.

## AS AND FOR A SECOND CAUSE OF ACTION
### (Money Lent)

27.    KDSC repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as if fully set forth herein.

28.    Between February 2004 and March 2004, KDSC, through SAL, its clearing firm, loaned at least $210,909.22 to Respondent Steven Mscisz in his account, which he has failed to repay $173,634.22 that is due and owing.

29.    As a result of Respondent Steven Mscisz' failure to repay said loan, KDSC has suffered damages in the amount of $173,634.22, together with interest thereon and its reasonable attorneys' fees to collect the indebtedness due and owing, which Respondent Steven Mscisz is liable.

30.    Between February 2004 and March 2004, KDSC, through SAL, its clearing firm, loaned at least $232,498.98 to Respondents Mark and Lynda Mscisz in their account, which they have failed to repay $176,923.98 that is due and owing.

31.    As a result of Respondents Mark and Lynda Mscisz' failure to repay said loan, KDSC has suffered damages in the amount of $176,923.98, together with interest thereon and its reasonable attorneys' fees to collect the indebtedness due and owing, which Respondents Mark and Lynda Mscisz are jointly and severally liable.

## AS AND FOR A THIRD CAUSE OF ACTION
### (Open Book Account)

32.    KDSC repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as if fully set forth herein.

33.    A book account was created and kept in permanent form in the regular course of business conducted between Respondent Steven Mscisz and KDSC.  This book account is evidenced by the Account Workbook annexed as Exhibit F and remains open.

34.    Based on the open book account between Respondent Steven Mscisz and KDSC, Respondent Steven Mscisz owed KDSC the amount of $173,634.22, together with interest thereon.

35.    A book account was created and kept in permanent form in the regular course of business conducted between Respondents Mark and Lynda Mscisz and KDSC.  This book account is evidenced by the Account Workbook annexed as Exhibit G and remains open.

36.    Based on the open book account between Respondents Mark and Lynda Mscisz and KDSC, Respondents Mark and Lynda Mscisz owed KDSC the amount of $176,923.98, together with interest thereon.

## AS AND FOR A FOURTH CAUSE OF ACTION
### (Fraud/Fraud in the Inducement)

37.    KDSC repeats, realleges, and incorporates by reference each and every allegation contained in the above paragraphs, as if fully set forth herein.

38.    To obtain margin credit, Mark and Lynda Mscisz provided a personal financial statement setting forth their assets and liabilities to SAL, in which they represented that their total assets exceeded $18,000,000 and their total liabilities were $6,000,000.  Respondents Mark

and Lynda Mscisz made the aforementioned representations for the specific purpose of inducing KDSC and its clearing firm to extend credit to them.

39. In reliance upon the aforementioned representations by Respondents Mark and Lynda Mscisz, KDSC and its clearing firm continued to extend, or extended additional, margin credit to Respondents Mark and Lynda Mscisz.

40. The material representations made by Respondents Mark and Lynda Mscisz were untrue, deceitful, false and fraudulent, and were known by them to be untrue at the time they were made. Specifically, when KDSC attempted to collect upon the margin debit owed by Mark and Lynda Mscisz, Mark Mscisz stated, contrary to his representations a month earlier, that his liabilities were greater than his assets and he may be filing for bankruptcy.

41. Respondents Mark and Lynda Mscisz acted with scienter and/or intent to defraud when they made the aforementioned untrue, false and fraudulent statements and representations, or they were made them with such a reckless or deliberate disregard of the applicable facts and circumstances such that it is reasonable to infer that the same were made by Respondents Mark and Lynda Mscisz knowingly and with the intent to deceive and defraud KDSC and its clearing firm.

42. As a direct and proximate result of the aforementioned facts, circumstances, representations, and Respondents Mark and Lynda Mscisz' fraudulent conduct, KDSC has sustained losses and damages in the approximate amount of $176,923.98.

**WHEREFORE**, KDSC demands judgment as follows:

i)      on the First, Second and Third Causes of Action, judgment against Steven Mscisz in the amount of $173,634.22;

ii)     on the First, Second and Third Causes of Action, judgment against Mark Mscisz and Lynda Mscisz, jointly and severally, in the amount of $176,923.98;

iii)    on the Fourth Cause of Action, judgment against Mark Mscisz and Lynda Mscisz, jointly and severally, in the amount of $176,923.98, and a specific factual finding of fraud;

iv)    on all causes of action, interest on the amounts due at the maximum statutory rate, and its costs of collection, including the NASD Filing and Hearing Fee, as well as KDSC's actual attorneys' fees; and

v)     such other and further relief as the Panel deems just, fair and equitable.

Dated: New York, New York
May 25, 2004

Respectfully submitted,

SICHENZIA ROSS FRIEDMAN FERENCE LLP

By: _____

Marc J. Ross, Esq.
Richard J. Babnick, Jr., Esq.
1065 Avenue of the Americas, 21st Floor
New York, New York 10018
(212) 930-9700

Attorneys for Claimant
Kashner Davidson Securities Corporation

9

# *Exhibit A*

# CLIENT ACCOUNT AGREEMENT

TO: SAL Financial Services, Inc. ("SAL"), Sterne, Agee & Leach, Inc. ("Sterne Agee") and its authorized agents.

In consideration of SAL opening a securities account ("Securities Account"), on my behalf, I agree as follows:

1. **Meaning of Words in this Agreement.** The words "I," "me," "my," and "us," refer to the person(s) who signed this Agreement. The words "you" and "your" refer to SAL or its authorized agents. "My broker" refers to the broker dealer introducing my account to SAL.

2. **Authority and Ownership.** I have the requisite legal capacity, am authorized to enter into this Agreement and have obtained and will provide you with all necessary authorizations from third parties to open accounts and effect securities transactions under this agreement. I will be the owner of all securities purchased, held, and sold by me through you, or will otherwise have the authority to purchase, hold or sell such securities.

3. **Clearing Broker Agreement.** I understand that my broker dealer entered into an agreement with SAL, who entered into an agreement with Sterne Agee to execute and clear securities transactions presented to SAL in my Securities Account. I further understand and agree that Sterne Agee will carry and maintain my Securities Account (as defined by SEC Securities Investors Protection Act), under the terms of the fully disclosed clearing agreement, except as may otherwise be provided in this agreement. I further understand that my broker dealer is not an agent of, or supervised by SAL. I understand that SAL has no control relationship over my broker dealer and is not responsible for the suitability or appropriateness of investments made by me or the genuineness of any transaction made on my behalf by my broker dealer.

4. **Appointment of broker dealer as Agent.** I appoint my broker as my agent for the purpose of carrying out my directions with respect to the purchase, sale or liquidation of securities in accordance with the terms and conditions of this Agreement, and I assume all risks with respect to the purchase, sale or liquidation of securities. All transactions will be executed only on my order or on the order of my authorized delegate except as otherwise provided in paragraph 6 below. To carry out your duties, you are authorized to appoint and use sub-agents. You and your sub-agents are authorized to open and close brokerage accounts, maintain customer records, hold securities in bearer, registered or book entry form, place and withdraw orders, provide information to third parties, including your affiliates, and take such other steps as are reasonable in connection with your duties.

5. **Settlement.** I agree to have collected funds available in the settlement Account, or to deliver to you sufficient collected funds to cover the amounts due on purchases of securities by the settlement date for payment for all securities purchased by you in my Securities Account (including commissions and fees) and that you may refuse to execute an order, or may cancel an order, if such funds are not available. You may charge my cash account interest on any post settlement date debits. I agree to deliver all properly endorsed securities which I have in my possession in good form prior to settlement of the sell or liquidation order, and such securities must be received by SAL prior to the settlement date. If I have established a Settlement Account, you shall deposit proceeds of any sale or liquidation of securities into the Settlement Account; otherwise such proceeds shall be distributed to me by check, or swept to my money market fund, if established.

6. **Indebtedness to SAL and Security Interest.** I authorize you to take any steps which you, in your sole discretion, determine to be necessary to complete or cancel a securities transaction or to minimize your losses, if any. I shall, at all times, be liable for the payment upon demand of any debit balance, and the interest thereon, or other obligations owing in my Securities Account or other account which I have with you. As security for the repayment of any and all present or future indebtedness owed to you by me under this agreement or otherwise, I grant you a continuing security interest and lien in, and a right of set-off with respect to all securities or other property that are, now or in the future, held, carried, or maintained for any purpose in or through my Securities Account to the extent of my interest, any present or future brokerage account with you in which I have an interest. I agree to reimburse you for all cost (including attorneys' fees), losses, or liabilities incurred by you in connection with the collection of any debit balance or unpaid deficiency in my Securities Account.

7. **Force Majeure.** You shall not be liable for loss or delay caused directly or indirectly by war, natural disasters, government restrictions, exchange or market rulings or other conditions beyond the control of SAL.

8. **Recording Conversations.** I understand and agree that, for your mutual protection, my broker and Sterne Agee may record any of our telephone conversations without further notice.

9. **Credit Investigation.** You may exchange credit information about me with others. You may request a credit report on me (1) if the purpose is to establish or maintain my margin and/or option account, (2) if I have chosen to settle transactions by check, (3) to comply with government agency or court orders, or (4) if, you determine it prudent for customary risk management procedures. If I ask, you will tell me the name and address of the consumer reporting agency that furnished the report. You may request a new credit report at any time without notice to me.

10. **Relationship with other Banks and Brokers.** From commissions and/or fees charged to my securities account for services rendered, I understand and agree that you may share, remit or otherwise pay banks or broker-dealers for their services in handling transactions for my account. In addition, I also understand and agree that other banks or broker-dealers, including Sterne Agee, may share, or otherwise remit commissions, fees and sales loads, including markups and markdowns on principal trades, to my broker in connection with transactions for my Securities Account. I understand and agree that brokers or dealers may refuse to accept or process any transactions that I may wish to effect.

11. **Margins Loans and Options.** *This paragraph is effective only when an account is maintained as a General Margin account as specified in Regulation T, as amended, issued by the Board of Governors of the Federal Reserve System.* (a) Securities purchased on margin or deposited against monies owed or borrowed may be maintained by SAL as collateral for my indebtedness. All property, now and hereafter held by SAL, or carried for the undersigned (either individually or jointly with

others), or deposited to secure the same, may from time to time and without notice to me, be carried in SAL general loans and may be pledged, repledged and hypothecated, separately or in common with any other property, for the sum due to SAL thereon or for a greater sum and without retaining in SAL possession or control for delivery a like amount of similar property. (b) The undersigned will at all times maintain margins for said accounts, as required by SAL from time to time. No arrangement conflicting with the firms usual requirements for margin shall be binding upon the firm or have any effect unless expressly agreed to in writing and signed for SAL by the CFO, Director of Clearing, or Compliance Officer. (c) Debit balances of the accounts of the undersigned shall be charged interest, in accordance with SAL usual custom, and with any increases in rates caused by market conditions and with such other charges as you may make to cover your facilities and extra services. _The undersigned acknowledges having received from you a statement setting forth the details of the conditions under which interest will be charged, the method of computing such interest, and the conditions under which additional collateral may be required._ (d) At any time and from time to time, in your discretion, you may without notice to the undersigned apply or transfer any or all monies and other property of the undersigned interchangeably between any accounts of the undersigned in order to avoid a margin call. (e) Until you receive written notice of revocation from the undersigned, you are hereby authorized to lend or hypothecate, to yourselves as brokers or to others, any securities held by SAL as collateral for the account of, or under the control of, the undersigned. I will not request that any transactions in options be effected for my account unless such request is in connection with my brokers options compliance program.

12. **Applicable Laws and Regulations.** All transactions shall be subject to rules, regulations, customs and usages of the exchange, market or clearing house where executed, and to all applicable federal and state laws and regulations. I will not buy, sell or liquidate any securities of a corporation of which I am an affiliate, or sell or liquidate any restricted securities, except in compliance with applicable laws and regulations and with notice, to you, that the securities are restricted.

13. **Fees and Charges.** I agree to the fees and charges indicated on my brokers fee schedule and that of SAL which I have received. I understand and agree that I will be charged an annual administration fee if I hold securities in my Securities Account and no trading activity occurs during any calendar year. You may debit my Securities Account for any fees or charges, which I incur, or any out-of-pocket expenses you may incur on my behalf, if applicable. I understand that you may change the fee schedule from time to time and I agree to be bound by such changed fee schedule.

14. **Certain Mutual Fund and UIT Transactions.** I understand and agree that sales loads or sales charges may be imposed in connection with purchases of shares or interests in mutual funds and unit investment trusts ("UITs") or other registered investment companies, that may be paid to my broker through SAL.

15. **Joint Accounts.** If this is a joint account, we understand and agree that you may follow the instructions of either of us without obtaining the consent of the other. Each of us will be fully liable for any amounts due you under this Agreement. Upon the death of either of us, you will treat the property in the account as belonging to the joint tenant with right of survivorship unless we have expressly elected to own the account as tenants in common or other registration, but you may first require the production of necessary legal documents. The liability regarding this account shall be joint and several.

16. **Amendments and Termination.** You may amend this Agreement at any time, in any respect, effective upon written notice to me. You may terminate any or all services contemplated hereunder at any time, effective upon written notice to me. I may close my Securities Account at any time by giving written notice to my broker or SAL. Closing my Securities Account or terminating services under this Agreement will not affect any rights and obligations incurred prior to such closure or termination.

17. **Notice of Changed Name, Address.** I agree to promptly notify you, or my broker dealer, in writing of any change to my name or address.

18. **Governing Laws.** This Agreement shall be governed by the laws of the State of Alabama.

19. ARBITRATION DISCLOSURES

- ARBITRATION IS FINAL AND BINDING TO THE PARTIES.

- THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

- PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

- THE ARBITRATORS AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OR RULING BY THE ARBITRATORS IS STRICTLY LIMITED.

- THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILATED WITH THE SECURITIES INDUSTRY.

- NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT, AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL; (i) THE CLASS CERTIFICATION IS DENIED; OR (ii) THE CLASS IS DECERTIFIED; OR (iii) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

# KASHNER DAVIDSON SECURITIES CORP
## UPDATED CLIENT AGREEMENT
## ADDING MARGIN TO CLIENT ACCOUNT

*Coded*

**ARBITRATION:** I EXPRESSLY ACKNOWLEDGE AND AGREE THAT ALL CLAIMS, DISPUTES AND OTHER MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE SUBMITTED TO THE ARBITRATION BOARD OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. (NASD), UNLESS OTHERWISE PROVIDED BY LAW. THIS EXPRESS AGREEMENT TO SUBMIT TO BE BOUND BY ARBITRATION INCLUDES, BUT IS NOT LIMITED TO, DISPUTES ARISING UNDER THE SECURITIES ACT OF 1933, THE EXCHANGE ACT OF 1934, CLAIMS ARISING UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), STATE OR COMMON LAW FRAUD AND SECURITIES STATUTES, AS WELL AS OTHERS SPECIFICALLY ENFORCEABLE UNDER THE PREVAILING ARBITRATION LAW AND PROCEDURES. THE AWARD RENDERED BY THE ARBITRATORS SHALL BE FINAL, AND JUDGEMENT MAY BE ENTERED UPON IT IN ANY COURT HAVING JURISDICTION THEREOF. COUNSEL CAN ADVISE ME ON HOW THIS PROVISION MAY AFFECT ME.

20. **Inactive Accounts.** I understand and agree that if I do not place a securities trade during any eighteen (18) month period, and there are no securities held in my Securities Account, my Securities Account may be automatically removed from your system. I will thereafter be required to re-establish a Securities Account prior to placing any further securities trades.

21. **Effectiveness.** I understand that this Agreement is effective upon receipt by you and evidenced by a notation on the internal records of SAL and Sterne Agee.

### NOTICE TO STERNE, AGEE & LEACH, INC.

This is to advise you that I have instructed my broker dealer to establish, on my behalf, and as my agent, a Securities Account with you. I have appointed my broker dealer as my exclusive agent to act for and on my behalf with respect to all matters regarding my Securities Account with you, including the placing of purchase, sales and liquidation orders and delivery of margin and option instructions if authorized by my Securities Account. You may look solely to my broker dealer and not to me with respect to any such orders or instructions. I understand that you may consider by delivering to my broker dealer confirmations and all other written notices, including margin maintenance calls, if applicable, to have been delivered to me and you are entitled to rely on my broker dealer, to forward the communications to me. I agree to reimburse you for any losses, costs or expenses in connection with the delivery or receipt of any of these communications, if you have acted in accordance with these instructions. These instructions are effective until I send you and/or my broker dealer written notice to the contrary. I understand and agree that you may share, pay or otherwise remit commissions, fees or sales loads, including markups and markdowns on principal trades, to my broker dealer in connection with transactions for my account.

NOTE TO CLIENT:
IT IS IMPORTANT THAT YOU THOROUGHLY READ THE AGREEMENT BEFORE YOU SIGN IT.

Notice: This agreement contains a pre-dispute arbitration clause, which is located at paragraph 19.

Account Number **REDACTED** 7459

Client's Signature X _____

Joint Account Holder Signature X _____

Name and Address Disclosure

( ) No, I do not want my name, address and securities positions disclosed to all the companies in which I own securities that are being held for me in that account pursuant to SEC rule 14b-1(c).

### DATE MARGIN ACCOUNT ESTABLISHED

2/12/04

AUTHORIZED BY _____

'04 FEB 13 AM 11:42

---

**Taxpayer ID Certification**

A. Under the penalties of perjury, I certify that *(check all that apply)*:

☑ I am a U.S. Person (including a U.S. Resident Alien).

☑ The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding.

☐ The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and I am subject to backup withholding.

**REDACTED** 7459

Account Number

X _____

Date 2/12/04

**REDACTED**

Social Security Number or Taxpayer ID

Signature Joint Account Holder X _____

Date 2/12/04

## DISCLOSURE STATEMENT OF CREDIT TERMS AND POLICIES
### Effective May 1, 2002

The following Disclosure Statement of Credit Terms and Policies is required by the Securities and Exchange Commission and is part of your Client Agreement. Should you have any questions regarding this Disclosure Statement, please contact your Investment Consultant.

### INTEREST CHARGE

Margin Transactions normally involve the extension of credit made by Sterne, Agee & Leach, Inc., (Sterne Agee) when you deposit only a portion of the moneys or the collateral required in a transaction. Withdrawals of cash from your account, or an increase in the market value of a security sold short (or short against the box) may create or add to your debit balance, for which interest and any other applicable charges will be assessed to your account.

Your account will be charged interest on any extension of credit to you by Sterne Agee in connection with the purchase, sale or carrying of any securities. The interest charge will be based on your adjusted debit balance multiplied by the daily margin interest rate. You will receive a statement of your account, at least quarterly, showing the adjusted daily debit balance, interest charges, and the applicable interest rates.

Interest will be charged to you if we approve prepayment of the proceeds from sales prior to settlement date. Interest may also be charged on debit balances in Cash accounts due to a late payment.

### DAILY MARGIN INTEREST RATE

The "daily margin interest rate" is based on a 360-day year and is calculated by dividing the applicable margin interest rate by 360. The applicable margin interest rate is set at a percentage above Sterne Agee's Base Rate as shown in the following table.

| If the amount of your average adjusted daily debit balance is: | The interest rate charged is: |
| --- | --- |
| Over 100,000 | Base Rate + 0.50% |
| 75,000-99,999 | Base Rate + 1.00% |
| 50,000-74,999 | Base Rate + 1.25% |
| 25,000-49,999 | Base Rate + 1.50% |
| Under 25,000 | Base Rate + 1.75% |

Sterne Agee sets the Base Rate at its discretion with consideration to commercially recognized interest rates relating to the extension of credit, as well as general market conditions. The margin interest rate may be changed without notice to you to reflect changes in the Base Rate. If your interest rate is increased for any other reason, Sterne Agee will notify you in writing at least 30 days prior to the date of the increase. Please contact your Investment Consultant for the current Base Rate.

The term "adjusted daily debit balance," means the daily debit balance less applicable free credits, if any. The daily debit balance is the unpaid amount loaned to you as of the close of the business day. Debits and credits resulting from purchases and sales are posted to your account as of the settlement date. A credit balance in your Cash account will be applied as a reduction of a debit balance in your Margin and/or Short Account. Should you deposit a check or other item that is later returned unpaid, your account may be adjusted to reflect additional interest or other charges that apply.

### INITIAL MARGIN AND ACCOUNT MAINTENANCE REQUIREMENTS

The Federal Reserve Board and various self- regulatory organizations determine margin loan rules and regulations. The maximum amount currently available to you is 50% of the value of marginable securities purchased or held in your account ("initial margin"). The maximum loan available for debt securities varies with the type of security. Your minimum account equity must be $2,000.00, or other amount as may be required by applicable rules, regulations, or Sterne Agee house policies. Initial margin and margin maintenance requirements may change without notice. Equity securities with a market value of less than $5.00 per share are not marginable.

A margin call (notification to deposit additional collateral) may be issued if your account equity drops below the margin maintenance requirement. Normally, additional collateral will be required if your account equity declines below 30% depending upon such factors as Sterne Agee, in its sole discretion, may deem material, including but not limited to the type, price, quantities and marketability of securities, or combination thereof, held in your account. If the market value of a security falls below $3.00 per share, the security will not be assigned a value as collateral to secure your margin obligations.

## SHORT OPTION POSITIONS

Uncovered option contracts are subject to both initial margin and margin maintenance requirements. These positions involve higher levels of risk and more stringent requirements may be imposed. Please contact your Investment Consultant for details.

## SHORT SALE TRANSACTIONS

Any credit resulting from a short (including a short sale against the box) will not reduce your debit balance on which interest is charged because the securities sold short must be borrowed to make delivery to the purchaser and an amount equal to the proceeds of the short sale must be deposited with the lender. You are liable for all dividends and interest paid on securities borrowed for the purpose of short sales.

The value of securities held short in your account will be "marked to the market" daily. Any resulting increase or decrease in the market value will be included in your adjusted daily debit balance.

Sterne Agee may at its discretion, for any reason and without notice, immediately cover any short security position by purchasing securities for your account.

## LIENS AND LIQUIDATIONS

All monies or securities held by Sterne Agee at any time in any of your accounts (individual, joint or otherwise) for any purposes shall be collateral subject to a general lien and security interest for the discharge of all your obligations to Sterne Agee.

Sterne Agee may also demand repayment of any loan balance in whole, or in part, at any time and for any reason. Additionally, Sterne Agee may require you to deposit additional collateral as security for your obligations.

## SIPC PROTECTION

Assets held in your Sterne, Agee & Leach, Inc. account for investment purposes are protected by combined SIPC and excess SIPC insurance coverage up to $25,000,000. SIPC protects your account for $500,000. Excess SIPC insurance covers all accounts for an additional $24,500,000. Claims of cash are limited to $100,000. Money Market fund shares are securities, not cash, and are protected up to the full $25,000,000 limit.

SIPC protection covers more than one account in which you have an interest provided you are acting in different capacities for each account. (For instance, coverage would apply if you had an individual account and a joint account with your spouse.) SIPC does not protect against a decline in market value of securities in your brokerage account.

Sterne, Agee may elect to pay interest on credit balances awaiting reinvestment at a rate determined by Sterne Agee and reserves the right to eliminate or otherwise change the rate or manner in which interest on credit balances is paid at any time without prior notice to you.

# *Exhibit B*

CLIENT ACCOUNT AGREEMENT

TO: SAL Financial Services, Inc. ("SAL"), Sterne, Agee & Leach, Inc. ("Sterne Agee") and its authorized agents.

In consideration of SAL opening a securities account ("Securities Account"), on my behalf, I agree as follows:

1.  **Meaning of Words in this Agreement.** The words "I," "me," "my," and "us," refer to the person(s) who signed this Agreement. The words "you" and "your" refer to SAL or its authorized agents. "My broker" refers to the broker dealer introducing my account to SAL.

2.  **Authority and Ownership.** I have the requisite legal capacity, am authorized to enter into this Agreement and have obtained and will provide you with all necessary authorizations from third parties to open accounts and effect securities transactions under this agreement. I will be the owner of all securities purchased, held, and sold by me through you, or will otherwise have the authority to purchase, hold or sell such securities.

3.  **Clearing Broker Agreement.** I understand that my broker dealer entered into an agreement with SAL, who entered into an agreement with Sterne Agee to execute and clear securities transactions presented to SAL in my Securities Account. I further understand and agree that Sterne Agee will carry and maintain my Securities Account (as defined by SEC Securities Investors Protection Act), under the terms of the fully disclosed clearing agreement, except as may otherwise be provided in this agreement. I further understand that my broker dealer is not an agent of, or supervised by SAL. I understand that SAL has no control relationship over my broker dealer and is not responsible for the suitability or appropriateness of investments made by me or the genuineness of any transaction made on my behalf by my broker dealer.

4.  **Appointment of broker dealer as Agent.** I appoint my broker as my agent for the purpose of carrying out my directions with respect to the purchase, sale or liquidation of securities in accordance with the terms and conditions of this Agreement, and I assume all risks with respect to the purchase, sale or liquidation of securities. All transactions will be executed only on my order or on the order of my authorized delegate except as otherwise provided in paragraph 6 below. To carry out your duties, you are authorized to appoint and use sub-agents. You and your sub-agents are authorized to open and close brokerage accounts, maintain customer records, hold securities in bearer, registered or book entry form, place and withdraw orders, provide information to third parties, including your affiliates, and take such other steps as are reasonable in connection with your duties.

5.  **Settlement.** I agree to have collected funds available in the settlement Account, or to deliver to you sufficient collected funds to cover the amounts due on purchases of securities by the settlement date for payment for all securities purchased by my Securities Account (including commissions and fees) and that you may refuse to execute an order, or may cancel an order, if such funds are not available. You may charge my cash account interest on any post settlement date debits. I agree to deliver all properly endorsed securities which I have in my possession in good form prior to settlement of the sell or liquidation order, and such securities must be received by SAL prior to the settlement date. If I have established a Settlement Account, you shall deposit proceeds of any sale or liquidation of securities into the Settlement Account; otherwise such proceeds shall be distributed to me by check, or swept to my money market fund, if established.

6.  **Indebtedness to SAL and Security Interest.** I authorize you to take any steps which you, in your sole discretion, determine to be necessary to complete or cancel a securities transaction or to minimize your losses, if any. I shall, at all times, be liable for the payment upon demand of any debit balance, and the interest thereon, or other obligations owing in my Securities Account or other account which I have with you. As security for the repayment of any and all present or future indebtedness owed to you by me under this agreement or otherwise, I grant you a continuing security interest and lien in, and a right of set-off with respect to all securities or other property that are, now or in the future, held, carried, or maintained for any purpose in or through my Securities Account to the extent of my interest, any present or future brokerage account with you in which I have an interest. I agree to reimburse you for all cost (including attorneys' fees), losses, or liabilities incurred by you in connection with the collection of any debit balance or unpaid deficiency in my Securities Account.

7.  **Force Majeure.** You shall not be liable for loss or delay caused directly or indirectly by war, natural disasters, government restrictions, exchange or market rulings or other conditions beyond the control of SAL.

8.  **Recording Conversations.** I understand and agree that, for your mutual protection, my broker and Sterne Agee may record any of our telephone conversations without further notice.

9.  **Credit Investigation.** You may exchange credit information about me with others. You may request a credit report on me (1) if the purpose is to establish or maintain my margin and/or option account, (2) if I have chosen to settle transactions by check, (3) to comply with government agency or court orders, or (4) if, you determine it prudent for customary risk management procedures. If I ask, you will tell me the name and address of the consumer reporting agency that furnished the report. You may request a new credit report at any time without notice to me.

10. **Relationship with other Banks and Brokers.** From commissions and/or fees charged to my securities account for services rendered, I understand and agree that you may share, remit or otherwise pay banks or broker-dealers for their services in handling transactions for my account. In addition, I also understand and agree that other banks or broker-dealers, including Sterne Agee, may share, or otherwise remit commissions, fees and sales loads, including markups and markdowns on principal trades, to my broker in connection with transactions for my Securities Account. I understand and agree that brokers or dealers may refuse to accept or process any transactions that I may wish to effect.

11. **Margin Loans and Options.** *This paragraph is effective only when an account is maintained as a General Margin account as specified in Regulation T, as amended, issued by the Board of Governors of the Federal Reserve System.* (a) Securities purchased on margin or deposited against monies owed or borrowed may be maintained by SAL as collateral for my indebtedness. All property, now and hereafter held by SAL, or carried for the undersigned (either individually or jointly with

Page 1 of 5
IBD-CAA(rev 3/18/02)

others), or deposited to secure the same, may from time to time and without notice to me, be carried in SAL general loans and may be pledged, repledged and hypothecated, separately or in common with any other property, for the sum due to SAL thereon or for a greater sum and without retaining in SAL possession or control for delivery a like amount of similar property. (b) The undersigned will at all times maintain margins for said accounts, as required by SAL from time to time. No arrangement conflicting with the firms usual requirements for margin shall be binding upon the firm or have any effect unless expressly agreed to in writing and signed for SAL by the CFO, Director of Clearing, or Compliance Officer. (c) Debit balances of the accounts of the undersigned shall be charged interest, in accordance with SAL usual custom, and with any increases in rates caused by market conditions and with such other charges as you may make to cover your facilities and extra services. *The undersigned acknowledges having received from you a statement setting forth the details of the conditions under which interest will be charged, the method of computing such interest, and the conditions under which additional collateral may be required.* (d) At any time and from time to time, in your discretion, you may without notice to the undersigned apply or transfer any or all monies and other property of the undersigned interchangeably between any accounts of the undersigned in order to avoid a margin call. (e) Until you receive written notice of revocation from the undersigned, you are hereby authorized to lend or hypothecate, to yourselves as brokers or to others, any securities held by SAL as collateral for the account of, or under the control of, the undersigned. I will not request that any transactions in options be effected for my account unless such request is in connection with my brokers options compliance program.

12. **Applicable Laws and Regulations.** All transactions shall be subject to rules, regulations, customs and usages of the exchange, market or clearing house where executed, and to all applicable federal and state laws and regulations. I will not buy, sell or liquidate any securities of a corporation of which I am an affiliate, or sell or liquidate any restricted securities, except in compliance with applicable laws and regulations and will notice, to you, that the securities are restricted.

13. **Fees and Charges.** I agree to the fees and charges indicated on my brokers fee schedule and that of SAL which I have received. I understand and agree that I will be charged an annual administration fee if I hold securities in my Securities Account and no trading activity occurs during any calendar year. You may debit my Securities Account for any fees or charges, which I incur, or any out-of-pocket expenses you may incur on my behalf, if applicable. I understand that you may change the fee schedule from time to time and I agree to be bound by such changed fee schedule.

14. **Certain Mutual Fund and UIT Transactions.** I understand and agree that sales loads or sales charges may be imposed in connection with purchases of shares or interests in mutual funds and unit investment trusts ("UITs") or other registered investment companies, that may be paid to my broker through SAL.

15. **Joint Accounts.** If this is a joint account, we understand and agree that you may follow the instructions of either of us without obtaining the consent of the other. Each of us will be fully liable for any amounts due you under this Agreement. Upon the death of either of us, you will treat the property in the account as belonging to the joint tenant with right of survivorship unless we have expressly elected to own the account as tenants in common or other registration, but you may first require the production of necessary legal documents. The liability regarding this account shall be joint and several.

16. **Amendments and Termination.** You may amend this Agreement at any time, in any respect, effective upon written notice to me. You may terminate any or all services contemplated hereunder at any time, effective upon written notice to me. I may close my Securities Account at any time by giving written notice to my broker or SAL. Closing my Securities Account or terminating services under this Agreement will not affect any rights and obligations incurred prior to such closure or termination.

17. **Notice of Changed Name, Address.** I agree to promptly notify you, or my broker dealer, in writing of any change to my name or address.

18. **Governing Laws.** This Agreement shall be governed by the laws of the State of Alabama.

19. **ARBITRATION DISCLOSURES**

   - ARBITRATION IS FINAL AND BINDING TO THE PARTIES.

   - THE PARTIES ARE WAIVING THEIR RIGHT TO SEEK REMEDIES IN COURT, INCLUDING THE RIGHT TO JURY TRIAL.

   - PRE-ARBITRATION DISCOVERY IS GENERALLY MORE LIMITED THAN AND DIFFERENT FROM COURT PROCEEDINGS.

   - THE ARBITRATORS AWARD IS NOT REQUIRED TO INCLUDE FACTUAL FINDINGS OR LEGAL REASONING AND ANY PARTY'S RIGHT TO APPEAL OR TO SEEK MODIFICATION OR RULING BY THE ARBITRATORS IS STRICTLY LIMITED.

   - THE PANEL OF ARBITRATORS WILL TYPICALLY INCLUDE A MINORITY OF ARBITRATORS WHO WERE OR ARE AFFILATED WITH THE SECURITIES INDUSTRY.

   - NO PERSON SHALL BRING A PUTATIVE OR CERTIFIED CLASS ACTION TO ARBITRATION, NOR SEEK TO ENFORCE ANY PRE-DISPUTE ARBITRATION AGREEMENT, AGAINST ANY PERSON WHO HAS INITIATED IN COURT A PUTATIVE CLASS ACTION; OR WHO IS A MEMBER OF A PUTATIVE CLASS WHO HAS NOT OPTED OUT OF THE CLASS WITH RESPECT TO ANY CLAIMS ENCOMPASSED BY THE PUTATIVE CLASS ACTION UNTIL; (i) THE CLASS CERTIFICATION IS DENIED; OR (ii) THE CLASS IS DECERTIFIED; OR (iii) THE CUSTOMER IS EXCLUDED FROM THE CLASS BY THE COURT. SUCH FORBEARANCE TO ENFORCE AN AGREEMENT TO ARBITRATE SHALL NOT CONSTITUTE A WAIVER OF ANY RIGHTS UNDER THIS AGREEMENT EXCEPT TO THE EXTENT STATED HEREIN.

## KASHNER DAVIDSON SECURITIES CORP
## UPDATED CLIENT AGREEMENT
## ADDING MARGIN TO CLIENT ACCOUNT

ARBITRATION: I EXPRESSLY ACKNOWLEDGE AND AGREE THAT ALL CLAIMS, DISPUTES AND OTHER MATTERS ARISING OUT OF OR RELATING TO THIS AGREEMENT SHALL BE SUBMITTED TO THE ARBITRATION BOARD OF THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC. (NASD), UNLESS OTHERWISE PROVIDED BY LAW. THIS EXPRESS AGREEMENT TO SUBMIT TO BE BOUND BY ARBITRATION INCLUDES, BUT IS NOT LIMITED TO, DISPUTES ARISING UNDER THE SECURITIES ACT OF 1933, THE EXCHANGE ACT OF 1934, CLAIMS ARISING UNDER THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO), STATE OR COMMON LAW FRAUD AND SECURITIES STATUTES, AS WELL AS OTHERS SPECIFICALLY ENFORCEABLE UNDER THE PREVAILING ARBITRATION LAW AND PROCEDURES. THE AWARD RENDERED BY THE ARBITRATORS SHALL BE FINAL, AND JUDGEMENT MAY BE ENTERED UPON IT IN ANY COURT HAVING JURISDICTION THEREOF. COUNSEL CAN ADVISE ME ON HOW THIS PROVISION MAY AFFECT ME.

20. Inactive Accounts. I understand and agree that if I do not place a securities trade during any eighteen (18) month period, and there are no securities held in my Securities Account, my Securities Account may be automatically removed from your system. I will thereafter be required to re-establish a Securities Account prior to placing any further securities trades.

21. Effectiveness. I understand that this Agreement is effective upon receipt by you and evidenced by a notation on the internal records of SAL and Sterne Agee.

### NOTICE TO STERNE, AGEE & LEACH, INC.

This is to advise you that I have instructed my broker dealer to establish, on my behalf, and as my agent, a Securities Account with you. I have appointed my broker dealer as my exclusive agent to act for and on my behalf with respect to all matters regarding my Securities Account with you, including the placing of purchase, sales and liquidation orders and delivery of margin and option instructions if authorized by my Securities Account. You may look solely to my broker dealer and not to me with respect to any such orders or instructions. I understand that you may consider by delivering to my broker dealer confirmations and all other written notices, including margin maintenance calls, if applicable, to have been delivered to me and you are entitled to rely on my broker dealer, to forward the communications to me. I agree to reimburse you for any losses, costs or expenses in connection with the delivery or receipt of any of these communications, if you have acted in accordance with these instructions. These instructions are effective until I send you and/or my broker dealer written notice to the contrary. I understand and agree that you may share, pay or otherwise remit commissions, fees or sales loads, including markups and markdowns on principal trades, to my broker dealer in connection with transactions for my account.

NOTE TO CLIENT:
IT IS IMPORTANT THAT YOU THOROUGHLY READ THE AGREEMENT BEFORE YOU SIGN IT.

Notice: This agreement contains a pre-dispute arbitration clause, which is located at paragraph 19.

Account Number   REDACTED  2265

Client's Signature X _Steve Macey_

Joint Account Holder
Signature X _____

AUTHORIZED BY _____

Name and Address Disclosure

( ) No, I do not want my name, address and securities positions disclosed to all the companies in which I own securities that are being held for me in that account pursuant to SEC rule 14b-1(c).

### DATE MARGIN ACCOUNT ESTABLISHED

2/18/04

---

**Taxpayer ID Certification**

A.   Under the penalties of perjury, I certify that (check all that apply):
☒  I am a U.S. Person (including a U.S. Resident Alien).
    The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and I am not subject to backup withholding either because I have not been notified by the Internal Revenue Service (IRS) that I am subject to backup withholding as a result of a failure to report all interest or dividends, or the IRS has notified me that I am no longer subject to backup withholding.
☐  The number shown on this form is my correct Taxpayer Identification Number (or I am waiting for a number to be issued to me), and I am subject to backup withholding.

REDACTED  2265
account Number

X _Steve Macey_    2/18/04
Signature         Date

REDACTED  2543
Social Security Number or Taxpayer ID

Signature (Joint Account Holder)    Date

## DISCLOSURE STATEMENT OF CREDIT TERMS AND POLICIES
### Effective May 1, 2002

The following Disclosure Statement of Credit Terms and Policies is required by the Securities and Exchange Commission and is part of your Client Agreement. Should you have any questions regarding this Disclosure Statement, please contact your Investment Consultant.

### INTEREST CHARGE

Margin Transactions normally involve the extension of credit made by Sterne, Agee & Leach, Inc., (Sterne Agee) when you deposit only a portion of the moneys or the collateral required in a transaction. Withdrawals of cash from your account, or an increase in the market value of a security sold short (or short against the box) may create or add to your debit balance, for which interest and any other applicable charges will be assessed to your account.

Your account will be charged interest on any extension of credit to you by Sterne Agee in connection with the purchase, sale or carrying of any securities. The interest charge will be based on your adjusted debit balance multiplied by the daily margin interest rate. You will receive a statement of your account, at least quarterly, showing the adjusted daily debit balance, interest charges, and the applicable interest rates.

Interest will be charged to you if we approve prepayment of the proceeds from sales prior to settlement date. Interest may also be charged on debit balances in Cash accounts due to a late payment.

### DAILY MARGIN INTEREST RATE

The "daily margin interest rate" is based on a 360-day year and is calculated by dividing the applicable margin interest rate by 360. The applicable margin interest rate is set at a percentage above Sterne Agee's Base Rate as shown in the following table.

| If the amount of your average adjusted daily debit balance is: | The interest rate charged is: |
| --- | --- |
| Over 100,000 | Base Rate + 0.50% |
| 75,000-99,999 | Base Rate + 1.00% |
| 50,000-74,999 | Base Rate + 1.25% |
| 25,000-49,999 | Base Rate + 1.50% |
| Under 25,000 | Base Rate + 1.75% |

Sterne Agee sets the Base Rate at its discretion with consideration to commercially recognized interest rates relating to the extension of credit, as well as general market conditions. The margin interest rate may be changed without notice to you to reflect changes in the Base Rate. If your interest rate is increased for any other reason, Sterne Agee will notify you in writing at least 30 days prior to the date of the increase. Please contact your Investment Consultant for the current Base Rate.

The term "adjusted daily debit balance," means the daily debit balance less applicable free credits, if any. The daily debit balance is the unpaid amount loaned to you as of the close of the business day. Debits and credits resulting from purchases and sales are posted to your account as of the settlement date. A credit balance in your Cash account will be applied as a reduction of a debit balance in your Margin and/or Short Account. Should you deposit a check or other item that is later returned unpaid, your account may be adjusted to reflect additional interest or other charges that apply.

### INITIAL MARGIN AND ACCOUNT MAINTENANCE REQUIREMENTS

The Federal Reserve Board and various self-regulatory organizations determine margin loan rules and regulations. The maximum amount currently available to you is 50% of the value of marginable securities purchased or held in your account ("initial margin"). The maximum loan available for debt securities varies with the type of security. Your minimum account equity must be $2,000.00, or other amount as may be required by applicable rules, regulations, or Sterne Agee house policies. Initial margin and margin maintenance requirements may change without notice. Equity securities with a market value of less than $5.00 per share are not marginable.

A margin call (notification to deposit additional collateral) may be issued if your account equity drops below the margin maintenance requirement. Normally, additional collateral will be required if your account equity declines below 30% depending upon such factors as Sterne Agee, in its sole discretion, may deem material, including but not limited to the type, price, quantities and marketability of securities, or combination thereof, held in your account. If the market value of a security falls below $3.00 per share, the security will not be assigned a value as collateral to secure your margin obligations.

## SHORT OPTION POSITIONS
Uncovered option contracts are subject to both initial margin and margin maintenance requirements. These positions involve higher levels of risk and more stringent requirements may be imposed. Please contact your Investment Consultant for details.

## SHORT SALE TRANSACTIONS
Any credit resulting from a short (including a short sale against the box) will not reduce your debit balance on which interest is charged because the securities sold short must be borrowed to make delivery to the purchaser and an amount equal to the proceeds of the short sale must be deposited with the lender. You are liable for all dividends and interest paid on securities borrowed for the purpose of short sales.

The value of securities held short in your account will be "marked to the market" daily. Any resulting increase or decrease in the market value will be included in your adjusted daily debit balance.

Sterne Agee may at its discretion, for any reason and without notice, immediately cover any short security position by purchasing securities for your account.

## LIENS AND LIQUIDATIONS
All monies or securities held by Sterne Agee at any time in any of your accounts (individual, joint or otherwise) for any purposes shall be collateral subject to a general lien and security interest for the discharge of all your obligations to Sterne Agee.

Sterne Agee may also demand repayment of any loan balance in whole, or in part, at any time and for any reason. Additionally, Sterne Agee may require you to deposit additional collateral as security for your obligations.

## SIPC PROTECTION
Assets held in your Sterne, Agee & Leach, Inc. account for investment purposes are protected by combined SIPC and excess SIPC insurance coverage up to $25,000,000. SIPC protects your account for $500,000. Excess SIPC insurance covers all accounts for an additional $24,500,000. Claims of cash are limited to $100,000. Money Market fund shares are securities, not cash, and are protected up to the full $25,000,000 limit.

SIPC protection covers more than one account in which you have an interest provided you are acting in different capacities for each account. (For instance, coverage would apply if you had an individual account and a joint account with your spouse.) SIPC does not protect against a decline in market value of securities in your brokerage account.

Sterne, Agee may elect to pay interest on credit balances awaiting reinvestment at a rate determined by Sterne Agee and reserves the right to eliminate or otherwise change the rate or manner in which interest on credit balances is paid at any time without prior notice to you.

# *Exhibit C*

Sterne, Agee Leach, Inc.
Confidential
Personal Financial Statement

| | | | |
|---|---|---|---|
| Name: | Mark Asciso | Business/Employer Name | self |
| Address: | 28 High St. | Position or Occupation | Burus Vault Manuf. / Owner & Manager |
| City/State/Zip: | Topsfield MA 01983 | Social Security Number | REDACTED -2787  Income Rep |
| Phone (Business): | 978-531-3336 | Spouse's SSN (if Joint Ac) | REDACTED -5333 |
| Phone (Home): | 978-887-8673 | | |

| Assets | | Liabilities and Net Worth | |
|---|---|---|---|
| Cash On Hand-Schedule A | 75,000 | Notes Payable to Banks-Demand | |
| U.S Gov't & Marketable Secs | | Notes Payable to Banks-Term | |
| See Schedule B | | Notes Payable to Others | |
| Sub Total Liquids Net Worth | | Notes Payable-Other Broker Dealers | |
| Real Estate-Home | 1,400,000 | Real Estate Mortgages | 6,000,000 |
| Real Estate-Other | 17,000,000 | Accounts Payable | |
| Notes/Accounts Receivable | | Other Liabilities: | |
| Other Personal Property | | | |
| Other Assets: | | | |
| | | Total Liabilities | 6,000,000 |
| Total Assets | 78,475,000 | Net Worth | |
| | | Total Liabilities and Net Worth | |

| Sources of Income(Annual) | |
|---|---|
| Salary | 125,000 + |
| Bonuses and Commissions | |
| Dividends | |
| Interest | |
| Other Income: | 100,000 + |
| Total Income | 225,000 + |

| General Information | |
|---|---|
| Have you ever defaulted on a loan? | no |
| Have you ever been in arbitration with a Broker/Dealer? | no |
| Are you a plaintiff or defendant in any suits or Legal Actions? | no |
| Have you ever taken bankruptcy? | no |
| Are you a guarantor or endorser of any loans? | no |
| Are you a partner or officer of a publicly traded company? | no |
| Are you considered to be an affiliate under SEC Rule 144? | no |
| Name and Symbol of Company. | |
| Quantity of shares owned: Restricted:_____ Non-Restricted:_____ | |

**Schedule A- Cash in Banks (Include Checking, Savings, and CD's Outside SALI)**

| Name of Bank | Type of Account | Type of Ownership | On Deposit |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**Schedule B- Securities Owned Outside SALI**

| Face Value -Bonds Shares - Stock | Description | Cost | Market Value | Amount Pledged to Secure Loan |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

The foregoing has been carefully read by me and is given to you for the purpose of obtaining credit from time to time in whatever form. I hereby certify the foregoing is a true and correct exhibit of my financial condition and may be treated by you as a continuing statement thereof until replaced by a new statement or until I specifically notify you of change therein. You are hereby authorized to check my credit and employment history and to answer questions about your credit experience with me.

Date 3/29/04

Signature _____

Spouse Signature if joint account _____

# *Exhibit D*

BROKER: Kashner Davidson Inc.                          4/01/04

REDACTED -2265

STEVEN MSCISZ
22 HIGH STREET
TOPSFIELD MA  01983

### GENERAL ACCOUNT MARGIN MAINTENANCE CALL

DEAR CLIENT,

IN ORDER TO MAINTAIN YOUR GENERAL ACCOUNT IN AN ACCEPTABLE MANNER WITH
OUR FIRM, PURSUANT TO THE PROVISIONS OF YOUR GENERAL ACCOUNT AGREEMENT,
AND TO REMAIN IN COMPLIANCE WITH REGULATION T OF THE FEDERAL RESERVE
BOARD, YOU ARE REQUESTED TO DEPOSIT IN YOUR ACCOUNT AT LEAST $210,326.64 IN
CASH OR ACCEPTABLE COLLATERAL. YOUR DEPOSIT OF CASH OR SECURITIES SHOULD
BE MADE ON OR BEFORE 4/8/04. IN THE EVENT OF YOUR FAILURE TO MEET THIS CALL,
WE WILL BE REQUIRED TO LIQUIDATE SUFFICIENT SECURITIES IN YOUR ACCOUNT TO
COVER THE ADDITIONAL MARGIN REQUESTED.

THIS MARGIN MAINTENANCE CALL IS BEING MADE AS A RESULT OF CHANGES IN THE
MARKET VALUE OF THE SECURITIES IN YOUR ACCOUNT. IT IS NOT A WAIVER OF ANY
PROVISIONS OF YOUR AGREEMENT WITH US. PLEASE DISREGARD THIS NOTICE IF YOU
HAVE ALREADY MAILED US YOUR CHECK OR HAVE TAKEN STEPS TO DEPOSIT THE
REQUIRED MARGIN. IF YOU HAVE ANY QUESTIONS REGARDING YOUR ACCOUNT, PLEASE
CONTACT YOUR ACCOUNT EXECUTIVE.

RESPECTFULLY,

STERNE, AGEE & LEACH

Balance Call

BROKER: Kashner Davidson Inc.     4/01/04
**REDACTED** -7459

Mark Mscisz &
Lynda E Mscisz JTWROS
28 High Street
Topsfield MA 01983

<center>GENERAL ACCOUNT MARGIN MAINTENANCE CALL</center>

DEAR CLIENT,

IN ORDER TO MAINTAIN YOUR GENERAL ACCOUNT IN AN ACCEPTABLE MANNER WITH OUR FIRM, PURSUANT TO THE PROVISIONS OF YOUR GENERAL ACCOUNT AGREEMENT, AND TO REMAIN IN COMPLIANCE WITH REGULATION T OF THE FEDERAL RESERVE BOARD, YOU ARE REQUESTED TO DEPOSIT IN YOUR ACCOUNT AT LEAST $331,777.80 IN CASH OR ACCEPTABLE COLLATERAL. YOUR DEPOSIT OF CASH OR SECURITIES SHOULD BE MADE ON OR BEFORE 4/8/04. IN THE EVENT OF YOUR FAILURE TO MEET THIS CALL, WE WILL BE REQUIRED TO LIQUIDATE SUFFICIENT SECURITIES IN YOUR ACCOUNT TO COVER THE ADDITIONAL MARGIN REQUESTED.

THIS MARGIN MAINTENANCE CALL IS BEING MADE AS A RESULT OF CHANGES IN THE MARKET VALUE OF THE SECURITIES IN YOUR ACCOUNT. IT IS NOT A WAIVER OF ANY PROVISIONS OF YOUR AGREEMENT WITH US. PLEASE DISREGARD THIS NOTICE IF YOU HAVE ALREADY MAILED US YOUR CHECK OR HAVE TAKEN STEPS TO DEPOSIT THE REQUIRED MARGIN. IF YOU HAVE ANY QUESTIONS REGARDING YOUR ACCOUNT, PLEASE CONTACT YOUR ACCOUNT EXECUTIVE.

     RESPECTFULLY,

     STERNE, AGEE & LEACH

Balance Call

# *Exhibit E*

4/28/2004 03:49:27 PM

# Account Workbook
## Activity Start Date 04/01/2004

Page: 1

REDACTED 7459 - MSCISZ  MARK

| REDACTED 7459 | IO | H | Cash Bal | -231,694.90 | Total Acct Val | | -176,119.90 |
|---|---|---|---|---|---|---|---|
| KD12 | CSI | 4C | | | | | |
| MARK MSCISZ & | MMF | RID | | | | | |
| LYNDA E MSCISZ JTWROS | Home | 978/887-8673 | Business | 508/922-8536 | Birthdate | REDACTED 1961 | |

| № | Date | Settle Date | Type | Quantity | Action | Description | CUSIP | Symbol | Price | Commission | Source | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 04/22/2004 | 04/22/2004 | 1 | | | TRF FM MARGIN      CFP | | | | | JNL | 100,000.00 |
| 2 | 04/22/2004 | 04/22/2004 | 2 | | | REC FM MARGIN      CFP | | | | | JNL | -231,694.90 |
| 3 | 04/22/2004 | | 1 | 74,100 | | VASO ACTIVE      CFP PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | | | JRL | -231,694.90 |
| 4 | 04/22/2004 | | 1 | | | FROM REDACTED 7459-5 MARK MSCISZ & | | VAPH | | | NOTE | |
| 5 | 04/22/2004 | | 2 | -74,100 | | VASO ACTIVE      CFP PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | | | JRL | |
| 6 | 04/22/2004 | | 2 | | | TO REDACTED 7459-1 MARK MSCISZ & | | VAPH | | | NOTE | |
| 7 | 04/08/2004 | 04/08/2004 | 1 | | | TRF FDS TO TYPE 2  AUT | | | | | JRL | -100,000.00 |
| 8 | 04/08/2004 | 04/08/2004 | 2 | | | TRF FDS FRM TYPE 1  AUT | | | | | JRL | 100,000.00 |
| 9 | 04/07/2004 | 04/07/2004 | 1 | | | INCOMING WIRE TRANSFABA | | | | | FEDWT | 100,000.00 |



# *Exhibit F*

5/12/2004 01:56:01 PM

Account Workbook
Balances

Page: 1

REDACTED 2265 - MSCISZ STEVEN

| REDACTED 2265 | IO | H | Cash Bal | -210,909.22 | Total Acct Val | | -173,634.22 |
|---|---|---|---|---|---|---|---|
| KD12 | CSI | 4C | | | | | |
| STEVEN MSCISZ | MMF | RID | | | | | |
| | Home | 978/887-3736 | Business | 508/922-8538 | Birthdate | REDACTED 1961 | |

| | Balance | Market Value | | Value |
|---|---|---|---|---|
| Cash | -210,909.22 | 37,275.00 | Fed-Call | |
| Margin | | | House-Call | |
| Short | | | Buying Power | |
| Div/Interest | | | SMA | |
| Other | | | Equity % | |
| Money Mkt | | | Net Equity | |
| USD/EQ | | | C/A - Type 1 | 18,637.50 |
| | | | C/A - Type 2 | |
| Net | -210,909.22 | 37,275.00 | Daily Interest | |
| Total Account Value | | -173,634.22 | MTD Interest | |
| Trade Date Bal | | -210,909.22 | Pending Chgs | |
| Settle Date Bal | | -210,909.22 | Commissions | 3,130.00 |
| Settle Date Free | | -210,909.22 | | |

5/12/2004 01:56:10 PM

# Account Workbook
*Positions*

Page: 1

REDACTED 2265 - MSCISZ  STEVEN

| REDACTED 2265 | IO  | H | Cash Bal | -210,909.22 | Total Acct Val | | -173,634.22 |
|---|---|---|---|---|---|---|---|
| KD12 | CSI | 4C | | | | | |
| STEVEN MSCISZ | MMF | RID | | | | | |
| | Home | 978/887-3736 | Business | 508/922-8538 | Birthdate | REDACTED /1961 | |

| | Quantity | Name | Mkt Price | Type | Security | Symbol | CUSIP | Value | Loc | Mgn |
|---|---|---|---|---|---|---|---|---|---|---|
| Σ | | | | | | | | 37,275.00 | | |
| 1 | 49,700 | VASO ACTIVE PHARM INC A | 0.7500 | 1 | VAPH | VAPH | 92232R-10-7 | 37,275.00 | SEG | Yes |

# *Exhibit G*

5/12/2004 01:56:26 PM

# Account Workbook
## Balances

Page: 1

**REDACTED** 7459 - MSCISZ  MARK

| **REDACTED** 7459 | IO | H | Cash Bal | -232,498.98 | Total Acct Val | -176,923.98 |
| KD12 | CSI | 4C | | | | |
| MARK MSCISZ & | MMF | RID | | | | |
| LYNDA E MSCISZ JTWROS | Home | 978/887-8673 | Business | 508/922-8536 | Birthdate | **REDACTED** 1961 |

| | Balance | Market Value | | Value |
|---|---|---|---|---|
| Cash | -232,498.98 | 55,575.00 | Fed-Call | |
| Margin | | | House-Call | |
| Short | | | Buying Power | |
| Div/Interest | | | SMA | |
| Other | | | Equity % | |
| Money Mkt | | | Net Equity | |
| USD/EQ | | | C/A - Type 1 | 27,787.50 |
| | | | C/A - Type 2 | |
| Net | -232,498.98 | 55,575.00 | Daily Interest | |
| Total Account Value | | -176,923.98 | MTD Interest | |
| Trade Date Bal | | -232,498.98 | Pending Chgs | |
| Settle Date Bal | | -232,498.98 | Commissions | 14,070.00 |
| Settle Date Free | | -232,498.98 | | |

5/12/2004 01:56:22 PM

# Account Workbook
### Positions

Page: 1

REDACTED 7459 - MSCISZ MARK

| REDACTED -7459 | IO | H | Cash Bal | -232,498.98 | Total Acct Val | | -176,923.98 |
|---|---|---|---|---|---|---|---|
| KD12 | CSI | 4C | | | | | |
| MARK MSCISZ & | MMF | RID | | | | | |
| LYNDA E MSCISZ JTWROS | Home | 978/887-8673 | Business | 508/922-8536 | Birthdate | REDACTED 1961 | |

| | Quantity | Name | Mkt Price | Type | Security | Symbol | CUSIP | Value | Loc | Mgn |
|---|---|---|---|---|---|---|---|---|---|---|
| Σ | | | | | | | | 55,575.00 | | |
| 1 | 74,100 | VASO ACTIVE PHARM INC A | 0.7500 | 1 | VAPH | VAPH | 92232R-10-7 | 55,575.00 | SEG | Yes |

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____
)
In the Matter of the Arbitration Between:        )
                                                 )
KASHNER DAVIDSON SECURITIES CORP.,               )
                                                 )
   *Claimant/Respondent in Counterclaim,*      )
                                                 )
        v.                         )
                                                 )
STEVEN MSCISZ, MARK MSCISZ, and                  )
LYNDA MSCISZ,                                    )     NASD DISPUTE RESOLUTION No. 04-03793
                                                 )
   *Respondents/Counter- and Third Party Claimants.* )
                                                 )
        v.                         )
                                                 )
VICTOR KASHNER, MATTHEW MEISTER and              )
TIMOTHY VARCHETTO,                               )
                                                 )
   *Third Party Respondents.*                   )
_____ )

### ANSWER, AFFIRMATIVE DEFENSES AND STATEMENT OF COUNTERCLAIMS & THIRD PARTY CLAIMS OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

Respondents/Counter- and Third Party Claimants Steven Mscisz ("Steven"), Mark Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") respond to the Statement of Claim of Claimant/Respondent-in-Counterclaim Kashner Davidson Securities Corporation ("Broker-Dealer" or "KDSC") as follows:

*ANSWER*

1.      The Customers admit the truth of the averments set forth in that paragraph.

2.      The Customers admit that Steven was a customer of KDSC who maintained account number ▮REDACTED▮2265 at KDSC, but the Customers deny the remaining averments set forth in that paragraph.

3.      The Customers admit that Mark and Lynda were customers of KDSC who jointly maintained account number ▮REDACTED▮7459 at KDSC, but the Customers deny the remaining averments set forth in that paragraph.

4.      The Customers admit that when it undertakes to afford them a forum for the complete and fair resolution of claims, defenses and counterclaims, the National Association of Securities Dealers ("NASD" or "Association") has jurisdiction over parties who have entered into express, unambiguous written agreements to arbitrate which provide that any and all controversies shall be heard before an arbitration panel ("Panel") convened by the Association, but the Customers deny the remaining averments set forth in that paragraph.

5.      The Customers deny the averments set forth in this paragraph.

6.      The Customers admit that Steven and Mark deposited shares of Vaso Active Pharmaceuticals, Inc. ("Vaso"), a publicly traded company, into their respective KDSC accounts, but the Customers deny the remaining averments set forth in that paragraph.

7.      The Customers deny the averments set forth in that paragraph.

8.     The Customers admit that KDSC offered margin credit to Mark on or about February 12, 2004, that Mark executed a Client Account Agreement adding margin privileges to their account, and that a true copy of that Client Account Agreement is appended to the Statement of Claim as Exhibit A, but the Customers deny the remaining averments set forth in that paragraph.

9.     The Customers admit that KDSC offered margin credit to Steven on or about February 18, 2004, that Steven executed a Client Agreement adding margin privileges to his account, and that a true copy of Steven's Client Account Agreement is appended to the Statement of Claim as Exhibit B, but the Customers deny the remaining averments set forth in that paragraph.

10.     The Customers admit that Steven and Mark, at the urging of the Broker-Dealer, margined their positions in Vaso, and that the Broker-Dealer now alleges a margin debit, but the Customers deny the remaining averments set forth in that paragraph.

11.     The Customers admit that Mark, with the input and assistance of KDSC's compliance officer, filled out a document entitled "Personal Financial Statement," and that a true copy of that document is appended to the Statement of Claim as Exhibit C, but the Customers deny the remaining averments set forth in that paragraph.

12.     The Customers admit that the U.S. Securities & Exchange Commission ("SEC" or "Commission") temporarily suspended trading in Vaso's stock on April 1, 2004.  Further responding, the Customers state that the Commission terminated the temporary trading suspension effective at 11:59 p.m. on April 15, 2004, and that Vaso's stock has since traded without interruption.

13.     The Customers admit that Sterne, Agee & Leach, Inc. ("SALI") purported to issue margin call notifications to Steven, Mark and Lynda, and that true copies of documents SALI used to convey such notifications are collectively appended to the Statement of Claim as Exhibit D, but the Customers deny the remaining averments set forth in that paragraph.

14.     The Customers admit that Mark and Lynda sent $100,000 to the Broker-Dealer on or about April 7, 2004, and neither Mark, Lynda nor Steven sent any money to KDSC after that $100,000 payment.  The Customers are without knowledge or information sufficient to admit or deny that the document appended to the Statement of Claim as Exhibit E is "[a] true and correct copy of KDSC Account Workbook for the activity in Mark and Lynda Mscisz' account for April 2004," so they deny that averment.  The Customers deny the remaining averments set forth in that paragraph.

15.     The Customers are without knowledge or information sufficient to admit or deny the averments set forth in that paragraph, which wrongfully assumes they had an obligation to "comply with or satisfy" any margin call or putative margin debt balance, so they deny the averments of that paragraph.

16.     The Customers are without knowledge or information sufficient to admit or deny that the document appended to the Statement of Claim as Exhibit F is "[a] true and correct copy of the KDSC Account Workbook for the balance of Steven Mscisz' account," so they deny that averment.  The Customers deny the remaining averments set forth in that paragraph.

17.     The Customers are without knowledge or information sufficient to admit or deny that the document appended to the Statement of Claim as Exhibit G is "[a] true and correct copy of the KDSC Account Workbook for the balance of Mark and Lynda Mscisz' account," so they deny that averment.  The Customers deny the remaining averments set forth in that paragraph.

18.     The Customers admit that the putative Client Agreements appended to the Statement of Claim are accurately reproduced to the extent they recite the text of paragraphs 6 and 15 from that document, which text speaks for itself.

19.     The Customers admit that the putative Client Agreements appended to the Statement of Claim are accurately reproduced to the extent they recite the text of paragraph 6 from that document, which text speaks for itself, but they deny that the language ostensibly quoted in that paragraph of the Statement of Claim is reproduced accurately.

20.     The Customers admit that the Broker-Dealer demanded that they pay it additional funds and that they have transmitted no funds to KDSC since approximately April 7, 2004, but they deny the remaining averments set forth in that paragraph.

21.     The Customers incorporate, as if fully set forth herein, their responses to paragraphs 1 through 20, inclusive, of the Broker-Dealer's Statement of Claim.

22.     The Customers deny the averments set forth in that paragraph.

23.     The Customers deny the averments set forth in that paragraph.

24.     The Customers deny the averments set forth in that paragraph.

25.     The Customers deny the averments set forth in that paragraph.

26.     The Customers deny the averments set forth in that paragraph.

27.     The Customers incorporate, as if fully set forth herein, their responses to paragraphs 1 through 26, inclusive, of the Broker-Dealer's Statement of Claim.

28.     The Customers deny the averments set forth in that paragraph.

29.     The Customers deny the averments set forth in that paragraph.

30.     The Customers deny the averments set forth in that paragraph.

31.     The Customers deny the averments set forth in that paragraph.

32.     The Customers incorporate, as if fully set forth herein, their responses to paragraphs 1 through 31, inclusive, of the Broker-Dealer's Statement of Claim.

33.     The Customers are without knowledge or information sufficient to enable them to admit or deny whether and in what form KDSC may have kept a "book account," so the averments of that paragraph are denied.

34.     The Customers are without knowledge or information sufficient to enable them to admit or deny the averments of that paragraph because it presupposes that KDSC ostensibly kept an accurate "book account", so the Customers deny the averments set forth in that paragraph.

35.     The Customers are without knowledge or information sufficient to enable them to admit or deny whether and in what form KDSC may have kept a "book account," so the averments of that paragraph are denied.

36.     The Customers are without knowledge or information sufficient to enable them to admit or deny the averments of that paragraph because it presupposes that the putative "book account" ostensibly kept by KDSC is accurate, so the Customers deny the averments set forth in that paragraph.

37.     The Customers incorporate, as if fully set forth herein, their responses to paragraphs 1 through 36, inclusive, of the Broker-Dealer's Statement of Claim.

38.     The Customers deny the averments set forth in that paragraph.

39.     The Customers deny the averments set forth in that paragraph.

40.     The Customers deny the averments set forth in that paragraph.

41.     The Customers deny the averments set forth in that paragraph.

42.     The Customers deny the averments set forth in that paragraph.

### FIRST AFFIRMATIVE DEFENSE

The Statement of Claim should be dismissed because it fails to state a claim on which relief may be granted.

### SECOND AFFIRMATIVE DEFENSE

The Broker-Dealer is estopped by its own conduct from asserting the claims set forth in the Statement of Claim.

### THIRD AFFIRMATIVE DEFENSE

To the extent the Statement of Claim accuses the Customers, or any of them, of misconduct, it must fail, because the Broker-Dealer was *in pari delicto*.

### FOURTH AFFIRMATIVE DEFENSE

The Broker-Dealer failed to satisfy conditions precedent to its alleged right to recover from the Customers.

### FIFTH AFFIRMATIVE DEFENSE

KDSC's claim must fail for want of consideration.

### SIXTH AFFIRMATIVE DEFENSE

KDSC's claims are precluded by its breaches of the fiduciary duties of loyalty, candor and good faith it owed to the Customers.

### SEVENTH AFFIRMATIVE DEFENSE

KDSC's claims are barred because of the failure of the consideration promised in exchange for the obligations on which it purports to sue.

### EIGHTH AFFIRMATIVE DEFENSE

KDSC's claims against the Customers must fail because it is not the real party in interest.

### NINTH AFFIRMATIVE DEFENSE

There has been an accord and satisfaction, either partial or complete, of the putative debt alleged by the Broker-Dealer.

### TENTH AFFIRMATIVE DEFENSE

KDSC's unclean hands preclude any recovery sounding in equity.

### STATEMENT OF COUNTERCLAIMS & THIRD PARTY CLAIMS

#### Parties

1.      The Customers are individuals residing in Topsfield, Essex County, Massachusetts.

2.      The Customers are informed and believe, and therefore aver, that KDSC is a corporation organized under the laws of the State of Florida, a member of the Association, and a Broker-Dealer licensed by the SEC.

3.      The Customers are informed and believe, and therefore avers that Victor Kashner ("Kashner") is an individual residing in the State of Florida and a principal, registered representative and associated person of the Broker-Dealer.

4.      The Customers are informed and believe, and therefore aver, that Matthew Meister ("Meister") is an individual residing in the State of Florida and a registered representative and associated person of the Broker-Dealer.

5.      The Customers are informed and believe, and therefore avers that Timothy Varchetto ("Varchetto") is an individual residing in the State of Florida and a registered representative and associated person of the Broker-Dealer.

### Count I
### Violations of Sections 7, 9 & 10(b)
### of the Securities Act of 1934

6.      The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 5, inclusive, of this Statement of Counterclaims & Third Party Claims.

7.      KDSC, Kashner, Meister and Varchetto, by the use of means and instrumentalities of interstate commerce and the mails, by the use of facilities of a national securities exchange, and in connection with the purchase and sale of shares of Vaso's stock, used or employed manipulative and deceptive devices and contrivances and otherwise engaged in violations of Sections 7, 9 and 10(b) of the Securities Act of 1934, including but not limited to:

     a.  Affirmative misrepresentations of and failures to disclose material facts to the Customers;

     b.  Exacting unreasonably high "markups" in connection with the purchase and sale of securities in the Customers' accounts;

     c.  Knowingly recommending transactions and trading strategies that were not suitable for the Customers;

     d.  Concealing material conflicts of interest from the Customers;

     e.  Extending margin credit to the Customers in an unlawful manner;

     f.  Unlawfully "selling out" the Customers' holdings at unreasonable prices in ostensible satisfaction of non-existent margin obligations;

     g.  Wrongfully inducing excessive trades in the Customers' accounts; and

      h.   On information and belief, unlawfully manipulating the price
           of Vaso's stock

in contravention of rules and regulations prescribed by the SEC as necessary or appropriate in

the public interest or for the protection of investors.

    8.     The Customers suffered significant pecuniary losses as a direct and proximate

result of the violations by KDSC, Kashner, Meister and Varchetto of the SEC's regulations and

the Securities Act of 1934, and they are thus entitled to judgment fully compensating them for

such damages.

<div align="center">

***Count II***
***Violations of the Florida Securities Transactions Act***

</div>

    9.     The Customers repeat and reallege, as if fully stated herein, the averments set

forth in paragraphs 1 through 8, inclusive, of this Statement of Counterclaims & Third Party

Claims.

    10.    KDSC, Kashner, Meister and Varchetto, in connection with the purchase and sale

of shares of Vaso's stock, used or employed manipulative and deceptive devices and contrivances

and otherwise engaged in violations of Section 517.301 and other provisions of the Florida Code,

including but not limited to:

      a.   Affirmative misrepresentations of and failures to disclose
           material facts to the Customers;

      b.   Exacting unreasonably high "markups" in connection with the
           purchase and sale of securities in the Customers' accounts;

      c.   Knowingly recommending transactions and trading strategies
           that were not suitable for the Customers;

      d.   Concealing material conflicts of interest from the Customers;

      e.   Extending margin credit to the Customers in an unlawful
           manner;

    f.   Unlawfully "selling out" the Customers' holdings at
unreasonable prices in ostensible satisfaction of non-existent
margin obligations;

    g.   Wrongfully inducing excessive trades in the Customers'
accounts; and

    h.   On information and belief, unlawfully manipulating the price
of Vaso's stock.

11.    The Customers suffered significant pecuniary losses as a direct and proximate

result of violations by KDSC, Kashner, Meister and Varchetto of the Florida Securities

Transactions Act, and they are thus entitled to judgment fully compensating them for such

damages.

### Count III
### Violations of the Massachusetts Uniform Securities Act

12.    The Customers repeat and reallege, as if fully stated herein, the averments set

forth in paragraphs 1 through 11, inclusive, of this Statement of Counterclaims & Third Party

Claims.

13.    KDSC, Kashner, Meister and Varchetto, in connection with the purchase and sale

of shares of Vaso's stock, used or employed manipulative and deceptive devices and contrivances

and otherwise engaged in violations of G.L. c. 110A, § 101, and other provisions of the

Massachusetts Uniform Securities Act, including but not limited to:

    a.   Affirmative misrepresentations of and failures to disclose
material facts to the Customers;

    b.   Exacting unreasonably high "markups" in connection with the
purchase and sale of securities in the Customers' accounts;

    c.   Knowingly recommending transactions and trading strategies
that were not suitable for the Customers;

    d.   Concealing material conflicts of interest from the Customers;

    e.  Extending margin credit to the Customers in an unlawful
manner;

    f.  Unlawfully "selling out" the Customers' holdings at
unreasonable prices in ostensible satisfaction of non-existent
margin obligations;

    g.  Wrongfully inducing excessive trades in the Customers'
accounts; and

    h.  On information and belief, unlawfully manipulating the price
of Vaso's stock.

14.    The Customers suffered significant pecuniary losses as a direct and proximate
result of the violations by KDSC, Kashner, Meister and Varchetto of the Massachusetts Uniform
Securities Act, and they are thus entitled to judgment fully compensating them for such damages.

### Count IV
### Violations of NASD Business Conduct Standards

15.    The Customers repeat and reallege, as if fully stated herein, the averments set
forth in paragraphs 1 through 14, inclusive, of this Statement of Counterclaims & Third Party
Claims.

16.    KDSC, Kashner, Meister and Varchetto, in connection with the purchase and sale
of shares of Vaso's stock, used or employed manipulative and deceptive devices and contrivances
and otherwise engaged in violations of Rules 2110, 2120, 2310, 2320, 2360, 2361, 2370, 2440,
2720, 2790, 3010, 3040, 3050, 3350, 3360, and other provisions of the Association's Business
Conduct Standards, including but not limited to:

    a.  Failure to observe high standards of commercial honor and just
and equitable principles of trade;

    b.  Affirmative misrepresentations of and failures to disclose
material facts to the Customers;

    c.  Exacting unreasonably high "markups" in connection with the
purchase and sale of securities in the Customers' accounts;

    d.  Knowingly recommending transactions and trading strategies that were not suitable for the Customers;

    e.  Concealing material conflicts of interest from the Customers;

    f.  Extending margin credit to the Customers in an unlawful manner;

    g.  Unlawfully "selling out" the Customers' holdings at unreasonable prices in ostensible satisfaction of non-existent margin obligations;

    h.  Failure to use reasonable diligence to obtain the most favorable possible price for transactions executed on the Customers' behalves;

    i.  Failure to supervise adequately its registered representatives and associated persons;

    j.  Wrongfully inducing excessive trades in the Customers' accounts; and

    k.  On information and belief, unlawfully manipulating the price of Vaso's stock.

17.    The Customers suffered significant pecuniary losses as a direct and proximate result of violations by KDSC, Kashner, Meister and Varchetto of the Association's Business Conduct Standards, and they are thus entitled to judgment fully compensating them for such damages.

## Count V
### Common Law Fraud

18.    The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 17, inclusive, of this Statement of Counterclaims & Third Party Claims.

19.    KDSC, Kashner, Meister and Varchetto, in connection with the purchase and sale of shares of Vaso's stock, misrepresented and failed to disclose to the Customers material facts it was obligated to disclose.

20.     The Customers suffered significant pecuniary losses as a direct and proximate result of the fraud by KDSC, Kashner, Meister and Varchetto, and they are thus entitled to judgment fully compensating them for such damages.

### Count VI
### Unjust Enrichment

21.     The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 20, inclusive, of this Statement of Counterclaims & Third Party Claims.

22.     KDSC, Kashner, Meister and Varchetto received and retained securities, money and other property against fundamental principles of equity and good conscience.

23.     The Customers are thus entitled to a decree compelling KDSC, Kashner, Meister and Varchetto to disgorge the securities, money, other property, and proceeds thereof with which it was unjustly enriched, and to make full restitution to the Customers.

### Count VII
### Conversion

24.     The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 23, inclusive, of this Statement of Counterclaims & Third Party Claims.

25.     The Customers had and continue to have a right to immediate possession of securities, money and other property they had entrusted to the Broker-Dealer.

26.     The Broker-Dealer converted the Customers' securities, money and other property to its own use by exercising dominion over them in a manner inconsistent with the Customers' rights.

27.     Kashner, Meister and Varchetto aided and abetted KDSC's wrongful conversion of the Customers' securities, money and other property to its own use

28.     The Customers suffered significant pecuniary losses as a direct and proximate result of the Broker-Dealer's unlawful conversion of their securities, money and other property, and they are thus entitled to judgment fully compensating them for such damages.

### Count VIII
### Breach of Contract

29.     The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 28, inclusive, of this Statement of Counterclaims & Third Party Claims.

30.     The Customers were parties to contracts with the Broker-Dealer.

31.     The Broker-Dealer breached those contracts.

32.     The Customers suffered significant pecuniary losses as a direct and proximate result of the Broker-Dealer's breaches of its contracts with them, and they are thus entitled to judgment fully compensating them for such damages.

### Count IX
### Racketeer Influenced and Corrupt Organization Act

33.     The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 32, inclusive, of this Statement of Counterclaims & Third Party Claims.

34.     Kashner and Meister, who received income derived, directly or indirectly, from a pattern of racketeering activity, used or invested, directly or indirectly, part of such income or the proceeds thereof, in the acquisition of an interest in or the operation of KDSC, an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

35.     Kashner and Meister, through a pattern of racketeering activity, acquired or maintained, directly or indirectly, an interest in or control of KDSC, an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce.

36.     Kashner, Meister and Varchetto, persons employed by or associated with KDSC, an enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce, conducted or participated, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

37.     Kashner, Meister and Varchetto conspired with one another to perpetrate the misconduct described in the three immediately preceding paragraphs of this Statement of Counterclaims & Third Party Claims.

38.     The Customers were injured in their business or property by reason of the misconduct alleged in this Count IX of their Statement of Counterclaims & Third Party Claims, and they are therefore entitled to threefold the damages they sustained, plus the costs of this proceeding, including a reasonable attorney's fee.

### Count X
### Abuse of Process

39.     The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 38, inclusive, of this Statement of Counterclaims & Third Party Claims.

40.     The Broker-Dealer has used the Association's process for an ulterior or illegitimate purpose, resulting in damage to the Customers.

41.     The Customers are thus entitled to judgment fully compensating them for such damages.

### Count XI
### *Massachusetts Consumer Protection Act*

42.    The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 41, inclusive, of this Statement of Counterclaims & Third Party Claims.

43.    None of the Customers is "a person entitled to bring action under" Section 11 of the Massachusetts Consumer Protection Act, G.L. c. 93A, § 11.

44.    The Customers have been injured by the use by KDSC, Kashner, Meister and Varchetto, in the conduct of trade or commerce (as those terms are defined under G.L. c. 93A, § 1), of the methods, acts or practices described in Counts I through X of this Statement of Counterclaims & Third Party Claims, which methods, acts or practices have been declared unlawful by G.L. c. 93A, § 2 or by rules and regulations issued thereunder.

45.    The unfair and deceptive methods, acts and practices alleged in this Count XI include but are not necessarily limited to:

   a.    employment of acts and practices that were oppressive or otherwise unconscionable in some respect;

   b.    violations of existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare promulgated by the Commonwealth of Massachusetts or any political subdivision thereof intended to provide the consumers protection, including but not limited to consumer protection regulations promulgated by the Commonwealth's Attorney General; and

   c.    other unethical and unscrupulous acts and omissions which violated at least the penumbra of some common law, statutory or other established concept of fairness.

46.    The use by KDSC, Kashner, Meister and Varchetto of the methods, acts and practices described in this Count XI was a willful or knowing violation of G.L. c. 93A, § 2.

47.     The demand requirements of G.L. c. 93A, § 9(3) do not apply to this Count XI, because it is asserted by way of counterclaim.

48.     The Customers are therefore entitled to recover from KDSC, Kashner, Meister and Varchetto their actual damages or twenty-five dollars, whichever is greater, with that amount multiplied by a factor of no more than three but not less than two, plus prejudgment interest, attorney's fees and costs.

49.     The Customers are also entitled to such equitable relief as the Panel deems necessary and proper to prevent further unfair or deceptive methods, acts or practices by KDSC, Kashner, Meister and Varchetto.

## Count XII
### Florida Consumer Protection Act

50.     The Customers repeat and reallege, as if fully stated herein, the averments set forth in paragraphs 1 through 49, inclusive, of this Statement of Counterclaims & Third Party Claims.

51.     The Customers have been injured by the use by KDSC, Kashner, Meister and Varchetto of the unconscionable, unfair or deceptive methods, acts or practices described in Counts I through XI of this Statement of Counterclaims & Third Party Claims, including but are not necessarily limited to:

      a.   employment of acts and practices that were oppressive or otherwise unconscionable in some respect;

      b.   violations of existing statutes, rules, regulations or laws meant for the protection of the public's health, safety or welfare promulgated by the State of Florida or any political subdivision thereof intended to provide the consumers protection, including but not limited to consumer protection regulations promulgated by the State Attorney General; and

    c.   other unethical and unscrupulous acts and omissions which violated at least the penumbra of some common law, statutory or other established concept of fairness.

52.    The Customers are therefore entitled to recover from KDSC, Kashner, Meister and Varchetto a declaratory judgment plus their actual damages, plus prejudgment interest, attorney's fees and costs.

WHEREFORE, the Customers respectfully request that the Panel make an award in their favor and against the Broker-Dealer, Kashner, Meister and Varchetto which:

a.    dismisses KDSC's Statement of Claim with prejudice;

b.    awards the Customers threefold their actual damages (in a sum to be determined) or twenty-five dollars, whichever is greater;

c.    awards the Customers prejudgment interest, attorney's fees and costs;

d.    orders KDSC to disgorge and make full restitution to the Customers of all sums by which it was unjustly enriched;

e.    orders other appropriate equitable relief; and

f.    grants the Customers such other and further relief as the Panel deems necessary and just.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated: August 26, 2004

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

---

| | |
|---|---|
| In the Matter of the Arbitration Between: | ) |
| | ) |
| KASHNER DAVIDSON SECURITIES CORP., | ) |
| | ) |
| *Claimant/Respondent in Counterclaim,* | ) |
| | ) |
| v. | ) |
| | ) |
| STEVEN MSCISZ, MARK MSCISZ, and | ) |
| LYNDA MSCISZ, | ) NASD DISPUTE RESOLUTION No. 04-03793 |
| | ) |
| *Respondents/Counter- and Third Party Claimants,* | ) |
| | ) |
| v. | ) |
| | ) |
| VICTOR KASHNER, MATTHEW MEISTER and | ) |
| TIMOTHY VARCHETTO, | ) |
| | ) |
| *Third Party Respondents.* | ) |

---

### MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ FOR RECONSIDERATION OF ORDERS ON DISCOVERY MOTIONS

Respondents/Counter- and Third Party Claimants Steven Mscisz, Mark Mscisz ("Mark") and Lynda Mscisz ("Lynda") (collectively "Customers") hereby request that the Panel or its Chairman reconsider the February 1, 2005 orders on the parties' reciprocal motions to compel discovery. In support of this motion, the Customers state the following:

1.       Without explaining his reasoning, the Chairman partially denied the Customers' request for an order compelling Claimant Kashner Davidson Securities Corporation ("KDSC") to produce information the Customers requested. In several instances (*see, e.g.,* Customers'

Request Nos. 3-7, 9-13, 19-20, 22-28, 30-39, 41, 43, 45-46) the Chairman may have accepted KDSC's objection that the requests were "impermissible interrogatories." However, "identify," "describe," and "state the basis" are defined terms in the requests, and each of their definitions includes a document production component. To the extent those requests incorporated such defined terms and thus sought document production, they should have been affirmed by the Chairman.

2.      In contrast, the Chairman ordered the Customers to respond to several requests which themselves constitute impermissible interrogatories (*see* KDSC Request Nos. 13, 14, 16, 28, 29 & 30). If the Chairman will compel one party to answer interrogatories, that compulsion should be reciprocal.

3.      Furthermore, as recited more specifically in the Customers' motion for leave to withdraw their counterclaims and third party claims (filed herewith), the Chairman's order denying most of their well-considered discovery requests has precluded the "fair and complete opportunity to obtain adjudication of their claims and defenses" on which their agreement to participate in this arbitration was conditioned. The Customers must therefore withdraw their claims against KDSC and its confederates and seek redress in a judicial forum. Concomitantly, several of KDSC's information requests (*see, e.g.,* Request Nos. 1, 12-14, 16-17, 25-31) with which the Chairman ordered the Customers to comply are no longer relevant to this arbitration.

4.      Similarly, because KDSC's Request Nos. 19 through 24 relate to its allegations that Mark and Lynda defrauded it with their March 29, 2004 financial statement, and because KDSC's own records (*see* Exhibit A) establish that no stock was purchased on margin after KDSC received that document, KDSC could not possibly have relied to its detriment upon the financial statement – thus precluding any liability for fraud. As a consequence, it is unduly

burdensome for the Customers to marshal and produce information – much of it highly confidential – that is not relevant to any viable claim. The fact of the matter is that, under the pretense of pursuing a fraud claim, KDSC seeks to conduct an unfettered fishing expedition into the personal financial affairs of Mark and Lynda. That is not the purpose of the Association's discovery rules.

WHEREFORE, the Customers respectfully request that the Panel or its Chairman grant the foregoing motion, ordering KDSC to produce the information referenced in paragraph 1 and excusing the customers from producing the information referenced in paragraphs 2 through 4.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

_____
William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated: February 24, 2005

# *Exhibit A*

9/09/2004 10:47:56 AM

## Account Workbook
### Activity Trades

KDSC 00015

Page: 1

REDACTED 7459 - MSCISZ  MARK

| REDACTED 7459 | | | | | | |
|---|---|---|---|---|---|---|
| KD12 | IO | H | | Cash Bal | -180,850.75 | Total Acct Val |
| MARK MSCISZ & | CSI | 4C | | | | |
| LYNDA E MSCISZ JTWROS | MMF | RID | | | | |
| | Home | 978/887-8673 | Business | 506/922-8536 | Birthdate REDACTED 1961 | -180,850.75 |

| # | Date | Settle Date | Type | Quantity | Action | Description | CUSIP | Symbol | Price | Commission | Source | Amount |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 12/10/2003 | 12/15/2003 | 1 | 2,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 5.0000 | | | -554,874.12 |
| 2 | 02/11/2004 | 02/17/2004 | 1 | 900 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 14.0000 | | | -10,000.00 |
| | | | | | | | | | | | | -12,608.75 |
| 3 | 02/12/2004 | 02/17/2004 | 2 | 500 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 14.0000 | | | -12,608.75 |
| 4 | 02/12/2004 | 02/17/2004 | 2 | 900 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 14.0000 | | | -12,608.75 |
| 5 | 02/13/2004 | 02/17/2004 | 1 | -900 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | | | CXL | 12,608.75 |
| 6 | 02/13/2004 | 02/17/2004 | 2 | 900 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 14.0000 | | | -12,608.75 |
| 7 | 02/13/2004 | 02/19/2004 | 2 | 3,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 14.9500 | | | -44,850.75 |
| 8 | 02/20/2004 | 02/25/2004 | 2 | 1,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 29.4000 | | | -29,400.00 |
| 9 | 02/20/2004 | 02/25/2004 | 2 | 2,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 26.0000 | | | -52,008.75 |
| 10 | 02/23/2004 | 02/26/2004 | 2 | 1,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 29.2500 | | | -29,256.75 |
| 11 | 03/03/2004 | 03/08/2004 | 2 | 1,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 36.8500 | | | -36,858.75 |
| 12 | 03/03/2004 | 03/08/2004 | 2 | -1,000 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 40.0000 | | | 39,989.67 |
| 13 | 03/05/2004 | 03/10/2004 | 2 | 3,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 39.2500 | | | -117,759.75 |
| 14 | 03/05/2004 | 03/10/2004 | 2 | -3,000 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 39.2500 | | | 117,736.50 |
| 15 | 03/10/2004 | 03/15/2004 | 2 | 10,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.7000 | | | -87,000.00 |
| 16 | 03/10/2004 | 03/15/2004 | 2 | 5,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 9.7000 | | | -48,503.75 |
| 17 | 03/11/2004 | 03/16/2004 | 2 | 2,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.1000 | | | -16,200.00 |
| 18 | 03/11/2004 | 03/16/2004 | 2 | 2,500 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.1000 | | | -20,250.75 |
| 19 | 03/11/2004 | 03/16/2004 | 2 | 3,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.1000 | | | -24,300.00 |
| 20 | 03/11/2004 | 03/16/2004 | 2 | 7,500 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.1000 | | | -60,750.00 |
| 21 | 03/17/2004 | 03/22/2004 | 2 | -5,000 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.7400 | | | 43,699.28 |
| 22 | 03/17/2004 | 03/22/2004 | 2 | -5,000 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.4400 | | | 42,160.59 |
| 23 | 03/26/2004 | 03/31/2004 | 2 | 4,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.0700 | | | -32,280.00 |
| 24 | 03/26/2004 | 03/31/2004 | 2 | 5,000 | Buy | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 8.0000 | | | -40,005.75 |
| 25 | 03/26/2004 | 03/31/2004 | 2 | -5,000 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 7.4700 | | | 37,339.78 |
| 26 | 06/24/2004 | 06/29/2004 | 1 | -14,850 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.4881 | | | 7,239.37 |
| 27 | 06/25/2004 | 06/30/2004 | 1 | -4,250 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.6400 | | | 2,711.18 |
| 28 | 06/30/2004 | 07/06/2004 | 1 | -150 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.7500 | | | 103.74 |
| 29 | 07/02/2004 | 07/08/2004 | 1 | -7,500 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.6400 | | | 4,791.13 |
| 30 | 07/08/2004 | 07/13/2004 | 1 | -12,500 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.7210 | | | 9,003.53 |
| 31 | 07/21/2004 | 07/26/2004 | 1 | -19,550 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.6600 | | | 12,893.91 |
| 32 | 07/22/2004 | 07/27/2004 | 1 | -15,350 | Sell | VASO ACTIVE PHARMACEUTICALS INC CLASS A | 92232R-10-7 | VAPH | 0.9749 | | | 14,905.34 |

THE NATIONAL ASSOCIATION OF SECURITIES DEALERS, INC.
ARBITRATION DEPARTMENT

_____
                                                  )
In the Matter of the Arbitration Between:         )
                                                  )
KASHNER DAVIDSON SECURITIES CORP.,                )
                                                  )
    *Claimant/Respondent in Counterclaim,*         )
                                                  )
        v.                                 )
                                                  )
STEVEN MSCISZ, MARK MSCISZ, and                   )
LYNDA MSCISZ,                                     )   NASD DISPUTE RESOLUTION No. 04-03793
                                                  )
    *Respondents/Counter- and Third Party Claimants,* )
                                                  )
        v.                                 )
                                                  )
VICTOR KASHNER, MATTHEW MEISTER and               )
TIMOTHY VARCHETTO,                                )
                                                  )
    *Third Party Respondents.*                     )
_____ )


**MOTION OF STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ FOR
COMPELLED COMPLIANCE WITH DISCOVERY ORDER AND SANCTIONS**


     Respondents/Counter- and Third Party Claimants Steven Mscisz, Mark Mscisz and Lynda

Mscisz (collectively "Customers") hereby request that the Panel or its Chairman compel

Claimant/Respondent-in-Counterclaim Kashner Davidson Securities Corporation ("KDSC") to

comply fully with the February 1, 2005 order compelling it to provide limited discovery to the

Customers and the imposition of appropriate sanctions for KDSC's willful noncompliance.  In

support of this motion, the Customers state the following:

1.      On February 1, 2005, the Chairman issued an order compelling KDSC to provide the Customers with several categories of documents KDSC had previously refused to produce.

2.      Although the documents the Chairman ordered KDSC to produce were but a fraction of what the Customers had originally requested – and although even that compulsory production did not require KDSC to produce the bare minimum which the Association has deemed "presumptively discoverable" in proceedings like this – KDSC knowingly chose to disregard its obligations without seeking reconsideration or modification of the Chairman's order.  Although the Customers cannot be certain that KDSC has actually produced the complete contents of all categories it purports to have produced, they are certain documents and categories of documents that undoubtedly have not been produced by KDSC.

3.      For instance, according to documents produced by KDSC itself (*see* Exhibits A through D), Third Party Respondent Matthew Meister ("Meister") was one of the associated persons involved in the Customers' accounts.  However, information specified in Discovery Guide List 1, Items 8 & 12 – which the Chairman ordered KDSC to produce – was produced only with respect to Third Party Respondent Timothy Varchetto, and not Meister.

4.      Although the Chairman ordered KDSC to produce the information specified in List 1, Item 9 – sections of KDSC's compliance manual and like materials concerning claims asserted in the case, KDSC has not done produced such materials in several relevant areas. Review of the Table of Contents to KDSC's compliance manual (copy at Exhibit E) indicates that the following relevant sections have been omitted from KDSC's production:

| *Pages* | *Topic* |
|---|---|
| 19-24 | COMMUNICATIONS WITH THE PUBLIC |
| 26-38 | MARKET MAKING/TRADING |
| 39-43 | INSIDER TRADING |
| 44-45 | REGISTERED PERSONNEL<br>(Hiring Practices & New Registered Representatives) |
| 50-54 | REGISTERED PERSONNEL<br>(Representative Termination, Outside Business Activities, Private Securities Transactions, Employee Related Accounts & Disclosures/Acknowledgements) |
| 55-57 | CUSTOMER COMPLAINTS |
| 58-59 | OPERATIONS |
| 75-77 | FINANCIAL |
| 84-87 | DESIGNATED SECURITIES |
| 123-131 | CORPORATE SECURITIES UNDERWRITING |
| 146 | SECURITIES ACCOUNT/TRANSACTION REPORTING FORM |
| Schedule C | ASSIGNMENT OF REPRESENTATIVES<br>(produced but redacted beyond meaningful use) |

In addition to the missing sections of the compliance manual, there may be other materials that also have been withheld.

5.      Although the Chairman ordered KDSC to produce the records specified in Request No. 8, KDSC – without first obtaining leave from the Chairman – redacted those records beyond recognition.  *See, e.g.,* Exhibit F

6.      Not only are these failures inconsistent with the Chairman's order, but they are also "inconsistent with just and equitable principles of trade and a violation of Rule 2110."  Code of Arbitration Procedure, IM-10100(c).

WHEREFORE, the Customers respectfully request that the Panel or its Chairman grant the foregoing motion, compel KDSC to comply fully with his February 1, 2005 order, and – as an appropriate sanction for KDSC's willful noncompliance – compel KDSC to produce all other documents requested by the Customers that have not previously been produced, even if not included in the February 1 order.

STEVEN MSCISZ, MARK MSCISZ & LYNDA MSCISZ

By their attorney,

William P. Corbett, Jr.
THE CORBETT LAW FIRM
*A Professional Corporation*
85 Exchange Street, Suite 326
Lynn, Massachusetts 01901-1429
(781) 596-9300

Dated:  February 24, 2005

# *Exhibit A*

# KASHNER DAVIDSON
## SECURITIES CORPORATION

MEMBERS NASD, SIPC

For change of address or phone number please print the new address
or phone number below:

| | |
|---|---|
| ( ) | ( ) |
| New Home Phone | New Business Phone |

**Symbol**
VAPH
**Item Description**

VASO ACTIVE
PHARMACEUTICALS INC
CLASS A

TOTAL AMOUNT
$10,000.00

Date Due
12/15/03

B-Bought **B**   S-Sold       2,000
If sufficient funds (cash, or money market, of SAL balances) or securities are
already on deposit with us we will automatically debit your account. Otherwise,
please detach and mail this portion with your payment or securities to reach us
on or before settlement date. Mail to: SEE BACK OF CONFIRM
PLEASE MAKE YOUR CHECK PAYABLE TO STERNE, AGEE & LEACH INC. AND RETURN CHECK WITH THIS COPY

Account Number
REDACTED 2265

SAL Reference
KD02

PDF 918 03 00    265    266   <<0f000265

STEVEN MSCISZ
22 HIGH STREET
TOPSFIELD MA  01983-1404

77 SOUTH PALM AVENUE
SARASOTA FL 34236

---

# KASHNER DAVIDSON
## SECURITIES CORPORATION

MEMBERS NASD, SIPC

**Broker** KD02

MATTHEW B MEISTER

**CUSTOMER COPY**
**RETAIN FOR YOUR RECORDS**
**TRADE CONFIRMATION**

SIPC

See Back for terms and conditions and capacity codes.

We Confirm That You        Quantity
BOUGHT        2,000

STEVEN MSCISZ
22 HIGH STREET

**Item Description**

VASO ACTIVE
PHARMACEUTICALS INC
CLASS A

**Symbol**
VAPH

At The Unit Price of
5.00

Executed
On This Date
12/10/03

For Settlement
On This Date
12/15/03

| Account Number | Account Type | Security Number/CUSIP | Capacity | Reported Price | |
|---|---|---|---|---|---|
| REDACTED 2265 | 1 | 92232R107 | 01 | 5.00 | 10,000.00 |

PROSPECTUS MAILED UNDER SEPARATE COVER
WE MAKE A MARKET IN THIS SECURITY

| | |
|---|---|
| Principal Amount | |
| Commission | |
| Transaction Fee | |
| Interest | |
| State Tax | |
| S.E.C. Fee | |
| **TOTAL** | **$10,000.00** |

Unless Otherwise Instructed We Will:
REGISTER SECURITIES IN STREET NAME AND HOLD IN ACCOUNT.

KDSC 00002

# *Exhibit B*

# KASHNER DAVIDSON
## SECURITIES CORPORATION

MEMBERS NASD, SIPC

For change of address or phone number please print the new address
or phone number below.

New Home Phone ( )

New Business Phone ( )

Symbol
**VAPH**

Item Description

**VASO ACTIVE
PHARMACEUTICALS INC
CLASS A**

TOTAL AMOUNT
**$10,000.00**

Date Due
**12/15/03**

B-Bought **B** S-Sold **2,000**

If sufficient funds (cash, or money market, of SAL balances) or securities are already on deposit with us we will automatically debit your account. Otherwise, please detach and mail this portion with your payment or securities to reach us on or before settlement date. Mail to: SEE BACK OF CONFIRM
PLEASE MAKE YOUR CHECK PAYABLE TO STERNE, AGEE & LEACH INC. AND RETURN CHECK WITH THIS COPY

Account Number
**60467459**

SAL Reference
**KD02**

PDF 505 00 0G   250   250   <<E1000250

MARK MSCISZ &
LYNDA E MSCISZ JTWROS
28 HIGH STREET
TOPSFIELD MA  01983-1404

77 SOUTH PALM AVENUE
SARASOTA FL 34236

---

# KASHNER DAVIDSON
## SECURITIES CORPORATION

MEMBERS NASD, SIPC

We Confirm That You
**BOUGHT**

Quantity
**2,000**

Broker **KD02**
**MATTHEW B MEISTER**

**SIPC**

CUSTOMER COPY
RETAIN FOR YOUR RECORDS
**TRADE CONFIRMATION**

See Back for terms and conditions and capacity codes.

Item Description

**VASO ACTIVE
PHARMACEUTICALS INC
CLASS A**

MARK MSCISZ &
LYNDA E MSCISZ JTWROS

Symbol
**VAPH**

At The Unit Price of
**5.00**

Executed
On This Date
**12/10/03**

Account Number
**60467459**

Account Type
**1**

Security Number/CUSIP
**92232R107**

**REDACTED**

Capacity
**01**

Reported Price
**5.00**

For Settlement
On This Date
**12/15/03**

PROSPECTUS MAILED UNDER SEPARATE COVER
WE MAKE A MARKET IN THIS SECURITY

| | |
|---|---|
| Principal Amount | 10,000.00 |
| Commission | |
| Transaction Fee | |
| Interest | |
| State Tax | |
| S.E.C. Fee | |

| **TOTAL** | **$10,000.00** |
|---|---|

Unless Otherwise Instructed We Will:
REGISTER SECURITIES IN STREET NAME AND HOLD IN ACCOUNT.

KDSC 00016

# *Exhibit C*

# KASHNER DAVIDSON
### SECURITIES CORPORATION
MEMBERS NASD, SIPC

941-951-2626

CARRIED BY
STERNE, AGEE & LEACH, INC.
205-414-7305

INTRODUCED BY
STERNE AGEE CAPITAL MARKETS, INC.
205-414-7301

STEVEN MSCISZ
22 HIGH STREET
TOPSFIELD MA  01983-1404

Your Investment Consultant is:
MATTHEW D MEISLER
77 SOUTH PALM AVENUE
SARASOTA FL 34236
941 951 2626

Account Number: [REDACTED]2265
Taxpayer ID Number: ON FILE
Branch Code: K002
Statement Period: 12/01/03 to 12/31/03

Page  1 of  4

| ASSET CATEGORY | PRIOR MONTH VALUE | CURRENT MONTH VALUE | PERCENT OF EQUITY | ESTIMATED ANNUAL INCOME | ESTIMATED CURRENT YIELD |
|---|---|---|---|---|---|
| CASH/CASH EQUIVALENT | | 0.00 | | | |
| MONEY MARKET ACCOUNTS | | | | | |
| CASH TR SER PRIME CASH * | 0.00 | 20,502.36 | | 0.00 | .14% |
| SECURITIES | | | | | |
| COMMON STOCKS | 0.00 | 12,060.00 | 100.00% | 0.00 | 0.00 |
| TOTAL PORTFOLIO SECURITY VALUE | 0.00 | 12,060.00 | | 0.00 | 0.00 |
| YOUR ACCOUNT NET PORTFOLIO EQUITY | 0.00 | 32,562.36 | | | |

| INCOME SUMMARY | THIS MONTH | YEAR TO DATE |
|---|---|---|
| CASH TR SER PRIME CASH | 2.36 | 2.36 |
| TOTAL INCOME | 2.36 | 2.36 |

| MONTHLY ACTIVITY SUMMARY | CASH |
|---|---|
| OPENING BALANCE | 0.00 |
| ADDITIONS: | |
| MONEY MARKET REDEMPTION | 10,000.00 |
| DIVIDEND & INTEREST RECEIVED | 2.36 |
| DEPOSITS | 30,500.00 |
| DEDUCTIONS: | |
| PURCHASES | 10,000.00 |
| MONEY MARKET PURCHASES | 30,502.36 |
| CLOSING BALANCE | 0.00 |

KDSC 00059

# *Exhibit D*

# KASHNER DAVIDSON

MEMBERS NASD, SIPC

941-951-2626

CARRIED BY
STERNE, AGEE & LEACH, INC.
INVESTMENTS SINCE 1901
205-414-7305

STERNE AGEE CAPITAL MARKETS, INC.
205-414-7300

REPRODUCED BY

PDF 002 00 00    22,239    20,374    <<SA020374.PDF >>

MARK MSCISZ &
LYNDA E MSCISZ JTWROS
28 HIGH STREET
TOPSFIELD MA 01983-1404

Your Investment Consultant is:
MATTHEW B METSJER
77 SOUTH PALM AVENUE
SARASOTA FL 34236
941 951 2626

Account Number:        /459
Taxpayer ID Number: ON FILE
Branch Code: KD02
Statement Period: 12/01/03 to 12/31/03

Page  1 of  3

**REDACTED**

| ASSET CATEGORY | PRIOR MONTH VALUE | CURRENT MONTH VALUE | PERCENT OF EQUITY | ESTIMATED ANNUAL INCOME | ESTIMATED CURRENT YIELD |
|---|---|---|---|---|---|
| CASH/CASH EQUIVALENT | 0.00 | 0.00 | | | |
| MONEY MARKET ACCOUNTS | | | | | |
| CASH TR SER PRIME CASH * | 0.00 | 0.15 | | | .14% |
| SECURITIES | | | | | |
| COMMON STOCKS | 0.00 | 12,060.00 | 100.00% | 0.00 | 0.00 |
| TOTAL PORTFOLIO SECURITY VALUE | 0.00 | 12,060.00 | | 0.00 | 0.00 |
| YOUR ACCOUNT NET PORTFOLIO EQUITY | 0.00 | 12,060.15 | | | |

| INCOME SUMMARY | THIS MONTH | YEAR TO DATE |
|---|---|---|
| CASH TR SER PRIME CASH | .15 | .15 |
| TOTAL INCOME | 0.15 | 0.15 |

| MONTHLY ACTIVITY SUMMARY | CASH |
|---|---|
| OPENING BALANCE | 0.00 |
| ADDITIONS: | |
| MONEY MARKET REDEMPTION | 10,000.00 |
| DIVIDEND & INTEREST RECEIVED | 0.15 |
| DEPOSITS | 10,000.00 |
| DEDUCTIONS: | |
| PURCHASES | 10,000.00 |
| MONEY MARKET PURCHASES | 10,000.15 |
| CLOSING BALANCE | 0.00 |

KDSC 00084

# *Exhibit E*

# WRITTEN SUPERVISORY PROCEDURES

## FOR

## KASHNER DAVIDSON SECURITIES CORPORATION

DATED: June 2002



CONFIDENTIAL

KDSC 00097

# Table of Contents

INTRODUCTION ......................................................................................................... 9
   Review of Firm Procedures ...................................................................................... 9
DEFINITIONS ............................................................................................................ 10
CONTACT QUESTIONNAIRE ................................................................................... 12
CUSTOMER ACCOUNTS .......................................................................................... 12
   New Accounts ....................................................................................................... 12
      Accounts Requiring Prior Approval by the CCO or SROP ................................ 14
      Refusal of Customer to Provide Information .................................................... 14
   Changes in Account Information ............................................................................ 14
   Death of Customer ............................................................................................... 14
   Third Party Accounts ........................................................................................... 15
   Discretionary Accounts ........................................................................................ 15
      Authorization and Acceptance ......................................................................... 15
      Indication of Discretion Exercised or Not Exercised ....................................... 15
      Prohibited Uses of Discretion ......................................................................... 15
      Cancelation of Discretionary Authority ........................................................... 15
      Approval and Review of Transactions ............................................................. 15
   Individual Retirement Accounts ............................................................................ 15
      Transfers and Rollovers ................................................................................. 16
      Withdrawals ................................................................................................... 16
      Roth IRA's ..................................................................................................... 16
      Prohibited Transactions ................................................................................. 16
      Suitability ...................................................................................................... 16
   Review of Transactions ........................................................................................ 17
      Transactions Requiring Pre-approval .............................................................. 17
   Periodic Review of Customer Accounts ................................................................ 17
   Supervisory Tools and Reports ............................................................................ 18
   Policies Regarding Questionable Activity .............................................................. 18
COMMUNICATION WITH THE PUBLIC ..................................................................... 19
   Firm Identification ................................................................................................ 19
   "Doing Business As" Names ................................................................................. 19
   Signage ................................................................................................................ 19
   Business Cards and Letterhead ............................................................................ 19
   Internal Use Only/Broker/Dealers Use Only Material ............................................ 19
   Issues Sold by Prospectus ................................................................................... 20
   Advertising and Sales Literature ........................................................................... 20
      Definitions ..................................................................................................... 20
      SIPC Disclosure ............................................................................................ 20
      Filing Requirements ....................................................................................... 20
      Documentation .............................................................................................. 20
      Seminars, Speaking Engagements and Media Participation ............................ 21
      Testimonials .................................................................................................. 21
      Advertising by Third Party .............................................................................. 21
   Policies Regarding Correspondence ..................................................................... 21
      Outgoing Correspondence ............................................................................. 21
      Incoming Correspondence ............................................................................. 22
   Telemarketing ...................................................................................................... 22
      Definitions ..................................................................................................... 22
      Procedures .................................................................................................... 22
      "Do-Not-Call" Lists ........................................................................................ 23
      Training and Education ................................................................................... 23
      Supervision ................................................................................................... 23
   Policies Regarding Internet Access ...................................................................... 24
      Permitted Use of Computers by Associated Persons ...................................... 24
Mark Up/Mark Down Policy ....................................................................................... 25
MARKET MAKING/TRADING ................................................................................... 26
   Registration and Withdrawal ................................................................................ 26
      NASDAQ ....................................................................................................... 26
      Non-NASDAQ ............................................................................................... 26
      Character of Quotations ................................................................................. 27
   OTC Bulletin Board Eligibility Requirements ........................................................ 28

Written Supervisory Procedures

KDSC 00098

CONFIDENTIAL

Impermissible Quotation Entries .................................................................. 28
Payments for Market Making .......................................................................... 28
Best Execution ............................................................................................... 28
Trade Reporting ............................................................................................. 29
   Monthly Review of Compliance Report Cards .......................................... 29
   Order Audit Trail System (OATS) ............................................................ 29
Payment for Order Flow .................................................................................. 31
Short Selling Activity ...................................................................................... 32
   Short Sale Rule ...................................................................................... 32
   Short Interest Reporting ........................................................................ 32
Prompt Receipt and Delivery of Securities ...................................................... 32
   Purchases ............................................................................................. 32
   Long Sales ............................................................................................. 33
   Short Sales ............................................................................................ 33
   Affirmative Determination ...................................................................... 33
   Proprietary Short Sales Where the Firm is Not a Registered Market Maker ... 33
Antitrust Issues for Market Makers ................................................................. 34
   Generally ............................................................................................... 34
   Setting Quotes ...................................................................................... 34
   Quoting Size for New Inside Market ........................................................ 35
   Harassment of Other Traders/Firms ....................................................... 35
   Coordination of Activities with other Traders/Firms ................................ 35
Confidentiality ................................................................................................ 36
   Customer Information ............................................................................. 36
   Trading Strategies/Information ............................................................... 36
Mark Up/Mark Down Policy ............................................................................ 36
   Supervisory Procedures ......................................................................... 37
Mark-Up/Mark-Down Disclosures ................................................................... 37
Correspondent Relationships .......................................................................... 37
Aggregation and Allocation Procedures .......................................................... 37
INSIDER TRADING ......................................................................................... 39
"Material Information" ..................................................................................... 39
"Nonpublic Information" .................................................................................. 39
Prohibition against Misuse of Material Nonpublic Information ......................... 39
Employee Related Accounts And Transactions With Other Firms ..................... 40
   Obligation to Disclose All Employee Related Accounts and Transactions ... 40
Chinese Wall .................................................................................................. 40
   Procedures ............................................................................................ 41
   Restricted List ....................................................................................... 41
   Watch List ............................................................................................. 41
   Procedures for Documenting Securities on the Restricted or Watch List ... 41
   Research Reports ................................................................................... 42
Employee and Proprietary Trading .................................................................. 42
Investigations ................................................................................................ 43
Education and Training .................................................................................... 43
REGISTERED PERSONNEL .............................................................................. 44
Hiring Practices .............................................................................................. 44
   Background Checks ................................................................................ 44
   NASD Registration and Qualification Examinations ................................. 44
   Prohibition against Parking .................................................................... 45
   State Registration .................................................................................. 45
   License to Sell Insurance Products .......................................................... 45
   RIA Registration .................................................................................... 45
   Applicants with Disciplinary History ....................................................... 45
   Taping Rule ........................................................................................... 45
New Registered Representatives ..................................................................... 45
   Assignment of Supervisor ...................................................................... 45
   Assignment of an ID Number to Each Registered Representative ............. 46
   Acknowledgment of Receipt of Written Procedures ................................ 46
Prohibited Activities ....................................................................................... 46
Communication with Regulatory Agencies ...................................................... 48
Changes in Personal History ........................................................................... 48
Red Flags and the Conduct of a Representative ............................................... 48
Heightened Supervision .................................................................................. 48

CONFIDENTIAL

Statutory Disqualification................................................................................................... 48
Annual Compliance Meeting ............................................................................................. 49
Gifts and Gratuities ........................................................................................................... 49
Representative Termination ............................................................................................... 50
Outside Business Activities................................................................................................ 50
Private Securities Transactions......................................................................................... 50
    Definitions ....................................................................................................................... 50
    Procedures ...................................................................................................................... 51
Employee Related Accounts ............................................................................................. 51
    Definitions ....................................................................................................................... 51
    Identification of Accounts ................................................................................................ 52
    Trading Activity ............................................................................................................... 52
    Review of Transactions ................................................................................................... 53
    Securities Accounts Maintained at Another Broker/Dealer ............................................. 53
    Transactions for or by Associated Persons of Another Broker/Dealer ........................... 53
Disclosures/Acknowledgments .......................................................................................... 54
CUSTOMER COMPLAINTS .................................................................................................. 55
Reportable Event Filings ................................................................................................... 55
    Reportable Actions.......................................................................................................... 55
Quarterly Statistical Information on Customer Complaints.................................................. 57
Review of Complaints......................................................................................................... 57
Review of Supervision........................................................................................................ 57
OPERATIONS ........................................................................................................................ 58
Possession of Customer Funds and Securities ................................................................. 58
    Customer Funds.............................................................................................................. 58
    Customer Securities ........................................................................................................ 58
Currency Transactions ....................................................................................................... 59
Fingerprinting ..................................................................................................................... 59
Misuse of Confirmations and Statements........................................................................... 59
Lost and Stolen Securities ................................................................................................. 60
Signature Guarantee .......................................................................................................... 60
Regulation T and Extensions of Credit to Customers ........................................................ 60
    Margin Agreements and Initial Deposit ........................................................................... 60
    Frozen Accounts ............................................................................................................. 60
Relation to the Bank Secrecy Act (31 Cfr 103.35)............................................................. 60
ANTI-MONEY LAUNDERING PROCEDURES ...................................................................... 63
New Accounts ..................................................................................................................... 63
    Non-Resident Aliens........................................................................................................ 64
    Corporations, Partnerships and other Commercial Entities ............................................ 64
    Trust Accounts ................................................................................................................ 64
    Review and Approval of New Accounts ........................................................................... 64
Limitations and Restrictions on Types of Deposits ............................................................ 66
Reporting Requirements ..................................................................................................... 66
    Currency Transaction Reporting ..................................................................................... 66
    Reporting of Foreign Bank and Financial Accounts........................................................ 66
    Record Keeping Requirements ....................................................................................... 67
    Wire Transfers and Other Funds Transmittals ............................................................... 67
Audit Program .................................................................................................................... 69
Clearing Firm Agreement ................................................................................................... 69
Suspicious Activity ............................................................................................................. 69
    Identifying Suspicious Activity ......................................................................................... 69
    Review of Suspicious Activity .......................................................................................... 70
    Suspicious Activity Reporting .......................................................................................... 71
    Confidentiality of Reports ................................................................................................ 71
    Record Keeping Requirements ....................................................................................... 71
    Requests for Information from Law Enforcement Agencies ............................................. 71
Training Program................................................................................................................. 72
NOTICE OF PRIVACY POLICY ............................................................................................. 72
Consumer............................................................................................................................ 73
Customer............................................................................................................................. 73
Investor Education and Protection ...................................................................................... 75
FINANCIAL ............................................................................................................................ 75
Securities Investor Protection Corporation ("SIPC")........................................................... 75
Record Keeping and Reports (SEC Rules 17a-3 and 17a-4).............................................. 75

4

CONFIDENTIAL

Fidelity Bond Requirements ........................................................................... 75
Fees for Services Performed ......................................................................... 75
Financial Statements ..................................................................................... 75
Net Capital ..................................................................................................... 76
   Daily Net Capital Position ......................................................................... 76
   Monthly Net Capital Computation ............................................................ 76
   Underwriting Commitments ....................................................................... 76
Violation and Early Warning Reports (SEC Rule 17a-11) .............................. 76
   Other Reporting Requirements ................................................................ 77
Clearing Agreement with SAL Financial Service, Inc. .................................... 77
Clearing Agreement Disclosures ................................................................... 77
   Customer Complaints ............................................................................... 77
   Exception Reports .................................................................................... 77
   Check Writing ........................................................................................... 78
CONTINUING EDUCATION ............................................................................... 78
Regulatory Element Requirement ................................................................. 78
   Persons Exempted from the Rule ............................................................ 79
   Firm Monitoring Procedures ..................................................................... 79
   Disciplinary Action for Non-Compliance .................................................. 79
Firm Element ................................................................................................. 79
   Needs Analysis ........................................................................................ 80
   Written Training Plan ................................................................................ 80
   Record Keeping for the Firm Element ...................................................... 81
BRANCH OFFICES ............................................................................................ 81
Registration ................................................................................................... 81
Procedures .................................................................................................... 81
Receipt of Funds and Securities ................................................................... 81
Correspondence ............................................................................................ 83
Inspections .................................................................................................... 83
DESIGNATED SECURITIES ............................................................................... 84
Definition ........................................................................................................ 84
Account Approval Process ............................................................................. 84
Prior Approval for Each Trade ....................................................................... 85
Exempt Transactions (Rule 15g-1) ............................................................... 85
Required Quotations ...................................................................................... 86
Markup/Markdown .......................................................................................... 86
Supervision .................................................................................................... 88
MUTUAL FUNDS ................................................................................................ 88
Firm Approved Products ................................................................................ 88
   Selling Agreement ................................................................................... 88
Record-Keeping System ................................................................................ 88
Prospectus Library ........................................................................................ 89
Communications with the Public .................................................................... 89
   Approval and Filing of Advertising and Sales Literature .......................... 89
   Special Prohibition Against Using Blended Family Performance .............. 89
   Use of Mutual Fund Reports .................................................................... 90
   Special Disclosure Requirements ............................................................ 90
Special Suitability Considerations ................................................................. 90
   Market Timing Programs .......................................................................... 90
   Class B Share Purchases for $250,000 or More ..................................... 90
Rights of Accumulation (ROA) ...................................................................... 91
Repurchase from Dealer ............................................................................... 91
Confirmation Disclosure ................................................................................ 91
Anti-Reciprocal Rule ..................................................................................... 91
Dealer Concessions ...................................................................................... 92
Review of Activity .......................................................................................... 93
Red Flags and Questionable Activity ............................................................ 94
VARIABLE CONTRACT PRODUCTS .................................................................. 94
Licensing and Appointments ......................................................................... 94
Firm Approved Products ................................................................................ 94
Prospectus Library and Delivery ................................................................... 94
Communications with the Public .................................................................... 95
   Approval and Filing of Advertising and Sales Literature .......................... 95
   Advertising by a Third Party ..................................................................... 95

CONFIDENTIAL

Communication Guidelines for Variable Products ........................................ 95
Dealer Concessions ........................................................................................ 96
Market Conduct and Sales Activity ............................................................... 96
   Investments Requiring Pre-Approval ......................................................... 97
   Tax Qualified Plans ..................................................................................... 97
   Exchanges and Replacements ...................................................................... 97
   Liquidations and Withdrawals ...................................................................... 97
   Special Suitability Considerations ................................................................ 97
   Processing Applications for Variable Products ............................................ 98
Review of Activity .......................................................................................... 98
   Red Flags and Questionable Activity .......................................................... 98
OPTIONS ............................................................................................................ 99
Advertising, Sales Literature and Correspondence ......................................... 99
Record Keeping ............................................................................................... 99
Opening Accounts ........................................................................................... 101
Suitability ........................................................................................................ 101
   Special Procedures for Uncovered Option Writing ...................................... 101
Delivery of Disclosure Document(s) ............................................................... 102
   Delivery of Special Statement for Uncovered Options Writers ................... 102
Changes in Financial Situation ....................................................................... 102
Trading Restrictions ........................................................................................ 102
Opening Transactions Over $25,000 Or 50 Contracts ................................... 103
Confirmations .................................................................................................. 103
Closing Sale Transactions ............................................................................... 103
Customer Complaints ...................................................................................... 103
Allocation of Exercise Notification ................................................................ 103
Position Limits ................................................................................................ 104
Exercise Limits ............................................................................................... 104
Options Reporting ........................................................................................... 104
Supervisory Review ........................................................................................ 104
MUNICIPALS .................................................................................................... 106
Definitions ....................................................................................................... 106
Supervisory Responsibility ............................................................................. 107
   Fees and Assessments .................................................................................. 107
   Reports and Quotations ................................................................................ 107
   Sales Practices ............................................................................................. 108
   Advertising and Sales Literature ................................................................. 108
   Miscellaneous .............................................................................................. 109
Uniform Practices ........................................................................................... 109
   Minimum Denominations ............................................................................. 110
Mark-up/Mark-down Policy ........................................................................... 110
Trading ............................................................................................................ 110
Syndicate Practices ......................................................................................... 110
SEC Rule 15c2-12 .......................................................................................... 110
   Secondary Market ........................................................................................ 111
   Official Statement Delivery ......................................................................... 111
Financial Advisor Activities ........................................................................... 111
Political Contributions - MSRB Rule G-37/G-38 .......................................... 111
   Prohibition on Political Contributions ......................................................... 111
   Retention of Consultants .............................................................................. 112
   Quarterly Reports ........................................................................................ 112
   Restricted Access ......................................................................................... 113
   Pre-Clearance .............................................................................................. 113
   Policy and Procedures Questions ................................................................. 113
   Education ...................................................................................................... 113
   New Hires ..................................................................................................... 113
   Amendments ................................................................................................ 113
GOVERNMENT SECURITIES ......................................................................... 114
Mark-Up/Mark-Down Policy ......................................................................... 114
Advertising and Sales Literature .................................................................... 114
   GNMA Securities ........................................................................................ 115
Settlement and Review of Transactions .......................................................... 115
CORPORATE BONDS ...................................................................................... 115
Suitability and Investment Features ................................................................ 115

Written Supervisory Procedures

CONFIDENTIAL

Bond Maturity .............................................................................................. 115
Advertising and Sales Literature ................................................................. 115
Supervision ................................................................................................. 116
ZERO-COUPON SECURITIES ........................................................................... 116
Sales Practices ........................................................................................... 116
Mark-up/Mark-down Policy .......................................................................... 117
Advertising and Sales Literature ................................................................. 117
COLLATERALIZED MORTGAGE OBLIGATIONS ............................................. 118
Advertising and Sales Literature ................................................................. 118
Print Advertising ..................................................................................... 118
Radio and Television Advertising ........................................................... 118
Filing and Approval Requirements ......................................................... 118
Educational Information ............................................................................... 119
The Public ............................................................................................... 119
Training ................................................................................................... 119
Suitability ..................................................................................................... 119
FREE-RIDING/WITHHOLDING ........................................................................... 120
Restricted Accounts .................................................................................... 120
NASD Compliance Desk & Free Riding Questionnaires ............................. 121
CORPORATE SECURITIES UNDERWRITINGS .............................................. 123
Managed Offerings (Firm Commitment) ...................................................... 123
Due Diligence .......................................................................................... 123
Documentation ........................................................................................ 123
NASD Corporate Finance Department Filing .......................................... 123
Blue Sky Filing ....................................................................................... 123
Syndication ............................................................................................. 124
Preliminary Prospectus Delivery Requirement ....................................... 124
Retention and Institutional Pot ............................................................... 124
Pricing ..................................................................................................... 124
SEC Effectiveness .................................................................................. 125
Delivery of Final Prospectus ................................................................... 125
Over-allotment ........................................................................................ 125
Closing .................................................................................................... 125
Settlement ............................................................................................... 125
Trading Restrictions (SEC Regulation M) .............................................. 125
Securities "Taken In Trade" (NASD Rule 2730) ..................................... 126
Selling Concessions, Discounts and Other Allowances ......................... 126
Restricted List ........................................................................................ 126
Non-Managed Offerings (Firm Commitment) .............................................. 126
Syndicate ..................................................................................................... 127
Syndicate Allocation ............................................................................... 128
Qualified Independent Underwriter .............................................................. 128
Best Efforts .................................................................................................. 129
Contingency Underwritings -SEC Rules 15c2-4 And 10b-9 ....................... 129
Offerings under Regulation D ...................................................................... 130
RESTRICTED SECURITIES ............................................................................... 132
Limitations on Amount Sold ......................................................................... 132
Holding Period ............................................................................................. 133
Filing and Record-Keeping Requirements .................................................. 133
Sec Rule 144A ............................................................................................. 133
DIRECT PARTICIPATION PROGRAMS .............................................................. 134
Due Diligence .............................................................................................. 135
Payments ..................................................................................................... 135
Suitability ..................................................................................................... 136
Firm Approved Products ............................................................................... 136
Organization and Offering Expenses ........................................................... 136
Partnership Rollups/Secondary Trading ...................................................... 136
COLLATERALIZED MORTGAGE OBLIGATIONS ............................................. 137
Advertising and Sales Literature ................................................................. 137
Print Advertising ..................................................................................... 137
Radio and Television Advertising ........................................................... 137
Filing and Approval Requirements ......................................................... 137
Educational Information ............................................................................... 138
The Public ............................................................................................... 138

CONFIDENTIAL

Training ....................................................................................................... 138
Suitability ................................................................................................... 138
AMENDMENTS ............................................................................................ 139
SCHEDULE A ............................................................................................... 140
DESIGNATION OF PRINCIPALS ................................................................ 140
SCHEDULE B ............................................................................................... 141
SUPERVISORY PROCEDURES CHECKLIST ............................................. 141
SCHEDULE C ............................................................................................... 143
ASSIGNMENT OF REPRESENTATIVES ................................................... 143
SCHEDULE D ............................................................................................... 144
BRANCH EXAM SCHEDULE ..................................................................... 144
SCHEDULE E ............................................................................................... 145
REGISTERED REPRESENTATIVE ACKNOWLEDGMENT ........................ 145
EXHIBIT A ..................................................................................................... 146
SECURITIES ACCOUNT / TRANSACTION REPORTING FORM ............... 146
EXHIBIT B ..................................................................................................... 147
DISCLOSURE OF OUTSIDE BUSINESS ACTIVITY ................................. 147
EXHIBIT C ..................................................................................................... 148
MASTER DO NOT CALL LIST ................................................................... 148
EXHIBIT D ..................................................................................................... 149
PAYMENT FOR ORDER FLOW DISCLOSUER ......................................... 149
EXHIBIT E ..................................................................................................... 150
ANTI MONEY LAUNDERING MAILER ...................................................... 150
EXHIBIT F ..................................................................................................... 151
PRIVACY POLICY DISCLOSURE .............................................................. 151
EXHIBIT G ..................................................................................................... 152
MARGI N DISCLOSURE ............................................................................. 152

CONFIDENTIAL

# *Exhibit F*




KDSC 00130

KASHNER DAVIDSON SECURITIES CORP
ACCOUNT NO: 8612
ATTN: T-1 AUT... REDACTED

| DATE | TIME | NUMBER | CITY | TYPE | MIN | USAGE |
|---|---|---|---|---|---|---|

JANUARY 03, 2004

PAGE 8

KASHNER DAVIDSON SECURITIES CORP
ACCOUNT NO: 8612
ATTN: T-1 AUT... REDACTED

| DATE | TIME | NUMBER | CITY | TYPE | MIN | USAGE |
|---|---|---|---|---|---|---|
| 12/04 | 11:05 AM | 508 922-0538 | HOPKINTON MA | D | .7 | .02 |

JANUARY 03, 2004

PAGE 7